2nd Set

Page 44 - 88

96. Here, the proposed intervention would unduly delay and prejudice the adjudication of the original parties' rights and would postpone or prevent relief to the Class. In a similar situation, the court in *In re Domestic Air Transp*, 148 F.R.D. at 337, articulated reasons for denying permissive intervention to objecting class members that apply equally here:

> Here the interests of . . . [the proposed intervenor] are the same as that of the named parties, to obtain a settlement that is fair, reasonable, and adequate for the class. There are no divergent interests, only differing opinions on how the proferred [sic] settlements fit within that framework. [The proposed intervenor's] . . . presence through intervention would not accomplish any more than their participation as objectors and would create the possibility of further delay and final disposition of this action.

That court concluded that permitting the objecting class members to intervene "would be unfair and would prejudice the rights of all class members." *Id.*; *see also Standard Heating*, 137 F.3d at 573 (affirming denial of permissive intervention where lower court determined that "additional parties would only be a source of repetition and delay"); *Omegon*, 346 N.W.2d 684 (denying permissive intervention as untimely due to substantial prejudice to existing parties). For these reasons, permissive intervention is inappropriate here.

**C. The Procedural Requirements for Intervention**

97. The proposed intervenors all fail to comply with the procedural requirement under Fed. R. Civ. P. 24(c) that they submit a "pleading setting forth the claim or defense for which intervention is sought." Dr. Morgan failed to submit any complaint, and only submitted a one page motion to intervene along with his objection. *See Gabauer v. Woodcock*, 425 F. Supp. 1, 3 (E.D. Mo. 1976) (a motion to dismiss is not a pleading required

for intervention), *aff'd in part & rev'd in part on other grounds*, 594 F.2d 662 (8th Cir. 1979). His motion is thus improper. Similarly, Mr. Pacinelli and Ms. Washburn have failed to submit the required pleadings. They do, however, purport to adopt Plaintiffs' complaints, but simply adopting the prior pleadings of an existing party is procedurally insufficient. *See, e.g., Retired Chicago Police Ass'n v. City of Chicago*, 7 F.3d 584, 595 (7th Cir. 1993). Proposed intervenors the Joneses, Mr. Miller and Ms. Patrick have filed perfunctory complaints in intervention that do not set forth any "claim or defense for which intervention is sought," but rather, they state only their objections to the settlement. As such, the Court finds that those complaints fall short of the requirements. Fed. R. Civ. P. 24(c); *see Roberts*, 1989 U.S. Dist. LEXIS 19086, at *3.[9] Accordingly, the Court concludes that none of the motions is procedurally proper.

98. The Court concludes that proposed intervenors fail to satisfy the requirements for intervention either as of right or permissively. The Court therefore denies, in their entirety, the motions to intervene and strikes the complaints in intervention.

**D. Conclusions of Law Regarding Notice to the Class**

99. The threshold requirement concerning a class notice program is whether the means employed to distribute the notice were reasonably calculated to apprise the class of the pendency of the action, of the proposed settlement, and of the class members' rights to opt out or object. The notice must be the "best notice practicable under the circumstances,

---

[9] Mr. Miller also purports to adopt the Plaintiffs' prior pleadings, but this effort is procedurally insufficient as set forth above.

including individual notice to all members who can be identified through reasonable effort." Fed. R. Civ. P. 23(c)(2); *Mullane v. Central Hanover Bank & Trust Co.*, 339 U.S. 306, 315 (1950); *Petrovic v. AMOCO Oil Co.*, 200 F.3d 1140, 1153 (8th Cir. 1999); *DeBoer v. Mellon Mortg. Co.*, 64 F.3d 1171, 1176 (8th Cir. 1995); *Grunin*, 513 F.2d 114 (8th Cir. 1975). Due process is satisfied by sending a copy of the notice by first-class mail to each class member whose address can be located with reasonable effort along with publication notice. *Eisen v. Carlisle & Jacquelin*, 417 U.S. 156, 173-77 (1974); *Mullane*, 339 U.S. at 314, 318. Dissemination of class notice based upon the insurer's computerized policyholder address data, plus national and regional newspaper publication, was characterized as "ideal" in *Prudential I*, 962 F. Supp. at 527-28. As described above, the same "ideal" approach to the notice program was followed here. These steps amply satisfy the procedural and constitutional requirements for Class Notice under Rule 23(c)(2) and (e). *Prudential I*, 962 F. Supp. at 527-28.

100. The timing of the notice program here was sound. Class Members had at least 45 days following the mailed Class Notice Packages and the Publication Notice to determine whether to participate in the Settlement.[10] Weiss Aff. ¶ 51. This period is far longer than that deemed adequate in other class action settlements. *See Grunin*, 513 F.2d at 121 (19 days between notice mailings and settlement hearing found sufficient); *see also Miller v. Republic Nat'l Life Ins. Co.*, 559 F.2d 426, 429 (5th Cir. 1977) (four weeks found sufficient); *Greenspun v. Bogan*, 492 F.2d 375, 378 (1st Cir. 1974) (24 days found sufficient);

---

[10] Many Class Members received substantially more time, as the mailing was spread out over 8 weeks.

*United Founders Life Ins. Co. v. Consumers Nat'l Life Ins. Co.*, 447 F.2d 647, 652 (7th Cir. 1971) (24 days found sufficient).

101. The content of the notice and the opportunity to opt-out was also sound. The class notice should present "a fair recital" of the subject matter and proposed terms of the settlement. *See DeBoer*, 64 F.3d at 1176 (notice need only be "reasonable enough to satisfy due process"); *Van Horn v. Trickey*, 840 F.2d 604, 606 (8th Cir. 1988) ("Class members need be given only the opportunity to object.") (citations omitted); *see generally Marshall v. Holiday Magic, Inc.*, 550 F.2d 1173, 1177 (9th Cir. 1977). Due process is satisfied where non-resident class members receive notice, an opportunity to be heard and participate in the litigation, and an opportunity to opt out of the class. *See Shutts*, 472 U.S. at 811-12; *accord Prudential II*, 148 F.3d at 305-06 (citing *Shutts*, 472 U.S. at 811-12). *See* Declaration of John Sexton ¶¶ 9-10. The mechanics of the notice process are left to the discretion of the court, subject only to the broad "reasonableness" standards imposed by due process. *See Grunin*, 513 F.2d at 122 (a "notice may consist of a very general description of the proposed settlement").

102. The content of the Class Notice thus goes far beyond the "summary" information required by Rule 23(e). *See Petrovic*, 200 F.3d at 1153; *Prudential II*, 148 F.3d at 320-28; *Prudential I*, 962 F. Supp. at 527. The Class Notice as approved by the Hearing Order was adequate, comprehensive and timely, and afforded Class Members sufficient information to make an informed and intelligent decision whether to participate in the Settlement.

103. Some objectors argue that the Class Notice was inadequate. (*See* objections of Cary LaCheen, Richard Morgan, Anne Murray and Frank Pacinelli.) While one objector, Ms. Murray, argues that the notice contains too much information, others argue that it does not contain enough information (*see* objections of LaCheen and Pacinelli). Based on the applicable law set forth above, the Court finds that the Class Notice achieves an appropriate balance between informing Class Members of their options and overwhelming them with detail. *See Prudential II*, 148 F.3d at 326-328; *Prudential I*, 962 F. Supp. at 528; (discussing "the tension involved in drafting an appropriate class action notice" and the court's "discretion to approve a wide range of possible notices . . . each of which would strike an appropriate balance between inclusiveness and brevity.").

104. One objector (Steven Creaturo) states that the Notice is inconsistent with the Settlement Agreement, because the Notice "implies" that Class Members are eligible for Internal Replacement Relief based on the use of "any value" from an old policy to buy a new policy, whereas the Settlement Agreement requires the use of the "full value." The Class Notice specifically refers to "the value," which should create no confusion. In any event, Class Members eligible for this form of relief were specifically notified on the Statement of Eligibility included in their Class Notice Packages. Thus, in light of the Statement of Eligibility, the Court finds that there is no room for confusion.

105. Another objector (Frank Pacinelli) complains that there is no disclosure of any incentive awards to the named plaintiffs, or of any amounts that have been earmarked for the named plaintiffs in the Claim Review Process. The reason is that the Settlement

Agreement does not provide for such awards or set-asides, and the parties have affirmed that there are none. *See* Weiss Reply Aff. at ¶ 58. Mr. Pacinelli also objects that the Class Notice misleads Class Members into thinking they need to file something to remain in the Class, and that if they do file something, their right to choose relief later is protected. The Court finds that this is not a reasonable reading of the Class Notice, and the parties have reported no flood of such letters.

