00-1980 DSD/ JMM

Findings of Fact &
Conclusions of Law

Will Arrive by Fax
in 2 Sets

#1 - Page  1 - 43

#2 - Page 44 - 88

**UNITED STATES DISTRICT COURT**
**DISTRICT OF MINNESOTA**

------------------------------------------------------------------------------------

LESA BENACQUISTO, DANIEL BENACQUISTO, RICHARD
THORESEN, ELIZABETH THORESEN, ARNOLD MORK,
ISABELLA MORK, RONALD MELCHERT and SUSAN
MELCHERT, on behalf of themselves and all others similarly situated, :

Plaintiffs,                   :

v.

AMERICAN EXPRESS FINANCIAL CORPORATION, AMERICAN
EXPRESS FINANCIAL ADVISORS, AMERICAN CENTURION
LIFE ASSURANCE COMPANY, AMERICAN ENTERPRISE LIFE
INSURANCE COMPANY, AMERICAN PARTNERS LIFE
INSURANCE COMPANY, IDS LIFE INSURANCE COMPANY,
and IDS LIFE INSURANCE COMPANY OF NEW YORK,

Defendants.                  :

------------------------------------------------------------------------------------

Case No. 00-1980 DSD/JMM

---

## FINDINGS OF FACT AND CONCLUSIONS OF LAW
## CONCERNING CLASS ACTION SETTLEMENT

---

The parties have submitted for approval a settlement of this class action

litigation that is memorialized in a Stipulation of Settlement filed with the Court on

September 18, 2000, with exhibits (the "Settlement Agreement").  For the reasons set forth

below in these Findings of Fact and Conclusions of Law, this Court has determined that a class

should be certified for purposes of this settlement and the settlement is fair, reasonable and

adequate and should therefore be approved.  Contemporaneously, this Court has issued a Final

Order Approving Class Action Settlement and Dismissing the Complaint with prejudice.

FILED _5-15-01_
FRANCIS E. DOSAL, CLERK
Judgment Ent'd. _____
Deputy Clerk's Initials _____

I.      **FINDINGS OF FACT**

   A.      **Background on the Litigation and Settlement**

      1.      **The Parties and Their Counsel**

         1.      Plaintiffs Lesa Benacquisto and Daniel Benacquisto are citizens and residents of the State of Pennsylvania.  Plaintiffs Richard W. Thoresen and Elizabeth J. Thoresen are citizens and residents of the State of Oregon.  Plaintiffs Arnold Mork and Isabella Mork are citizens and residents of the State of Minnesota.  Plaintiffs Ronald Melchert and Susan Melchert are citizens and residents of the State of Wisconsin.  *See* Complaint at ¶¶ 6-9.  Each of these plaintiffs has purchased life insurance policies and/or deferred annuity contracts from Defendants.

         2.      The Plaintiffs and the Class[1] are represented by the law firms of Milberg Weiss Bershad Hynes & Lerach LLP; Lockridge Grindal Nauen, P.L.L.P; Chestnut & Cambronne, P.A.; Hubbard & Biederman, LLP; Bonnett Fairbourn Friedman & Balint, P.C.; Schiffrin & Barroway, LLP; the Lustigman Firm PC; Charles H. Johnson Associates, P.A.; Arnzen, Parry & Wentz, P.S.C.; James Hoyer Newcomer Forizs & Smiljanich, P.A.; and Uitz & Associates.  All are experienced plaintiffs' counsel with knowledge of insurance, consumer and class action litigation.

         3.      The Defendants are related entities involved in the issuance and sale of life insurance and annuity products.  Defendant American Express Financial Corporation

---

[1]      Capitalized terms in these Findings of Fact and Conclusions of Law have the meanings set forth in the Settlement Agreement, unless otherwise specified.

("AEFC"), a Minneapolis-based company, is a wholly-owned subsidiary of American Express Company, and provides a variety of financial and insurance products and services. Defendant American Express Financial Advisors, Inc. is a subsidiary of AEFC which markets and sells various financial and insurance products. Defendant IDS Life Insurance Company is a subsidiary of AEFC and is a stock life insurance company organized under the laws of the state of Minnesota. Defendant IDS Life Insurance Company of New York is a subsidiary of IDS Life Insurance Company and is a stock life insurance company domiciled in New York. Defendant American Centurion Life Assurance Company is a subsidiary of IDS Life Insurance Company and is domiciled in New York. Defendant American Enterprise Life Insurance Company is a subsidiary of IDS Life Insurance Company and is domiciled in Indiana. Defendant American Partners Life Insurance Company is a subsidiary of IDS Life Insurance Company and is domiciled in Arizona. *See* Defendant's Memorandum in Support of Final Approval of Class Action Settlement and in Response to Objections ("Def. Mem.") pp. 6-7.

    4.    The Defendants are represented by the law firms of LeBoeuf, Lamb, Greene & MacRae, L.L.P. and Leonard, Street and Deinard, P.A. These law firms have extensive knowledge and expertise in the defense of complex insurance and consumer class actions. The Defendants are also represented by experienced and knowledgeable in-house counsel.

### 2.    Procedural History

    5.    Plaintiffs filed three actions in the District Court of the State of Minnesota, County of Hennepin (the "State Court"), entitled *Benacquisto v. IDS Life*

*Insurance Company and American Express Financial Corporation,* court file no. CT 96-018477 (the "Benacquisto Action"), filed on December 12, 1996; *Mork, et al. v. IDS Life Insurance Company and American Express Financial Corporation,* court file no. CT 97-4742 (the "Mork Action"), filed on March 21, 1997; and *Thoresen v. American Express Financial Corporation, American Centurion Life Assurance Company, American Enterprise Life Insurance Company, American Partners Life Insurance Company, IDS Life Insurance Company, and IDS Life Insurance Company of New York,* court file no. MC 98-015681 (the "Thoresen Action"), filed on October 13, 1998.

      6.    The Benacquisto Action and the Mork Action were consolidated by court order dated June 5, 1997. On or about August 29, 2000, the State Court entered an order consolidating the Thoresen Action with the two previously consolidated cases.

      7.    On August 21, 2000, plaintiffs filed an action in the United States District Court for the District of Minnesota (the "Federal Court"), entitled *Benacquisto v. American Express Financial Corporation, American Express Financial Advisors, American Centurion Life Assurance Company, American Enterprise Life Insurance Company, American Partners Life Insurance Company, IDS Life Insurance Company, and IDS Life Insurance Company of New York et al.,* court file no. 00-1980.

      8.    On September 1, 2000, the Plaintiffs in the consolidated state court actions filed a Consolidated Complaint, which brought together claims asserted in each of the actions as well as certain additional claims. The consolidated action is entitled *Benacquisto v. American Express Financial Corporation, American Express Financial Advisors, American*

*Centurion Life Assurance Company, American Enterprise Life Insurance Company, American Partners Life Insurance Company, IDS Life Insurance Company, and IDS Life Insurance Company of New York*, court file no. 96-18477.

      **3.**      **The Claims and Defenses**

      **a.**      **Plaintiffs' Claims**

      9.      Plaintiffs allege that Defendants knowingly or recklessly engaged in a common course of conduct that misled or otherwise harmed Class Members in connection with the marketing, sale, administration and servicing of their insurance-related products including permanent life insurance policies and deferred annuity contracts, both of which are insurance-related products. Specifically, Plaintiffs allege that the Defendants applied a common course of conduct to Class Members by making "misrepresentations to potential customers in which they overstated the performance of their life insurance policies and their fixed and variable annuities, including misrepresentations regarding: the illustrated account value or cash value of a policy, the interest crediting rate of a policy; the policy's mortality and expense charges and/or cost of insurance, administrative or other charges; the policy's surrender value or rate of return; and the account value of an annuity." *See* Complaint ¶ 23. This course of conduct is alleged to have been applied to all members of the Class in connection with their Policies and Annuities.

      10.      <u>The Replacement Allegations</u>. Plaintiffs allege that Defendants improperly replaced Class Members' existing policies and annuities with Policies and Annuities issued by Defendants. Specifically, Plaintiffs allege that Defendants failed to

disclose that the replacement Policies or Annuities could lose value because of potentially higher fees and/or expenses. *See* Complaint ¶ 35. Plaintiffs also allege that Defendants were aware of and encouraged this replacement practice. *See* Complaint ¶ 37.

