**UNITED STATES DISTRICT COURT**
**DISTRICT OF MINNESOTA**

---

LESA BENACQUISTO, DANIEL BENACQUISTO, RICHARD THORESON, ARNOLD MORK, ISABELLA MORK, RONDALD MELCHERT and SUSAN MELCHERT, on behalf of themselves and all others similarly situated,

**Civil No. 00-1980(DSD/JMM)**

Plaintiffs,

v.

AMERICAN EXPRESS FINANCIAL CORPORATION, AMERICAN EXPRESS FINANCIAL ADVISORS, AMERICAN CENTURION LIFE ASSURANCE COMPANY, AMERICAN ENTERPRISE LIFE INSURANCE COMPANY, AMERICAN PARTNERS LIFE INSURANCE COMPANY, IDS LIFE INSURANCE COMPANY, and IDS LIFE INSURANCE COMPANY OF NEW YORK,

Defendants.

---

# MEMORANDUM OF LAW IN SUPPORT OF MOTION TO ENFORCE CLASS ACTION SETTLEMENT AS TO CLAIMS OF RICHARD M. KALAC AND TRUDY A. KALAC BEFORE THE NASD

## INTRODUCTION

American Express Financial Advisors, Inc. ("AEFA") and IDS Life Insurance Company(IDS") submit this motion to the Court in order to enforce an Order issued by this Court on January 19, 2005, as well as the terms of a class action settlement that was approved by this Court, as it relates to an action subsequently filed with the National

Association of Securities Dealers ("NASD") by class members Trudy A. Kalac ("Mrs. Kalac") and Richard M. Kalac ("Mr. Kalac") (collectively "the Kalacs").

As stated to this Court in a previous motion granted by this Court, the Kalacs' Statement of Claim before the NASD implicates the same annuity and life insurance products that were at issue in the case of *Lesa Benacquisto, et al. v. American Express Financial Corporation, et al.* (File Nos. 96-018477 and 00-1980 (DSD/JMM)) ("*Benacquisto*"). A Final Order and Judgment Approving Class Action Settlement and Dismissing Complaint (the "Final Order and Judgment") was entered in this action on May 15, 2001, the effect of which was among other things, to grant final certification of the settlement class, to approve the proposed settlement, and to dismiss the settlement class members' claims. (*See* Final Order and Judgment (attached as Exhibit A)).

The Final Order and Judgment made clear that "[a]ll Class Members who have not been timely excluded from the Class with respect to a Policy or Annuity are hereby permanently barred and enjoined" from commencing any other lawsuit, arbitration, or administrative, regulatory or other proceeding in any jurisdiction **relating** to the matters at issue in the case. (*See* Ex. A ¶ 14.) (emphasis added)The Final Order and Judgment also explains that this Court "**expressly retains jurisdiction** as to all matters relating to the administration, consummation, enforcement and interpretation of the Settlement Agreement and of this Order and Judgment….**including, without limitation….resolving …whether claims or causes of action allegedly related to this case are or are not barred by this Order and Judgment…**" " (*Id.* ¶ 15.) (emphasis added) As explained below, the NASD Arbitration panel in the underlying matter expressly rejected this Court's authority over the issue of deciding what subsequent actions were covered by the

settlement, and ruled that it, not this Court, had jurisdiction over the issue of deciding what subsequent claims are covered or not, and allowed the claims to proceed in a subsequently filed action by class members who did not opt out and accepted the class settlement benefits. The panel's Order, and the arguments of claimants' counsel for the Order, appear to be in defiance of this Court's Orders and authority. In essence, as argued by counsel for the Kalacs, the class action settlement was inadequate and thus the settlement should not be binding. In short, the Kalacs, their counsel, and the arbitration panel have proceeded in a fashion which guts the Benacquisto settlement, and the Orders of this Court.

