RECEIVED
MAY 17 2004
MPLS GCO-LITIGATION

NATIONAL ASSOCIATION OF SECURITIES DEALERS REGULATION, INC.
ARBITRATION PANEL

| | |
|---|---|
| In the matter of the Arbitration between<br><br>TRUDY A. KALAC and RICHARD M. KALAC,<br><br>Claimants,<br><br>v.<br>AMERICAN EXPRESS FINANCIAL ADVISORS and GREG HOGUE,<br><br>Respondents. | NASD Arb. No.<br><br>STATEMENT OF CLAIM |

CLAIMANTS Trudy and Richard Kalac ("the Kalacs"), demand arbitration against Respondents American Express Financial Advisors ("American Express") and Greg Hogue ("Hogue") before NASDR, Inc. For its statement of claim against Respondents, the Kalacs allege as follows:

## I. PARTIES

1.1 The Kalacs are a retired couple living in Sisters, Oregon who invested their entire retirement savings with American Express and relied upon American Express and their financial advisors to give them sound, prudent, advice in the investment of their retirement savings. Mr. Kalac was born and raised in Elwood City, PA. After high school, Mr. Kalac worked in Oklahoma both with the rodeo and in construction. In 1960, Mr. Kalac joined the Air Force until he was honorably discharged in 1964. Throughout the 1960s and 1970s, Mr. Kalac worked a number of jobs in mining, manufacturing and production. While he was working, Mr. Kalac put himself through school and obtained a B.S. in Geology from the University of Nevada. In 1981, Mr. Kalac joined MICO, Inc. ("MICO") as its District Sales Manager for eleven Western States and Western Canada. MICO is a company headquartered in Mankato, Minnesota that manufactures hydraulic components and brake systems. After a long and successful career with MICO, Mr. Kalac retired at the end of 1998. Through his participation in MICO's profit sharing plan, Mr. Kalac accumulated approximately $248,000 in retirement savings.

Mrs. Kalac was born and raised in Portland, Oregon. She is the mother of three adult sons. While raising her sons, she worked primarily as an office manager in dental offices. Mr. and Mrs. Kalac were married in 1980. In 1993, the Kalacs moved to Sisters, Oregon. Since that time, Mrs. Kalac has worked part-time in retail, selling vitamins and selling items at craft shows. Mrs. Kalac is now retired.

1.2 Respondent American Express is a member of the NASD.

1.3 Respondent Greg Hogue is a financial advisor employed by American Express in the Bend, Oregon office and registered with the NASD. When the Kalacs moved to Central Oregon in 1993, American Express assigned their accounts to Mr. Hogue, who the Kalacs understood would act as their financial advisor. Mr. Hogue was their trusted advisor until 2003 when management of the Kalacs' American Express accounts was transferred to American Express employees Dennis Callahan and Suzanne Johannsen.

## II. BACKGROUND FACTS

2.1 In the 1980s, the Kalacs opened an account in a Portland, Oregon branch of American Express. This was the first security account held by either Mr. or Mrs. Kalac. Except for Mr. Kalac's participation in the MICO profit-sharing plan, neither of the Kalacs had any previous investment experience. Under MICO's plan, Mr. Kalac received periodic statements documenting the amount of money accumulating in his profit-sharing

account. However, Mr. Kalac did not know any of the details of the investments in MICO's profit-sharing plan and Mr. Kalac had no control or input as to the investment of his MICO profit-sharing account. In short, before Mr. Hogue became their financial advisor, neither of the Kalacs had significant investment experience.

2.2 The Kalacs chose to open their account with American Express based on American Express' reputation for providing financial planning. The Kalacs did not have a sophisticated understanding of the securities markets and wanted an "expert" to advise them and take care of their retirement finances.

2.3 When the Kalacs moved moved to Sisters in 1993, American Express assigned their account to respondent Greg Hogue, who worked as a financial advisor in the Bend, Oregon branch of American Express. The Kalacs did not know Mr. Hogue, but trusted that as a financial advisor for a well-known company such as American Express, that he was a knowledgeable, diligent and trustworthy person who would appropriately advise them with regard to their retirement planning.

2.4 The Kalacs explained to Mr. Hogue that they moved to Sisters for their retirement, that Mr. Kalac was planning an early retirement, relying upon his profit-sharing at MICO, and that Mrs. Kalac, except for a few "side" jobs, was essentially retired.

