**SCHWABE, WILLIAMSON & WYATT, P.C.**
ATTORNEYS AT LAW
PACWEST CENTER, SUITES 1600-1900 • 1211 SOUTHWEST FIFTH AVENUE • PORTLAND, OREGON 97204-3795
TELEPHONE: 503.222.9981 • FAX: 503.796.2900 • www.schwabe.com

B. SCOTT WHIPPLE
Admitted in Oregon and Washington
Direct Line: (503) 796-2938
E-Mail: swhipple@schwabe.com

April 12, 2005

**VIA OVERNIGHT DELIVERY**

Audrey Philips
NASD Dispute Resolution
300 South Grand Avenue
Suite 900
Los Angeles, CA 90071-3135

Re: Trudy A. Kalac and Richard M. Kalac v. American Express Financial Advisors and Greg Hogue
NASD Case No. 04-03420

Dear Ms. Philips:

Enclosed is the original and three copies of Claimants' Memorandum in Opposition to Respondents' Motion to Dismiss. A hearing is scheduled for this matter on Friday, April 15, 2005. Therefore, I ask that you overnight to the panel members the enclosed copies of Claimants' brief, so that they will receive them on April 14, in advance of the hearing.

Thank you for your assistance with this matter.

Best regards,

B. Scott Whipple

Enclosures

cc: Gary Irwin, Esq. (via overnight mail, w/ enclosures)
Trudy and Dick Kalac (via first class mail, w/ enclosures)
Michael Furlong, Esq. (w/o enclosures)

NATIONAL ASSOCIATION OF SECURITIES DEALERS REGULATION, INC.
ARBITRATION PANEL

| | |
|---|---|
| In the matter of the Arbitration between<br><br>TRUDY A. KALAC and RICHARD M. KALAC,<br><br>Claimants,<br><br>vs.<br><br>AMERICAN EXPRESS FINANCIAL ADVISORS and GREG HOGUE,<br><br>Respondents. | No. NASD Arb. No. 04-03420<br><br>AFFIDAVIT OF B. SCOTT WHIPPLE IN IN OPPOSITION TO RESPONDENTS' MOTION TO DISMISS |

STATE OF OREGON )
) ss.
County of Multnomah )

I, B. Scott Whipple, being first duly sworn on oath, do depose and say that if called into court I could and would competently testify from my own, personal knowledge to the following facts:

1. I am counsel for claimants Trudy and Richard Kalac.

2. With regard to American Express Financial Advisors' ("AEFA") Motion to Enforce Class Action Settlement ("Motion") filed in the U.S. District Court of Minnesota, AEFA's counsel did not serve me with a Notice of Motion, as required by Local Rule 7.1.

3. I called a local attorney who advised me that the Motion would not be heard until after AEFA's counsel served a Notice of Motion. The Clerk of the Court also advised me that the court would not take action until after I received a Notice of Motion from opposing counsel.

4. On January 26, 2005, counsel for the Kalacs and AEFA had a telephone conference with the Panel Chairperson.

5. During January 26, 2005 conference, I raised the issue that AEFA had filed a Motion to Enforce Class Action Settlement with the U.S. District Court of Minnesota. Counsel for AEFA never advised the panel nor me of the existence of the previously issued order.

6. I was completely unaware of the existence of the January 19, 2005 order issued by the U.S. District Court of Minnesota until April 3, 2005, when I read about it for the first time in AEFA's Motion to Dismiss.

Dated this 12th day of April 2005.

B. Scott Whipple

This instrument was acknowledged before me this 12th of April 2005, by B. Scott Whipple.

OFFICIAL SEAL
KIMBRA FAY KASCH
NOTARY PUBLIC-OREGON
COMMISSION NO. 361803
MY COMMISSION EXPIRES OCTOBER 27, 2006

NOTARY PUBLIC FOR OREGON
My commission expires 10/27/06

## CERTIFICATE OF SERVICE

I hereby certify that on the 12th day of April, 2005, I served the foregoing AFFIDAVIT OF B. SCOTT WHIPPLE IN OPPOSITION TO RESPONDENTS' MOTION TO DISMISS, on the following parties at the following addresses:

**Via Overnight Mail**
Ms. Audrey C. Philips
Hearing Administrator
NASD
Dispute Resolution - West Regional Office
One California Plaza
300 South Grand Avenue, Suite 900
Los Angeles, CA 90071-3135

**Via Overnight Mail**
Gary Irwin
Law Offices of Edgerton, Weaver & Irwin
Interlachen Corporate Center
5050 Lincoln Drive, Suite 480
Minneapolis, MN 55436

by sending a copy thereof via overnight courier in a sealed, prepaid envelope, addressed to each party's last-known address, as indicated above.

