# EXHIBIT 3

**STATEMENT OF CLAIM**

CLAIMANT: PAUL RUSSELL

RESPONDENT: AMERICAN EXPRESS FINANCIAL ADVISORS, INC.

**JURISDICTION**

Claimant, Paul Russell ("Mr. Russell"), at all times material to this action, resided in Lake County, Florida. His claims against American Express ("Respondent") arise from his association with Respondent as a customer of its office in Leesburg, Lake County, Florida from 1998 until July 2002.

**SUMMARY**

**Paul Russell asserts claims against Respondent for:**

**Breach of Contract**
**Breach of Fiduciary Duty**
**Negligence**
**Gross negligence**
**Unsuitability of Assets and Allocations**
**Failure to Supervise**
**Common Law Fraud**

**Mr. Russell reserves the right to amend these claims, including those for damages, pending discovery after filing of this Statement of Claim.**

On December 22, 1998, Paul Russell, completed an IRA Investment Application ("Application") with American Express Financial Advisors, Inc. ("Respondent") through its Leesburg, Florida branch office number 026, and subsequently, he and his wife, Tyva Russell, opened accounts with Respondent, an IRA Roth Conversion Account and an American Express Brokerage Account. A copy of the Application is attached hereto as Exhibit A. At that time, Mr. Russell was nearing 68 years old and Mrs. Russell was 66.

Mr. Russell retired to Lake County, Florida from Minnesota with his wife. Mr. Russell has a high school education. After high school, he served in the United States Army in Korea from 1951 through 1953, and worked for the State of Minnesota in a survey crew for two years before going to IBM. He worked for IBM for approximately 35 years, from 1956 until 1991, in several capacities. Mr. Russell's long-term employment with IBM was rewarded with an accumulation of company stock, his provision for retirement. When he retired from IBM, he withdrew monies from

his retirement plan in a lump sum which he invested with International Diversified Services, which was taken over by American Express. Mr. Russell drove a school bus in Minnesota for Jamestown Public Schools after retirement in 1994 and 1995 before moving to Florida.

Contrary to an unfounded position taken by Respondent that Mr. Russell had substantial investment experience, Mr. Russell was and is an unsophisticated investor with no training or expertise in securities investments. His investment experience amounted to his retirement program through IBM whereby he received IBM stock. He looked forward to a financially secure retirement in Florida and had planned to live out his "golden years" on the retirement monies he entrusted to Respondent.

On the Application, Mr. Russell's overall investment objective was "Growth and Income" with an overall risk tolerance of "Moderate/aggressive." While willing to incur some risk, Mr. Russell was assured that his portfolio would contain carefully selected securities with proven performance records and that it would be well monitored and vigilantly managed. However, Mr. Russell was totally unprepared and did not agree to any terms, objectives, or a risk tolerance that could have resulted in the unnecessary disaster that lay ahead.

In March 1999, an Asset Allocation Analysis ("Analysis"), attached hereto as Exhibit B, was prepared for Mr. Russell by the Respondent's district management. It showed a diversified portfolio with projections for after-tax returns beginning from -8.9% to 30% and moving to a after-tax return over an investment period from .6% to 17.7% with assurances stated that "[T]here is a 98% chance of realizing a return which is greater than the worst case return and a 2% chance of exceeding the best case return."[1] After two and one half (2½) years, Mr. Russell's initial investment of $428,268.00 had plummeted to approximately $236,272.00. That loss is far afield from the projections and assurances made by Respondent, using his stated risk factor, and is reflected in the Financial Position/Statements summary attached hereto as Composite Exhibit C.

Instead of placing Mr. Russell's retirement funds in high quality securities that enjoyed the performance record promised to him by Respondents, his retirement monies were invested in low-performing, poor quality American Express securities and left

---

[1] See, American Express Financial Advisors, Inc., Asset Allocation Analysis For Paul & Tyva Russell, pg. 18.

to steadily deteriorate with none of the promised careful individualized vigilant monitoring and management. Mr. Russell's inquiries and apprehensions were, without exception, met with more cursory and generalized assurances that the market was adjusting, that withdrawing his accounts would be the worst thing he could do, and that if he just left everything to Respondent, his losses would be recovered and the yields promised would be realized. He reasonably relied upon Respondent's representations as he had no expertise or experience that caused him to distrust Respondent. It was only after he realized that Respondent was knowingly allowing his accounts to incur continued losses without any measures to bring them into compliance with his stated objectives, that he withdrew his funds to prevent even further losses.

Respondent breached its duties to Mr. Russell by its misrepresentations, failure to disclose material facts, fraud, unsuitable asset selection, failure to adequately and properly supervise, and negligence. As a result, Mr. Russell incurred unnecessary and substantial losses for which Respondent should be held liable.

Efforts to obtain documents which would enable the exact determination and calculation of Mr. Russell's losses have been thwarted by Respondent. (See correspondence attached hereto as Composite Exhibit D) Therefore, Mr. Russell reserves the right to amend the amount of damages. At this time, he claims damages of $366,748.00, plus interest, loss of opportunity, loss of benefit of the bargain, costs, expenses and disbursements incurred in pursing the arbitration proceeding, full reimbursement of filing and forum fees, attorneys' fees pursuant to Section 517, Florida Statutes, and such of his relief deemed proper and just.

**CLAIM**

**Background:**

Respondent developed a relationship with Mr. Russell over several years and was more than an "order taker" and processing broker. Respondent exercised total control over the choice of securities it invested for Mr. Russell, and its conduct was always to induce Mr. Russell to allow it to maintain that control. Due to the nature of their relationship, at the time Mr. Russell entrusted his retirement funds with Respondent, Respondent knew that Mr. Russell's understanding of securities investments was very limited. He had no expertise that would enable him to appreciate the risks and differences inherent to the nature of various securities instruments. Although he was provided with literature, prospectuses, and projections, it was

written sufficiently technically so that, as an unsophisticated investor, he had little appreciation for its contents and implications for his individual needs and circumstances.

