**UNITED STATES DISTRICT COURT**
**DISTRICT OF MINNESOTA**

LESA BENACQUISTO, DANIEL BENACQUISTO, RICHARD THORESEN, ELIZABETH THORESEN, ARNOLD MORK, ISABELLA MORK, RONALD MELCHERT and SUSAN MELCHERT, on behalf of themselves and all others similarly situated,

Case No. 00-1980 DSD/JMM

Plaintiffs,

v.

AMERICAN EXPRESS FINANCIAL CORPORATION, AMERICAN EXPRESS FINANCIAL ADVISORS, AMERICAN CENTURION LIFE ASSURANCE COMPANY, AMERICAN ENTERPRISE LIFE INSURANCE COMPANY, AMERICAN PARTNERS LIFE INSURANCE COMPANY, IDS LIFE INSURANCE COMPANY, and IDS LIFE INSURANCE COMPANY OF NEW YORK,

Defendants.

**FINAL ORDER AND JUDGMENT APPROVING CLASS ACTION SETTLEMENT AND DISMISSING COMPLAINT**

WHEREAS plaintiffs and defendants entered into a Stipulation of Settlement, with exhibits (collectively, the "Settlement Agreement"), dated September 18, 2000, to settle this class action litigation; and

WHEREAS on October 2, 2000, this Court and the Minnesota State Court for the County of Hennepin jointly entered an Order (the "Hearing Order") preliminarily certifying the putative class in this Action for settlement purposes under Minn. R. Civ. P. 23.01, 23.02(c), and 23.03(b) and Fed. R. Civ. P. 23(a), 23(b)(3), and 23(c)(2), ordering individual and publication notice to potential class members, scheduling a Fairness Hearing for March 6, 2001, and providing those persons with an opportunity either to exclude themselves from the settlement class or object to the proposed settlement; and

FILED 5-15-01
FRANCIS E. DOSAL, CLERK
Judgment Ent'd 5-15-01
Deputy Clerk's Initials

WHEREAS this Court and the Minnesota State Court for the County of Hennepin jointly held a Fairness Hearing on March 6, 2001 to determine whether to give final approval to the proposed settlement; and

WHEREAS this Court has issued Findings of Fact and Conclusions of Law Concering Class Action Settlement, dated MAY 15, 2001, granting final certification of the settlement class, approving the proposed settlement, and dismissing the settlement class members' claims (among other things); now, therefore,

Based on the submissions of the Parties and Class Members, on the evidence adduced at the Fairness Hearing, and on this Court's Findings of Fact and Conclusions of Law dated MAY 15, 2001, it is hereby **ORDERED, ADJUDGED AND DECREED** as follows:

1. **Incorporation of Other Documents.** This Order and Judgment Approving Class Action Settlement incorporates and makes a part hereof:

(a) the Stipulation of Settlement dated September 18, 2000, and filed with the Courts on September 18, 2000 (the "Stipulation of Settlement"),

(b) the following exhibits to the Stipulation of Settlement: (i) Exhibit A (Guidelines for Determining, Scoring and Awarding Relief in the Claim Review Process); (ii) Exhibit B (Class Notice Package); (iii) Exhibit C (Publication Notice); (iv) Exhibit D (Proposed Hearing Order); (v) Exhibit E (Confidentiality Agreement), (vi) Exhibit G (Statement to Accompany Post-Execution Date Responses to Customer Complaints), (vii) Exhibit H (Post-Settlement Claim Form Mailing); (viii) Exhibit I

(Post-Mailing Reminder); and (ix) Exhibit J (Claim Review Administrative Forms and Letters); and

(c) the Affidavit of Jeffrey D. Dahl, sworn to February 23, 2001, Exhibit __ to this Order and Judgment (describing the Class Notice Package, its distribution to Class Members, and the Publication Notice)

2. **Jurisdiction.** This Court has personal jurisdiction over all Class Members (as defined below) and has subject matter jurisdiction over this Action and all claims and causes of action resolved by this settlement, including all the Claims and Causes of Action referred to in the Release. Accordingly, this Court has jurisdiction to approve the proposed settlement, grant final certification of the Class, release Claims and Causes of Action as set forth in the Release, and dismiss this Action on the merits and with prejudice.

3 **Final Class Certification.** The Class that was previously certified preliminarily is hereby finally certified for settlement purposes under Fed. R. Civ. P. 23(a), 23(b)(3), and 23(c)(2). The Class consists of (A) All persons or entities who, as of the Eligibility Date, have or had (i) an ownership interest in a cash value life insurance policy issued by IDS Life Insurance Company ("IDS") or IDS Life Insurance Company of New York ("IDSNY") pursuant to an individual sale in the United States, including its territories and commonwealths, issued at any time during the Class Period; or (ii) an ownership interest in an individual deferred annuity contract or a participation interest in a Group Qualified Annuity issued by IDS, IDSNY, American Centurion Life Assurance Company, American Enterprise Life Insurance Company or American Partners Life Insurance Company in the United States, including its territories and

commonwealths, that was in force at any time during the Class Period; and (B) all Qualified Plans and Qualified Plan Representatives that purchased, owned, held or had any interest with respect to any Group Qualified Annuity. The Class does not include (i) any present officer, any former officer of grade 50 and above, or equivalent, or any financial advisor of Defendants; or (ii) any insurance company that owns or owned a Policy or Annuity pursuant to an absolute assignment effected as part of an exchange under Section 1035 of the Internal Revenue Code Notwithstanding the foregoing, the Class shall not include (unless and to the extent such persons or entities are Class Members by virtue of their ownership interest in another Policy or Annuity) the following: (i) any persons or entities who make a timely election to be excluded from the proposed Class with respect to a particular Policy or Annuity otherwise included within the Class; (ii) any persons or entities who have an ownership interest in (a) a Policy that was terminated prior to the Eligibility Date due to the death of the insured and on which death benefits were paid; (b) an Annuity that was terminated prior to the Eligibility Date by reason of the death of the annuitant; (c) a Policy or Annuity that was issued, but not accepted or funded, or was returned to the issuer, as part of the exercise of a free look provision in the Policy or Annuity; (d) a Policy or Annuity that was rescinded as part of a reissue of a new life insurance policy or annuity contract, or because of a material misrepresentation on a Policy or Annuity application, or where the Policy or Annuity was rescinded and the premiums or other monies paid were returned to the Policy or Annuity owner; (e) a Policy or Annuity that is the subject of a release signed by any person or entity while represented by counsel settling a claim or dispute and releasing the issuer from any further liability concerning such Policy or Annuity; (f) a life insurance policy that was a term life

insurance policy or graded premium whole life insurance policy; (g) an annuity contract that was settled (*i.e.*, annuitized) prior to the inception of the Class Period; or (h) an annuity contract that was issued as an immediate annuity. A list of those persons who have validly excluded themselves from the Class, and who therefore are not bound by this Order and Judgment, is on file with this Court as Plaintiffs' and Defendants' Joint Submission of Exclusions From Class, dated March 21, 2001, and is incorporated herein and made a part hereof A small number of requests for exclusion were deficient and subject to "cure" letters. The Parties will supplement their submission once those outstanding issues are resolved.

4. **Appointment of Co-Class Counsel and Lead Counsel and Adequacy of Representation.** The law firms of Milberg Weiss Bershad Hynes & Lerach LLP and Lockridge Grindal Nauen, P.L.L.P are hereby appointed Co-Class Counsel; the law firm of Milberg Weiss Bershad Hynes & Lerach LLP is hereby appointed Lead Counsel; and the Class representatives have fully and adequately represented the Class for purposes of entering into and implementing the settlement and have satisfied the requirements of Fed. R. Civ. P. 23(a)(4).

5. **Class Notice.** Notice was provided to the Class in accordance with the Hearing Order. Individual notice was sent by first-class mail, postage prepaid, to the last known address of the Policy and Annuity Owners and, in the case of a Group Qualified Annuity, to persons or entities who hold or held a participation interest in the Group Qualified Annuity, all as reflected by Defendants' records as maintained at the Corporate Office or by the results of any searches performed by a vendor hired by Defendants to update addresses of such persons or entities. In cases of pending litigation against the Defendants, notice was also mailed to any legal

counsel known to represent the Class Member. Also in accordance with the Hearing Order, publication notice was published and notice was posted on the internet at the web sites for Defendants and Co-Class Counsel. This Court finds that the notice outlined above:

(a) constituted the best practicable notice to Class Members under the circumstances of this Action;

(b) was reasonably calculated, under the circumstances, to apprise Class Members of (i) the pendency of this class action; (ii) their right to exclude themselves from the Class and the proposed settlement, (iii) their right to object to any aspect of the proposed settlement (including final certification of the settlement class, the fairness, reasonableness or adequacy of the proposed settlement, the adequacy of the Class' representation by Plaintiffs or Plaintiffs' counsel, and/or the award of attorneys' fees); (iv) their right to appear at the Fairness Hearing -- either on their own or through counsel hired at their own expense — if they did not exclude themselves from the Class; and (v) the binding effect of the Order and Judgment in this Action, whether favorable or unfavorable, on all persons who do not request exclusion from the Class;

(c) was reasonable and constituted due, adequate and sufficient notice to all persons entitled to be provided with notice; and

(d) fully satisfied the requirements of the Federal Rules of Civil Procedure (including Fed. R. Civ. P. 23(c)(2) and (e)), the United States Constitution (including the Due Process Clause), the Rules of this Court, and any other applicable law.

6 **Final Settlement Approval.** The terms and provisions of the Settlement Agreement, including all exhibits, have been entered into in good faith and are hereby fully and finally approved as fair, reasonable and adequate as to, and in the best interests of, each of the Parties and the Class Members, and in full compliance with all applicable requirements of the Federal Rules of Civil Procedure, the United States Constitution (including the Due Process Clause), and any other applicable law. The Parties and Class Members are hereby directed to implement and consummate the Settlement Agreement according to its terms and provisions.

7. **Early Implementation.** The Defendants are hereby authorized, in their sole discretion but in consultation with Co-Class Counsel, and without requiring further approval of this Court, to implement the settlement before the Final Settlement Date (as defined in the Settlement Agreement), in which case all provisions in the Settlement Agreement specifying actions to be taken on or after the Final Settlement Date shall, to the extent necessary, be deemed to provide that those actions shall be taken on or after the date the Defendants elect to implement the settlement

8. **Appeal After Early Implementation.** If the Defendants choose to exercise their discretion to implement the settlement before the Final Settlement Date, anyone seeking to appeal from this Court's rulings must first (i) request to intervene upon a representation of inadequacy of counsel; (ii) request a stay of implementation of the settlement; and (iii) post an appropriate bond. Unless a would-be appellant satisfies all three of these requirements, the Defendants are authorized to implement the settlement before the Final Settlement Date even if such implementation would moot any appeal.

9. **Post-Settlement Mailing**. The Parties are hereby directed to mail the Post-Settlement Mailing materials substantially in the form attached as Exhibit H to the Settlement Agreement, as provided by the Stipulation of Settlement.

10. **Securities Registration Not Required.** This Court hereby confirms that, to the extent that any rights provided under this settlement (including but not limited to the right to designate another person as eligible to receive the ADB under the Settlement Agreement) might be deemed to be a security under section 3(a)(10) of the Securities Act of 1933, as amended, registration of any such right would not be required by virtue of this Court's approval of the settlement.

11. **No Tax Advice Being Given**. This Court hereby confirms that the Parties and their counsel are not making any representations or providing any opinions or advice concerning the tax consequences of the proposed settlement or the election of any remedies under the settlement to individual Class Members, and the Parties and their counsel shall not be held liable for any tax consequences or elections.

12. **Binding Effect.** The terms of the Settlement Agreement and of this Order and Judgment shall be forever binding on Plaintiffs and all other Class Members, as well as their heirs, executors and administrators, successors, assigns, guardians, attorneys, trustees, and representatives, and those terms shall have *res judicata* and other preclusive effect in all pending and future claims, lawsuits or other proceedings maintained by or on behalf of any such persons, to the extent those claims, lawsuits or other proceedings involve matters that were or could have been raised in the Action or are otherwise encompassed by the Release.

13 **Release.** The following Release, which is also set forth in Section XII of the Stipulation of Settlement, is expressly incorporated herein in all respects, is effective as of the Final Settlement Date, and forever discharges the Releasees from any Claims or Causes of Action that arise from or relate to the Released Conduct:

A. Release and Waiver

1. In consideration for the relief set forth in this Agreement, Plaintiffs and all other Releasors (defined below) shall, as of the Final Settlement Date, release, acquit and forever discharge the Releasees (defined below) from any and all past or present Claims and Causes of Action (defined below) that are based upon, related to, or connected with, directly or indirectly, in whole or in part: (a) the allegations, facts or subjects set forth or otherwise raised in Benacquisto, et al. v. American Express Financial Corporation, et al., No. 96-18477, pending before the Minnesota State Court for the County of Hennepin (together with the actions consolidated therewith, also filed in the Minnesota State Court for the County of Hennepin and entitled Mork, et al. v. IDS Life Insurance Company, et al., No. 97-04742, and Thoresen, et al. v. American Express Financial Corporation, et al., No. 98-015681) and/or Benacquisto, et al. v. American Express Financial Corporation, et al., No. 00-1980 DSD/JMM, pending before the United States District Court for the District of Minnesota; or (b) the Released Conduct (defined below).

