When the policy application was taken, the owner is shown as the irrevocable trust and so is the beneficiary. Yet, the owner's signature does not show Mr. Ogorzalek's capacity as the trustee and the source of the original check is shown as being from him rather than from the trust. It is my understanding that the use of personal funds to pay for the policy jeopardizes the tax status of the policy in that it opens the argument that the policy was purchased by the Ogorzaleks and donated to the trust, rather than purchased by the trust. If so, this would be a further indication of a general indifference to the purposes of the policy and the requisite focus on its suitability for that purpose. You should confirm with the Ogorzaleks how that initial premium was paid and what, if any, discussion was held regarding the trust requirements at the time of purchase. Mr. Wareham is clearly aware of these requirements and sets them out in detail in his December 05, 2000 letter.

The use of a variable life insurance policy in an irrevocable trust raises a particular suitability issue as contributions to the trust are considered gifts to the ultimate beneficiaries if the "Crummey" power requirements are properly documented and adhered to. However, since the purchase payment requirements in a variable life policy are so unpredictable, it is not possible to design the policy with any certainty that the annual gift exclusion can be adhered to. I do not know from the file, what portion of the annual gift exclusions was to be used for the donations to the trust, but it would appear it was important to keep the annual payments to about $10,000. This was more likely driven by cash flow than tax considerations, but either way the trust limits the flexibility the owner has to deal with a negative performance.

**Since formal discovery has not yet commenced, Claimant reserves the right to amend the claim once all revelant documents are obtained.**

## III. LEGAL BASES OF CLAIMS

### BREACH OF FIDUCIARY DUTY

### The "Shingle Theory" Applies To Respondent.

The "shingle theory," as set out in an SEC proceeding, provides that brokerage firms, by hanging out their shingles and holding themselves out as financial planners, advisors and brokers, impliedly represent that they will deal fairly with their customers in accordance with the standards and practices of the profession.

The shingle theory covers a wide variety of activities. It governs relationships between brokers, on the one hand, and their customers and applies with equal force to brokerage firms, such as American Express, and its salespersons, such as Warham.[4] In fact, "[t]he shingle theory's implied representation can reach any act the SEC or the courts believe a broker should not perform."[5]

4 A. Jacobs, Litigation and Practice Under Rule 10b-5, at Pt. 9, ¶210.03.

5 A. Jacobs, Litigation and Practice Under Rule 10b-5, at Pt. 9, ¶210.03.

## American Express' Breach Of Fiduciary Duties

The fiduciary (or trust and confidence) theory is more limited than the shingle theory.[6] It states:

> "Neither the broker-investor, nor the dealer-investor relationship is entirely fiduciary per se. It is only when the parties come to the understanding that the broker or dealer will be acting primarily for the benefit of the investor and the investor places trust and confidence in such understanding that a complete fiduciary relationship is formed..."[7]

Carras v. Burns[8] illustrates the condition under which brokers would be transformed into fiduciaries regardless of the theory applied.[9] In Carras, a registered representative convinced the executors of an estate not to retain an attorney to manage the estate's securities account, but rather to let him do so. After he proceeded to put the account on margin and churned it, the estate brought an action.

The opinion stated that while the registered representative was only acting as a broker without management authority, he would be an agent for each separate trade without any interest beyond his commission. Although he would be obliged to execute customer orders faithfully, he would not be obliged to volunteer advice. On the other hand, *once he had taken control of the account,* as Wareham did in this case, "he could neither misrepresent nor fail to disclose the known hazards of *the stock he recommended*. ... On the contrary, to avoid misleading the executors, he would be obliged to suggest alternative investments in the estate's interest, regardless of the effect on brokerage commission."[10]

Since Carras, the clear weight of authority has been that a fiduciary relationship exists even when the client maintains a non-discretionary account but allows the stockbroker to initiate trades on the clients' behalf.

These relationships were fiduciary. American Express established with Ogorzalek a fiduciary relationship based upon trust in light of Ogorzalek instructions to American Express. Ogorzalek justifiably looked to American Express for professional financial guidance and recommendations for prudent growth investment opportunities. This original conservative investment need was twisted and misused by American Express to obtain compensation in the form of commissions, spreads, and worked to defraud Ogorzalek.

