The release noted that firms should not place the supervisory function on only one member of management since all members of management would be held fully responsible for any unacceptable employee practices. In addition, the release cautioned "failure to recognize the nature and extent of this duty to supervise and to establish and implement meaningful supervisory procedures has resulted and will continue to result in disciplinary action against the firm and responsible individuals."[32]

## SRO Supervisory Standards

The NASD, the NYSE, and the AMEX have also promulgated requirements regarding a member's general duty to supervise. The NASD rules require that:

> Each member shall establish, maintain and enforce written procedures, which will enable it to supervise properly the activities of each registered representative and associated person to assure compliance with applicable security laws, rules, regulations and statements of policy promulgated there under and with the Rules of this Association.[33]

NYSE rules provide that:

> Each member organization is required through a general partner or any officer who is a holder of voting stock to...supervise diligently all accounts handled by registered representatives of the organization.[34]

Civil courts have adopted both the SEC requirements[35] and those promulgated by the SROs[36] as the basic standards upon which to measure internal supervision and control.[37] In Hecht vs. Harris Upham & Co., the court stated:

> Good standard practices in the brokerage business requires that a "partner" is obliged to know the "essential facts" relative to each customer and....that a firm should not rely exclusively on a registered representative to obtain the essential facts but should have a series of checks to determine the full facts are being obtained sufficiently to satisfy the firm's responsibilities.[38]

---

32 Id.

33 NASD Conduct Rule 3010.. See Securities Industry Association, Compliance and Legal Division Seminar Outline, 71-73 (Mar. 18-21, 1990).

34 NYSE Rule 405.

35 SEC Rule 15b10-4, 17 C.F.R. 240.15B10-4 (subsequently rescinded).

36 NASD Conduct Rule 3010.

40 Vucinich vs. Paine, Webber, Jackson & Curtis, 803 F.2d 454 (9th Cir. 1986); SEC vs. First Sec. Co. of Chicago, 463 F.2d 981 (7th Cir. 1972); Hecht vs. Harris, Upham & Co., 283 F. Supp. 417 (N.D.Cal. 1968); Moscarelli vs. Stamm, 288 F.Supp. 453 (E.D.N.Y. 1968). Most cases find firms secondarily liable under theories of respondeat superior, conspiracy, aiding and abetting, or the control person provisions of the federal securities acts. But see Colonial Realty Corp. vs. Bache & Co., 358 F.2d 178 (2d Cir.), cert. denied, 385 U.S. 817 (1966); Buttrey vs. Merrill Lynch, Pierce, Fenner & Smith, 410 F.2d 135 (7th Cir.), cert. denied, 396 U.S. 838 (1969).

38 Hecht, V. Harris, Upham & Co., 283 F. Supp. 417 (N.D.Cal. 1968), modified, 430 F.2d 165 (6th Cir. 1981). In this case, the brokerage firm was found liable for churning that occurred in the customer's account because the partner who was required under the firm's rules to approve the opening of accounts approved the trading of commodities futures on margin merely by being informed by the registered representative (a new employee at the firm) that the customer had been known to him and had been a former client. Although the data on the new account card was sufficient to put the firm on notice that the customer was a widow expecting to receive dividend checks monthly, the partner, who had never met or heard of the customer, made no further inquiry. Id. at 439.

Some cases have actually enunciated in detail adequate day-to day supervisory procedures. For example, in Smith vs. Christie, the court found the following supervisory procedures to be sufficient to relieve the broker-dealer of any liability for the acts of the registered representative:

> Branch managers were required daily to review all transactions for suitability to client objectives, size concentration and indications of churning. If there were particularly heavy trading in a client's account, that account would be flagged and reviewed by the compliance department ...Occasionally the branch manager would contact client to make sure any unusual transactions had been undertaken in accordance with the client's interest....Branch managers also reviewed client accounts monthly and conducted compliance checks on two or three randomly selected brokers per month.[39]

Obviously, American Express and Wareham never followed even these minimum standards.

