**UNITED STATES DISTRICT COURT**
**District of Minnesota**

| | | |
|---|---|---|
| Lesa Benacquisto, Daniel Benacquisto, Richard Thoresen, Elizabeth Thoresen, Arnold Mork, Isabella Mork, Ronald Melchert, on behalf of themselves and all others similarly situated<br><br>Plaintiffs | ) | |
| v. | ) | **Civil No. 00-1980 DSD/JMM** |
| American Express Financial Corporation, American Express Financial Advisors, American Centurion Life Assurance Company, American Enterprise Life Insurance Company, American Partners Life Insurance Company, IDS Life Insurance Company and IDS Life Insurance Company of New York<br><br>Defendants | ) | |

**MEMORANDUM OF EARL AND NANCY LINDSAY**
**IN OPPOSITION TO**
**MOTION TO ENJOIN ARBITRATION PROCEEDING**

EARL and NANCY LINDSAY ("the Lindsays"), by counsel, submit the following memorandum in opposition to the motion of the above-referenced defendants (collectively "Ameriprise") to enjoin the Lindsays from pursuing claims in the arbitration proceeding filed by the Lindsays with NASD Dispute Resolution ("the Arbitration").

## INTRODUCTION

Ameriprise's injunction motion is nothing more than a thinly veiled attempt to intimidate and harass two 80 year old customers who have chosen to file an arbitration for redress of legitimate claims which have no connection with this class action or any order entered herein. Moreover, by virtue of the misrepresentations and omissions of Ameriprise agents in connection with the settlement of this class action, which constituted violations of the Court's order, Ameriprise is *equitably estopped* from availing itself of the protections it would otherwise be afforded under the terms of the settlement of this class action.

## BACKGROUND

### The Class Action Settlement

The above-captioned action is the result of the consolidation of a number of class actions brought by Milberg Weiss and others alleging various causes of action arising out of Ameriprise's acts and omissions in connection with the marketing and sale of certain annuities and life insurance products. The Court entered a Final Order and Judgment Approving Class Action Settlement and Dismissing Complaint in this matter on May 15, 2001 ("the Class Action Order")(appearing at pages 1-17 of Ameriprise's exhibits herein), which incorporated a Stipulation of Settlement ("the Stipulation," which appears at

pages 29-73 of Ameriprise's Exhibits). Among other things, the Class Action Order provided that

> 1. In consideration for the relief set forth in this Agreement, Plaintiffs and all other Releasors shall, as of the Final Settlement Date, release, acquit and forever discharge the Releasees from any and all **past or present** Claims and Causes of Action that are **based upon, related to, or connected with, directly or indirectly, in whole or in part: (a) the allegations, facts or subjects set forth or otherwise raised in [the actions which form the consolidated class action]** . . .

(Class Action Order, p.9)(parentheticals omitted)(emphasis added)

> 3. Nothing in this Release shall be deemed to alter . . . (ii) a Class Member's right to assert any claim that independently arises from acts, facts or circumstances **that occur for the first time after the last day of the Class Period**; . . . (v) A Class Member's right to assert any claim peculiar to the Class Member that falls outside the general categories of claims or conduct described in the complaints in the Actions or the Release in this settlement and is **based on facts that were not discovered and could not with reasonable care have been discovered by the Class Member before the deadline to submit an Election Form set forth in the Stipulation of Settlement**.

(Class Action Order, p. 10)(emphasis added)

6. In connection with this Release, Plaintiffs and all other Class Members, on their own behalf and on behalf of all other Releasors, acknowledge that they are aware that they may hereafter discover claims presently unknown or unsuspected, or facts in addition to or different from those that they now know or believe to be true with respect to the matters released herein **that occurred prior to the last day of the Class Period**.

(Class Action Order, p. 10)(emphasis added)

> 1. "Claims and Causes of Action" (as used in this Release) means any and all claims for relief . . ., any and all allegations of

> liability . . ., and any and all demands for damages or equitable relief . . .regardless of whether based on federal, state, or local law, statute, ordinance, regulation, contract, common law, or any other source, and regardless of whether foreseen or unforeseen, suspected or unsuspected, or fixed or contingent **at the time of this Settlement**.

(Class Action Order, p.11)(emphasis added)

> 2. "Released Conduct" means any and all direct or indirect acts, representations, omissions, suggestions, or communications that are related to or connected in any way with the design, development, marketing, sale, administration, servicing, underwriting, or performance **of the Policies or the Annuities** . . .

