# EXHIBIT B

**Exhibit B**

**AMERICAN EXPRESS FUNDS**

AXP New Dimensions Fund
AXP Growth Dimensions Fund
AXP Growth Fund
AXP Partners Growth Fund
AXP Equity Select Fund
AXP Focused Growth Fund
AXP Partners Aggressive Growth Fund
AXP Strategy Aggressive Fund
AXP Partners Small Cap Growth Fund
AXP Managed Allocation Fund
AXP Stock Fund Prospectus
AXP Blue Chip Advantage Fund
AXP Quantitative Large Cap Equity Fund
AXP Large Cap Equity Fund
AXP Research Opportunities Fund
AXP Small Cap Advantage Fund
AXP Partners Small Cap Core Fund
AXP Discovery Fund
AXP Mutual Fund
AXP Diversified Equity Income Fund
AXP Partners Value
AXP Partners Fundamental Value Fund
AXP Equity Value Fund Prospectus
AXP Partners Select Value Fund
AXP Large Cap Value Fund
AXP Mid Cap Value Fund
AXP Partners Small Cap Value Fund
AXP Progressive Fund
AXP Global Balanced Fund
AXP Partners International Select Value Fund
AXP Global Equity Fund
AXP Partners International Core Fund
AXP International Fund
AXP European Equity Fund
AXP Partners International Small Cap Fund
AXP Partners International Aggressive Growth
AXP Emerging Markets Fund
AXP Tax-Free Money Fund
AXP Cash Management Fund
AXP Short Duration U.S. Government Fund
AXP U.S. Government Mortgage Fund
AXP Insured Tax-Exempt Fund
AXP Intermediate Tax-Exempt Fund
AXP Limited Duration Bond Fund

AXP California Tax-Exempt Fund
AXP Massachusetts Tax-Exempt Fund
AXP Michigan Tax-Exempt Fund
AXP Minnesota Tax-Exempt Fund
AXP New York Tax-Exempt Fund
AXP Ohio Tax-Exempt Fund
AXP Selective Fund
AXP Core Bond Fund
AXP Tax-Exempt Bond Fund
AXP Diversified Bond Fund
AXP Global Bond Fund
AXP Income Opportunities Fund
AXP High Yield Tax-Exempt Fund
AXP High Yield Bond Fund
AXP Global Technology Fund
AXP Precious Metals Fund
AXP Utilities Fund Prospectus
AXP Small Company Index Fund
AXP Mid Cap Index Fund
AXP S&P 500 Index Fund

Barry G. Reed, AZ Bar No. 020906
Hart L. Robinovitch, AZ Bar No. 020910
ZIMMERMAN REED P.L.L.P.
14646 N. Kierland Boulevard, Suite 145
Scottsdale, AZ 85254
Telephone: 480.348.6400
Email: hlr@zimmreed.com

Timothy J. Becker (admitted *Pro Hac Vice*)
Carolyn G. Anderson (admitted *Pro Hac Vice*)
Anne T. Regan (admitted *Pro Hac Vice*)
ZIMMERMAN REED P.L.L.P.
651 Nicollet Mall, Suite 501
Minneapolis, Minnesota 55402
Telephone: 612.341.0400
Email: tjb@zimmreed.com

Richard A. Lockridge (admitted *Pro Hac Vice*)
Gregg M. Fishbein (admitted *Pro Hac Vice*)
Mary E. Briedé (admitted *Pro Hac Vice*)
LOCKRIDGE GRINDAL NAUEN, P.L.L.P.
100 Washington Avenue South, Suite 2200
Minneapolis, Minnesota 55401
Telephone: 612.339.6900
Email: gmfishbein@locklaw.com

***Attorneys for Plaintiffs***

**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF ARIZONA**

| | |
|---|---|
| John Haritos, et al.,<br><br>Plaintiffs,<br><br>vs.<br><br>American Express Financial Advisors, Inc., n/k/a Ameriprise Financial, Inc.,<br><br>Defendant. | Case No.: 02-2255 PHX-PGR<br><br>**THIRD AMENDED CLASS ACTION COMPLAINT FOR BREACH OF FIDUCIARY DUTY AND FRAUD UNDER THE INVESTMENT ADVISERS ACT** |

## OVERVIEW

1. This Class Action Complaint is brought on behalf of the above-named Plaintiffs and a class of individuals who purchased Financial Plans from American Express Financial Advisors, Inc. ("AEFA"). The allegations in this Complaint are directed at

AEFA for its violations of the Investment Advisers Act of 1940, 15 U.S.C. § 80b-1 et seq., (the "Advisers Act"). This Complaint alleges AEFA breached the fiduciary duties it owed to its clients by failing to disclose material conflicts of interest at the time that disclosure is required – namely, prior to the prospective client's purchase of financial advisory services, when clients are making their decision to purchase AEFA's financial investment advice.

