# UNITED STATES DISTRICT COURT
# DISTRICT OF MINNESOTA

Lesa Benacquisto, Daniel Benacquisto, Richard Thoresen, Elizabeth Thoresen, Arnold Mork, Isabella Mork, Ronald Melchert, and Susan Melchert, on behalf of themselves and all others similarly situated,

Plaintiffs,

vs.

American Express Financial Corporation, American Express Financial Advisors, American Centurion Life Assurance Company, American Enterprise Life Insurance Company, American Partners Life Insurance Company, IDS Life Insurance Company, and IDS Life Insurance Company of New York,

Defendants,

Civil No. 00-cv-01980 DSD/JMM

**EXHIBIT LIST IN RESPONSE OF DR. G. ALLEN WEST AND BARBARA WEST ("Claimants") TO MOTION TO ENFORCE CLASS-ACTION SETTLEMENT AS TO CLAIMANTS PRESENTED TO THE NASD**

| Exhibit | Description |
|---|---|
| A | Affidavit of G. Allen West |
| B | Affidavit of Barbara West |
| C | Statement of Claim |

# Exhibit A

**NATIONAL ASSOCIATION OF SECURITIES DEALERS, INC.**
**ARBITRATION**

| | | |
|---|---|---|
| In the Matter of the Arbitration Between: | ) | |
| | ) | |
| Dr. G. Allen and Barbara West | ) | |
| | ) | |
| Claimants, | ) | |
| | ) | **NASD Case No. 06-00952** |
| v. | ) | |
| | ) | |
| Ameriprise Financial Services, Inc. and IDS Life Insurance Co. | ) | |
| | ) | |
| Respondents | ) | |

** ** ** ** **

AFFIDAVIT OF G. ALLEN WEST

Comes the Affiant, G. Allent West, and having been duly sworn, states as follows:

1. I am G. Allen West, a resident of Louisville, Jefferson County, Kentucky, and the husband of Barbara West, and I am currently ninety-one (91) years of age, and retired from the ministry after serving as a pastor for approximately forty-five (45) years;

2. In September, 1998, my wife and I met with Mr. Steve Pippen, an American Express (now, Ameriprise) agent and representative regarding my wife's IRS, and at this meeting, Mr. Pippen volunteered advice on an Aegon Insurance Company policy owned by us, which then had a death benefit of $178,872.00, and today would have a death benefit of $251,204.00;

3. Mr. Pippen advised us to convert our Aegon policy, explaining that the conversion would eventually provide my wife with a far better death benefit of $300,000.00;

4. In September, 1998, and based on Mr. Pippen's advice, we allowed Mr. Pippen to invest the cash surrender value of our Aegon policy into a Variable Universal Life Insurance with IDS;

5. In November, 2000, my wife and I received a document relating to a class action involving IDS, and on or about November 27, 2000, we contacted Mr. Pippen's office to inquire about the notice, and we were advised that we did not need to do anything with these papers unless, for some reason, we wanted to make a claim against IDS; at this point in time, we had no knowledge of any reason for any claim on our behalf against either IDS or American Express or Mr. Pippen;

6. From October, 1998 through the end of June, 2003, the death benefit on this newly acquired IDS policy remained steady at $235,000.00, and we did not know of any reason to suspect the soundness of the investment, or the advice which had been provided by Mr. Pippen;

7. On or about July 26, 2003, my wife and I received an IDS statement which showed that the death benefit on that policy had plummeted to $93,000.00;

8. On July 28, 2003, my wife and I met with Mr. Pippen to confer with him and inquire as to this substantial loss in our investment, and Mr. Pippen again confirmed that he had projected the death benefit to reach $300,000.00, and he blamed the significant loss on the fluctuations in the stock market, which we did not understand;

9. As of November 17, 2005, my wife and I were advised by an Ameriprise representative that our IDS policy would likely expire within five (5) years, and that it had a cash surrender value of approximately $34,000.00;

10. My wife and I have never received, or been advised, of any benefit due us in

connection with any class action involving our IDS policy or investment.

Further, the Affiant sayeth naught.

G. Allen West

Dr. G. Allen West

Date: June 29, 2006

COMMONWEALTH OF KENTUCKY )
) SS.
COUNTY OF JEFFERSON )

The foregoing instrument was sworn to and/or affirmed before me, a Notary Public in and for said County and State, this 29th day of June, 2006, by DR. G. ALLEN WEST, who personally appeared before me, and provided sufficient evidence of identity, and who executed the foregoing instrument and affidavit, and acknowledged that he did examine and read same and did sign the foregoing instrument and affidavit, and that the same is his free act and deed.

In witness whereof, I have hereunto set my hand and official seal this 29th day of June, 2006.

