**UNITED STATES DISTRICT COURT**
**DISTRICT OF MINNESOTA**

---

LESA BENACQUISTO, DANIEL BENACQUISTO, RICHARD THORESEN, ELIZABETH THORESEN, ARNOLD MORK, ISABELLA MORK, RONALD MELCHERT and SUSAN MELCHERT, on behalf of themselves and all others similarly situated,

Plaintiffs,

v.

AMERICAN EXPRESS FINANCIAL CORPORATION, AMERICAN EXPRESS FINANCIAL ADVISORS, AMERICAN CENTURION LIFE ASSURANCE COMPANY, AMERICAN ENTERPRISE LIFE INSURANCE COMPANY, AMERICAN PARTNERS LIFE INSURANCE COMPANY, IDS LIFE INSURANCE COMPANY, and IDS LIFE INSURANCE COMPANY OF NEW YORK,

Defendants.

Case No. 00-1980 DSD/JMM

---

**FINAL ORDER AND JUDGMENT APPROVING CLASS ACTION SETTLEMENT AND DISMISSING COMPLAINT**

WHEREAS plaintiffs and defendants entered into a Stipulation of Settlement, with exhibits (collectively, the "Settlement Agreement"), dated September 18, 2000, to settle this class action litigation; and

WHEREAS on October 2, 2000, this Court and the Minnesota State Court for the County of Hennepin jointly entered an Order (the "Hearing Order") preliminarily certifying the putative class in this Action for settlement purposes under Minn. R. Civ. P. 23.01, 23.02(c), and 23.03(b) and Fed. R. Civ. P. 23(a), 23(b)(3), and 23(c)(2), ordering individual and publication notice to potential class members, scheduling a Fairness Hearing for March 6, 2001, and providing those persons with an opportunity either to exclude themselves from the settlement class or object to the proposed settlement; and

FILED 5-15-01
FRANCIS E. DOSAL, CLERK
Judgment Ent'd 5-15-01
Deputy Clerk's Initials ______

WHEREAS this Court and the Minnesota State Court for the County of Hennepin jointly held a Fairness Hearing on March 6, 2001 to determine whether to give final approval to the proposed settlement; and

WHEREAS this Court has issued Findings of Fact and Conclusions of Law Concering Class Action Settlement, dated MAY 15, 2001, granting final certification of the settlement class, approving the proposed settlement, and dismissing the settlement class members' claims (among other things); now, therefore,

Based on the submissions of the Parties and Class Members, on the evidence adduced at the Fairness Hearing, and on this Court's Findings of Fact and Conclusions of Law dated MAY 15, 2001, it is hereby **ORDERED, ADJUDGED AND DECREED** as follows:

1. **Incorporation of Other Documents.** This Order and Judgment Approving Class Action Settlement incorporates and makes a part hereof:

(a) the Stipulation of Settlement dated September 18, 2000, and filed with the Courts on September 18, 2000 (the "Stipulation of Settlement");

(b) the following exhibits to the Stipulation of Settlement: (i) Exhibit A (Guidelines for Determining, Scoring and Awarding Relief in the Claim Review Process); (ii) Exhibit B (Class Notice Package); (iii) Exhibit C (Publication Notice); (iv) Exhibit D (Proposed Hearing Order); (v) Exhibit E (Confidentiality Agreement); (vi) Exhibit G (Statement to Accompany Post-Execution Date Responses to Customer Complaints); (vii) Exhibit H (Post-Settlement Claim Form Mailing); (viii) Exhibit I

(Post-Mailing Reminder); and (ix) Exhibit J (Claim Review Administrative Forms and Letters); and

(c) the Affidavit of Jeffrey D. Dahl, sworn to February 23, 2001, Exhibit __ to this Order and Judgment (describing the Class Notice Package, its distribution to Class Members, and the Publication Notice).

2. **Jurisdiction.** This Court has personal jurisdiction over all Class Members (as defined below) and has subject matter jurisdiction over this Action and all claims and causes of action resolved by this settlement, including all the Claims and Causes of Action referred to in the Release. Accordingly, this Court has jurisdiction to approve the proposed settlement, grant final certification of the Class, release Claims and Causes of Action as set forth in the Release, and dismiss this Action on the merits and with prejudice.

3. **Final Class Certification.** The Class that was previously certified preliminarily is hereby finally certified for settlement purposes under Fed. R. Civ. P. 23(a), 23(b)(3), and 23(c)(2). The Class consists of (A) All persons or entities who, as of the Eligibility Date, have or had (i) an ownership interest in a cash value life insurance policy issued by IDS Life Insurance Company ("IDS") or IDS Life Insurance Company of New York ("IDSNY") pursuant to an individual sale in the United States, including its territories and commonwealths, issued at any time during the Class Period; or (ii) an ownership interest in an individual deferred annuity contract or a participation interest in a Group Qualified Annuity issued by IDS, IDSNY, American Centurion Life Assurance Company, American Enterprise Life Insurance Company or American Partners Life Insurance Company in the United States, including its territories and

commonwealths, that was in force at any time during the Class Period; and (B) all Qualified Plans and Qualified Plan Representatives that purchased, owned, held or had any interest with respect to any Group Qualified Annuity. The Class does not include (i) any present officer, any former officer of grade 50 and above, or equivalent, or any financial advisor of Defendants; or (ii) any insurance company that owns or owned a Policy or Annuity pursuant to an absolute assignment effected as part of an exchange under Section 1035 of the Internal Revenue Code.

Notwithstanding the foregoing, the Class shall not include (unless and to the extent such persons or entities are Class Members by virtue of their ownership interest in another Policy or Annuity) the following: (i) any persons or entities who make a timely election to be excluded from the proposed Class with respect to a particular Policy or Annuity otherwise included within the Class; (ii) any persons or entities who have an ownership interest in (a) a Policy that was terminated prior to the Eligibility Date due to the death of the insured and on which death benefits were paid; (b) an Annuity that was terminated prior to the Eligibility Date by reason of the death of the annuitant; (c) a Policy or Annuity that was issued, but not accepted or funded, or was returned to the issuer, as part of the exercise of a free look provision in the Policy or Annuity; (d) a Policy or Annuity that was rescinded as part of a reissue of a new life insurance policy or annuity contract, or because of a material misrepresentation on a Policy or Annuity application, or where the Policy or Annuity was rescinded and the premiums or other monies paid were returned to the Policy or Annuity owner; (e) a Policy or Annuity that is the subject of a release signed by any person or entity while represented by counsel settling a claim or dispute and releasing the issuer from any further liability concerning such Policy or Annuity; (f) a life insurance policy that was a term life

insurance policy or graded premium whole life insurance policy; (g) an annuity contract that was settled (*i.e.*, annuitized) prior to the inception of the Class Period; or (h) an annuity contract that was issued as an immediate annuity. A list of those persons who have validly excluded themselves from the Class, and who therefore are not bound by this Order and Judgment, is on file with this Court as Plaintiffs' and Defendants' Joint Submission of Exclusions From Class, dated March 21, 2001, and is incorporated herein and made a part hereof. A small number of requests for exclusion were deficient and subject to "cure" letters. The Parties will supplement their submission once those outstanding issues are resolved.

4. **Appointment of Co-Class Counsel and Lead Counsel and Adequacy of Representation.** The law firms of Milberg Weiss Bershad Hynes & Lerach LLP and Lockridge Grindal Nauen, P.L.L.P. are hereby appointed Co-Class Counsel; the law firm of Milberg Weiss Bershad Hynes & Lerach LLP is hereby appointed Lead Counsel; and the Class representatives have fully and adequately represented the Class for purposes of entering into and implementing the settlement and have satisfied the requirements of Fed. R. Civ. P. 23(a)(4).

5. **Class Notice.** Notice was provided to the Class in accordance with the Hearing Order. Individual notice was sent by first-class mail, postage prepaid, to the last known address of the Policy and Annuity Owners and, in the case of a Group Qualified Annuity, to persons or entities who hold or held a participation interest in the Group Qualified Annuity, all as reflected by Defendants' records as maintained at the Corporate Office or by the results of any searches performed by a vendor hired by Defendants to update addresses of such persons or entities. In cases of pending litigation against the Defendants, notice was also mailed to any legal

counsel known to represent the Class Member. Also in accordance with the Hearing Order, publication notice was published and notice was posted on the internet at the web sites for Defendants and Co-Class Counsel. This Court finds that the notice outlined above:

(a) constituted the best practicable notice to Class Members under the circumstances of this Action;

(b) was reasonably calculated, under the circumstances, to apprise Class Members of (i) the pendency of this class action; (ii) their right to exclude themselves from the Class and the proposed settlement; (iii) their right to object to any aspect of the proposed settlement (including final certification of the settlement class, the fairness, reasonableness or adequacy of the proposed settlement, the adequacy of the Class' representation by Plaintiffs or Plaintiffs' counsel, and/or the award of attorneys' fees); (iv) their right to appear at the Fairness Hearing -- either on their own or through counsel hired at their own expense — if they did not exclude themselves from the Class; and (v) the binding effect of the Order and Judgment in this Action, whether favorable or unfavorable, on all persons who do not request exclusion from the Class;

(c) was reasonable and constituted due, adequate and sufficient notice to all persons entitled to be provided with notice; and

(d) fully satisfied the requirements of the Federal Rules of Civil Procedure (including Fed. R. Civ. P. 23(c)(2) and (e)), the United States Constitution (including the Due Process Clause), the Rules of this Court, and any other applicable law.