106. The remaining objection about notice, by Richard Morgan, does not address the actual notice program at all. Rather, Dr. Morgan assumes that the Class Notice must be deficient because he expects that a small proportion of the Class would elect the Claim Review Process. According to Dr. Morgan, it would constitute legal malpractice for a lawyer not to recommend that his client elect the Claim Review Process, and he criticizes Class Counsel for not recommending this election in every instance. Dr. Morgan, though represented by his own counsel, proves the contrary point. He did not make that election himself. *See* Dahl Aff. ¶ 72. Dr. Morgan's assumption is unwarranted, as his own actions demonstrate.

107. Based upon a review of the individual and publication notice materials and the affidavits concerning these materials, the notice methodology and dissemination, and the operation of the IDS Class Action Information Center, the Court concludes that the best practicable notice was given to the Class in this case and that the notice (i) was reasonably calculated, under the circumstances, to apprise Class Members of the pendency of the litigation and of their right to object to or exclude themselves from the proposed settlement, (ii) was

reasonable and constituted due, adequate and sufficient notice to all persons entitled to receive notice, and (iii) meets all applicable requirements of law, including but not limited to Fed. R. Civ. P. 23(c) and the due process requirements of the Minnesota Constitution and the United States Constitution.

**E. Certification of the Class**

108. In the Hearing Order, the Courts preliminarily certified the Class for settlement purposes. This Court makes the following findings in support of its decision to grant final certification of the Class, which are intended to supplement and finalize the certification findings made by the Courts in the Hearing Order.

109. In order to certify the Class, the Court must find that the proposed Class meets the four threshold requirements of Fed. R. Civ. P. 23(c): numerosity; commonality; typicality; and adequacy of representation. In addition, the Fed. R. Civ. P. 23(b)(3) requirements that common questions of law and fact predominate over individual questions and that a class action is superior to other available means of adjudication, must be satisfied.

110. In *Amchem Products, Inc. v. Windsor*, 521 U.S. 591, 618 (1997), the Supreme Court expressly acknowledged that cases may be certified for settlement purposes only.[11] The Court further held that, when the question of certification is raised in connection

---

[11] *See also, e.g.*, *Petrovic*, 200 F.3d 1140; *Van Horn*, 840 F.2d 604; *DeBoer*, 64 F.3d 1171; *Prudential II*, 148 F.3d 283; *Hanlon v. Chrysler Corp.*, 150 F.3d 1011 (9th Cir. 1998); *Haavisto v. Perpich*, 498 N.W.2d 746 (Minn. Ct. App. 1993), *aff'd in part and rev'd in part*, 520 N.W.2d 727 (Minn. 1994).

with a class action settlement, "settlement is relevant to a class certification," *id.* at 619, and must be considered as "a factor in the calculus." *Id.* at 622.

**1. Numerosity**

111. Rule 23(a)(1) requires that the Class must be so numerous that "joinder of all members is impracticable." Plaintiffs need not demonstrate that it would be impossible to join all the putative class members; rather, they need simply show that joinder in this case would be difficult and inconvenient. *See Boyd v. Ozark Airlines, Inc.*, 568 F.2d 50, 54 (8th Cir. 1977) (impracticability depends upon the facts of each case); *Morgan v. United Parcel Service of Am., Inc.*, 169 F.R.D. 349, 354 (E.D. Mo. 1996) ("'[i]mpracticable' does not mean that joinder must be impossible"). With over 2.8 million Policies and Annuities encompassed by this Class of over 2 million Class Members, there is little question that numerosity is satisfied here. *See, e.g., Snell*, 2000 U.S. Dist. LEXIS 13611, at *37 ("there can be little dispute but that a class of over 230,000 members is sufficiently numerous to warrant a class action approach").

**2. Commonality**

112. To satisfy Rule 23(a)(2), there must be "questions of law or fact common to the class." Fed. R. Civ. P. 23(a)(2); *see generally DeBoer*, 64 F.3d at 1174 ("Commonality is not required on every question raised in a class action."); *Ario v. Metropolitan Airports Comm'n*, 367 N.W.2d 509, 513 (Minn. 1985) ("commonality requires 'common legal grievances' among class members"). Rule 23 is satisfied when the legal question "'linking the class members is substantially related to the resolution of the

litigation.'" *DeBoer*, 64 F.3d at 1174 (quoting *Paxton v. Union Nat'l Bank*, 688 F.2d 552, 561 (8th Cir. 1982)); *Fielder v. Credit Acceptance Corp.*, 175 F.R.D. 313, 319-20 (W.D. Mo. 1997) (same); *see generally,* 1 Herbert B. Newberg and Alba Conte, *Newberg on Class Actions* ("Newberg") §3.10 at 3-51 (December, 1992) ("When the party opposing the class has engaged in some course of conduct that affects a group of persons and gives rise to a cause of action, one or more of the elements of that cause of action will be common to all the persons affected.").

113. In this case, the Complaint alleges twenty factual and legal issues common to the Class regarding Defendants' practices and course of conduct in the design and sale of its Policies and Annuities. Several courts have certified settlement classes based on similar allegations, and this Court concludes that the commonality requirement is satisfied here. *See, e.g., Prudential I*, 962 F. Supp. at 511; *Snell*, 2000 U.S. Dist. LEXIS 13611.

**3. Typicality**

114. Typicality under Rule 23(a)(3) means that there are "'other members of the class who have the same or similar grievances as the plaintiff.'" *Alpern v. UtiliCorp United*, 84 F.3d 1525, 1540 (8th Cir. 1996) (quoting *Donaldson v. Pillsbury Co.*, 554 F.2d 825, 830 (8th Cir. 1977)). The burden is "'fairly easily met so long as other class members have claims similar to the named plaintiff.'" *Alpern*, 84 F. 3d at 1540 (quoting *DeBoer*, 64 F.3d at 1174); *see also Fielder*, 175 F.R.D. at 320. Slight factual differences that may exist between the named class representatives and other class members will not defeat typicality. *See Alpern*, 84 F.3d at 1540; *Donaldson*, 554 F.2d at 831; *Snell*, 2000 U.S. Dist. LEXIS

13611, at *39-40; *Streich v. American Family Mut. Ins. Co.*, 399 N.W.2d 210, 217 (Minn. Ct. App. 1987). *See also DeBoer*, 64 F.3d at 1174-75 (typicality requirement satisfied where class members holding different mortgage instruments sought same form of relief).

115. The Court finds that Plaintiffs here assert claims concerning the same allegedly deceptive practices as are alleged to have been visited on all Class Members. Because Plaintiffs assert claims that arise from the same alleged course of conduct that purportedly harmed all Class Members, the typicality requirement is satisfied. *See Duhaime*, 177 F.R.D. at 63 (typicality "clearly fulfilled" where absent class members were subjected to the same deceptive sales practices as were named plaintiffs); *Elkins*, 1998 U.S. Dist. LEXIS 1557, at *40-41 (same); *Prudential I*, 962 F. Supp. at 517-19 (same).

**4. Adequacy of Representation**

116. Rule 23(a)(4) requires that "the representative parties . . . fairly and adequately protect the interests of the class." As the Supreme Court observed in *Amchem*, "[t]he adequacy inquiry under Rule 23(a)(4) serves to uncover conflicts of interest between named parties and the class they seek to represent." *Amchem*, 521 U.S. at 625. This factor generally requires that (a) plaintiffs' counsel be qualified, experienced and able to prosecute the suit competently and vigorously, and (b) the interests of the class representatives not be antagonistic to or in conflict with other members of the class. *See Paxton*, 688 F.2d at 562-63; *Snell*, 2000 U.S. Dist. LEXIS 13611, at *40; *Fielder*, 175 F.R.D. at 320; *Morgan*, 169 F.R.D. at 357. The Court finds that both of these criteria are met here.

117. First, Plaintiffs' counsel is composed of highly experienced class action attorneys, many of whom have qualified as lead counsel in other nationwide class actions involving similar claims. *See* Weiss Aff. ¶ 90.[12] Plaintiffs' counsel have a proven track record in the prosecution of class actions.[13] In addition, Plaintiffs' counsel have vigorously conducted this litigation for more than four years and conducted an extensive review of the relevant factual and legal issues, and engaged in difficult settlement negotiations. Plaintiffs' counsel agreed to this Settlement only after they satisfied themselves that they had achieved the best possible compromise for the Class.

118. Second, no conflicts of interest or other antagonisms exist between the Plaintiffs and the Class Members that would impair their incentive to prosecute vigorously all aspects of the claims against Defendants. *See DeBoer*, 64 F.3d at 1175; *Petrovic*, 200 F.3d at 1148; *Prudential II*, 148 F.3d at 312-13; *Elkins*, 1998 U.S. Dist. LEXIS 1557, at *43-46; *Duhaime*, 177 F.R.D. at 63-64; *Willson*, 1995 N.Y. Misc. LEXIS 652, at *29 (policyholders

---

[12] *See, e.g.*, *In re Prudential Life Ins. Co. Sales Practices Litig.*, 106 F. Supp. 2d 721, 730 (D.N.J. 2000) ("Prudential III"); *In re Metropolitan Life Ins. Co. Sales Practices Litig.*, MDL No. 1091, Misc. Docket No. 96-179, Findings of Fact and Conclusions of Law Concerning the Award of Attorneys' Fees, Expenses and Incentive Awards ("*MetLife* Findings") at 29 (W.D. Pa. July 26, 2000); *Willson*, 1995 N.Y. Misc. LEXIS 652, at *28.