11.   <u>Performance Allegations</u>.  Plaintiffs also allege that Defendants improperly sold Policies and Annuities on the basis that interest would accrue on such Policies and Annuities in specified amounts at specified future years. *See* Complaint ¶ 55.

12.   <u>The "Vanishing Premium" Allegations</u>.  Plaintiffs also allege that Defendants sold non-term life insurance Policies based upon policy illustrations and related documents showing that policy premiums would eventually "vanish" and would be paid by accumulated policy value, not by the policy owner. *See* Complaint ¶ 47. Similarly, Plaintiffs allege that Policies were sold on the basis that premiums would not rise above certain "target" amounts. *Id*.

13.   <u>The Investment Plan Allegations</u>.  Plaintiffs also allege that Defendants used presentations and materials to sell Policies as investment products and not as insurance. *See* Complaint ¶ 56. Plaintiffs further allege that Defendants "concealed" the "insurance coverage aspect of how the purchaser's monies were to be used." *Id*. Plaintiffs allege that Defendants sold Policies as "investments comparable to mutual funds, savings plans and securities" which were alleged to be more attractive to "potential customer[s]." *Id*.

14.   <u>The Qualified Plan Allegations</u>.  Plaintiffs also allege that Defendants deceptively promoted "the insurance features of deferred annuities used to fund qualified plans." *See* Complaint ¶ 76. Plaintiffs further assert that Defendants failed to disclose

material facts about the tax-deferral aspects of deferred annuities used in connection with qualified plans or arrangements, and the costs associated with such products. *See* Complaint ¶¶ 86, 88.

15.   <u>Senior Sales</u>. Plaintiffs also assert that Defendants trained their agents to sell Annuities to the "senior market." *See* Complaint ¶ 93. Plaintiffs allege that this was improper because "senior citizens are not good candidates to purchase annuities . . . ." *Id.* According to Plaintiffs, this is due, in part, to the fact that "senior citizens often have emergency needs for liquidity for which . . . deferred annuities . . . are ill-suited . . . ." *Id.*

**b.   Defendants' Defenses**

16.   Defendants do not admit liability, and they regard their defenses as strong. Were this litigation to proceed to trial, there is no doubt Defendants would mount a vigorous defense. Defendants have raised the following defenses, among others:

(i)    Defendants did not use the so-called "vanishing premium" concept or otherwise make misleading representations regarding premium payments;

(ii)   Defendants made significant disclosures regarding the advantages and disadvantages of "internal replacements" (*i.e.*, replacing an existing policy or annuity with a new policy or annuity issued by the same company);

(iii)  Disclosures were made advising of the relative merits of using existing policy values to fund the purchase of new insurance policies or annuities;

(iv)   Defendants actively monitor and discourage advisors from selling replacement policies and annuities that do not benefit customers. The one internal replacement program that Defendants undertook included substantial disclosures and left the replacing contract owner in a better position;

(v)    Disclosures were made that the policies being purchased were life insurance and that cash values would not accumulate in a life insurance policy at a rate at which it would accumulate in other investment vehicles;

(vi)     Plaintiffs' breach of contract claims are barred by the parol evidence rule
         because they are contradicted by the unambiguous language of the policies and
         annuities;

(vii)    Many of plaintiffs' claims are barred by the applicable statutes of limitation;

(viii)   Defendants prohibited their advisors from engaging in improper sales practices
         and had training and supervision programs to prevent advisors from improperly
         selling life insurance;

(ix)     Defendants did not artificially inflate credited interest rates to sell policies, or
         artificially reduce credited interest rates on policies already sold. All of its
         interest crediting practices were based on actuarially sound principles.
         Throughout the Class Period, Defendants required that its illustrations be
         accompanied by disclosures that explicitly warned prospective policyowners that
         credited interest rates were not guaranteed;

(x)      Defendants' illustrations do not contain "inflated" or "unreasonable" interest
         rate projections because they do not, and do not purport to, project interest rates
         at all. Rather, they illustrate the current interest rates on the product continued
         into the future. This use of current scales is not only an appropriate way of
         avoiding the types of misleading statements plaintiffs attribute to Defendants,
         but is also approved by state insurance regulations;[2]

(xi)     Plaintiffs' allegation that the sale of individual annuities into a qualified plan
         causes an unnecessary "double dose" of tax deferral is based on a faulty
         premise, because the annuity purchase *is* the transaction that provides the tax
         deferral through the purchase of an Individual Retirement Annuity (a separate
         investment product different from the more commonly known "Individual
         Retirement Account," or "IRA") or a Tax-Sheltered Annuity;

(xii)    Congress expressly contemplated that qualified annuities were appropriate when
         it provided for them as separate investment products in sections 408(b) and
         403(b) of the Internal Revenue Code;

(xiii)   Qualified annuities have many valuable features irrespective of tax deferral,
         including the annuitization pay-out option and the guaranteed death benefit,

---

[2]      *See, e.g.,* NAIC Model Regulation Service, *Rules Governing the Advertising of
Life Insurance* § 5(o)(2), at 570-75 (Apr. 1995) ("[i]f nonguaranteed policy elements are
illustrated, they must be based on the insurer's current scale").

making them a suitable investment for particular customers depending on their individual retirement goals and risk tolerances;

(xiv)   Defendants fully disclosed the costs associated with annuities in applications, contracts and prospectuses, including substantial disclosures of surrender charges and surrender periods;

(xv)   Defendants' advisors were well-trained to explain the tax consequences upon the withdrawal of funds from an annuity and the relative advantages of purchasing an annuity versus other products;

(xvi)   Annuities include features that many older purchasers value, including annuitization, the ability to control distributions, the ability to withdraw ten percent of funds annually without incurring a surrender charge, a nursing home waiver of surrender charges, and for fixed annuities, initial rates that are often higher than those offered on CD's;

(xvii)   Defendants have never "targeted" senior citizens for the sale of annuities, and often cut commissions on certain sales to the elderly.

Def. Mem. at 19-21.

17.   The Court need not and does not address the merits of the parties' claims and defenses for purposes of ruling on the settlement. *See Grunin v. International House of Pancakes*, 513 F.2d 114, 123 (8th Cir. 1975); *In re Employee Benefit Plans Sec. Litig.*, No. 3-92-708, 1993 U.S. Dist. LEXIS 21226, at *15 (D. Minn. June 2, 1993); *Holden v. Burlington N., Inc.*, 665 F. Supp. 1398, 1407 (D. Minn. 1987). Accordingly, this decision does not constitute a finding of liability or no liability, but rather approves the parties' compromise of their claims and defenses.

**4.    The Settlement Negotiations and Preliminary Approval**

18.    Settlement negotiations in this litigation spanned the course of three years and involved substantial discussion of the parties' claims and defenses as well as substantial input from actuarial experts on both sides.  *See* Affirmation of Charles C. Platt ("Platt Aff.") ¶ 7; Affidavit of Melvyn Weiss ("Weiss Aff.") ¶¶ 21-22.

19.    During the course of the settlement negotiations, Class Counsel and their professional consultants conducted a thorough examination of the relevant facts.  Among other things, Class Counsel reviewed approximately 350,000 pages of documents produced by Defendants.  Class Counsel took the depositions of numerous of Defendants' officers, employees and sales representatives.  Class Counsel also obtained and reviewed informal discovery provided by Defendants.  *See* Platt Aff. ¶ 8; Weiss Aff. ¶¶ 19, 22.

20.    In 1997, the parties, through their respective counsel, entered into preliminary discussions to explore a possible settlement.  These discussions were prompted by the parties' desire to avoid the expense, uncertainties and burden of protracted litigation, and to put to rest any and all claims or causes of actions that have been, or could have been, asserted against the Defendants in the litigation by the Plaintiffs and/or other members of the putative class.  Settlement negotiations began in or about the fall of 1997 and continued through the summer and fall of 2000.  The negotiations were frequently contentious and difficult in nature.  *See* Platt Aff. ¶ 10; Weiss Aff. ¶¶ 21, 25.

21.    On September 18, 2000, the parties executed the Settlement Agreement.

22.    The Court finds that negotiations were conducted at arm's length and that the Settlement was the result of zealous advocacy on both sides.

23.    On September 18, 2000, the State Court and the Federal Court, sitting together, were presented with the executed Settlement Agreement.