Despite this Court's Orders, class members, the Kalacs, submitted a claim to NASD arbitration which concerns, in substantial part, the very products and claims at issue in the class action, such as the use of an annuity within a qualified plan. In order to effectuate the enforcement of the settlement of those claims previously resolved with Court approval in the class action lawsuit, AEFA previously submitted the exact issues now raised herein to this Court in December 2004, and the Court issued the Attached Order, dated January 19, 2005. A copy of Claimant's Statement of Claim in the underlying arbitration was submitted to this Court as part of the motion papers, which ended with this Court's Order barring the claimants from proceeding in the NASD arbitration as to any claims covered by the class action **and** as to five specific annuity and life insurance products which were covered by the class action, which claimants admit have not been the subject of a timely opt-out claim, but have nonetheless been re-asserted as the basis for claims in the underlying NASD arbitration.(This Court's January 19, 2005 Order is

attached hereto as Exhibit A ) A copy of claimants' NASD Statement of Claim is also attached again for the Court's reference(Exhibit B) , but here, in brief, are some illustrative excerpts from claimants' NASD Statement of Claim which reveal that core claims asserted by the Kalacs in the NASD arbitration are the same as those claims which were settled by the class action settlement.

> In 1998 and January 1999 Mr. Kalac rolled over approximately $248,000 from his profit-sharing account into **an IRA... American Express Annuity Product. ...Two primary features of a flexible annuity are to provide tax deferred growth and to provide guaranteed value at death for heirs.** ***As an IRA, this account already provided for tax-deferred growth*** **(Note: the Court will recall that this was one of the key issues in Mork and Thoreson, which issue was specifically settled)** and...the Kalacs ...were not concerned about leaving assets to heirs(another issue in the class action-allegations of the sale of unneeded insurance coverage).
>
> The investment of a large portion of the Kalacs' retirement savings primarily in growth funds was **unsuitable**... **(Another issue in the class action)** Respondents heavily invested the Kalacs in **life insurance products and variable annuities**. Upon information and belief, Respondents invested the Kalacs in life insurance products and variable annuities instead of more traditional investments because of **higher commissions**. (Another issue in the class actions)
>
> These investments were **not suitable** for the Kalacs.(Another issue in the class action)
>
> The panel should award the Kalacs the following damages:
> The lost opportunity cost of what Claimant would have earned if suitably invested (damages equal to appreciation of a well-managed account).
>
> **Disgorgement and restitution of all earnings, profits, compensation and benefits received by Respondents** as a result of their unlawful acts and practices in an amount according to proof **(One of the many claims for relief in the class actions);**
>
> Pre and post judgment interest at the legal rate.(Also amongst the many claims for relief in the class action case)
>
> (emphasis and commentary in parenthesis added)

In its January 19, 2005 Order, this Court recognized the obvious and made a decision. Although movant AEFA believes that the Court's decision was entirely correct and appropriate, of greater importance seems to be that it was the Court's decision, the Kalacs did not appeal, it is thus a final and binding Order of a Federal Court, and the Court should not be called upon to re-decide the same issue over and over again. Also, an NASD arbitration panel should not be empowered to overrule Federal Court Orders.

Regretfully, this motion has become necessary because the Kalacs have simply ignored the Court's Order. Instead, the Kalacs and their counsel have continued to pursue the barred claims in the underlying NASD arbitration. A copy of the Kalacs' counsel's brief to the NASD panel (drafted after this Court issued its Order of January 19, 2005) is attached hereto for the Court's reference (Exhibit C ), but here are some illustrative selected excerpts:

> **IV. ARGUMENT**
>
> **A. The Kalac's Claims are not Barred by the Class Action Settlement**
>
> The class action settlement and related release do not bar the Kalacs' claims in connection with account numbers: 90903948698-004; 9090610634-004; 93002300010-004; 93103019163-004; and 9316300267-004 (collectively the "IDS Accounts"). **(Note: These are the precise accounts which this Court held were barred from the arbitration in its January 19, 2005 Order)** The terms of the Final Order and Judgment Approving Class Action Settlement and Dismissing Complaint ("Final Order") explicitly exclude the Kalacs' suitability, negligence, breach of fiduciary duty, and failure to supervise claims.**(Note: All of these categories of Claims were specifically at issue, and settled, in the Class Actions)**