2.5 The size of the Kalac account remained modest for the first several years that they maintained the American Express Account. Until 1995, the equity in their account never exceeded $20,000.[1]

2.6 In 1995, the Kalacs deposited approximately $320,000 with American Express, which was money that Mrs. Kalac received as a result of a medical lawsuit. Mr. Hogue invested all of this money in proprietary American Express funds, primarily the American Express "Growth Fund," American Express "Stock Fund," American Express "Mutual Fund" and American Express "New Dimensions" Fund. These funds are primarily composed of equity investments and not suitable for individuals who are of retirement age and therefore not able to ride the "ups and downs" of the market for an extended period.

2.7 In 1998, Mr. Kalac retired from MICO. The Kalacs met with Mr. Hogue in November 1998 and January 1999 to discuss what to do with the funds in Mr. Kalac's profit-sharing account at MICO. Upon the advice and encouragement of Mr. Hogue, Mr. Kalac rolled over approximately $248,000 from his profit-sharing account into an IRA that Mr. Hogue set-up at American Express. Mr. Hogue invested all of the funds from the MICO profit-sharing account in an American Express Annuity Product. The Annuity was invested in 25% American Express VP Cap Resource Fund, 25% AXP VP Managed Fund, 25% AXP VP New Dimensions and 25% AIM Growth-Income fund. The investment of a

---

[1] All of the values cited in the Statement of Claim are based on available information and are

large portion of the Kalac's retirement savings primarily in growth funds was unsuitable, especially because the Kalacs were fully retired.

2.8 During meetings with Mr. Hogue, the Kalacs discussed what withdrawals they could take from their retirement account to maintain their modest lifestyle. Mr. Hogue advised the Kalacs to withdraw $5,000 monthly and told them that they would want to give themselves a "raise" each year by increasing their monthly withdrawals. Taking Mr. Hogue's advice, the Kalacs began withdrawing $5,000 monthly from their retirement accounts.

2.9 The Kalacs' retirement accounts performed well through 1999, during a well-known period of unprecedented growth in the United States stock market. However, as explained below, Respondents' risky strategy of investing the Kalacs' retirement nest egg in growth funds would soon backfire.

2.10 As of 2000, Mr. Hogue had opened three accounts for the Kalacs. A joint account, an IRA for Mrs. Kalac and an IRA for Mr. Kalac. Those three accounts represented all of the Kalac's retirement funds. Each account was invested in securities primarily consisting of proprietary American Express growth funds. Specifically, on March 26, 2000, Mr. Hogue had invested the money in the Kalacs' joint account in the following mutual funds:

---

subject to amendment after discovery.

| | |
|---|---|
| American Express Stock Class A Fund | $ 96,772.79 |
| American Express New Dimension Class A Fund | $302,587.27 |
| American Express Mutual Class A Fund | $ 54,711.15 |
| American Express Bond Class A Fund | $ 26,190.07 |
| American Express Growth Class A Fund | $247,387.56 |
| American Express Managed Allocation Class A Fund | $ 6,431.89 |
| Variable Universal Life Insurance for Mr. Kalac | $ 35,807.41 |
| Variable Universal Life Insurance for Mrs. Kalac | $ 15,930.18 |
| Flexible Annuity for Mr. Kalac | $ 58,358.27 |

The Flexible Annuity was almost entirely composed of another proprietary American Express growth fund, the AXP VP Cap Resource Fund. Despite the fact that the Kalacs told Mr. Hogue that they were not concerned about leaving assets to their heirs, Respondents heavily invested the Kalacs in life insurance products and variable annuities. Upon information and belief, Respondents invested the Kalacs in life insurance products and variable annuities instead of more traditional investments because of higher commissions. Also upon information and belief, Respondents invested in the Kalacs in a large number of mutual funds, without properly allocating the investments, so that the Kalacs could take advantage of the break points, the up-front fees the Kalacs had to pay for

purchase of Class A shares. Attached as Exhibit A is a copy of the Kalacs March 26, 2000 account statement.

2.11 These investments were not suitable for the Kalacs, who retired and were counting on their investments at American Express to carry them through their "golden years."