B. Scott Whipple

NATIONAL ASSOCIATION OF SECURITIES DEALERS REGULATION, INC.
ARBITRATION PANEL

| | |
|---|---|
| In the matter of the Arbitration between<br><br>TRUDY A. KALAC and RICHARD M. KALAC,<br><br>Claimants,<br><br>vs.<br><br>AMERICAN EXPRESS FINANCIAL ADVISORS and GREG HOGUE,<br><br>Respondents. | No. NASD Arb. No. 04-03420<br><br>CLAIMANTS' MEMORANDUM IN OPPOSITION TO RESPONDENTS' MOTION TO DISMISS |

## I. INTRODUCTION

The panel should deny Respondents American Express Financial Advisors Inc.'s ("AEFA") and Gregory D. Hogue's ("Hogue") Motion to Dismiss for the following reasons:

1. The Kalacs' claims are peculiar to them, arose after the end of the class action settlement and are therefore not subject to the class action settlement;

2. The order obtained from the Federal District Court of Minnesota was obtained without the proper notice to Claimants' counsel;

3. Respondent AEFA filed an Uniform Submission Agreement and therefore submitted to the NASD's jurisdiction for all of Claimants' claims;

4. Pursuant to the applicable NASD rules, Hogue has been properly served;

5. AEFA's counsel answered on behalf of Hogue, thereby signaling to both the NASD and Claimants that Hogue had appeared and was not challenging service and to dismiss Hogue at this late date would be unjust;

6. All of the applicable statutes of limitations began to run when the Claimants "knew or should have known" that AEFA and Hogue where fleecing them and the panel cannot make that determination without first hearing the parties' testimony; and

7. At the hearing, Claimants' will testify that they did not know and should not have known about AEFA's and Hogue's unlawful actions not more than two years prior to the date they filed their Statement of Claim and therefore all of their claims are timely.

In addition, the panel should re-order AEFA to produce discovery documents it has already ordered AEFA to produce and sanction AEFA for its abuse of the discovery process.

## II. HOGUE; A COMPLIANCE NIGHTMARE

This Panel should not be swayed by the desperate attempts of Respondents. AEFA and Hogue to divert attention from the real issue in this case: Hogue's unconscionable failure to provide even minimal financial planning services to Trudy and Richard Kalac ("Kalacs"). The Panel need not rely on the Kalacs to conclude that Hogue was a compliance nightmare that should have been terminated long before he had the opportunity to decimate the Kalacs' retirement savings. Instead, the Panel can simply trust AEFA's own employees, who concluded the following about the risk Hogue posed AEFA and its customers:

1. "No Planning . . . . Reviewed potential consequences of not doing F/P (Financial Planning) w/ clients . . . . **No suitability documentation system maintained"** in files. (Ex. K, June 12, 1997 Compliance Interview Record)(AXP 00758-761)(Emphasis added);

2. "Gap: No Financial Planning." (Ex. L, October 1, 1998 Compliance Interview Record)(AXP 00751-756);

3. "We went to his (Hogue's) office, a shed in the backyard . . . . Frank reviewed Greg's data from Sales Force Status Report and **commented clearly that there are many red flags**, low income, low production, decrease sales, production, **product mix, no planning**, lost clients, new clients, cash ratio and new money." (Ex. M, October 1, 1998 addendum to Greg Hogue Summary Letter)(AXP 00748)(Emphasis added);

4. "Gap: No financial planning." (Ex. N, October 14, 1998 Sales Practice Review)(AXP 00746);

5. **"Basically he has lousy client service and we wanted to take clients from him."** (Ex. O, e-mail about Hogue sent before March 11, 1999)(AXP 00800)(Emphasis added);

6. "Gap: Low CSS (Client Satisfaction Survey) score." (Ex. P, May 5, 1999 Sales Practice Review)(AXP 00736);

7. "Not meeting the plan (to increase client satisfaction) **will mean having clients reassigned at a minimum, and a maximum, termination.**" (Ex. Q, December 6, 1999 memo to Hogue)(AXP 00801)(Emphasis added);

8. "I do not believe he is meetin (sic) Compliance requirements." (Ex. R, March 10, 2000 e-mail)(AXP 00799);

9. "I had been asking him for assorted paperwork and documentation pretty much since I took over at FCS in March and was getting virtually no response so I

decided to meet him in person to see what was going on . . . . Greg doesn't do much business, is almost never in the office, doesn't have a computer, doesn't pick up his mail or voice messages timely, doesn't submit documentation or response (sic) to written requests, but says he is very busy. I don't know what he does but it doesn't seem to be business related. **This was my first meeting with Greg and I left the meeting underwhelmed.** Lots of mumbled apologies, vague excuses, low expectations for the future, low energy, **completely unimpressive. Why does this guy work for us** and how does he make the money to pay his office expenses and build a house?" (Ex. S, August 1, 2000 Notes to Compliance Issues File for Greg Hogue) (AXP 00721-722)(Emphasis added);

10. "Did you twitch when you saw the subject?" (Ex. T, February 13, 2001 e-mail referencing a customer complaint that Greg had not given the customer her money back, which he had promised over a year ago)(AXP 00796);

11. "I hope you are working on getting access to LN again. You are missing lots of information and making yourself more at risk." (Ex. U, July 20, 2001 note referring to Hogue's failure to use a computer to keep up to date)(AXP 00795);