Mr. Russell met with Respondent on several occasions and Respondent knew that Mr. Russell was primarily dependent upon his verbal representations and assurances, as he had no means or resources that would enable him to analyze the written materials. The materials that were understandable appeared to assure that, over various time periods, there was a "100% chance" that his assets would last during his retirement years with an assurance of a reasonable return.[2] Respondent made representations that induced Mr. Russell to act in reliance thereof, and due to the relationship that developed and Respondent's *de facto* control over the account, Respondent was a fiduciary and was responsible to Mr. Russell as a fiduciary.

**Investment Objectives:**

**Growth and Income for <u>Retirement</u> Accounts:**

As an inexperienced unsophisticated investor, Mr. Russell realized that he would need to rely upon the advice and expertise of others regarding his investment management. He was acquainted with Respondent and felt that he could trust the representations and assurances of Respondent.

Mr. Russell made the Application to Respondent shortly before his sixty-eighth birthday. He always made it clear to Respondent that he could not afford to sustain substantial losses and that he depended upon the monies entrusted to Respondent for his livelihood for the rest of his retirement years. He understood that in order to obtain growth and some modest income from his investment, there was a degree of risk involved. However, Respondent failed to fully disclose the nature of the risks of the unsuitable securities in which it placed Mr. Russell. It misrepresented the nature of its services to Mr. Russell, in that Mr. Russell was led to believe that careful management and monitoring would prevent the kinds of losses he incurred. He was led to believe that the services he would receive were far more personal and individualized than they actually were. He considered that the level of risk he was willing to incur would be safeguarded and balanced by the portfolio maintenance by Respondent through the "rebalancing" and

[2] See, American Express Financial Advisors, Inc., Asset Allocation Analysis for Paul & Tyva Russell, pg. 16.

"reoptimization" promised.[3] The substantial losses incurred by Mr. Russell certainly called for that "reoptimization." Sadly, it did not happen.

**Respondent's Misrepresentations and Failure to Disclose Material Facts:**

During Mr. Russell's initial conferences with Respondent, he expressed his objectives as stated above. He assumed that his account would be managed accordingly. Respondent assured him that Respondents were financial advisors and would make selections of assets and asset allocations and manage the account in accordance with his objectives and needs. When Mr. Russell contracted with Respondent for its services, he was not knowledgeable as to the various types and quality of securities, how they were bought, sold, redeemed, or how the various fees and charges for Respondent's services with respect to the particular securities were calculated. Respondents made no explanation or disclosure of that information, except to tell Respondent that they required more that his former employer to manage the account. Respondent recommended certain securities and then actually selected others without explanation.

**Respondent's Conduct:**

**Respondent's Choice of Poor Quality/Performing Assets:**

Respondent knew that the monies entrusted to it were the retirement funds of Mr. Russell. As such, Respondent had a duty to invest those funds in high quality and high performing securities. Instead, Respondent invested those retirement monies in low quality American Express securities, most of which were not initially recommended. Mr. Russell had no input in the choosing of the securities that were actually purchased or redeemed for his accounts. Respondent did not take adequate measures to properly monitor the investments' performance and bring the accounts into compliance with Mr. Russell's investment objectives. As a result, Mr. Russell sustained unnecessary damages.

The Analysis prepared for Mr. Russell by Respondent stated that "[O]ne of the key benefits of the American Express Asset Allocation Analysis is that it allows us to build a portfolio

---

[3] See, American Express Financial Advisors, Inc., Asset Allocation Analysis for Paul & Tyva Russell, pg. 23.

which is personalized around your unique circumstances."[4] Verbal representations of similar nature were also repeatedly made to Mr. Russell, and he believed them and relied to his detriment upon them. These now appear to be "boiler plate" statements and assurances. The analysis further stated that "[I]n designing the proposed investment plan, I have made the following assumptions." After that passage, there are bold headings designated "Assumptions" and "Goals" under which there is nothing. Then, there is a bold heading of "Alternatives" that reads, in pertinent part:

> Based on the goals listed above, your present financial position and investment experience, and my assessment of your risk tolerance, I have selected the asset mix and specific investments illustrated in this proposal. [5]

Although the proposed investment plan did contain some mention of specific needs such as a plan to have sufficient liquidity for a new automobile and a vacation, it does not appear that Mr. Russell's account was set up with the type of personalized considerations he was led to believe would be given to the choices for his investments. Given the particularly poor grade of securities Respondent chose for Mr. Russell, either his personal goals and needs were negligently ignored or Respondent acknowledged them and recklessly invested his retirement funds in unsuitable assets. No reasonable person would agree that the assets chosen by Respondent were appropriate for Mr. Russell, given his stated objectives, retirement age and personal circumstances.

**Respondent's Liability:**

Mr. Russell maintains that Respondent did assume a position as fiduciary. Respondent did not act just as an order-taker. Mr. Russell exercised no initiative or discretion with respect to the accounts' asset investments or allocations. Respondent initially advised Mr. Russell that he was too heavy in IBM stock and that the IBM stock should be liquidated and the funds placed in a more diversified portfolio. Mr. Russell agreed and Respondent controlled the choice of assets, the volume and

---

[4] See, American Express Financial Advisors, Inc., Asset Allocation Analysis for Paul & Tyva Russell, pg. 17.

[5] See, American Express Financial Advisors, Inc., Asset Allocation Analysis for Paul & Tyva Russell, pg. 17.

frequency of all purchases, sales and trading in Mr. Russell's accounts; every purchase, redemption, and sale of every asset was made at the discretion of Respondent who advised Mr. Russell that the assets were all suitable and that the transactions related to them were all appropriate. Occasionally, Respondent would call and advise of some transaction; Mr. Russell trusted that advice without question.

When his accounts incurred significant and steady losses, Mr. Russell questioned the prudence of continuing with the portfolio, but Respondent always assured him that he should trust Respondent's experience and expertise and that the market would "correct and adjust" and that he would recover his losses and make a profit. Those assurances were false and Respondent reasonably knew or, as an expert, should have known them to be false. While his retirement funds steadily dwindled, Respondents continued to make a profit on the transactions they initiated within his accounts.

Respondent represented to Mr. Russell that his investments would be managed according to his expressed investment objective of growth and income. Respondent's conduct was such that it did, from the beginning, always exercise sole discretion for the selection of all of the assets and their allocations and assumed full supervisory management services of the accounts, in acceptance of the trust and reliance of an unsophisticated retired investor.