2. Plaintiffs and all other Class Members, on their own behalf and on behalf of all other Releasors also hereby contractually agree and acknowledge that, unless this settlement is ultimately disapproved, they shall not now or hereafter initiate, participate in, maintain, maintain a right to or assert against the Releasees, or any of them, either directly or indirectly, derivatively, on their own behalf, or on behalf of the Class or the general public or any other person or entity, any Claims and Causes of Actions (defined below) that are based upon, related to, or connected with, directly or indirectly, in whole or in part: (a) the allegations, facts or subjects set forth or otherwise raised in Benacquisto, et al. v. American Express Financial Corporation, et al., No 96-18477, pending before the Minnesota State Court for the County of Hennepin (together with the actions consolidated therewith, also filed in the Minnesota State Court for the County of Hennepin and entitled Mork, et al. v. IDS Life Insurance Company, et al., No. 97-04742, and Thoresen, et al. v. American Express Financial Corporation, et al., No. 98-015681) and Benacquisto, et al. v. American Express Financial Corporation, et al., No. 00-1980 DSD/JMM, pending before the United States District Court for the District of Minnesota; or (b) that relate in any way to the Released Conduct

3. Nothing in this Release shall be deemed to alter (i) a Class Member's right to make a claim for contractual benefits that will become payable in the future pursuant to the express written terms of an In Force Policy or In Force Annuity issued by any of Defendants; (ii) a Class Member's right to assert any claim that independently arises from acts, facts or circumstances that occur for the first time after the last day of the Class Period; (iii) a Class Member's right to make a claim for theft or embezzlement in connection with a Policy or Annuity; (iv) a Class Member's right to assert any claim based on facts arising out of or relating to the administration or servicing of a Policy or Annuity after its purchase unless they arise out of or relate to any of the matters described in sections XII.B.2.(i)-(xiii) of the Stipulation of Settlement; or (v) a Class Member's right to assert any claim peculiar to the Class Member that falls outside the general categories of claims or conduct described in the complaints in the Actions or the Release in this settlement and is based on facts that were not discovered and could not with reasonable care have been discovered by the Class Member before the deadline to submit an Election Form set forth in the Stipulation of Settlement.

4. Plaintiffs and all other Class Members, on their own behalf and on behalf of all other Releasors, expressly agree that this Release will be, and may be raised as, a complete defense to, and will preclude any action or proceeding that relates in any way to, the Released Conduct.

5. Plaintiffs and all other Class Members, on their own behalf and on behalf of all other Releasors, expressly understand that certain principles of law, such as Section 1542 of the Civil Code of the State of California, provide that a "general" release does not extend to claims that a creditor does not know or suspect to exist in his favor at the time of executing the release and which, if known by him, must have materially affected his settlement with the debtor. To the extent that these principles of law arguably may be applicable — notwithstanding that the parties have chosen Minnesota law to govern the Stipulation of Settlement — Plaintiffs and the Class Members hereby agree that these principles (including Cal. Civ. Code Section 1542 and all similar federal or state laws, rights, rules, or legal principles of any jurisdiction that may be applicable herein) are hereby knowingly and voluntarily waived and relinquished by Plaintiffs and the Class Members, and Plaintiffs and the Class Members hereby agree and acknowledge that this is an essential term of both the Settlement Agreement and this Release.

6 In connection with this Release, Plaintiffs and all other Class Members, on their own behalf and on behalf of all other Releasors, acknowledge that they are aware that they may hereafter discover claims presently unknown or unsuspected, or facts in addition to or different from those that they now know or believe to be true with respect to the matters released herein that occurred prior to the last day of the Class Period. Nevertheless, subject to paragraph 3 above, it is the intention of Plaintiffs and the Class Members in executing this Release fully, finally and forever to settle and release all such

matters that exist, hereafter may exist, or might have existed (whether or not previously or currently asserted in any action or proceeding) with respect to their Policies and Annuities.

7. Nothing in this Release shall preclude any action to enforce any of the terms of the Settlement Agreement, provided that such action shall be brought in the Minnesota State Court for the County of Hennepin or the United States District Court for the District of Minnesota.

8. Plaintiffs and all other Class Members, on their own behalf and on behalf of all other Releasors, hereby agree and acknowledge that the provisions of this Release, individually and collectively, constitute an essential and material term of the Settlement Agreement.

9. This Release is the result of a compromise of a disputed claim and shall never at any time be used as evidence of any admission of liability, wrongdoing or damages by the Company.

B. <u>Release and Waiver -- Definitions</u>

1. "Claims and Causes of Action" (as used in this Release) means any and all claims for relief (including any federal, exclusively federal, state, or other causes of action, suits, petitions, or demands in law or equity), any and all allegations of liability (including any allegations of debts, obligations, promises, guarantees, damages, awards, or for any equitable, legal and administrative relief), and any and all demands for damages or equitable relief (including any claims for rescission, reformation, restitution or all damages of any kind, including those in excess of actual damages and claims for mental anguish), that have been, could have been, may be or could be asserted in any court action, whether federal, state or otherwise, or before any administrative body (including any brought by or on behalf of any state or local insurance, prosecutorial or other organization), tribunal, arbitration panel, or other adjudicatory body, regardless of whether based on federal, state or local law, statute, ordinance, regulation, contract, common law, or any other source, and regardless of whether foreseen or unforeseen, suspected or unsuspected, or fixed or contingent at the time of this Settlement.

2. "Released Conduct" means any and all direct or indirect acts, representations, omissions, suggestions, or communications that are related to or connected in any way with the design, development, marketing, sale, administration, servicing, underwriting, or performance of the Policies or the Annuities, including, without limitation, acts, representations, omissions, suggestions or communications in connection with (i) the explanation, description, marketing, sale, solicitation, illustration or replacement of any Policy or Annuity; (ii) the application for or purchase of any Policy or Annuity; (iii) the suitability of any purchases, sales or replacements of any Policy or

Annuity; (iv) the taking of any loans, or the accumulation of any interest or cash values on any Policy or Annuity; (v) the setting, reduction, adjustment, payment, or lack of payment of any interest rates, purchase rates or renewal rates on any Policy or Annuity; (vi) the setting, charging or reducing of any cost of insurance, commissions, incentives, premiums, taxes, fees, mortality and expense fees, charges, contract charges, surrender charges, or expenses on any Policy or Annuity; (vii) the investment choices made with respect to assets held in any Policy or Annuity; (viii) the surrender, lapse, or termination of any Policy or Annuity; (ix) the tax status, tax impact or tax consequences of any Policy or Annuity or any actions or inaction taken with respect thereto; (x) the costs, commissions, terms, or benefits or disadvantages of any Policy or Annuity compared to any other life insurance policy, annuity contract or investment; (xi) the comparison or lack of comparison of any Policy or Annuity to any other product; (xii) the preparation by any financial advisor acting for the Company of any financial plan or the provision of financial or investment advice insofar as it resulted in the sale, modification or maintenance of any Policy or Annuity; (xiii) the effect that a Class Member's election and award of benefits in this Settlement Agreement may have on the value of any Policy or Annuity; and (xiv) the administration or servicing of any Policy or Annuity after its purchase.

3. "Releasees" means the Company[1] and its past, present and future parents, subsidiaries, affiliates, partners, predecessors, successors and assigns, and each of their respective past, present and future officers, directors, shareholders, employees, general agents, agents, advisors, branch managers, producers, sales representatives, brokers, solicitors, representatives, attorneys, heirs, administrators, executors, insurers, predecessors, successors and assigns, or any of them, including any person or entity acting on behalf of, or at the direction of, any of them.

4. "Releasors" means, to the extent they are not excluded from the Class with respect to a Policy or Annuity, the Plaintiffs and all Class Members, on behalf of themselves and their respective heirs, executors, administrators, successors, assigns, guardians, attorneys, trustees, qualified plans, fiduciaries, plan fiduciaries, plan trustees, plan sponsors, plan participants, plan beneficiaries, and representatives, and on behalf of the Policies' insureds and beneficiaries, the Annuities' annuitants and beneficiaries, and the Policies' and Annuities' nominal and beneficial owners.

---

[1] "Company" means IDS Life Insurance Company, IDS Life Insurance Company of New York, the American Express Company, American Express Financial Corporation, American Express Financial Advisors, American Express Service Corporation, American Express Trust Company, American Centurion Life Assurance Company, American Enterprise Life Insurance Company and American Partners Life Insurance Company, collectively

14. **Permanent Injunction**. All Class Members who have not been timely excluded from the Class with respect to a Policy or Annuity are hereby permanently barred and enjoined from (i) filing, commencing, prosecuting, maintaining, intervening in, participating in (as class members or otherwise), or receiving any benefits or other relief from, any other lawsuit, arbitration, or administrative, regulatory or other proceeding or order in any jurisdiction based on or relating to the Claims and Causes of Action, or the facts and circumstances relating thereto, in the Action and/or the Released Conduct (as that term is defined in the Settlement Agreement) as to that Policy or Annuity, and (ii) organizing or soliciting the participation of any Class Members in a separate class for purposes of pursuing as a purported class action (including by seeking to amend a pending complaint to include class allegations, or by seeking class certification in a pending action) any lawsuit or other proceeding based on or relating to the Claims and Causes of Action, or the facts and circumstances relating thereto, in the Action and/or the Released Conduct as to that Policy or Annuity. This Court finds that issuance of this permanent injunction is necessary and appropriate in aid of this Court's jurisdiction over the Action and to protect and effectuate this Order and Judgment.

15. **Enforcement of Settlement.** Nothing in this Order and Judgment shall preclude any action to enforce the terms of the Settlement Agreement; nor shall anything in this Order and Judgment preclude Plaintiffs or Class Members from participating in the Claim Review Process described in the Settlement Agreement if they are entitled to do so under the terms of the Settlement Agreement.

16. **Attorneys' Fees and Expenses.** The Court hereby grants Co-Class Counsels' application for an award of attorneys' fees and reimbursement of their disbursements and expenses for their past and future work on the Actions in the amount of $28 million, to be paid by Defendants to Lead Counsel. The $28 million consists of approximately $27, 380, 000 in fees and $620,000 in reimbursement of expenses Such fees and expenses are to be paid by Defendants within 10 days after the last date of entry of the Order and Judgment in the Actions, subject to the conditions set forth in the Stipulation of Settlement. Plaintiffs' counsel shall set aside in a Qualified Settlement Fund ten percent, or $2,738,000, of the fee award pending substantial completion of the administration of the Claim Review Process. Plaintiffs' counsel shall advise this Court when payments are made to Class Members in the Claim Review Process, and may draw down this final ten percent (plus any accumulated interest) at that time without further order of this Court. Lead Counsel, in its sole discretion, shall allocate and distribute this award of attorneys' fees and expenses among counsel for the Class.

17. **No Other Payments.** The preceding paragraph of this Order and Judgment covers, without limitation, any and all claims for attorneys' fees and expenses, costs or disbursements incurred by Co-Class Counsel or any other counsel representing Plaintiffs or Class Members, or incurred by Plaintiffs or the Class Members, or any of them, in connection with or related in any manner to the Actions, the settlement of the Actions, the administration of such settlement, and/or the Released Conduct except to the extent otherwise specified in this Order and Judgment and the Stipulation of Settlement.

18. **Modification of Settlement Agreement.** The Parties are hereby authorized, without needing further approval from this Court, to agree to and adopt such amendments to, and modifications and expansions of, the Settlement Agreement -- including without limitation, the Post-Settlement Mailing materials and the forms to be used in the Claim Review Process -- as are consistent with this Order and Judgment and do not limit the rights of Class Members under the Settlement Agreement.

19. **Retention of Jurisdiction.** This Court has jurisdiction to enter this Order and Judgment. Without in any way affecting the finality of this Order and Judgment, this Court expressly retains jurisdiction as to all matters relating to the administration, consummation, enforcement and interpretation of the Settlement Agreement and of this Order and Judgment, and for any other necessary purpose, including, without limitation,

(a) enforcing the terms and conditions of the Settlement Agreement and resolving any disputes, claims or causes of action that, in whole or in part, are related to or arise out of the Settlement Agreement, this Order and Judgment (including, without limitation, whether a person or entity is or is not a Class Member; whether claims or causes of action allegedly related to this case are or are not barred by this Order and Judgment, etc.);

(b) entering such additional Orders as may be necessary or appropriate to protect or effectuate this Order and Judgment approving the Settlement Agreement, dismissing all claims on the merits and with prejudice, and permanently enjoining

Class Members from initiating or pursuing related proceedings, or to ensure the fair and orderly administration of this settlement; and

(c) entering any other necessary or appropriate Orders to protect and effectuate this Court's retention of continuing jurisdiction;

*provided, however,* that nothing in this paragraph is intended to restrict the ability of the Parties to exercise their rights under paragraphs 7 and 18 above.

20. **No Admissions.** This Order and Judgment, and the Settlement Agreement (and any other document referred to here, or any action taken to carry out this Order and Judgment) shall not be used or construed as an admission or concession by the Defendants of any actual or potential fault, wrongdoing, liability or damages whatsoever, and shall not be used as any evidence or inference of any fault, wrongdoing, liability or damage against the Defendants. Entering into or carrying out the Settlement Agreement, and any negotiations or proceedings related to it, shall not be construed as, or deemed evidence of, an admission or concession by Defendants as to any actual or potential fault, wrongdoing, liability or damages and shall not be offered or received in evidence or used for impeachment in any action or proceeding against any party hereto in any court, administrative agency or other tribunal for any purpose whatsoever, except as evidence of the settlement or to enforce the provisions of this Order and Judgment and the Settlement Agreement; *provided, however,* that this Order and Judgment and the Settlement Agreement may be filed in any action against or by the Defendants or Releasees (as defined in the Stipulation of Settlement) to support a defense of *res judicata*, collateral estoppel, release,

waiver, good-faith settlement, judgment bar or reduction, full faith and credit, or any other theory of claim preclusion, issue preclusion or similar defense or counterclaim.