---

6 A. Jacobs, Litigation and Practice Under Rule 10b-5, at Pt. 9, ¶210.03.
7 S. Goldberg, Fraudulent Broker-Dealer Practices ¶2.9[b][5] (Am. Inst. for Sec. Reg. 1978).

8 526 F.2d 251 (4th Cir. 1975).

9 S. Goldberg, Fraudulent Broker-Dealer Practices [Am. Inst. for Sec. Reg. 1978], at 5.2.

10 Carras v. Burns, 516 F.2d 251 (4th Cir. 1975), at 257.

At all times herein mentioned, by reason of said fiduciary relationships, Ogorzalek were entitled to and did repose full trust and confidence in Respondent, and intended to and did rely upon the fidelity, integrity, loyalty and expertise of American Express in managing their funds. The failure of American Express to protect Ogorzalek portfolio constituted a breach of fiduciary duty.

**Violation Of Industry Rules**

American Express warrants and contracted with Ogorzalek to handle the accounts in accordance with their contractual and legal duties. American Express failed to do so as set forth above and by violating at least the following applicable industry rules:

1. Rule 401 of the NYSE (good business practices);
2. Rule 405 of the NYSE (know your customer);

**Burden of Proof**

When "a [fiduciary] relationship is found to exist, the burden of proving fair dealing properly shifts to the fiduciary. Furthermore, the standard of proof for establishing fair dealing is not the ordinary standard of fair preponderance of the evidence, but requires proof either by clear and convincing evidence, clear and satisfactory evidence or clear, convincing and unequivocal evidence." Dunham v. Dunham, 528 A.2d 1123, 1134 (Conn. 1987) (internal citations omitted). See also, among others, Hicks v. Clayton, 67 Cal.App.3d 251, 262, 136 Cal.Rptr. 512 (Cal. 1977). This is also true in ERISA cases: "once the ERISA plaintiff has proved a breach of fiduciary duty and a prima facie case of loss to the plan or ill-gotten profit to the fiduciary, the burden of persuasion shifts to the fiduciary to prove that the loss was not caused by, or his profit was not attributable to, the breach of duty." Martin v. Feilen, 965 F.2d 660, 671 (8th Cir.1992), cert. denied, 506 U.S. 1054, 113 S.Ct. 979 (1993). "Once plaintiffs have established a prima facie case of failure to diversify, the burden of persuasion shifts to defendants to show that the investments at issue were nevertheless 'clearly prudent' under the circumstances." Liss v. Smith, 991 F.Supp. 278, 301 (S.D.N.Y. 1998).

**Fraud, Deceit And Omission Of Material Fact**

As described above, American Express knowingly and recklessly disregarded Ogorzalek's investment objectives. Concealing and/or misrepresenting to Ogorzalek complete information about the risks of the investment strategy employed and failing to

disclose such risks to Ogorzalek when American Express knew or should have known that Ogorzalek would rely on these misrepresentations or omissions "in connection with" making the decision to buy or sell certain securities, gives rise to liability.

**VIOLATIONS OF THE ANTI-FRAUD PROVISIONS**
**OF THE SECURITIES EXCHANGE ACT OF 1934, AS AMENDED**

In connection with the purchase and sale of securities in the Ogorzalek accounts, American Express willfully, intentionally and recklessly violated and aided and abetted violations of Section 10(b) of the Securities Exchange Act of 1934, as amended, and Rule 10b-5 promulgated there under, directly or indirectly, by making use of the facilities of the United States mail and the means and instrumentalities of transportation and communication in interstate commerce by:

i. employing devices, schemes and artifices to defraud;
ii. making untrue statements of material fact or omitting to state material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading; and
iii. engaging in acts, practices and a course of business, which would and did operate as a fraud and deceit upon Ogorzalek to his respective detriment.