## In-House Supervisory Rules

Since it acts as a fiduciary, American Express had a duty to be diligent in enforcing its rules[40]. Therefore, the firm's own compliance manual[41] is a standard by which its action should be measured. When a defendant has disregarded rules that it has established to govern the conduct of its own employees, evidence of those rules may be used against the defendant to establish the correct standard of care. The content of the in-house rules may also indicate knowledge of the risks involved and the precautions that may be necessary to prevent the risks.[42] Failure to meet these standards is generally conclusive as to supervisory liability

---

39 1980 Fed. Sec. L.Rp (CCH) ¶97,828, at 90,122-23 (N.D. Cal. 1980). For other cases exploring the guidelines of adequate supervision and the requirements of diligent enforcement of the supervision system, see Henricksen vs. Henricksen, 640 F.2d 880 (7th Cir.), cert. denied, 454 U.S. 1097 (1981).

40 Miller vs. Smith Barney, Harris Upham & Co., Shearson American Express and D. Lawrence Burdick, 1986 Fed. Sec.L.Rep. (CCH) ¶92,498 (S.D.N.Y.Feb. 27, 1986); Henricksen vs. Henricksen, 640 F.2d 880 (7th Cir.), cert. denied, 454 U.S. 1097 (1981); Hecht vs. Harris, Upham & Co., 430 F.2d 1202 (9th Cir. 1970).

41 In some cases, the standards are contained in a compliance manual, but sometimes they are contained in policy or procedure manuals.

42 Thropp vs. Bache Halsey Stuart Shields, Inc., 650 F.2d 817, 820 (6th Cir. 1981) (citing Montgomery vs. Baltimore & Ohio R.R., 22F.2d 359 (6th Cir. 1927)).

## INSURANCE AND VARIABLE ANNUITY RULES

## AMERICAN EXPRESS VIOLATED THE RULES AND RULINGS OF THE NATIONAL ASSOCIATION OF SECURITIES DEALERS AND THE SECURITIESAND COMMISSION EXCHANGE.

### (i) Recent NASD Regulation, Inc. Proceedings

The NASD addressed the obligations of the broker/dealers involved in the sale of variable annuities, in the recent variable annuity enforcement actions of NASD, CUNA Broker Services, Inc. Case No. C05010054 and Mutual Service Corporation – Case No.C05010053. The sales practices addressed in those cases including the following.

i. Failure to maintain certain records recording the rationale for the purchase of variable annuity products;
ii. Failure to demonstrate reasonable efforts made to obtain certain customer information needed for suitability determinations to support the purchase of variable annuity products;
iii. The recommendation of variable annuity products without having reasonable grounds for believing that the transactions were suitable;
iv. Failure to communicate material facts to a customer in connection with the sale of an annuity contract;
v. Improper supervision by home office principles responsible for reviewing and approving the suitability of the variable annuity insurance products in its offices of supervisory jurisdiction;
vi. The period of the procedures involving the manner in which sales persons were permitted to sell variable annuity products.

As a result of the failure of American Express to adhere to industry and NASD guidelines relating to the sale of variable annuity products, Ogorzalek has been victimized and has sustained losses in excess of $50,000.00, as a result of the unsuitable, speculative, volatile and improper annuity investments purchased in her IRA.

It is submitted that the Respondent committed similar negligent and improper acts and omissions particularized in these two NASD Regulatory Proceedings.

### (ii) NASD Notice To Members 96-86 and NASD Rule 2310

NASD Notice to Members 96-86 clearly sets forth that associated persons are required to adhere to the suitability requirements of NASD Conduct Rule 2310. In this regard, brokers involved in the sale of variable annuities are required to give consideration to a number of suitability elements encompassed by Rule 2310 including the following:

a. The customer's inability to fully appreciate how much of the purchase payment or premium is allocated for insurance or other costs, and a customer's ability to understand the complexity of variable products generally.

b. The customer's need for liquidity and short term investment.

c. The customer's immediate need for retirement income.

d. The customer's investment sophistication and whether he or she is able to monitor the investment experience of a separate account.