(Class Action Order, p.11)(emphasis added)

The Stipulation provided, among other things:

> 26. "Class Period" means that period beginning on January 1, 1985 and ending on February 29, 2000, inclusive.

(Stipulation, p. 9)

The Stipulation (and by operation of its incorporation, the Class Action Order itself) also required that Ameriprise retain "one or more Administrators to assist them in performing their obligations under [the Stipulation]" and to "establish a telephone bank with a toll-free telephone number(s) for the sole purpose of responding to inquiries from Class Members about the Actions or the proposed settlement" (Stipulation, pp. 42-46). The terms of the Stipulation required that Ameriprise ensure that the Administrator it retained "**accurately** and **neutrally** describe . . .the provisions of [the Stipulation] in communications with

Class Members" (Stipulation, p.43)(emphasis added). Other relevant provisions of the Stipulation include:

> 1. The Administrator, **under the supervision of the Parties**, shall be responsible for (i) staffing the telephone bank with telephone representatives; (ii) educating the telephone representatives about the background of the Actions, the product concepts relevant to the proposed settlement, and the terms and chronology of the proposed settlement; (iii) training the telephone representatives to answer inquiries; (iv) **providing scripts and model questions and answers (prepared by [Ameriprise] and approved by [Milberg Weiss]) for the telephone representatives to use in answering inquiries;** (v) training the telephone representatives to refer Class Member inquiries to Co-Class Counsel or their designees if the Class Member so requests **or where otherwise appropriate**; . . . and taking any other steps, in consultation with [Ameriprise] and Co-Class Counsel, **to promote accurate and efficient communications with Class Members, Claimants and other policy and annuity owners**.
>
> b. Defendants and Co-Class Counsel or their designees **<u>shall</u> agree on all telephone scripts to be used by the telephone representatives, and all training materials and presentations, whether written or oral, provided to telephone representatives**.

(Stipulation, pp. 44-45)(emphasis added).

**<u>The Lindsays' Arbitration Claim</u>**

Earl and Nancy Lindsay are 80 year old residents of Virginia. They were customers of Ameriprise throughout the Class Period, the pendency of this class action and the settlement thereof, and continue to maintain accounts with Ameriprise. On April 3, 2006, the Lindsays filed a Statement of Claim with the NASD to redress claims against Ameriprise arising out of their relationship

through 2004; a relationship which extends almost 5 years beyond the end of the Class Period; over 4 years after the Stipulation was signed, and over 3 years after the Class Action Order was entered.

The Statement of Claim, which comports in all respects with the pleading standards of the NASD Code of Arbitration Procedure, asserts causes of action for violations of the Virginia Securities Act, breach of fiduciary duty, actual and constructive common-law fraud, gross negligence and breach of contract arising out of Ameriprise's acts and omissions in connection with its handling of the Lindsays' financial affairs.[1] The investments recommended and sold to the Lindsays by Ameriprise include not only the life insurance and variable annuity products at issue in this action, but also include long-term care policies and mutual funds recommended and sold to the Lindsays by Ameriprise during AND <u>AFTER</u> the time frame covered by the Class Action Order and/or Stipulation. In short, the Statement of Claim involves allegations of wrongdoing which involve products, time frames and acts and omissions not involved in this case.

---

[1] The only pleading standards for Statements of Claim are contained in NASD CAP Rule 10314(a), which provides, in pertinent part, that "[t]he Statement of Claim shall specify the relevant facts and the remedies sought." Nonetheless, one of the effects (and perhaps the intent) of Ameriprise's filing with this Court is to subject the Statement of Claim to the Court's interpretation of the sufficiency of the Lindsays' pleadings in the Arbitration, an avenue which is not available to Ameriprise in SRO arbitration or a proper function for this Court.