2. AEFA is an Investment Advisor Firm that offers a variety of financial planning services to the public through its sales force of some 10,500 financial Advisors. These financial services include, but are not limited, to the sale of financial planning services, the sale of various insurance related products (chief amongst them being variable life insurance and disability insurance), annuities and an assortment of other investment related products. AEFA holds itself out to the public, and is registered with the Securities Exchange Commission (SEC), as a "financial Advisor" under the Advisers Act. As such, AEFA and its army of financial Advisors owe a fiduciary duty to each and every one of their respective clients.

3. The focus of this lawsuit revolves around AEFA's (and its Advisors') breach of their fiduciary obligations in connection with the sale of financial planning services. As fiduciaries, AEFA and its Advisors were required to be scrupulously forthright, honest and candid with their clients, to place the interests of their clients above their own, and to supply every client with all the information that a reasonable investor might consider relevant. Unbeknownst to Plaintiffs and the Class, however, AEFA failed to disclose critical conflicts of interest that were embedded within the financial planning services it offered. And, while its is clear that AEFA's sales force delivered a pre-determined "sales pitch" following a prescribed and time-tested formula, the crux of this lawsuit is not about what AFEA told its potential clients. Instead, this case is about *what AFEA failed to tell* its customers (i.e., AEFA's uniform omissions and surreptitious scheme).

4. AEFA's failure to disclose the existence of blatant conflicts of interests was endemic in the relationship between AEFA's sales force and their investing clients. Specifically, AEFA requires that its Financial Advisors sell financial planning services. In establishing its sales tactics, the Company creates a public image designed to foster the belief that AEFA is a "trustworthy" provider of "objective," unbiased, customized financial advice. The Advisors, in turn, acting pursuant to pre-determined company guidelines, sell the financial planning services under the guise that the client will receive "objective" financial planning advice. However, while the company promised "objective" financial planning, it actually delivered a platform to peddle AEFA products. This scheme was never disclosed to its clients and included, but was not limited to:

a. AEFA's refusal to disclose that it did not sell any form of non-proprietary variable life insurance or annuities;

b. AEFA's refusal to disclose that its Advisors had a direct financial incentive, through both cash incentives and higher commissions to push the sales of variable insurance and annuities over other investment devices;

c. That AEFA Advisors received higher commissions for the sale of proprietary mutual funds than the sale of nonproprietary mutual funds from 1999 through 2002;

d. That required its Advisors to pay the "ticket charges" associated with trades on nonproprietary mutual funds, but paid the ticket charges for proprietary products;

e. AEFA's failure to disclose that management's and senior executive's bonuses, which were directly related to their ability to increase the volume of proprietary sales over nonproprietary sales, posed a "conflict of interest" from 1999 through 2003;

f. AEFA's creation of incentive schemes designed to pay Financial Advisors cash bonuses for selling insurance products (bonuses were only paid on the sale of proprietary insurance products and the scheme specifically excluded the sale of nonproprietary insurance products);

g. AEFA's efforts to enter into agreements with certain mutual fund families where it received kick-backs from the funds for the sale of their products;

h. AEFA's decision to provide Advisors with extravagant prizes that ranged from actual cash awards, paid by managers to their subordinates, to all expense paid trips at luxury resorts for Advisors who demonstrated an ability to sell proprietary products;

i. That advancement within the Company, specifically from the Advisor ranks to management (and its accompanying bonus structure) was predicated on the ability of the Advisor to sell proprietary products; and

j. Management's development of a "hit list" of their "worst offenders" designated as persons who were selling unsatisfactory levels of proprietary products.

5. In the end, each of these schemes created a conflict of interest between the "objective" advice promised to the client and the Advisor's (or managements') financial well-being. None of these schemes were expressly disclosed to the clients in any of the sale literature provide to the client *at the time* they purchased their financial planning services. Throughout the class period, AEFA was keenly aware that these schemes created material conflicts of interest between itself and its client. Evidencing as much, in April of 2004, in response to mounting regulatory and public pressure, AEFA altered its so-called "disclosures" to expressly state that "a conflict of interest" existed between the Advisors and their clients. AEFA knew that a conflict of interest existed, yet it specifically kept that information hidden from its clients during the Class Period. As a

consequence, the investing public unknowingly purchased Financial Plans laden with products that were in the best interest of and most profitable for AEFA.

6. Accordingly, Plaintiffs and the Class, seek restitution for the fees paid to AEFA for the financial planning services purchased throughout the time Class Period. The Class is entitled to rescission because AEFA's failure to disclose the existence of these conflicts was in direct violation of the fiduciary obligations owed to its clients.