Debra O'Connell

Notary Public, Kentucky, State-at-Large

My Commission expires: 5/19/07

# Exhibit B

**NATIONAL ASSOCIATION OF SECURITIES DEALERS, INC.**
**ARBITRATION**

| | | |
|---|---|---|
| In the Matter of the Arbitration Between:<br><br>Dr. G. Allen and Barbara West<br><br>Claimants,<br><br>v.<br><br>Ameriprise Financial Services, Inc. and IDS Life Insurance Co.<br><br>Respondents | ) | **NASD Case No. 06-00952** |

** ** ** ** **

AFFIDAVIT OF BARBARA WEST

Comes the Affiant, Barbara West, and having been duly sworn, states as follows:

1. I am Barbara West, a resident of Louisville, Jefferson County, Kentucky, and the wife of Dr. G. Allen West, and I am currently eighty (80) years of age;

2. In September, 1998, my husband and I met with Mr. Steve Pippen, an American Express (now, Ameriprise) agent and representative regarding my IRA, and at this meeting, Mr. Pippen volunteered advice on an Aegon Insurance Company policy owned by us, which then had a death benefit of $178,872.00, and today would have a death benefit of $251,204.00;

3. Mr. Pippen advised us to convert our Aegon policy, explaining that the conversion would eventually provide me with a far better death benefit of $300,000.00, on the life of my husband;

4. In September, 1998, and based on Mr. Pippen's advice, we allowed Mr. Pippen to invest the cash surrender value of our Aegon policy into a Variable Universal

Life Insurance with IDS;

5. In November, 2000, my husband and I received a document relating to a class action involving IDS, and on or about November 27, 2000, we contacted Mr. Pippen's office to inquire about the notice, and we were advised that we did not need to do anything with these papers unless, for some reason, we wanted to make a claim against IDS; at this point in time, we had no knowledge of any reason for any claim on our behalf against either IDS or American Express or Mr. Pippen;

6. From October, 1998 through the end of June, 2003, the death benefit on this newly acquired IDS policy remained steady at $235,000.00, and we did not know of any reason to suspect the soundness of the investment, or the advice which had been provided by Mr. Pippen;

7. On or about July 26, 2003, my husband and I received an IDS statement which showed that the death benefit on that policy had plummeted to $93,000.00;

8. On July 28, 2003, my husband and I met with Mr. Pippen to confer with him and inquire as to this substantial loss in our investment, and Mr. Pippen again confirmed that he had projected the death benefit to reach $300,000.00, and he blamed the significant loss on the fluctuations in the stock market, which we did not understand;

9. As of November 17, 2005, my husband and I were advised by an Ameriprise representative that our IDS policy would likely expire within five (5) years, and that it had a cash surrender value of approximately $34,000.00;

10. My husband and I have never received, or been advised, of any benefit due us in connection with any class action involving our IDS policy or investment.

Further, the Affiant sayeth naught.

Barbara West
Barbara West

Date: June 29, 2006

COMMONWEALTH OF KENTUCKY )
) SS.
COUNTY OF JEFFERSON )

The foregoing instrument was sworn to and/or affirmed before me, a Notary Public in and for said County and State, this 29th day of June, 2006, by BARBARA WEST, who personally appeared before me, and provided sufficient evidence of identity, and who executed the foregoing instrument and affidavit, and acknowledged that she did examine and read same and did sign the foregoing instrument and affidavit, and that the same is her free act and deed.

In witness whereof, I have hereunto set my hand and official seal this 29th day of June, 2006.

Debra O'Connell
Notary Public, Kentucky, State-at-Large

My Commission expires: 5/19/07

# EXHIBIT C

**NASD DISPUTE RESOLUTION**
**MATTER NO. __________**
**IN THE MATTER OF THE ARBITRATION BETWEEN**

**DR. G. ALLEN AND BARBARA WEST**

**CLAIMANTS**

**V.** **STATEMENT OF CLAIM**

**AMERIPRISE FINANCIAL f/k/a AMERICAN EXPRESS FINANCIAL ADVISORS, INC.** **RESPONDENT**

**IDS LIFE INSURANCE COMPANY** **RESPONDENT**

* * * * * * * * *

Dr. G. Allen and Barbara West ( "Wests"), by counsel, for their Statement of Claim against the Respondent, Ameriprise Financial f/k/a American Express Financial Advisors, Inc. ("American Express") and Respondent, IDS Life Insurance Company ( "IDS"), state as follows:

1. The Wests request an expedited hearing in this matter, given their advanced ages and questions concerning their health, as well as the basis of this claim which involves death benefit amounts in a life insurance policy. Dr. West is ninety years old (ninety-one in May 2006) and Mrs. West is eighty years old.

2. The Wests are now and were at all times referenced herein, residents of Louisville, Jefferson County, Kentucky.

3. American Express, is and was at all times referenced herein, a corporation duly organized and with headquarters in the state of Minnesota, and was authorized to conduct business in the Commonwealth of Kentucky. IDS is, and was at all time referenced herein, a corporation owned, controlled and operated by American Express. Steve Pippen was at all times

referenced herein an agent of American Express and IDS.

4. As a member of the NASD the Respondents and their agent Steve Pippen is bound to arbitrate this dispute. Additionally, the Respondents have also contractually bound themselves to arbitrate this dispute.

5. In September of 1998, Steve Pippen, an agent of American Express, met with the Wests and advised them to convert an insurance policy with Aegon Insurance Company, and invest its cash surrender value (and other cash) into a Variable Universal Life Insurance policy, with a represented death benefit of over $ 300,000.00.