6 **Final Settlement Approval.** The terms and provisions of the Settlement Agreement, including all exhibits, have been entered into in good faith and are hereby fully and finally approved as fair, reasonable and adequate as to, and in the best interests of, each of the Parties and the Class Members, and in full compliance with all applicable requirements of the Federal Rules of Civil Procedure, the United States Constitution (including the Due Process Clause), and any other applicable law. The Parties and Class Members are hereby directed to implement and consummate the Settlement Agreement according to its terms and provisions.

7. **Early Implementation.** The Defendants are hereby authorized, in their sole discretion but in consultation with Co-Class Counsel, and without requiring further approval of this Court, to implement the settlement before the Final Settlement Date (as defined in the Settlement Agreement), in which case all provisions in the Settlement Agreement specifying actions to be taken on or after the Final Settlement Date shall, to the extent necessary, be deemed to provide that those actions shall be taken on or after the date the Defendants elect to implement the settlement.

8. **Appeal After Early Implementation.** If the Defendants choose to exercise their discretion to implement the settlement before the Final Settlement Date, anyone seeking to appeal from this Court's rulings must first (i) request to intervene upon a representation of inadequacy of counsel; (ii) request a stay of implementation of the settlement; and (iii) post an appropriate bond. Unless a would-be appellant satisfies all three of these requirements, the Defendants are authorized to implement the settlement before the Final Settlement Date even if such implementation would moot any appeal.

9. **<u>Post-Settlement Mailing</u>**. The Parties are hereby directed to mail the Post-Settlement Mailing materials substantially in the form attached as Exhibit H to the Settlement Agreement, as provided by the Stipulation of Settlement.

10. **<u>Securities Registration Not Required</u>.** This Court hereby confirms that, to the extent that any rights provided under this settlement (including but not limited to the right to designate another person as eligible to receive the ADB under the Settlement Agreement) might be deemed to be a security under section 3(a)(10) of the Securities Act of 1933, as amended, registration of any such right would not be required by virtue of this Court's approval of the settlement.

11. **<u>No Tax Advice Being Given</u>.** This Court hereby confirms that the Parties and their counsel are not making any representations or providing any opinions or advice concerning the tax consequences of the proposed settlement or the election of any remedies under the settlement to individual Class Members, and the Parties and their counsel shall not be held liable for any tax consequences or elections.

12. **<u>Binding Effect</u>.** The terms of the Settlement Agreement and of this Order and Judgment shall be forever binding on Plaintiffs and all other Class Members, as well as their heirs, executors and administrators, successors, assigns, guardians, attorneys, trustees, and representatives, and those terms shall have *res judicata* and other preclusive effect in all pending and future claims, lawsuits or other proceedings maintained by or on behalf of any such persons, to the extent those claims, lawsuits or other proceedings involve matters that were or could have been raised in the Action or are otherwise encompassed by the Release.

13. **Release.** The following Release, which is also set forth in Section XII of the Stipulation of Settlement, is expressly incorporated herein in all respects, is effective as of the Final Settlement Date, and forever discharges the Releasees from any Claims or Causes of Action that arise from or relate to the Released Conduct:

A. Release and Waiver

1. In consideration for the relief set forth in this Agreement, Plaintiffs and all other Releasors (defined below) shall, as of the Final Settlement Date, release, acquit and forever discharge the Releasees (defined below) from any and all past or present Claims and Causes of Action (defined below) that are based upon, related to, or connected with, directly or indirectly, in whole or in part: (a) the allegations, facts or subjects set forth or otherwise raised in Benacquisto, et al. v. American Express Financial Corporation, et al., No. 96-18477, pending before the Minnesota State Court for the County of Hennepin (together with the actions consolidated therewith, also filed in the Minnesota State Court for the County of Hennepin and entitled Mork, et al. v. IDS Life Insurance Company, et al., No. 97-04742, and Thoresen, et al. v. American Express Financial Corporation, et al., No. 98-015681) and/or Benacquisto, et al. v. American Express Financial Corporation, et al., No. 00-1980 DSD/JMM, pending before the United States District Court for the District of Minnesota; or (b) the Released Conduct (defined below).

2. Plaintiffs and all other Class Members, on their own behalf and on behalf of all other Releasors also hereby contractually agree and acknowledge that, unless this settlement is ultimately disapproved, they shall not now or hereafter initiate, participate in, maintain, maintain a right to or assert against the Releasees, or any of them, either directly or indirectly, derivatively, on their own behalf, or on behalf of the Class or the general public or any other person or entity, any Claims and Causes of Actions (defined below) that are based upon, related to, or connected with, directly or indirectly, in whole or in part: (a) the allegations, facts or subjects set forth or otherwise raised in Benacquisto, et al. v. American Express Financial Corporation, et al., No. 96-18477, pending before the Minnesota State Court for the County of Hennepin (together with the actions consolidated therewith, also filed in the Minnesota State Court for the County of Hennepin and entitled Mork, et al. v. IDS Life Insurance Company, et al., No. 97-04742, and Thoresen, et al. v. American Express Financial Corporation, et al., No. 98-015681) and Benacquisto, et al. v. American Express Financial Corporation, et al., No. 00-1980 DSD/JMM, pending before the United States District Court for the District of Minnesota; or (b) that relate in any way to the Released Conduct.

3. Nothing in this Release shall be deemed to alter (i) a Class Member's right to make a claim for contractual benefits that will become payable in the future pursuant to the express written terms of an In Force Policy or In Force Annuity issued by any of Defendants; (ii) a Class Member's right to assert any claim that independently arises from acts, facts or circumstances that occur for the first time after the last day of the Class Period; (iii) a Class Member's right to make a claim for theft or embezzlement in connection with a Policy or Annuity; (iv) a Class Member's right to assert any claim based on facts arising out of or relating to the administration or servicing of a Policy or Annuity after its purchase unless they arise out of or relate to any of the matters described in sections XII.B.2.(i)-(xiii) of the Stipulation of Settlement; or (v) a Class Member's right to assert any claim peculiar to the Class Member that falls outside the general categories of claims or conduct described in the complaints in the Actions or the Release in this settlement and is based on facts that were not discovered and could not with reasonable care have been discovered by the Class Member before the deadline to submit an Election Form set forth in the Stipulation of Settlement.

4. Plaintiffs and all other Class Members, on their own behalf and on behalf of all other Releasors, expressly agree that this Release will be, and may be raised as, a complete defense to, and will preclude any action or proceeding that relates in any way to, the Released Conduct.

5. Plaintiffs and all other Class Members, on their own behalf and on behalf of all other Releasors, expressly understand that certain principles of law, such as Section 1542 of the Civil Code of the State of California, provide that a "general" release does not extend to claims that a creditor does not know or suspect to exist in his favor at the time of executing the release and which, if known by him, must have materially affected his settlement with the debtor. To the extent that these principles of law arguably may be applicable — notwithstanding that the parties have chosen Minnesota law to govern the Stipulation of Settlement — Plaintiffs and the Class Members hereby agree that these principles (including Cal. Civ. Code Section 1542 and all similar federal or state laws, rights, rules, or legal principles of any jurisdiction that may be applicable herein) are hereby knowingly and voluntarily waived and relinquished by Plaintiffs and the Class Members, and Plaintiffs and the Class Members hereby agree and acknowledge that this is an essential term of both the Settlement Agreement and this Release.

6. In connection with this Release, Plaintiffs and all other Class Members, on their own behalf and on behalf of all other Releasors, acknowledge that they are aware that they may hereafter discover claims presently unknown or unsuspected, or facts in addition to or different from those that they now know or believe to be true with respect to the matters released herein that occurred prior to the last day of the Class Period. Nevertheless, subject to paragraph 3 above, it is the intention of Plaintiffs and the Class Members in executing this Release fully, finally and forever to settle and release all such

matters that exist, hereafter may exist, or might have existed (whether or not previously or currently asserted in any action or proceeding) with respect to their Policies and Annuities.

7. Nothing in this Release shall preclude any action to enforce any of the terms of the Settlement Agreement, provided that such action shall be brought in the Minnesota State Court for the County of Hennepin or the United States District Court for the District of Minnesota.

8. Plaintiffs and all other Class Members, on their own behalf and on behalf of all other Releasors, hereby agree and acknowledge that the provisions of this Release, individually and collectively, constitute an essential and material term of the Settlement Agreement.

9. This Release is the result of a compromise of a disputed claim and shall never at any time be used as evidence of any admission of liability, wrongdoing or damages by the Company.

B. Release and Waiver -- Definitions

1. "Claims and Causes of Action" (as used in this Release) means any and all claims for relief (including any federal, exclusively federal, state, or other causes of action, suits, petitions, or demands in law or equity), any and all allegations of liability (including any allegations of debts, obligations, promises, guarantees, damages, awards, or for any equitable, legal and administrative relief), and any and all demands for damages or equitable relief (including any claims for rescission, reformation, restitution or all damages of any kind, including those in excess of actual damages and claims for mental anguish), that have been, could have been, may be or could be asserted in any court action, whether federal, state or otherwise, or before any administrative body (including any brought by or on behalf of any state or local insurance, prosecutorial or other organization), tribunal, arbitration panel, or other adjudicatory body, regardless of whether based on federal, state or local law, statute, ordinance, regulation, contract, common law, or any other source, and regardless of whether foreseen or unforeseen, suspected or unsuspected, or fixed or contingent at the time of this Settlement.