[13] *See, e.g.*, *In re Prudential Sec. Inc. Ltd. P'ships Litig.*, 163 F.R.D. 200, 208 (S.D.N.Y. 1995) (finding that some of the same legal counsel "have successfully conducted numerous class actions, including class actions under the federal securities laws and RICO, in this Court and in federal district courts throughout the United States," and preliminarily approving class settlement of $110 million).

represented "mix of characteristics representative of the mix found in the Class itself").[14] This settlement benefits the Class as a whole and does not sacrifice the interests of some Class Members for those of others. Rather, it provides for automatic relief to Class Members who were generally subject to the alleged improper conduct of Defendants, and for very specific relief through the Claim Review Process where Class Members believe they were subject to specific misrepresentation or harm. In fact, because it is expected that sufficient funds will be left over after administration of the Claim Review Process, all Class Members will also likely receive a portion of the spillover as a result of this settlement.

119. There are also no conflicts between currently injured Class Members and Class Members potentially injured in the future. The entire Class is presently identifiable and was sent proper notice. Accordingly, each Class Member was able to make an informed decision about electing the Claim Review Process, the Internal Replacement Relief, or receiving the General Relief, as provided for under the Settlement. *See In re Metropolitan Life Ins. Co.*, slip op. at 38. Future claims of the sort at issue in *Amchem*, are not encompassed by this settlement, and the Settlement Agreement expressly excludes any claim "that independently arises from acts, facts, or circumstances that occur for the first time after the last day of the Class Period." Settlement Agreement § XII.A.3.

120. Because the interests of the Plaintiffs and the other Class Members are congruent as against Defendants, and because Plaintiffs' counsel are qualified, experienced and

---

[14] Speculation as to potential conflicts is not a valid reason to refuse to certify a class. *Reynolds v. National Football League*, 584 F.2d 280, 285-86 (8th Cir. 1978); *Blackie v. Barrack*, 524 F.2d 891, 908 (9th Cir. 1975).

able to conduct the action, the Court finds that the adequacy requirement of Rule 23(a)(4) is satisfied.

**5. Predominance of Common Questions**

121. Rule 23(b)(3) authorizes certification where common questions of law or fact predominate over individual questions. *See Amchem*, 521 U.S. at 622-25. "Courts have taken the common sense approach that the class is united by a common interest in determining whether a defendant's course of conduct is in its broad outlines actionable, which is not defeated by slight differences in class members' positions, and that the issue may profitably be tried in one suit." *Blackie*, 524 F.2d at 902; *accord Prudential I*, 962 F. Supp. at 510-11.[15] No "bright-line" rule governs this determination.

122. The Court, having examined the record before it, concludes that this requirement is met in this case. The parties have asserted numerous claims and defenses for which common issues predominate. *See supra* at ¶¶ 9-16. Among other things, the Plaintiffs allege that Defendants failed to disclose sufficient information to their customers concerning the impact that interest rates and costs could have on the products being sold, and that those customers suffered harm or disappointed expectations when their products did not perform as expected. Plaintiffs further allege that proof relating to these issues would dominate at trial,

---

15 *See, e.g.*, *Lerch v. Citizens First Bancorp, Inc.*, 144 F.R.D. 247, 252 (D.N.J. 1992) (predominance satisfied where defendant's challenged activity stems from a classwide course of conduct); *In re Western Union Sec. Litig.*, 120 F.R.D. 629, 637 (D.N.J. 1988) (same, quoting *Blackie*); *see also Zinberg v. Washington Bancorp, Inc.*, 138 F.R.D. 397, 410 (D.N.J. 1990) ("Where all Class Members are united in their desire to establish the defendants' complicity and liability, individual issues, if they exist, are secondary.").

and individual issues would be secondary. As was true in the *Snell* case, the record before the Court distinguishes this action from the two recent decisions in the District of Minnesota that rejected class certification. In both *Parkhill v. Minnesota Mutual Life Ins. Co.*, 188 F.R.D. 332, 340 (D. Minn. 1999), and *In re Hartford Sales Practices Litig.*, 192 F.R.D. 592, 604 (D. Minn. 1999), the court had before it a record contradicting the plaintiffs' class certification theory of "uniform" sales presentations, and demonstrating "fragmentized" issues on the plaintiffs' liability case. No such record exists in this action and, as explained below, the objectors do not point to such evidence.

**6. Superiority**

123. Rule 23(b)(3) lists four nonexclusive factors bearing on the superiority determination:

- class members' interest in prosecuting separate suits;
- litigation elsewhere that would undermine certification here;
- whether the court is the appropriate forum for resolution of Policy and Annuity owner claims; and
- whether the proposed class is manageable.

124. The Court finds that here, Class Members would likely have no interest in prosecuting separate suits. Certification permits a classwide adjudication of the claims of similarly situated claimants where individual prosecution would not be expected or cost-effective. *See Deposit Guaranty Nat'l Bank v. Roper*, 445 U.S. 326, 339 (1980); *see also Shutts*, 472 U.S. at 809 (class actions "permit the plaintiffs to pool claims which would be

uneconomical to litigate individually," and as a result, "most of the Plaintiffs would have no realistic day in court if a class action were not available").

125. Rule 23(b)(3) also suggests that, in determining the superiority issue, the Court should consider "the extent and nature of any litigation concerning the controversy already commenced by or against members of the class." Here, only a small number of Policy and Annuity owners have brought individual lawsuits against Defendants. The existence of these suits thus does not undermine the propriety of class certification.

126. Another superiority factor set forth in Rule 23(b)(3) is "the desirability or undesirability of concentrating the litigation of the claims in the particular forum." This Court is an appropriate forum for resolution of the Policy and Annuity owners' claims against these Minneapolis-based Defendants. As explained above, personal jurisdiction extends to Class Members under the Due Process Clause. *See Shutts*, 472 U.S. at 811-12; *Heller*, 548 N.W. 2d at 289; *accord Prudential II*, 148 F.3d at 306. Each of the conditions to jurisdiction over non-residents of Minnesota is satisfied here: the Policy and Annuity owners are adequately represented, and they have been given adequate notice, an opportunity to be heard and an opportunity to opt-out.

**7. Manageability**

127. The United States Supreme Court in *Amchem* confirmed that the manageability of a class action at trial is an irrelevant consideration in the context of a proposed settlement class because the proposal is that there be no trial. *See Amchem*, 521

U.S. at 620; *Prudential II*, 148 F.3d at 316 n.57; *see also*, *Duhaime*, 177 F.R.D. at 65. This consideration is therefore inapplicable here.

**F. Objections to Class Certification**

128. A few objectors complain that the class definition is too broad, or that no settlement class should be certified because not all Class Members have suffered injury. (*See* objections of Richard Giachetti, R. Gusky, Roosevelt and Mattie Jones, Lisa Kirby, Carl Margolis, Jack Miller, Richard Morgan, Leonard Osborne, Frank Pacinelli, Sue Waters Patrick, and Susan Winsor.) None of these objectors, however, points to matters in the record before the Court. In fact, nearly all of them appear content with the record before the Court, for they do not submit any facts to distinguish their own circumstances from those of other Class Members in arguing that a class should not be certified.

129. Some of these objectors claim that the Class is too broad because it includes people whom they argue were not harmed. Dr. Morgan, for example, argues that only persons who elect the Claim Review Process or the Internal Replacement Relief have a claim and that persons who will receive the General Relief are without claims but are taking funds away from those who choose other relief options.[16] These arguments are misplaced for several reasons. First, the Plaintiffs have very clearly alleged that all Class members have been harmed and the record before this Court supports that assertion. For example, all Class Members owned their contracts during a period when interest rates were reduced. Second, the

[16] Dr. Morgan lacks standing to assert this issue since he did not elect either the Claim Review Process or the Internal Replacement Relief.

Class Members who elect the Claim Review Process or Internal Replacement Relief are not being deprived of any relief as a result of the General Relief. As noted above, it is expected that the Claim Review Relief Fund will be more than enough to satisfy the claims of persons in the Claim Review Process. Indeed, it is expected that there will be enough money to give all such Class Members full compensatory relief if it is warranted. And the Internal Replacement Relief is entirely separate from the other forms of relief and is uncapped, and therefore is unaffected by the General Relief.