24.    On October 2, 2000, the Courts each entered a joint order preliminarily certifying the Class for purposes of settlement and preliminarily approving the settlement. *See* Findings and Order Conditionally Certifying a Class for Settlement Purposes, Preliminarily Approving the Class Settlement, Directing the Issuance of a Class Notice to the Class and Scheduling a Fairness Hearing (the "Hearing Order"). In the Hearing Order, the Courts found that the settlement was "within the range of possible approval, and therefore is preliminarily approved and sufficient to warrant sending notice to the Class." *Id.* at ¶ 5. Also in the Hearing Order, the Courts appointed the law firms of Milberg Weiss Bershad Hynes & Lerach LLP and Lockridge Grindal Nauen, P.L.L.P as Co-Class Counsel ("Class Counsel"), and appointed Milberg Weiss Bershad Hynes & Lerach LLP as Lead Counsel. *Id.* at ¶ 4. The Courts authorized the Defendants to retain "one or more third-party administrators to implement the terms of the Settlement Agreement . . ." and authorized Class Counsel to retain the Claim Evaluator. *Id.* at ¶ 9. Furthermore, the form of the Class Notice Package, Publication Notice and the notice methodology were approved, *id.* at ¶ 7, and the Fairness Hearing was scheduled for March 6, 2001. *Id.* at ¶ 6.

5.     **The Class**

25.     The Class includes (A) All persons or entities who, as of the Eligibility

Date, have or had (i) an ownership interest in a cash value life insurance policy issued by IDS

Life Insurance Company ("IDS") or IDS Life Insurance Company of New York ("IDSNY")

pursuant to an individual sale in the United States, including its territories and

commonwealths, issued at any time during the Class Period; or (ii) an ownership interest in an

individual deferred annuity contract or a participation interest in a Group Qualified Annuity

issued by IDS, IDSNY, American Centurion Life Assurance Company, American Enterprise

Life Insurance Company or American Partners Life Insurance Company in the United States,

including its territories and commonwealths, that was in force at any time during the Class

Period; and (B) all Qualified Plans and Qualified Plan Representatives that purchased, owned,

held or had any interest with respect to any Group Qualified Annuity.  The Class does not

include (i) any present officer, any former officer of grade 50 and above, or equivalent, or any

financial advisor of Defendants; or (ii) any insurance company that owns or owned a Policy or

Annuity pursuant to an absolute assignment effected as part of an exchange under Section 1035

of the Internal Revenue Code.  Notwithstanding the foregoing, the Class shall not include

(unless and to the extent such persons or entities are Class Members by virtue of their

ownership interest in another Policy or Annuity) the following:  (i) any persons or entities who

make a timely election to be excluded from the proposed Class with respect to a particular

Policy or Annuity otherwise included within the Class; (ii) any persons or entities who have an

ownership interest in (a) a Policy that was terminated prior to the Eligibility Date due to the

death of the insured and on which death benefits were paid; (b) an Annuity that was terminated prior to the Eligibility Date by reason of the death of the annuitant; (c) a Policy or Annuity that was issued, but not accepted or funded, or was returned to the issuer, as part of the exercise of a free look provision in the Policy or Annuity; (d) a Policy or Annuity that was rescinded as part of a reissue of a new life insurance policy or annuity contract, or because of a material misrepresentation on a Policy or Annuity application, or where the Policy or Annuity was rescinded and the premiums or other monies paid were returned to the Policy or Annuity owner; (e) a Policy or Annuity that is the subject of a release signed by any person or entity while represented by counsel settling a claim or dispute and releasing the issuer from any further liability concerning such Policy or Annuity; (f) a life insurance policy that was a term life insurance policy or graded premium whole life insurance policy; (g) an annuity contract that was settled (*i.e.*, annuitized) prior to the inception of the Class Period; or (h) an annuity contract that was issued as an immediate annuity.

26.    The Class consists of approximately 2,016,000 Class Members, who collectively own or owned approximately 2,800,000 Policies and Annuities.  *See* Affidavit of Jeffrey Dahl ("Dahl Aff."), ¶ 12.

27.    Based on the record before the Court, the members of the Class have similar interests in seeking recovery for the alleged harms asserted against the Defendants. From this record it appears that the common questions of law and fact affecting the Class will predominate over individual issues of particular Class Members.

**6.     The Settlement Relief**

28.     The Settlement Agreement provides for three types of settlement relief: General Relief, the Claim Review Process, and Internal Replacement Relief.  The General Relief is automatically available to all Class Members who do not choose a different type of relief, and requires no further action by Class Members.  Internal Replacement Relief, as discussed below, is available for some Class Members who replaced policies during the Class Period.  Class Members who are eligible for Internal Replacement Relief received notification of their eligibility in their individualized Class Notice Packages.  The Claim Review Process is available to all Class Members, and is intended for those who believe that they were misled or otherwise harmed and who wish to have their claim reviewed individually by the Claim Evaluator appointed by Class Counsel.

**a.     General Relief**

29.     The General Relief consists of Accidental Death Benefit coverage, which is insurance coverage that will protect Class Members against the risk of accidental death.  The General Relief will automatically be provided to all Class Members who do not elect the Claim Review Process or Internal Replacement Relief discussed *infra*.  Class Members are not required to take any action or to purchase anything to obtain the General Relief.  Class Members are also not required to demonstrate that they were misled or harmed in order to receive the General Relief.

30.     The General Relief is coverage separate from and in addition to any coverage a Class Member might have through his or her Class Policy or Annuity.  The amount

of General Relief coverage that a Class Member receives varies based upon an actuarial calculation which takes into account such factors as the amount paid into the Annuity, the face amount of the Policy, and the attained age of the contract owner. *See* Analysis of Benefits Made Available by the Proposed Settlement in *Benacquisto, et al. v. American Express Financial Corporation, et al.*, dated February 26, 2001 ("Analysis of Benefits") (Exhibit A to Affidavit of Marc Giguere, sworn to February 26, 2001) at p. 11; Affidavit of Actuary Terry Long ("Long Aff."), ¶ 37. Each Class Member received as part of the Class Notice Package an individualized statement of the minimum face amount of such coverage available under the settlement. The face amount listed was calculated on the assumption that every Class Member would receive the General Relief. That face amount will be increased to account for persons who do not receive the General Relief (*e.g.*, through electing and receiving another remedy or excluding themselves from the Class) or for unused monies from the Claim Review Process as provided in the Settlement Agreement. The individualized statement also contained an indication of the payee on the coverage (usually the Policy or Annuity owner) and the person whose life measures the availability of a claim (usually the insured or the annuitant). The Class Member is permitted to designate an alternate payee. *See* Dahl Aff., Ex. A.

31.    The coverage provided through the General Relief will begin on the Implementation Date, which is defined in the Settlement Agreement as a date no more than 30 days after the approval of the settlement is final and there remains no opportunity to appeal. Settlement Agreement §§ II.49 and V.A.1. The coverage will continue for up to three years.

Each Class Member was provided with his or her specific period of coverage in his or her Class Notice Package.

32.     The General Relief is designed to address the harm allegedly experienced by all Class Members, and to otherwise provide a benefit for those Class Members who, for whatever reason, do not wish to pursue a Claim in the Claim Review Process or, if eligible, elect Internal Replacement Relief. Even if a Class Member feels he or she was not misled, he or she can still participate in the settlement by simply doing nothing and receiving the General Relief automatically.

33.     Defendants are required under the Settlement Agreement to conduct yearly research with respect to all terminated Policies and Annuities to determine whether persons covered by the Accidental Death Benefit have died. Where such deaths are discovered, Defendants will provide a notice of the potential availability of benefits.

34.     The General Relief has a value to the Class of $100 million.[3] The parties have valued the General Relief by reference to the price at which Class Members could purchase similar coverage in the marketplace. *See* Analysis of Benefits at p. 11; Long Aff. ¶ 43. This is a well-established methodology that has been employed in similar settlements. *See, e.g., Snell v. Allianz Life Ins. Co. of N. Am.,* Civ. No. 97-2784, 2000 U.S. Dist. LEXIS 13611, *15-16 (D. Minn. Sept. 8, 2000). Other courts have recognized that the value of a settlement should be measured by its benefit to the class, rather than by its cost to the defendant. *See In re Prudential Ins. Co. of Am. Sales Pracs. Litig.,* 962 F. Supp. 450, 557

---

[3]     This value is determined as of January 1, 2001. *See* Analysis of Benefits at 12.