The Class Notice states that the release shall not be "deemed to alter…a class member's right to assert any claim that *independently* arises from acts, facts or circumstances that *occur for the first time* after the last day of the class period…."(emphasis added)
The final order also states that "Nothing in this Release shall be deemed to alter a Class Member's right to assert any claim peculiar to the Class Member that falls outside the general categories of claims or conduct described in the complaints in the Actions or the Release in this settlement and is based on facts that were not discovered and could not with reasonable care have been discovered by the Class Member before the deadline to submit an Election Form set forth in the Stipulation of Settlement."
**The class action lawsuit settled by AEFA was based on fees it charged in connection with sales and management of IDS variable life insurance and variable annuity products. (Emphasis added)(Note: The Class Actions were, of course, much broader in scope than this, and the release and Order of this Court issued in May 2001 covers much broader categories of Claims)**

**(Emphasis and commentary in parenthesis is added)**

(In) January 1999, the Kalacs rolled money from his(sic) profit sharing account …into an **unsuitable flexible annuity…there is no rationale reason to purchase an annuity in a tax protected account like Mr. Kalac's IRA. (emphasis added)(Note: Again, this was one of the key issues settled in the class action lawsuits)**
Kalac brief p. 7.

At page 10 of his brief, the Kalacs' counsel informed the panel that

"The class action lawsuit settled by AEFA **was based on fees** it charged in connection with sales and management of IDS variable life insurance and variable annuity products.(Note: As the Court is aware, the Class Actions were, of course, much broader in nature than this.) The Kalacs do not seek recovery

> of fees they were assessed in connection with the IDS accounts. Kalc brief at p. 10[1]
>
> The Kalacs' claims are peculiar to them and fall outside the general categories of relief in the Class Action suit. ..The Kalcs' claims are independent causes of action based on the suitability of their investments shortly after Richard Kalac's retirement (1998) and the subsequent mismanagement of Kalac's accounts....**By not opting out of the class action settlement, the Kalacs received a mere three years of accidental death benefit coverage in exchange for their forbearance in bringing suit in connection with AEFA's fees. At most, the Kalacs were compensated for inappropriate or unlawful fees that AEFA charged on the IDS accounts. (Note-This is not at all what the Settlement Agreement and the Orders of this Court state)**
>
> Kalac brief at pp. 10-11. (emphasis and commentary in parentheticals added)

The actual facts are, as this Court knows from having presided over the Class Action and the Settlement thereof, quite different from those which the Kalacs' counsel represented to the NASD panel. (Which he also did despite this Court's Order of January 19, 2005, prohibiting such arguments). For example, the <u>Mork</u> and <u>Thoreson</u> actions directly concerned the issue of selling tax-deferred annuities for tax-qualified accounts, and the suitability of variable annuities overall. These claims have again been asserted by class members, the Kalacs, and respondent is again in jeopardy on the same exact issues again, i.e., respondents have not received any benefit from settling the class action as to class members, the Kalacs. Moreover, the order of the Arbitration panel creates precedent which undermines the authority of this Court, undermines the Rule of law and the authority and jurisdiction of the Federal Courts, and decimates its Orders and the Settlement of the Class Action lawsuit. The Kalacs' counsel attacks the settlement terms

[1] ( Note, however, that Claimants' Statement of Claim, at p. 22, paragraph 3.6 c. requests "Disgorgement and restitution of all earnings, profits, compensation, and benefits received by respondents...)

of the class action (despite their processing through a thorough fairness hearing) as insufficient to support settlement of the claims at issue in the case and now re-asserted in an NASD arbitration. In short, class members, the Kalacs, have been allowed to opt-out years after the opt-out date passed, although they did not do so in compliance with this Court's Orders, and accepted the benefits of the settlement. The Kalacs also did not take advantage of the claims review process established by this Court's Orders, which also invalidates all of this carefully designed procedure for review of claims. Allowing subsequent actions to assert claims settled by a class action settlement undoes the entire carefully crafted body of law surrounding class actions, a subject of continuing intense legislative actions, which the Federal Courts are largely assigned to enforce and apply.