2.12 American Express classifies its New Dimensions Fund as a "growth fund." American Express' website lists "growth funds" as securities with "higher risk" as compared to other funds American Express offers. The 2003 prospectus for the New Dimensions Fund states that investment strategy for this fund is to invest "in common stocks showing potential for significant growth." The prospectus continues "These companies often operate in areas where dynamic economic and technological changes are occurring. The Fund may invest up to 30% of its total assets in foreign investments." The prospectus also states that the "Fund is designed for investors with above-average risk tolerance."

2.13 Not surprisingly, American Express also classifies its Growth Fund as a "growth fund." The 2003 prospectus states that the "Fund is designed for investors with above-average risk tolerance." The prospectus states that the investment strategy for the Growth Fund is to invest in common stocks "that appear to offer growth opportunities" and that the fund may invest up to 25% of its total assets in foreign securities.

2.14 American Express classifies its Stock Fund as a "Blend Fund." According to American Express' website, a "Blend Fund" carries with it more risk that a "Value Fund" but less risk that a "Growth Fund." The 2003 prospectus states that "under normal market conditions," the fund invests at least 80% of its assets in common stocks.

2.15 American Express classifies its Mutual Fund as a "Value Fund." The 2003 prospectus states that fund will invest up to 65% of its assets in common stocks.

2.16 American Express classifies its Managed Allocation Fund as an "Asset Allocation Fund." The Fund is a "fund of funds," and includes investments in growth funds.

2.17 As a group, the funds were not suitable for the Kalacs. The Kalacs were retired, did not have an above-average risk tolerance, and should have been invested in invested in blue chip and fixed income securities. Respondents did not invest any of the Kalacs' retirement savings investments in American Express' "Income / Tax-Exempt Income" investment category, which American Express classifies as its lowest risk of investment.

2.18 As of March 2000, Mr. Hogue had invested the money in Mrs. Kalac's IRA as follows:

| | |
|---|---|
| American Express New Dimensions Fund Class A | $ 18,975.95 |
| American Express Mutual Fund Class A | $ 11,228.76 |

| | |
|---|---|
| American Express Bond Fund Class A | $ 1,770.16 |
| Flexible Annuity | $ 23,733.95 |
| Technology Funding Partners IV | $ 720.00 |
| Phoenix Leasing Cash Dist. Fund – III | $ 182.94 |

The Flexible annuity was primarily composed of the following three growth funds: 1) American Express VP Cap Resource Fund ($11,176); 2) American Express VP International Fund ($5,673); and 3) American Express VP Strategy Aggressive Fund ($6,412). Two primary features of a flexible annuity are to provide tax deferred growth and to provide guaranteed value at death for heirs. As an IRA, this account already provided for tax deferred growth and as stated above, the Kalacs advised Mr. Hogue that they were not concerned about leaving assets for heirs. Upon information and belief, Respondents made the investments in the flexible annuity to generate additional income for Respondents through increased commissions and increased up-front charges.

2.19 As of March 2000, Mr. Hogue had invested the funds in Mr. Kalac's IRA in two flexible annuities, one valued at $28,880.82 (which was comprised primarily of investments in the same three American Express growth mutual funds that comprised Mrs. Kalac's flexible annuity) and one valued at $339,710.42, which as noted in paragraph 2.7, compromised the entire value of Mr. Kalac's profit-sharing funds he received from MICO. As noted in paragraph 2.7, the annuity was comprised of four separate growth funds. As

with the investments in Mrs. Kalac's IRA, upon information and belief, Respondents made the investments to increase Respondents' income, not to further the Kalacs' investment goals.

2.20 In the "Retirement" section of its website, American Express states: "**Make Sure Your Assets Are Properly Allocated.** If you are heavily invested in growth stocks and other aggressive investments in your 401(k) or other retirement plan, it may be time to consider moving some assets to less volatile investments." However, Mr. Hogue did not heed his employer's advice when it came to the Kalacs' account and rather invested the Kalacs in Mutual Funds and Variable Annuities that were primarily invested in growth stocks. Mr. Hogue invested only a very small portion of the Kalac's retirement savings in conservative, low risk investments, such as bonds.

2.21 The Kalacs, without a sophisticated understanding of the securities market, relied completely on Mr. Hogue to manage their account. Unfortunately for them, once he invested their money in volatile securities, Mr. Hogue took a "hands off" approach to managing their account. Mr. Hogue seemed to call or visit the Kalacs only when it was in his best interest to sell a new them a new product, such as a long-term care insurance policy that American Express was peddling to its customers.