12. "Greg confirms that LTC, VUL and AXP funds are pretty much all he sells. Fits his client needs. . . . **No planning whatsoever.** . . . There has been no correspondence submitted to the OSJ since June 1999. **How does Greg communicate with his clients?"** (Ex. V, September 2001 Compliance Interview Record)(AXP 00706-716)(Emphasis added);

13. "Customer Service: Indications are that this is a major gap in your business practice. . . . **You have an obligation to contact your clients on a regular basis, and update their files**, even if the update might say that there is no change to suitability information. In volatile time (sic) such as we are having now, this is even more important. . . . You are knowledgeable of the products you present, but I am concerned that you are losing clients and opportunities, making yourself vulnerable to client complaints, and harming the brand, by not taking seriously your responsibilities toward your practice and it's growth." (Ex. W, October 15, 2001 Annual Compliance Interview)(AXP 00703-705)(Emphasis added);

14. "**Gap: You are not presenting Financial Planning to your clients. Follow-Up Actions/Dates: Since this is what our company does it raises a concern that your clients are not getting the service and attention to detail that the company advertises** . . . **Finally, the issue I am most concerned about it the service or lack thereof you are giving to your clients.** When a client has to make a 'third' request to get something done there is a service issue with the advisor and potentially a complaint from the client." (Ex. X, July 15 2002 Compliance Interview Record)(AXP 00689-699)(Emphasis added);

15. "Still no (financial) plans." (Ex. Y, August 27, 2002 follow-up notes to 2002 Compliance Interview)(AXP 00687-88);

Almost inconceivably, this is a *partial* list of AEFA's observations regarding the failure of Hogue to even attempt financial planning. Yet, despite the obvious relevance

of these compliance documents to the Kalacs' claims that Hogue did not provide financial planning and ignored their concerns about their investments, AEFA produced these documents only after the Kalacs moved to compel their production. AEFA's Motion to Dismiss is just an extension of its "hide the ball" litigation tactics. Instead of addressing the real issue in this case, AEFA shamelessly attacks Claimants' counsel. The Panel should not reward AEFA's questionable tactics.

## III. DISPUTED FACTS

A lengthy restatement of the relevant facts is not necessary. The facts are found in the Statement of Claim and as set forth above, in AEFA's internal compliance documents. However, the Kalacs feel it is important to clarify the AEFA's restatement of the "facts", which would be more accurately labeled AEFA's revisionist history.

First, the Kalacs claims are timely. They will testify that they trusted Hogue because he was a financial planner and they were novice investors. The Kalacs will testify that they did not suspect that Hogue was not providing the financial planning services that AEFA and Hogue promised until less than two years prior to the date they filed their Statement of Claim.

Second, the Kalacs' are not seeking documents dating back to 1995 in disregard of the applicable statutes of limitation on their claims. However, counsel for the Kalacs is shocked by Hogue's long history of compliance failures and AEFA's failure to take action to protect the Kalacs from Hogue's destructive actions. The Panel should consider how long AEFA knew that Hogue was failing to provide financial planning to his clients

so that appropriate punitive damages may be awarded in this case.

Third, it was not until January 1999 that Mr. Kalac rolled money from his profit-sharing account with MICO, his former employer, into an unsuitable flexible annuity recommended by Hogue. Setting aside the fact that Hogue put 75% of this retirement nest egg in equity funds, there is no rationale reason to purchase an annuity in a tax protected account like Mr. Kalac's IRA.

Fourth, the Kalacs disagree with AEFA's calculations regarding the Kalacs' account. However, AEFA's damage calculations have nothing to do with its Motion to Dismiss. It is widely recognized within the brokerage industry that the suitability of a client's investments changes as the client moves into different phases of life. AEFA would like the Panel to believe that suitability is a static concept focused on the time of an investment's purchase and that gains made over the life of an account conclusively establish the suitability of the investments therein. For litigation purposes, AEFA's lawyers attempt to redirect the Panel's focus to 1989, when the Kalacs first opened their account and Mr. Kalac was gainfully employed. But AEFA's own compliance department takes a different view of suitability, as demonstrated by the following excerpts from its reviews of Hogue:

16. "Gap: No suitability documentation maintained." (Ex. Z, October 16, 1997 Sales Practice Review)(AXP 00757);

17. **"You have an obligation to contact your clients on a regular basis, and update their files,** even if the update might say that there is no change to suitability

information. In volatile time (sic) such as we are having now, this is even more important." (Ex. W, October 15, 2001 Annual Compliance Interview)(AXP 00703-705)(Emphasis added);

18. "Gap: **Updated suitability information for your clients. This is a company policy - even if you have not seen your clients for years, it is imperative that you contact them to update their suitability status with us."** (Ex. X, July 15 2002 Compliance Interview Record)(AXP 00689-699);

19. "I don't know if you have been staying current on this project (suitability update), but I'm pointing it out to you to ensure you know about it **so that you can be working your clients now to bring their suitability current."** (Ex. AA, December 6, 2001 fax to Hogue)(AXP 00786)(Emphasis added).