**Respondent as Fiduciary and Expert:**

Respondent knew that Mr. Russell was relying upon the accounts for his retirement and that he was investing retirement funds at retirement age. Respondent also knew that: (1) as an unsophisticated investor, Mr. Russell had no means to independently analyze and assess its recommendations; (2) he had no knowledge or resources to make determinations as to the viability and suitability of its choices of investments and allocations of those investments; (3) he had expressed his trust and reliance upon its expert advice; and (4) he would accept its choices of assets and asset allocation.

The Financial Position/Statements summary attached hereto as Composite Exhibit C shows assets unsuitable for a retirement account. The asset choices and allocations of assets for Mr. Russell and their management failed to adequately provide appropriate safeguards and the protection that Respondent promised.

**Respondent's failure to establish an Investment Policy Statement:**

Under the Rules of Fair Practice, Respondents had a duty to obtain sufficient personal information of Mr. Russell to enable the creation and maintenance of a secure retirement portfolio. Respondent's inquiry should have included sufficient personal information of Mr. Russell to enable it to ascertain his level of sophistication and understanding of the various types and classes of securities. If Respondent had made such inquiry, it would have known that Mr. Russell had little understanding of the risks involved and the costs involved in Respondent's management of the accounts. An Investment Policy Statement should include more than the scant information contained in the IRA Investment Application. In the very tiny fine print on page six (6) of the Application, under section "M - Explanation of Investment," sub-sections "Adequate Information" and "Appointment," reference is made to provision of a document called *Your Guide to IRAs;* there is a statement that the Individual Retirement Custodial Account Agreement in *Your Guide to IRAs* and the information in the IRA Investment Application comprises the custodial agreement with Respondent. Respondent never provided Mr. Russell with such Agreement. Mr. Russell was told to initial all of the subsections, which he did. He was told that all applicable documents were in the packets provided to him. However, an inspection of all of the information provided revealed no such documents. Therefore, Mr. Russell relied on the verbal assurances and promises made to him concerning Respondent's management of the accounts and on the other literature provided.

Inasmuch as Respondent failed to make sufficient inquiries as to Mr. Russell's understanding and circumstances, it operated at a deficit from the outset, unable to appropriately tailor a diversified portfolio consistent with Mr. Russell's investment goals, real risk tolerance, required liquidity, anticipated time horizon for various asset investments, and tax considerations. Yet, Respondent represented that the services provided would be individualized and closely monitored. In the Analysis prepared for Mr. Russell, projections were shown for returns on securities, but the investments actually chosen by Respondent, were not of the same quality as those he was encouraged to liquidate or for which performance projections were provided. No explanation was offered except that the securities chosen were appropriate and suitable.

Mr. Russell was led to believe that his accounts were receiving constant personalized management based on specific strategies designed to meet his personal objectives and needs.

Respondents did not determine his level of understanding regarding investment services and failed to disclose to him the true nature of their services or the risks inherent in any of the transactions engaged in on his behalf.

Respondent failed to explain how a balanced return, consistent with the preservation of the purchasing power of the portfolio would be achieved. Mr. Russell was not advised how, over a predetermined investment horizon, Respondent would meet or exceed those items and goals with the overall portfolio in terms of market index, or a blended market index, that most closely corresponded to its style of investment management. Respondents did not explain how the overall level of risk would be balanced in the portfolio, consistent with the risk associated with particular investment instruments and index.

Indeed, it appears from reviewing the transaction summaries that there were no such strategies. Certainly, none were ever related to Mr. Russell, and he had no investment knowledge that would cause his question Respondent with respect to those issues. He was looking to Respondent for that expertise and Respondent did not provide a sufficient level of information needed by such an unsophisticated investor to know whether the statements made to his were true and not misleading. By failing to establish a comprehensive Investment Policy Statement, Respondent failed to obtain a sufficient level of information and provide the specific disclosures and explanations required to make informed decisions with respect to the appropriateness and suitability of the assets, allocations and management of the accounts, consistent with his objectives of conservation and conservative growth and to make the representations not misleading or deceptive.

**Effect of Failure to Establish and Implement a Comprehensive Investment Policy Statement:**

Mr. Russell was advised that Respondent would choose a portfolio of broadly diversified assets and allocations and that he would never lose his initial investments. However, after a while, Mr. Russell began observing that the assets chosen by Respondent were not performing as predicted. Accordingly, he telephoned Respondent to inquire whether his investments were safe. He expressed his concerns that perhaps he should remove his funds from the accounts and regroup with an alternate financial plan for retirement. He was always given the same assurances and advice and told that the worst thing he could do would be to remove his accounts. He was repeatedly advised to leave his money with Respondent and it would be safe.

Mr. Russell's apprehensions were repeatedly met with responses of general reassurance. He was told that the decline was temporary and not out of the ordinary, the market was just making adjustments. He was repeatedly instructed to leave everything to their judgment and all would be well. He was told that he would recover all of his losses. Mr. Russell reasonably relied upon those representations and trusted that they were true. He had no knowledge or experience that would allow him to realize and question that there was no appropriate plan, monitoring or management of the account, consistent with his personalized goals and needs.

**Respondent's Contractual Duty and Breach:**

Respondent had a contractual duty and an implied duty of good faith and fair dealing to invest Mr. Russell's monies in accordance with his stated objectives of conservative growth and to provide his with all the material information and truthful representations needed to form a valid basis for his decisions regarding Respondent's management and continued management of his monies and accounts. That duty included making only those transactions which were in the best interest of Mr. Russell's stated needs and objectives in the most efficient and cost effective manner.

Respondent also had a duty to fully disclose how it would derive consideration for its services, including **all** of its revenues and benefits from its handling and management of Mr. Russell's accounts with respect to fees, charges, costs, commissions, bonuses, and other valuable consideration. Respondent had a duty to truthfully advise Mr. Russell with respect to representations it made concerning the performance of the assets and how they were allocated and traded as well as the economic climate and its effect on his investments.