21. **Dismissal of Action.** The Action, including all individual and Class claims resolved in them, are hereby dismissed on the merits and with prejudice against Plaintiffs and all other Class Members, without fees or costs to any party except as otherwise provided in this Order and Judgment.

22. **Bond Requirement.** Any appeal of the orders and judgment of this Court in this action shall be conditioned upon the posting of a bond by the proposed appellant of $500,000.

SO ORDERED this 15th day of May, 2001. LET THE JUDGMENT BE ENTERED ACCORDINGLY.

The Honorable David S. Doty
United States District Judge

# UNITED STATES DISTRICT COURT
# DISTRICT OF MINNESOTA

## CIVIL NOTICE

The purpose of this notice is to summarize the time limits for filing with the District Court Clerk's Office a Notice of Appeal to the Eighth Circuit Court of Appeals from a final decision of the District Court in a civil case.

***This is a summary only. For specific information on the time limits for filing a Notice of Appeal, review the applicable federal civil and appellate procedure rules and statutes.***

Rule 4(a) of the Federal Rules of Appellate Procedure (Fed. R. App. P.) requires that a Notice of Appeal be filed within:

1. Thirty days (60 days if the United States is a party) after the date of "entry of the judgment or order appealed from;" or

2. Thirty days (60 days if the United States is a party) after the date of entry of an order denying a timely motion for a new trial under Fed. R. Civ. P. 59; or

3. Thirty days (60 days if the United States is a party) after the date of entry of an order granting or denying a timely motion for judgment under Fed. R. Civ. P. 50(b), to amend or make additional findings of fact under Fed. R. Civ. P. 52(b), and/or to alter or amend the judgment under Fed. R. Civ. P. 59; or

4. Fourteen days after the date on which a previously timely Notice of Appeal was filed.

If a Notice of Appeal is not timely filed, a party in a civil case can move the District Court pursuant to Fed. R. App. P. 4(a)(5) to extend the time for filing a Notice of Appeal. This motion must be filed no later than 30 days after the period for filing a Notice of Appeal expires. If the motion is filed after the period for filing a Notice of Appeal expires, the party bringing the motion must give the opposing parties notice of it. The District Court may grant the motion, but only if excusable neglect or good cause is shown for failing to file a timely Notice of Appeal.

FORMS\APPEALNO.CIV
Rev. August 11, 1995

# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

### Prehearing Conference Program

The United States Court of Appeals for the Eighth Circuit has established an early intervention Prehearing Conference Program. The purpose of the program is twofold: (1) to facilitate settlement discussions in civil cases by providing an impartial atmosphere for an open discussion of the case and alternative methods of disposition and (2) to promote the delineation of issues, early resolution of procedural problems, and effective administration of an appeal throughout the appellate process. See 8th Cir. R. 33A.

The program is directed by Mr. John Martin. Mr. Martin screens newly filed appeals based on information furnished by both appellants and appellees in the court's Appeal Information Forms A and B. Contact with counsel is by telephone and in personal conferences held in several cities throughout the Circuit. All communications with Mr. Martin are confidential. Counsel can openly discuss and evaluate the issues and explore alternatives in a non-adversarial setting without fear that the subsequent processing of the appeal or ultimate disposition of the case will be adversely affected by participation in the program.

Participation in the program is voluntary. However, the Court strongly encourages your participation and cooperation. Over the past twenty years, the program has enabled many appellate litigants to achieve mutually satisfactory resolution of certain issues or an overall settlement prior to progressing through all stages of the appellate process. Issue delineation enables counsel to focus only on those issues that need judicial resolution. The program has helped relieve the ever-increasing caseload confronting the Court, and it has also saved litigants and attorneys substantial amounts of time and money.

In order for the program to function effectively certain information must be provided at the initiation of the appeal. *Eighth Circuit Rule 3B directs each civil appellant to: (1) file a completed Appeal Information Form A with the Notice of Appeal at the time the Notice is filed with the District Court clerk and (2) forward a copy of the completed Form A and a copy of Appeal Information Form B to the appellee for completion.* Appellee may complete Form B and send it to the clerk of the Court of Appeals. If you have any questions about the Prehearing Conference Program or the Appeal Information Forms, please contact Mr. Martin at (314)-539-3669.

Forms A and B are available from the District Court clerk and the Court of Appeals clerk and can be found at the Court of Appeals' web site at: www.ca8.uscourts.gov

*June 1 2000*

Forms/8thcircuitprehearingconf wpd

DAVID G. DERICKSON, P.C.
One Columbus Plaza
3636 North Central, Suite 1050
Phoenix, Arizona 85012
Telephone (602) 277-6072
Facsimile (602) 277-6078

David G. Derickson, SBA #002450
John Foreman, SBA #003252
Attorneys for Claimant

**ARBITRATION CLAIM**
**NATIONAL ASSOCIATION OF SECURITIES DEALERS**

| | |
|---|---|
| RICHARD VEHRING, a married man, surviving son of VIVIAN A. VEHRING, (deceased) and TRUSTEE OF THE VIVIAN VEHRING DECEDENT TRUST,<br>*Claimant,*<br>v.<br>IDS LIFE INSURANCE COMPANY, A Minnesota Corporation and a wholly owned subsidiary of AMERICAN EXPRESS FINANCIAL CORPORATION; AMERICAN EXPRESS FINANCIAL CORPORATION, a Minnesota Corporation; AMERICAN EXPRESS FINANCIAL ADVISORS, Inc., a Minnesota Corporation; Jason Gerald Knight.<br>*Respondents.* | **STATEMENT OF CLAIM** |

1. IDS Life Insurance Company, American Express Financial Corporation and American Express Financial Advisors, Inc. ("The Corporate Respondents") are member-organizations of and/or operated through authority granted by the National Association

of Securities Dealers ("NASD"). The Corporate Respondents and Claimant have agreed to submit this claim to arbitration before the National Association of Securities Dealers.

2. Respondent Jason Knight ("Knight") sold Vivian Vehring an Annuity (See Attachment A) on behalf of the corporate Respondents. That transaction forms the basis of this claim.

3. The Annuity contract specifies the law of the state in which the Annuity was delivered will govern. (See page 4, Attachment A) Arizona is the state where the Annuity was sold and delivered.

4. Claimant Richard Vehring ("Claimant" or "Richard") is a resident of Maricopa County, State of Arizona. He is Trustee of the Vivian Vehring Decedent Trust ("Decedent Trust") and heir to the estate of Mrs. Vivian A. Vehring ("Vivian" or "Claimant's mother"), his Mother. Vivian died April 9, 2001.

5. At all times relevant to this claim, Respondent IDS Life Insurance Company ("IDS") was and is a corporation existing under the laws of the State of Minnesota, doing business in the State of Arizona.

6. At all times relevant to this claim, Respondent American Express Financial Corporation ("AEFC") was and is a Delaware corporation doing business in the State of Arizona.

7. At all times relevant to this claim, Respondent American Express Financial Advisors, Inc. ("AEFA") was and is a corporation existing under the laws of the State of Minnesota, doing business in the State of Arizona.

8. At all times relevant to this claim, Respondent Jason Gerald Knight ("Knight") was doing business as a financial advisor and branch manager at O'Dell, Knight, Nall & Associates at 931 East Southern Avenue, Mesa, Arizona, 85204.

9. At all times relevant to this claim Knight was acting for and on behalf of his marital community and as an agent/employee/salesman for the corporate Respondents. Knight was and is married to Lisa R. Knight.

10. IDS is wholly owned by American Express Financial Corporation. Knight was branch manager at O'Dell, Knight, Nall & Associates and a licensed agent for IDS Life Insurance products. He was an authorized agent of IDS and AEFC at all times relevant to this complaint.

11. On June 24, 1999 Knight sold an IDS Life Insurance product deferred annuity contract for a flexible portfolio annuity to Claimant's mother, for the consideration of a lump sum single purchase payment of $450,000.00, paid in full by personal check signed by Claimant's mother on June 24, 1999. All purchase payment funds were assigned to an American Express VP Cash Management Mutual Fund, with an annual interest rate of 5.00% for the first year. The guaranteed interest rate for the remainder of the contract was 3.00%. (Attachment A)

12. IDS, AEFA and AEFC provided training and education to their financial advisors, including Knight, about annuity contracts like the one purchased by Vivian. The training and education taught Knight and his fellow advisors they should tell prospective purchasers the annuities would pay at least the total purchase price at death even if

they were over the age of 75 years at the time the annuity was purchased and even though the purchaser died within ten years of issuance of the annuity. (Attachment B).

13. Knight followed his training and education in dealing with Vivian and Claimant. (Attachment B).

14. Knight told Vivian and Claimant that, upon her death, her estate would receive no less than the purchase price, or $450,000. Knight has confirmed by letter sent to the Claimant dated November 5, 2001: " When we signed each agreement, I was under the impression that the annuity provided the death benefit in the amount of the contribution should market conditions change – which is the reason it was so appropriate for your parents. Both policies were sold on this premise and I confirmed your understanding on several occasions." (Attachment B)

15. An identical annuity from corporate Respondents was sold by Knight to Claimant's father, Vivian's husband. The corporate Respondents paid the purchase price of Claimant's father's annuity when he died to Vivian as her deceased husband's heir before she purchased her annuity.

16. She signed the contract for her annuity relying on the truthfulness of Knight's representation and upon the prior actions of corporate Respondents. It was reasonable for Vivian to expect her estate would receive no less than the purchase price upon her death.

17. Vivian passed away in April 9, 2001. Upon notice of the death of Claimant's Decedent, IDS Life Insurance Company paid $320,817.34 by check payable to the Decedent Trust, care of Claimant, Trustee. The check was dated May 23, 2001.

Claimant made repeated attempts to obtain the full amount promised in the annuity contract and to obtain an explanation and accounting for the failure to pay the full amount. No accounting for fees and commissions or explanation for the failure to pay the purchase amount was ever provided to Claimant.

18. The check was $129,182.66 less than the $450,000.00 plus interest promised under the Deferred Annuity Contract death benefit clause as it had been explained by Knight.

19. Claimant was told by IDS that a pending class action law suit against IDS and AEFC defined the terms of the death benefit in the Decedent Trust.

20. IDS, AEFA and AEFC told Richard that the matter was out of their hands and referred him to the class action representatives for further information.

21. The Respondents have used methods similar to those used against Claimant's mother to sell similar annuities to many other victims though out the country. As a result, the corporate Respondents have been sued in state and federal class actions for common law fraud, breach of fiduciary duty, negligent misrepresentation, fraudulent inducement, negligence, violation of consumer fraud statutes, other state and federal torts. The Claimant's mother was a member of one of the classes of victims in those class action lawsuits, *Benacquisto, et al v. American Express Financial Corp., et al.*, Minnesota District Court for the Fourth District, Nos. 96-18477, 97-4742, 98-15681 and *Benacquisto, et al. v. American Express Financial Corp., et al.*, United States District Court, District of Minnesota, No. 00-1980 DSD. Although officially denying liability, the corporate Respondents settled those class action lawsuits effective September 18,

2000, for all the described claims for policies in effect from January 1, 1985 through February 29, 2000.

22. The settlement precludes claims by members of the class or their successors in interest for the tortious conduct alleged in the class actions. However, the release and waiver portion of the settlement states: "Nothing in this Release shall be deemed to alter (i) a Class Member's right to make a claim for contractual benefits that will become payable in the future pursuant to the express written terms of an ... In Force Annuity issued by any of Defendants; ... (iii) a Class Member's right to make a claim for theft ... in connection with an ... Annuity.... (Stipulation of Settlement, *Benacquisto, et al v. American Express Financial Corp., et al*, Minnesota District Court for the Fourth District, Nos. 96-18477, 97-4742, 98-15681 and *Benacquisto, et al v. American Express Financial Corp., et al*, United States District Court, District of Minnesota, No. 00-1980 DSD, XII(A)3), page 54).

23. Richard filed a claim with the class action representative, alleging among other things, the substance of the above allegations. Only a small award ($6,497.00) was recovered through the class action process on December 10, 2002.

24. An action alleging claims not precluded by the settlement, breach of contract, conversion and racketeering, was filed in the Superior Court of Arizona in Maricopa County (No. 2004-023398) on December 7, 2004.

25. This Arbitration Claim contains the claims the Claimant has against the Respondents permitted by the settlement raised in the class actions.

**CLAIM ONE**
**(BREACH OF CONTRACT)**

26. Claimant's mother complied with all of the requirements of the deferred annuity contract including payment of the premium in the amount of $450,000.00 as described by Knight and described in the signed contract dated June 24, 1999.

27. Claimant's mother relied upon the assurance by Knight, trained agent and financial advisor for IDS, AMFA and AEFC, that the death benefit would provide a full reimbursement if she died before the 10 year term of the contract was completed.

28. Respondents' failure and refusal to pay the full amount of the annuity contract constitutes a breach of the deferred annuity contract.

29. As a direct and proximate result of respondent's breach of the deferred annuity contract, Claimant, as Trustee of the Decedent Trust, was damaged in the amount of unpaid proceeds, loss of interest on the unpaid proceeds, and attorneys' fees and costs in bringing this lawsuit.