As part of American Express's violative activity referred to herein, American Express, among other things, represented to Ogorzalek that they would exercise their fiduciary duty to the benefit of Ogorzalek, when in fact; the conduct of American Express with respect to Ogorzalek's account was undertaken for the sole purpose of generating compensation for the American Express

American Express, among other things, transacted business in the Ogorzalek account in a manner designed for the primary purpose of benefiting American Express irrespective of the benefit or loss to Ogorzalek and in connection therewith, omitted to disclose to Ogorzalek the risks of conducting such transactions as recommended by his agent.

American Express's conduct, as referred to herein, was taken with the intent to mislead and defraud Ogorzalek, and American Express intended to induce Ogorzalek to act upon such misrepresentations, and Ogorzalek was so induced.

## AMERICAN EXPRESS' FAILURE TO SUPERVISE

The rationale for holding broker-dealers to a duty to supervise those who personally deal with the investing public is self-evident. The broker-dealer derives financial gain directly geared to the sales of its broker-representative. Purchasers of securities frequently rely heavily for investment advice on the broker-representative handling the purchaser's portfolio. The opportunity and temptation to take advantage of the client is ever present. To ensure the diligence of supervision and control, the broker-dealer and Branch Office Manager are held vicariously liable if the broker-representative injures the investor. The very nature of the vast securities business, as it has developed in this country, militates for such a rule as public policy.[11]

## Supervision

Effective supervisory procedures necessarily depend upon the type of business conducted by the firm and on the firm's structures and, accordingly, will vary from firm to firm. However, the Self Regulatory Organizations' [SRO] rules do provide generally for certain standards for a system of internal supervision within member firms.

## Legal Bases of Supervisory Liability

Brokerage firms held liable for the legal violations of their employees will be held responsible under principles of vicarious or secondary liability as opposed to the primary liability of the representative for the actual act.[12] Among the possible theories under which to bring a cause of action against a brokerage firm for the act of its registered representatives are aiding and abetting; common law agency; and the controlling person provisions of the federal securities laws.[13]

---

11 Zweig v. Hearst Corp., 521 F.2d 1129, 1135 (9th Cir.), cert. denied, 423 U.S. 1025 (1975).

12 But see 15(b)(4)(E), 15 U.S.C. 78o(b)(4)(E) (1989); 15(b)(5)(E), 15 U.S.C. 78o(b)(5)(E) (1989); SEC vs. First Sec. Co. of Chicago, 463 F.2d 981 (7th Cir.), cert. denied sub nom. McKy vs. Hochfelder; 409 U.S. 880 (1972). If the manager of a brokerage firm fails to properly supervise the staff, the liability of the firm may be based on the failure of the broker to properly maintain and establish appropriate supervisory procedures as well as upon agency principles.

13 Note that in some cases, broker-dealers had been found liable on a secondary basis under a cause of action for conspiracy. For a discussion for the use of civil conspiracy, see S. Jaffee, Broker Dealers and Securities Markets: A Guide to the Regulatory Process, 187-190 (Supp. 1977).

**Controlling Person Provisions**

Both the Securities Act of 1933 and Securities Exchange Act of 1934 provide that a person may be jointly and severally liable along with the person who primarily violates one of these statutory provisions, provided that the person controls the primary violator.[14] Accordingly, the broker-dealer is liable to the same extent and to the same person to whom the salesperson is liable.[15]

Section 15 of the Securities Act of 1933 provides that:

> Every person who controls any person liable under Section 11 and 12 shall also be liable jointly and severally with and to the same extent as such controlled person to any person to whom such controlled person is liable, unless the controlling person had no knowledge of or reasonable ground to believe in the existence of the facts by reason of which the liability of the controlled person is allowed to exist.[16]

Similarly, Section 20(a) of the Securities Exchange Act of 1934 provides that:

> Every person who, directly or indirectly, controls any person liable under any provision of this title or of any rule or regulation there under shall also be liable jointly and severally with and to the same extent as such controlled person to any person to whom such controlled person is liable, unless the controlling person acted in good faith and did not directly or indirectly induce the act or acts constituting the violation or cause of action.[17]

The courts interpret both of the foregoing sections similarly.[18] Since it is generally recognized that the relationship between sales personnel and the brokerage firm is that of controlled person to controlling person,[19] the control person provisions have been interpreted to either expressly create or imply a cause of action against a brokerage firm for fraud committed by its sales personnel.[20]

---

14 For the applicable definitions of control, see SEC Rule 405, 17 C.F.R. 230.405 (1989); SEC Rule 12b-2, 17 C.F.R. 240.12b-2 (1989).