It is respectfully submitted that American Express violated the entirely of these elements with the wholesale dumping of Ogorzalek's lump sum rollover into annuity products without any concern for Ogorzalek best financial interests. Indeed, it is submitted that the entirety of the investment decisions foisted upon Ogorzalek by American Express were wholly designed to generate commissions without regard to Ogorzalek long term retirement plans and needs.

**(iii) <u>NASD Notice to Members 99-35</u>**

NASD Notice to Members 99-35 provided enhanced clarification of the suitability rule under 2310 as well as the obligations of the broker pursuant to Rule 3010. This notice to Members sets forth 16 separate elements of required information and conduct under 6 separate categories which brokers involved in the sale of variable annuities are required to provide and perform, including customer information, product information, liquidity and earnings accrual; income, net worth, and contract size thresholds; investments in tax qualified accounts and variable annuity replacements. These rules serve as a standard of care and conduct, which should otherwise have been followed by the Respondents with respect to the sale of the variable annuity products to Ogorzalek, but it is submitted that the respondent agent, violated the requirements of NASD Notice to Members 99-35 by engaging in the following proscribed conduct:

a. Failure to make reasonable efforts to obtain comprehensive customer information, including the customer's occupation, martial status, age, number of dependents, investment objectives, risk tolerance, status, previous investment experience, liquid net worth, other investment and savings and annual income.

b. Failure to "discuss all relevant facts with the customer, including liquidity issues such as potential surrender charges and the Internal Revenue Service penalty; fee, including mortality and expense charges, administrative charges and investment advisory fees; and any applicable state and local government premium taxes; and market risk."

c. Failure to "insure that the variable annuity application and any other information provided by the customer....is complete and accurate and promptly forwarded to a registered principal for review.

d. Failure to "review the customer's investment objectives, risk tolerance, and other information to determine the variable annuity contract as a whole and the underlying sub-accounts recommended to the customer are suitable".

e. Failure to "have a thorough knowledge of the specifications of each variable annuity that is recommended, including the death benefit, fees and expenses, sub-account choices, special features, withdrawal privileges, and tax treatment".

f. Failure to give current Prospectus when the variable annuities in question were recommended.

g. Violation of Rule 2210 by using sales material not approved by a registered principal of the Respondent Corporation.

h. Failure to "Inquire about whether the customer has a long term investment objective and failure to make sure that the customer understands the effective surrender charges on redemptions and that a withdrawal prior to the age of $59^{1/2}$ could result in a withdrawal tax penalty".

i. Failure to "establish procedures to require a principal's careful review of variable annuity investments that exceed a stated percentage of the customer's net worth".

j. Failure to "disclose to the customer that the tax deferred accrual feature is provided by the tax qualified retirement plan [in this case the Claimant's IRA roll over} and that the tax deferred accrual feature of the variable annuity is unnecessary.'

k. Failure to "conduct an especially comprehensive suitability analysis prior to approving the sale of a variable annuity with surrender charges to a customer is a tax-qualified account subject to plan minimum distribution requirements".

(iv) <u>NASD Notice to Members 00-44 and NASD Rule 3010-</u>

American Express also violated the pronouncement of NASD Notice to Members 00-44 (annexed as by failing to follow the therein stated "Guidelines for Supervision of Variable Life Insurance Sales" and particularly, the guidelines set forth under subcategories

(a) Customer information;

(b) Review of the customers information;

(c) Product information;

(f) Advertising and sales literature; and

(g) Members supervisory systems and procedures.

As noted under item (a) "customer information";

> A registered principal should review the account information form and to verify that his recommendation of both the policy and the sub account allocation is consistent with the customer's investment objective and risk tolerance.