Finally, the Statement of Claim also included the following "10301(d) Statement:"

**<u>RULE 10301(d) STATEMENT</u>**

> **<u>The Benacquisto Class Action</u>:** In the Fall of 2000, the Lindsays received a *Notice of Class Action, Proposed Settlement and Fairness Hearing* regarding a class action pending in state court in Minnesota which referenced variable annuities and variable universal life insurance policies of the type sold to the Lindsays. Accompanying the notice was a letter from Richard W. Kling, President and CEO of AEFA affiliate IDS Life Insurance Company. King's letter extolled AEFA's commitment to its customers and exhorted the Lindsays to call a "special toll-free number" with any questions they might have and asked that the Lindsays not contact the Court (*see* **Exhibit 4**). As the Lindsays had no idea of the meaning or import of the class action notice, the Lindsays followed Mr. Kling's advice and called the "special toll free number" and were told they should "stay put" and "do nothing." Unfortunately, the Lindsays followed that advice and failed to opt out of the class action.
>
> **<u>The AEFA Class Actions</u>:** There are currently pending 2 putative class actions which purport to cover AEFA's acts and omissions with regard to the Lindsays as set forth herein: (a) *In Re American Express Financial Advisors Securities Litigation*, Civil Action No. 1:04-CV-1773 (SDNY); and, (b) *Haritos, et al v American Express Financial Advisors, Inc.*, Case No. 02-2255 (D. Ariz.). Upon information and belief, neither of these class actions has been certified and the Lindsays have not received any notice of either certification or settlement. The Lindsays hereby certify that they will take all actions necessary to opt out of both of these class actions if and when they are ever certified.

(*see* Ameriprise Exhibits at p.28)

## ARGUMENT

### A. The Arbitration Involves Time Periods, Insurance and Investment Products and Acts and Omissions Not Addressed or Foreclosed by the Class Action Settlement

It is unclear from Ameriprise's submissions in this matter exactly what relief it is seeking. While Ameriprise gives lip service to simply attempting to prevent "double recovery" by the Lindsays in connection with the annuities and life insurance policies, the memorandum and proposed Order it has submitted to the Court appear in places to be requesting that the Court enjoin ALL of the Lindsays' arbitration claims, even though Ameriprise is well aware that the Lindsays have submitted claims involving acts, omissions, products and time periods that have absolutely no connection with this class action or the settlement thereof. For example:

- "Because the Final Order and Judgment bars the Lindsays from raising the claims asserted in the Statement of Claim, . . ." (Ameriprise Memo., p.2)
- "The Claims in the Statement of Claim Were Released Under the Final Order and Judgment" (Ameriprise Memo., p.8)
- "The claims set forth in the Statement of Claim are claims that are clearly barred by the class-action settlement." (Ameriprise Memo., p.8)
- "The Lindsays' claims are related to the Released Conduct under the Settlement Agreement . . ." (Ameriprise Memo., p.9)

- "The Final Order and Judgment Authorizes this Court to Enjoin The Lindsays' NASD Proceeding" (Ameriprise Memo., p.14)

Additionally, while there are numerous references throughout Ameriprise's carefully crafted memorandum to the Lindsays' allegations regarding variable annuities and life insurance, the memorandum is bereft of references to the Lindsays' claims regarding mutual funds or long term care policies or the Lindsays' claims arising out of the recommendation and sale to them of securities by Ameriprise agents not registered in the Commonwealth of Virginia.

There also appears to be an overarching suggestion in Ameriprise's memorandum that, because Ameriprise may have misrepresented and omitted material facts about variable annuities and life insurance in various oral and written presentations, any of the Lindsays' claims based on misrepresentations and omissions about other topics (e.g., mutual funds, long term care policies and the true nature and status of the Lindsays' financial situation) contained in those same presentations are also barred by the settlement in this case.

The breadth of the proposed order Ameriprise has submitted to this Court appears to have been designed so that it can later be used by Ameriprise in an attempt to have the arbitrators bar all of the Lindsays' claims, including those which fall outside the Class Period and have no connection to the variable annuities or life insurance policies which were the subject of the settlement of this class action.  It is likewise not difficult to envision Ameriprise attempting to use

the proposed order to prospectively circumscribe evidence presented in the Arbitration, even though it knows or should know that this Court has no authority to dictate what evidence the arbitrators are allowed to consider. It logically follows that either of these scenarios would likely require yet another trip to federal court in Minnesota. The Court should not allow the Lindsays to be set up for such maneuvering. Accordingly, it is imperative that the Court take this opportunity to clarify the impact of the Class Action Order on the Lindsays' arbitration claim.

### 1. Relevant Allegations of the Statement of Claim

The Statement of Claim filed by the Lindsays in the Arbitration (which, as noted previously, comported in all respects with the pleading standards of the NASD Code of Arbitration Procedure) contains the following relevant allegations:

- Unbeknownst to the Lindsays, these "Financial Plans" were nothing more than computer generated, highly scripted, "cookie cutter" marketing presentations geared to little more than convincing the Lindsays (and others who received them) to invest all of their money in inappropriate, overpriced and substandard proprietary insurance **<u>and</u> investment products** issued and/or underwritten by AEFA or one of its affiliates, including IDS Insurance, without any regard to the suitability of those **investments** for the Lindsays' ages, investment objectives and circumstances.