## JURISDICTION AND VENUE

7. Federal subject matter jurisdiction exists pursuant to Title 28 U.S.C. § 1331 and Title 15 U.S.C. § 80b-14 (Advisers Act).

8. Venue is proper in this district pursuant to Title 28 U.S.C. § 1391(b) and Title 15 U.S.C. § 80b-14.

9. Throughout the Class Period, Defendant AEFA has continuously and systematically transacted business in this District, and has perpetrated the acts giving rise to the violations complained of in this District and nationwide.

## THE PARTIES

10. Plaintiffs are all present or former AEFA clients who purchased a Financial Plan and seek rescission of that contract.

a. Plaintiff John Haritos was, at all relevant times, a resident of this District, and a prospective or actual client of AEFA. On July 6, 2000, Mr. Haritos signed a Financial Advisory Service (FAS) Agreement with AEFA and purchased AEFA's Financial Advisory Service for the sum of $500, discounted by $350 due to American Express Card Membership Reward Points.

b. Plaintiffs David Austin and Emily Austin, husband and wife, were, at all relevant times, residents of Phoenix, Maryland, and prospective or actual clients of AEFA. On November 28, 2000, the Austins signed a Financial

Advisory Service (FAS) Agreement with AEFA and purchased AEFA's Financial Advisory Service for the sum of $550.

c. Plaintiff Michael Tooley was, at all relevant times, a resident of Richmond, Virginia, and a prospective or actual client of AEFA. On February 5, 2004, Mr. Tooley signed a Financial Advisory Service (FAS) Agreement with AEFA and purchased AEFA's financial advisory services for the sum of $500, reduced by $100 because of a Costco membership discount.

d. Plaintiff Omar Shahine was, at all relevant times, a resident of San Francisco, California, and a prospective or actual client of AEFA. On March 12, 2004, Mr. Shahine signed a Financial Advisory Service (FAS) Agreement with AEFA and purchased AEFA's financial advisory services for the sum of $1200, reduced by a Microsoft employee discount of $100.

11. Defendant American Express Financial Advisors, Inc. ("AEFA") is an investment advisor firm with offices in this District and throughout the United States. AEFA is a Delaware corporation whose principal place of business is located in Minneapolis, Minnesota. The Company owns, manages and administers over $400 billion in assets. On August 1, 2005, AEFA became known as Ameriprise Financial, Inc. ("Ameriprise").

## FACTUAL ALLEGATIONS

### *A. Defendant's Course of Conduct: AEFA's Public Image*

12. American Express was founded in 1850 as a messenger service. In 1958, American Express entered the credit card business. In 1984, American Express acquired IDS Life Insurance and IDS Financial Services. Since then it has advertised that "Since 1894, we've been helping millions of people reach their personal and business financial goals."

13. Historically, AEFA and its predecessor, IDS Life, were in the life insurance business. The Company offered certain products manufactured by itself in the form of variable and term life insurance, disability insurance and certain investment related services (like mutual funds). These products were referred to as "proprietary products" because they were either owned and/or manufactured by AEFA.

14. In order to better sell financial planning services (and in turn its proprietary products) to its prospective customers, AEFA conducted extensive market research regarding the sale of financial planning services. That market research established that prospective clients look for "trustworthy" and "objective" advice from financial planners before they will purchase financial planning services. Recognizing this, AEFA utilized these concepts (i.e., that its Advisors are "trustworthy" and would render "unbiased, objective" advice) in an effort to grow the number of clients who purchase financial planning services and, in turn, increase the company's assets under management.

15. AEFA actively cultivated the image of a trustworthy fiduciary/Advisor by broadcasting messages nation-wide through the mail, telephone, print, radio, television, the Internet, and elsewhere. These messages sought to induce members of the public to "realize their financial dreams" by employing AEFA as their financial Advisor.

***B. An Overview of AEFA's Business and How the Company Makes Money.***

16. AEFA's sales force is comprised of approximately 10,500 financial Advisors. Since March 2000, AEFA has categorized these Advisors as either "Platform 1" (P1) or "Platform 2" (P2) Advisors. Prior to March 2000, AEFA's Advisor-agents were simply referred to as "Advisors" or "personal financial Advisors." These Advisors act as investment Advisors and broker-dealers.

17. P1 Advisors are AEFA employees. P2 Advisors are AEFA franchisees, and are required to maintain AEFA's brand standards.