6. During that same meeting, the Wests made it clear to Mr. Pippen that they could not afford any significant risks with their investment, in view of their advanced ages and the obvious importance and need of a life insurance policy.

7. During that same meeting, Steve Pippen did not disclose the relationship between American Express and IDS Life Insurance Company. In fact, at no time for any purpose did American Express or IDS disclose its relationship. He represented to the Wests that the life insurance would have a death benefit of well over $ 300,000.00.

8. Based upon Mr. Pippen's representations, the Wests agreed to follow his advice and entrusted their investment future to American Express. An agreement was reached and the Wests began to closely monitor their death benefit under the new variable life insurance policy. For some time, the death benefit remained steady at $ 235,000.00

9. On or about July 26, 2003, the West received an IDS statement showing their death benefit had plummeted to $ 93,000.00. Immediately, on or about July 28, 2003, the Wests contacted Mr. Pippen to confront him on the alarming plummet of their death benefit. Mr. Pippen

admitted he had told them they would receive at least $ 300,000.00 in their death benefit and blamed the plummet on the stock market.

10. On or about October 3, 2003, the Wests met with Mr. Pippen, wherein he promised to increase the death benefit but not to the previous mark of $ 235,000.00 or the amount of $ 300,000.00. From that point, the Wests' death benefit never increased again.

11. From October of 2003 to October of 2004, the Wests attempted to work with American Express to recover some of their original cash value, but American Express refused to assist them. American Express dismissed their claims and advised them, on October 12, 2004, that they were closing their handling of the matter.

12. American Express, through its agent, Steve Pippen, had a duty to the Wests to properly manage and/or invest the Wests' account, specifically that of their death benefit, and breached that duty. American Express, through its agent, Steve Pippen was negligent and grossly negligent in its management and investment of the Wests' account, specifically that of their death benefit. As a direct and proximate result of this mismanagement and negligence, the Wests sustained monetary loss and permanent emotional and mental pain and suffering.

13. American Express, through its agents, had a fiducial duty to the Wests to properly manage and invest the Wests' account, specifically that of their death benefit, and breached that duty of finest loyalty. At no point did Steve Pippen or any other American Express or IDS representative disclose the relationship between American Express and IDS.

14. At no point did American Express or IDS, by and through its agents disclose the conflict of interest that arose as a direct result of their relationship in the Wests' investment strategies.

15. American Express and IDS, through its Agent Steve Pippen and other representatives, committed fraud upon the Wests by not informing them of the relationship between American Express and IDS.

16. The Wests were unfortunate victims of American Express agents, such Steve Pippen, used as sales agents to push high-risk and inappropriate American Express products, such as variable life insurance policies through its sister company, IDS. These sale agents, including Steve Pippen, used boilerplate investment strategy consultations to induce their sales to unsuspecting victims.

17. American Express knew or should have known that the IDS life insurance policy was high-risk to people such as the Wests. Even so, American Express, through its agents, including Steve Pippen, did not inform the Wests of the variable life insurance policy's high-risk, even though the Wests voiced such concerns to its Agent, Mr. Pippen. The Wests made it crystal-clear they were in no position to take risks with their life insurance given their advanced age and health concerns.

18. American Express, through its agents, caused extreme emotional stress on the Wests by refusing to correct their plummeting death benefits amount. Its response to the Wests' concerns was to conduct a quick survey of their claims and then close the matter. Such conduct was heartless, flagrant and outrageous.

19. American Express, through its agent, Steve Pippen, knew or should have known of the West's particular frailties concerning management of their investments, given their age and need for low-risk investment strategy. If it could not tell from their advanced age and appearance, the Wests specifically stated to Mr. Pippen that they could not afford any high-risk investment

strategies.

20. American Express, through its agents, including Steve Pippen misrepresented numerous facts to the Wests including, but not limited to: its relationship with IDS; the high-risk aspect of the variable life insurance it convinced the Wests to purchase; the value of the Wests' death benefit; and its ability to fix the Wests' death benefit once it became obvious the same would continue to plummet. These misrepresentations caused the Wests obvious monetary and mental injuries.

21. American Express, through its agents, violated several Kentucky laws, including the Kentucky Consumer Protection Act. Its acts were unfair, unconscionable, false, misleading and deceptive, all to the detriment of the Wests.

22. American Express, through its agents, breached their contractual agreement with the Wests.

23. As a result American Express' conduct, it is estimated that within five (5) years the Wests' death benefit will plummet to $0.00, after being promised it would exceed $ 300,00.00.

GIVEN THE ABOVE, the Wests request the following damages:

1. Compensation in the amount of $ 300,000.00 for the agreed upon death benefit level;

2. Restoration of the agreed-upon death benefit amount;

3. Punitive damages in an undetermined amount;

4. Costs and expenses incurred in this action;

5. Applicable interest and attorney's fees;

6. For any and all other relief to which the Wests may appear entitled.

Respectfully submitted,

James M. Gary
Justin S. Gilfert
WEBER & ROSE P.S.C.
2700 Aegon Center
400 West Market Street
Louisville, Kentucky 40202
(502) 589-2200
*Counsel for Claimants*