2. "Released Conduct" means any and all direct or indirect acts, representations, omissions, suggestions, or communications that are related to or connected in any way with the design, development, marketing, sale, administration, servicing, underwriting, or performance of the Policies or the Annuities, including, without limitation, acts, representations, omissions, suggestions or communications in connection with (i) the explanation, description, marketing, sale, solicitation, illustration or replacement of any Policy or Annuity; (ii) the application for or purchase of any Policy or Annuity; (iii) the suitability of any purchases, sales or replacements of any Policy or

Annuity; (iv) the taking of any loans, or the accumulation of any interest or cash values on any Policy or Annuity; (v) the setting, reduction, adjustment, payment, or lack of payment of any interest rates, purchase rates or renewal rates on any Policy or Annuity; (vi) the setting, charging or reducing of any cost of insurance, commissions, incentives, premiums, taxes, fees, mortality and expense fees, charges, contract charges, surrender charges, or expenses on any Policy or Annuity; (vii) the investment choices made with respect to assets held in any Policy or Annuity; (viii) the surrender, lapse, or termination of any Policy or Annuity; (ix) the tax status, tax impact or tax consequences of any Policy or Annuity or any actions or inaction taken with respect thereto; (x) the costs, commissions, terms, or benefits or disadvantages of any Policy or Annuity compared to any other life insurance policy, annuity contract or investment; (xi) the comparison or lack of comparison of any Policy or Annuity to any other product; (xii) the preparation by any financial advisor acting for the Company of any financial plan or the provision of financial or investment advice insofar as it resulted in the sale, modification or maintenance of any Policy or Annuity; (xiii) the effect that a Class Member's election and award of benefits in this Settlement Agreement may have on the value of any Policy or Annuity; and (xiv) the administration or servicing of any Policy or Annuity after its purchase.

3. "Releasees" means the Company[1] and its past, present and future parents, subsidiaries, affiliates, partners, predecessors, successors and assigns, and each of their respective past, present and future officers, directors, shareholders, employees, general agents, agents, advisors, branch managers, producers, sales representatives, brokers, solicitors, representatives, attorneys, heirs, administrators, executors, insurers, predecessors, successors and assigns, or any of them, including any person or entity acting on behalf of, or at the direction of, any of them.

4. "Releasors" means, to the extent they are not excluded from the Class with respect to a Policy or Annuity, the Plaintiffs and all Class Members, on behalf of themselves and their respective heirs, executors, administrators, successors, assigns, guardians, attorneys, trustees, qualified plans, fiduciaries, plan fiduciaries, plan trustees, plan sponsors, plan participants, plan beneficiaries, and representatives, and on behalf of the Policies' insureds and beneficiaries, the Annuities' annuitants and beneficiaries, and the Policies' and Annuities' nominal and beneficial owners.

---

[1] "Company" means IDS Life Insurance Company, IDS Life Insurance Company of New York, the American Express Company, American Express Financial Corporation, American Express Financial Advisors, American Express Service Corporation, American Express Trust Company, American Centurion Life Assurance Company, American Enterprise Life Insurance Company and American Partners Life Insurance Company, collectively.

14. **Permanent Injunction**. All Class Members who have not been timely excluded from the Class with respect to a Policy or Annuity are hereby permanently barred and enjoined from (i) filing, commencing, prosecuting, maintaining, intervening in, participating in (as class members or otherwise), or receiving any benefits or other relief from, any other lawsuit, arbitration, or administrative, regulatory or other proceeding or order in any jurisdiction based on or relating to the Claims and Causes of Action, or the facts and circumstances relating thereto, in the Action and/or the Released Conduct (as that term is defined in the Settlement Agreement) as to that Policy or Annuity, and (ii) organizing or soliciting the participation of any Class Members in a separate class for purposes of pursuing as a purported class action (including by seeking to amend a pending complaint to include class allegations, or by seeking class certification in a pending action) any lawsuit or other proceeding based on or relating to the Claims and Causes of Action, or the facts and circumstances relating thereto, in the Action and/or the Released Conduct as to that Policy or Annuity. This Court finds that issuance of this permanent injunction is necessary and appropriate in aid of this Court's jurisdiction over the Action and to protect and effectuate this Order and Judgment.

15. **Enforcement of Settlement.** Nothing in this Order and Judgment shall preclude any action to enforce the terms of the Settlement Agreement; nor shall anything in this Order and Judgment preclude Plaintiffs or Class Members from participating in the Claim Review Process described in the Settlement Agreement if they are entitled to do so under the terms of the Settlement Agreement.

16. **Attorneys' Fees and Expenses.** The Court hereby grants Co-Class Counsels' application for an award of attorneys' fees and reimbursement of their disbursements and expenses for their past and future work on the Actions in the amount of $28 million, to be paid by Defendants to Lead Counsel. The $28 million consists of approximately $27, 380, 000 in fees and $620,000 in reimbursement of expenses. Such fees and expenses are to be paid by Defendants within 10 days after the last date of entry of the Order and Judgment in the Actions, subject to the conditions set forth in the Stipulation of Settlement. Plaintiffs' counsel shall set aside in a Qualified Settlement Fund ten percent, or $2,738,000, of the fee award pending substantial completion of the administration of the Claim Review Process. Plaintiffs' counsel shall advise this Court when payments are made to Class Members in the Claim Review Process, and may draw down this final ten percent (plus any accumulated interest) at that time without further order of this Court. Lead Counsel, in its sole discretion, shall allocate and distribute this award of attorneys' fees and expenses among counsel for the Class.

17. **No Other Payments.** The preceding paragraph of this Order and Judgment covers, without limitation, any and all claims for attorneys' fees and expenses, costs or disbursements incurred by Co-Class Counsel or any other counsel representing Plaintiffs or Class Members, or incurred by Plaintiffs or the Class Members, or any of them, in connection with or related in any manner to the Actions, the settlement of the Actions, the administration of such settlement, and/or the Released Conduct except to the extent otherwise specified in this Order and Judgment and the Stipulation of Settlement.

18. **Modification of Settlement Agreement.** The Parties are hereby authorized, without needing further approval from this Court, to agree to and adopt such amendments to, and modifications and expansions of, the Settlement Agreement -- including without limitation, the Post-Settlement Mailing materials and the forms to be used in the Claim Review Process -- as are consistent with this Order and Judgment and do not limit the rights of Class Members under the Settlement Agreement.

19. **Retention of Jurisdiction.** This Court has jurisdiction to enter this Order and Judgment. Without in any way affecting the finality of this Order and Judgment, this Court expressly retains jurisdiction as to all matters relating to the administration, consummation, enforcement and interpretation of the Settlement Agreement and of this Order and Judgment, and for any other necessary purpose, including, without limitation,

(a) enforcing the terms and conditions of the Settlement Agreement and resolving any disputes, claims or causes of action that, in whole or in part, are related to or arise out of the Settlement Agreement, this Order and Judgment (including, without limitation, whether a person or entity is or is not a Class Member; whether claims or causes of action allegedly related to this case are or are not barred by this Order and Judgment, etc.);

(b) entering such additional Orders as may be necessary or appropriate to protect or effectuate this Order and Judgment approving the Settlement Agreement, dismissing all claims on the merits and with prejudice, and permanently enjoining

Class Members from initiating or pursuing related proceedings, or to ensure the fair and orderly administration of this settlement; and

(c) entering any other necessary or appropriate Orders to protect and effectuate this Court's retention of continuing jurisdiction;

*provided, however,* that nothing in this paragraph is intended to restrict the ability of the Parties to exercise their rights under paragraphs 7 and 18 above.

20. **<u>No Admissions</u>.** This Order and Judgment, and the Settlement Agreement (and any other document referred to here, or any action taken to carry out this Order and Judgment) shall not be used or construed as an admission or concession by the Defendants of any actual or potential fault, wrongdoing, liability or damages whatsoever, and shall not be used as any evidence or inference of any fault, wrongdoing, liability or damage against the Defendants. Entering into or carrying out the Settlement Agreement, and any negotiations or proceedings related to it, shall not be construed as, or deemed evidence of, an admission or concession by Defendants as to any actual or potential fault, wrongdoing, liability or damages and shall not be offered or received in evidence or used for impeachment in any action or proceeding against any party hereto in any court, administrative agency or other tribunal for any purpose whatsoever, except as evidence of the settlement or to enforce the provisions of this Order and Judgment and the Settlement Agreement; *provided, however,* that this Order and Judgment and the Settlement Agreement may be filed in any action against or by the Defendants or Releasees (as defined in the Stipulation of Settlement) to support a defense of *res judicata*, collateral estoppel, release,

waiver, good-faith settlement, judgment bar or reduction, full faith and credit, or any other theory of claim preclusion, issue preclusion or similar defense or counterclaim.

21. **Dismissal of Action.** The Action, including all individual and Class claims resolved in them, are hereby dismissed on the merits and with prejudice against Plaintiffs and all other Class Members, without fees or costs to any party except as otherwise provided in this Order and Judgment.