130. Referring to *Amchem*, several Class Members argue that there is a conflict between Class Members with current claims and those who are said to have future claims. As noted above, however, the claims at issue here involve facts and circumstances that occurred in the past, and Class Members have clearly been put on notice of those claims as a result of the Class Notice. *See Snell*, 2000 U.S. Dist. LEXIS 13611, at *50-51 (like the matter at bar, *Snell* involved "a discrete and identified class that has suffered a harm the extent of which has largely been ascertained"); *Prieto v. John Hancock Mut. Life Ins. Co.*, Civ. No. 3:97-CV-2441-L, 2001 U.S. Dist. LEXIS 310, at *11-12 (N.D. Tex. Jan. 12, 2001) (alleged injury resulting from purchase of life insurance occurs at the time of purchase); *Duhaime*, 177 F.R.D. at 63-64 (same); *Prudential I*, 962 F. Supp. at 521, 571 ("All class members . . . are presently injured."; Appendix C to the opinion, a chart listing twenty material distinctions between *Prudential* and *Amchem*).[17] *See also Prudential II*, 148 F.3d at 306, 310-16 ("we

---

[17] The *Amchem* decision in the Third Circuit is *Georgine v. Amchem Prods., Inc.*, 83 F.3d 610 (3d Cir. 1996). The Supreme Court had not yet ruled at the time of the District (continued...)

believe the 'proposed class has sufficient unity so that absent members can fairly be bound by decisions of class representatives.'") (citing *Amchem*). The Supreme Court's primary concern in *Amchem* was collusive settlements. The settlement here is not the result of collusion, but rather of a lengthy and hard-fought negotiation process, and the result achieved is highly beneficial to the Class. Accordingly, this objection is without merit.

131. Some objectors also challenge certification because the laws of different states could apply. While it is possible that different states' laws might apply to certain of Plaintiffs' claims had this case been tried, that fact does not lead to the result that this Class should not be certified. Plaintiffs' claims under federal law involve a common body of law. The possible existence of variations in state law does not necessarily defeat a finding of predominance. *In Prudential II*, for example, the Third Circuit held that variations in state law "could be overcome at trial by grouping similar state laws together and applying them as a unit," 148 F.3d at 315, and Plaintiffs have provided an affidavit on how this might be done from the expert who provided a similar affidavit to the District Court in the *Prudential* case. *See Prudential I*, 962 F. Supp. at 525; Declaration of Samuel Issacharoff. Moreover, had this litigation proceeded, the Court may have concluded that the law of Minnesota would apply to some or all of Plaintiffs' causes of action. In any event, to the extent variations in state law would suggest that the case might not be readily manageable as a class action, in the settlement

---

[17] (...continued)
Court's decision in *Prudential*.

context the Court need not inquire into this issue, for the case will not be tried. *See Amchem,* 521 U.S. at 620.

132. The Court finds that for the foregoing reasons, certification of the Class for settlement purposes is appropriate, warranted and necessary if the benefits of the settlement are to reach all of Defendants' Policy and Annuity owners.

## G. Fairness of the Proposed Settlement

### 1. The Applicable Standards

133. Rule 23(e) provides that "A class action shall not be . . . compromised without the approval of the court, and notice of the proposed . . . compromise shall be given . . . ." The rule requires the Court to "independently and objectively analyze the evidence and circumstances before it in order to determine whether the settlement is in the best interest of those whose claims will be extinguished." *Newberg* § 11.41, at 11-88 to 11-89. The ultimate question is whether the proposed settlement is "fair, reasonable, and adequate." *Petrovic,* 200 F.3d at 1148, citing *In re Flight Trans. Corp. Sec. Litig.*, 730 F.2d 1128, 1135 (8th Cir. 1984). "Rule 23(e) imposes on the trial judge the duty of protecting absentees, which is executed by the court's assuring the settlement represents adequate compensation for the release of the class claims." *Prudential II,* 148 F.3d at 316 (citation omitted).

134. In determining whether the settlement is fair, reasonable and adequate, the Court should consider (1) the possible rewards of continued litigation weighed against the benefits of the settlement; (2) the defendant's financial condition; (3) the complexity and

expense of further litigation; and (4) the amount of opposition to the settlement. *See Van Horn*, 840 F.2d at 604; *Grunin*, 513 F.2d at 124.[18]

135. A number of additional principles and factors guides the Court's review of the Settlement. First, the approval of a proposed class action settlement is a matter within the sound discretion of the Court. A court's determination will not be overturned unless the party challenging the settlement clearly shows that the court abused its discretion. *See Wiener v. Roth*, 791 F.2d 661, 662 (8th Cir. 1986); *In re Flight Trans.*, 730 F.2d at 1135. *See also Thompson v. Edward D. Jones & Co.*, 992 F.2d 187, 191 (8th Cir. 1993); *Van Horn*, 840 F.2d at 607.

136. Second, judicial policy favors resolution of litigation short of trial, particularly in class action suits. *See Petrovic*, 200 F.3d at 1148; *see also Pfizer, Inc. v. Lord*, 456 F.2d 532, 543 (8th Cir. 1972) ("The policy of the law encourages compromise to avoid the uncertainties of the outcome of litigation as well as the avoidance of wasteful litigation and expense incident thereto."); *Snell*, 2000 U.S. Dist. LEXIS 13611, at *52 ("settlements bring a

[18] The Court may not modify the proposed settlement, but must approve or disapprove the proposed settlement "as a whole" in relation to all of those covered by it. *See Evans v. Jeff D.*, 475 U.S. 717, 727 (1986); *Walsh v. Great Atlantic & Pacific Tea Co.*, 726 F.2d 956, 965 (3d Cir. 1983).

certainty to the resolution of disputes that a Trial cannot . . .").[19] In evaluating the proposed Settlement, courts should be mindful to:

> consider the vagaries of litigation and compare the significance of immediate recovery by way of the compromise to the mere possibility of relief in the future, after protracted and expensive litigation. In this respect, "it [is] proper to take the bird in the hand instead of a prospective flock in the bush."

*In re Employee Benefit Plans Sec. Litig.*, 1993 U.S. Dist. LEXIS 21226, at *15 (quoting *In re King Resources Co. Sec. Litig.*, 420 F. Supp. 610, 625 (D. Colo. 1976)). As aptly recognized in *Wilkerson v. Martin Marietta Corp.*, 171 F.R.D. 273, 285 (D. Colo. 1997), "the one constant about litigation . . . is that the ultimate jury result is uncertain, unknown and unpredictable."

137. Third, the Settlement at issue here enjoys a presumption that it is fair and reasonable because it is the product of arm's-length negotiations conducted by experienced counsel who are fully familiar with all aspects of class action litigation. *See Employee Benefit Plans*, 1993 U.S. Dist. LEXIS 21226, at *17 (the court is entitled to rely on the judgment of experienced counsel in its evaluation of the merits of a class action settlement); *Welsch v.*

---

19 *See generally Officers for Justice v. Civil Service Comm'n*, 688 F.2d 615, 625 (9th Cir. 1982) ("[V]oluntary conciliation and settlement are the preferred means of dispute resolution. This is especially true in complex class action litigation . . . ."); *see also Class Plaintiffs v. Seattle*, 955 F.2d 1268, 1276 (9th Cir. 1992) (strong judicial policy favors settlements, particularly where complex class action litigation is concerned); *White v. National Football League*, 822 F. Supp. 1389, 1416 (D. Minn. 1993) (same); *In re Sumitomo Copper Litig.*, 189 F.R.D. 274, 280 (S.D.N.Y. 1999) (same).

*Gardebring*, 667 F. Supp. 1284, 1295 (D. Minn. 1987) (same).[20] Although a trial court must consider the terms of a class action settlement to the extent necessary to protect the interests of the class, "'judges should not substitute their own judgment as to optimal settlement terms for the judgment of the litigants and their counsel.'" *Petrovic*, 200 F.3d at 1148-49 (quoting *Armstrong v. Board of School Directors*, 616 F.2d 305, 315 (7th Cir. 1980), *overruled on other grounds*, *Felzen v. Andreas*, 134 F.3d 873, 875 (7th Cir. 1998)); *see also Cotton v. Hinton*, 559 F.2d 1326, 1330 (5th Cir. 1977) ("Indeed, the trial judge, absent fraud, collusion, or the like, should be hesitant to substitute its own judgment for that of counsel."); *see also SST v. City of Minneapolis*, 288 N.W.2d. 225, 231 (Minn. 1979).

138. Furthermore, the mere fact that alternative or potentially more favorable settlement terms can be postulated in the abstract affords no basis to reject a fair and adequate settlement achieved through arduous, arm's-length negotiations. As the Court of Appeals for the Third Circuit has aptly observed:

> The evaluating court must . . . guard against demanding too large a settlement based on its view of the merits of the litigation; after all, settlement is a compromise, a yielding of the highest hopes in exchange for certainty and resolution.