(D.N.J. 1997) ("*Prudential I*") (holding that the value of the relief to the Class is what matters and rejecting objection that the relief provided had no value), *aff'd sub nom.*, *Krell v. Prudential Ins. Co. of Am.,* 148 F.3d 283 (3d. Cir. 1998) ("*Prudential II*"), *cert. denied*, 525 U.S. 1114 (1999); *Duhaime v. John Hancock Mut. Life Ins. Co.*, 177 F.R.D. 54, 71 (D. Mass. 1997) (rejecting an objection that the settlement did not sufficiently "punish" John Hancock, and holding "[t]he value of a settlement should not be measured by its cost to the defendant, but by its benefit to the class"), *aff'd*, 183 F.3d 1 (1st Cir. 1999).  This Court finds that the General Relief provides substantial value to the Class.

**b.**   **The Claim Review Process**

35.   The Settlement Agreement provides for the establishment of a funded, streamlined Claim Review Process.  Any Class Member who believes that he or she was misled or otherwise harmed in the marketing, sale, administration or servicing of a Policy or Annuity may elect the Claim Review Process and submit a claim which will be reviewed and scored and will have an award assigned in accordance with the strength of the claim.

36.   The Claim Review Process is available to Class Members without cost. The process is straightforward, and Class Members will not need to retain separate counsel, though they are free to enlist the services of separately-retained counsel for purposes of completing the Claim Form.

37.   The Claim Review Process will be administered by a Claim Evaluator chosen by Class Counsel.  Class Counsel informed the Courts at the Fairness Hearing that Chris Seeger, Esq., will be the Claim Evaluator.  Class Counsel represented that Mr. Seeger

and his staff are highly experienced in this type of work and have earned accolades from both plaintiffs and defendants in similar actions. Because the Claim Evaluator is selected and managed by Class Counsel, it is expected that the Claim Evaluator will resolve close questions in favor of Class Members, whereas a neutral evaluator, or one selected by the Defendants, might resolve such close questions differently.

38.     While Defendants will provide information from their files for each Claim filed, they will not take part in the evaluation of the merits of a Claim submitted in the Claim Review Process.

39.     Class Members who elected the Claim Review Process will be sent a simple and straightforward Claim Form (Exhibit H to the Settlement Agreement) on which to describe their claims in their own words, subject to penalty for perjury. They are also asked to submit any documentation relating to their claims and their Policies or Annuities.

40.     Thirty days before the deadline for submitting Claim Forms, Defendants will send a reminder mailing to those persons who properly elected the Claim Review Process but have not yet sent in completed Claim Forms. If a Class Member fails to submit a timely Claim Form, he or she will be provided with the General Relief.

41.     Once a timely Claim Form is received, the Defendants will then compile objective information from their files relating to the Policy or Annuity at issue, including, among other things, the application file, transaction history, complaint history and, to the extent it is maintained in electronic form, the disciplinary history of the advisor who made the sale. The information provided to the Claim Evaluator will include the Policy or Annuity

owner's name, current address and social security number. Class Members who participate in the Claim Review Process will be informed by letter accompanying the Claim Form that the information is being provided to the Claim Evaluator solely for the purpose of evaluating Claims in the Claim Review Process and that the Claim cannot be processed without the information.

42.     Based on the information provided, the Claim Evaluator will determine whether a Claim falls within one of the seven specific claim categories provided for in the Settlement (*i.e.*, Replacement Claims; Performance Claims; Life Insurance Accelerated Payment Claims; Life Insurance Savings and Retirement Misrepresentation Claims; Qualified Annuity Misrepresentation Claims; Annuity Tax Consequence Misrepresentation Claims; or Annuity Age Misrepresentation Claims), or within the Other Marketing, Sales, Administration and Servicing Claims category. Class Counsel has indicated that, after their review of the discovery in this action, they expect that nearly all Claims will fit within the seven specific categories. The last category is designed to capture those few claims that do not fall within the seven specific claim categories. It thus provides the flexibility of entertaining other Claims. *See Prudential II*, 148 F.3d at 328.

43.     The Claim Evaluator will then evaluate each Claim and determine a score of "0" through "3" (or, for Life Insurance Accelerated Payment Claims only, a score of "0" through "4") for that Claim. In scoring the Claim, the Claim Evaluator will apply the scoring standards set forth in the Settlement Agreement at Exhibit A. Those standards provide

appropriate criteria for scoring claims in the Claim Review Process because they permit persons with stronger claims to achieve higher scores and thus larger awards.

44.     Depending on the score a Claim achieves, the Claim Evaluator will determine the Claimant's award.  For Claimants who score a "2", "3", or "4", the amount of the award will be determined in accordance with the Relief Tables contained in the appendix, which is part of the Settlement Agreement.  These Relief Tables are in tabular form and provide for certain levels of relief in accordance with the claim category, the claim score, the type of Policy or Annuity, and other relevant information.  The Relief Tables are set up in such a way that one award amount is listed for a particular Policy or Annuity in each applicable claim category and for each score level of "2", "3" or "4".  The Relief Tables were compiled with the substantial assistance of the parties' actuarial experts.  Awards to Class Members whose Policies or Annuities are in-force will be added to the cash value of the Policy or Annuity.  Awards to Class Members whose Policies or Annuities are terminated shall be in the form of a cash payment.  A score of "1" entitles the Claimant to the General Relief.  A score of "0" is limited to the extreme situation where the Claim is contradicted by the documentation submitted to the Claim Evaluator or, in the Claim Evaluator's discretion, merits such a score.  The parties have represented to the Court that they expect very few Claims to receive a 0 score.

45.     A score of "4" in the accelerated payment category represents an award intended to equal full compensation for Claimants who were promised in writing a "paid-up" policy.  The award for a score of "3" is intended to equal full compensation for all other

claims. The award for a score of "2" is 50% of the award for a score of "3". These awards were calculated without taking an offset for attorneys' fees and other expenses that would likely have to be paid if Claimants were to pursue their claims individually in court.

46.     Once Claims are scored and relief is determined, Class Members will receive an award notification letter in the mail. *See* Settlement Agreement at Ex. J. This letter provides Class Members with a statement of their award and the type and amount of relief that they will receive. If a check is enclosed with the award letter, the amount of that check will be so stated. The letter will also provide Class Members with a toll-free telephone number to call if they have any questions or are dissatisfied with their awards. *See id.*

47.     The relief made available to Class Members through the Claim Review Process is funded by Defendants through an $85 million Claim Review Relief Fund. *See* Settlement Agreement, § VIII.A. Beginning 10 days after the last date of entry of the Final Order and Judgment in this litigation, interest shall accrue on the $85 million Claim Review Relief Fund. *See id.* The interest will first be applied to the Claim Evaluator Fees and Expenses, if any, above the amounts already to be paid by Defendants according to Section VII.E of the Settlement Agreement; the interest that accrues will then be applied to the Claim Review Relief Fund itself. *See id.*

48.     The provision of this streamlined process for assessing the Claims of Class Members is a substantial benefit to the Class. As part of this process, the Defendants have waived several significant defenses, such as statute of limitations defenses, and thus eliminated legal hurdles that Claimants would otherwise face. The Defendants will not seek to

argue against awards to Claimants, but will simply provide objective, previously existing information from their files that will permit the Claim Evaluator to perform his duties. The Defendants also will not solicit statements from the advisors or sales agents who sold the Policies and Annuities at issue. In addition, this streamlined Claim Review Process results in Class Members receiving their individual awards much sooner than they would have had they filed individual lawsuits with the Courts.

49.     As of February 22, 2001, Class Members validly elected the Claim Review Process for 67,846 Policies and Annuities. *See* Dahl Aff. ¶ 60. Based on this number of elections, it is anticipated by the parties' actuaries that once all claims are scored in the Claim Review Process, there will be money remaining from the $85 million plus interest. *See* Analysis of Benefits at pp. 26-27; Long Aff. ¶ 24. Accordingly, it is not anticipated that any Claimants will have their awards in the Claim Review Process reduced to a pro rata share.

50.     Unused monies from the Claim Review Relief Fund will be distributed as follows: (i) if the unused monies are less than or equal to $2 million, they will be used to increase proportionately the awards in the Claim Review Process; (ii) if unused monies exceed $2 million, they will first be applied to provide Accidental Death Benefit coverage to Class Members receiving the Internal Replacement Relief, up to the amounts that such Class Members would have received if they were to receive General Relief in the first place. Any remaining unused monies will be allocated among the three types of relief provided for under the Settlement Agreement, with persons who receive awards in the Claim Review Process being provided with increased awards, and persons receiving General Relief or Internal

Replacement Relief being provided with additional Accidental Death Benefit coverage. The additional Accidental Death Benefit coverage will be equal to the amount of such coverage that can be purchased with the available funds at the actuarially determined cost of providing such coverage, as distinguished from the price at which Class Members could purchase such coverage in the open market. *See* Settlement Agreement, Ex. A, pp. 17-18; Transcript of Fairness Hearing (hereinafter "Tr."), pp. 52-55.