The Class Action Settlement Agreement, Release and Order of this Honorable Court specifically states as follows:

> 1. In consideration for the relief set forth in this Agreement, Plaintiffs and all other Releasors (defined below) shall, as of the Final Settlement Date, release, acquit and forever discharge the Releasees (defined below) from any and all past or present Claims and Causes of Action (defined below) that are based upon, related to, or connected with, directly or indirectly, in whole or in part: (a) the allegations, facts or subjects set forth or otherwise raised in Benacquisto, et al. v. American Express Financial Corporation, et al., No. 96-18477, pending before the Minnesota State Court for the County of Hennepin (together with the actions consolidated therewith, also filed in the Minnesota State Court for the County of Hennepin and entitled Mork, et al. v. IDS Life Insurance Company, et al., No. 97-04742, and Thoresen, et al. v. American Express Financial Corporation, et al., No. 98-15681) and/or Benacquisto, et al. v. American Express Financial Corporation, et al., No. 00-1980 DSD/JMM, pending before the United States District Court for the District of Minnesota; or (b) the Released Conduct (defined below).

2. Plaintiffs and all other Class Members, on their own behalf and on behalf of all other Releasors also hereby contractually agree and acknowledge that, unless this settlement is ultimately disapproved, they shall not now or hereafter initiate, participate in, maintain, maintain a right to or assert against the Releasees, or any of them, either directly or indirectly, derivatively, on their own behalf, or on behalf of the Class or the general public or any other person or entity, any Claims and Causes of Actions (defined below) that are based upon, related to, or connected with, directly or indirectly, in whole or in part: (a) the allegations, facts or subjects set forth or otherwise raised in Benacquisto, et al. v. American Express Financial Corporation, et al., No. 96-18477, pending before the Minnesota State Court for the County of Hennepin (together with the actions consolidated therewith, also filed in the Minnesota State Court for the County of Hennepin and entitled Mork, et al. v. IDS Life Insurance Company, et al., No. 97-04742, and Thoresen, et al. v. American Express Financial Corporation, et al., No. 98-15681) and/or Benacquisto, et al. v. American Express Financial Corporation, et al., No. 00-1980 DSD/JMM, pending before the United States District Court for the District of Minnesota; or (b) the Released Conduct.

3. Nothing in this Release shall be deemed to alter (i) a Class Member's right to make a claim for contractual benefits that will become payable in the future pursuant to the express written terms of an In Force Policy or In Force Annuity issued by any of Defendants; (ii) a Class Member's right to assert any claim that independently arises from acts, facts or circumstances that occur for the first time after the last day of the Class Period; (iii) a Class Member's right to make a claim for theft or embezzlement in connection with a Policy or Annuity; (iv) a Class Member's right to assert any claim based on facts arising out of or relating to the administration or servicing of a Policy or Annuity after its purchase unless they arise out of or relate to any of the matters described in sections XII.B2(i)-(xiii) of the Stipulation of Settlement; or (v) a Class Member's right to assert any claim peculiar to the Class Member that falls outside the general categories of claims or conduct described in the complaints in the Actions or the Release in this settlement and is based on facts that were not discovered and could not with reasonable care have been discovered by the Class Member before the deadline to submit an Election Form set forth in the Stipulation of Settlement.

4. Plaintiffs and all other Class Members, on their own behalf and on behalf of all other Releasors, expressly agree that this Release will be, and may be raised as, a complete defense to, and will preclude any action or proceeding that relates in any way to, the Released Conduct.

....

6. In connection with this Release, Plaintiffs and all other Class Members, on their own behalf and on behalf of all other Releasors, acknowledge that they are aware that they may hereafter discover claims presently unknown or unsuspected, or facts in addition to or different from those that they now know or believe to be true with respect to the matters released herein that occurred prior to the last day of the Class Period. Nevertheless, subject to paragraph 3 above, it is the intention of Plaintiffs and the Class Members in executing this Release fully, finally and forever to settle and release all such matters that exist, hereafter may exist, or might have existed (whether or not previously or currently asserted in any action or proceeding) with respect to their Policies and Annuities.

7. Nothing in this Release shall preclude any action to enforce any of the terms of the Settlement Agreement, provided that such action shall be brought in the Minnesota State Court for the County of Hennepin or the United States District Court for the District of Minnesota.

8. Plaintiffs and all other Class Members, on their own behalf and on behalf of all other Releasors, hereby agree and acknowledge that the provisions of this Release, individually and collectively, constitute an essential and material term of the Settlement Agreement.

9. This release is the result of a compromise of a disputed claim and shall never at any time be used as evidence of any admission of liability, wrongdoing or damages by the Company.