2.22 Despite their limited investment experience, the Kalacs knew enough to be concerned about preserving the equity of their account because it represented their entire

retirement savings which had grown principally because of Mr. Kalac's 27 years of hard work with MICO. In March, 2000, the Kalacs met with Mr. Hogue to discuss their retirement accounts. At that time, the value of the Kalac retirement accounts was approximately $1,200,000. During the meeting, Mr. Kalac asked Mr. Hogue about diversifying their investments and "locking in" some of the gains. Specifically, Mr. Kalac asked if he and his wife should do "something different" with their accounts, like purchasing bonds, to preserve the equity they had acquired in their retirement funds. Mr. Kalac told Mr. Hogue that he would like to "lock in" the $1,000,00, but would be willing to invest the other $200,000 (approximate) in investments that were subject to market swings, if that was what Mr. Hogue advised. Mr. Hogue responded by assuring the Kalacs that they should not be making any changes to their account because bonds would not provide as a good of return as the mutual funds. Mr. Hogue told the Kalacs that within five years that they would double their money and that they would have so much money in retirement that they would have trouble spending it all. Specifically, Mr. Hogue told the Kalacs that in a few years they would probably want to use some of the gains in their retirement account to purchase a $500,000 motor home (a retirement idea that did not appeal to the Kalacs).

2.23 On March 26, 2000 the total value of the Kalacs' accounts at American Express was $1,269,380. As the year progressed, the Kalacs continued to receive account

statements that caused them great stress and worry. They watched as the value of their account started to plummet. In April 2000, the value of their accounts declined $73,447. In May 2000, their account declined another $37,718. In June – August 2000, the value of the Kalacs account grew from the May value by $71,058, which left it short of the March value by $40,106. In September 2000, the value of the account declined another $49,175. In October 2000, the value of the account declined another $81,379 and in November 2000 another $59,227. In the six months that followed the Kalacs meeting with Mr. Hogue to discuss a more conservative investment strategy, a strategy that Mr. Hogue rejected, the value of the Kalacs account decreased $229,887 (18%). However, the Kalacs had put their complete faith in Mr. Hogue and remained hopeful that his investment strategy was appropriate for them.

2.24 The value of the Kalacs account continued to spiral downward. In January 2001, the value of the Kalacs account declined by another $103,722. From the period January 2001 through July 2001, the value of the Kalac's account declined $183,585. In the spring of 2001, the Kalac contacted Mr. Hogue to discuss the $500,000 decline in the value of their account. Mr. Hogue advised the Kalacs that it would be better if the Kalacs stopped looking at the account statements and that there was nothing to worry about. Mr. Hogue advised the Kalacs that they were not really losing money, because they were maintaining the same number of shares in each of their investments. Mr. Hogue told the

Kalacs not to make any changes to their portfolio. Mr. Kalac told Mr. Hogue about his desire to purchase a horse trailer for $8,000. Mr. Hogue advised Mr. Kalac to take the money from the Kalac retirements accounts, stating that there was plenty of money in their retirement accounts and that there would be no problem with such a withdrawal of funds.

2.25 Upon the request of the Kalacs, in August 2001 Mr. Hogue visited the Kalacs at their home. The Kalacs again expressed their deep concern about their retirement savings. The Kalacs again asked Mr. Hogue whether they should be making different investments in the account in order to preserve the equity in their retirement accounts. Again, Mr. Hogue advised the Kalacs that the market would "come back" and that they should not make any changes in their account. The Kalacs, having put their complete faith in Mr. Hogue, again heeded his advice.

2.26 Shortly after the terrorist attacks of September 11, 2001, the Kalacs again asked Mr. Hogue about their retirement savings. Mr. Hogue again assured the Kalacs that the market would turn around and that they should not make any changes to the investments in their accounts. Mr. Hogue specifically advised the Kalacs that there would be "political decisions" that would positively impact the value of the accounts. Mr. Hogue told the Kalacs that the politicians would want to make sure that the market

remained stable and that the Kalacs would miss out on growth opportunities if they did not maintain the account as it was invested.