In short, AEFA's self-serving version of the "facts" is not entirely accurate. Though labeled a "Motion to Dismiss," Respondents' Motion relies upon exhibits outside the parties' pleading and is akin to a Motion for Summary Judgment. It is not appropriate to grant such a motion unless there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. (*See* ORCP 47C). The parties will dispute issues of material fact and it would be inappropriate for the panel to grant Respondents' motion based upon argument of counsel without the benefit of sworn testimony by all parties. Moreover, the sworn testimony by all of the parties will establish that Respondents are not entitled to a judgment as a matter of law.

//

## IV. ARGUMENT

### A. The Kalacs' Claims are not Barred by the Class Action Settlement

The class action settlement and related release do not bar the Kalacs' claims in connection with account numbers: 90903948698-004; 90906106934-004; 93002300010-004; 93103019163-004; and 9316300267-004 (collectively the "IDS Accounts"). The terms of the Final Order and Judgment Approving Class Action Settlement and Dismissing Complaint ("Final Order") explicitly exclude the Kalacs' suitability, negligence, breach of fiduciary duty, and failure to supervise claims. These claims first arose in March of 2000 (though the Kalacs did not discovery the claims until much later) as a result of AEFA's mismanagement of the IDS Accounts. (A copy of the Class Notice is attached as Exhibit G to Respondent's Motion to Dismiss). The Class Notice states that the release **shall not be "deemed to alter … a class member's right to assert any claim that independently arises from acts, facts or circumstances that occur for the first time after the last day of the class period…."** (Ex. G, p. 10)(Emphasis added). There is no dispute that the class period ended on February 29, 2000.

The Kalacs' Statement of Claim makes clear that that their claims are based, in large part, upon Hogue's failure to follow the Kalacs' explicit March 2000 instruction to "lock in" the gains on all of their accounts, including the IDS Accounts. The suitability of the investments in the IDS Accounts should be analyzed from March 2000, when the Kalacs discussed their strategy to place their retirement funds in secure, low risk investments. Hogue was negligent and breached his fiduciary duty to the Kalacs by failing to follow the Kalacs' explicit instruction to preserve their gains. AEFA negligently supervised Mr. Hogue, by inexcusably allowing him to gamble with the Kalacs' money. In discussing this matter with counsel for AEFA, Mr. Irwin, he acknowledged that the class action settlement was not intended to prohibit claims that

arose after the class period. It is axiomatic that a settlement agreement does not usually bar claims based upon facts that arise after the date of the settlement and the class action settlement upon which Respondents' rely is no different in that respect than the typical settlement agreement. Accordingly, even under AEFA's reasoning, it remains liable for conduct in March 2000 and beyond.

The final order also states that "Nothing in this Release shall be deemed to alter a Class Member's right to assert any claim peculiar to the Class Member that falls outside the general categories of claims or conduct described in the complaints in the Actions or the Release in this settlement and is based on facts that were not discovered and could not within reasonable care have been discovered by the Class Member before the deadline to submit an Election Form set forth in the Stipulation of Settlement." (AEFA Motion to Dismiss, Exhibit G, p. 10). The class action lawsuit settled by AEFA was based on fees it charged in connection with sales and management of IDS variable life insurance and variable annuity products. The Kalacs do not seek recovery based on the fees they were assessed in connection with the IDS Accounts. The Kalacs claims are peculiar to them and fall outside the general categories of claims in the class action suit. The Federal District Court of Minnesota was not apprised of Mr. Kalac's retirement at the end of the 1998 or the Kalacs' conversations with Hogue about "locking in" gains and crafting a conservative portfolio. Nor was the Court apprised of Hogue's long history of compliance violations or AEFA's repeated failure to take corrective action. The Kalacs' claims are independent causes of action based on the suitability of their investments shortly after Richard Kalac's retirement and the subsequent mismanagement of Kalacs' accounts by a trusted fiduciary.

By not opting out of the class action settlement, the Kalacs received a mere three years of accidental death insurance coverage in exchange for their forbearance in

bringing suit in connection with AEFA's fees. At most, the Kalacs were compensated for inappropriate or unlawful fees that AEFA charged on the IDS accounts. However, the proceeds of the class action settlement have no relationship with the damage caused by AEFA by failing to follow the Kalacs' instructions to move them into conservative investments and by recklessly managing of the Kalac's accounts.

AEFA's threat to appeal any award by this panel rings hollow. There is no doubt that the class action settlement or subsequent order do not prohibit claims that arise after the end of the class period. Regardless, these claims are peculiar to the Kalacs and are not subject to the class action settlement.

**B. The Mutual Fund Accounts Are Not at Issue**

AEFA admits that the Kalacs' remaining accounts are not covered by the class action settlement. The Kalacs' investments in the remaining accounts were limited to high-risk mutual funds recommended by Hogue and AEFA. The remaining accounts did not contain the unsuitable IDS variable annuities or variable life insurance policies at issue in the class action lawsuit.