Respondent breached written and oral contractual duties by failing to fulfill those duties as described herein and as evidenced by the exhibits attached hereto.

**Respondent's Fiduciary and Ethical Duty and Breach:**

Respondent had a fiduciary duty to Mr. Russell to manage Mr. Russell's accounts in keeping with his expressed needs and goals in the most cost effective and efficient manner. Respondent had a fiduciary duty under the applicable securities laws, industry rules and equitable principles of fair trade to exercise ethical sales practices and high standards of professional conduct in offering, selling, exchanging, recommending and providing advice

to Mr. Russell. He confided his need for Respondent to monitor and manage his retirement investments with the utmost care, as he had no investment experience or knowledge and no one to provide further support. Respondent knew that the funds were for retirement support. Respondent knew that Mr. Russell was trusting in it to act in accordance with his stated investment objectives. Respondent exercised full discretion for the conduct of the accounts. In its role as confidant and fiduciary, Respondent knew that Mr. Russell would accept whatever advice it offered.

Respondent breached its fiduciary and ethical duty by failing to fulfill those duties and described herein and as evidenced by the exhibits attached hereto.

**Respondent's Duty to Exercise Reasonable Care and Its Negligence:**

Respondent had a duty to exercise reasonable care in the handling of Mr. Russell's accounts, particularly with respect to the allocations and types of securities and mutual funds in which it placed Mr. Russell's monies for retirement accounts and the management of those assets.

Respondent breached its duty of reasonable care by negligently handling the accounts in a manner not in conformity with the accepted rules and standards of the industry and of professional competence and conduct or expectations and rules for good faith and fair dealing.

**Respondent's Duty and Gross Negligence:**

Respondent had a duty to exercise reasonable care in the handling of Mr. Russell's accounts, particularly with respect to the allocations and types of securities and mutual funds in which it placed Mr. Russell's monies and the management of those assets.

The conduct of Respondent as set forth herein created an unreasonable risk of unforeseeable harm to Mr. Russell. Respondent, by handling Mr. Russell's accounts as it did, knowingly, willfully and maliciously acted in indifferent and reckless disregard of its duties to Mr. Russell by investing his monies such that it knew, or but for its blind, indifferent, reckless and uncaring acts and omissions would have known, as prudent securities industry professionals, that in all reasonable likelihood, its misrepresentations, omissions of material facts and other misconduct and acts described herein would cause

damages and losses to Mr. Russell. Such conduct was gross negligence.

**Unsuitability of Investments:**

Respondent had a duty to invest Mr. Russell's monies in assets suitable for his stated objectives, risk tolerance and individual needs. Respondents failed to consider the three factors necessary for the creation and management of an appropriate and suitable portfolio: (1) Mr. Russell's financial situation; (2) his understanding of the risks related to each investment; and (3) his investment objectives. The application that supposedly guided Respondent's association with Mr. Russell was an insufficient foundation for provision of the services promised and reasonably expected by Mr. Russell.

The monthly statements generated by Respondent did not, in a manner comprehensible to Mr. Russell, disclose investment strategies, measures to bring the portfolio into compliance with stated objectives and needs, or all charges being debited and incurred by the accounts. Mr. Russell was given no specific explanations of asset performance histories, projections for performance over given time horizons, or information concerning the suitability of the assets in terms of their inherent risks as related to Mr. Russell's objectives. Breakpoints and trading times and redemptions were not explained to him. Mr. Russell was simply assured that his accounts were receiving the utmost personalized attention. The quality of assets chosen and allocated in Mr. Russell's portfolio was not consistent with his objectives or the NASD Rules of Fair Practice.

**Analysis Shows Unsuitability:**

The unsuitability and poor quality of Respondent's choices of particular assets for Mr. Russell's retirement accounts are reflected in the Loss of Investment and Investment Opportunity illustration, attached hereto as Composite Exhibit D. This illustration shows the performance of the assets chosen by Respondent compared to that of a surrogate index model. Had Respondent exercised more prudent and responsible choices such as those shown in the comparison index model, Mr. Russell's losses would not have occurred.

Damages are calculated, as nearly as possible at this time without the benefit of discovery, according to that Loss of Investment and Investment Opportunity illustration.

**Respondent's Violation of NASD Conduct Rules:**

Respondent violated the very NASD Conduct Rules under which it is bound. Those rules mandate that, in recommending to a customer the purchase, sale or exchange of any security, a member shall have reasonable grounds for believing that the recommendation is suitable on the basis of the facts disclosed by the customer as to his other holdings and as to his financial situation and needs. Respondent knew that the monies Mr. Russell entrusted to them were his life's savings and resources upon which he had relied for his retirement livelihood and that he was relying upon its expertise, integrity and representations to preserve those funds and derive a modest growth from them, if possible. Mr. Russell expressly stated that he would need those funds for his retirement and for living expenses, that he and his wife were retired, and that the funds were vital to his continued financial well-being. Accordingly, Respondent knew or should have known that it should not have chosen assets that were excessively speculative and poorly allocated with no individualized management and the constant monitoring and "rebalancing" that was promised.

**Respondent's Duty and Failure to Supervise:**

Respondent owed a duty of reasonable care to Mr. Russell to manage his funds and accounts in a careful and appropriate manner. It had a duty to diligently train, supervise and control its employees and representatives so as to avoid foreseeable harm and loss to Mr. Russell. At all times material hereto, with respect to Mr. Russell's accounts, Respondent, its employees and representatives were acting within the scope of their roles under the contract agreements and as employees of Respondent and fiduciaries of their client. Respondent is liable for the misconduct and negligence of its registered representatives and employees under the doctrine of *respondeat superior* and the applicable federal and state securities laws.

Respondent, its employees and representatives were grossly negligent, careless, and reckless in the performance of their duties which was known to Respondent, who negligently supervised its employees and representatives and notwithstanding such knowledge, continued to retain those employees and representatives without adequate implementation of a system of supervision that would have prevented its misconduct.