**CLAIM TWO**
**(THEFT BY CONVERSION)**

30. Respondents refused to pay $129,182.66, the difference between the amount they had promised they would pay ($450,000.00) and what was actually paid ($320,817.34). The refusal of Respondents to pay was without claim of legal authority and with the intent to permanently deprive Claimant of the $129,182.66. Therefore, it constitutes theft pursuant to A.R.S. § 13-1802 (A)(1) .

31. Respondents were entrusted by Claimant's elderly mother with $450,000 for a limited use. They were authorized to use the money for investment and payment

of the premium of an annuity. If the annuitant died before the annuity began to pay, no less than the entire initial payment was to be repaid. When they failed to return the entire initial payment when the annuitant died, Respondents converted the portion not returned ($129,182.66) for an unauthorized term or use. Respondents' actions constitute theft by conversion of property to which the claimant was entitled pursuant to A.R.S. § 13-1802 (A)(2).

32. Respondents continue to control property of claimant without lawful authority, knowing or having reason to know that the property was stolen in violation of A.R.S. § 13-1802(A)(5).

33. Respondents used, and intended that Claimant's Decedent rely upon, misleading and false information and concealed and omitted material facts in connection with the sale of annuity contracts, resulting in loss of property or assets. Such conduct constitutes theft, in violation of A.R.S. § 13-1802(A)(3).

34. As a result of the acts set forth above, corporate Respondents committed theft of property to which Claimant is entitled.

35. The conduct of the corporate Respondents in keeping the $129,182.66 owed to Claimant plus interest, attorney's fees and costs without even a claim of legal entitlement was intentional and violated the criminal law of the state of Arizona. The conduct of respondents was and continues to this day to be outrageous and done with an evil mind.

36. In addition to compensatory damages, claimant is entitled to punitive damages for respondent's outrageous, intentional conduct.

**CLAIM THREE**
**(RACKETEERING-VIOLATIONS OF A.R.S. § 13-2314.04)**

37. On information and belief, respondents engaged in a pattern of racketeering activity by unlawfully promoting and selling deferred annuity contracts, not only to Claimant's Decedent, but to other existing clients, resulting in conversion of their assets, as well as Vivian's assets.

38. A "pattern of racketeering activity" is defined as at least two acts of racketeering, in violation of A.R.S. §13-2301, subsec. D, including theft and a scheme or artifice to defraud. Respondents' conduct constitutes a pattern of racketeering activity by this definition.

a. AEFA holds itself out to the public and is registered with the Securities and Exchange Commission ("SEC") as a "financial adviser" under the Advisers Act. As such, AEFA is a fiduciary to its clients.

b. It is the legal duty of a fiduciary to be scrupulously forthright, honest and candid with its clients; to place the interests of its clients above its own interests; and to supply every client with all information that a reasonable investor might consider relevant. Paying lip service to that fiduciary duty, AEFA portrays itself as a fount of trusted financial advice, communicating to the public, "We consider your needs first" and, "One of American Express' values is 'to place the interests of customers and clients first.'

c. AEFA's public pledge of "placing clients first" and discharging its fiduciary duties, however, is an empty sales slogan. As AEFA conceded in a recent

internal memo: "Our goal is to *balance* the needs of clients, *advisors/employees and shareholders*." Consistent with that policy, which illegally subordinates clients' needs, AEFA's nationwide force of some 12,000 "advisors" is nothing more than a high-pressure sales operation that seeks to profit at its clients' expense. AEFA does so through the sale of so-called "Financial Plans" whose sole purpose is not to provide objective investment "advice," but rather to promote the sale of proprietary American Express insurance and other financial products.

d. AEFA seeks to cultivate the trust and confidence of prospective clients by offering them a "free initial consultation." At the "free initial consultation," an AEFA "advisor," through high-pressure sales tactics, attempts to sell the potential client a Financial Plan at what appears to be a reasonable price (a typical flat fee of $500).

e. AEFA touts each of its Financial Plans as a "comprehensive and objective financial plan." They are nothing of the sort. To the contrary, AEFA's Financial Plans are In the *Benacquisto* Action, American Express paid over $215 million to settle claims that it engaged in a policy of churning clients' cash value life insurance policies and annuities. The *Benacquisto* settlement agreement bars all class members -- who purchased cash value life insurance or annuities prior to March 1, 2000 -- from asserting any further claims. simply a sales tool to promote the sale of high-priced and often inappropriate insurance and other financial products. When selling

AEFA's Financial Plans to customers, AEFA's financial "advisors" fail to disclose the inherent and actual conflicts of interest in such Plans, as well as the biased nature of the "advice" for which clients are paying hundreds of dollars.

f. AEFA, through its highly trained "financial advisor" sales force, uses the supposedly "objective" Financial Plans to attempt to induce AEFA's clients to transfer as much of their assets as possible to AEFA management, and to buy AEFA's high-priced financial products B in particular, its inappropriate and overpriced variable universal life ("VUL") insurance from sister-company, IDS Life Insurance Company ("IDS").

g. AEFA, a fiduciary, perpetrates this manipulative and deceptive scheme nationwide through a system of uniform training and "canned" sales scripts.

h. Respondents used existing customers' long standing relationship improperly by "mining" information about these customers and employing past customer confidence and trust to sell policies whose value was either intentionally or recklessly misrepresented.

i. Respondents committed theft and theft by conversion on two or more occasions by failing to pay the full purchase price to the heirs of purchasers of annuity contracts similar to the Annuity purchased by Claimant's mother in this case who died before the contract began annuity payments.

Claimant asks the NASD Arbitrators to award the following :

1. Compensatory damages to compensate claimant for the improperly withheld $129,182.66 with interest at the highest rate permitted by law from May 23, 2001;

2. Punitive damages for the intentional criminal acts of corporate Respondents;

3. Treble damages as a result of the pattern of unlawful "racketeering" activity by respondents available under A.R.S. § 13-2314.04(A);

4. All costs and attorneys fees incurred in this matter as provided by Arizona law; and

5. Any further relief the Arbitrators determine is appropriate.

RESPECTFULLY SUBMITTED this 21 day of September, 2005.

DAVID G. DERICKSON, P.C.

By: John Foreman

David G. Derickson, Esq.
John Foreman, Esq.
Suite 1050
3636 North Central Avenue
Phoenix, Arizona 85012
Attorneys for Claimant

**VERIFICATION**

STATE OF ARIZONA )
) ss.
County of Maricopa )

Richard Vehring, having first been duly sworn, upon my oath, depose and say:

1. That I am the Claimant in the attached Arbitration Claim.

2. That I have read the foregoing Arbitration Claim and know the contents thereof.

3. That the matters alleged therein are true, except those things contained therein stated upon information and belief, and as to those matters, I believe them to be true.

Richard Vehring
RICHARD VEHRING

SUBSCRIBED AND SWORN to before me this 21st day of September, 2005

Donna C. Hatheway
NOTARY PUBLIC

My Commission Expires:

DONNA C. HATHEWAY
Notary Public - Arizona
MARICOPA COUNTY
My Commission Expires
AUGUST 2, 2008

**STATE OF MINNESOTA** **DISTRICT COURT**
**COUNTY OF HENNEPIN** **FOURTH JUDICIAL DISTRICT**

LESA BENACQUISTO, DANIEL BENACQUISTO, RICHARD THORESEN, ELIZABETH THORESEN, ARNOLD MORK, ISABELLA MORK, RONALD MELCHERT and SUSAN MELCHERT, on behalf of themselves and all others similarly situated,

Plaintiffs,

v.

AMERICAN EXPRESS FINANCIAL CORPORATION, AMERICAN EXPRESS FINANCIAL ADVISORS, AMERICAN CENTURION LIFE ASSURANCE COMPANY, AMERICAN ENTERPRISE LIFE INSURANCE COMPANY, AMERICAN PARTNERS LIFE INSURANCE COMPANY, IDS LIFE INSURANCE COMPANY, and IDS LIFE INSURANCE COMPANY OF NEW YORK,

Defendants.

Case No. 96-018477

(Consolidated Cases: 96-018477, 97-004742, 98-105681)

**UNITED STATES DISTRICT COURT**
**DISTRICT OF MINNESOTA**

LESA BENACQUISTO, DANIEL BENACQUISTO, RICHARD THORESEN, ELIZABETH THORESEN, ARNOLD MORK, ISABELLA MORK, RONALD MELCHERT and SUSAN MELCHERT, on behalf of themselves and all others similarly situated,

Plaintiffs,

v.

AMERICAN EXPRESS FINANCIAL CORPORATION, AMERICAN EXPRESS FINANCIAL ADVISORS, AMERICAN CENTURION LIFE ASSURANCE COMPANY, AMERICAN ENTERPRISE LIFE INSURANCE COMPANY, AMERICAN PARTNERS LIFE INSURANCE COMPANY, IDS LIFE INSURANCE COMPANY, and IDS LIFE INSURANCE COMPANY OF NEW YORK,

Defendants.

Civ Case No. 00-1980 DSD/JMM

# STIPULATION OF SETTLEMENT

## TABLE OF CONTENTS


Page

I. INTRODUCTION . . . . . 1

II. DEFINITIONS . . . . . 4

III. CERTIFICATION OF THE CLASS . . . . . 18

IV. SETTLEMENT RELIEF . . . . . 20

V. GENERAL RELIEF . . . . . 23
A. Accidental Death Benefit . . . . . 23
B. Research Initiative Regarding Terminated Policies and Annuities . . . . . 24

VI. INTERNAL REPLACEMENT RELIEF . . . . . 24
A. Procedures . . . . . 24
B. Available Relief . . . . . 25

VII. THE CLAIM REVIEW PROCESS . . . . . 28
A. Procedures . . . . . 28
B. Claim Categorization . . . . . 32
C. Review of the Claim . . . . . 32
D. Distribution of Relief Awarded in the Claim Review Process . . . . . 33
E. Payment of the Claim Evaluator Fees and Expenses . . . . . 34

VIII. DEFENDANTS' FUNDING OBLIGATIONS . . . . . 35
A. Establishing the Claim Review Relief Fund . . . . . 35
B. Funding Reverts upon Termination . . . . . 35

IX. NOTICE TO THE CLASS AND COMMUNICATIONS WITH CLASS MEMBERS . . . . . 35
A. Introduction . . . . . 35
B. Class Notice Package . . . . . 36
C. Publication Notice . . . . . 40
D. Post-Settlement Mailing . . . . . 40
E. Post-Mailing Reminder . . . . . 41
F. Retention of Administrator . . . . . 42
G. Toll-Free Telephone Number for Settlement Information . . . . . 44
H. Right of Communication with Claimants and Defendants' Customers . . . . . 46
I. Media Communications . . . . . 48
J. Defendants' Dealings with Producers . . . . . 48
K. Co-Class Counsels' Communication with Producers . . . . . 49
L. Co-Class Counsels' Administrative Responsibilities . . . . . 49

X. REQUESTS FOR EXCLUSION .......... 51

XI. OBJECTIONS TO SETTLEMENT .......... 51

XII. RELEASE AND WAIVER AND ORDER OF DISMISSAL .......... 53
A. Release and Waiver .......... 53
B. Release and Waiver -- Definitions .......... 56
C. Order of Dismissal .......... 59

XIII. ATTORNEYS' FEES AND EXPENSES .......... 59

XIV. ORDER OF NOTICE, SETTLEMENT HEARING AND ADMINISTRATION .......... 61

XV. FINAL APPROVAL AND FINAL ORDERS AND JUDGMENTS .......... 62

XVI. MODIFICATION OR TERMINATION OF THIS AGREEMENT .......... 62

XVII. GENERAL MATTERS AND RESERVATIONS .......... 65

**IT IS HEREBY STIPULATED AND AGREED**, by, between and among Lesa Benacquisto, Daniel Benacquisto, Arnold Mork, Isabella Mork, Ronald Melchert, Susan Melchert, Richard W. Thoresen and Elizabeth J. Thoresen (collectively, the "Plaintiffs"), on behalf of themselves and the Class defined below and through their duly authorized counsel, and IDS Life Insurance Company, IDS Life Insurance Company of New York, American Express Financial Corporation, American Centurion Life Assurance Company, American Enterprise Life Insurance Company, American Partners Life Insurance Company and American Express Financial Advisors (collectively, "Defendants"), through their duly authorized representatives, that the class action lawsuits entitled: Benacquisto, et al. v. American Express Financial Corporation, et al., No. 96-18477, pending before the Minnesota State Court for the County of Hennepin (together with the actions consolidated therewith, also filed in the Minnesota State Court for the County of Hennepin and entitled Mork, et al. v. IDS Life Insurance Company, et al., No. 97-04742, and Thoresen, et al. v. American Express Financial Corporation, et al., No. 98-015681), and Benacquisto, et al. v. American Express Financial Corporation, et al., No. 00-1980 DSD/JMM, pending before the United States District Court for the District of Minnesota (collectively, the "Actions"), are settled, compromised and dismissed on the merits and with prejudice, and the claims are released, on the terms and conditions set forth in this Stipulation of Settlement (the "Settlement Agreement" or "Agreement") and the Release set forth herein, subject to the approval of the Courts.

## I. INTRODUCTION

A. On or about December 13, 1996, plaintiffs in the action originally entitled Benacquisto, et al. v. IDS Life Insurance Company, et al., No. 96-18477, filed their complaint in the Minnesota State Court for the County of Hennepin. In that action, they asserted causes of

action for common law fraud, breach of fiduciary duty, negligent misrepresentation, fraudulent inducement, negligence, and violation of consumer fraud statutes in connection with defendants' replacement of cash value life insurance policies, on behalf of themselves and a class of consumers.