15 For a thorough discussion of the various causes of actions under the control person provisions of the federal securities law, Ssee A. Bromberg & L. Lowenfels, Securities Fraud & Commodities Fraud 5:106.1-106.132 (1989).

16 15 U.S.C. 77(o)(1989).

17 15 U.S.C. 78t(a) (1989).

18 Pharo vs. Smith, 621 F.2d 656, aff'd in part and remanded in part, 625 F.2d 1226 (5th Cir. 1980); Westlake vs. Abrams, 565 F. Supp. 1330 (N.D.Ga. 1983).

19 See, e.g. Hecht vs. Harris, Upham & Co., 430 F.2d 1202 (9th Cir. 1970).

20 SEC vs. Lum's, 365 F. Supp. 1046 (S.D.N.Y. 1973); Anderson vs. Francis I. Du Pont & Co., 291 F. Supp. 705 (D.C.Minn. 1968); Moscarelli vs. Stamm, 288 F. Supp. 453 (E.D.N.Y. 1968), Lorenz vs. Watson, 258 F. Supp. 724 (E.D.Pa. 1966). But see SEC vs. Geon Indus., 531 F.2d 39 (2d Cir. 1976).

Generally, a person is deemed to be in control if the person has some means of discipline or influence, either direct or indirect.[21] Although some courts have not imposed liability unless the plaintiff could show that the alleged controlling person exercised actual control over the controlled person in relation to the transaction in question,[22] the majority view is that liability can be imposed on the sole basis of the alleged controlling person's authority to control the conduct of the person primarily liable.[23]

The 1934 Act explicitly states that to avoid liability under its terms, defendants must prove that they "acted in good faith and did not directly or indirectly induce the act or acts constituting the violation or cause of action."[24] By contrast, the 1933 Act states that:

> Every person who, by or through stock ownership, agency or otherwise, or who, pursuant to or in connection with an agreement or understanding with one or more persons by or through stock ownership, agency, or otherwise, controls any person liable under Section 11 and 12, shall also be liable jointly and severally with and to the same extent as such controlled person is liable unless the controlling person had no knowledge of the facts by reason of which the liability of the controlled person is alleged to exist.[25]

**Respondeat Superior**

In almost any instance where the acts of the registered representative are within the scope of the business he or she was employed to carry out and are the type of activity the registered representative is expected to perform, a cause of action against the brokerage firm should be brought under the common-law theory *respondeat superior*.[26] Under *respondeat superior*, a principal is liable for the fraud of its agents where the principal puts the agent in a position to commit the fraud and where it is perpetrated within the scope of the agent's employment.[27] Theoretically, there are no defenses to respondeat superior liability if the employees perpetrate the violations within the scope of their employment, as Wareham was in this case.

---

21 Strong vs. France, 474 F.2d 747 (9th Cir, 1973); Klapmeier vs. Telecheck Int'l, 482 F.2d 247 (8th Cir. 1973).

22 See, e.g. Ingenito vs. Bermec corp., 441 F. Supp. 525, 533 (S.D.N.Y. 1977).

23 See, e.g., Paul F. Newton & Co. vs. Texas Commerce Bank, 630 F.2d 1111 (5th Cir. 1990); SEC vs. First Sec. Co. of Chicago, 463 F.2d 981 (7th Cir. 1972), cert. denied sub nom McKy v. Hochfelder, 409 U.S. 880 (1972); Myzel vs. Fields, 386 F.2d 718 (8th Cir, 1967), cert. denied, 390 U.S.951 (1968); Savino vs. E. F. Hutton & Co., 507 F. Supp. 1225 (S.D.N.Y. 1981); Harriman v. E.I. Du Pont de Nemours & Co., 372 F. Supp. 101 (D.Del. 1974).