It is submitted that if the same had been properly conducted in the Claimant's account, none of the losses would have occurred or they would have been minimized though an appropriate asset allocation model designed to secure a financially secure retirement.

It is also submitted that American Express' agent Wareham wholly failed to apprise Ogorzalek of any of the effective hidden cost features of the variable policy, which she was sold and as a result of her income, Ogorzalek was wholly unable to make an informed investment decision regarding the recommendation of the variable universal policy.

American Express's agent Wareham also wholly failed to provide Ogorzalek with member approved product information brochures "that explain the features and the principal risks associated with variable life insurance". Indeed, Ogorzalek was left with the impression that she would have a guaranteed annual income.

It is further submitted that Respondent's agent Wareham violated item (f)"advertising and sales literature" by providing Ogorzalek with improper and incomplete disclosures relative to her investment needs and how the same would be met with the variable annuity products. In addressing the same in item (f) in NASD Notice to Members 00-44, it is clearly stated that:

> Any variable life insurance communication that overemphasizes the investment aspects of the policy or potential performance of the sub accounts may be misleading.

Had the Ogorzalek known that she stood to sustain a drastic drop in the market valuation of the various sub accounts in their annuities and had the same properly explained to her she most certainly would not have agreed with the transactions

Members supervisory systems and procedures" clearly require a supervisory system to assure compliance with NASD Rule 3010 recently designed to achieve compliance with NASD rules. Most manuals state that:

> Supervisory systems must address the activities of all of the members of registered representatives and associated persons and may include components such as automated exception reports and surveillance programs that monitor unusual activity. Members must adopt written supervisory procedures that document the supervisory system and that are reasonably designed to achieve compliance with all applicable securities laws and regulations and NASD rules.

It is submitted that the Respondent's agent Wareham engaged in a thoughtless scheme of placing the entirely of the lump sum retirement distributions of a number of other retirees into speculative, unsuitable variable annuities wholly designed to generate commissions without any concern or best financial interest of these retiring, unsophisticated predominately blue-collar retirees.

## THE COUNTS

### COUNT ONE
*BREACH OF FIDUCIARY DUTY*

Ogorzalek repeat and reallege each and every allegation contained in the preceding paragraphs, with the same force and effect as if set forth herein at length.

A securities broker acts as an agent for his customers. Under the common law and Court decisions, an agent by virtue of the agent's superior knowledge, and by the trust reposed in the agent by the principal, will be considered a fiduciary with respect to all matters within the scope of his agency. The broker is therefore regarded by the courts as a fiduciary. A fiduciary, in turn, is subject to duties that go beyond mere fairness and honesty; they oblige him to act to further the beneficiary's best interests. A fiduciary owes his principal an obligation of diligent and faithful service similar to that of a trustee. Like a trustee, he is held to rigorous duties of loyalty and care: He must avoid acts that put his interest in conflict with the beneficiary's; his duties must be exercised with the utmost good faith and integrity; and he must employ such skill and judgment as might reasonably be expected of persons skilled in his calling.

The relationship between customer and broker-dealer/account executive is one of *dependence* by the customer on the latter. Because the broker-dealer/account executive simultaneously deal for their customer while acting for their own gain, profits and commissions the law has stepped in to provide safeguards in the form of stringent standards of conduct. Posner. Id.

When, as here, Wareham acting as an employee of American Express, recommended that Ogorzalek purchase an annuity. American Express assumed a heightened responsibility to not only deal fairly and honestly with Ogorzalek but to do so in a manner that is the punctilio of honesty and integrity. As Justice Cardozo, then Judge Cardozo of the New York State Court of Appeals wrote in the landmark decision Meinhard v. Salmon, 240 N.Y. 458, 464 (1928).