(Statement of Claim, p. 3)(emphasis added)

- Upon information and belief, from the inception of the Lindsays' relationship with AEFA and Altemus **through 2003**, the Lindsays deposited over $500,000 with AEFA and Altemus for the purposes of retirement. Consistent with the real purpose of the "Financial Plans," all - or almost all -

of the Lindsays' money was invested in proprietary insurance **and investment products** of AEFA and its affiliates, including variable annuities, life insurance, **long term care insurance and mutual funds**.

(Statement of Claim, p.3)(emphasis added)

- The Lindsays retired and moved to Virginia in 1995, where they have continuously resided to this day. Altemus and AEFA both knew that the Lindsays had moved to Virginia. Nonetheless, AEFA did nothing to ensure that Altemus became registered as an "agent" in Virginia, as required by Va. Code §13.1-504(A), and **Altemus continued to recommend and effect transactions in the Lindsays' accounts through the end of 2003**.

(Statement of Claim, p.4)

- The **securities investments** sold to the Lindsays were unsuitable and improper for persons of the Lindsays' age, investment objectives and circumstances, **particularly when viewed in light of the expensive and unnecessary insurance policies** Altemus and AEFA **had also** recommended and sold to the Lindsays. This unsuitability was exacerbated by **changes in the securities markets in 2000**, but neither Altemus nor anyone else from AEFA took any steps to protect the Lindsays' retirement savings from certain erosion and losses in the light of the changed market conditions.

(Statement of Claim, pp. 4-5)(emphasis added)

- The "Financial Plans" created for the Lindsays provided for the regular deposits into the Lindsays bank accounts for the purpose of paying insurance premiums and funding the Lindsays' living expenses in retirement. Unbeknownst to the Lindsays, these payments did not represent income being generated by their **AEFA investments**, but for the most part represented a continuous erosion of their investment principal, such that - with each passing month - the money the Lindsays were depending on in retirement was being systematically depleted to pay for the overpriced, underperforming and **unsuitable investments and insurance policies** recommended and sold to the Lindsays by Altemus and AEFA.

(Statement of Claim, p. 5)(emphasis added)

- The Lindsays were advised **in early 2004** that Altemus was departing AEFA and that their accounts were being turned over to Glen Cleary (Cleary), another registered representative of AEFA and the branch office manager of AEFA's Canton, Ohio office. Upon information and belief, Cleary was never registered as an "agent" in Virginia, as required by Va. Code §13.1-504(A). Nonetheless, **Cleary recommended and effected the purchase and sale of securities in the Lindsays' accounts during 2004, and AEFA did nothing to ensure his registration in Virginia in compliance with §13.1-504.**

(Statement of Claim, pp. 5-6)(emphasis added)

- AEFA's acts of recommending and effecting transactions in the Lindsays' accounts by registered representatives who were not properly registered as "agents" with the Commonwealth of Virginia; Altemus' misrepresentations and omissions of material facts concerning the suitability of the investments he recommended and sold to the Lindsays; Altemus and AEFA's failure to disclose the real reason for the recommendation of proprietary AEFA and AEFA related products for purchase in the Lindsays' accounts; and, Altemus' continuing misrepresentations and omissions concerning the true status and nature of the Lindsays' accounts constitute **violations of the Virginia Securities Act** (Va. Code §§ 13.1-501, *et seq*), which were the direct and proximate cause of the Lindsays' damages and which AEFA is liable for.

(Statement of Claim, p. 6)

- AEFA and Altemus held themselves out to the Lindsays as investment professionals and experts. By virtue of those representations and AEFA's and Altemus' registration with the NASD, AEFA and Altemus agreed that, in exchange for the fees derived from the Financial Plans and the insurance <u>**and**</u> **investment products** recommended and sold to the Lindsays, AEFA and Altemus would conduct themselves and all transactions in accordance with the constitution, rules, regulations, customs, usages, rulings and interpretations of the NASD. The collective acts and omissions of Altemus and AEFA described herein constitute a breach of AEFA's implied contract with the Lindsays, as the result of which the Lindsays have suffered incidental and consequential damages for which AEFA is liable.