18. Whether classified as a P1 or P2 Advisor, all AEFA Advisors are subject to supervision and oversight by Field Leaders (i.e., managers and field executives) and the Home Office. Both P1 and P2 Advisors are required to comply with business and brand goals established by the Home Office, and are compensated based upon performance standards established at the Home Office. All Advisors must use AEFA's approved software tools and must participate in AEFA's ongoing training and education.

19. The Advisor-Agent Sales Force is supervised and managed by Field Leaders in regional Market Groups. Each Market Group is headed by a Group Vice President, who in turn supervises several Field Vice Presidents. Advisor-agents, whether P1 or P2, communicate chiefly with the Field Vice Presidents and branch managers, though Advisors often interact with Group Vice Presidents through email, training, and marketing events. Group Vice Presidents are responsible for the overall sales results of the Market Group and report to one of four Senior Vice Presidents. Additionally, Group Vice Presidents oversee human resources, leadership development, and training of Advisors. Field Vice Presidents are largely responsible for helping Advisors develop their business objectives and goals.

20. AEFA makes its profits in two ways: 1) through "manufacturing" margins and 2) through "distribution" margins. Specifically, when AEFA manufactures (i.e., creates) a product line, whether it is a mutual fund, life insurance product, annuity or the sale of financial planning services, the company generates a "manufacturing" margin. This margin is obtained by selling the product for more than development costs. Conversely, when AEFA sells another company's product (e.g., a competitor's mutual fund), its profit is limited to what the company receives from acting as a distributor (i.e. a "distribution margin").

21. Manufacturing margins are considerably more profitable to the company than distribution margins. In fact, AEFA recognizes that as much as 90% of the company's

profits stem directly from manufacturing margins. Manufacturing margins, in turn, only exist when a financial Advisor sells a client a proprietary product.

22. AEFA earns manufacturing margins on proprietary products. Proprietary products are either products that American Express Financial Corporation (AEFC) or its affiliates manufacture, or products that AEFC and AEFA have "cobranded" with another manufacturer. They include American Express (AXP) mutual funds, IDS long-term care insurance, IDS disability insurance, IDS life insurance, IDS annuities, IDS property and casualty insurance, savings certificates, and sub-advised funds.

23. Sub-advised, or subaccount, funds are mutual funds that may be manufactured by outside companies, but which are "cobranded" with American Express and sold to a client through an IDS insurance or annuity product. AEFA expressly represents that it "owns" these funds as if they were AXP Mutual Funds. Beginning in 2004, AEFA also began to use the sub-accounts in its wrap mutual fund product and Strategic Portfolio Services (SPS), both of which are proprietary products.

24. Nonproprietary products are manufactured by an outside entity and are sold in a brokerage account. AEFA distributes these brokered products through its Advisor-sales force and only earns a distribution margin on these products.

25. Starting in the late 1990s, AEFA began to recognize a correlation between increased profit from manufacturing margins and the sale of financial planning services. Specifically, AEFA conducted detailed and comprehensive studies to evaluate the relationship between the sale of a financial plan *and* the sale of *future* AEFA products. Those studies underscored three critical components: 1) the likelihood of a sale increased when the client believed the Advisor was "*objective*," 2) that if clients are charged a fee for financial planning, they will have more confidence in the service (i.e., believe the "Financial Plan" is reliable); and 3) a client who purchased a Financial Plan would be far likelier to purchase proprietary (high margin) products. In fact, AEFA

learned that clients with Financial Plans purchased 3-4 times more products than those clients who did not buy financial planning services. Accordingly, throughout the Class Period, AEFA blasted its Advisors and field leaders with messages about increasing the number of "Initial Clients with a Plan" (ICWP) (i.e., new customers to AEFA whose "initial" purchase was financial planning services). By selling Financial Plans to these new AEFA clients, AEFA predicted increased sales of its own manufactured products.

26. In this sense, the financial planning arrangement was little more than a bait and switch; the prospect of "unbiased" financial planning and subsequent sale of objective financial products was the "bait" AEFA used to "switch" its prospective customers to purchase more proprietary products (thereby increasing its own profits). AEFA failed to disclose to its clients either its elaborate scheme or the inherent conflicts of interest in its corporate goal to push the sale of proprietary products.

### *C. The "Prop Wars" – AEFA Reacts to the Influx of Nonproprietary Products.*

27. For years, the vast majority of products sold by AEFA, and its predecessor, IDS, were proprietary products (i.e., products manufactured, developed, and/or "owned" by AEFA). In fact, unbeknownst to its customers, well into 2000, the Company offered few, if any, nonproprietary products. This meant that AEFA's sales force was virtually required to sell proprietary products to its AEFA clients because there were simply no nonproprietary products to offer. None of this was ever disclosed to prospective AEFA clients. Instead, clients were told they would receive objective, customized financial advice – not from a salesperson who would want to push products – but from an unbiased financial Advisor.