22. **Bond Requirement.** Any appeal of the orders and judgment of this Court in this action shall be conditioned upon the posting of a bond by the proposed appellant of $500,000.

SO ORDERED this 15th day of May, 2001. LET THE JUDGMENT BE ENTERED ACCORDINGLY.

The Honorable David S. Doty
United States District Judge

# UNITED STATES DISTRICT COURT
# DISTRICT OF MINNESOTA

## CIVIL NOTICE

The purpose of this notice is to summarize the time limits for filing with the District Court Clerk's Office a Notice of Appeal to the Eighth Circuit Court of Appeals from a final decision of the District Court in a civil case.

***This is a summary only. For specific information on the time limits for filing a Notice of Appeal, review the applicable federal civil and appellate procedure rules and statutes.***

Rule 4(a) of the Federal Rules of Appellate Procedure (Fed. R. App. P.) requires that a Notice of Appeal be filed within:

1. Thirty days (60 days if the United States is a party) after the date of "entry of the judgment or order appealed from;" or

2. Thirty days (60 days if the United States is a party) after the date of entry of an order denying a timely motion for a new trial under Fed. R. Civ. P. 59; or

3. Thirty days (60 days if the United States is a party) after the date of entry of an order granting or denying a timely motion for judgment under Fed. R. Civ. P. 50(b), to amend or make additional findings of fact under Fed. R. Civ. P. 52(b), and/or to alter or amend the judgment under Fed. R. Civ. P. 59; or

4. Fourteen days after the date on which a previously timely Notice of Appeal was filed.

If a Notice of Appeal is not timely filed, a party in a civil case can move the District Court pursuant to Fed. R. App. P. 4(a)(5) to extend the time for filing a Notice of Appeal. This motion must be filed no later than 30 days after the period for filing a Notice of Appeal expires. If the motion is filed after the period for filing a Notice of Appeal expires, the party bringing the motion must give the opposing parties notice of it. The District Court may grant the motion, but only if excusable neglect or good cause is shown for failing to file a timely Notice of Appeal.

FORMS\APPEAL.NO CIV
Rev. August 11, 1995

# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

### Prehearing Conference Program

The United States Court of Appeals for the Eighth Circuit has established an early intervention Prehearing Conference Program. The purpose of the program is twofold: (1) to facilitate settlement discussions in civil cases by providing an impartial atmosphere for an open discussion of the case and alternative methods of disposition and (2) to promote the delineation of issues, early resolution of procedural problems, and effective administration of an appeal throughout the appellate process. See 8th Cir. R. 33A.

The program is directed by Mr. John Martin. Mr. Martin screens newly filed appeals based on information furnished by both appellants and appellees in the court's Appeal Information Forms A and B. Contact with counsel is by telephone and in personal conferences held in several cities throughout the Circuit. All communications with Mr. Martin are confidential. Counsel can openly discuss and evaluate the issues and explore alternatives in a non-adversarial setting without fear that the subsequent processing of the appeal or ultimate disposition of the case will be adversely affected by participation in the program.

Participation in the program is voluntary. However, the Court strongly encourages your participation and cooperation. Over the past twenty years, the program has enabled many appellate litigants to achieve mutually satisfactory resolution of certain issues or an overall settlement prior to progressing through all stages of the appellate process. Issue delineation enables counsel to focus only on those issues that need judicial resolution. The program has helped relieve the ever-increasing caseload confronting the Court, and it has also saved litigants and attorneys substantial amounts of time and money.

In order for the program to function effectively certain information <u>must</u> be provided at the initiation of the appeal. *Eighth Circuit Rule 3B directs each civil appellant to: (1) file a completed Appeal Information Form A with the Notice of Appeal at the time the Notice is filed with the District Court clerk and (2) forward a copy of the completed Form A and a copy of Appeal Information Form B to the appellee for completion.* Appellee may complete Form B and send it to the clerk of the Court of Appeals. If you have any questions about the Prehearing Conference Program or the Appeal Information Forms, please contact Mr. Martin at (314)-539-3669.

Forms A and B are available from the District Court clerk and the Court of Appeals clerk and can be found at the Court of Appeals' web site at: www.ca8.uscourts.gov

*June 1, 2000*

Forms/8thcircuitprehearingconf.wpd

**BOLIVER LAW FIRM**
8712 W. Dodge Rd., Suite 400
Omaha, Nebraska 68114-3431
(402)392-0107 (402)392-1011 (fax)

Gail E. Boliver*
Christopher A. Clausen†
JoAnn L. Barten†
Eric R. Bidwell †
*Licensed in Iowa and Nebraska
†Licensed in Iowa

E-mail address:
boliver@marshallnet.com

Affiliated with Dale A. Lamb, Attorney
717 5th Avenue, Grinnell, Iowa 50112
(641) 236-4630; (641) 236-3610 (fax)

IOWA OFFICE
2414 S. 2nd Street
Marshalltown, Iowa 50158
(641)752-7757; (641)752-6597 (fax)

June 7, 2005

Mr. George Friedman, Esq.
Executive Vice President
NASD Arbitration Department
One Liberty Plaza
165 Broadway, 27th Floor
New York, NY 10006

RE: Mrs. Mary Campbell, individually, and as Trustee and Mrs. Katherine Caradori, individually, and as Trustee vs. American Express Financial Advisors, Broker-Dealer and Mr. David L. Stinnett, Registered Representative and Mr. Gerald Denney, Registered Representative.

NASD # ____________

Dear Mr. Friedman:

Please accept this letter as a Statement of Claim for Mrs. Mary Campbell and Mrs. Katherine Caradori against American Express Financial Advisors, Broker-Dealer, member of the NASD, Mr. David L. Stinnett, Registered Representative, former member of the NASD and Mr. Gerald Denney, Registered Representative, member of the NASD.

## STATEMENT OF CLAIM

## PARTIES

**Mrs. Mary Campbell** is a single (widowed) individual, 79 years of age having been born on June 27, 1925, and is a resident of Omaha, Nebraska. Mrs. Campbell (hereinafter "Mary") is the mother of Claimant, Mrs. Katherine Caradori.

**Mrs. Katherine Caradori** is an individual, 60 years of age having been born on July 6, 1944, is a resident of Omaha, Nebraska and currently separated from her husband. Mrs. Caradori (hereinafter "Kathy") is the daughter of Claimant, Mary Campbell.

**American Express Financial Services** is a broker-dealer, member of the NASD with offices in Omaha, Nebraska and its corporate office in Minneapolis, Minnesota.



Gail E. Boliver – boliver@marshallnet.com Christopher A. Clausen – cclausen@marshallnet.com JoAnn L. Barten – jbarten@marshallnet.com Eric Bidwell – ebidwell@marshallnet.com

**Mr. David L. Stinnett** was, at all material times in this matter, a registered representative, member of the NASD, employed by American Express Financial Advisors and offered securities and insurance products through American Express Financial Advisors. Upon information and belief, Mr. Stinnett left the employment of American Express in September 2003. Mr. Stinnett is currently unemployed and holds no registrations or licenses.

**Mr. Gerald Denney** was, at all material times in this matter, a registered representative, member of the NASD, employed by American Express Financial Advisors and offered securities and life insurance products through American Express Financial Advisors. According to information obtained from the NASD, Mr. Denney's employment history is as follows:

| | |
|---|---|
| February 2004 - present | Commonwealth Financial Network |
| 9/2000 - 2/2004 | Painewebber, Inc. |
| 12/1998 - 9/2000 | Dean Witter Reynolds, Inc. |
| 1/1995 - 12/1998 | American Express Financial Advisors<br>IDS Life Insurance Company |

**BACKGROUND**

Mrs. Mary Campbell was born in June, 1925. After graduating from high school in 1943, Mrs. Campbell married her husband, who was a farmer. Mary's husband served in the Armed Forces during WWII. Upon his return, he returned to farming until his sudden and unexpected death in 1981. Mary remained alone on the farm for the next 15 years for estate tax purposes. However, by 1997, Mary was becoming weary of the responsibilities of operating the farm. Her only child, Katherine, lived in Omaha, Nebraska. In 1998, Mary moved to Joplin, Missouri. In 2003, Mary moved back to Nebraska and lives in Omaha just a short distance from Katherine and her grandson.

Mrs. Katherine Caradori was born in July 1944. After graduating from high school and attending a couple of years of college, Kathy became a flight attendant until approximately 1985. Upon the achievement of 15 years of service with Frontier Airlines, Kathy decided to be a stay-at-home mom until 1994. She received a lump sum settlement from her retirement and was assured that her health benefits and flying privileges would continue during her lifetime. Kathy returned to full-time work from 1994 through 1999. Currently, she is working part-time from her home in a clerical capacity earning below minimum wage.

In 1997, the family's (Mary and Kathy) primary assets were a 510 acre farm and a 640 acre farm in Western Nebraska owned by the family farm LLC. Kathy owned approximately 77% and the balance is owned by her mother, Mary. The 640 acre farm has limited value due to its location and the extreme drought conditions over the past few years in western Nebraska. Mary and Kathy have tried to sell the farm, but cannot find a buyer. They currently still own this property.