*In re General Motors Corp. Pick-Up Truck Fuel Tank Prod. Liab. Litig.*, 55 F.3d 768, 806 (3d Cir. 1995) ("*GM Trucks*"), *cert. denied*, 516 U.S. 824 (1995) (also quoted in *Prudential II*, 148 F.3d at 316-17); *see also Officers for Justice v. Civil Serv. Comm'n*, 688 F.2d 615,

---

[20] As stated in Moore's Federal Practice *Manual for Complex Litigation* (*Third*) §30.42, at 240 (1995), a "presumption of fairness, adequacy and reasonableness may attach to a class settlement reached in arms-length negotiations between experienced, capable counsel after meaningful discovery."

625 (9th Cir. 1982) ("The proposed settlement is not to be judged against a hypothetical or speculative measure of what might have been achieved by the negotiators."), *cert. denied*, 459 U.S. 1217 (1983); *Milstein v. Werner*, 57 F.R.D. 515, 524 (S.D.N.Y. 1972) (court should not require proponent of proposed settlement to "justify each term of settlement against a hypothetical or speculative measure of what concessions might have been gained").

**2. Application of the Standards**

139. **The Risks of Continued Litigation**. This first factor asks "whether the possible rewards of continued litigation with its risks and costs are outweighed by the benefits of the settlement." *Elkins*, 1998 U.S. Dist. LEXIS 1557, at *76 (citing *Ressler v. Jacobson*, 822 F. Supp. 1551, 1553 (M.D. Fla. 1992)); *see also Van Horn*, 840 F.2d at 607 (this is "[t]he single most important factor" in reviewing fairness of settlement); *Petrovic*, 200 F.3d at 1150 (same); *Snell*, 2000 U.S. Dist. LEXIS 13611, at *52; *SST*, 288 N.W.2d at 231 ("[t]he court must compare the settlement terms with the likely rewards the plaintiff would have received after a full trial"). The Court's task is not to reach any conclusions as to the merits of the Plaintiffs' case, nor to substitute its opinion for that of the parties' counsel and Class Members. *See Employee Benefit Plans*, 1993 U.S. Dist. LEXIS 21226, at *13; *see also DeBoer*, 64 F.3d at 1178 ("the value of the settlement need not be determined with absolute precision"). Rather, the determination generally should reflect "'an amalgam of delicate balancing, gross approximation, and rough justice.'" *Employee Benefit Plans*, 1993 U.S. Dist. LEXIS 21226, at *13; *see also SST*, 288 N.W.2d at 231 (quoting *City of Detroit v. Grinnell Corp.*, 495 F.2d 448, 468 (2d Cir. 1974)).

140. The risks that Plaintiffs face in establishing liability and damages clearly demonstrate that the settlement is not only fair, reasonable and adequate, but extremely beneficial. *See, e.g.*, *Weiss v. Mercedes-Benz of N. Am.*, 899 F. Supp. 1297, 1301 (D.N.J. 1995) ("the risks surrounding a trial on the merits are always considerable"); *West Virginia v. Chas. Pfizer & Co.*, 314 F. Supp. 710, 743-44 (S.D.N.Y. 1970) ("no matter how confident one may be of the outcome of litigation, such confidence is often misplaced" ), *aff'd*, 440 F.2d 1079 (2d Cir.1971).

141. Defendants would assert substantial defenses in this litigation (set forth above). Indeed, many plaintiffs in similar litigations have proven unsuccessful as a result of such defenses. *See, e.g., Brown v. Royal Maccabees Life Ins. Co.*, 137 F.3d 1236 (10th Cir. 1998) (granting summary judgment after rejecting argument that policy illustration was part of the contract); *Parkhill v. Minnesota Mut. Life Ins. Co.*, MDL No. 1186, Civil No. 97-515 (DSD/JMM) (D. Minn. Aug. 25, 2000) (Order granting defendant's motion for summary judgment and dismissing plaintiff's amended complaint with prejudice); *In re The Hartford Sales Practices Litig.*, MDL No. 97-MD-1204, Civ. No. 97-1619/RHK/JMM (D. Minn. Mar. 8, 2000) (dismissing plaintiffs' action with prejudice); *Parkhill v. Minnesota Mut. Life Ins. Co.*, 995 F. Supp. 983 (D. Minn. 1998) (dismissing five of plaintiffs' claims with prejudice on defendants' motion for summary judgment); *In re The Northwestern Mutual Life Ins. Co. Sales Prac. Litig.*, 70 F. Supp. 2d 466 (D.N.J. 1999) (granting summary judgment based on lack of reasonable reliance and statute of limitations); *Frith v. Guardian Life Ins. Co. of Am.*, 9 F. Supp. 2d 734, 739-40 (S.D. Tex. 1998) (dismissing vanishing premium claim for lack of

reasonable reliance and holding that the parol evidence rule barred extrinsic evidence); *Gamble v. American Fidelity Life Ins. Co.*, No. 97-0436-BH-S, 1998 U.S. Dist. LEXIS 2975 (S.D. Ala. Feb. 3, 1998) (claims barred by statute of limitations); *Elkins*, 1998 U.S. Dist. LEXIS 1557, at *58 (class member's claims regarding policies purchased in the 1980s would be barred by the statute of limitations); *Solomon v. Guardian Life Ins. Co.*, No. 96-1597, 1997 U.S. Dist. LEXIS 14911 (E.D. Pa. Sept. 26, 1997); *Furey v. Guardian Life Ins. Co.*, 689 N.Y.S.2d 208, 261 A.D.2d 355 (App. Div. 2d Dep't 1999). As a result, the outcome of this litigation at trial is far from certain, and a substantial risk exists that Class Members could receive no recovery if the litigation were to proceed. In fact, the one objector's counsel who reviewed the discovery record here characterized the Defendants, at least in some respects, as "fairly clean."

142. The uncertainty of Plaintiffs' success on the merits supports the compromise of their and the Class claims as reached in the Settlement Agreement. *See DeBoer*, 64 F.3d at 1177 (where plaintiffs do not have a very strong case, "virtually any benefit inuring to the class would be better than the prospect of an ultimately unsuccessful litigation"); *Bussie*, 50 F. Supp. at 76 ("the reality that the Class would encounter significant, and potentially insurmountable, obstacles to a litigated recovery underscores the reasonableness of the compromise set forth in the Settlement Agreement.").

143. In light of the risk of failing to establish liability and damages at trial, the settlement here provides Class Members with a recovery where none might otherwise be had. Those who elect the Claim Review Process will be able to submit their claim to a

funded, streamlined review process where they can achieve full recovery, without having to bear the burden of attorneys' fees and without facing the defenses that Defendants would otherwise assert. Class Members who elect the Internal Replacement Relief will receive relief related to their replacement situation without making any showing against Defendants. Finally, Class Members who accept the General Relief will automatically be provided with a form of coverage in compensation for their generalized claims relating to their insurance-based products.

144. **The Ability of the Defendants to Withstand a Greater Judgment.** The total economic relief to be conferred upon the Class is valued at over $215 million, plus attorneys' fees, expenses and other costs ordinarily borne by the Class. Whether the Defendants here could withstand a greater judgment is of minor consequence when the settlement gives Class Members the opportunity to receive full relief without having to pay attorneys' fees. *See, e.g.*, *In re Metropolitan Life Ins. Co.*, slip op. at 53. In fact, two of the objectors (James Gesick and Philip Perry) expressed concern that the settlement was too large because they fear Defendants will pass the cost along to them as Defendants' customers. The Settlement Agreement, however, contains an anti-clawback provision. *See* Settlement Agreement § IV.G.

145. **Continued Litigation Would Be Long, Complex and Expensive.** Courts have consistently viewed the expense and possible duration of litigation as factors appropriately considered in evaluating the reasonableness of a settlement. *See DeBoer*, 64 F.3d at 1178 ("'The very purpose of compromise is to avoid the delay and expense of . . . a

trial.'") (citations omitted); *EEOC v. McDonnell Douglas Corp.*, 894 F. Supp. 1329, 1334 (E.D. Mo. 1995); *see generally Class Plaintiffs*, 955 F.2d at 1292 ("complexity, duration, and sheer enormity of" the pending class action weighed heavily against a conclusion that the district court abused its discretion in approving the settlement).[21]

146. The Court finds that litigating these actions through trial would be complex, expensive and time-consuming. Plaintiffs' claims are premised on challenges to the actuarial, accounting, investment and financial assumptions underlying Defendants' Policies and Annuities for over a decade. Litigation of Plaintiffs' claims through trial would entail extensive (and expensive) proof of Defendants' internal procedures for establishing interest crediting rates, the quality and performance of Defendants' investments and the decision-making process relating to investments, Policy and Annuity pricing assumptions, product development, marketing and other relevant determinations. The evaluation and development of these complex factual issues would require substantial expert testimony concerning highly complex actuarial methodologies, statutory accounting practices and sophisticated financial theories.