51.   Settlements with programs such as the Claim Review Process here have consistently been approved by courts across the country. *See Snell v. Allianz*, 2000 U.S. Dist. LEXIS 13611, at *15-21; *Manners v. American Gen. Life Ins. Co.,* No. 3-98-0266, slip op. at 20-21 (M.D. Tenn. June 21, 1999); *In re Manufacturers Life Ins. Co. Premium Litig.*, MDL No. 1109, Master File No. 96-CV-230, slip op. at 11-12 (S.D. Cal. Dec. 21, 1998); *Elkins v. Equitable Life Ins. Co. of Iowa*, No. 96-296-CIV-T-17B, 1998 U.S. Dist. LEXIS 1557, *21-28 (M.D. Fla. Jan. 28, 1998); *Duhaime*, 177 F.R.D. at 65-67; *Prudential I*, 962 F. Supp. at 488-90; *Natal v. Transamerica Occidental Life Ins. Co.*, No. 694829, slip op. at 14-16 (Cal. Sup. Ct. July 28, 1997); *Michels v. Phoenix Home Life Mut. Ins. Co.*, No. 5318-95, 1997 N.Y. Misc. LEXIS 171, *21-24 (Sup. Ct. Jan. 3, 1997); *Willson v. New York Life Ins. Co.*, No. 94/127804, 1995 N.Y. Misc. LEXIS 652, *18-21 (Sup. Ct. Nov. 8, 1995); *see also Prudential II*, 148 F.3d at 295-96. This Court finds that the Claim Review Process here provides substantial value to the Class.

c.     **Internal Replacement Relief**

52.    The Settlement Agreement also provides for the Internal Replacement Relief, which is designed to address the claims of certain Class Members who owned life insurance policies issued by the Defendants and replaced those policies with new life insurance policies also issued by the Defendants.  The persons eligible for this form of relief, numbering approximately 17,500, *see* Dahl Aff. ¶ 8, were identified as those who, based on objective criteria, were arguably misled or harmed by such an internal replacement.  Specifically, Internal Replacement Relief is available to Class Members who, in the context of such an internal replacement, either (a) paid a surrender charge on the old policy; (b) were issued a new policy with a higher underwriting rate class than on the old policy; (c) were issued a new policy with a lower cost of insurance rate band than the old policy; or (d) were issued a new policy that was identical to the original policy.

53.    Class Members were notified by an individualized statement in the Class Notice Package of whether they were eligible to elect the Internal Replacement Relief.[4]  *See* Dahl Aff., Ex. A.  The Class Members eligible for the Internal Replacement Relief were also provided with a special Election Form, which indicated the available choice between the Claim Review Process and the Internal Replacement Relief (as opposed to the default General Relief).  *See* Dahl Aff., Ex. B.

---

[4]      The parties nevertheless notified Class Members in the Class Notice Package that they could call the toll-free number for the class action information center if they were not listed as eligible for the Internal Replacement Relief but believed they fit within its definition.

54.     The relief under the Internal Replacement Relief is available without any showing that the Class Member had a legal claim of being misled or harmed.  The precise form of relief for an eligible Class Member depends upon which category of internal replacement applies.  A Class Member who paid a surrender charge on the old policy, for example, will recover 50% of that charge.  Other forms of Internal Replacement Relief include reinstating the original underwriting rate class going forward, reinstating the original cost of insurance rate band going forward, a one-time bonus of 75 basis points applicable to the cash value that the new policy had at the time of the replacement, or the opportunity to apply for an enhanced policy with favorable underwriting standards.  An eligible Class Member who wished to submit a Claim and possibly achieve a higher level of award could elect the Claim Review Process instead.

55.     Within 90 or 120 days after the Implementation Date, benefits will be made available through the Internal Replacement Relief.  Settlement Agreement § VI.B.1. The Implementation Date is a date no more than 30 days after the settlement is finally approved and there remain no opportunities to appeal.  *Id*. § II.49.

56.     No cap was imposed on the Internal Replacement Relief, and thus, Defendants bore the risk that all or nearly all of the eligible Class Members would elect this option.  If every eligible Class Member had elected this form of relief, the estimated value of this component would have been greater than $126 million.  *See* Analysis of Benefits at p. 32. The parties estimated, however, that the Internal Replacement Relief would not be elected by each eligible Class Member and this remedy would have a value of $30 million.

### 7.     The Release

57.     In consideration of the comprehensive relief described above, the Settlement Agreement provides for a release of claims relating to the marketing, sale, administration and servicing of the policies and annuities subject to this litigation.   The full text of that release is contained in part XII of the Settlement Agreement and was included in the individual notice sent to each Class Member.   *See* Dahl Aff., Ex. A.   This release is common in settlements such as this, and has been approved in similar forms in numerous cases.   *See Manners v. American Gen. Life*, slip op. at 19-20; *Bussie v. Allmerica Fin. Corp.,* 50 F. Supp. 2d 59,  80 (D. Mass. 1999); *Elkins,* 1998 U.S. Dist. LEXIS 1557, at *33; *Duhaime,* 177 F.R.D. at 68; *Natal v. Transamerica*, slip op. at 21-22; *Michels*, 1997 N.Y. Misc. LEXIS 171, at *24; *Willson*, 1995 N.Y. Misc. LEXIS 652, at *23.   This settlement provides substantial value to the Class, and it is appropriate that Defendants receive a broad release as part of this compromise.

### 8.     The Fairness Hearing

58.     On March 6, 2001, the Courts held a hearing regarding the fairness, adequacy and reasonableness of the Settlement (the "Fairness Hearing").

59.     The parties filed extensive memoranda, declarations, affidavits and reports with the Courts prior to the Fairness Hearing.   These submissions included numerous declarations and affidavits from fact and expert witnesses.

60.     The parties' submissions also responded to the 48 objections filed by Class Members or their counsel regarding the settlement.

61.　Defendants' and Plaintiffs' counsel were heard in support of the settlement at the Fairness Hearing.  In addition, objector Steven Creaturo was heard through attorney Clair Carlin; objectors R. Gusky, Lisa Kirby and Carl Margolis were heard through attorney Frank Tomlinson; objectors Roosevelt and Mattie Jones were heard through attorney Kearney Dee Hutsler; objector Richard Morgan was heard through attorney John Pentz; objector Frank Pacinelli was heard through attorney David Paterson; objector Sue Waters Patrick was heard through attorney Stephen Griffis; objector Marion Washburn was heard through attorney Kenneth Nelson; and objector Susan Winsor was heard through attorney Eric Finamore.

**B.　Notice of the Settlement**

62.　In the Hearing Order, the Courts approved the form of the Class Notice Package, the Publication Notice and the notice methodology set forth in the Settlement Agreement.  The Courts found that the Class Notice Package, together with the Publication Notice, was "the best practicable notice . . . reasonably calculated, under the circumstances: to apprise Class Members of the pendency of the Actions and of their right to object to or exclude themselves from the proposed settlement . . . reasonable and constitutes due, adequate and sufficient notice to all persons entitled to receive notice . . . and meets all applicable requirements of law including, . . . Minn. R. Civ. P. 23.03 and Fed. R. Civ. P. 23(c) and the due process requirements of the Minnesota Constitution and the United States Constitution." Hearing Order ¶¶ 7-8.  Based on the findings set forth below, the Court now affirms these conclusions.

63.     The Notice Package is a well-organized document that begins with a recitation of the decisions a Class Member must make and then sets forth the remaining contents of the 20-page description of the Settlement.  Overall, the notice is written in plain English and is clearly divided into useful, relevant sections, including, for example, the following:

- Why You Have Received This Notice

- Description of the Class

- Decisions You Must Make Now

- Description of the Lawsuit and the Settlement Negotiations

- The Benefits of the Proposed Settlement

- Release of Class Members' Claims and Dismissal of Lawsuits

- Instructions for Excluding Yourself from the Class

- Fairness Hearing, Right to Object to Proposed Settlement and Right to Appear

- Attorneys' Fees and Expenses

- How to Get Additional Information.