B. Release and Waiver – Definitions

1. "Claims and Causes of Action" (as used in this Release) means any and all claims for relief (including any federal, exclusively federal, state, or other causes of action, suits, petitions, or demands in law or equity), any and all allegations of liability (including any allegations of debts, obligations, promises, guarantees, damages awards, or for any equitable, legal and administrative relief), and any and all demands for damages or equitable relief (including any claims for rescission, reformation, restitution or all damages of any kind, including those in excess of actual damages and claims for mental anguish), that have been, could have been, may be or could be asserted in any court action, whether federal, state or otherwise, or before any administrative body (including any brought by or on behalf of any state or local insurance, prosecutorial or other organization), tribunal, arbitration panel, or other adjudicatory body, regardless of whether based on federal, state

of local law, statute, ordinance, regulation, contract, common law, or any other source, and regardless of whether foreseen or unforeseen, suspected or unsuspected, or fixed or contingent at the time of this Settlement.

2. "Released Conduct" means any and all direct or indirect acts, representation, omission, suggestions, or communications that are related to or connected in any way with the design, development, marketing, sale, administration, servicing, underwriting, or performance of the Policies or the Annuities, including without limitation, acts, representations, omissions, suggestions or communications in connection with (i) the explanation, description, marketing, sale, solicitation, illustration or replacement of any Policy or Annuity; (ii) the application for or purchase of any Policy or Annuity; (iii) the suitability of any purchases, sales or replacements of any Policy or Annuity; (iv) the taking of any loans, or the accumulation of any interest or cash values on any Policy or Annuity; (v) the setting, reduction, adjustment, payment, or lack of payment of any interest rates, purchase rates or renewal rates on any Policy or Annuity; (vi) the setting, charging or reducing of any cost of insurance, commissions, incentives, premiums, taxes, fees, mortality and expense fees, charges, contract charges, surrender charges, or expenses on any Policy or Annuity; (vii) the investment choices made with respect to assets held in any Policy or Annuity; (viii) the surrender, lapse, or termination of any Policy or Annuity; (ix) the tax status, tax impact or tax consequences of any Policy or Annuity or any actions or inaction taken with respect thereto; (x) the costs, commissions, terms, or benefits or disadvantages of any Policy or Annuity compared to any other life insurance policy, annuity contract or investment; (xi) the comparison or lack of comparison of any Policy or Annuity to any other product; (xii) the preparation by any financial advisor acting for the Company of any financial plan or the provision of financial or investment advice insofar as it resulted in the sale, modification or maintenance of any Policy or Annuity; (xiii) the effect that a Class Member's election and award of benefits in this Settlement Agreement may have on the value of any Policy or Annuity; and (xiv) the administration or servicing of any Policy or Annuity after its purchase.

3. "Releases" means the Company[2] and its past, present and future parents, subsidiaries, affiliates, partners, predecessors,

---

[2] "Company" means IDS Life Insurance Company, IDS Life Insurance Company of New York, the American Express Company, American Express Financial Corporation, American Express Financial Advisors, American Express Service Corporation, American Express Trust Company, American Centurion Life Insurance Company, American Enterprise Life Insurance Company and American Partners Life Insurance Company, collectively.

> successors and assigns, and each of their respective past, present and future officers, directors, shareholders, employees, general agents, agents, advisors, branch managers, producers, sales representatives, brokers, solicitors, representatives, attorneys, heirs, administrators, executors, insurers, predecessors, successors and assigns, or any of them, including any person or entity acting of behalf of, or at the direction of, any of them.
>
> 4. "Releasors" means, to the extent they are not excluded from the Class with respect to a Policy or Annuity, the Plaintiffs and all Class Members, on behalf of themselves and their respective heirs, executors, administrators, successors, assigns, guardians, attorneys, trustees, qualified plans, fiduciaries, plan fiduciaries, plan trustees, plan sponsors, plan participants, plan beneficiaries, and representatives, and on behalf of the Policies' insureds and beneficiaries, the Annuities' annuitants and beneficiaries, and the Policies' and Annuities' nominal and beneficial owners.