2.27 The Kalacs spoke with Mr. Hogue about their desire to withdraw an additional $700 per month to purchase a new automobile. Mr. Hogue told the Kalacs that they had plenty of money in the retirement savings account and should take out additional money for the new automobile. Upon Mr. Hogue's advice, the Kalacs increased their scheduled monthly withdrawal to $5,700.

2.28 In July 2002, the Kalacs became aware that they did not receive the normal deposit into their checking account from the automatic redemption from their retirement account. After investigating the situation, Mrs. Kalac learned that there was no more equity in mutual fund that they had been tapping for their monthly withdrawals. Mr. Hogue never advised the Kalacs that there was a danger of exhausting the equity of a particular fund and did not advise them that they would not be receiving the full amount of their monthly withdrawal. Mrs. Kalac suggested to Mr. Hogue that she instruct American Express to liquidate the mutual fund with the largest equity position to fund the monthly withdrawals. Mr. Hogue, without any analysis of asset allocation or other factors, told Mrs. Kalac that was a good idea.

2.29 In early 2003, the Kalacs saw an advertisement for an investment seminar hosted by American Express. The Kalacs attended the seminar and met Dennis Callahan

and Suzanne Johannsen, American Express financial advisors who were colleagues of Mr. Hogue. The Kalacs expressed that they were no longer comfortable with Mr. Hogue managing their financial affairs and asked if American Express would permit a re-assignment of their accounts to different financial advisors. Mr. Callahan and Ms. Hogue assured the Kalacs that a re-assignment was permitted and soon became the Kalacs financial advisors.

2.30 The Kalacs met with their new financial advisors several times throughout the first part of 2003. The Kalacs' new advisors suggested that the Kalacs immediately reduce their monthly withdrawal by $1,500 a month to $4,200, which the Kalacs did. Recognizing that the investments in the Kalacs' retirement accounts were unsuitable for the Kalacs lifestyle and appetite for risk, the new advisors also advised the Kalacs of other recommended changes to their accounts, recommendations that the Kalacs also followed. Some of the changes that the Kalacs' new financial advisors at American Express implemented are as follows:

a. In Mrs. Kalac's IRA, reallocated the investments in the Variable Universal Life investment by transferring from the Managed Fund to the AXP VP Extra Income Fund;

b. In Mr. Kalac's IRA, transferred funds in the Variable Universal Live investment from Managed fund to the AXP VP Extra Income Fund and from the Equity Fund to the AXP VP Federal Income Fund;

c. In the Kalac's joint account transferred funds from the Stock Fund to the Intermediate Tax-Exempt Fund;

d. In the Kalac's joint account transferred funds from the Managed Allocation Fund to the AXP Short Duration U.S. Government Fund;

e. In the Kalac's joint account transferred funds from the Mutual Fund to the Federal Income Fund;

f. In the Kalac's joint account transferred funds from the New Dimensions Fund to the Intermediate Tax-Exempt Fund;

g. In the Kalac's joint account transferred funds from the Managed Allocation Fund to the Federal Income Fund; and

h. In Mr. Kalac's IRA, reallocated the investments in his flexible annuity by transferring fund from the AXP VP Cap Resource Fund, AXP VP Managed Fund, AXP VP New Dimension Fund and A I M Core-Equity Fund to the AXP VP Bond Fund and AXP VP Extra Income Fund.

This significant reallocation of the Kalac's retirement portfolio by American Express financial advisors Dennis Callahan and Suzanne Johannsen is a tacit admission that Mr.

Hogue did not know his customers and had not made suitable investments in their retirement accounts. Attached as Exhibit B is the Kalacs' June 30, 2003 statement.

2.31 Because respondents mismanaged the Kalacs' retirement accounts, the Kalacs have had to make significant lifestyle changes. Mr. Kalac had been enjoying his retirement by playing golf several times a week, travelling, riding horses and horse camping. However, as of April 1, 2004, because of respondents' mismanagement of the Kalac's retirement accounts, Mr. Kalac returned to work as a sales person. Mr. Kalac will be working full-time as outside sales persons whose territory will include Oregon, Washington, Idaho and Western Canada. As a result of his new employment, employment he sought only because respondents' mismanagement of his retirement accounts have forced him to return to work, Mr. Kalac will be on the road for significant periods of time. Also, even if time were to permit, the Kalacs have made a decision to cut-back on a number of their favorite recreational activities (most notably golf and travelling) because their retirement assets have significantly declined and they worry about maintaining even their modest life throughout their renewed retirement. This is not how the Kalacs planned to spend their retirement years and is a far cry from Mr. Hogue's statement to the Kalacs that they would double their money and would have trouble spending all of the money they would