Despite its admission that the remaining accounts are not subject to the class action settlement, AEFA raises the specter of appeal in another attempt to distract the Panel. Respondents cite the *Chandler* case (Attached as Ex H to Respondent's Motion to Dismiss). However, the *Chandler* decision analyzes a claim by a class member for bad advice with regard to the class action settlement documents. There is no mention of any claims that arose after the class period, like the Kalacs' claims. The *Chandler* case is completely unrelated to the case before the panel and is cited by Respondents to unnecessarily complicate the issues and scare the panel into believing that any award will be subject to appeal.

While there is little chance of an appeal in this matter, the Kalacs suggest that any

award could be granted in two parts. One part of the award could relate to the Kalacs' claims as they relate to the IDS Accounts. The second part of the award could relate to the accounts that held the unsuitable equity funds. This procedure would eliminate AEFA's concern that any award the panel issues will be a mixed result of the claims that are clearly not subject to the class action settlement and the IDS accounts, which AEFA argues are subject to the class action settlement (despite the fact that the claims arose after the end of the class period).

**C. The Kalacs did not opt out of the Class.**

The Kalacs did not opt out of the class. The Kalacs are not financially or legally sophisticated and did not fully understand their rights. Even if the Kalacs had understood their legal rights, they probably would not have opted out of the class. At the time of the deadline to opt out of the class the Kalacs had no idea that AEFA was aware of Hogue's pattern of compliance violations or that AEFA had considered taking clients away from Hogue. At that time, the Kalacs still trusted Hogue, a financial advisor backed by the brand name "American Express." Regardless, the class action notices and settlement are facially inapplicable to the facts and claims asserted by the Kalacs in this arbitration, which are peculiar to them and arose after the end of the class period.

**D. Evidence of Conduct Arguably Covered by the Class Action Settlement is Relevant and Admissible in This Case**

Even if the Panel finds that the class action settlement bars recovery on the Kalacs' claims on the IDS Accounts, the manner in which AEFA and Mr. Hogue handled the IDS Accounts is relevant to the Kalacs' claims on the remaining accounts. Hogue's placement of the Kalacs in variable life insurance and variable annuities in tax sheltered retirement accounts exemplifies a continuing course of conduct of recommending unsuitable investments. The Kalacs are entitled to demonstrate how AEFA and Hogue

failed to conduct an appropriate suitability analysis when they recommended the investments in the IDS Accounts to the Kalacs and did not re-tool the investments when the Kalacs asked Hogue about being more conservative, even though the Kalacs paid AEFA and Hogue more than $20,000 in commissions (Ex. BB, AXP 0677-686). Moreover, any settlement relating to the fees charged by AEFA on the IDS Accounts does not render irrelevant the fact that AEFA failed to heed the Kalacs' directives to lock in the gains in all of their accounts in March of 2000.

**E. The Class Action Settlement Issues Are Properly Before This Arbitration Panel**

To the extent that AEFA argues that issues regarding the enforceability of the class action settlement are not properly before this panel, AEFA waived its right to enforce the class action settlement in front of the U.S. District Court of Minnesota when it submitted its Uniform Submission Agreement in this arbitration to the NASD on July 27, 2004. The Uniform Submission Agreements states, in part, that AEFA "submit(s) the present matter in controversy, as set forth in the attached statement of claims, answers, cross claims and all related counterclaims and/or third-party claims which may be asserted to arbitration ..." (Ex. CC). This panel has the sole authority, by agreement of the parties, to determine whether the class action settlement applies to the Kalacs' investments in the IDS Accounts.

**F. AEFA's Subsequent "Hide The Ball" Litigation Tactics**

AEFA attacks the candor of counsel for the Kalacs. However, it is AEFA that has been less than forthright with the counsel for the Kalacs and the Panel. When AEFA filed a Motion to Enforce Class Action Settlement, the Certificate of Service signed by AEFA's counsel states that counsel mailed a copy of the Motion and supporting

documents to counsel for the Kalacs on December 15, 2004. In reality, AEFA's counsel sent the documents to the Kalacs' counsel by overnight delivery via Federal Express on December 27, 2004. (Ex. DD).

In support of its Motion to Enforce Class Action Settlement in the U.S. District Court of Minnesota, AEFA's counsel failed to serve counsel for the Kalacs with a Notice of Motion, as required by Local Rule 7.1. (Whipple Aff. ¶ 2). The Kalacs' counsel called the clerk of that court, who advised him that the court would not hear the motion until AEFA's counsel served him with a Notice of Motion advising him of a hearing date. (Whipple Aff. ¶ 3). The hearing date triggers the date by which a response to the motion is due. (See Local Rule 7.1, Ex. EE). The Kalacs' counsel also called a local attorney who advised him of the same thing -- the motion would not be heard until after AEFA's counsel served a Notice of Motion. (Whipple Aff. ¶ 3).