Respondent, its employees and representatives were also negligent for: (1) allowing advice and recommendations to be made to place Mr. Russell's monies in investments which were clearly unsuitable and inappropriate for his stated needs and objective; (2) causing Mr. Russell to pay excessive and unnecessary loads,

commissions, expenses, costs, and fees, based upon manipulations, misrepresentations, schemes, devices and deceptions designed to mislead him; (3) allowing violations of its own stated and announced policies, conditions, and procedures, and industry rules and standards applicable to investments made with Mr. Russell's monies; (4) retaining employees when it was known or should have been known that they were negligent, careless, reckless or noncompliant with its and its affiliate's policies, procedures, rules and applicable state and federal regulatory guidelines governing and relating to the investments made for Mr. Russell; (5) failing to adequately train, supervise and control its employees and representatives regarding recommending and advising clients having needs, goals and investment objectives such as those of Mr. Russell; (6) failing to provide adequate supervision and control of its employees and representatives, thereby allowing them to invest Mr. Russell's monies as described herein, when it knew or should have known that such continued investments, advice, recommendations, and misconduct would, in all reasonable likelihood, result in harm to Mr. Russell; and/or (7) continuing to employee its employees and representatives and allowing them to engage in the practices and misconduct which enabled the fraud, breaches of fiduciary duty, breach of contract and good faith and fair dealing, negligence and gross negligence which was perpetrated upon Mr. Russell.

**Mitigation of Losses and Damages:**

When it became apparent that Respondent's assurances were fruitless and after substantial loss, Mr. Russell advised Respondent that he was considering closing his accounts. Consistent with its customary misrepresentations, Respondent advised Mr. Russell that closing the account would be the worst thing he should do and that if he would "just hang in there, the market will adjust and you will get all of your losses back."

Mr. Russell finally lost faith in Respondent and closed the accounts in the Summer of 2002. The choice of unsuitable and inappropriate assets and transactions conducted by Respondent through its sole control of Mr. Russell's retirement accounts are easily revealed when compared with those which would have been more appropriate and suitable. Because of the losses suffered by Mr. Russell at the hands of Respondent, not only did he lose approximately $191,996.00 of the monies he invested with Respondent from 1999 through July 2002, he lost earnings and other opportunities for earnings from more appropriate investments, plus expenses, legal fees, and other costs. Using the more appropriate investment surrogate index model (Exhibit D) as a comparison, from the date of his investments through March

31, 2005, the same investment amount would have produced a value of $645,679.00. Therefore, Respondents are responsible for Mr. Russell's losses from investments totaling $366,748.00 plus expenses, legal fees, and other costs. Damages are calculated as nearly as possible without the benefit of knowing at this time the all fees, charges, commissions and costs incurred by Mr. Russell. See Loss of Investment and Investment Opportunity sheet, attached hereto as Exhibit D. The right to amend damages calculations to reflect information derived through future discovery is reserved.

**LEGAL ANALYSIS**

Statutory and SRO rule violations give rise to causes of actions and are evidence to support Mr. Russell's claims for damages. See Jolley v. Welch, 904 F.2d 988 (5th Cir. 1990); Merrill Lynch v. Cheng, 697 F. Supp. 1224, 1227 (D.D.C. 1986)(violation of NASD rule was evidence of negligence); Miley v. Oppenheimer & Co., 637 F.2d 318, 333 (5th Cir. 1981); SEC v. First Sec. Co., 463 F.2d 981 (7th Cir. 1972), *cert. denied*, 409 U.S. 880 (1972); Buttrey v. Merrill Lynch, Fenner & Smith, Inc., 410 F.2d 135 (7th Cir.), *cert. denied*, 396 U.S. 835 (1969); Knight v. E.F. Hutton & Co., Inc., 750 F. Supp. 1109 (M.D. Fla. 1990); Csordas v. Smith Barney, Harris Upham & Co., Inc., Fed.Sec.L.Rep. (CCH) par. 97230 at 94,998 (Cir.Ct. 9th Jud. Cir., Orange City, Fla. July 16, 1992).

**Breach of Contract:**

Respondent entered into written agreements with Mr. Russell, whereby it agreed to act in his best interests through appropriate handling of his retirement funds in accordance with his expressed objectives. Respondent made additional express oral representations that any market losses were merely "adjustments" and losses would be recovered and his principal would always be preserved if he would not close the accounts with Respondent. Those assurances became part of the agreements. Respondent had a duty to perform according to its written and oral promises and also according to the terms of the agreements requiring it to abide by the rules of the exchanges and markets where transactions for Mr. Russell's accounts took place. Violations of SRO rules and statutes governing securities transactions are evidence of Respondent's culpability for Mr. Russell's claims for damages.

Expressly made oral representations, of advice and direction from Respondent caused Mr. Russell to trust Respondents and he justifiably and reasonably relied upon those express

representations regarding the performance of his assets and the direction of the market to his detriment. Despite disclaimers in Respondent's boiler plate agreement language that it was not responsible for advice, that is precisely what it led Mr. Russell to believe he was paying Respondent to provide. The express advice and promises made to his superceded such disclaimer in the written agreements. Once Respondent undertook to make such assurances and promises, it had a duty to perform accordingly and to make complete disclosure of material information and to conduct its handling and management of Mr. Russell's account with the reasonable care of a prudent investor. Those assurances and promises became part of Respondent's contract with Mr. Russell.

Evidence of Respondent's breaches of its duty is described and illustrated in this Statement of Claim and the attached exhibits. As a result of its breached duties, Respondent caused damages to Mr. Russell as described herein.

**Breach of Fiduciary Duty:**

**NYSE Rule 405 imposed a responsibility** on Respondent to know the essential facts related to Mr. Russell so that his accounts could be established and managed in the most advantageous and efficient manner consistent with his investment objectives. Respondent's assumed a role as Mr. Russell's fiduciary from the outset of their association. Mr. Russell placed extraordinary trust and reliance in Respondent. Respondent knew this and knew that Mr. Russell was an unsophisticated investor with limited resources and income and that he was dependent upon Respondent for total management of the accounts.