B. On or about March 21, 1997, plaintiffs in the action entitled Mork, et al. v. IDS Life Insurance Company, et al., No. 97-04742, filed their complaint in the Minnesota State Court for the County of Hennepin. In that action, they asserted causes of action for common law fraud, breach of fiduciary duty, negligent misrepresentation, fraudulent inducement, negligence and violation of consumer fraud statutes in connection with defendants' replacement of cash value life insurance policies and deferred annuity contracts, on behalf of themselves and a class of consumers. This action was consolidated with the Benacquisto action by court order.

C. On or about October 13, 1998, plaintiffs in the action entitled Thoresen, et al. v. American Express Financial Corporation, et al., No. 98-015681, filed their complaint in the Minnesota State Court for the County of Hennepin. In that action, they asserted causes of action for violation of the Minnesota Deceptive Trade Practices Act, false or misleading advertising, violation of the Minnesota Consumer Fraud Act, fraud, fraudulent concealment and deceit, breach of fiduciary duty/constructive fraud, negligent misrepresentation, negligence, negligence per se, unjust enrichment and imposition of constructive trust, declaratory and injunctive relief, and reformation in connection with defendants' sale of deferred annuities purchased to fund or constitute tax qualified retirement plans or arrangements established pursuant to Sections 401(a), 401(k), 403(a), 403(b), 408(a), 408(b), 408(k), 408(p), 408A or 457 of the Internal Revenue Code, on behalf of themselves and a class of consumers. On or about July 2, 1999, plaintiffs in that action filed an Amended Complaint asserting similar causes of action.

D. On or about August 29, 2000, the Minnesota State Court for the County of Hennepin entered an order consolidating the actions described in subsections B through C, above, into the action described in subsection A, above. These consolidated actions are referred to herein as the "State Court Action."

E. On or about September 1, 2000, plaintiffs in the State Court Action filed a Consolidated Complaint under the caption Benacquisto, et al. v. American Express Financial Corporation, No. 96-18477. In that Consolidated Complaint, plaintiffs assert claims relating to the marketing, sale, servicing, and administration of cash value life insurance policies and deferred annuity contracts issued and sold by Defendants.

F. On or about August 21, 2000, plaintiffs filed a complaint in the United States District Court for the District of Minnesota in an action entitled Benacquisto, et al. v. American Express Financial Corporation, et al., No. 00-1980 DSD/JMM (the "Federal Court Action"). In that action, they assert claims relating to the marketing, sale, servicing and administration of cash value life insurance policies and deferred annuity contracts issued and sold by Defendants.

G. Before commencing the Actions and throughout the pendency of the Actions, and during settlement negotiations, Plaintiffs' counsel and their professional consultants conducted a thorough examination and evaluation of the relevant law and facts to assess the merits of Plaintiffs' claims and potential claims and to determine how best to serve the interests of Plaintiffs and the Class, as defined below. In the course of their examination, Plaintiffs' counsel reviewed approximately 350,000 pages of documents produced by Defendants, deposed or interviewed 12 officers, employees and sales representatives of Defendants, and conducted other informal discovery of Defendants. In addition, Plaintiffs' counsel retained and consulted with experts

concerning the discovery conducted in this matter, the merits of Plaintiffs' claims and potential claims, alleged damages and the defenses raised by Defendants.

H. Based upon their discovery, investigation and evaluation of the facts and law relating to the matters alleged in the pleadings, and after reviewing this Agreement with their various consultants and experts, Plaintiffs and their counsel have agreed to settle the Actions pursuant to the provisions of this Agreement after considering, among other things: (i) the substantial benefits available to Plaintiffs and the Class under the terms of this Agreement, which are fair, reasonable and adequate, in the best interests of the Class, and fairly resolve the claims at issue; (ii) the attendant risks and uncertainty of litigation, especially in complex actions such as these, as well as the difficulties and delays inherent in such litigation; and (iii) the desirability of consummating this Agreement promptly to provide effective relief to Plaintiffs and the Class.

I. Defendants expressly deny any wrongdoing alleged in the Actions, and do not admit or concede that any facts or claims that have been or could have been alleged against them in the Actions have merit, would overcome their defenses, or would result in any determination of liability or damages. Without conceding any liability, wrongdoing or fault, and without admitting that any damages are recoverable or the amount of any damages that may have been incurred, Defendants consider it desirable for the Actions to be settled and dismissed because this settlement will (i) provide significant benefits to Defendants' present and former policy and annuity owners; and (ii) avoid the substantial expense, burdens and uncertainties associated with continued litigation of those claims.

## II. <u>DEFINITIONS</u>

As used in this Agreement and the annexed exhibits (which are an integral part of this Agreement and are incorporated in their entirety by reference), the following terms have the

following meanings, unless a section or subsection of this Agreement or its exhibits provides otherwise:

1. "Accidental Death Benefit" or "ADB" means the form of General Relief to be provided to Class Members as described in section V below.

2. "Actions" means the class action lawsuits entitled: Benacquisto, et al. v. American Express Financial Corporation, et al., No. 96-18477, pending before the Minnesota State Court for the County of Hennepin (together with the actions consolidated therewith, also filed in the Minnesota State Court for the County of Hennepin and entitled Mork, et al. v. IDS Life Insurance Company, et al., No. 97-04742, and Thoresen, et al. v. American Express Financial Corporation, et al., No. 98-015681), and Benacquisto, et al. v. American Express Financial Corporation, et al., No. 00-1980 DSD/JMM, pending before the United States District Court for the District of Minnesota.

3. "Administrator" means Rust Consulting of Minneapolis and Faribault, Minnesota or any other third-party administrator(s) whom Defendants shall retain to help implement the terms of this Agreement, upon consultation with Co-Class Counsel.

4. "Affinity Group" means (i) the Class Member, his or her spouse, parent or child (including a stepchild residing with the Class Member); and (ii) any person in whom the Class Member has an insurable interest.

5. "Agreement" or "Settlement Agreement" means this Stipulation of Settlement and the attached exhibits, including any subsequent amendments thereto and any exhibits to such amendments.

6. "Alternate Measuring Life" means, for purposes of any Accidental Death Benefit provided for in this settlement, a person designated on the Designation Form, as provided

herein, who is a member of the Class Member's (which, in the case of a participation interest in a Group Qualified Annuity, means the participant's) Affinity Group and is not the insured under the Policy or the annuitant under the Annuity making the Class Member eligible for relief.

7. "Alternate Payee" means such person as the Class Member (which, in the case of a participation interest in a Group Qualified Annuity, means the participant) may designate on the Designation Form, as provided herein, to receive the Accidental Death Benefit pursuant to the terms and conditions set forth below.

8. "Annuity" or "Annuities" means one or more fixed or variable deferred annuity contracts, including individual contracts, group contracts and participation interests in group contracts issued by any of the Defendants in the United States, including its territories and commonwealths, that was In Force at any time during the Class Period.

9. "Attorneys' Fees and Expenses" means such funds as may be awarded to Co-Class Counsel to compensate them and all other attorneys for Plaintiffs or Class Members in the Actions for their fees and expenses in connection with the Actions.

10. "Benefit Voucher" means the voucher to be included in the Class Notice Package, substantially in the form contained in the attached Exhibit B, entitling the Class Member to payment of the ADB upon Defendants' receipt of due proof of the qualifying death of the Measuring Life within the applicable period, as provided in this Agreement.

11. "Claim" means a claim by a Class Member or his or her representative timely submitted on the Claim Form (with any necessary attachments) for consideration pursuant to the Claim Review Process, as provided in this Agreement.

12. "Claim Categorization" means the assignment of a Claim to one or more Claim categories, as described in the attached Exhibit A.

13. "Claim Designation" means the scoring of a Claim by the Claim Evaluator pursuant to the attached Exhibit A.

14. "Claim Evaluator" means a person chosen by Co-Class Counsel who is responsible for Claim Review Administration, Claim Categorization, Claim Designation, and, where appropriate, awarding relief for Claims pursuant to the terms of this Agreement. The Claim Evaluator may retain assistants as are reasonably necessary to process Claims in an efficient and timely manner. Defendants may request that Co-Class Counsel remove the Claim Evaluator for financial or gross misconduct. Such request shall not be unreasonably denied. Co-Class Counsel may also remove the Claim Evaluator for any reason at any time. If the Claim Evaluator is removed, Co-Class Counsel shall choose another Claim Evaluator.

15. "Claim Evaluator Fees and Expenses" means the fees and expenses incurred by the Claim Evaluator in connection with carrying out his or her duties as provided in this Agreement.

16. "Claim File" means the file to be assembled for each Claim, as provided in this Agreement, for use in the Claim Review Process. The Claim File shall include (i) the Claim Form and all other materials submitted by the Claimant; (ii) the Customer File; (iii) any other information agreed to by the Parties; and (iv) any other information provided to the Claim Evaluator.

17. "Claim Form" means the form for Claimants to submit a Claim to the Claim Review Process, which shall be substantially in the form contained in the attached Exhibit H. Each Claim Form, in order to be included in the Claim Review Process, shall include a signed Claimant Oath.

18. "Claim Review Administration" means, with respect to each Claim submitted to the Claim Review Process, those administrative tasks to be completed after Defendants deliver the relevant Claim File to the Claim Evaluator, and includes, without limitation, the categorization, designation, and awarding of relief for that Claim.

19. The "Claim Review Process" means the procedures and process described in section VII to this Agreement and in the attached Exhibit A for the presentation, evaluation and resolution of Claims.

20. "Claim Review Relief Fund" means the total amount of $85 million, plus interest as described in this Agreement, available to provide relief to Claimants through the Claim Review Process.

21. "Claimant" means a Class Member, or the legal or authorized representative of a Class Member, who submits a Claim to the Claim Review Process. The legal or authorized representative of a Class Member who submits a Claim on a Class Member's behalf shall, in order for the Claim to be included in the Claim Review Process, include with the Claim Form any documentation supporting his or her authorization to act on the Class Member's behalf for this purpose.

22. "Claimant Oath" means the oath, signed by each Claimant, that appears at the conclusion of the Claim Form. Each oath shall state: "I swear under penalty of perjury that (i) the foregoing is true and correct; (ii) I submit herewith copies of all documents in my possession or control relating to the life insurance policy or deferred annuity contract that is the subject of my claim; and (iii) all such copies (if any) are authentic and unaltered copies of the original documents."

23. "Class" or "Class Member" means the persons or entities described in section III of this Agreement.

24. "Class Notice" means the legal notice of the terms of the proposed settlement included in the Class Notice Package.

25. "Class Notice Package" means the notice package, as approved in form and content by Co-Class Counsel and Defendants' Counsel and the Courts, and substantially in the form of the attached Exhibit B, to be provided to Class Members pursuant to section IX of this Agreement. Except as otherwise provided in section IX.B, below, the Class Notice Package shall include (i) a cover letter from Defendants; (ii) the Class Notice; (iii) one or more Election Forms (depending on the number of Policies or Annuities); (iv) one or more Designation Forms (depending on the number of Policies or Annuities); (v) one or more Statements of Eligibility (depending on the number of Policies or Annuities); (vi) a Benefit Voucher evidencing the relief to which the Class Member is entitled if the Class Member does not elect the Internal Replacement Relief or the Claim Review Process; (vii) a fact sheet for Qualified Plans (for Class Notice Packages sent to the Owners of Group Qualified Annuities); and (viii) a Plan Participant Information Sheet (for Class Notice Packages sent to persons or entities with participation interests in Group Qualified Annuities).

26. "Class Period" means that period beginning on January 1, 1985 and ending on February 29, 2000, inclusive.

27. "Co-Class Counsel" means the law firms of Milberg Weiss Bershad Hynes & Lerach LLP and Lockridge Grindal Nauen, P.L.L.P.

28. "Company" means IDS Life Insurance Company, IDS Life Insurance Company of New York, the American Express Company, American Express Financial

Corporation, American Express Financial Advisors, American Express Service Corporation, American Express Trust Company, American Centurion Life Assurance Company, American Enterprise Life Insurance Company and American Partners Life Insurance Company, collectively.

29. "Company Liaison" means a person appointed by the Defendants to serve as a liaison between the Claim Evaluator and the Defendants, as more particularly described in section VII.A.2 below.

30. "Corporate Office" means the headquarters of Defendants at 52 AXP Financial Center, Minneapolis, Minnesota and its administrative offices that provide administrative support functions for the operations of Defendants.

31. "Cost of Insurance Rate Band" means the premium or cost of insurance rate table assigned to a Policy based on the Policy Face Amount.

32. "Courts" means the Minnesota State Court for the County of Hennepin and the United States District Court for the District of Minnesota, where the Actions are pending.

33. "Customer File" means a file of information for each Policy or Annuity about which a Claim is timely submitted that shall include to the extent available from Defendants' records as maintained at the Corporate Office at the time the Customer File is created: (i) the Policy or Annuity Owner's (or the participant's, in the case of a Group Qualified Annuity) name, current address and social security number or tax identification number; (ii) the Policy or Annuity number; (iii) the Policy or Annuity plan code; (iv) the Policy Face Amount as of the Issue Date; (v) the Policy's or Annuity's Issue Date; (vi) the type of Qualified Plan being funded by a Qualified Annuity; (vii) the issue age and gender of the Policy's insured or the Annuity's annuitant; (viii) the Policy's or Annuity's termination date, if applicable; (ix) any Policy or Annuity surrender charge paid; (x) the Policy's scheduled premium, if applicable; (xi) the payment, loan and transaction

history and current values of the Policy or Annuity as of the Eligibility Date; (xii) to the extent available, the Policy's or Annuity's application file (excluding any medical underwriting); and (xiii) any summaries of complaints relating to the Policy or Annuity as electronically maintained by the Company's Client Relations area.