24 Securities Exchange Act of 1934, 20(a), 15 U.S.C. 78t(a) (1989).

25 Securities Act of 1933, 15, 15 U.S.C. 77(o)(1989).

26 There is, however, a line of cases that rejects liability under respondeat superior on the grounds that the control person provisions of the federal securities laws preempt the common-law doctrine. For an extensive discussion of this line of cases, see A. Bromberg & L. Lowenfels, Securities Fraud & Commodities Fraud 5:106.47 (1989).

27 See, Henricksen vs. Henricksen, 640 F.2d 880 (7th Cir. 1981); Marbury Mgmt. vs. Kohn, 629 F.2d 705 (2d Cir.), cert denied, 449 U.S. 1011 (1980); Rolf vs. Blyth Eastman Dillon & Co., 424 F. Supp. 1021 (S.D.N.Y. 1977), aff'd in part, remanded in part, 570 F.2d 38 (2d Cir.), cert denied, 439 U.S. 1039, and amended, 637 F.2d 77 (2d Cir. 1980), Holloway vs. Howerdd, 536 F.2d 690 (6th Cir. 1976); Carras vs. Burns, 516 F.2d 251 (4th Cir. 1975); Fey vs. Walston & Co., 493 F.2d 1036 (7th Cir. 1974); Lewis vs. Walston & Co., 487 F.2d 617 (5th Cir. 1973); Hecht vs. Harris, Upham & Co., 283 F. Supp. 417 (N.D.Cal. 1968), modified, 430 F.2d 1202 (9th Cir. 1970). Liability for acts committed within the course of employment can be phrased in terms master-servant as well as principal-agent.

## SEC Supervisory Standards

In 1964, amendments to the Securities Exchange Act gave the SEC specific authority to bar, censure, or otherwise limit the activities of firms or employees for failure to supervise.[28] The SEC did not actually set supervisory standards until 1968, at which time the various regulatory agencies concluded that mandatory standards should be set and that a firm's management should be subject to liability if it fails to implement them.[29] As a result, the SEC issued a release,[30] the terms of which required that the following supervisory functions be carried out:

(1) The review of the firm's methods of obtaining customers' accounts, including provisions for assuring that adequate information is obtained as to the customers' objectives, needs and finances.

(2) The review of customer accounts, including a review for churning and switching of securities in customers' accounts as well as unsuitable recommendations and sales of unregistered securities.

(3) The review of methods of recruiting and training of employees, including provisions for assuring that salesmen will not be hired unless the firm can adequately service the business created and maintain an appropriate ratio between sales personnel and back office personnel, attention ... to the adequate training and compensation of back office personnel.

(4) The review of back office operations, i.e., all systems and procedures, including the currency and accuracy of books and records, the status and causes of "fails to receive" and "fails to deliver" net capital, credit extensions and financial reports. Attention also should be given to operations that can or should be automated. Prompt delivery of securities to customers and prompt disbursement of customers' funds should be emphasized.

(5) The review of sales techniques and methods of salesmen. Specifically, procedures should be used for the review of salesmen's telephone recommendations to customers, sales correspondence with customers, new issue sales, suitability of recommendations and discretionary accounts.[31]

---

28 Securities Acts Amendments of 1964, Pub. L. No. 467, 78 Stat. 565 (1964).

29 Supervisory Responsibility of Broker-Dealer Management, SEC Release No. 34-8404, 1968 Fed.Sec.L.Rep. (CCH).

30 Id. The SEC also promulgated SEC Rule 15b10-4(C), adopted July 27, 1967, which required covered entities to establish, maintain, and enforce written procedures for the supervision of associated persons in dealing with securities customers. The procedures were to be used to ensure that associated persons were adequately supervised in all securities dealings with customers, whether opening new accounts, servicing old account, or handling customer complaints. 17 C.F.R. 250 15b10-4 (1981).

31 Id.