> Many forms of conduct permissible in the work-a-day world for those acting at arm's length are forbidden to those bound by fiduciary ties. A trustee is held to something stricter than the morals of the marketplace. Not honesty alone, but the *punctilio of an honor the most sensitive*, is then the standard of behavior. As to this *has developed a tradition that is unbending and inveterate*. Uncompromising rigidity has made the attitude of courts of equity when petitioned to undermine the rule of undivided loyalty by the "disintegrating erosion" of particular exceptions. Only thus has the level of conduct for fiduciaries been kept at a level higher than that trodden by the crowd. [emphasis added]

Wareham violated these obligations in that he exercised discretion to effect trading inconsistent with the goals and objectives of Ogorzalek, which caused financial injury.

**COUNT TWO**

*MISREPRESENTATIONS, OMISSIONS AND MANIPULATIVE DEVICES BY RESPONDENT VIOLATE SECTIONS 10(b) AND 20(a) OF THE EXCHANGE ACT AND RULE 10b-5 PROMULGATED THEREUNDER*

Ogorzalek repeat and reallege each and every allegation contained in the preceding paragraphs, with the same force and effect as if set forth herein at length.

American Express, directly and indirectly, acting singly and in concert, engaged in a plan, scheme and unlawful course of conduct in violation of Section 10(b) of the 1934 Act, 15 U.S.C. sections 78j(b), 78t(a), and upon SEC Rule 10b-5, in that they a) employed devices, schemes and artifices to defraud; b) made untrue statements of material facts and omitted to state material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading; and (c) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon Ogorzalek.

American Express acted with scienter in that it knowingly and/or recklessly engaged in fraudulent and deceptive acts and made materially false statements and omissions. The circumstances give rise to a strong inference of fraud and fraudulent intent, as indicated by the foregoing allegations.

**COUNT THREE**

*VIOLATIONS OF UNIFORM SECURITIES ACT*

Ogorzalek repeat and reallege each and every allegation contained in the preceding paragraphs, with the same force and effect as if set forth herein at length.

By reason of the foregoing, American Express violated General Statutes of the state securities laws (Uniform Securities Act).

**COUNT FOUR**

*IMPROPER ACCOUNT ACTIVITY*

Ogorzalek repeat and reallege each and every allegation contained in the preceding paragraphs, with the same force and effect as if set forth herein at length.

The "suitability" requirement mandates obtaining knowledge at the outset of a broker-dealer customer relationship of the customer's prior investment experience, ability to sustain risk and loss, need for the funds invested, personal life and career goals as they are affected by and affect that customer's investments. <u>See</u> Rules 2310(a) and (b), NASD Conduct Rules ("The Association's

suitability rule is fundamental to fair dealing and is intended to promote ethical sales practices and high standards of professional conduct." IM-2310-3); Erdos v. Securities and Exchange Commission, 742 F.2d 507,508 (9th Cir. 1984). See also NASD Suitability Interpretation. Sec. Exch. Act. Rel. No. 36973 (March 14, 1996).

The suitability doctrine requires that a broker-dealer invest in securities that he reasonably believes are suitable for the customer. The doctrine is based on a "homely truth about investing - investment decisions can be made only in light of the goals and needs of the person for whom they are made." Robert Mundheim, Professional Responsibilities of Broker-Dealers: The Suitability Doctrine, 1965 Duke L.J. 445, 448. Where the doctrine applies, as it does here, it in effect shifts the responsibility for making inappropriate decisions from the customer to the broker-dealer.

An unsuitable investment also subjects a broker to liability under the antifraud provisions of federal securities law and state common law. Because the securities in the account were predominately speculative and high-risk the account was in clear violation of this doctrine.

**COUNT FIVE**
*CONVERSION*

The Ogorzalek repeat and reallege each and every allegation contained in the preceding paragraphs, with the same force and effect as if set forth herein at length.

By reason of the foregoing, American Express converted the account of the commissions and other transaction related compensation.

**COUNT SIX**
*RECKLESSNESS*

Ogorzalek repeat and reallege each and every allegation contained in the preceding paragraphs, with the same force and effect as if set forth herein at length.

By reason of the foregoing, American Express was reckless in handling and supervision of the account.