(Statement of Claim, p. 8)(emphasis added)

### 2. The Arbitration Involves Time Periods Not Addressed or Foreclosed by The Class Action Settlement

The Arbitration involves claims "that independently [arise] from acts, facts [and] circumstances that occur[ed] for the first time after the last day of the Class Period" (*see* the Class Action Order). The Statement of Claim clearly and repeatedly refers to acts and omissions occurring after both the Class Period and the date of the settlement herein. No fair or legitimate reading of either the Class Action Order or the Stipulation can support any assertion by Ameriprise that those claims are foreclosed by the settlement of this class action. Accordingly, to the extent Ameriprise is asking this Court to enjoin the Lindsays' pursuit of those claims in the Arbitration, that request should be denied.

### 3. The Arbitration Involves Investment and Insurance Products Not Addressed or Foreclosed By the Class Action Settlement

The Arbitration involves claims which do not relate to any insurance policy or annuity addressed or foreclosed by the Class Action Settlement, specifically mutual funds and long-term care policies. Ameriprise is well aware of this.

Ameriprise has submitted an affidavit executed by a representative of Rust Consulting, the administrator retained by Ameriprise to administer the class action settlement. The RUST representative swears and affirms that class notice packages was sent to the Lindsays "with respect to policy and annuity numbers"

90901572112, 93001016136, 90901572118, 93002108903, 93102324244 and 93104135530. It is no accident that the RUST representative limits her sworn representations to these accounts, that she specifically designates the products involved as "policies" and "annuities," or that she refers to the designated accounts as "the 'Class Accounts,' " because Ameriprise is well-aware that the extent of any release effected by the settlement of this class action is limited to matters "related to or connected . . . with the Policies or Annuities" (*see* the Class Action Order at p. 11). Accordingly, should the Court enjoin any of the claims asserted in the Arbitration, such injunction should be limited to the "Class Accounts" as identified in the sworn affidavit of the RUST consultant.

Finally - and perhaps most telling - is the fact that Ameriprise has not asserted the settlement of this class action as a basis for dismissing either of the two putative class actions currently pending in federal court in Arizona and New York arising out of Ameriprise's use of "Financial Plans" to sell proprietary and unsuitable mutual funds and insurance products to its clients, including the Lindsays (*see* the reproduction of the Lindsays' "10301(d) Statement," *supra*). Included herewith at pages 1-108 of the Lindsays' exhibits are full copies of the most recent iterations of the Complaints in those class actions together with a description of the actions from the *Stanford Securities Class Action Clearinghouse* describing, among other things, an October 24, 2005 press release issued by Ameriprise announcing its decision to pay $100 million to settle

those class actions.

The Court should note that the class period in the New York and Arizona actions begins in March of 1999 and extends through the Spring of 2004, a period overlapping the Class Period in this action by approximately 2 years. It is also worth noting that Co-Class Counsel in the Arizona action is the same firm which served as Co-Class Counsel in this action: the Lockridge, Grindal firm of Minneapolis. Milberg Weiss, Co-Class counsel in this matter, is also Co-Class Counsel in the New York Action. Yet, notwithstanding this overlap of Class Periods and commonality of Class Counsel, Ameriprise has never even suggested to the federal courts in either Arizona or New York that the settlement in this action in any way impacted either of those two actions, opting instead to pay at least $100 million to settle the litigation. The reasons for this deafening silence are simple: Ameriprise knows full well that the settlement of this class action has no preclusive effect on any of the Lindsays' allegations with regard to the mutual funds, financial plans and long term care insurance policies Ameriprise recommended and sold to the Lindsays. Any suggestion by Ameriprise to the contrary is, at a minimum, disingenuous and belied by its actions in the New York and Arizona class actions.

**4. The Arbitration Involves Acts and Omissions Not Addressed or Foreclosed by the Class Action Settlement**

The Arbitration alleges violations of the Virginia Securities Act arising out of Ameriprise's acts and omissions in connection with the recommendation and sale of mutual funds and financial plans to the Lindsays, including the fact that Ameriprise agents recommended and effected the purchase and sale of securities in the Commonwealth of Virginia without being registered to do so for a period of at least nine (9) years. Nothing about the settlement of this class action supports any suggestion by Ameriprise that this Court should enjoin the Lindsays' pursuit of those claims in the Arbitration.