28. In fact, to this day AEFA does not offer any form of nonproprietary annuity or variable life insurance. Further, the investment components within the annuities and variable life policies are exclusively made up of either proprietary funds or funds that

AEFA owns. None of this was expressly disclosed to prospective clients prior to purchasing financial planning services, throughout the Class period.

29. With the explosion of mutual funds in the late 1990's, AFEA came under increasing pressure to allow its clients access to nonproprietary mutual funds. However, the availability of nonproprietary products caused AEFA mounting difficulty in selling its own products and in turn maximizing its profit.

30. In an effort to respond to this trend, AEFA undertook a series of initiatives, (none of which were ever clearly disclosed to its clients), designed to maximize the sale of its proprietary products while creating the appearance of considering all financial products. These initiatives included, but were not limited to, the following:

a. AEFA's policy, throughout the class period, prohibiting Advisors from selling nonproprietary variable life and/or annuities;

b. From 1999 through 2002, AEFA paid higher commissions to Advisors who sold proprietary mutual funds rather than nonproprietary mutual funds;

c. AEFA created incentive schemes that rewarded Advisors with cash, trips and prizes for the sale of proprietary products;

d. From 2002 through the present, AEFA maintained a national incentive scheme for the sale of insurance with awards up to $36,000 for achieving certain levels of sales of proprietary insurance products; and

e. From 1999 through 2004, AEFA incentivized managers and executives based upon their market group's level of proprietary sales. For example, during this time period, management and executives received a 3:1 (i.e., three hundred percent) larger bonus for the sale of proprietary versus nonproprietary products.

31. Each of these incentives was implemented with the express purpose of increasing the level of proprietary sales (including variable insurance and annuities) and *none* of the incentives were adequately disclosed to clients who purchased financial planning services. Proprietary sales were so critical to AEFA that in 2001, the Chief Executive Officer of the Company issued an edict noting the importance of proprietary sales and demanding the sales force increase the level of proprietary sales on a company-wide basis.

32. The failure to disclose these incentives was recently identified by the New Hampshire Bureau of Securities Regulation ("New Hampshire Regulatory Action"). Specifically, the New Hampshire Regulatory Action, like this case, alleged AEFA and its sales force were entangled in a series of material conflicts of interest involving the sale of financial planning services and proprietary products. Ultimately, Defendants settled the case. In the Settlement Agreement, which is public record, AEFA specifically agreed not to challenge the fact that the Company pressured its Advisors to sell proprietary products stating:

> [A]EFA agents, acting as both investment adviser representatives and broker-dealer agents, operated in a system in which they were pressured to sell and were rewarded when they sold American Express proprietary mutual funds.

*See In re American Express Financial Advisors Inc.*, *Settlement Agreement*, attached as Exhibit A to this Complaint.

33. The New Hampshire Regulatory Action further confirmed, that *"[t]his conduct constituted a scheme to defraud* fee-paying advisory clients in that the investment advice rendered was in many instances not in the best interest of the client but instead was tailored toward what would make the most profit for AEFA." *See Settlement Agreement* at ¶ 6.

34. As the New Hampshire Regulatory Action found, and as Plaintiffs here have alleged since November 2002 in their original Complaint, unbeknownst to Plaintiffs or the Class, financial incentives existed at AEFA specifically designed to promote the sale of proprietary products over nonproprietary products. None of these schemes, incentive programs and compensation packages were ever fully disclosed to prospective clients *at the time* they purchased their so-called "objective" financial planning services.

***D. The Financial Planning Process***

35. In an effort to increase the likelihood of a sale of financial advisory services and investment products, AEFA offers prospective clients "free" initial consultations. During the "free" consultation, the Advisors implemented a time tested, company wide best practice known as the Personal Money Management Interview (the "PMM Interview"). At its core, the PMM Interview is a high-pressured sales pitch specifically designed to get clients "worried" about the state of their financial affairs.

36. The PMM Interview is a ten-step process designed to convert prospective clients into actual clients of AEFA's financial advisory services. Unbeknownst to the client, it is also a hook to ensure future sales of AEFA products (i.e., future revenue to the Company).

37. The PMM Interview process is a company best practice that AEFA advisors are expected to follow irrespective of tenure. The Company requires new Advisors to memorize "scripts" for the PMM Interview. Managers role-play with less tenured Advisors to ensure proficiency with the PMM Script and PMM Interview process. More senior Advisors, while not required to adhere to the script verbatim, are expected to discuss the principles outlined in the PMM Interview process.