In 1997, Kathy noticed an advertisement in the newspaper concerning a financial planning opportunity with American Express Financial services representatives. When Kathy placed a call to the number in the advertisement, she was assigned to Representative David Stinnett. The purpose of the first meeting was Kathy's personal finance and not any other financial issue or planning.

A second meeting was planned between Kathy and Mr. Stinnett. It wasn't until the 3rd or 4th meeting that discussions about the farm were raised and extended to Mary. Mary then joined the meetings.



Gail E. Boliver – boliver@marshallnet.com Christopher A. Clausen – cclausen@marshallnet.com JoAnn L. Barten – jbarten@marshallnet.com Eric Bidwell – ebidwell@marshallnet.com

The topic of the meetings included farm investment issues, how to realize estate and income tax savings through proper planning and how to improve cash flow. Kathy had an investment portfolio with an approximate value of $200,000. The meetings focused on the charitable remainder trust (CRUT) concept to avoid paying income taxes when a farm was sold. The result of a transfer of the farm to the CRUT would be that the owner could avoid the capital gains taxes otherwise due if the farm was sold. Mr. Stinnerr and Mr. Denney advised Kathy and Mary that their cash flow would be enhanced through alternative investments from farm sales proceeds.

Mary and Kathy recall that Mr. Stinnett and Mr. Denney recommended, after some discussion, a 9% withdrawal rate from a CRUT. Mr. Stinnett and Mr. Denney indicated that this 9% withdrawal would be absolutely no problem. They advised that the withdrawal rate could be as high as 20% based on the historical performance of the markets. Mr. Stinnett advised that the CRUT was a vehicle to support Mary and Kathy's life style and leave them with only a concern of 'how to spend all of the money they would be receiving' from the CRUT. This was repeated over and over to Mary and Kathy.

Mr. Stinnett and Mr. Denney recommended that both Mary and Kathy transfer to, or give their Missouri farm, which represented the vast majority of their financial assets, to a CRUT. Mr. Stinnett and Mr. Denney also recommended that Mary immediately transfer her Certificates of Deposit to the CRUT, rather than let them mature and be redeemed without penalty. Mr. Stinnett and Mr. Denney advised Mary that she should not be concerned about the penalties because she would get more money back based on investment gains. The purpose of the immediate transfer was to take full advantage of the recommendation for the CRUT. Since establishing CRUTs would remove assets from their estate, a "Wealth Replacement Trust" using life insurance was an integral part of the estate and financial planning recommendation. If this recommendation made any sense at all, the Representatives should have explained the advantages and disadvantages of using existing policies for the funding as well as the impact of the ongoing premium that was to be paid from their retirement accounts.

## INVESTMENT OBJECTIVES

Both Mary Campbell and Katherine Caradori simply wanted to generate retirement income which would provide for their living expenses for the balance of their lives. They had no desire or interest in any strategy which would risk their future income or assets. Mary didn't have a high income need. They wanted reasonable, steady income.

## PORTFOLIO

Prior to meeting Mr. Stinnett, Mr. Denney and American Express Financial Advisors, Mary and Kathy owned an interest in two farms plus each had a small investment account. Both Mary and Kathy were solely interested in having their asset holdings continue to provide the appropriate income they needed for life. They knew what the farm was able to generate and wanted to continue to receive an income stream from the planning that was being considered.

American Express Financial Advisors (Mr. Stinnett and Mr. Denney) stressed that a CRUT could provide more income than the farm could produce. Both Mary and Kathy attended the meetings with Mr. Stinnett and Mr. Denney which focused on transferring one's assets to a CRUT. Prior to that time, neither Mary nor Kathy had established any kind of charitable gift program. They simply wanted an investment program that would provide income from their assets for the balance of their lives.



Gail E. Boliver – boliver@marshallnet.com Christopher A. Clausen – cclausen@marshallnet.com JoAnn L. Barten – jbarten@marshallnet.com Eric Bidwell – ebidwell@marshallnet.com

Mr. Stinnett and Mr. Denney along with the concurrence of American Express Financial Advisors recommended and highly encouraged Mary and Kathy to transfer nearly 100% of their financial assets into a Charitable Remainder Trust.

Along with the trust, and for the purpose of "wealth replacement", the Respondents recommended that Mary and Kathy establish a Wealth Replacement Trust (Irrevocable Life Insurance Trust) that would purchase insurance products to replace assets given or transferred to the CRUTs. It was recommended that Kathy surrender her American Family life insurance which she held for many years, and purchase an IDS Life Insurance policy for $1.5 million. The $.5 million value over the $1 million value of the farm was for future appreciation.

Prior to establishing the CRUTs, Kathy had a life insurance policy with $250,000 of death benefits and believed that she had appropriate coverage. Mr. Stinnett recommended that Kathy surrender the American Family policy and purchase a new IDS policy. The insurance contracts surrendered by Mary included those by Hartford, Fidelity and Life of Virginia. The annual premium for the new life insurance was designated by Mr. Stinnett and Mr. Denney to be approximately $18,000 per year. Mr. Stinnett and Mr. Denney had estimated the CRUT would generate approximately $72,000 of income for Kathy and $37,000 for Mary which was enough to cover the 9% annual distribution for their living expenses and insurance premiums due. Kathy was to pay approximately $10,000 of the $18,000 annual premium and Mary was to pay the remaining $8,000. (The cash value has continued to fund this policy).

Mr. Stinnett recommended that both Kathy and Mary invest in some mutual funds with certain percentages in various accounts. Mary wanted a managed account. Mary and Kathy were told that their investment portfolios were to be managed by a "team of experts" who would monitor the portfolios and be making "appropriate switches to ensure the funds would not lose money over the long run".

Mr. Stinnett and Mr. Denney recommended an attorney to prepare the CRUT documents and Renaissance to provide administrative services (frankly unknown to Mary and Kathy) for an initial fee of about $2000 plus ongoing annual maintenance charges. Renaissance ceased being the administrator. Mary and Kathy were not told they could administer their own CRUTs.

Mr. Stinnett and Mr. Denney also recommended that Kathy and Mary purchase variable annuities for the CRUT and Revocable Trusts. Neither Kathy nor Mary knew anything about variable annuities. They were not told that there were any commissions paid on the purchases of variable annuities and what additional fees and expenses were related to these proprietary products.

The implications of having a CRUT own a tax sheltered annuity was also not discussed. As the years went by and the accounts experienced significant losses, Mary and Kathy urged the Respondents to "do something", Mr. Stinnett recommended that the variable annuities be surrendered (thus incurring surrender fees and penalties) and be replaced by purchasing new fixed annuities. By this time, Mr. Stinnett was down on American Express. He advised other companies would have a better policy. He then recommended the purchase of an Allianz policy. Mr. Stinnett did not make adjustment to the investment accounts within current insurance/annuity contracts that would have avoided surrender charges and new commissions and policy fees. The recommendations made and implemented were clearly not in the clients' best interests.

Kathy was advised by Mr. Stinnett that she should purchase a $350,000 IDS flexible premium variable life policy (#9090 0661 90366) owned by her revocable trust and sold in



Gail E. Boliver – boliver@marshallnet.com Christopher A. Clausen – cclausen@marshallnet.com JoAnn L. Barten – jbarten@marshallnet.com Eric Bidwell – ebidwell@marshallnet.com

approximately August 2000. Mr. Stinnett advised that this was purely for investment purposes (tax shelter). Kathy told Mr. Stinnett that she did not want, or need, anymore life insurance. Kathy followed Mr. Stinnett's recommendation to "invest" in life insurance and she purchased the policy. Mr. Stinnett recommended selling the investments in the Revocable Trust and putting the money in this policy.

A summary of the various policies, their surrender charges and depletion of their cash value for Mary and Cathy are as follows:

A. Mary M. Campbell

1. IDS Life Insurance and Annuities

| | | |
|---|---|---|
| 9300-06075932 | Surrender - $4,373 | |
| 9300-06159120 | Surrender - $4,000 | |
| 9300-06218743 | Surrender - $2,578 | |
| 9300-06159108 | Surrender - $1,807 | |
| | Total Charges | $12,758 |
| Life insurance policy cash value in 1999 - | | $92,482 |
| Life insurance policy cash value in 2002 - | | $41,960 |
| | Loss: | $50,522 |
| Flex Annuity cash value in 1999: | | $127,895 |
| Flex Annuity cash value in 2002 | | $51,856 |
| | Loss: | $76,039 |

2. Allianz

| | | | |
|---|---|---|---|
| 31031082 | 1st year loss - $3000 | Commission | $4000 |
| 31031138 | 1st year loss - $3065 | Commission | $3448 |
| 31031344 | 1st year loss - $3514 | Commission | $4332 |
| 31031413 | 1st year loss - $3407 | Commission | $4200 |
| | Loss Allianz | $25,966 | |
| | Total Loss: | $165,285* (estimated) | |

B. Katherine Caradori

1. IDS Life Insurance and Annuities

| | | |
|---|---|---|
| 9300-06183910 | Surrender - $3,667 | |
| 9300-06218085 | Surrender - $12,570 | |
| 9300-06218266 | Surrender - $10,000 | |
| 9090-66190366 | Surrender - $5,652 | |
| | Total Charges | $31,889 |
| Life insurance policy cash value in 1999 - | | $Undetermined |
| Life insurance policy cash value in 2002 - | | $Undetermined |
| | Loss: | $Undetermined |



Gail E. Boliver – boliver@marshallnet.com Christopher A. Clausen – cclausen@marshallnet.com JoAnn L. Barten – jbarten@marshallnet.com Eric Bidwell – ebidwell@marshallnet.com

| | | | |
|---|---|---|---|
| | Flex Annuity cash value in 1999: | | $248,010 |
| | Flex Annuity cash value in 2002 | | $109,857 |
| | | Loss: | $138,153 |

2. Allianz

| | | | |
|---|---|---|---|
| 31031242 | 1st year loss - $7,575 | Commission | $9,335 |
| 31031993 | 1st year loss - $3,782 | Commission | $4,662 |
| 31031195 | 1st year loss - $14,643 | Commission | $18,053 |

Loss Allianz $58,050

<u>Total Loss: $228,092*</u> (estimated)

* Additional losses and fees/expenses incurred are yet to be determined. Additional discovery should clarify specific losses.