---

[21] *See also Officers for Justice*, 688 F.2d at 625 (the expense and possible duration of the litigation are major factors to be considered in evaluating the reasonableness of a settlement); *In re Rio Hair Naturalizer Products Liability Litig.*, MDL 1055, 1996 U.S. Dist. LEXIS 20440, at *38 (E.D. Mich. Dec. 20, 1996) ("costs of and delays inherent in the prosecution and defense of . . . complex, protracted litigation necessarily are substantial"); *Lake v. First Nationwide Bank*, 900 F. Supp. 726, 732 (E.D. Pa. 1995) ("due to the relative complexity of the issues involved and the amount of data that would need to be processed, the costs of litigating this matter through trial would likely be high" and, due to the fact that there are over a hundred thousand class members involved, "the task of poring through the relevant records would clearly be a significant undertaking").

147. The risks to the Class of failing to succeed on Plaintiffs' claims through a complex and expensive trial and likely appeals weigh in favor of approving this Settlement with its certain outcome and immediate relief, especially where, as here, Class Members have, and were clearly notified of, the right to opt-out and pursue their own remedy if they so desire. By reaching this Settlement, the parties have avoided protracted litigation and established a means for a prompt resolution of Policy and Annuity owner claims against Defendants. *See DeBoer*, 64 F.3d at 1178 ("The parties to a class action are not required to incur immense expense before settling as a means to justify that settlement."). Class Members will automatically receive General Relief or Internal Replacement Relief (if it is elected and the Class Member is eligible) or submit Claims in the Claim Review Process (if it is elected) soon after the Courts issue the Final Orders and Judgments and those Judgments become final and no longer subject to appeal. These expedited avenues of relief provide meaningful and timely benefits to the Class Members. Given the alternative of a very long, complex trial and appeal process -- as well as the substantial risks involved -- the Court determines that the availability of prompt relief under the Settlement is highly beneficial to the Class.

148. **Reaction of the Class.** Courts also look to the reaction of Class Members in determining the fairness of a class action settlement. *See Petrovic*, 200 F.3d at 1152; *Bell Atl. Corp. v. Bolger*, 2 F.3d 1304, 1313-14 & n.15 (3d Cir. 1993); *In re Employee Benefit Plans Sec. Litig.*, 1993 U.S. Dist. LEXIS 21226, at *17-18; *see also Prudential II*, 148 F.3d at 318 (agreeing with the District Court that the small percentage of opt outs and the limited number of objections "weighed in favor of approving the settlement").

149. Here, a relatively small percentage of the Class chose to opt out of the Class. Only approximately 16,000 of the 2.8 million Policies and Annuities in the Class have sought exclusion (less than six-tenths of one percent of the Class), and only 48 individuals submitted objections. Numerous Class Members took advantage of the opportunity to contact the IDS Class Action Information Center. These figures suggest a very positive reaction by the Class Members to the settlement, and thus weigh in favor of its approval as fair, reasonable and adequate.

**3. Objections to the Fairness of the Settlement**

150. Several objectors have questioned various provisions in this settlement. On the whole, however, they do not question the fact that Class Counsel have achieved a substantial settlement for Class Members. Nor do they question that the Class faces a substantial risk that they would be unable to establish liability or damages were the litigation to proceed without a settlement. They also do not question the fact that Class Members received extensive notice and clear instructions on how to elect to exclude themselves from the Class. Notably, the objectors chose not to exclude themselves, even though that would be the obvious course of action if they were unhappy with the terms of the settlement.

151. The objections that were asserted concerning the fairness of the settlement fall into several categories: (1) the relationship between the harms alleged and the settlement relief; (2) the form and value of the General Relief; (3) the scope and procedures in the Claim Review Process; (4) the structure and value of the Internal Replacement Relief; (5) the clarity of the Notice; and (6) the provision of the Release.

152. **Relationship Between the Relief and the Harm Claimed.** Some objectors argue that the settlement relief offered here does not match the harm claimed on behalf of members of the Class. (*See* objections of R. Gusky, John Heffernan, Lisa Kirby, David Krumpe, Carl Margolis, Jack Miller, Richard Morgan, Leonard Osborne and Sue Waters Patrick.) In fact, the settlement relief here is tailored to the harms alleged. First, every Class Member had the opportunity to elect the Claim Review Process, through which he or she can pursue specific claims set forth in the Class Notice or other claims relating to the marketing, sale, servicing or administration of the Policies or Annuities. Several of these objectors (Gusky, Kirby, Margolis, Miller and Patrick) appear to have recognized this fact because they themselves elected the Claim Review Process. *See* Dahl Aff. ¶¶ 66, 69, 71, 75. Second, the Internal Replacement Relief is specifically related to the harm alleged. An eligible Class Member who incurred a surrender charge as part of a replacement, for example, will receive a 50% refund of that charge. Finally, the General Relief is the default and provides an additional form of coverage for persons allegedly wronged in connection with their insurance-related products.

153. Ms. Patrick argues that, after a finding of liability and damages at trial, the jury would not award coverage protecting Class Members against accidental death. It is, of course, far from certain that Plaintiffs would succeed at trial, and the provision of additional coverage is adequate compensation for Class Members allegedly harmed in connection with their insurance-related products. In fact, Ms. Patrick, in her papers, points to numerous other settlements that have been approved by courts around the country, where the general relief to

class members who did not elect a claim review process consisted of such things as discounts on new policies, annuities or mutual funds, bonuses attributable to new policies, or even an additional form of coverage. *See* Objector Sue Water Patrick's Memorandum in Response to Defendants' Opposition to Intervention and Response to Objections and to Plaintiffs' Memorandum in Support of Motion for Final Approval of the Proposed Settlement at 6-11. Ms. Patrick appears to embrace those forms of relief even though they too might not be awarded at trial. Moreover, the relief here is automatic and the Class Member does not need to spend money to receive the relief.

154. **Objections to the Value and Form of the General Relief**. Several objectors (Tessa and Gerald Abell, Richard Egerman, Arthur Jacob, Eugenia Kwiatkowski, Cary LaCheen, Jon Mikalson, Sue Waters Patrick, Phillip Perry and Phillip Settles) question the value of the General Relief because, they say, they will not receive any benefit unless they die during the period of coverage. This objection is based on the inaccurate premise that insurance coverage has no value unless a claim is paid. According to this reasoning, no one would ever pay for insurance coverage unless the risk protected against was certain to occur. Courts have rejected this argument because, among other reasons, no one ever really knows when a risk will occur and when coverage will be needed. Moreover, the fact that the open market ascribes a real value to this insurance satisfies any doubt that this insurance provides a real benefit. *See Garst*, slip op. at 52 ("[r]egardless of whether a death benefit actually is paid, the *free* protection itself has value . . .") (emphasis in original); *Dornberger v. Metropolitan Life Ins. Co.*, 961 F. Supp. 506, 539-540 (S.D.N.Y. 1997) ("a policyholder

receives substantial benefit from the very fact that the insurer is at risk and is bound to pay out on a claim, even if a claim never arises."); *In re Real Estate Title & Settlement Servs. Antitrust Litig.*, MDL No. 633, 1986 WL 6531, at *18 (E.D. Pa. June 10, 1986) (extra title insurance provides benefit to all class members, regardless of whether they make any claim for the insurance), *aff'd*, 815 F.2d 695 (3d Cir. 1987), *cert. denied*, 485 U.S. 909 (1988); *cf. Union Labor Life Ins. Co. v. Pireno*, 458 U.S. 119, 131 (1982) (the transfer of risk occurs when policy is formed). For this reason, the Court rejects the objections that the General Relief is without significant value.

155. A number of the objectors express a desire for an alternative form of General Relief, including cash payments rather than additional coverage. The alternatives they seek are, in fact, available through the Claim Review Process, and Class Members were clearly informed of this option. In any event, as previously stated, the fact that one can conceive of alternative forms of relief does not make those under consideration unfair, unreasonable, or inadequate. *See*, *e.g.*, *GM Trucks*, 55 F.3d at 806.

156. Two objectors (William Bannon and Susan Winsor) argue that the General Relief should not be measured by the value of the benefit provided to Class Members, but by the cost imposed on the Defendants. As noted above, however, the proper measurement is the benefit provided to Class Members, not the cost to the Defendants. *See Prudential I*, 962 F. Supp. at 557.

157. For the foregoing reasons, the Court rejects the objections to the form and value of the General Relief.

**4. Objections to the Scope and Procedures in the Claim Review Process**

158. Some objectors argue that the Claim Review Process should contain an appeals process. (*See* objections of R. Gusky, Lisa Kirby, Carl Margolis, Jack Miller, Sue Waters Patrick and Marion Washburn.) The Court concludes that the settlement is fair, reasonable and adequate without one. First, the Claim Evaluator is chosen by Class Counsel and will give Claimants the benefit of the doubt more so than would a neutral evaluator or one chosen by Defendants. Second, to the extent any Claimants are dissatisfied with their awards in the Claim Review Process, they may seek resolution through the toll-free number that will be indicated on the letter notifying them of their awards.