*See* Dahl Aff. Ex. A.

64.     In accordance with the Hearing Order, the class action Administrator, Rust Consulting, Inc. ("Rust"),[5] caused Class Notice Packages, in the form approved by the Courts, to be mailed to the last known addresses of the more than two million Class Members,

---

[5]     Rust is an organization experienced in administering class action notice programs, including the notice programs in settlements similar to this one.  *See* Dahl Aff. ¶ 4.

by first-class United States mail. *See* Dahl Aff. ¶¶ 13, 18-20. The Class Notice Packages were mailed from October 12, 2000 through December 15, 2000, Dahl Aff. ¶ 20, thus providing many Class Members with substantially longer notice than required by the Courts.[6]

65.   In total, as of February 22, 2001, Rust had mailed or caused to be mailed, 2,124,206 Class Notice Packages to Class Members. *Id*. at ¶ 32. Rust remails notice packages that were returned with a forwarding address. *Id*. ¶ 25.

66.   The Class Notice Package included: (1) a cover letter from Richard Kling, President and CEO of IDS Life Insurance Company; (2) the Notice of Class Action, Proposed Settlement and Fairness Hearing; (3) a Statement of Eligibility, containing basic information about the specific Policy or Annuity subject to the settlement; (4) a Benefit Voucher evidencing the estimated benefits that will be provided automatically to all Class Members who do not choose the Claim Review Process or the Internal Replacement Relief; (5) an Election Form for Class Members to elect the Claim Review Process or, where eligible, the Internal Replacement Relief; (6) a Designation Form for Class Members to change the payee and/or measuring life for the death benefits as provided under the Settlement; (7) a Change of Address Form; (8) a Fact Sheet for Qualified Plans (for Class Notice Packages sent to Qualified Plans); and (9) a Plan Participant Information Sheet (for Class Notice Packages sent to Qualified Plans and participants in Qualified Plans). Dahl Aff. ¶ 7. The Benefit Voucher, Statement of Eligibility Election Form, Designation Form and Change of Address

---

[6]      A small number of notices were mailed after December 15, 2000. Those Class Members had their deadlines extended. *See* Dahl Aff. ¶ 31.

Form were customized for each Policy or Annuity in the database that is subject to the Settlement. *Id.* ¶ 16.

      67.    The Class Notice Package in this case is substantially similar to the notice package considered and approved in numerous other insurance sales practices settlements around the country. *See, e.g., Prudential II*, 148 F.3d at 306 ("the provision of individual notice to each class member is by no means typical of the notice provided in most class actions, and certainly qualifies as unprecedented."); *Duhaime*, 177 F.R.D. at 60-62. Similarly, the dissemination of the notice in this case -- by first class mail to Class Members at their last known address -- more than satisfies the requirement established by Rule 23(c) of "individual notice to all members who can be identified through reasonable effort." Fed. R. Civ. P. 23(c)(2); *see, e.g., In re Beef Indus. Antitrust Litig.*, 607 F.2d 167, 178-79 (5th Cir. 1979).

      68.    As required by the Hearing Order, the Publication Notice was published on December 4-5, 2000 in the national editions of The New York Times, The Wall Street Journal, and USA Today, as well as in The Star-Tribune (Minneapolis) and in the newspaper with the highest circulation in each of the 50 states and in the District of Columbia and Puerto Rico. *See* Dahl Aff. at ¶¶ 33-34. In addition, the Publication Notice was posted on the American Express web page and the web pages for Class Counsel.

      69.    The Publication Notice included, among other things: (i) the case caption; (ii) a description of the Class; (iii) a brief description of the proposed settlement; (iv) identification of Class Counsel; (v) the date and time of the Fairness Hearing;

(vi) information about and the deadline for filing objections to the settlement; (vii) information about and the deadline for filing for exclusion; (viii) the consequences of requesting exclusion; (ix) the consequences of remaining in the Class; (x) a description of the Release; (xi) a description of the preliminary injunction issued by the Courts; (xii) a description of the Defendants' responsibility for Class Counsels' attorneys' fees and expenses; and (xiii) the procedure for obtaining additional information, including a toll-free telephone number regarding how Class Members could obtain an individual Class Notice Package.

70.     The Court finds that the Publication Notice is a clear and comprehensive summary of the proposed settlement that gave Class Members detailed and accurate information about the lawsuit, the terms of the settlement and about available options.

71.     At the direction of the parties, Rust established the IDS Class Action Information Center, which consisted of a telephone bank with toll-free telephone numbers to answer questions about the Settlement Agreement and this litigation.  *See* Dahl Aff. ¶¶ 36-38. Rust hired approximately 175 operators and 25 supervisors to work on this telephone bank. *Id*. at ¶ 39.  Rust, along with Defendants' representatives and Class Counsel, extensively trained these individuals on life insurance and annuity products and sales concepts, the background of this litigation, the details of the proposed Settlement, the systems permitting access to policy and contract information, the appropriate manner in which to respond to Class Member telephone inquiries and the extensive telephone scripts with questions and answers carefully prepared by counsel for both parties to answer questions from Class Members. *Id*. at ¶¶ 40-42.  This training was monitored by Class Counsel at all times. *Id*. at 40.

72.     The toll-free number for the IDS Class Action Information Center was included in both the notice that was mailed to Class Members and the notice that was published in newspapers around the country and posted on the Internet.  *Id.* at ¶ 37.  Between October 13, 2000 and February 22, 2001, the telephone bank received approximately 184,246 calls on the toll-free numbers designated for Policy and Annuity owner calls.  *Id.* at ¶ 52.  Class Counsel were present at the telephone bank throughout this period and monitored and responded to numerous telephone calls.  *Id.* at ¶¶ 49, 50.  Class Counsel spoke with more than 21,000 Class Members and monitored over 7,600 other calls.  *See* Reply Affidavit of Melvyn I. Weiss ("Weiss Reply Aff."), ¶ 7.

73.     The notice program clearly conveyed to Class Members that they had to make certain choices with respect to the Settlement.  It also clearly informed them of the deadline of January 29, 2001 for opting out of the Class, electing remedies within the Class, and submitting objections to the settlement.  The notice program also clearly informed Class Members of the procedures for taking each of these actions.  For example, Class Members were informed that, to exclude themselves from the Class with respect to a particular Policy or Annuity, they must follow the simple and straightforward procedure of sending a letter to a specified address and stating in such letter their name, address, telephone number, policy or annuity number(s) for which they request exclusion and a statement that the Class Member wishes to be excluded with respect to those Policies and/or Annuities.

74.     The notice program also clearly informed Class Members of the value of the settlement.  In the Class Notice Package and the Publication Notice, the settlement relief

(excluding attorneys' fees, expenses and other costs ordinarily borne by the Class) was described as having an estimated value of $215 million. In addition, both the Class Notice Package and the Publication clearly set forth the guaranteed $85 million value of the Claim Review Process and the $100 million guaranteed value of the General Relief.

75.     Valid requests for exclusion were submitted for approximately 16,000 Policies and Annuities, representing less than sixth-tenths of one percent of the 2.8 million Policies and Annuities covered by the Class.[7]

76.     A total of 48 persons, or 0.00238% of the more than two million Class Members, filed objections to the settlement. Forty-eight is actually an overstatement of the number of objectors here, for it includes persons who (i) excluded themselves from the Class and thus lack standing to object; (ii) stated no basis for their objections; (iii) subsequently informed Class Counsel that they were withdrawing their objections; and (iv) were not Class Members at all. Sixteen of the objections (Donna Alford, John Benkert, Lawrence Calhoun, Ruth Casey, Blanche Haugland, Betty Jaques, the Donald D. Jones Revocable Trust, Marilou Kelly, David Krumpe, Joseph Nardello, William O'Connell, Jean Osgood, Lois Racine, Peggy Robinson, John and Janet Sargent, and Jill Thacker) fit within these categories.

77.     One Class Member, a columnist for the publication *Business Insurance* and self-proclaimed critic of most class action settlements, wrote a laudatory column about the

---

[7]     On March 21, 2001, the parties jointly submitted to the Courts a list of 15,311 Policies and Annuities whose owners validly excluded themselves from the Class. The parties also informed the Courts that requests for exclusion with respect to 959 additional Policies and Annuities were subject to "cure" letters from the Administrator and that the parties will supplement their submission once those outstanding issues are resolved.

settlement entitled "One Class Action Too Hard to Pass Up." She concluded that she was provided with useful information and substantial relief. *See* Weiss Reply Aff., Ex. A.