Plainly, the precise claims raised by the Kalacs in their arbitration proceeding are barred by this Court's May 15, 2001 Order. Further, this Court issued an Order on January 19, 2005, barring the Kalacs from proceeding with any and all claims relating to the annuities and life insurance covered by the class action lawsuit. The Order does not contain any of the limitations argued for by the Kalacs' counsel, and he has not even sought this Court's permission for proceeding in violation of this Court's Orders or appealed the Orders, all of which undermines the carefully crafted law around class actions and settlement thereof. Indeed, only recently, Congress, with the President's approval, created procedures further clarifying the role of the Federal Courts in supervising the carefully enacted body of law governing class action lawsuits, all of which is undermined by the Kalacs' decision to proceed as if this Court's Orders did not exist, or that the approval of this Court for arguing that this Court's Orders are inapplicable should be the normal rule

of procedure. The Kalcs did not appeal this Court's Orders. Instead, they have just plowed forward in the NASD arbitration, as if this Court has no authority over them.

Movant's argument to the panel was that if there were any questions about the Court's Order, those questions should be directed to the Court. Otherwise, the settling defendants in Benacquisto are faced with varying rulings and limitations on this Court's Orders which effectively nullify the class action settlement. If the Court's Orders are treated as mere pieces of paper, without repercussions for violation and the enforcement of the rule of law, then class action settlements become extremely inadvisable, this Court faces endless litigation over its Orders and whether they matter or not, and no settlement approved by this Court can be called a settlement at all. For example, the Kalacs' counsel argues that the relief obtained through the class action was insufficient, but, if this becomes a ground for ignoring a settlement and Federal Court Order, then such settlements have no meaning, and the authority of this Court is tarnished.
Plainly, the arguments advanced by the Kalacs' counsel to the arbitration panel were false, misstated the record in the class action suit, and were made in violation of this Court's Orders.

The Kalacs' counsel made one additional argument to the panel, which also seems to misconstrue the settlement and Order and will render the class action settlement meaningless. If accepted-as it was by the NASD panel, in combination with the above arguments- then this Court in fact has not retained jurisdiction to determine what

subsequent actions are covered and what are not, and the Court faces an endless stream of arguments that subsequent actions are not covered, even when they quite clearly are. Claimant's final argument for why the NASD arbitration panel should ignore this Court's rulings, as described below, at least does not appear to be based on factually plainly incorrect assertions(As with most of the arguments of claimants' counsel concerning what was covered by the Benacquisto class actions), but respondent's counsel believes the argument is also incorrect. This argument concerns the potential conflict between the broad release as recited above, and a provision thereafter which states that "Nothing in this Release shall be deemed to alter …a class member's right to assert any claim that **independently** arises from acts, facts or circumstances that occur **for the first time** after the last day of the class period." Claimants' argument about this provision seems to have two dimensions. First, various issues raised in the class action as to variable annuity and life products would cover losses and claims only extending through the class period. Accordingly, all the same issues litigated in the class action could be re-litigated again, with respect to the same products sold during the class period, and with respect to the precise damage claims asserted in the class actions, on the ground that the losses arose after the end of the class period-even though the claims for relief in the class action sought recovery of such alleged damages. For example, in the class action, plaintiffs argued that, over the typical life of a variable annuity product, a client would pay significantly higher fees than on a simple IRA without the annuity wrapper, and thus, all those projected extra fees should be returned as damages. It was not contemplated in the class action that every customer who purchased an annuity would be forced out of their investment-instead, projected damages if they held their investments (as most did) were

debated over in the class action. The argument of the Kalacs' counsel, as now accepted by the NASD arbitration panel, would mean that such fees were only covered for a short period of time-through the class period- and thus, the main body of the issues IDS Life thought it had settled, and which were explicitly negotiated and at issue in the fairness hearings, are not settled after all, despite this Court's Orders. As further example, a class member who purchased an annuity on the last day of the class period would not be covered in any way by the settlement because all of their alleged damages would necessarily arise after the class period. The release period and the concept of res judicata would be written out of the law and this Court's Orders would become no more than a subject of debate and optional compliance, if the position of the Kalacs' counsel is adopted.