2.32 The Kalacs reached out to American Express in an attempt to amicably resolve the wrongs that American Express committed. American Express has refused to acknowledge the gross mismanagement of the Kalacs' retirement accounts. American Express even had the audacity to charge the Kalacs a large surrender penalty in order for the Kalacs to liquidate the unsuitable investments in which American Express had invested their retirement savings. When the Kalacs complained, in attempt to confuse and manipulate them into forgoing their legal rights, American Express tried to convince the Kalacs that the gross mismanagement of their account was subject to a class action settlement. After the Kalacs retained counsel, American Express did not even extend the courtesy of responding to a demand letter.

## III. CLAIMS

### A. SUITABILITY

3.1 A broker-dealer who makes recommendations to a customer must recommend only those securities and types of securities that he/she reasonably believes are suitable for the customer. Respondents, knowing that the Kalacs were retired, purchased investments that were unsuitable for the Kalacs and as a result, caused the Kalacs substantial damage for which respondents should be made responsible.

## B. BREACH OF FIDUCIARY DUTY

3.2 Respondents had a fiduciary duty to the Kalacs to act in good faith and in the best interest of the Kalacs. Respondents breached their fiduciary duty, putting their own economic interests above that of the Kalacs, by making investment decisions based upon the commissions that respondents could generate rather than making investment decisions based upon the Kalacs' life situation.

## C. NEGLIGENCE

3.3 Respondents negligently failed to protect the Kalacs from foreseeable losses in their retirement accounts and caused the Kalacs substantial damages, for which Respondents should be made responsible.

## D. NEGLIGENT MISREPRESENTATION

3.4 Respondents committed negligent misrepresentation by failing to provide the Kalacs with all of the information that they were entitled to receive about

## D. VIOLATIONS OF OREGON SECURITIES LAWS

3.5 Respondents are liable under Oregon Securities laws for selling securities by means of an untrue statement of material fact or for an omission to state a material fact necessary in order to make the statements made, in light of the circumstances under which they are made, not misleading. ORS 59.115. Mr. Hogue, by repeatedly assuring the Kalacs that their retirement accounts were properly invested and that they would double their

money in five years, made untrue statements of material fact in order to induce the Kalacs into the investments that Mr. Hogue recommended and implemented. Also, Mr. Hogue failed to advise the Kalacs of the risky nature of his investment scheme for a retirement couple, an omission of a material fact. Therefore, respondents are liable for the consideration paid for the securities that the Kalacs purchased in their American Express retirement accounts, less the income received when they liquidated their accounts, plus 9% interest from the date of payment and the panel should also grant the Kalacs' attorney fees for bringing this action.

**E. FAILURE TO SUPERVISE**

3.6 American Express has a duty to supervise its employees. American Express failed to supervise Mr. Hogue and allowed him to invest the Kalacs' entire retirement assets in unsuitable investments. American Express could have and should have prevented the mismanagement of the Kalac retirement accounts but failed to do so.

## IV. DAMAGES

The panel should award the Kalacs the following damages:

a. Compensatory damages in an amount according to the proof but not less than $398,000;

b. The lost opportunity cost of what Claimant would have earned if suitably invested (damages equal to the appreciation of a well-managed account);

c. The return of the Kalacs' investment, less the income received upon

liquidation, plus 9% interest from the date of the investments;

c. Disgorgement and restitution of all earnings, profits, compensation and benefits received by Respondents as a result of their unlawful acts and practices in an amount according to proof;

d. Costs of suit, including but not limited to filing fees with the NASD;

e. Attorney Fees;

f. Pre and post judgment interest at the legal rate;

g. Punitive damages of $500,000; and/or

h. Such other relief as the panel may deem just and proper.

## V. RESERVATION OF RIGHTS

Claimants reserve the right to amend this Statement of Claim as additional discovery is conducted into its claims against Respondents.

DATED this 3rd day of May, 2004.

By: [signature]
B. Scott Whipple OSB #98375, WSB #29030
Attorney for Claimants

**Exhibits**

Exhibit A – March 26, 2000 Account Statement
Exhibit B – June 30, 2003 Account Statement