On January 6, 2005, the Kalacs' counsel sent a letter to the NASD and asked the NASD to forward the letter to the Panel. The letter asked the Panel to discuss Respondents' Motion to Enforce the Class Action Settlement, filed with the U.S. District Court of Minnesota. (Ex. CC).

Without the benefit of a response brief or an appearance by counsel for the Kalacs, the U.S. District Court of Minnesota apparently issued an order barring the Kalacs from proceeding with a claim in the NASD arbitration for losses suffered as a result of their unsuitable investments in variable annuities and variable life insurance products that are based on or related to the claims and causes of action or the facts and circumstances

relating to the underlying case. (Ex. F). As discussed above, this order does not prohibit the Kalacs' claims because they are peculiar, after the class period and are not based on related to any of the claims or facts of the underlying case. Apparently, that order was entered January 19, 2006.

On January 26, 2005, counsel for the Kalacs and AEFA had a telephone conference with the Panel Chairperson. (Whipple Aff. ¶ 4). During that conference, counsel for the Kalacs raised the issue that AEFA had filed a Motion to Enforce Class Action Settlement with the U.S. District Court of Minnesota. (Whipple Aff. ¶ 5). AEFA's counsel chose not to disclose to the Panel or the Kalacs' counsel that an order had already been entered. Instead, AEFA decided to string the Kalacs' counsel and the Panel along by giving the impression that the motion would not be pursued in the U.S. District Court of Minnesota until after the Panel reviewed briefing on the motion and conducted a hearing.

The Panel Chairperson advised counsel that he would discuss the issue with the other panel members. On February 3, 2005, the Panel Chairperson ordered a further telephonic hearing to discuss various issues raised by AEFA's Motion to Enforce Class Action Settlement. (Ex. FF). That hearing was originally scheduled for March 1, 2005. (Ex. GG). However, the hearing was postponed until April 15, 2005 to accommodate the schedule of counsel for AEFA. Counsel for AEFA and Hogue chose not to advise either the Panel or the Kalacs' counsel of the existence of the order until filing the Motion to Dismiss.

Not satisfied with the entry of order on an unopposed motion, AEFA has taken its unsavory litigation tactics one step further. In an attempt to distract the Panel from the real issues in the case, AEFA attacks the candor of the Kalacs' counsel for failing to disclose the existence of the order to the Panel. The Kalacs' counsel was completely unaware of the existence of the January 19, 2005 order until he read about it for the first time in AEFA's Motion to Dismiss. (Whipple Aff. ¶ 6) Apparently, AEFA thought it could gain an advantage by delaying disclosure of the District Court's entry of the order until just before the Panel's hearing date on AEFA's Motion to Enforce Class Action Settlement. The Panel should not tolerate such behavior.

Regardless, depending on the position AEFA takes with regard to the claims that arise after the class period (AEFA's counsel has suggested that AEFA will stipulate that those claims are not subject to the class action settlement), the Kalacs may file a motion with the Federal District Court of Minnesota, seeking relief from the order. First, AEFA failed to give notice as required by local rules. Second, AEFA waived its right to enforce the class action settlement in the U.S. District Court of Minnesota by signing and submitting a Uniform Submission Agreement to the NASD. Waiver is the voluntary relinquishment of a known right. *Alderman v. Davidson*, 326 Or 508, 514, 954 P.2d 779 (1998). AEFA knew that of the release in the class action settlement well before it submitted its Uniform Submission Agreement to the NASD in this arbitration and should not have done so if it intended to defend against the Kalacs claims by seeking relief in the U.S. District Court of Minnesota.

In any event, the release in the class action settlement does not apply to the Kalacs' claims because their claims arose after the end of the class period and their claims could not have been discovered before the deadline to opt out of the class action lawsuit against AEFA. It is entirely appropriate for the NASD to proceed with this matter. As noted above, for potential appeal purposes, the Kalacs suggest it would be prudent to issue two awards -- one award for the losses in the IDS Accounts plus interest and a second award for loses in the stock funds, plus interest, attorney fees and punitive damages.

### G. AEFA's Counsel Submitted to the Panel's Jurisdiction on Behalf of Hogue

Both the Statement of Answer and Amended Statement of Answer begin "This is the Statement of Answer of American Express Financial Advisors, Inc. ('AEFA') and of **Gregory D. Hogue.**" (Emphasis added). Had the NASD been notified at the outset of the case that service of Hogue was an issue, the NASD would have served Hogue duplicate copes of the Statement of Claim at his last known residential and business address pursuant to NASD Rule 9134. (Exhibit HH). After service under Rule 9134, the Kalacs would have been able to secure a default judgment against Hogue under NASD Rule 10314. However, AEFA's counsel specifically appeared on behalf of Hogue and Rule 9134 provided that service is to be made on counsel.