Mr. Russell entered into the business relationship by expressing his need for complete trust and reliance upon Respondent. Respondent controlled the accounts with ongoing advice that his assets were safe and protected, and Mr. Russell regularly relied upon those representations. Respondent's knowledge of that dependence, reliance and its assumption of de facto control created heightened duties whereby there existed a continuing responsibility to monitor, manage and advise Mr. Russell as a fiduciary on an ongoing basis. As applies to Respondent, Section 518.10, Florida Statutes, defines a "fiduciary" as one , whether individual or corporate, who by reason of a written agreement; has the responsibility for the acquisition, investment, reinvestment, exchange, retention, sale, or management of money or property of another. Accordingly, Respondent's conduct was governed by Section 518.11, Florida statutes, Florida's Prudent Investor Rule, which states, in pertinent part:

> (1) A fiduciary has a duty to invest and manage investment assets as follows:
>
> (A) The fiduciary has a duty to invest and manage investment assets as a prudent investor would considering the purposes, terms, distribution requirements, and other circumstances ... [T]his standard requires the exercise of reasonable care and caution and is to be applied to investments not in isolation, but in the context of the investment portfolio as a whole and as a part of an overall investment strategy that should incorporate risk and return objectives reasonably suitable ... [I]f the fiduciary has special skills, or is named fiduciary on the basis of representations of special skills, the fiduciary is under a duty to use those skills.

Respondent exercised de facto control over Mr. Russell's accounts. Respondent knew that he would accept and rely upon its selection of assets and their allocations within his portfolio, because he possessed no resources or means to analyze and evaluate its choices. Respondent caused Mr. Russell to rely upon its management and financial recommendations and supervisory services by its representations as to the viability and security of the accounts and assurances for recovery of losses and positive performance of the assets it chose. In such cases, the law is well established and the duties clear. See NASD Rules of Fair Practice, Rule 2510, NYSE, Rule 408, and Amex Rule 924; Lindemuth v. Shannon Fin. Corp., 1987 U.S. Dist. LEXIS 4819 600 F. Supp. 261 (N.D. Cal. 1987). As a fiduciary, Respondent had a duty of utmost good faith and loyalty. Grauchbnauer v. A.G. Edwards & Sons, Inc., 810 F.2d 1042 (11th Cir. 1987). In Csordas v. Smith Barney, Harris Upham & Co., Fed.Sec.L.Rep. (CCH) par 97,230 at 94,998 (Cir.Ct. 9th Jud. Cir., Orange City, Fla., July 16, 1992), the court stated:

> The law is clear that a securities broker owes to his investment customer a fiduciary duty of loyalty and due care when recommending the purchase of a security...[and] in each such transaction the broker owes a duty to his customer, among others, to recommend a purchase of a security only after studying it sufficiently to become informed as to its nature, price and financial prognosis. First Union Brokerage v. Milos, 717 F. Supp. 1519 (S.D. Fla. 1989).

A broker has a duty to exercise good faith toward his customer and to do all in his or his power to protect the

3 N.E.2d 872 (1935). A broker, as agent, has a duty to use reasonable efforts to give its principal information relevant to the affairs that have been entrusted to it. See Restatement (Second) of Agency § 381 (1958). When a broker usurps control over a nondiscretionary account, "the broker owes his customer the same fiduciary duties as he would have had the account been discretionary from the moment of its creation." Lieb v. Merrill Lynch, Pierce, Fenner & Smith, 461 F. Supp. 951 (E.D. Mich. 1978). The Lieb court listed duties universally applicable of a fiduciary. Respondent had a responsibility to:

> (1) manage the account in a manner directly comporting with the needs and objectives of Mr. Russell as stated in the authorization papers; (2) keep informed regarding the charges in the market which affected Mr. Russell's interest and act responsively to protect those interests: (3) keep Mr. Russell informed as to each completed transaction; and (4) explain forthrightly the practical impact and potential risks of the course of dealing in which it was engaged.

**Fraudulent Transactions - Violations of Section 517.301, F.S.:**

As defined by Section 517.021(12)(a), of the Florida Securities Investor Protection Act ("Florida Act"), Respondent is an "investment advisor;" as such, its business association with Mr. Russell was subject to the provisions of that Act. Section 517.301, Florida Statutes, makes it illegal to employ any device, scheme or artifice to defraud; to obtain money or property by means of any untrue statement of a material fact or any omission to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; or to engage in any transaction, practice or course of business which operates or would operate a fraud or deceit upon a person. It is illegal to knowingly and willfully falsify, conceal, or cover up a material fact, make false, fictitious statements or representations.

Respondent made specific promises and assurances to Mr. Russell that it knew or should have known were not true as alleged herein. It concealed and omitted material facts with respect to the assets and allocations it chose through *de facto* control of his accounts with respect to the safety of his principal, the projected growth and earnings of the securities it chose, the real cost of its services with respect to the account and the true nature of those services, the suitability of the securities and their allocations in his portfolio with respect to his investment objectives and needs, and the risks involved with those securities. Such conduct was in reckless disregard of the

those securities. Such conduct was in reckless disregard of the truth of the communications.

That undisclosed material information would have been considered and would have caused Mr. Russell to make different decisions with respect to the account with Respondent. Respondents failed to discuss the inherent risks attendant to the types of securities it recommended and the costs associated therewith. Respondents never discussed or advised Mr. Russell of the possibilities of what eventually happened to his investments or how they would compensate for those eventualities if they were to transpire in order to bring his accounts back into compliance with his stated objectives. As a result, Respondents representations and failure to disclose material information caused economic harm to Mr. Russell through Respondent's inducement through such conduct for Mr. Russell to allow the transactions that caused that harm. In other words, but for Respondent's improper representations and failure to disclose material information, Mr. Russell would not have acted and relied upon Respondent as he did, and but for Respondent's wrongful conduct, he would not have been damaged.

Mr. Russell's claims show the elements necessary for claims of fraudulent transactions under the Florida Act: (1) a misrepresentation or omission of material fact; (2) justifiable reliance on the misrepresentation or omission; (3) the misrepresentation or omission was made in connection with the purchase or sale of securities; (4) with scienter or reckless disregard as to the truth of the communications; and (5) that the untruth was the direct proximate cause of loss. Under the Florida Act, the element of scienter is satisfied by a showing of mere negligence. Grippo v. Perazo, T.S.C. Corp., 357 F.3d 1218, 1222 (11th Cir. 2004); In re Checkers Securities Litigation, 858 F. Supp. 1168 (M.D. Fla. 1994).