34. "Default Measuring Life" means, with respect to the ADB provided for in this Agreement, the insured under the applicable Policy or the annuitant under the applicable Annuity, except that, in the case of a participation interest in a Group Qualified Annuity, "Default Measuring Life" means the participant or, where applicable, the beneficiary of a deceased participant.

35. "Default Payee" means, with respect to the ADB provided for in this Agreement, the Owner of the applicable Policy or Annuity, except that in the case of a participation interest in a Group Qualified Annuity, "Default Payee" means the participant.

36. "Defendants" means IDS Life Insurance Company, IDS Life Insurance Company of New York, American Express Financial Corporation, American Centurion Life Assurance Company, American Enterprise Life Insurance Company, American Partners Life Insurance Company and American Express Financial Advisors, collectively.

37. "Defendants' Counsel" means the law firms of LeBoeuf, Lamb, Greene & MacRae, L.L.P. and Leonard, Street and Deinard, P.A.

38. "Designation Form" means the document substantially in the form attached as part of Exhibit B, one or more copies of which form (i) shall be included in the Class Notice Package; and (ii) may be used by Class Members to designate an Alternate Payee and/or an Alternate Measuring Life, pursuant to this Agreement.

39. "Election Form" means the document substantially in the form attached as part of Exhibit B, one or more copies of which will be included in the Class Notice Package and must be used by Class Members in electing Internal Replacement Relief or the Claim Review Process pursuant to sections VI and VII of this Agreement.

40. "Eligibility Date" means a date specified by the Company that is not more than 90 days before the date on which the Class Notice Package is first mailed, as provided in this Agreement.

41. "Execution Date" means the first date on which the Agreement has been executed by all of the undersigned.

42. "Fairness Hearing" means the hearing at or after which the Courts will make final decisions whether to approve this Agreement as fair, reasonable and adequate.

43. "Favorable Underwriting" means the underwriting requirements and guidelines ordinarily applied by Defendants, except that if the applicant is table rated for excess mortality risk, he or she will be charged cost of insurance charges at a rate two tables (or if rated at Table A, one table) less than his or her actual rating.

44. "Final Order and Judgment" means the order finally certifying the Class for settlement purposes only and approving the settlement and this Agreement, and the judgment entered pursuant to that order, as contemplated in section XV of this Agreement and substantially in the form attached as Exhibit F.

45. "Final Settlement Date" means the last date on which the Final Order and Judgment approving this Agreement becomes final. For purposes of this definition, the Final Order and Judgment shall become final: (i) if no appeal is taken therefrom, on the date on which the time to appeal therefrom has expired; (ii) if any appeal is taken therefrom, on the date on

which all appeals therefrom, including petitions for rehearing or reargument, petitions for rehearing en banc and petitions for certiorari or any other form of review, have been finally disposed of in a manner resulting in affirmance of the Final Order and Judgment; or (iii) on a date after entry of the Final Order and Judgment, which date counsel for the Parties agree to in writing.

46. "General Relief" means the benefits available to Class Members as more particularly described in section V.A of this Agreement.

47. "Group Qualified Annuity" means, for purposes of this Agreement only, a group Annuity that was purchased to fund or constitute all or part of a Qualified Plan, including all participation interests in such group deferred annuity contract.

48. "Hearing Order" means the order to be entered by the Courts concerning notice, administration and the Fairness Hearing, as contemplated in section XIV of this Agreement, and substantially in the form attached as Exhibit D.

49. "Implementation Date" means (i) for purposes of General Relief and Internal Replacement Relief, a date selected by Defendants, and communicated in writing to Co-Class Counsel, that is no more than 30 days after the Final Settlement Date; and (ii) for purposes of the Claim Review Process, the date Defendants first commence the Post-Settlement Mailing. Defendants shall use their best efforts to begin mailing the Post-Settlement Mailing no later than 30 days after the Final Settlement Date.

50. "In Force" means, for purposes of this Agreement only, that a Policy or Annuity has not lapsed, been surrendered, or otherwise terminated, and has not ceased to provide coverage due to the death of the insured or the annuitant. The term "In Force," for purposes of this Agreement only, does not include (i) a Policy providing coverage under a reduced paid-up

insurance non-forfeiture option or an extended term non-forfeiture option; or (ii) an Annuity that has been settled (*i.e.*, annuitized).

51. "Interest Rate" means interest, compounded quarterly, at the rate equal to ten basis points plus the coupon issue yield equivalent (as determined by the Secretary of the Treasury) of the average accepted auction price for the last auction of 52-week United States Treasury bills, or if more recent, the longest term United States Treasury bill of not less than 300 days in maturity at the auction settled immediately before the Fairness Hearing or, if the auction immediately preceding the Fairness Hearing does not include such bills, then at the most recent auction prior to the Fairness Hearing that includes United States Treasury bills of not less than 300 days in maturity.

52. "Internal Replacement," for purposes of the Internal Replacement Relief, means the use of the full cash or account value of one or more cash value life insurance policies (excluding graded premium whole life policies) that were issued by one of the Defendants, by means of a surrender or withdrawal of values from one or more such policies, in order to purchase within twelve months of such surrender or withdrawal a Policy or Policies issued by one of the Defendants. The term "Internal Replacement" shall not apply to transactions involving (i) such replacements where the policy owner is exercising a contractual change or conversion privilege; (ii) group term life insurance; (iii) term insurance; or (iv) such replacements where the policy owner is exercising an option under a binding or conditional receipt.

53. "Issue Date" means the "issue date" set forth on the Policy or Annuity.

54. "Lead Counsel" means the law firm of Milberg Weiss Bershad Hynes & Lerach LLP.

55. "Measuring Life" means the person upon whose qualifying death the ADB provided for in this Agreement will be paid, which person shall be the Default Measuring Life unless an Alternate Measuring Life is designated as provided herein.

56. "Owner" means the person or entity whose Social Security number or taxpayer identification number appears in Defendants' records as maintained at the Corporate Office as the identifying owner of the Policy or Annuity as of the Eligibility Date or, if earlier, the date of termination of the Policy or Annuity.

57. "Parties" or "Party" means Plaintiffs (in their individual and representative capacities) and/or Defendants, and, where applicable, their respective counsel.

58. "Payee" means the person to whom the ADB under this Agreement shall be paid. That person shall be the Default Payee unless an Alternate Payee is designated as provided herein; provided, however, that if the Default Payee and the Alternate Payee are deceased or cannot be paid for any reason, the Defendants may pay the ADB to any person named as the beneficiary of the Policy or Annuity, or if that person is deceased or cannot be paid for any reason, to any relative of the Class Member or Measuring Life by blood or marriage appearing to Defendants to be equitably entitled to such payment.

59. "Plaintiffs" means Lesa Benacquisto, Daniel Benacquisto, Arnold Mork, Isabella Mork, Ronald Melchert, Susan Melchert, Richard W. Thoresen and Elizabeth J. Thoresen, and any other Class Members who may subsequently be added as named plaintiffs, in their individual and representative capacities.

60. "Policy" or "Policies" means a cash value life insurance policy or policies issued by any of the Defendants pursuant to an individual sale in the United States, including its territories and commonwealths, during the Class Period.

61. "Policy Face Amount" means, for traditional policies, the face amount of the base policy, excluding any riders sold at issue. For variable or non-variable universal life policies, "Policy Face Amount" means the specified face amount of the policy, excluding any riders sold at issue.

62. "Post-Settlement Mailing" means the letter and Claim Form to be mailed to all Class Members who have timely elected the Claim Review Process.

63. "Proceeding" means any formal action or hearing commenced by written claim or process, whether conducted by a court or administrative agency, where there is an opportunity for appeal.

64. "Producer" means any of the Company's current or former advisors, producers, account representatives, sales representatives, sales agents, general agents, branch managers, brokers or solicitors, and any other person who engages or has engaged in the sale or distribution of the Defendants' cash value life insurance or deferred annuity products.

65. "Publication Notice" means the published summary of the Class Notice, including notice of the proposed settlement, the Fairness Hearing and the Class Members' exclusion and objection rights, as approved in form and content by the Courts, as described in section IX.C and substantially in the form of the attached Exhibit C.

66. "Qualified Annuity" means, for purposes of this Agreement only, an Annuity that was purchased to fund or constitute all or part of a Qualified Plan.

67. "Qualified Plan" means, for purposes of this Agreement only, a tax qualified retirement plan or arrangement pursuant to Sections 401(a), 401(k), 403(a), 403(b), 408(a), 408(b), 408(k), 408(p), 408A, or 457 of the Internal Revenue Code.

68. "Qualified Plan Representatives" means, for purposes of this Agreement only, all persons or entities who act or acted on behalf of the Qualified Plan and its participants and beneficiaries (with respect to the Qualified Plan), including but not limited to trustees, plan administrators and plan sponsors. Qualified Plan Representatives does not mean the Plaintiffs or the attorneys for Plaintiffs.

69. "Release" means the release and waiver set forth in section XII of this Agreement.

70. "Relief Tables" means the accompanying tables and schedules for use in connection with the General Relief and the Claim Review Process.

71. "Replaced Policy," for purposes of the Internal Replacement Relief, means a cash value life insurance policy, the values of which were used in order to purchase a Policy as described in the definition of "Internal Replacement" above.

72. "Statement of Eligibility" means a statement prepared by Defendants, and provided as part of the Class Notice Package, that includes: (i) the Class Member's name and address as reflected from Defendants' records as maintained at the Corporate Office; (ii) the identification number of each Policy or Annuity making the Class Member eligible for relief; (iii) the status of each Policy or Annuity as of the Eligibility Date; (iv) a statement of the form(s) of relief for which the Class Member may be eligible; (v) the Default Payee and Default Measuring Life, if any, for purposes of the ADB provided for in this Agreement; and (vi) the identity of any co-owner of record of each Policy or Annuity. The Statement of Eligibility will be substantially in the form included in the attached Exhibit B.

73. "Surrender Charge" means the charge provided for in certain life insurance policies or annuity contracts that is payable, unless waived, upon termination or partial surrender of such policy or annuity as set forth therein.

74. "Target Premium" is the amount of annual premium payment equal to the guideline level premium as defined in the Internal Revenue Code.

75. "Terminated" means, for purposes of this Agreement only, that a Policy or Annuity has lapsed, been surrendered or otherwise terminated, and has not been reinstated, including any Policy providing coverage under an extended term non-forfeiture option or a reduced paid-up insurance non-forfeiture option or any Annuity that has been settled (*i.e.*, annuitized).

76. "Underwriting Rate Class" means the class assigned to an individual insured person based on that person's use of tobacco, height, weight, medical history, occupation and avocations.

## III. CERTIFICATION OF THE CLASS

Promptly after execution of this Agreement, Co-Class Counsel shall apply to the Courts for, among other things, certification of the Class for purposes of satisfying the provisions of this Agreement. The Class shall consist of the following Class Members:

(A) All persons or entities who, as of the Eligibility Date, have or had (i) an ownership interest in a cash value life insurance policy issued by IDS Life Insurance Company ("IDS") or IDS Life Insurance Company of New York ("IDSNY") pursuant to an individual sale in the United States, including its territories and commonwealths, issued at any time during the Class Period; or (ii) an ownership interest in an individual deferred annuity contract or a participation or beneficial interest in a Group Qualified Annuity

issued by IDS, IDSNY, American Centurion Life Assurance Company, American Enterprise Life Insurance Company or American Partners Life Insurance Company in the United States, including its territories and commonwealths, that was In Force at any time during the Class Period; and (B) all Qualified Plans and Qualified Plan Representatives that purchased, owned, held or had any interest with respect to any Group Qualified Annuity. The Class does not include (i) any present officer, any former officer of grade 50 and above, or equivalent, or any financial advisor of Defendants; or (ii) any insurance company that owns or owned a Policy or Annuity pursuant to an absolute assignment effected as part of an exchange under Section 1035 of the Internal Revenue Code. Notwithstanding the foregoing, the Class shall not include (unless and to the extent such persons or entities are Class Members by virtue of their ownership interest in another Policy or Annuity) the following: (i) any persons or entities who make a timely election to be excluded from the proposed Class with respect to a particular Policy or Annuity otherwise included within the Class; (ii) any persons or entities who have an ownership interest in (a) a Policy that was terminated prior to the Eligibility Date due to the death of the insured and on which death benefits were paid; (b) an Annuity that was terminated prior to the Eligibility Date by reason of the death of the annuitant; (c) a Policy or Annuity that was issued, but not accepted or funded, or was returned to the issuer, as part of the exercise of a free look provision in the Policy or Annuity; (d) a Policy or Annuity that was rescinded as part of a reissue of a new life insurance policy or annuity contract, or because of a material misrepresentation on a Policy or Annuity application, or where the Policy or Annuity was rescinded and the premiums or other monies paid were returned to the Policy or Annuity owner; (e) a Policy or Annuity that is the subject of a release signed by any

person or entity while represented by counsel settling a claim or dispute and releasing the issuer from any further liability concerning such Policy or Annuity; (f) a life insurance policy that was a term life insurance policy or graded premium whole life insurance policy; (g) an annuity contract that was settled (*i.e.*, annuitized) prior to the inception of the Class Period; or (h) an annuity contract that was issued as an immediate annuity.