**B. The Administrator Retained and Supervised by Ameriprise Misrepresented and Omitted Material Facts and Otherwise Failed to Provide Accurate Information to the Lindsays in Response to Their Inquiries About the Class Action Settlement, and Ameriprise is Therefore Equitably Estopped From Claiming the Benefit of the Settlement Herein Even With Regard to the Subject Insurance and Annuity Products**

> Equitable estoppel is the effect of the voluntary conduct of a party whereby he is absolutely precluded, both at law and in equity, from asserting rights which might perhaps have otherwise existed, either of property, of contract, or of remedy, as against another person, who has in good faith relied upon such conduct, and has been led thereby to change his position for the worse, and who on his part acquires some corresponding right either of property, contract or remedy. * * *
>
> The doctrine of estoppel in pais is founded in justice and good conscience and is a favorite of the law. It arises when one by his

> acts or representations, **or by his silence when he ought to speak**, intentionally **or through culpable negligence**, induces another to believe certain facts to exist, and such other rightfully acts on the belief so induced in such manner that if the former is permitted to deny the existence of such facts it will prejudice the latter.

Transamerica Insurance Group v. Paul, 267 N.W. 2d 180, 183 (Minn. 1978)[citing In re Estate of Peterson, 281 N.W. 275, 278 (1938)](emphasis added).

As set forth in the "10301(d) Statement" in the Lindsays' Statement of Claim, the Lindsays did exactly what they were told to do upon receipt of the *Notice* in this class action. More relevant for this Court's consideration is the affidavit executed by the Lindsays and submitted herewith, in which the Lindsays' state, among other things, that:

(1) They called the "special toll-free number" set forth in Mr. Kling's letter.[2]

(2) Upon calling the "special toll-free number," the Lindsays spoke to someone they presume to be one of the "specially trained personnel" also referenced in Mr. Kling's letter.

(3) The Lindsays advised the "specially trained personnel" that they did not understand the purpose or content of the Class Action Notice and inquired what, if anything, they were supposed to do.

(4) In response to the Lindsays' inquiries, they were told by the "specially trained personnel" to "do nothing" and "stay put."

(5) At no time during the Lindsays' telephone conversation with the court-

[2] The instruction to contact the toll-free number with inquiries was also included in the Court approved Class Notice.

mandated "specially trained personnel" were the Lindsays ever asked if they wanted to speak to class counsel, advised to contact class counsel, or advised to speak to counsel of their own choosing.

(6) At no time during the Lindsays' telephone conversation with the court-mandated "specially trained personnel" was it ever explained that, if the Lindsays followed the advice to "stay put" and "do nothing," the Lindsays would be forfeiting important legal rights regarding the life insurance policies for which they had paid significant premiums and the variable annuities which constituted a significant portion of their net worth.

The Court should note that it is not being asked to merely accept the representations set forth in the Lindsays' sworn affidavit with nothing more. This is not the product of the fading, self-serving memory of aging, disgruntled investors who wish to get a "second bite at the apple" by rewriting history. Attached to the Lindsays' sworn affidavit are their contemporaneous notes of the conversation with Ameriprise's "specially trained personnel" on November 1, 2000.

Ameriprise argues that the order entered by this Court in the Chandler matter (found at pages 105-113 of Ameriprise's exhibits) supports its argument that the Lindsays should be enjoined from pursuing their variable annuity and life insurance claims in the pending arbitration. Quite to the contrary, the Court's opinion in Chandler supports the Lindsays' position.

"Rather than calling 'trained personnel who are employed by the independent, Court-approved Administrator,' the Chandlers sought advice from a broker" (Chandler order at p. 5). Unlike the Chandlers, the Lindsays did EXACTLY what they were advised to do by both IDS CEO Kling and the provisions of the Class Notice; they called the "specially trained personnel." [3]

It is inconceivable that, when mandating the establishment of the "special toll-free number" and establishing the guidelines for its operation - including the training and supervision of the "specially trained personnel" who would be responding the inquiries of affected parties - this Court intended that inquiring parties not be able to rely on the advice which was rendered, particularly when the Court entrusted the training and supervision of those "specially trained personnel" to the very entity which now attempts to escape the consequences of their actions.