38. The goal of each PMM Interview is to sell AEFA's Financial Advisory Services, i.e., AEFA's Financial Plans. Advisors are taught to create "a sense of urgency" regarding the client's financial well being and to "gain commitments" to

engage in financial planning. When the prospective client expresses reluctance to purchase a financial plan (what AEFA terms "resistance"), the Advisor is taught techniques to overcome the resistance and to close the sale, all under the guise of providing "trusted," "objective" advice.

39. Unbeknownst to the prospective client, however, the real purpose of the PMM Interview and subsequent financial planning process is not to provide either "trusted" or "objective" advice. Instead the purpose of the PMM interview is to sell Financial Plans that will, in turn, invariably push AEFA's proprietary products.

40. When a prospective client appears ready to purchase financial planning services, the Advisor quotes the client a fee and presents the FAS Agreement and accompanying FAS Brochure (which together are known as the Form ADV). The FAS Brochure is a thirty plus page document largely written in eight point font. Advisors are taught to spend less than ten minutes discussing the content of the FAS Brochure, and instead, focus on fostering a sense of urgency for the client to engage in financial planning services. In fact, of the hundreds of training manuals provided to new and senior Advisors, not one deals directly with how to clearly communicate the disclosures in the FAS Brochure.

41. However, even if Advisors were taught to discuss the limited disclosures contained in the FAS Brochure, the discussion would be of little help to the prospective client. This is because the disclosures fall woefully short of notifying the prospective client of the existence of material conflicts of interest. For example, at times throughout the Class Period, AEFA failed to disclose the following to prospective clients:

a. That direct conflicts of interest exist between the Advisor and the client;[1]

[1] At all times throughout the Class period, AEFA knew that a conflict of interest existed between the client and their respective Advisor, yet refused to disclose the conflict or in any way warn the client. Evidencing this knowledge is the following: 1) AEFA conceded as much in the Settlement Agreement it executed with the State of New Hampshire acknowledging that it engaged in a "scheme to defraud" its customers (*see Settlement Agreement* attached hereto as Exhibit A); and 2) on April 1, 2004 on the first

b. That AEFA was, first and foremost, an insurance company in the business of selling insurance and annuities;

c. That Advisors were not allowed to sell any form of nonproprietary variable life insurance or annuities;

d. That AEFA Advisors had a direct financial incentive, through both a bonus scheme and higher commission structure to push the sales of variable insurance and annuities over other investment mechanisms and could receive up to a $36,000 bonus for the sale of insurance products;

e. That AEFA Advisors had a direct financial incentive, through higher commissions, to push the sale of proprietary mutual funds over nonproprietary products;

f. That after 2001, AEFA Advisors had a direct financial incentive to push proprietary products since AEFA required Advisors to pay the "ticket charges" associated with trades on nonproprietary mutual funds, while AEFA paid the ticket charges for proprietary products;

g. That AEFA management and senior executives received bonuses directly related to their ability to increase the volume of proprietary sales over nonproprietary sales and that this policy created a conflict of interest;

h. That AEFA entered into agreements with certain mutual fund families where it received kick-backs from the funds for the sale of their products, which management monitored;

---

full page of the FAS Brochure in big font, bold print and bulleted AEFA specifically told prospective clients that a "conflict of interest" existed between the client and the Advisor. Nothing in the financial planning relationship changed from March 31, 2004 to April 1, 2004. The *only* difference was the AEFA, under mounting regulatory pressure, acknowledged in clear and concise language that the "advice" its Advisors provided was riddled with conflicts of interest.

i. That extravagant prizes, including cash awards, and all-expense-paid trips to luxury resorts, were provided by managers to AEFA employees and Advisors who demonstrated an ability to push proprietary products; and

j. That advancement within the Company, specifically from the Advisor ranks to a Field Leader position (and its accompanying bonus structure) was largely predicated on the ability to sell proprietary products.

42. After the Advisor receives the client's signature on the FAS Agreement, the Advisor is required to create the client's Financial Plan with AEFA-approved software.

43. Each of the Named Plaintiffs and the Class purchased financial advisory services from AEFA unaware of these schemes or the numerous conflicts of interests the Advisors had in the transaction.

## CLASS ALLEGATIONS

44. Plaintiffs restate and reallege each and every allegation set forth in the paragraphs above as if stated herein.

45. The Named Plaintiffs to this action, John Haritos, David and Emily Austin, Michael Tooley and Omar Shahine bring this action on their own behalf respectively, and pursuant to Rule 23(b)(3) of the Federal Rules of Civil Procedure as a class action on behalf of the following Class:

> All individuals who purchased Financial Plans with American Express Financial Advisors (AEFA) between November 8, 1999 and April 1, 2004 and whose initial purchase with AEFA was for Financial Advisory Services (FAS). Excluded from the Class are current and former Advisors and employees of American Express or its affiliates, and those who are barred from asserting further claims against AEFA under the *Benacquisto et al. v. American Express Financial Corp.* settlement agreement.[2]

[2] In the *Benacquisto* action, American Express paid over $215 million to settle claims that it engaged in a policy of churning clients' cash value life insurance policies and annuities. The *Benacquisto* settlement agreement bars all class members -- who purchased cash value life insurance or annuities prior to March 1, 2000 -- from asserting any further claims.