<u>Mary M. Campbell, Charitable Remainder Trust</u>

By early 1998, the farm had been liquidated and the proceeds were payable to Mary and Kathy's CRUTs. By June, 1998, the Trust had a current value of $439,000. From that time forward, the account would steadily fall through 1999 (ending the year at $407,000) and continuing through the year 2000 to $326,000; and continuing through 2001 ending the year with a value of $255,000; and through 2002 ending the year at $225,000.

In mid-2003, after continual requests by Mary Campbell to stop the losses, Mr. Stinnett transferred $129,000 into three separate Allianz fixed annuities in the Charitable Trust.

The asset allocation was inappropriate and a contributing cause to the failure of the Mary Campbell Charitable Remainder Trust. In addition, the misrepresentation of the Respondents that 9% was a conservative distribution, was also a contributing cause to the failure of the Mary M. Campbell Charitable Remainder Trust. Product selection, both variable annuities and life insurance, were contributing causes to the failure of the CRUT.

<u>Mary M. Campbell, Revocable Trust</u>

On or about the same time that the Respondents recommended the CRUT to Mary, they also recommended a Revocable Trust. The Revocable Trust was created with financial assets which Mary had in her investment account. By March 1998, the account had a current value of approximately $290,000. By the end of December, the account had grown to $295,000. Deposits were credited to the Revocable Trust. By the end of 1999, the Revocable Trust had a value of approximately $428,000. Again, in the year 2000, the account saw a positive net inflow of dollars into the account. However, the account declined in value to $385,000. In 2001, the account again saw a positive net inflow of dollars into the account, but, the account value dropped to $336,000 by December 2001. In 2002, the account saw its first year of negative cash flows primarily caused by the requirement to pay the life insurance premiums. The account ended the year with a value of $277,000. In 2003, the account continued to decline until, after pleas by Mary Campbell, Mr. Stinnett transferred $125,000 (total in various products) to attempt to "stop the bleeding".

Inappropriate asset allocation, inappropriate product selection, and excessive costs of life insurance all contributed to the failure of the Mary Campbell Revocable Trust.



Gail E. Boliver – boliver@marshallnet.com Christopher A. Clausen – cclausen@marshallnet.com JoAnn L. Barten – jbarten@marshallnet.com Eric Bidwell – ebidwell@marshallnet.com

Katherine Caradori Charitable Remainder Trust

The Respondents recommended to Kathy Caradori that she also establish a Charitable Trust. As a result, by June 1998, farm proceeds had been deposited into the account and create a portfolio of approximately $858,000.

In January, 1999, Kathy's Charitable Remainder Trust had approximately $787,000. By year-end, with withdrawals of approximately 13%, the account increased slightly to $810,000. In the year 2000, with withdrawals for distributions, the account value was approximately $680,000. In 2001, the account began at $667,000 and ended with $532,000. In 2002, the account began at $515,000 and ended with $465,000. After continuous pleas from Kathy, the Respondents finally withdrew the funds in June 2003 and placed them into two fixed income vehicles.

In 2003, Mr. Stinnett recommended that Kathy invest in real estate, options and study the stocks herself. He recommended that Kathy trade on-line herself.

Asset allocation and product selection, including variable annuities and life insurance, recommended withdrawals at 9% and other factors caused the failure of Kathy's CRUT.

Katherine Caradori Revocable Trust

On or about the same time the Respondents recommended the Charitable Trust, they also recommended a Revocable Trust. On or about May, 1998, the Katherine Caradori Revocable Trust had a value of approximately $109,000. Throughout the next few years, there was a positive net inflow of dollars into the account. Despite the numerous deposits into the account, the value continued to decline:

| **1999** | | **2000** | | **2001** | |
|---|---|---|---|---|---|
| January - | $239,000 | January - | $270,000 | January - | $255,000 |
| December - | $265,000 | December - | $247,000 | December - | $202,000 |

| 2002 | | **2003** | |
|---|---|---|---|
| January - | $199,000 | January - | $172,000 |
| December - | $173,000 | December - | $106,000* |

* $50,000 was transferred into Allianz Annuity in a brokerage account for Kathy Caradori.

Inappropriate asset allocation, inappropriate product selection (including variable annuities and life insurance), and excessive costs of life insurance all contributed to the failure of the Katherine Caradori Revocable Trust.

## PORTFOLIO VIOLATIONS

*Violations of Duties*

1. Breach of Fiduciary Duty

In Nebraska, fiduciary duty is a "confidential relationship that exists between two persons if one has gained the confidence of the other and purports to act or advise with the other's interest in mind."



Gail E. Boliver – boliver@marshallnet.com Christopher A. Clausen – cclausen@marshallnet.com JoAnn L. Barten – jbarten@marshallnet.com Eric Bidwell – ebidwell@marshallnet.com

In *James vs. McNair*, 164 Neb. 1, 81 N.W.2d 813, 818 (1957) the Nebraska Supreme Court stated: 'Every man has a trust to whom a business is committed by another. Every man is a trustee whose office is to advise or to operate, not for himself, but for others.' ".... The rules of equity, which determines the consequences of acts performed by a fiduciary, are not restricted to attorney/client, nor to conventional relations, but extend to all cases where, on the one hand, confidence is properly reposed, and, on the other, knowledge or authority or influence arises from any cause. ...a person gratuitously or officiously assuming, as agent or trustee to control or manage the property or interest of another is as firmly bound by the implied terms of his confidential relations as one who is regularly employed and paid."

In 1995, the Nebraska Supreme Court updated the guidance on fiduciary duty in Wolf vs. Walt, 247 Neb. 858, 530 N.W.2d 890 (NE1995) by stating: "A *fiduciary duty* arises out of a confidential relationship which exists when one party gains the confidence of the other and purports to act or advise with the other's interest in mind." (at page 898). In 2003, the Nebraska Supreme Court refined the obligation of a fiduciary and stated: A fiduciary has..."an obligation to refrain from doing any harmful act to the principal. *Crosby vs. Luehrs*, 266 Neb. 827, 834, 669 N.W.2d 635, 643 (2003).

In *Fletcher vs. Matthew*, the Nebraska Supreme Court held that an "agency" is a fiduciary relationship resulting from one person's manifested consent that another may act on behalf and subject to the control of the person manifesting such consent and further, resulting from another's consent to so act. *Oddo vs. Speedway Scaffold Company*, 233 Neb. 1, 443 N.W.2d 598 (1989). Further, that "'a confidential relationship exists between two persons if one has gained the confidence of the other and purports to act or advise with the other's interest in mind.'" *Schaneman v. Schaneman*, 206 Neb. 113, 125-26, 291 N.W.2d 412, 420 (1980).

Mary and Kathy placed 100% of their trust for their financial future in Mr. Stinnett, Mr. Denney and American Express Financial Advisors (all members of the NASD). Mr. Stinnett and Mr. Denney were licensed, educated, experienced and trained registered representatives and both Mr. Stinnett and Mr. Denney and American Express Financial Advisors breached their fiduciary duties to Mary and Kathy.

Mr. Stinnett and Mr. Denney, licensed, educated, experienced registered representatives, and American Express Financial Advisors a broker-dealer held a relationship of trust and confidence with Mary and Kathy. Mr. Stinnett, Mr. Denney and American Express Financial Advisors were under a duty to act in the clients' best interests and give advice that met Mary and Kathy's planning and retirement objectives. Mary and Kathy placed all of their confidence, faith and future in Mr. Stinnett, Mr. Denney and American Express Financial Advisors. Their research, experience, training and education dominated Mary and Kathy's decision-making capability. As a result of the breach of fiduciary duty Mary and Kathy have been damaged.

Mary and Kathy placed their total confidence and trust in Mr. Stinnett, Mr. Denney and American Express Financial Advisors. Mary and Kathy had no knowledge of securities analysis, insurance products, annuities or asset management. Mary and Kathy totally relied upon the expertise of Mr. Stinnett, Mr. Denney and American Express Financial Advisors.

As a result of the improper recommendations and breach of fiduciary duty by Mr. Stinnett, Mr. Denney and American Express Financial Advisors, Mary and Kathy were damaged in an amount as is more fully set forth below in the section titled DAMAGES.