159. One objector (Marion Washburn) makes a number of "suggestions," though the Court finds that these suggestions are not necessary to make the settlement here fair, reasonable and adequate. She suggests that a Claimant's individual counsel be allowed to communicate with the Claim Evaluator during the evaluation process and that detailed letters explaining the award be provided. The Claim Review Process in this Settlement is a straight-forward program. The Claimant will submit a form and the Defendants will submit objective information.[22] The Claim Evaluator will score the claim in accordance with the guidelines set forth in the Settlement Agreement and will determine an award based upon the Relief Tables that are also part of the Settlement Agreement. This simple process is already readily

---

[22] Though objector Washburn suggests as an "improvement" to the Settlement that the Claim Evaluator be given information about the disciplinary history of sales agents, the Settlement Agreement already provides for the disclosure of such information. *See* Settlement Agreement, p. 31.

understandable. While Claimants may retain their own counsel to assist them in filling out the claim form, there is no need for advocacy once the form is submitted, and thus there is no benefit to adding a mechanism to permit communication between such counsel and the Claim Evaluator. Indeed, permitting advocates to intervene at other points in the process could only delay the entire process for other Class Members. In addition, the Scoring Guidelines and Relief Tables are part of the Settlement Agreement. There is no complex math involved. As a result, there is no need for detailed letters of explanation along with the awards.

160. Two objectors (Steven Creaturo and Frank Pacinelli) contend that the Claim Review Process is unfair because it does not encompass certain claims. Mr. Creaturo contends that the Claim Review Process does not encompass claims that sales illustrations guaranteed certain performance. The Claim Review Process does, however, encompass such claims (in claim categories entitled Life Insurance Accelerated Payment or "Vanishing Premium" Claims and Performance Misrepresentation Claims). It will be up to the Claim Evaluator to determine the strength of such a claim. Mr. Pacinelli argues that the Claim Review Process is unfair because it does not provide relief in his situation where he was allegedly advised to terminate insurance on his son in favor of an investment product and his son passed away several years later. The Claim Review Process is flexible enough to encompass this claim (in the Other Marketing, Sales, Administration and Servicing Claims category) and the Settlement Agreement permits the Claim Evaluator to exercise discretion in such circumstances, including discretion with respect to the relief.

161. Ten objectors argue that the score of "0" should be eliminated from the Claim Review Process. (*See* objections of R. Gusky, Roosevelt and Mattie Jones, Lisa Kirby, Carl Margolis, Jack Miller, Richard Morgan, Frank Pacinelli, Sue Waters Patrick, Marion Washburn and Susan Winsor.) They argue that the possibility of a "0" score is unfair. The Court disagrees. First, the standard for being a "0" is exceedingly high:

> A Claim shall be given a score of 0 if (i) it is <u>contradicted by the Documentation</u> submitted to the Claim Evaluator; or (ii) in the discretion of the Claim Evaluator, the Claim otherwise deserves such a score.

Stipulation of Settlement, Exhibit A, § III.B.5 (emphasis added). The Court is confident that the Claim Evaluator, working under the direction of Class Counsel -- the advocates for the Class -- will only give such a score in rare and deserving circumstances. Second, it is important to the Claim Review Process that the possibility of no relief exist. Otherwise, the process could be swamped with undeserving claims, which would slow down the process for other Claimants, and dilute the relief to be awarded to those with deserving claims. Third, objectors are wrong in suggesting that those few Class Members who receive a "0" score receive no consideration in exchange for their release. The consideration for the release is the provision of a funded process rather than the specific awards determined through that process. Moreover, even those who receive a score of "0" are entitled to share in any spillover.

162. Some objectors argue that they should know their awards in the Claim Review Process before having to choose whether to exclude themselves from the Class. As noted above, the availability of the funded process is the consideration provided to Class Members, not the ultimate award determined. If these objectors were correct, then no

litigation class could ever be certified, since class members in those cases are called upon to decide whether to remain in the class before it is known whether there will be any recovery, let alone its amount. In any event, substantial information is available to Class Members concerning the Claim Review Process, including the Scoring Guidelines and the Relief Tables which are part of the Settlement Agreement.[23]

163. In light of the number of Class Members electing the Claim Review Process, it is expected that there will be funds left over from the $85 million for the Claim Review Process. To the extent there is "spillover" to those Class Members receiving the General Relief, the Settlement Agreement provides that such Class Members receive additional accidental death protection in an amount that can be purchased by Defendants with such funds. Three objectors, who each submitted nearly identical objections (R. Gusky, Lisa Kirby and Carl Margolis), have misunderstood the spillover provision and argue that it is unfair because they believe the additional coverage is valued at the price Class Members would have to pay to purchase it on the open market. Class Counsel and Defendants' counsel reiterated at the Fairness Hearing that the additional coverage will be purchased based on the actuarially determined cost of providing the coverage rather than the price at which Class Members can purchase similar coverage. Accordingly, this objection is rejected as moot. Similarly rejected as unnecessary is proposed additional language to the Settlement Agreement which purports to clarify this issue. The Court concludes that the Settlement Agreement is already sufficiently

---

[23] One objector (Frank Pacinelli) suggested at the Fairness Hearing that the Relief Table on file was an incomplete copy. Subsequent review has revealed that this objector was mistaken.

clear, and the Court is further assured by the statements made in open court by both parties at the Fairness Hearing confirming their agreement. *See* Tr. at 54-55.[24]

164. **Objections to the Internal Replacement Relief**. Two objectors (Steven Creaturo and Frank Pacinelli), neither of whom is actually eligible for Internal Replacement Relief, argue that the value of the Internal Replacement Relief is not properly disclosed. In fact, the parties' estimated value of the settlement relief of $215 million (exclusive of fees, expenses and costs), as stated in the Class Notice, clearly contemplated an estimated value for the Internal Replacement Relief of $30 million. Unlike the other forms of relief, the Internal Replacement Relief has no cap and Defendants were thus actually at risk for up to approximately $126 million if all eligible Class Members elected it.

165. Mr. Creaturo also objects on the ground that the Internal Replacement Relief treats some replacements differently than others. Class Counsel, however, originally brought suit with respect to internal replacements of policies and have negotiated for this form of relief. Moreover, claims involving external replacements are more difficult to identify and prove in court than internal replacement claims: with an internal replacement claim, the replacing company knows that a replacement is involved, and cannot as easily point to competitive issues involving the other company as a defense. Internal replacement claims are also easier to prove when full values are involved. In any event, the Internal Replacement

[24] The actuaries for Defendants and Plaintiffs used the same methodology to determine the cost of providing spillover ADB coverage as that cited in the letter to the Courts dated March 12, 2001 from Frank H. Tomlinson, counsel for objectors Kirby, Margolis and Gusky. However, the actuaries for Defendants and Plaintiffs utilized more current ADB mortality rate assumptions and an interest rate more reflective of the current environment.

Relief is uncapped and in no way reduces the value of the General Relief or the Claim Review Process.

166. **Objections to the Release.** Several objectors (R. Gusky, Roosevelt and Mattie Jones, Carl Margolis, Jack Miller and Sue Waters Patrick) suggest that the Release improperly encompasses "future claims" of the type at issue in *Amchem*. These objectors are wrong. The Settlement Agreement specifically provides that it does not release "a Class Member's right to assert any claim that independently arises from acts, facts or circumstances that occur for the first time after the last day of the Class Period." Settlement Agreement § XII.A.3.

167. The Court also finds unavailing the similar objection that the release forces Class Members to release claims that they are unaware they have. The Class Notice Package goes to great lengths to inform Class Members of the claims that they might have, such as vanishing premium claims,[25] and the Settlement makes the toll-free number available for Class Members who have questions. Furthermore, no Policy or Annuity owner who remains in the Class will go uncompensated. As described above in detail, the General Relief, the Internal Replacement Relief and the Claim Review Process provide significant relief to

---

[25] A Class Member who bought a vanishing premium policy during the Class Period that has not yet reached its vanish date might have an unknown claim (but for the Notice, which is another valuable benefit of this Settlement), but does not have a "future claim."

anyone who remains in the Class. *See Prudential II*, 148 F.3d at 326 (affirming similar release as not overbroad).[26]

**H. Application for Attorneys' Fees and Expenses**

168. Subsequent to negotiating the terms of the proposed settlement, Plaintiffs' Lead counsel and Defendants' counsel negotiated terms pursuant to which, if approved by the Court, Defendants would pay Plaintiffs' counsels' fee and reimburse Plaintiffs' counsels' expenses from their own funds, and not from the Class recovery, up to a combined total of $28 million, to be paid within 10 days after the last date of entry of the Final Order and Judgment. Settlement Agreement § XIII. Plaintiffs' counsel now request that the Court approve their application for an award of attorneys' fees and expenses in accordance with this agreement. Plaintiffs' counsel request attorneys' fees and expenses in the amount of $28 million, consisting of approximately $27,380,000 in fees and $620,000 in reimbursement of expenses.