## II.   CONCLUSIONS OF LAW

### A.   Jurisdiction

78.   This Court has subject matter jurisdiction based on federal question jurisdiction pursuant to 28 U.S.C. § 1331 (2000). Plaintiffs assert, among other things, violations of 15 U.S.C. § 1601, *et. seq.*, and 18 U.S.C. § 1961, *et. seq. See Hamm v. Rhone-Poulenc Rorer Pharm., Inc.*, 187 F.3d 941, 945 (8th Cir. 1999), *cert. denied*, 528 U.S. 1117 (2000) (district court has federal subject matter jurisdiction based on alleged violations of 18 U.S.C. § 1961, *et. seq.*); *Alumax Mill Prods., Inc. v. Congress Fin. Corp.*, 912 F.2d 996, 1002-03 (8th Cir. 1990) (same). In addition, the existence of federal subject matter jurisdiction authorizes this Court to exercise supplemental jurisdiction under 28 U.S.C. § 1367(a) over Plaintiffs' state law claims. *Hamm*, 187 F.3d at 945 (where subject matter jurisdiction over claims under 18 U.S.C. § 1961, *et. seq.*, district court has supplemental jurisdiction over state law claims); *Alumax*, 912 F.2d at 1003 (same).

79.   This Court has personal jurisdiction over the named plaintiffs who are parties to this class action and have agreed to serve as representatives for the Class. In addition, the Court has personal jurisdiction over all Class Members because, as discussed in section D. below, those Class Members have been given notice, an opportunity to be heard, and an opportunity to exclude themselves from the Class. *Phillips Petroleum Co. v. Shutts*, 472 U.S. 797, 811-12 (1985); *accord White v. NFL*, 41 F.3d 402, 407-08 (8th Cir. 1994); *In*

*re Prudential II*, 148 F.3d 283. The Court therefore finds that all Class Members who did not request exclusion from the Class by the applicable deadlines are subject to this Court's personal jurisdiction. *See In re Metropolitan Life Ins. Co.*, MDL No. 1091, Misc. Docket No. 96-179, slip op. at 27 (W.D. Pa. Dec. 28, 1999) (citing *Shutts,* 472 U.S. at 812-13).

**B.      Motions to Intervene and Complaints in Intervention**

80.      In late January, 2001, five sets of objectors (Roosevelt and Mattie Jones, Jack Miller, Richard E. Morgan, Jr., Sue Waters Patrick and Marion Washburn) moved to intervene. On March 2, 2001, another Class Member (Frank Pacinelli) also filed a motion to intervene. On March 20, 2001, Susan Winsor filed a motion to intervene "*nunc pro tunc.*" The Joneses, Miller and Patrick each submitted complaints in intervention; the other proposed intervenors did not. Dr. Morgan submitted only a one-page motion to intervene. The proposed intervenors variously seek to reopen discovery, vacate the conditionally approved Settlement Agreement, hold a hearing on class certification and proceed with litigation against Defendants.

81.      Intervention may be accomplished in one of two ways, as of right or with the permission of the Court. Both methods of intervention are discussed below.

**1.      Intervention as of Right**

82.      Intervention as of right pursuant to Fed. R. Civ. P. 24(a) is authorized only when the party seeking intervention establishes each of the following requirements:

(i)      the party has an interest in the subject matter of the litigation;

(ii)      the party's ability to protect that interest might be impaired or impeded by the disposition of the case;

(iii)   the interest will not be adequately represented by the existing parties; and

(iv)   the application to intervene is timely.

*See Standard Heating & Air Conditioning Co. v. City of Minneapolis*, 137 F.3d 567, 570-71

(8th Cir. 1998); *Jenkins v. Missouri*, 78 F.3d 1270, 1274 (8th Cir. 1996).[8]

83.   The Court assumes that intervenors, as Class Members, have an interest in the subject matter of the litigation.  None of proposed intervenors other than Mr. Pacinelli, however, has provided any individual facts beyond stating their membership in the Class.  Mr. Pacinelli sought to submit an affidavit relating to his individual circumstances at the Fairness Hearing itself.  The Class Notice adequately informed Class Members that they were required to submit materials by the January 29, 2001 deadline, and Mr. Pacinelli's affidavit is out of time.  In any event, his affidavit and the affidavit of his counsel, which was also handed to the Court at the Fairness Hearing, are not helpful to the Court's determination.  Mr. Pacinelli's affidavit would be more appropriately submitted to the Claim Evaluator in the Claim Review Process.  For each of these reasons, his affidavit and his attorney's affidavit will not be accepted by the Court.

84.   A person cannot intervene as of right if an existing party in the litigation adequately represents his or her interests.  *See Jenkins*, 78 F.3d at 1275.  The Court finds that

---

[8]   The federal rule also authorized intervention upon a timely application when a U.S. statute confers an unconditional right to intervene, Fed. R. Civ. P. 24(a), but that basis for intervention is not at issue here.

proposed intervenors' interests are adequately represented by the existing named Plaintiffs and

Class Counsel, therefore intervention as of right is prohibited.

85.    Where, as here, the proposed intervenors are members of a class already

involved in the litigation, there is a presumption of adequate representation.  *See Jenkins*, 78

F.3d at 1275; *Liddell v. Caldwell*, 546 F.2d 768, 770 (8th Cir. 1976); *Cook v. Powell Buick,*

*Inc.*, 155 F.3d 758, 762 (5th Cir. 1998); *United States v. Franklin Parish Sch. Bd.*, 47 F.3d

755, 757 (5th Cir. 1995); *Morgan v. McDonough*, 726 F.2d 11, 14 (1st Cir. 1984).  To

overcome the presumption of adequate representation, proposed intervenors would have to

show adversity of interest, collusion, or nonfeasance.  *See, e.g., Bradley v. Milliken*, 828 F.2d

1186, 1192 (6th Cir. 1987).

86.    The proposed intervenors here, to the extent they make any arguments of

inadequate representation, dispute the result obtained by Class Counsel and Class Counsel's

motives in that they hope to be compensated for their work.  The Court finds that the concerns

expressed by the proposed intervenors do not overcome the presumption of adequate

representation because differences in opinion as to litigation strategy and the details of

settlement remedies do not overcome the presumption.  *See, e.g., Jenkins,* 78 F.3d at 1275-

76; *Washington Elec. Coop., Inc. v. Massachusetts Mun. Wholesale Elec. Co.*, 922 F.2d 92,

98 (2d Cir. 1990) ("putative intervenor's interest is not inadequately represented merely

because its motive to litigate is different from that of a party to the action"); *Evans v.*

*Buchanan*, 130 F.R.D. 306, 313 (D. Del. 1990) ("fact that Proposed Intervenor would have

made different strategic choices if she controlled the actions of the [class] does not by itself

entitle her to intervene in this lawsuit"); *Pierson v. United States*, 71 F.R.D. 75, 80 (D. Del.

1976) ("A simple difference as to litigation tactics is insufficient" to show inadequacy of

representation). *See also In re NASDAQ Market-Makers Antitrust Litig.*, 187 F.R.D. 465, 491

(S.D.N.Y. 1998) (negotiating a settlement of which proposed intervenor does not approve

does not warrant intervention); *In re Domestic Air Transp. Antitrust Litig.*, 148 F.R.D. 297,

336-37 (N.D. Ga. 1993) (holding presumption of adequate representation not overcome,

noting "The goals of Rule 23 would be defeated if the Court permitted every individual or

entity that objected to discrete aspects of the settlement to intervene.").

      87.    In addition, and as discussed more fully herein, the Court finds that

Class Counsel has adequately represented Class Members, as evidenced by their zealous

advocacy on behalf of Class Members for over four years, and their subordination of their own

pecuniary interests to the interests of the Class by refraining from discussing attorneys' fees

until the other terms of the settlement were in place, and their commitment to continue their

work in seeing the administration of the settlement relief through to its completion even though

their fees will be capped. Class Counsel has also consistently been recognized as providing

adequate representation of class members in numerous similar class actions. *See, e.g., Snell*,

2000 U.S. Dist. LEXIS 13611, at *33 (Class Counsel "have exceptional skill, and expertise,

in such class action matters"); *In re Prudential Ins. Co. of Am. Sales Pracs. Litig.*, 106 F.