Similarly, as to so-called "suitability" claims, the variable annuities and variable life products generally increased in value throughout the class period, but the so-called stock market crash occurred commencing in April 2000, shortly after the class period, but while the class action litigation was pending and within the eventually agreed to release period. Nonetheless, according to the argument advanced by the Kalacs' counsel, and accepted by the NASD arbitration panel, all claims regarding suitability and the like are fair game for re-litigation in subsequently filed actions, without opting out, because the losses arose **after** the class period. Under this approach, it would be irrelevant whether those issues were specifically litigated, or could have been litigated, in the class action litigation or were covered by the release, because the damages allegedly arose after the class period. The NASD panel agreed with claimants' counsel that damages could be

obtained, despite this Court's Orders, if such alleged damages occurred after the end of the class period. This would be true even if the damages arose within the Release period of the class action settlement. In short, the class action settlement has been vastly limited, and, indeed, eliminated as a practical matter for clients who purchased covered products toward the end of the class period.

Respondent's position is that the Kalac's claims do not arise **"independently"** of the issues raised in the class action. Indeed, claimants' own Statement of Claim in the NASD arbitration alleges that the products were unsuitable **when sold**-which was during the class period. Second, the Release extends through the "Final Settlement Date," which this Court's records show was September 24, 2001-the date the appeal period on this Court's May 15, 2001 Order ran. Third, claims like those asserted by the Kalacs in their NASD arbitration "relate back" to the original suitability claims. Fourth, although identical claims were in fact raised within the class action case, even if they had not been, they "could have been asserted" in the Class Action, which was not settled until September 24, 2001. In this Court's Order in the Chandler matter, the Court rejected arguments like those asserted by the Kalacs here, reasoning that the claims at issue "necessarily relate back" to the "inappropriate funding claims." Here, the Kalacs made the investments at issue **during the class period**-the accounts did not decline in value, however, until after the class period, but within the period of the class action release. Under the Kalacs' rationale, and that adopted by the NASD arbitration panel, such claims are not covered by this Court's Orders-a position which guts the class action settlement. Sixth, this Court's May 15, 2001 Final Order and Judgment states, at p. 8, paragraph 12, that

> "the terms of the Settlement Agreement **and** of this Order shall be forever binding on Plaintiffs and all other Class Members , as well as their heirs, executors, and administrators, successors, assigns, guardians, attorneys, trustees, and representatives, and those terms shall have *res judicata* and other preclusive effect in all pending and future claims, lawsuits, or other proceedings maintained on or on behalf of any such persons, to the extent those claims, lawsuits, or other proceedings involve matters that were or could have been raised in the Action **or** are otherwise encompassed by the Release.(emphasis added)

Finally, and in any event, this Court retained jurisdiction over the issue of deciding what future actions are covered by this Court's Orders-but the arbitration panel concluded instead that it, not this Court, had the jurisdiction to decide the issue. Explicitly rejecting movant's argument that this Court had jurisdiction over the issue, the NASD arbitration panel instead decided that it, not this Court, had jurisdiction over the issue of how this Court's Orders should be interpreted and agreed with claimants' counsel's arguments, the effect of which is that this Court's January 15, 2005 and May 15, 2001 Orders are a nullity. Despite this Court's Order that the Kalacs must dismiss their NASD arbitration claims regarding the covered products, the arbitration proceeds as if this Court's Orders are meaningless, except that perhaps respondents have been prejudiced because the Panel apparently was offended by the argument that this Court had jurisdiction to interpret, and apply its Orders, and to administer the class action settlement, and that the Panel should defer to this Court's Orders.

AEFA requested that the NASD arbitration panel follow this Court's May 15, 2001 Order and January 19, 2005 Order, or, in the alternative, if the panel believed the Orders were unclear, to submit the issues to this Court for determination. This Court retained

jurisdiction over precisely this issue. Respondent believes that one of many of the rationales for this was to prevent varying and inconsistent rulings by various other adjudicative bodies across the country, and to provide the settling parties with the benefit expected from the decision to resolve the matter via settlement. If the very claims settled in the Class Action suit can proceed ahead in various forums such as NASD arbitration, then why would anyone ever settle a class action lawsuit?