During an April 11 2005 conference with counsel for parties and the regional director for the NASD, Respondents' counsel conceded that the NASD has followed all applicable procedures and that his inability to locate Hogue has put him in a "quandary." Hogue had an affirmative duty to keep his address current with the NASD and AEFA

affirmatively accepted service on his behalf. The "quandary" AEFA finds itself in is not the Kalacs' problem. However, if the panel dismisses Hogue as requested, the Kalacs will have statute of limitations issues with respect to their claims against Hogue. The Panel should tell AEFA it is too late. Regardless, if the Panel decides to dismiss Hogue, the order should in no way provide a defense by AEFA against the Kalacs' claims.

**H. All of the Kalacs' Claims are Timely**

As part of its strategy to distract the Panel rather than address the issues, AEFA dedicates a large portion of its brief to arguing that the Kalacs' claims are barred by various statutes of limitations. The Panel should reserve ruling on when the Kalacs' knew or should have known about their claims until listening to sworn testimony from all parties. It is not appropriate to dismiss the Kalacs' claims, based upon what they knew or should have known, without first receiving the testimony. Regardless, Respondents' statute of limitations arguments are without merit and can be quickly dismissed.

**1. The Kalacs' Suitability Claims are Timely**

As noted above, suitability is not a static concept. The Panel will hear testimony about changing suitability and the requirements to "know your customer." The Kalacs' financial situation changed and the suitability analysis underlying their claims begins in March 2000, the date when the Kalacs will testify that they told Hogue that they wanted to make sure that at least of $1,000,000 of the principal investments were safe. The Kalacs will also testify that they are novice investors that do not understand the financial markets. The Kalacs will further testify that they put their complete trust in Hogue, believing that he was providing them the financial planning services advertised by AEFA and promised by Hogue, and therefore believed him when he advised them not to alter their investments. The Kalacs will testify that not until the summer of 2002 did they first get an inkling that Hogue might not be the financial planner that AEFA held him out to be and it was not until February 2003, when they met with AEFA advisors Callahan and

Johansen did they understand that Hogue had been reckless with their investments and had negligently jeopardized their retirement "nest egg." In other words, the Kalacs claims are within the statute of limitations.

**2. The Kalacs' Tort Claims are Timely**

The Kalacs' tort claims are based upon AEFA's continuing duties to the Kalacs. For example, AEFA had a continuing duty to supervise Hogue. From March of 2000 through early 2003, when the Kalacs transferred their accounts out of Hogue's management, AEFA and Hogue continually breached their fiduciary duties to the Kalacs -- AEFA and Hogue had a continuing duty to manage the Kalacs' retirement "nest egg" in a manner that was not negligent. Hogue had a duty not to negligently misrepresent to the Kalacs that the securities he purchased on their behalf would earn them so much money that they would not know what to do with it all. The Panel should not dismiss the Kalacs' claims based upon AEFA's unsupported allegations that the Kalacs should have discovered Hogue's problems earlier, especially in light of the fact that AEFA tried to keep this information from them during the course of discovery in this lawsuit, as explained below. The Kalacs' brought their claims within two years of when they discovered the claims.

**3. The Kalacs Claims Pursuant to Oregon Securities Laws are Timely**

AEFA misstates the statute of limitations under the Oregon Securities Law. The Kalacs' claims under ORS 59.115 and ORS 59.135 are permissible because they were brought "within three years after the sale **<u>or</u>** two years after the person bringing the claim should have discovered the facts on which the action is based, **<u>whichever is later</u>**." ORS 59.115(6)(Emphasis added). Despite quoting the applicable language from the Oregon Securities Law in its brief, AEFA inexplicably concludes that the Kalacs' claims under ORS 59.115 and ORS 59.135 are barred because they should have been filed "no later

than three years after the act or occurrence giving rise to the claim."

The Kalacs filed their Statement of Claim in May of 2004, approximately 14 months after discovering from other AEFA financial advisors that they were invested in funds totally inappropriate for a retired couple and less than two years after first questioning whether Hogue was providing the financial planning services he and AEFA promised. Additionally, ORS 59.135 provides for continuing liability beyond the date of a sale of security, and imposes continuing liability for their continued deceptions. For example, AEFA never notified the Kalacs that Hogue was a compliance nightmare and that they considered terminating him or reassigning his clients. Notwithstanding AEFA's attempt to impose a statute of repose that does not exist, this Panel should deny AEFA's motion to dismiss the Kalacs' Oregon Securities Law claims.

**4. The Doctrine of Laches is Inapplicable**

AEFA's laches argument is equally unpersuasive. The case law cited by AEFA suggests that a laches defense may apply if a customer does not complain after reviewing account statements. The facts of this case are to the contrary. The Kalacs complained to Hogue on several occasions. The Kalacs continued to put their trust in Hogue, who was supported by AEFA and who held him out to the public as a financial advisor, despite the fact that AEFA knew that Hogue was not providing any financial planning services for his clients. AEFA now wants this panel to punish the Kalacs because they trusted AEFA's financial professional. Not only does this argument call for an unconscionable result, it is not supported by the law cited by AEFA. Moreover, as already argued by AEFA, the six-year statute of limitations imposed by the NASD is the applicable guideline to determine if a claim is timely. The panel should hear all of the testimony before making any rulings on statute of limitations grounds. To do otherwise at this point in the case, without any admissible evidence provided by AEFA, and without hearing the Kalacs' testimony, would not be fair or lawful.