The attached exhibits show specific purchases of securities by Mr. Russell through Respondent's brokerage. Mr. Russell's attempts to obtain commission runs and expense statements have been unsuccessful. If they appear in his periodic statements, as a lay person, it is impossible for him to discern the extent of those charges from the statements. This is further showing of Respondent's attempts to conceal material information.

As an unsophisticated investor with no experience and knowledge that would enable Mr. Russell to understand what little written representations were given to him; he relied primarily upon Respondent's oral representations concerning his accounts and the projected growth and security of Respondent's choices and

management of his assets. That reliance was justified as measured by standards adopted by the courts and the industry; Mr. Russell's claims and allegations satisfy each of those considerations as follows:

(1) The existence of a long standing business or personal relationship between the customer and the broker;

(2) The lack of sophistication and expertise of the customer in financial and security matters;

(3) The existence of a fiduciary duty owed by the broker to the customer;

(4) The customer did not initiate the stock transactions or seek to expedite the transactions;

(5) The customer had no access to relevant information;

(6) Representations were specific;

(7) Respondent concealed its fraud.

Brushi v. Brown, Fed.Sec.L.Rep. (CCH) par. 94,517 at 93,291 (11th Cir. July 12, 1989); Kennedy v. Josephal & Co., 814 F.2d 798 (1st Cir. 1987); Straub v. Vaisman & Co., 540 F.2d 591 (2d Cir. 1976).

**Negligent Misrepresentation - Common law:**

As the facts stated herein above allege, the elements necessary to prove negligence misrepresentation under Florida common law are: (1) misrepresentation (omission) of a material fact; (2) knowledge by the representor as to the truth or falsity of the representation or that the representation was made under circumstances in which he ought to have known of its falsity; (3) intent by the representor that the representation induce another to act on it; and, (4) injury to plaintiff as a result of acting in justifiable reliance on the misrepresentation. Gilchrist Timber Co. v. Rayonier, 696 So.2d 334, 337 (Fla. 1997); In re Checkers Securities Litigation, 858 F. Supp. 1168 (M.D.Fla. 1994); C & J Sapp Publishing Co. v. Tandy Corp., 585 So. 2d 290, 292 (Fla. 2d DCA 1991).

The RESTATEMENT (SECOND) OF TORTS § 552, Information Negligently Supplied for the Guidance of Others provides:

One who, in the course of his business,

> profession, or employment, or in any other transaction in which he has pecuniary interest, negligently supplies false information for guidance of others in their business transactions is subject to liability under the theory of negligent misrepresentation for pecuniary loss caused to others by their justifiable reliance on that information.

**Negligence:**

Pursuant to Rule 2310 (formerly, Article III, Section 1) of the Rules of Fair Practice, Respondent was charged with performing sufficient due diligence analysis to "know its customer" in terms of the customer's financial circumstance, needs and risk tolerance so that appropriate transactions could have been made. Under that Rule (formerly Article III, Section 2), Respondent was responsible to have a reasonable basis for recommending a particular security or strategy. Respondent had a duty to perform under its agreements with Mr. Russell with the reasonable care of a prudent investor, but breached that duty of reasonable care.

Respondent made solicited transactions and was not merely an order-taker; Mr. Russell made no independent analyses, and transactions were not made of his own initiative. Accordingly, Respondent had a duty to make those transactions with reasonable care. Evidence of Respondent's breach of that duty through its acts and omissions are herein described and illustrated in the attached exhibits. The harm to Mr. Russell was a result of such acts and omissions and was reasonably foreseeable; he has sustained damages and losses as a result of that negligence.

**Gross negligence:**

Respondent not only breached its duty to perform under the agreements with the reasonable care of a prudent person and investor, it did so with reckless indifference as to the truthfulness of its representations with an intent to further its own gain. Such recklessness and callous disregard for the welfare and safe management of a retiree's retirement resources and assets can be deemed as nothing short of outrageous conduct. Consequently, Mr. Russell suffered losses for which damages should be awarded.

**Unsuitability of Assets and Allocations:**

Inasmuch as all transactions made within Mr. Russell's accounts were completely controlled by Respondents, NASD Conduct

Rule 2310 required that all those recommended transactions be suitable for him. NYSE Rule 405(1) and Amex Rules 411 and 923 also apply. Respondent had a duty to make a customer-specific analysis of suitability for Mr. Russell with its choices of assets and allocations consistent with his financial profile and investment objectives. Respondent also had a duty to consider the anticipated cost-maintenance percentage and turnover rate for transactions when determining suitability. Respondent had a duty to manage and monitor the accounts in such a manner as to know when Mr. Russell was financially unable to bear the risks associated with the transactions it made and adjust its conduct and transactions accordingly. Respondent's failure to make such proper determination resulted in transactions unsuitable for Mr. Russell's accounts.

Mr. Russell placed total reliance upon Respondent for the investment and management of all of his retirement assets which comprised the majority of his financial worth and funds upon which he relied for support. Mr. Russell did not rely upon other consultants or investment advisors. He had no investment experience with any type of securities instruments. He was unsophisticated in terms of his understanding and knowledge of the economic features of the investments chosen for him by Respondent or their complexities. Finally, he had no ability to independently evaluate how market developments affected or would affect the various securities chosen for him by Respondent. As an element of a claim for unsuitability, Mr. Russell alleges that churning caused inappropriate transactions and choices of asset allocation and therefore, his account's value was diminished.

Respondent breached its duty to choose suitable assets for Mr. Russell and manage those in a manner consistent with his stated objectives. Mr. Russell justifiably relied upon Respondent to his detriment, sustaining losses as a result.