## IV. SETTLEMENT RELIEF

A. Pursuant to this Agreement, three alternative types of relief are being made available with respect to a Policy or Annuity (consistent with subsection C herein): General Relief, Internal Replacement Relief or the Claim Review Process. With respect to each applicable Policy or Annuity, a Class Member may either accept General Relief or elect one of the other available forms of relief, but in no case shall more than one form of relief be provided with respect to a particular Policy or Annuity. After making an election, except as provided for in sections VI.B.3 and VII.A.1.b.(1), a Class Member may not change that election at some later time.

B. A Class Member who wishes to elect the Internal Replacement Relief, if eligible, or the Claim Review Process with respect to a particular Policy or Annuity must submit an Election Form indicating the election for the particular form of relief no later than 30 days before the Fairness Hearing.

C. Except as provided otherwise in this paragraph and notwithstanding any other provision of this Agreement, where more than one person or entity has or had a current or prior ownership interest in a Policy or Annuity, all such persons and entities, including persons or entities who have or had a participation interest in a Group Qualified Annuity, shall be presumed to be acting jointly with the Policy's or Annuity's Owner in exercising any right and receiving any benefit created under this Agreement (including all exhibits hereto) with respect to that Policy or

Annuity, including the completion of any Election Form and/or Claim Form. Except with respect to Group Qualified Annuities, if any one person or entity excludes himself or herself from the Class with respect to a Policy or Annuity in which more than one person or entity has a current or prior ownership interest, then all persons and entities having a current or prior ownership interest in that Policy or Annuity will be deemed to be excluded with respect to that Policy or Annuity. The Owner of a Group Qualified Annuity may exclude all persons or entities with participation or ownership interests in a Group Qualified Annuity from the Class with respect to such participation or ownership interests, but may not exclude such persons or entities on an individual basis. A person or entity who has a current or prior participation interest in a Group Qualified Annuity may exclude himself or herself from the Class with respect to that participation interest. There shall be only one award of relief with respect to each Policy or Annuity, regardless of the number of Class Members with current or prior ownership interests therein. In the case of a Group Qualified Annuity, any election of remedies shall be made only by the Owner of such Annuity, and any award of relief will be made only to persons or entities holding the participation interests in the Group Qualified Annuity.

D. A Class Member who, for good cause shown, is unable to return an Election Form electing the Claim Review Process in a timely manner may, along with the Election Form, present the reason for the delay. The Claim Evaluator shall determine if an extension should be granted, whether based on hardship or other good cause shown. If the request for such extension is made within 30 days before the anticipated conclusion of the scoring process for all Claims, no extension shall be granted without the written consent of Defendants. Defendants or the Administrator will promptly provide such untimely Election Forms to the Claim Evaluator. Untimely Election Forms that are granted an extension as provided in this paragraph shall not be

counted as electing the Claim Review Process for purposes of determining the percentage set forth in section XVI.F, below, regardless of the election actually evidenced by such Election Form.

E. If Defendants determine that any particular form of relief provided under this Agreement could cause adverse consequences to the Class Member or to his or her Policy or Annuity, or if the provision of enhancements to the cash value of a Policy or Annuity in connection with the Internal Replacement Relief or the Claim Review Process will be unduly administratively burdensome for Defendants, Defendants may, in their sole discretion, provide the cash equivalent of any such relief. Nothing in this paragraph shall require Defendants to review or analyze the potential or actual consequences of any form of relief provided under this Agreement upon any Class Member, nor shall Defendants be liable for any such consequences.

F. If, under the terms of this Agreement, a Class Member is entitled to relief with respect to a Policy or Annuity that is In Force on the Implementation Date, but such Policy or Annuity becomes Terminated prior to the award of such relief, Defendants will provide the relief in the form that would have been available if the Policy or Annuity had been Terminated on the Implementation Date.

G. Defendants and Co-Class Counsel agree and warrant that they will act in good faith in overseeing and implementing this Settlement Agreement. Defendants agree and warrant that they will not utilize any extraordinary or exceptional accounting or actuarial principles to recapture from Policy and Annuity owners the costs of, or deprive Class Members of, the benefits provided in this Settlement Agreement. This provision shall not be construed to interfere with Defendants' conduct of their business in the ordinary course.

## V. GENERAL RELIEF

### A. Accidental Death Benefit

1. General Relief will automatically be provided for each Policy or Annuity for which Internal Replacement Relief or the Claim Review Process is not elected. The General Relief consists of the ADB. The ADB will commence on the Implementation Date.

2. The specific terms of the ADB are set forth in the Benefit Voucher. Among other things, those terms provide that the Payee shall receive upon Defendants' receipt of timely and due proof of the accidental death of the Measuring Life during the period beginning on the Implementation Date and continuing for up to three years thereafter, an amount provided in the Relief Tables. The estimated amount and duration of the ADB with respect to each Policy or Annuity will be set forth in the Benefit Voucher.

3. If the Default Measuring Life is deceased as of the Implementation Date, then prior to the Implementation Date (or within 30 days of the death of the Measuring Life, whichever is later), the Class Member (which, in the case of a participation interest in a Group Qualified Annuity, means the participant) or his or her estate must use the Designation Form to designate a member of the Class Member's Affinity Group as an Alternate Measuring Life for purposes of the ADB and provide written proof of the date of death of the Default Measuring Life.

4. At any time prior to payment of a claim under the ADB, the Class Member (which, in the case of a participation interest in a Group Qualified Annuity, means the participant) may designate an Alternate Payee by fully completing and submitting the Designation Form to be provided as part of the Class Notice Package.

5. The amount of the ADB will be adjusted after all Claims in the Claim

Review Process and all elections for the Internal Replacement Relief have been fully processed. The applicable ADB amounts will be adjusted proportionally, accounting for all Class Members receiving ADBs as part of the settlement, except as provided in section IV.A.10 of Exhibit A to this Agreement, such that the total actuarially determined value to Class Members of the ADB is equal to $100 million, based on comparable insurance rates in the open market.

B. Research Initiative Regarding Terminated Policies and Annuities

One year following the Implementation Date and then annually thereafter until the ADB provided for in this Agreement is no longer in effect, Defendants shall determine or cause to be determined, based on the Social Security numbers of the Measuring Lives with respect to all Terminated Policies and Annuities receiving General Relief, whether any Measuring Life has died since the Implementation Date. If the foregoing research reveals that any such person has died, Defendants will provide notice to the Payee at his or her last known address, as reflected in Defendants' records as maintained at the Corporate Office or as updated through the research initiative described in this paragraph, of the potential availability of the benefits provided for herein, regardless of whether the death of the Measuring Life was accidental.

## VI. INTERNAL REPLACEMENT RELIEF

A. Procedures

1. Class Members who were issued Policies as a result of an Internal Replacement may, under the circumstances set forth below, be eligible for (subject to confirmation by Defendants) and receive one of the forms of relief set forth below, whichever reasonably appears to have the highest value. To receive Internal Replacement Relief, a Class Member must have selected Internal Replacement Relief on the Election Form included in the Class Notice Package and timely returned the Election Form.

2. A Class Member who satisfies the eligibility criteria for the Internal Replacement Relief set forth in subsection B, below, shall nevertheless not be eligible for this form of relief if the applicable Internal Replacement was reversed without cost prior to the Eligibility Date.

B. Available Relief

1. A Class Member whose Policy was issued as the result of an Internal Replacement may, subject to confirmation by the Defendants, be eligible to elect Internal Replacement Relief and receive one form of relief as follows:

a. A Class Member who owns a Policy that is In Force on the Implementation Date and who paid a Surrender Charge(s) as the result of an Internal Replacement shall receive a contribution to the Policy's cash value, within 90 days of the Implementation Date, of 50% of the Surrender Charge(s) actually paid.

b. A Class Member who owned a Policy that is Terminated on the Implementation Date and who paid a Surrender Charge(s) as the result of an Internal Replacement shall receive a payment, to be sent within 90 days of the Implementation Date, of 50% of the Surrender Charge(s) actually paid.

c. A Class Member who owns a Policy that is In Force on the Implementation Date and who, as the result of an Internal Replacement, received a Policy with an Underwriting Rate Class that was higher than the Underwriting Rate Class of the Replaced Policy shall receive, effective for cost of insurance deductions beginning within 120 days after the Implementation Date, reinstatement of the original Underwriting Rate Class applicable to the Replaced Policy on that portion (up to 100%) of the Policy equal to the original face amount of the Replaced Policy.

d. A Class Member who owns a Policy that is In Force on the Implementation Date and who, as the result of an Internal Replacement, received a Policy with a lower face amount than the Replaced Policy such that the Policy is in a lower Cost of Insurance Rate Band (resulting in a higher cost of insurance deduction per $1000 of coverage) than the Replaced Policy shall receive, effective for the cost of insurance deductions beginning within 120 days after the Implementation Date, reinstatement of the original Cost of Insurance Rate Band applicable to the Replaced Policy.

e. A Class Member who owns a Policy that is In Force on the Implementation Date and who, as the result of an Internal Replacement, received the same product as the Replaced Policy in the same face amount and with the same Underwriting Rate Class as the Replaced Policy shall receive, within 90 days after the Implementation Date, a one-time 75 basis point bonus applicable to the Policy's cash value at the time of the replacement, which bonus will be credited to the Policy.

f. A Class Member who owns or owned a Policy that is Terminated on the Implementation Date and who, as the result of an Internal Replacement, (i) received a Policy with an Underwriting Rate Class that was higher than the Underwriting Rate Class of the Replaced Policy; (ii) received a Policy with a lower face amount than the Replaced Policy such that the Policy is in a lower Cost of Insurance Rate Band (resulting in a higher cost of insurance deduction per $1000 of coverage) than the Replaced Policy; and/or (iii) received the same product as the Replaced Policy in the same face amount and with the same Underwriting Rate Class as the Replaced Policy, shall be eligible, for a period starting on the Implementation Date and concluding 120 days thereafter, to apply for a new individual universal life or individual variable universal life insurance policy to be issued by one of the Defendants on the life of the Terminated Policy's

insured, with either a smoker or non-smoker classification, as applicable, with no less than the minimum policy issue amount, and with a face amount equal to or less than the face amount of the Policy, and to receive as a policy credit on such new policy a one-time bonus of 100 basis points on the premium payments (up to the amount of the Target Premium) received during the first year of that new policy, which policy credit is payable within 90 days after the end of the first year of such policy. The application for such new policy will be subject to Favorable Underwriting. If the insured under the Policy does not satisfy Favorable Underwriting and is therefore declined (or if he or she is deceased before the end of 90 days after the Implementation Date), the Class Member (or his or her estate) may, within 90 days of receiving notice that the application was declined, designate another person in his or her Affinity Group who may be named as the insured, subject to the same policy limits and Favorable Underwriting. If the designee described in the previous sentence does not satisfy Favorable Underwriting and is therefore declined, the Class Member may, within 90 days of receiving notice that the application was declined, designate another person in his or her Affinity Group who may be named as the insured, subject to the same policy limits and Favorable Underwriting.

2. Any relief to be awarded under the Internal Replacement Relief shall be reduced by any relief previously granted in favor of a Class Member as a result of a customer or insurance department complaint or inquiry or other claim or litigation involving an Internal Replacement and the applicable Policy.

3. In the event a Class Member who elects the Internal Replacement Relief is not eligible for such relief for the applicable Policy as set forth above, Defendants shall notify such Class Member of his or her ineligibility and provide that Class Member with the opportunity to elect the Claim Review Process or, if no such election is made within 45 days of such notice,

provide the Class Member with the General Relief. If a Class Member elects the Claim Review Process as set forth in this paragraph, that election shall not count as an election of the Claim Review Process for purposes of determining the percentage set forth in section XVI.F, below.

## VII. THE CLAIM REVIEW PROCESS

### A. Procedures

1. Claim Submission. Class Members who elect to forgo General Relief and Internal Replacement Relief with respect to a Policy or Annuity may submit a Claim based on that Policy or Annuity to the Claim Review Process. Claims submitted to the Claim Review Process shall be evaluated in accordance with this section and the attached Exhibit A; relief for such Claims, if any, shall be awarded in accordance with Exhibit A. Except as provided in this paragraph or Exhibit A, Class Members who submit an Election Form selecting the Claim Review Process with respect to a Policy or Annuity shall not be entitled to any form of General Relief or Internal Replacement Relief with respect to that Policy or Annuity.

a. To submit a Claim to the Claim Review Process, a Class Member must elect Claim Review on the Election Form included in the Class Notice Package and timely return the Election Form as provided herein.

b. Beginning on the Implementation Date, Defendants shall mail a Post-Settlement Mailing, including a Claim Form, to each Class Member who elected the Claim Review Process on a timely returned Election Form.

(1) The Claim Form sent to each such Class Member shall advise the Class Member that he or she shall have 60 days from Defendants' mailing of the Claim Form to submit a Claim by completing and returning the Claim Form. The Claim Form shall also advise the Class Member that he or she may choose not to submit a Claim Form, and that if he or

she does not timely submit a Claim Form, he or she will no longer be eligible for the Claim Review Process, but instead will receive the General Relief for which he or she would have been eligible had he or she not elected the Claim Review Process on the Election Form.