Simply put, the Lindsays did everything this Court instructed them to do in making inquiries about the import and meaning of the Class Action Notice. By

---

[3] Notably, NOTHING in either CEO Kling's letter or the Class Notice itself advised the Lindsays that they should consult with their own counsel, or even Milberg Weiss. In fact, it is arguable that the Class Notice dissuaded the Lindsays from retaining their own counsel. Part J of the Class Notice provides, in **bold face type**, that **"You will not be charged for the services of the law firms representing the Class,"** but goes on to advise the Lindsays that, should they hire their own counsel in connection with the class action or any other claim against Ameriprise, they will "have to pay his or her attorneys' fees and expenses yourself." Otherwise, the instructions to the Lindsays regarding any inquiries they may have were limited to calling the "special toll-free number" to speak with "specially trained personnel."

contrast, Ameriprise failed to ensure that its agents conformed with the dictates of the Class Action Order to “promote accurate and neutral communications” with the Lindsays and to refer the Lindsays to Co-Class counsel for a full explanation of the impact of this settlement on the Lindsays’ Ameriprise investments when the Lindsays advised Ameriprise’s agent that they did not understand either the content or import of the Class Action Notice. Instead, Ameriprise’s agents advised the Lindsays to “stay put” and “do nothing;” advice on which the Lindsays relied, because it was coming from the very people this Court had instructed them to contact. Ameriprise should not be rewarded, nor the Lindsays penalized - a second time - because they made the mistake of relying on the veracity of the representations of Ameriprise agents. To do so would require this Court to turn a blind eye to violations of its own Order.

## CONCLUSION

There can be no doubt that there are claims asserted by the Lindsays in the Arbitration involving time periods, products, acts and omissions which are not foreclosed by even the most tortured reading of the Class Action Order. Any suggestion by Ameriprise to the contrary is made in a bad faith attempt to harass and intimidate the Lindsays and should be rejected by this Court. However, the Lindsays’ entitlement to relief does not end with those claims.

Ameriprise should not be rewarded, nor the Lindsays penalized - a second

time - because they made the mistake of relying on the veracity of the representations of Ameriprise agents. The Lindsays followed this Court's instructions in the class action to the letter, and yet, now find themselves subjected to litigation 1,200 miles away simply because they had the unmitigated temerity to exercise their rights to pursue claims against Ameriprise in arbitration.

By contrast, the Court now has before it sworn representations that Ameriprise's agents did not comply with the dictates of the Class Action Order that its agents accurately, neutrally and properly communicate with the Lindsays regarding the settlement of the class action. It is precisely situations like this to which the doctrine of equitable estoppel is meant to apply. The interests of equity and justice demand that the Court invoke the tools available to it to ensure that Ameriprise is not unjustly enriched at the Lindsays' expense a second time.

Accordingly, the Lindsays respectfully ask this Court to reject Ameriprise's request for injunctive relief in all respects, or at a minimum, allow the Lindsays to proceed forward with the Arbitration of those claims which clearly have nothing to do with the prior settlement of this action unfettered by Ameriprise's bad faith invocation of the judicial system to thwart the pursuit of those claims.

EARL E. LINDSAY
NANCY L. LINDSAY

/s/ Charles W. Austin, Jr.

By:______________________________________

Charles W. Austin, Jr.
C. W. AUSTIN, JR. P.C.
11930 Rothbury Drive
Richmond, VA 23236
Va. State Bar # 28684
(804) 379-3590
(804) 379-3121 FAX
CWAjr@mindspring.com

Appearing *Pro Hac Vice*

Harvey H. Eckart
ECKART & LEONETTI, P.A.
366 Jackson St., Suite 300
St. Paul, MN 55101
MN Attorney License # 0215879
(651) 224-3870
(651) 224-8035 FAX
Eckart@EckartandLeonetti.com

Appearing as Local Counsel

**CERTIFICATE OF WORD COUNT COMPLIANCE**

Pursuant to Local Rule 7.1(C), undersigned counsel hereby certifies the following:

The foregoing Memorandum of Earl and Nancy Lindsay in Opposition to Motion to Enjoin Arbitration Proceeding was prepared utilizing Corel WordPerfect 10, and the "word count" option of the word processing program was applied to include all text, headings and footnotes. The memorandum contains 5,337 words in 13 point Arial font.

/s/ Charles W. Austin, Jr.
By:____________________________________

Charles W. Austin, Jr.
C. W. AUSTIN, JR. P.C.
11930 Rothbury Drive
Richmond, VA 23236
Va. State Bar # 28684
(804) 379-3590
(804) 379-3121 FAX
CWAjr@mindspring.com

Appearing *Pro Hac Vice* on behalf of
Earl and Nancy Lindsay