46. *Numerosity*: The members of the Class are so numerous that joinder of all members is impracticable. AEFA has offices throughout the United States and has approximately 10,500 financial Advisors. Since 1999, as a result of the corporate emphasis on selling financial planning services, the number of financial plans sold by AEFA had increased by approximately 75 percent. In 2000, AEFA sold approximately 177,000 financial plans. The number of plans sold in 2004 had increased to 234,000. During the Class Period, the number of customers who purchased a Plan and thus qualify for inclusion in the Class likely exceeds 500,000.

47. *Commonality*: Common questions of law and fact exist as to all Class Members and predominate over any questions solely affecting individual members of the Class. Common questions of fact exist concerning AEFA's uniform, fraudulent, and manipulative course of business, include:

a. Whether AEFA had uniform nondisclosures regarding incentives to recommend proprietary and preferred products,

b. Whether AEFA had uniform nondisclosures regarding AEFA's secret revenue-sharing agreements with other financial services companies, which created incentives to recommend those companies' products;

c. Whether AEFA had uniform training of its financial Advisors;

d. Whether AEFA management pressured financial Advisors to recommend proprietary over nonproprietary products;

e. Whether AEFA Advisors' financial planning recommendations were scripted and automated;

f. Whether AEFA trained and employed its financial Advisors to routinely and systematically sell financial planning services without disclosing various conflicts of interests;

g. Whether AEFA's written materials provided to FAS clients prior to purchasing financial planning services uniformly failed to disclose various conflicts of interest;

h. Whether AEFA Advisors generally promoted more American Express proprietary products than nonproprietary products to their clients; and

i. Whether AEFA Advisors or managers were compensated more for selling proprietary products than nonproprietary products.

Common questions of law exist because this case alleges a single cause of action—AEFA's breach of its fiduciary duty to its advisory clients by failing to disclose, prior to the client's payment for financial planning fees, the existence of material conflicts of interest that impaired the financial Advisor-agent's ability to render unbiased and objective investment advice. Common questions of law include:

a. Whether AEFA's conduct operated as a fraud or deceit upon its clients or prospective clients;

b. Whether AEFA breached its fiduciary duties to Plaintiffs and Members of the Class;

c. Whether AEFA violated the Investment Advisers Act; and

d. Whether Plaintiffs and the Class Members are entitled to rescind their purchases of financial planning services purchased from AEFA.

48. *Typicality*: The Named Plaintiffs' claims are typical of the claims of the Class because AEFA failed to disclose and or intentionally omitted the information set forth above from each of the Named Plaintiffs and the Class. Thus, each of the omissions described above applies to each Named Plaintiff in a manner identical to that of the rest of the Class. As noted above, the central allegations in this case involve AEFA's failure to disclose the existence of certain conflicts of interest between the Company, its sales

force and its clients, presenting a mixed question of law and fact. Specifically, AEFA's failure to disclose included, but is not limited to the following:

a. That a conflict of interest existed between the Advisor and the client;

b. That AEFA was, first and foremost, an insurance company in the business of selling insurance and annuities;

c. That AEFA also holds itself out as a broker-dealer, selling mutual fund products;

d. That Advisors were not allowed to sell any form of nonproprietary variable life insurance or annuities;

e. That AEFA Advisors had a direct financial incentive, through both a bonus scheme and higher commission structure to push the sales of variable insurance and annuities over other investment mechanisms and could receive up to a $36,000 bonus for the sale of insurance products;

f. That AEFA Advisors received higher commissions for the sale of proprietary mutual funds than nonproprietary mutual funds;

g. That after 2001 AEFA required Advisors to pay the "ticket charges" associated with trades on nonproprietary mutual funds while AEFA paid the ticket charges for proprietary products;

h. That AEFA management and senior executives received bonuses directly related to their ability to increase the volume of proprietary sales over nonproprietary sales and that this policy created a conflict of interest;

i. That AEFA entered into agreements with certain mutual fund families where it received kick-backs from the funds for the sale of their products, which management monitored; and

j. That extravagant prizes ranging from actual cash awards, paid by managers to their subordinates, to all-expense-paid trips to luxury resorts,

were provided to AEFA employees and Advisors who demonstrated an ability to sell proprietary products.