Gail E. Boliver – boliver@marshallnet.com Christopher A. Clausen – cclausen@marshallnet.com JoAnn L. Barten – jbarten@marshallnet.com Eric Bidwell – ebidwell@marshallnet.com

2. Negligence

Nebraska's common law of negligence has four elements:

1. Duty;
2. Breach of Duty;
3. Proximate Cause; and
4. Damages.

Mr. Stinnett, Mr. Denney and American Express owed a duty of proper advice and management to Mary and Kathy concerning their assets. Once American Express, Mr. Stinnett and Mr. Denney accepted Mary and Kathy as customers, they were under an obligation, established by the industry, the NASD and the common law of the State of Nebraska to properly manage and advise Mary and Kathy concerning their assets and retirement investments.

The NASD requires the registered representative and broker-dealer members to make recommendations based on a suitability concept. Suitability requires a registered representative to make recommendations based on:

1). Customers' financial status;
2). Customers' tax status;
3). Customers' investment objectives; and
4). Such other information used or considered to be reasonable by such member or registered representative in making recommendations to the customer.

Mr. Stinnett, Mr. Denney and American Express breached their duties to Mary and Kathy. In particular, Mr. Stinnett, Mr. Denney and American Express were negligent in the following particulars:

1. Failing to properly advise Claimants concerning risks of CRUTs; the appropriateness of nearly 100% of financial assets in CRUTs; high costs of "new" life insurance (and associated commissions); and proper asset allocations for each.

2. Failing to recommend a proper asset allocation for each Claimant given their financial holdings, needs, and limited income potentials.

3. Failing to monitor the portfolios through turbulent financial times.

4. Failing to properly diversify each of Claimants' portfolios.

5. Failing to advise Claimants concerning the risks associated with their portfolios and failing to offer less aggressive alternatives.

6. Failing to communicate with Claimants in writing, e-mail or other verifiable form.

7. Failing to follow basic portfolio management techniques for Claimants' investment objectives and conditions as known;

8. Failing to properly "know your customer" as required by NASD and NYSE Rules;

9. Failing to properly supervise Claimants' accounts as required by the NASD and NYSE Rules; and



Gail E. Boliver – boliver@marshallnet.com Christopher A. Clausen – cclausen@marshallnet.com JoAnn L. Barten – jbarten@marshallnet.com Eric Bidwell – ebidwell@marshallnet.com

10. Failing to treat Claimants' accounts with the degree of honesty and commercial integrity as required by NASD given Claimants' investment objectives.

The Respondents' breach of their common law, regulatory, and contractual responsibilities to Mary and Kathy was a proximate cause of damage to them. As a result of the breach of duty and proximate cause of damages, Mary and Kathy were damaged in an amount as is more fully set forth below in the section titled DAMAGES.

3. <u>Violations of Nebraska Securities Acts</u>

The Nebraska Securities Act requires a registered representative and broker-dealer to make recommendations for securities and investment products that are suitable based upon investment objectives, financial situation and **needs**, and other relevant information known to the registered representative and broker-dealer. The Nebraska law further requires a broker-dealer to properly supervise a registered representative.

Registered Representatives Stinnett and Denney, and broker-dealer American Express failed to make recommendations based upon the investment objectives, financial situation, and needs of Mary and Kathy.

Mr. Stinnett, Mr. Denney and American Express created high-risk portfolios unsuitable for and investment objective of income on behalf of Mary and Kathy.

As a result of such violations, Mr. Stinnett, Mr. Denney and American Express have violated the Nebraska Securities Act. As a result of the violations of the Nebraska Securities Acts, Mary and Kathy were damaged in an amount as is more fully set forth below in the section titled DAMAGES.

4. <u>Violations of NASD Rules of Supervision and Suitability</u>

<u>A. Suitability</u>

The NASD sets standards for broker-dealers and its member registered representatives. The NASD requires members to make recommendations based upon the following:

1). Customers' financial status;
2). Customers' tax status;
3). Customers' investment objectives; and
4). Such other information used or considered to be reasonable by such member or registered representative in making recommendations to the customer. (NASD Manual 2310).

Neither Mr. Stinnett, Mr. Denney nor through any supervisory action of American Express, took any action to properly diversify the portfolios of Mary and Kathy given modern portfolio theory and applications. Had even the most fundamental application of modern portfolio theory been applied, Mary and Kathy would not have suffered the losses in the high-risk portfolios created by Mr. Stinnett, Mr. Denney and American Express. Further, in light of their asset holdings, the recommendations to establish CRUTs and remove most of their assets from their control and available for medical or other emergencies was not in Mary and Kathy's best interest. Since the property was inherited their advisors also failed to evaluate the actual tax consequences of an outright sale versus the CRUT.



Gail E. Boliver – boliver@marshallnet.com Christopher A. Clausen – cclausen@marshallnet.com JoAnn L. Barten – jbarten@marshallnet.com Eric Bidwell – ebidwell@marshallnet.com

Mr. Stinnett, Mr. Denney and American Express knew or should have known that the portfolios were high-risk and unsuitable given the conditions that existed for Mary and Kathy, given their investment objectives. The advisors should also have known that a 9% payout on the CRUT was more than double the recommended payout percentage to avoid the invasion of principal thus endangering their retirement nest-egg.

As a result of the unsuitable recommendations by Mr. Stinnett and Mr. Denney and approved by American Express, Mary and Kathy were damaged in an amount as is more fully set forth below in the section titled DAMAGES.

B. Supervision

American Express is obligated by the NASD Rules of Supervision to set up a system to supervise registered representatives. Under Notice to Members (NTM) 99-45 (See **Exhibit A**), the NASD requires NASD member firms to set up procedures to adequately and effectively supervise registered representatives.

Mr. Stinnett and Mr. Denney are responsible for understanding firm policies and NASD rules. The NASD not only requires "written supervision" policies, but **effective** procedures to protect investors from inappropriate/unsuitable recommendations. The supervisor of Mr. Stinnett and Mr. Denney is responsible for monitoring compliance with securities laws and NASD Rule compliance and taking such actions necessary to enforce rules and protect customers. Failure to supervise is non-compliance with securities laws and NASD duties. American Express failed to properly supervise Mr. Stinnett and Mr. Denney.

American Express has breached its duty of supervision of Mary and Kathy's investments. The supervisors of their accounts never alerted Mary and Kathy during the time period of their portfolios, of the risks of their portfolios.

As a result of the failure of supervision, Mary and Kathy were damaged in an amount as is more fully set forth below in the section titled DAMAGES.

5. **Misrepresentation**

In Nebraska, misrepresentation is defined as follows:

1. The respondents represented to Mary and Kathy that the positions were appropriate for her financial circumstances, tax status, needs and other conditions.
2. The representations were false.
3. The representations were material.
4. The Respondents knew the representations were false.
5. The Respondents intended to deceive Mary and Kathy.
6. Mary and Kathy acted in reliance on the truth of the representations and was justified in relying on the representations.
7. The representations were a proximate cause of Claimant's damage.
8. The amount of damage.

In the alternative, see Negligent Misrepresentation - Nebraska law sets forth the following:



Gail E. Boliver – boliver@marshallnet.com Christopher A. Clausen – cclausen@marshallnet.com JoAnn L. Barten – jbarten@marshallnet.com Eric Bidwell – ebidwell@marshallnet.com

1. The Respondents, on or about the date of engagement of services and throughout the term of the portfolios, negligently supplied information to Mary and Kathy, which information was totally inadequate.
2. The Respondents had a financial interest in supplying the information.
3. The Respondents intended to supply the information for the benefit and guidance of Mary and Kathy.
4. The Respondents intended the information to influence the transactions.
5. Mary and Kathy acted in reliance of the truth of the information supplied and was justified in relying on the information.
6. The negligently supplied information was a proximate cause of Mary and Kathy's damages.
7. The amount of damage.

In particular, Mr. Stinnett and Mr. Denney, with the approval of American Express made representations and recommendations to Mary and Kathy that the portfolios were appropriate given their financial circumstances, tax status, needs and other conditions.

Mr. Stinnett, Mr. Denney and American Express knew or should have known that such positions and actions recommended were not prudent for Mary and Kathy and would not match their investment objectives. As a result of the misrepresentation, Mary and Kathy were damaged in an amount as is more fully set forth below in the section titled DAMAGES.

6. <u>Negligent Supervision and Respondeat Superior</u>

American Express, a broker-dealer, member of the NASD and registered in Nebraska owed a duty under the Rules of the NASD and its interpretive guidance to set- up a written procedure to effectively supervise Mr. Stinnett and Mr. Denney. At no time did the supervisors of Mr. Stinnett and Mr. Denney write to Mary and Kathy and inform them of the high-risk characteristics of their portfolio. The supervisor(s) also failed to question the appropriateness of funding a tax sheltered trust with a proprietary tax sheltered product and permitted unnecessary and costly replacements that were not in the clients' best interests.

American Express provided no notice of portfolio risks nor took any defensive strategies to minimize the losses in the portfolios. There were no known actions taken by American Express to defend Mary and Kathy against the unsuitable and erroneous actions or inactions of Mr. Stinnett and Mr. Denney. No documents were received by Mary and Kathy from American Express that alerted them to problems or risks in their portfolios.

Under the common law doctrine of respondeat superior, an employer has an obligation to be responsible for its employees. Mr. Stinnett and Mr. Denney were employees of American Express and therefore American Express is responsible for the acts, omissions and errors of Mr. Stinnett and Mr. Denney.

American Express failed to properly supervise licensed, trained, educated and experienced registered representatives (Mr. Stinnett and Mr. Denney). As a result of the negligent supervision of Mary and Kathy's account, they were damaged in an amount as is more fully set forth below in the section titled DAMAGES.



Gail E. Boliver – boliver@marshallnet.com Christopher A. Clausen – cclausen@marshallnet.com JoAnn L. Barten – jbarten@marshallnet.com Eric Bidwell – ebidwell@marshallnet.com

7. <u>Breach of Contract</u>

American Express, Mr. Stinnett and Mr. Denney had advised Mary and Kathy they were qualified, licensed, capable professionals and able to properly advise them of their financial needs given their specific circumstances as outlined in the NASD Rules.

American Express, Mr. Stinnett and Mr. Denney, requested that Mary and Kathy trust them based on their experience, sophistication, training and education. American Express, Mr. Stinnett and Mr. Denney offered to properly advise and execute a proper investment portfolio for Mary and Kathy. Mary and Kathy accepted the offer and transferred positions to American Express and Mr. Stinnett and Mr. Denney.

American Express, Mr. Stinnett and Mr. Denney breached their contract of proper financial advice to Mary and Kathy. Both the firm and the Registered Representatives are obligated to follow the rules of the NASD as part of their duties in this contract. Mary and Kathy signed customer agreements. Said agreements state that the transactions in the accounts will comply with all SRO's rules. The Respondents did not comply with SRO rules resulting in a breach of contract. See *Komanoff v. Mabon, Nubent & Co.*, 884 F. Supp. 848, 860 (S.D.N.Y. 1995). See also *Iowa Grain v. Farmers Grain and Feed Co.*, 293 N.W.2d 22, 25 (Iowa 1980): "A broker's covenant with its customer that it will follow exchange rules and customs establishes a contractual duty to the customer." As a result of their breach, Mary and Kathy were damaged.

The breach of the agreement was a proximate cause of damages to Mary and Kathy. Mary and Kathy were damaged in an amount as is more fully set forth below in the section titled DAMAGES.

## DAMAGES

Claimants, Mary Campbell and Kathy Caradori, understand the NASD panel has full authority to decide the damages of the case. However, as an aide to the panel, Mary and Kathy have suffered losses calculated by projecting suitable strategies and asset allocation.

<u>MARY CAMPBELL</u>

| | Out of Pocket* | Benchmark** |
|---|---|---|
| A. Revocable Trust | $61,249 | $80,000 |
| B. CRUT | $60,877 | $135,209 |
| | $122,126 | $215,209 |
| C. Life Ins. | Unknown at time of this filing. Damages will be supplemented upon completion of discovery and investigation. | |
| D. Other | Attorney Fees and costs (pursuant to Nebraska Securities Act). | |



Gail E. Boliver – boliver@marshallnet.com Christopher A. Clausen – cclausen@marshallnet.com JoAnn L. Barten – jbarten@marshallnet.com Eric Bidwell – ebidwell@marshallnet.com

KATHERINE CARADORI

| | Out of Pocket* | Benchmark** |
|---|---|---|
| A. Revocable Trust | $78,766 | $116,923 (May 2003) |
| B. CRUT | $27,539 | $128,055 (May 2003) |
| | $106,305 | $244,978 |
| C. Life Ins. | Unknown at time of this filing. Damages will be supplemented upon completion of discovery and investigation. | |
| D. Other | Attorney Fees and costs (pursuant to Nebraska Securities Act). | |

* OOP - This made-up damage theory is usually proposed by Respondents. This flawed theory assumes that Claimants' investments were placed under a mattress, then taken out at the end of a period with no adjustment for market conditions.

**Benchmark - A proper portfolio asset allocation for Claimants at the time of the investments. This theory properly adjusts for market conditions.

Further, Mary and Kathy request compensation from Respondents, jointly and severally, in a fair and reasonable amount, interest at the legal rate from the date of the award, costs, expert fees, attorney fees and such other damages as the panel may deem appropriate under the facts of this case.

## LOCATION

Mary and Kathy would request this arbitration to be set in Omaha, Nebraska.

Thank you for your assistance in this matter.

Respectfully submitted,
Mrs. Mary M. Campbell, Claimant
Mrs. Katherine M. Caradori, Claimant

By:____________________

Gail E. Boliver, 20573
Boliver Law Firm
8712 West Dodge Road, Suite 400
Omaha, NE 68114
Telephone: 402-392-0107
Facsimile: 402-392-1011
e-mail boliver@marshallnet.com
Attorneys for Claimants

**STATE OF MINNESOTA** | **DISTRICT COURT**
**COUNTY OF HENNEPIN** | **FOURTH JUDICIAL DISTRICT**

LESA BENACQUISTO, DANIEL BENACQUISTO, RICHARD THORESEN, ELIZABETH THORESEN, ARNOLD MORK, ISABELLA MORK, RONALD MELCHERT and SUSAN MELCHERT, on behalf of themselves and all others similarly situated,

Plaintiffs,

v.

AMERICAN EXPRESS FINANCIAL CORPORATION, AMERICAN EXPRESS FINANCIAL ADVISORS, AMERICAN CENTURION LIFE ASSURANCE COMPANY, AMERICAN ENTERPRISE LIFE INSURANCE COMPANY, AMERICAN PARTNERS LIFE INSURANCE COMPANY, IDS LIFE INSURANCE COMPANY, and IDS LIFE INSURANCE COMPANY OF NEW YORK,

Defendants.

Case No. 96-018477

(Consolidated Cases: 96-018477, 97-004742, 98-105681)

**UNITED STATES DISTRICT COURT**
**DISTRICT OF MINNESOTA**

LESA BENACQUISTO, DANIEL BENACQUISTO, RICHARD THORESEN, ELIZABETH THORESEN, ARNOLD MORK, ISABELLA MORK, RONALD MELCHERT and SUSAN MELCHERT, on behalf of themselves and all others similarly situated,

Plaintiffs,

v.

AMERICAN EXPRESS FINANCIAL CORPORATION, AMERICAN EXPRESS FINANCIAL ADVISORS, AMERICAN CENTURION LIFE ASSURANCE COMPANY, AMERICAN ENTERPRISE LIFE INSURANCE COMPANY, AMERICAN PARTNERS LIFE INSURANCE COMPANY, IDS LIFE INSURANCE COMPANY, and IDS LIFE INSURANCE COMPANY OF NEW YORK,

Defendants.

Civ
Case No. 00-1980 DSD/JMM

# STIPULATION OF SETTLEMENT

# TABLE OF CONTENTS


Page

I. INTRODUCTION . . . . . 1

II. DEFINITIONS . . . . . 4

III. CERTIFICATION OF THE CLASS . . . . . 18

IV. SETTLEMENT RELIEF . . . . . 20

V. GENERAL RELIEF . . . . . 23
A. Accidental Death Benefit . . . . . 23
B. Research Initiative Regarding Terminated Policies and Annuities . . . . . 24

VI. INTERNAL REPLACEMENT RELIEF . . . . . 24
A. Procedures . . . . . 24
B. Available Relief . . . . . 25

VII. THE CLAIM REVIEW PROCESS . . . . . 28
A. Procedures . . . . . 28
B. Claim Categorization . . . . . 32
C. Review of the Claim . . . . . 32
D. Distribution of Relief Awarded in the Claim Review Process . . . . . 33
E. Payment of the Claim Evaluator Fees and Expenses . . . . . 34

VIII. DEFENDANTS' FUNDING OBLIGATIONS . . . . . 35
A. Establishing the Claim Review Relief Fund . . . . . 35
B. Funding Reverts upon Termination . . . . . 35

IX. NOTICE TO THE CLASS AND COMMUNICATIONS WITH CLASS MEMBERS . . . . . 35
A. Introduction . . . . . 35
B. Class Notice Package . . . . . 36
C. Publication Notice . . . . . 40
D. Post-Settlement Mailing . . . . . 40
E. Post-Mailing Reminder . . . . . 41
F. Retention of Administrator . . . . . 42
G. Toll-Free Telephone Number for Settlement Information . . . . . 44
H. Right of Communication with Claimants and Defendants' Customers . . . . . 46
I. Media Communications . . . . . 48
J. Defendants' Dealings with Producers . . . . . 48
K. Co-Class Counsels' Communication with Producers . . . . . 49
L. Co-Class Counsels' Administrative Responsibilities . . . . . 49

X. REQUESTS FOR EXCLUSION . . . . . 51

XI. OBJECTIONS TO SETTLEMENT . . . . . 51

XII. RELEASE AND WAIVER AND ORDER OF DISMISSAL . . . . . 53
A. Release and Waiver . . . . . 53
B. Release and Waiver -- Definitions . . . . . 56
C. Order of Dismissal . . . . . 59

XIII. ATTORNEYS' FEES AND EXPENSES . . . . . 59

XIV. ORDER OF NOTICE, SETTLEMENT HEARING AND ADMINISTRATION . . . . . 61

XV. FINAL APPROVAL AND FINAL ORDERS AND JUDGMENTS . . . . . 62

XVI. MODIFICATION OR TERMINATION OF THIS AGREEMENT . . . . . 62

XVII. GENERAL MATTERS AND RESERVATIONS . . . . . 65