169. The Court finds that the fee negotiations in this case were conducted at arms' length, and only after all of the terms of the Settlement had been agreed upon and the State Court had given its permission to discuss fees. Moreover, the Court finds that the fee will be paid by the Defendants, separate and apart from any recovery to the Class. This means both (i) that the fee awarded will not diminish the Class recovery, and (ii) Defendants had a particular incentive to negotiate the fee at arms's length. There is no evidence in this case that

---

[26] Additional objections raised, but not discussed here, have also been considered, and are hereby rejected.

the settlement was in any way collusive. Under such circumstances, the negotiated fee is entitled to a great deal of weight in considering the fee request. *See In re First Capital Holdings Corp. Fin. Prods. Litig.*, 33 F.3d 29 (9th Cir. 1994); *Johnson v. Georgia Highway Express, Inc.*, 488 F.2d 714, 720 (5th Cir. 1974) ("In cases of this kind, we encourage counsel on both sides to utilize their best efforts to understandingly, sympathetically and professionally arrive at a settlement as to attorney's fees."); *Snell*, 2000 U.S. Dist. LEXIS 13611, at *59-61; *Elkins*, 1998 U.S. Dist. LEXIS 1557, at *99.

170. Moreover, the evidence in this case, including several expert affidavits, establish that the ultimate value of this settlement to the Class will exceed $251 million, consisting of $215 million in settlement benefits, plus $28 million in attorneys' fees and expenses and $8 million in notice and other costs, all of which (including attorneys' fees) are ordinarily borne by the Class, and therefore are properly considered as part of the overall recovery. Using $251 million (or even $215 million) as a minimum for valuing the Settlement means that the negotiated fee is less than 11% (or at most is only 12.7%) of the recovery. This is consistent with, if not at the low end of, fees awarded in similar cases. *See, e.g., Blum v. Stenson*, 465 U.S. 886, 904 (1984) (approving one-third).

171. In addition, Plaintiffs' counsel have submitted evidence that their lodestar in this case is over $9,500,000, which represents many tens of thousands of hours of professional time. Thus, the requested fee of $27,380,000 results in a multiplier of approximately 2.88 times the lodestar. For the reasons set forth elsewhere in these findings, this multiplier is fully supported. Other courts, in fact, have awarded fees that resulted in

significantly higher multiples of the lodestar. *See, e.g.*, *Mercedes-Benz of North America, Inc.,* 899 F. Supp.1297 (multiplier of 9.3 times the lodestar); *Michels*, 1997 N.Y. Misc. LEXIS 171 (multiplier of 3.3); *Willson*, 1995 N.Y. Misc. LEXIS 652 (multiplier of 4.6).

172. In any event, the actual multiplier effectively is less because the lodestar does not take into account the work still to be done by Plaintiffs' counsel in the implementation of this settlement.

173. The Court has considered the objections that have been raised to the fee request, and find them to be without merit. Rather, the Court finds persuasive the comments of the District of Minnesota, Judge Erickson, in *Snell*, *supra*:

> Given the liberal access, that Plaintiffs' Counsel has extended to the Class Members, and that allows the Class Members to consult, without cost, with Class Counsel on any matter relevant to the implementation of this settlement, and given the effort that Class Counsel expended in securing the settlement agreement, that we now review, we are fully satisfied that the requested award of attorneys' fees is both reasonable, and deserving. Class Counsel have secured a favorable recovery for the Class Members, and they should be commensurately rewarded for that recovery. Our acceptance of the fee request is facilitated by the fact that the fee amount was independently negotiated by the settling parties, and comes from a source that does not impact upon the total settlement fund that is available to the Class. The Intervenors, and Objectors, do not so much as suggest, let alone establish, that the fee award has detracted, in any measurable way, from the relief the Class can expect from the settlement that we now approve.
>
> While the requested attorneys' fees exceed the value of the attorneys' time, as computed by a lodestar approach, we find the request reasonable in view of the benefits afforded the Class by the settlement that Class Counsel have secured. Class Counsel funded the prosecution of the Plaintiffs' claims, and expended thousands of hours of legal effort, which could otherwise have been billed to litigation that competes with this one for counsels' time. As a percentage of the total value of the settlement secured, the amount of the requested fees is strikingly small,

> at least in the milieu of class action lawsuits. Realistically, counsel assumed responsibility for litigating claims that less dedicated attorneys would have ignored, or abandoned, and the fees and costs being requested are, in all things, reasonable. We are also impressed by the fact that Class Counsel assume the risk of being obligated, under the Settlement Agreement, to provide legal services, without recompense, for as long as they are needed, in the settlement process, by the Class.
>
> Therefore, given the entirety of the Record before us, we grant the Motion to Approve the Settlement, and we award the attorneys' fees, and costs, that have been requested by the Class.

*Snell*, 2000 U.S. Dist. LEXIS 13611 at *59-61.

174. Accordingly, the Court hereby grants Plaintiffs' request for $28 million, consisting of approximately $27,380,000 in fees and $620,000 in reimbursement of expenses, to be paid by Defendants in accordance with the terms of the Settlement Agreement, with one proviso. In view of the fact that further work needs to be done, the Court will require that Plaintiffs' counsel set aside in a Qualified Settlement Fund ten percent, or $2,738,000, of the fee award pending substantial completion of the administration of the Claim Review Process. Plaintiffs' counsel shall advise the Courts when payments are made to Class Members in the Claim Review Process, and may draw down this final ten percent (plus any accumulated interest) at that time without further order of the Courts.

175. The attorneys' fees and expenses awarded herein shall be treated as a qualified settlement fund for tax purposes.

**I. Bond Requirement**

176. A bond requirement under Rule 7 of the Federal Rules of Appellate Procedure and the equitable powers of the Court is appropriate where the delay engendered by an appeal will work to the financial detriment of the Class. *See In re NASDAQ Market-Makers Antitrust Litig.,* 187 F.R.D. 124, 128 (S.D.N.Y. 1999). Such a bond provides a "guarantee that the appellee can recover from the appellant the damages caused by the delay incident to the appeal." *Morgan Guarantee Trust Co. v. Republic of Palau,* 702 F. Supp. 60, 65 (S.D.N.Y. 1988), *vacated on other grounds*, 924 F.2d 1237 (2d Cir. 1991).

177. In the present action, the Class will suffer from the delays incident to any appeal, for an appeal will delay the provision of much of the settlement relief described above. For Class Members receiving the General Relief, the period for which they will receive coverage begins only after the approval of the settlement is final and all opportunities for appeal have expired. As a result, the recovery, which is $100 million as of the beginning of year 2001, will be subject to the effect of time on the value of money. The delay of a year at a 5% interest rate, for example, could thus have a $500,000 impact on these Class Members.

178. Class Members who receive the Internal Replacement Relief will also suffer from delay. To the extent they receive a refund of transaction costs, for example, payment will not be made until 90 days after the approval of the settlement is final and no potential for appeals remains. Persons who will have their cost of insurance deductions

reduced, will receive that benefit within 120 days of such finality. These persons will thus be affected by the time value of money or a delay before their insurance rates are reduced.

179. The Claim Review Process will also be affected by delay. Though the Claim Review Relief Fund will earn interest, the rate is set as of the date of the Fairness Hearing and the possibility exists that rates will change to the disadvantage of Class Members. In addition, the cost of administering the Claim Review Process will likely increase, and that increase will be reflected in the Claim Evaluator's fee, which is paid out of interest on the Claim Review Relief Fund insofar as it exceeds the $2 million to be paid by Defendants.

180. In the absence of a bond requirement, the Class will suffer irreparable harm if appeals are filed. Accordingly, the Court requires that no appeals will be had of the orders and judgment of this Court in this action without a bond first being posted by the proposed appellant in the amount of $500,000. This amount represents less than one quarter of one percent of the benefits provided to the Class under the Settlement.

For all the foregoing reasons, it is hereby ORDERED:

1. That the motions to intervene by Class Members Roosevelt and Mattie Jones, Jack Miller, Richard E. Morgan, Jr., Frank Pacinelli, Sue Waters Patrick, Marion Washburn and Susan Winsor are denied.

2. That the Class is hereby granted final certification for settlement purposes.

3. That the settlement is hereby granted final approval.

4. That the application for Attorneys' Fees and Expenses to Plaintiffs' Counsel in the amount of $28 million is hereby granted, subject to the 10% hold-back discussed above.

5. That the Complaint is hereby dismissed with prejudice.

6. That any appeals of the orders and judgment in this action be conditioned upon the posting of a $500,000 bond.

7. That a Final Judgment shall be entered, consistent with the Court's disposition of this action.

The Honorable David S. Doty
United States District Judge

Dated: May 15, 2001