Supp. 2d 721, 734 (D.N.J. 2000) ("*Prudential III*") (praising quality of Class Counsel's

representation); *see also Natal v. Transamerica*; *In re Metropolitan Life Ins. Co.*, *supra*.

88.    The proposed intervenors do not suggest that they could or would be able to achieve a better result for the Class than Class Counsel has achieved here.  First, some of the proposed intervenors appear to argue that a class should not be certified.  As such, their interests are antagonistic to those of other Class Members.  Second, Class Counsel has achieved a settlement under which Class Members can recover the full amount of their alleged harms if they choose to pursue the Claim Review Process, automatic coverage if they choose to do nothing, or substantial benefits if they elect the Internal Replacement Relief.

89.    In contrast to the work and results of Class Counsel, the proposed intervenors have done the bare minimum to assert themselves.  Though the Class Notice informed Class Members that they were welcome to review the discovery record in this litigation for purposes of considering their options with respect to the settlement, none of them reviewed that record before the January 29, 2001 deadline.  Only one of proposed intervenors' counsel -- John Pentz, representing Dr. Morgan -- reviewed the record thereafter, which he did two business days before the Fairness Hearing.  A few days before the Fairness Hearing, Mr. Pacinelli's counsel first sought to review the discovery record, but he subsequently withdrew that request.  Several of the proposed intervenors seek to reopen discovery even though they have not reviewed the discovery record compiled by Class Counsel and do not suggest that there were any inadequacies in the substantial discovery conducted to date.  The one attorney who did eventually review these materials stated at the Fairness Hearing that, at least in one respect, "[t]his was a fairly clean company" and "[i]t's not like other companies

that were trying to get business by . . . drastically overstating what their future interest rate performance would be." Tr. at 39-40.

90.     Proposed intervenors have similarly demonstrated a lack of familiarity with the terms of the settlement.  Dr. Morgan, for example, submitted an objection which appears to refer to some other settlement, not this one.  He quotes language that does not appear in the Settlement Agreement here and refers to terms that are not part of the settlement here.  As a further example, Ms. Washburn requests an "improvement" to the settlement that Defendants provide the Claim Evaluator with advisor disciplinary histories, but that information is already being provided under the terms of the Settlement Agreement (at least insofar as it is electronically maintained).

91.     The proposed intervenors have also been provided with adequate opportunities to protect their interests, even if they feel that they have not been adequately represented.  As set forth in the Class Notice, every Class Member was given the opportunity to exclude himself or herself from the Class.  Requesting an exclusion here requires no more than sending a signed letter to the address listed in the Class Notice, indicating the Class Member's name, address, telephone number, policy or annuity number(s) and stating that the Class Member wishes to be excluded for each listed Policy and Annuity.  None of the proposed intervenors availed themselves of this opportunity. *See* Dahl Aff. ¶ 77. *See, e.g.*, *Snell*, 2000 U.S. Dist. LEXIS 13611, at *26-28; *Roberts v. Heim*, No. C-84-8069, 1989 U.S. Dist. LEXIS 19086, at *3 (N.D. Cal. Mar. 30, 1989); *Horton v. Metropolitan Life Ins. Co.*, No. 93-1849-CIV-T-23A, 1994 U.S. Dist. LEXIS 21394, at *23-25 (M.D. Fla. Oct. 25,

1994) (class members who had opportunity to opt-out but instead chose to remain in class and object could not legitimately claim that denial of intervention would prevent them from protecting their rights).

92.     The proposed intervenors did avail themselves of another means by which to protect their interests -- they submitted objections to the settlement. *See, e.g., NASDAQ Market-Makers,* 187 F.R.D. at 491 (disputes as to proposed class action settlement could be adequately addressed through court's consideration of fairness and objections, making intervention unwarranted); *In re Domestic Air Transp. Antitrust Litig.,* 144 F.R.D. 421, 423 (N.D. Ga. 1992) (denial of intervention would not prejudice objectors' ability to protect their interests because objectors had availed themselves of right to object and appear through counsel at fairness hearing); *Officers for Justice v. Civil Service Comm'n,* 473 F. Supp. 801, 829-30 (N.D. Cal. 1979), *aff'd,* 688 F. 2d 615 (9th Cir. 1982); *see also Jenkins,* 78 F.3d at 1275 (no impairment of interests because of other avenues available); *Pieper v. Tri-State Mach. Co.,* No. C2-92-2063, 1993 Minn. App. LEXIS 561, at *7-9 (Minn. Ct. App. June 1, 1993) (affirming denial of intervention as of right because movants had an available alternative to intervention); *Tierney,* 406 N.W.2d at 580 (same). The Court addresses the specific objections below.

93.     The timeliness of a motion to intervene is a matter of discretion for the court. *See NAACP v. New York*, 413 U.S. 345, 365-66 (1973) ("[T]imeliness is to be determined from all the circumstances . . . [and] is to be determined by the court in the exercise of its sound discretion.") (citations omitted); *Sault v. Clearwater Enterprises, Inc.,*

Nos. C6-89-1827, C8-89-1229, CX-89-1829, 1990 Minn. App. LEXIS 160, *3 (Minn. Ct.

App. 1990) (same); *see also Michigan Ass'n for Retarded Citizens v. Smith*, 657 F.2d 102,

105 (6th Cir. 1981) ("The purpose of the [timeliness] inquiry is to prevent a tardy intervenor

from derailing a lawsuit within site of the terminal."); *United States v. BASF-INMONT Corp.*,

819 F. Supp. 601, 607 (E.D. Mich. 1993) (same), *aff'd mem.*, 52 F.3d 326 (6th Cir. 1995).

A motion to intervene as of right is not timely where allowing intervention would result in

substantial prejudice to existing parties. *See Snell*, 2000 U.S. Dist. LEXIS 13611, at *27-30;

*Halverson*, 617 N.W.2d at 450; *Omegon, Inc. v. Minnetonka*, 346 N.W.2d 684 (Minn. Ct.

App. 1984).

       94.    Intervention at this advanced stage of this litigation, which began in

1996, would cause substantial prejudice to Defendants and Class Members. The parties have

expended substantial resources in this litigation and in negotiating a Settlement, and

intervention would serve only to prolong the resolution of the case, require the expenditure of

additional resources to continue the litigation, delay the settlement relief for Class Members,

and potentially jeopardize the parties' hard-fought settlement. *See Campbell v. Hall-Mark*

*Elecs. Corp.*, 808 F.2d 775, 779 (11th Cir. 1987) (intervention would "significantly

prejudice" existing parties because of delay of relief; "[i]ntervention at this point would only

jeopardize a legitimately negotiated, accepted, and approved settlement"); *Bloomington v.*

*Westinghouse Elec. Corp.*, 824 F.2d 531, 535 (7th Cir. 1987) ("Intervention at this time

would render worthless all of the parties' painstaking negotiations because negotiations would

have to begin again and [proposed intervenor] would have to agree to any proposed consent

decree."); *NASDAQ Market-Makers*, 187 F.R.D. at 490-91 (jeopardizing settlement agreement by intervening prejudices existing parties); *United States v. BASF-INMONT Corp.*, 819 F. Supp. at 607 ("[T]he parties will suffer prejudicial delay resulting from the intervention which, naturally, will seek to reexamine issues previously settled in formulating the consent decree."); *Pieper*, 1993 Minn. App. LEXIS 561, at *11 (affirming denial of intervention because intervention at late stages of proceedings would unduly prejudice plaintiff). Here, each of the proposed intervenors waited until the last moment before seeking intervention. Though this litigation began over four years ago, none of them has raised his or her voice until now. In fact, Mr. Pacinelli, though he submitted a timely objection, did not seek to intervene until two business days before the Fairness Hearing, and Ms. Winsor did not seek to intervene until two weeks after the Fairness Hearing. Each of the motions to intervene is untimely and would prejudice the interests of Class Members by either preventing their recovery of relief in this litigation or delaying their receipt of such relief.

### 2.   Permissive Intervention

95.    A court has discretion to allow permissive intervention when the application to intervene is timely and the applicant's claim or defense and the main action share a question of law or fact in common. "In exercising its discretion the court shall consider whether the intervention will unduly delay or prejudice the adjudication of the rights of the original parties." Fed. R. Civ. P. 24(b); *see also United States v. Metropolitan Dist. Comm'n*, 147 F.R.D. 1, 6 (D. Mass. 1993) (court may block permissive intervention "where intervention would unduly delay or prejudice the adjudication of the original parties' rights").