The Order of the Panel allowing the claims to proceed as specified is attached hereto. As a practical matter, the panel's Order renders this Court's Order a nullity, and is contrary to this Court's Orders that it retained jurisdiction over what subsequent Actions were covered or not covered by this Court's Orders. If this approach is allowed, the Orders of this Court will be mere pieces of paper, and can be second guessed and undermined by innumerable arbitration or other adjudicative forums across the country in an endless stream.

Respondents contend that, at minimum, the period of the Release approved by this Court extends to the "Final Settlement Date," which this Court's clerks and Rust Consulting have informed respondent is September 24, 2001. At pages 8-9, paragraphs 12 and 13 of this Court's Order of May 15, 2001, the Court states that the settlement and release extends through the "final settlement date" and includes all claims which were or could have been raised in the Class Action prior to that date. All of the Claims at issue were or could have been raised by the "final settlement date." Further, the Court's Orders and

Judgments state that all claims which were or could have been raised in the class action lawsuits are settled and may not be asserted again.

On a separate but related subject, this Court's May 15, 2001 Order states that the Benacquisto settlement shall not be cited by any party as evidence of wrongdoing, or be admitted into evidence in any future proceeding. Instead, claimants' Statement of Claim, attached hereto, contends that respondent AEFA's reliance on the Settlement agreement and Orders of this Court are illegal, and provide the basis for a claim for relief from an arbitration panel. . Further, the issue of the Benacquisto settlement has been briefed before the arbitration panel, at its request, and the panel has interpreted and reached its own decision as to what is covered and what is not covered, a ruling at variance with this Court's Order. Respondents have been forced to, in effect, appeal the panel's rulings, an approach which may well not place respondents in a good light with a panel of arbitrators, none of whom are judges and almost certainly not accustomed to the process where decisions are subject to review. Respondents contend that the raising of these issues before the panel has denied respondent due process and a fair hearing in the arbitration matter and that the entire arbitration matter should be dismissed as an appropriate remedy to address the repeated violations of this Court's Orders. In addition, or in the alternative, movants seek all of their attorneys' fees incurred in making these motions to this Court, none of which should have been necessary. Without some type of disincentive for ignoring this Court's Orders, challenges such as this seem likely to proliferate and burden the Court. Movants contend that the Orders of this Court should be interpreted with a great deal of respect for the Court's authority and a recognition that

the Court cannot afford to be endlessly tied up in the future with enforcing Orders which it issued and which are clear on their face.

Respondent AEFA also respectfully requests that this Honorable Court retain jurisdiction over this matter to ensure that its Orders are followed and that respondent AEFA is not punished in the arbitration for arguing for the benefits it expected from the class action settlement.

Respondent AEFA attaches hereto its previous motion papers to this Court, which describe the issues and facts in some detail.

## CONCLUSION

For all of these reasons, movant again respectfully requests that this Honorable Court enjoin class members, the Kalacs, from proceeding on any claims before the NASD in NASD arbitration number 04-03420 involving the annuities and variable life insurance policies specified in this Court's January 19, 2005 Order. The claims at issue in the arbitration arose during the release period covered by this Court's May 15, 2001 Order, and, in any event, certainly "relate back" to the allegations that, during the class period, claimants purchased unsuitable investments-namely, the very products at issue in the class action.

Dated: May 6, 2005

Edgerton, Weaver & Irwin, LLC

**s/Gary Irwin**
By: Gary R. Irwin

(License #0179991)
5050 Lincoln Drive, Ste. 480
Interlachen Corp. Center
Minneapolis, MN 55436
(952) 345-4444
girwin@neilaw.com

ATTORNEY FOR
AMERICAN EXPRESS
FINANCIAL ADVISORS, INC.,

**IN THE UNITIED STATES DISTRICT COURNT**

**FOR THE DISTRICT OF MINNESOTA**

**WORD COUNT CERTIFICATE**

I hereby certify that the number of words in the memorandum filed with the Motion to Enforce Class Action Settlement has been counted at 6,307. Microsoft Word 2002 was used to prepare the memorandum. The word processing program has been applied specifically to include all text, including headings, footnotes, and quotations.

Dated: May 6, 2005

**s/ Gary R. Irwin**
By: Gary R. Irwin (0179991)
821 Marquette Avenue, Suite 1308
Minneapolis, MN 55402
(612) 333-1905
girwin@neilaw.com
*Attorney for Respondents*