## V. The Panel Should Sanction AEFA for Discovery Abuse

As noted above, in an attempt to hide documents from the Kalacs, AEFA failed to produce a number of documents that are clearly relevant to the Kalacs' claims. It was not until the Panel ordered production that AEFA produced any of Hogue's compliance documents. (Ex. II). To make matters worse, however, AEFA STILL HAS NOT PRODUCED ALL RESPONSIVE DOCUMENTS AND INFORMATION. Attached as Exhibit JJ is a March 25, 2005 letter from the Kalacs' counsel to counsel for AEFA advising him that there are still serious deficiencies with AEFA's production. Many pages are missing or illegible. AEFA explains that the documents are old and AEFA is only required to keep documents for six years. However, that explanation certainly does not address why pages are missing from 2002 compliance reviews or 1999 agreements.

Generally, the Kalacs' counsel is in favor of cooperation with regard to discovery and is reluctant to file discovery motions. However, AEFA's questionable litigation tactics have caused Kalacs' counsel to re-think that policy for purposes of this case. The Kalacs served a discovery request May 3, 2004 and they still do not have all of the requested documents. The Kalacs request that the Panel order production of all of the missing and illegible pages, as set forth in the attached Exhibit JJ, within seven days of the hearing.

Moreover, AEFA has still failed to answer the Kalacs' Requests for Information No. 2 and No. 3, which the panel *already* ordered AEFA to produce on or before February 28, 2005. Specifically, the Panel Chair ordered AEFA, by no later than February 28, 2005, to provide "Contact information for the co-workers, supervisors, operations managers and branch managers of Mr. Hogue as set forth in Claimants' Request for Information Nos. 2 and 3 ... as follows: Business address and phone numbers when available, and if not available, personal addresses without phone numbers." (Ex. II). The Kalacs request that the Panel order full and complete answers to their Requests

for Information within seven days of the hearing.

The Kalacs further request that the Panel sanction AEFA for its lack of good faith and for its attempts to frustrate the Kalacs' entitlement to full discovery. AEFA's failure to produce documents and information is hindering the Kalacs' prosecution of their case. It is clear that AEFA is attempting to manage the litigation process through deception rather than allowing this case to proceed to a hearing with all the relevant information on the table. The Kalacs ask that the Panel apply the principals of Spoliation by drawing all inferences in favor of the Kalacs with regard to all missing documents.[1] The Kalacs further ask the Panel to assess a monetary sanction on AEFA to compensate the Kalacs for the additional attorneys' fees they have unnecessarily expended on discovery issues and also to punish AEFA for abusing the discovery process.

## IV. CONCLUSION

The class action settlement does not impact the Kalacs' claims. Greg Hogue should not be dismissed from this lawsuit because AEFA answered the Statement of Claim on his behalf and is inexcusably late in requesting relief from its own error in answering for Hogue. The Kalacs filed their Statement of Claim within all applicable limitations periods. For the foregoing reasons, the Panel should deny the Respondents' Motion to Dismiss. The Panel should also compel production of the remaining documents AEFA has failed to produce, despite the Panel's order to do so. The Panel should award the Kalacs' their attorneys' fees incurred as a result of AEFA's refusal to

//

[1] The most common sanction imposed for both negligent and intentional spoliation-of-evidence claims is an adverse inference against the spoliator. The jury is instructed that the evidence destroyed would have been disfavorable to the spoliator. To draw an adverse inference from the destruction of evidence, it should appear that "the evidence would have been relevant to an issue at trial and otherwise would naturally have been introduced into evidence." Lundquist v. United States, 1997 U.S. App. LEXIS 16204 (9th Cir. Wash. 1997).

produce all documents and sanction AEFA for its abuse of the discovery process in this case.

Dated this 12th day of April, 2005.

SCHWABE, WILLIAMSON & WYATT, P.C.

By: ______________________________
B. Scott Whipple, OSB #98375; WSB #29030
Michael D. Furlong, OSB #02308
Of Attorneys for Claimants

## CERTIFICATE OF SERVICE

I hereby certify that on the 12th day of April, 2005, I served the foregoing CLAIMANTS' MEMORANDUM IN OPPOSITION TO RESPONDENTS' MOTION TO DISMISS, on the following parties at the following addresses:

**Via Overnight Mail**
Ms. Audrey C. Philips
Hearing Administrator
NASD
Dispute Resolution - West Regional Office
One California Plaza
300 South Grand Avenue, Suite 900
Los Angeles, CA 90071-3135

**Via Overnight Mail**
Gary Irwin
Law Offices of Edgerton, Weaver & Irwin
Interlachen Corporate Center
5050 Lincoln Drive, Suite 480
Minneapolis, MN 55436

by sending a copy thereof via overnight courier in a sealed, prepaid envelope, addressed to each party's last-known address, as indicated above.

B. Scott Whipple