**Failure to Supervise:**

Mr. Russell was justified in his reasonable reliance upon Respondent's conduct. He trusted and depended upon Respondent as his fiduciary of the accounts. Respondent had a duty to supervise the conduct of its brokers. Respondent is jointly and severally liable to Mr. Russell for his damages. Under the common law doctrine of *Respondeat Superior*, Respondent was vicariously and directly responsible for its conduct and that of its employees, for which strict liability lies and for which there is no good faith defense. The four elements of this doctrine are:

1. A principal will be liable to third persons for all conduct committed by the agent, in the principal's behalf, within the actual or apparent scope of his agency (the agent's authority);

2. Apparent authority is such power as a principal holds his agent out as possessing or permits him to exercise; it is the authority the principal gives the agent the appearance of possessing or which the agent appears to have by reason of actual authority;

3. Apparent authority must be based upon the conduct of the principal. The conduct must be of a character intended, or which the principal should reasonably contemplate as likely to mislead those dealing with the agent. It should stem from some affirmative act or negligence of the principal; and,

4. The third person claiming apparent authority must prove that he exercised reasonable reliance on the broker's representations. Reliance alone is insufficient; it must be based upon good faith and in the exercise of reasonable prudence (he was justified in believing that the broker was acting on the firm's authority).

Section 20 of the Securities and Exchange Act of 1934 imposes supervisory duties of Respondent as a "control person" as follows:

> Every person who, directly or indirectly, controls any person liable under any provision of this chapter or of any rule or regulation thereunder shall also be liable jointly and severally with and to the same extent as such controlled person to any person to whom such controlled person is liable, unless the controlling person acted in good faith and did not directly or indirectly induce the act or acts constituting the violation or cause of action.

In the 1990 case of Hollinger v. Tital Capital Corp., 914 F. 2d 1564 (9th Cir. 1990), the 9th Circuit ruled that, as a matter of law, brokerage firms are control persons of their brokers.

Here, Respondent's management met with Mr. Russell and made the same assurances and representations as to positive performance of the accounts and the market and was aware of the its recommendations, de facto control, and Mr. Russell's reliance and dependence upon Respondent for decisions as to his accounts.

There were repeated contacts between the firm, its manager and Mr. Russell regarding the representations and management of his accounts by the brokerage. Respondent knew that Mr. Russell lacked sophistication as to investments and market and financial analyses. Respondent knew or should have known that the assets and their allocations chosen for the accounts were inconsistent with Mr. Russell's objectives and financial circumstances and retirement age.

Mr. Russell was justified in his reliance on Respondent. Respondent's supervisory system was inadequate and its implementation was unreasonable. Section 15(b) of the Securities Act of 1934 authorizes the SEC to impose sanctions upon firms which have failed to provided a supervisory system to deal with and prevent the misconduct that took place.

NASDR Disciplinary Proceeding No. C02980024 (February 16, 2000) set forth an explanation of the required conduct under NASD Conduct Rule 3010, the rule on reasonable supervision as follows:

1. Respondent had a duty to prevent violations of the securities laws, including NASD Conduct Rule 2310 ("Recommendations to Customer" - Suitability);

2. Respondent had a duty to follow the firm's own procedures in supervising brokers;

3. Respondent had a duty to inquire whether Mr. Russell realized how much of his funds were being consumed by commissions;

4. Respondent had a duty to review Mr. Russell's active account; and,

5. Respondent had power and therefore, the duty to control its firm's conduct, hire and retain competent personnel who would act in compliance with the fiduciary and legal duties imposed upon the firm, dismiss from employment that personnel whose conduct violated its policies and those standards governing the securities industry, and reverse trades.

**Common Law Fraud**

In order to state a claim for common-law fraud in Florida, the following elements must be proved: (1) a false statement of fact; (2) known to be false at the time it was made; (3) made for the purpose of inducing action in reliance of the correctness of

the representation; and, resulting damage. Gilchrist Timber Co. v. Rayonier, 696 So. 2d 334 (Fla. 1997); In re Checkers Securities Litigation, 858 F. Supp. 1168 (M.D. Fla. 1994).

Respondent made statements and gave assurances to Mr. Russell that it knew was false at the time they were made. Respondents concealed the truth of the cost of its fees and commissions and the devaluation of the accounts. Respondent told Mr. Russell specifically that as long as he left his accounts with it, he would never lose his principal and that all of his losses would be recovered. Respondent told Mr. Russell that the securities it chose in the course of its *de facto* control of his account were suitable and consistent with his stated needs. Respondent advised Mr. Russell that it would "take care of him." These false statements and misrepresentations were knowingly made to induce Mr. Russell's trust in Respondent and were designed to induce his unwitting acquiescence and approval of its fraudulent conduct and to prevent him from withdrawing his accounts from Respondent's control. Respondent deceived Mr. Russell into thinking that it was his trusted fiduciary and that his accounts were receiving individual and constant scrutiny and personal management and monitoring. As a result, Mr. Russell justifiably relied upon Respondent's misrepresentations and falsehoods and that wrongdoing caused his damages.

**Economic Loss Rule Does Not Bar Recovery of Tort Damages:**

Respondent knowingly made representations, gave financial advice and caused Mr. Russell's actions in reliance upon those misrepresentations and false statements. The RESTATEMENT (SECOND) OF TORTS, § 552, Information Negligently Supplied for the Guidance of Others, creates an exception to the bar of recovery of economic damages in this case. Aside from and in contradiction to the information contained within the agreements it signed with Mr. Russell, Respondent made express representations and provided information as guidance upon which it induced Mr. Russell to act in justifiable reliance of that information. Therefore, the economic loss rule does not bar recovery of Mr. Russell losses as contained within his claims against Respondent. Moransais v. Heathman, 744 So. 2d 973 (Fla. 1999); Gilchrist Timber Co. v. Rayonier, Inc., 696 So. 2d 334 (Fla. 1997).

The economic loss rule may not be used to bar recovery of economic losses due to damages resulting from statutory violations. Comptech International, Inc. v. Milam Commerce Park, LTD, 753 So. 2d 1219 (Fla. 1999); Williams v. Peak Resort International, Inc., 676 So. 2d 513 (Fla. 1996).

# INDEX OF EXHIBITS

| EXHIBIT NUMBER | DESCRIPTION |
|---|---|
| A | Application |
| B | American Express Financial Advisors, Inc., Asset Allocation Analysis |
| Composite C | Financial Positions/Statements Summary |
| D | Loss of Investment and Investment Opportunity |
| Composite E | Correspondence with American Express |