(2) Claimants shall retain the right to supplement their Claim Forms at any time prior to the scoring of their Claims. Any such supplementation shall not impose any unreasonable administrative burden on the Defendants. Each Claim submitted to the Claim Review Process must be made by means of a Claim Form executed with the Claimant Oath, that is completed to the best of the Claimant's ability, and shall include copies of all documents in the Claimant's possession or control relating to the Policy or Annuity that is the subject of the Claim, and any affidavits or other materials the Claimant wishes to submit.

(3) A Claimant's failure, without reasonable justification, to provide a completed Claim Form and all relevant documents in his or her possession or control may result in a default or adverse relief determination under the Claim Review Process.

c. A Class Member who, for good cause, is unable to return his or her Claim Form in a timely manner may present the reason for the delay and request additional time to file the Claim Form. If a Class Member seeks an extension of time to file a Claim Form, the Claim Evaluator shall determine if an extension shall be granted, whether based on hardship or other good cause shown. If the request for such extension is made within 30 days before the anticipated conclusion of the scoring process for all Claims, no extension shall be granted without the written consent of Defendants. Untimely Claim Forms that are granted an extension as provided in this paragraph shall not be counted as Claim Forms for purposes of determining the percentages set forth in section VII.E, below.

2. <u>Defendants' Gathering of Certain Information</u>

a. Upon receipt of a Claim Form from a Class Member, the Administrator shall provide Defendants with a copy of the Claim Form and copies of all documents submitted by the Class Member.

b. For each timely filed Claim Form, Defendants shall use their best efforts to assemble the Customer File and, at Defendants' expense, provide a Claim File to the Claim Evaluator as follows: (i) within 60 days after the date on which Claim Forms are due from Claimants for 30,000 timely filed Claim Forms received by Defendants; and (ii) within an additional 30 days thereafter for each additional 15,000 timely filed Claim Forms received by Defendants. For each Claim Form for which an extension has been granted pursuant to paragraph 1.c. of this subsection, Defendants shall use their best efforts to assemble the Customer File and, at Defendants' expense, provide a Claim File to the Claim Evaluator within 30 days of the date on which Defendants receive written notice from the Claim Evaluator that such Claim Form has been granted an extension, for the first 1,000 such Claim Forms, and within 30 additional days for each additional 1,000 such Claim Forms. The Claim Evaluator shall keep all information received from Defendants confidential.

c. Defendants shall designate a Company Liaison to serve at the Defendants' expense as a customer resource liaison to reasonably and promptly respond to (i) general requests from the Claim Evaluator for information that is reasonably necessary and appropriate with respect to the evaluation, designation and resolution of Claims submitted to the Claim Review Process and which can be easily obtained electronically from the Defendants' current computer systems; and (ii) individualized requests by the Claim Evaluator for information and other assistance with respect to particular Policies or Annuities about which Claims have been

made that are reasonably necessary and appropriate with respect to the evaluation, designation and resolution of Claims submitted to the Claim Review Process, including, but not limited to, specific complaint files relating to a Claimant's Claim. This provision shall not permit the Claim Evaluator to shift any of his or her obligations to the Company or the Company Liaison.

d. In addition to providing the Claim File for each Claim, as provided above, Defendants shall provide the Claim Evaluator with the following information: (i) the product trade names that correspond to the Policy and Annuity plan codes referenced in the Customer Files; (ii) insofar as it is electronically maintained at the Corporate Office, the disciplinary histories of the advisors who sold Policies and Annuities that are the subject of Claims in the Claim Review Process to the extent such histories relate to the sale of Policies and Annuities; and (iii) for each advisor who sold Policies and Annuities that are the subject of Claims in the Claim Review Process, the number of replacements resulting in the issuance of Policies or Annuities performed by such advisor, insofar as such data is electronically maintained at the Corporate Office.

e. Nothing contained in this Agreement or in Exhibit A hereto shall be construed to require the Claim Evaluator to obtain any information that is not contained in the Claim File, or to undertake any analysis or perform any services beyond those which the Claim Evaluator deems necessary, in his or her discretion, to implement the provisions of Exhibit A.

f. Nothing contained in this Agreement or in the attached Exhibit A shall be construed to require Defendants to provide any information to the Claim Evaluator other than the Claim File and the materials specified in subparagraph c and d, above.

g. All such information, and all other information provided to Plaintiffs, to Co-Class Counsel, to any individual Class Member or counsel for any Class Member,

or to the Claim Evaluator regarding Policy and Annuity owners, Class Members, and present or former advisors, employees or representatives, as well as any procedures of Defendants disclosed to any of the foregoing in connection with implementing the terms of this Agreement, constitute trade secrets and highly confidential and proprietary business information which shall be deemed "Confidential" pursuant to the stipulated Protective Order Regarding Use and Disclosure of Confidential Information, entered on March 1, 2000 in the State Court Action, and the Stipulated Protective Order Regarding Use and Disclosure of Confidential Information entered in the Federal Court Action, and shall be subject to all of the provisions thereof.

3. Nothing herein shall make the Defendants liable or otherwise responsible for any acts or omissions by the Claim Evaluator or his or her agents, including, without limitation, the Claim Evaluator's categorization and designation of Claims.

B. <u>Claim Categorization</u>

1. Based solely upon his or her review of the Claim File and in accordance with the attached Exhibit A, the Claim Evaluator shall determine the Claim category or categories applicable to the Claim.

2. Any decision by the Claim Evaluator regarding the categorization of a Claim shall be final and binding.

3. In no event shall more than one form of relief be awarded for a single Policy or Annuity, nor shall there be duplicative relief for a single Policy or Annuity.

C. <u>Review of the Claim</u>

1. For each Claim that the Claim Evaluator has categorized, the Claim Evaluator shall determine, based upon his or her review of the Claim File and in accordance with the attached Exhibit A, (i) the Claim Designation or Designations applicable to the Claim in each

applicable Claim category; and (ii) the relief for the Claim, if any, that takes into account, among other things, the nature and strength of the Claim and the damages incurred because of the alleged misrepresentation(s) or other alleged wrongdoing.

2. The Claim Evaluator shall use his or her reasonable best efforts (i) to complete review of each Claim within 150 days of his or her receipt of the Claim File; and (ii) to complete the Claim Review Process within 180 days of his or her receipt of the last Claim File delivered with respect to a timely filed Claim Form.

3. The Claim Evaluator shall not contact any Producer except with Co-Class Counsel and Defendants' counsel, as provided in section IX.K herein.

4. Any final scoring of Claims and/or award of relief in the Claim Review Process by the Claim Evaluator shall be final and binding, subject to the provisions of the attached Exhibit A. Defendants, the Claimant, Class Members, Co-Class Counsel, Defendants' Counsel, the successors or assigns of any of the foregoing, and any other party in interest, are prohibited from seeking review or in any other way challenging in any forum whatsoever, including in a judicial proceeding or an arbitration, a decision or award of relief, if any, pursuant to the foregoing provisions and the attached Exhibit A.

D. Distribution of Relief Awarded in the Claim Review Process

1. The relief provided as a result of the Claim Review Process shall be paid for from the Claim Review Relief Fund, which will have an aggregate cash value of $85 million. Defendants shall have no obligation to provide any money in excess of $85 million, plus any interest as provided in section VIII.A, to the Claim Review Relief Fund for any reason.

2. After the Claim Evaluator has scored all Claims received in the Claim Review Process, he or she shall make a preliminary determination of the appropriate relief for

those Claims pursuant to the procedures described in the attached Exhibit A. If, based on the Claim Evaluator's determinations, the aggregate preliminary awards in the Claim Review Process would exceed the Claim Review Relief Fund, together with any available interest accrued thereon in accordance with section VIII.A, then the Claim Evaluator shall reduce all final awards from the Claim Review Relief Fund pursuant to the formula described in the attached Exhibit A.

3. If, based on the Claim Evaluator's determination, the value of the aggregate preliminary awards in the Claim Review Process is less than the Claim Review Relief Fund, together with any available interest accrued thereon in accordance with section VIII.A, then the relief available to Class Members will be increased as provided in the attached Exhibit A.

E. Payment of the Claim Evaluator Fees and Expenses

Within 10 days after the last date of entry of the Final Order and Judgment, the Defendants shall make a payment of $2 million to Lead Counsel which shall be applied by Lead Counsel to pay the Claim Evaluator Fees and Expenses. If Claim Forms are timely submitted with respect to Policies and Annuities amounting to more than two percent (2%) of the total number of all Policies and Annuities (counting each participation interest in a Group Qualified Annuity separately), then the Defendants shall pay to Lead Counsel an additional amount up to a total of $1 million, which shall be applied by Lead Counsel to pay the Claim Evaluator Fees and Expenses. This additional amount will be paid in increments as follows: $100,000 for each full tenth of one percent (0.1%) of the total number of Policies and Annuities by which the number of Policies and Annuities for which Claim Forms are timely submitted exceeds two percent (2%) of the total number of Policies and Annuities; provided, however, that the additional amount to be paid by Defendants to be applied toward the Claim Evaluator Fees and Expenses shall in no event exceed $1 million, and the total amount paid by Defendants for the Claim Evaluator Fees and

Expenses shall not exceed $3 million. The additional amount, if any, provided for in the previous sentence shall be paid by Defendants within 45 days after the date on which Claim Forms are due to be submitted by Claimants. Any remaining Claim Evaluator Fees and Expenses shall be payable from the interest accrued on the Claim Review Relief Fund. Any portion of the payments to be made by Defendants pursuant to this paragraph that is not applied by Lead Counsel to pay the Claim Evaluator Fees and Expenses shall be applied by Lead Counsel to increase the Claim Review Relief Fund.

## VIII. DEFENDANTS' FUNDING OBLIGATIONS

### A. Establishing the Claim Review Relief Fund

Beginning 10 days after the last date of entry of the Final Order and Judgment, interest shall accrue on the Claim Review Relief Fund at the Interest Rate. The interest that accrues on the Claim Review Relief Fund shall first be applied to the Claim Evaluator Fees and Expenses, if any, over and above the amounts to be paid by Defendants as provided in Section VII.E, above. Any additional accrued interest shall be added to the Claim Review Relief Fund.

### B. Funding Reverts upon Termination

If this Agreement is terminated for any reason, the right to all remaining funds reserved by Defendants for the benefit of the Class, as well as all funds applicable to the Claim Evaluator Fees and Expenses that have not been expended for purposes of the Claim Review Process, shall revert to Defendants.

## IX. NOTICE TO THE CLASS AND COMMUNICATIONS WITH CLASS MEMBERS

### A. Introduction

As set forth below, Defendants will provide notice of the proposed settlement by mail and publication. After the Final Settlement Date, Defendants will send a Post-Settlement

Mailing to all Class Members who have timely elected the Claim Review Process or who elected the Claim Review Process after an extension has been granted pursuant to section IV.D, above.

B. Class Notice Package

Subject to the requirements of the Hearing Order, Defendants shall send a Class Notice Package by first-class mail, postage prepaid, to the last known address of the Policy and Annuity Owners and, in the case of a Group Qualified Annuity, also to persons or entities who hold or held a participation interest in the Group Qualified Annuity, all as reflected by Defendants' records as maintained at the Corporate Office or by the results of any searches performed by a vendor hired by Defendants to update addresses of such persons or entities. The Class Notice Package will be sent over the course of 60 days, beginning within 10 days after the last date on which the Hearing Order is entered, and ending no later than 75 days before the Fairness Hearing, or as the Courts may otherwise direct. Where the Defendants are aware that the Class Member has pending litigation against Defendants, or any of them, relating to any matter proposed to be released by this Agreement, the Class Notice Package also shall be sent to any legal counsel known to currently represent the Class Member. Defendants shall pay for the costs associated with producing and mailing the Class Notice Package.

1. Class Notice. Each Class Notice Package shall contain a Court-approved Class Notice. The proposed Class Notice, agreed upon by the Parties, will be substantially in the form included in the attached Exhibit B. The Class Notice shall conform to all applicable requirements of the Minnesota Rules of Civil Procedure, the Minnesota Constitution, the Federal Rules of Civil Procedure, the United States Constitution (including the Due Process Clause), the Rules of Court and any other applicable law, and shall otherwise be in the manner and form

agreed upon by the Parties and approved by the Courts. It shall include the following three topics:

a. General Terms. The Class Notice shall contain a plain and concise description of the Actions, the conditional Class certification and the proposed settlement, including information on who are Class Members and how the proposed settlement would operate to provide relief to individual Class Members. The Class Notice Package also shall have a foreign-language statement on the envelope substantially in the form included in Exhibit B.

b. Notice of Exclusion and Objection Rights. The Class Notice shall provide information about the deadlines and procedures for Class Members to exclude themselves from the Class, object to the proposed settlement, or remain in the Class, as well as the legal effects of exercising each of these options.

c. Notice of Fees and Expenses. The Class Notice shall provide information about the amounts being sought by Co-Class Counsel as Attorneys' Fees and Expenses. It also shall explain that Defendants will pay the fees and expenses awarded by the Courts to Co-Class Counsel and any Court-approved costs arising from notifying the Class and that such fees and expenses will not be paid out of funds designated for relief to Class Members under this settlement. The Notice shall state that the Defendants will pay $2 million toward the Claim Evaluator Fees and Expenses, and may pay up to an additional $1 million (for a total of up to $3 million), depending on the number of Claim Forms timely submitted, with any remaining Claim Evaluator Fees and Expenses to be paid from accrued interest on the Claim Review Relief Fund. The Class Notice also shall explain that, under the settlement, individual Class Members are responsible for any fees and expenses of any counsel they may retain or have retained to