49. *Adequacy*: The Named Plaintiffs will adequately and vigorously defend the interests of the Class. To date, each Named Plaintiff has participated in discovery, including, but not limited to, producing documents, answering interrogatories, answering request for admissions, and providing deposition testimony. The Named Plaintiffs will continue to vigorously protect the interest of the Class. The proposed Class Counsel, Zimmerman Reed, PLLP and Lockridge Grindal Nauen, PLLP are seasoned, experienced litigators in the area of class action litigation. Class Counsel have demonstrated their ability to adequately protect the interests of the Class and will do so throughout the pendancy of this lawsuit

50. *Predominance*: The central allegations in this case revolve around allegations of AEFA's fraudulent course of conduct. These liability issues predominate over all other issues and include, but are not limited to: 1) AEFA's failure to disclose the existence of certain conflict of interest as described above; 2) AEFA's uniform so-called disclosures provided to its clients in the FAS Agreement and FAS Brochure; and 3) AEFA's uniform sales techniques used in connection with the PMM Interview process and the sale of financial planning services.

51. *Superiority*: Prosecution of these actions as a class is far superior to that of individual litigation. Specifically, individual actions create the risk of inconsistent adjudications. Given AEFA's pervasive presence in the market place, coupled with the vigor under which it has defended this case, the cost of prosecuting this action means that a class is not merely the best way to advance Plaintiffs' rights, but the only way.

52. *Manageability*: Manageability will not be an impediment to certifying this case as a class action. Adequate procedures will be available not only to identify the potential class members, but also to determine the amount of rescissory damages to

which they would be entitled. Significantly, the New Hampshire Regulatory Settlement signifies that this Class is not only certifiable, but that it is manageable. Specifically, in that settlement AEFA agreed that it could identify all ICWPs (i.e., every client on a client-by-client basis who purchased a plan and the date that he or she purchased it) *and* the individual recommendations made in connection with the plan on a plan-by-plan basis for each plan sold in the State of New Hampshire over a four year period. *See Settlement Agreement* attached hereto as Exhibit A ¶ 4 at pg 5. The requirements of the New Hampshire settlement are incredibly more onerous for both the Court and AEFA than those required in this case. There will be little or no difficulty managing this class action.

**COUNT I: VIOLATIONS OF**

**THE INVESTMENT ADVISERS ACT**

**15 U.S.C. § 80b-6, 80b-15**

53. Plaintiffs reassert and reallege each and every allegation set forth in the paragraphs above as if stated herein.

54. Applicability of the Investment Advisers Act of 1940 – The Advisers Act section 15 U.S.C. § 80b-6 (Prohibited transaction by investment advisers) provides in relevant part:

> It shall be unlawful for any investment adviser by use of the mails or any means or instrumentality of interstate commerce, directly or indirectly:
>
> (1) to employ any device, scheme, or artifice to defraud any client or prospective client;
>
> (2) to engage in any transaction, practice, or course of business which operates as a fraud or deceit upon any client or prospective client;
>
> ***
>
> (4) to engage in any act, practice, or course of business which is fraudulent, deceptive, or manipulative."

55. The Advisers Act reflects a congressional intent to eliminate, or at least to expose, all conflicts of interest which might incline an investment adviser – consciously or subconsciously – to render advice which was not disinterested. *See SEC v. Capital Gains Research Bureau, Inc.*, 375 U.S. 180, 191-92 (1963). As a registered financial Advisor, AEFA (and its agents) is bound by a fiduciary duty to each financial client who purchased financial services from the Company. Plaintiffs here allege that AEFA was *bound* by that fiduciary duty on a class-wide basis and *breached* that duty on a class-wide basis, making the claims of more than 500,000 former AEFA financial clients most efficiently and most appropriately handled as a Class

56. Pursuant to the Advisers Act, AEFA and its agents were bound by a legally imposed fiduciary duty to act in the best interest of their clients. AEFA owed Plaintiffs and the Class a duty to act with reasonable care in training and supervising its agents, and to ensure that full, honest, and adequate disclosure was made to each client.

57. Instead, AEFA breached its duty by failing to disclose material information to its fee-paying clients and operated sales programs that contaminated the entire financial advice process. This included, but is not limited to, the allegations set forth in the Complaint. By this conduct, AEFA affirmatively breached its duties and conducted its business in a manner that operated as a fraud and deceit upon its investment Advisor customers.

58. As a result of Defendant's breaches, AEFA's advisory clients, who were the subject of this scheme, were damaged and are entitled to rescission of their investment advisory contracts and entitled to recover all fees paid in connection with their purchases pursuant to such contracts.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs pray for relief and judgment, as follows: