# NATIONAL ASSOCIATION OF SECURITIES DEALERS, INC.

Mrs. Mary Campbell, individually, and as Trustee and Mrs. Katherine Caradori, individually, and as Trustee,

Claimants,

vs.

American Express Financial Advisors, Inc., n/k/a Ameriprise Financial, David L. Stinnett and, and Gerald Denney,

Respondents.

NASD-DR #05-03008

**STATEMENT OF ANSWER**

## INTRODUCTION

This is the Statement of Answer of David L. Stinnett, Gerald Denney and American Express Financial Advisors, Inc. now known as Ameriprise Financial ("Ameriprise"). Respondents deny any liability to Claimants, deny all allegations in the Statement of Claim, other than as admitted or qualified hereafter, and respectfully request dismissal of the Claimants' claim in its entirety.

It has turned out there are matters which limit Respondents' ability to Answer, and may require an Amended Answer. Several of the Claimants' accounts are included in a class-action lawsuit regarding life insurance and variable annuities from which the Claimants did not opt out. The claims involving the Claimants' insurance products are not subject to NASD arbitration.[1]

[1] NASD Code of Arbitration Procedure 10301(d)(2) provides that "Any claim filed by a member or members of a putative or certified class action is also ineligible for arbitration at the Association if the claim is encompassed by a putative or certified class action filed in federal or state court...(unless)...Claimants demonstrates that it has...complied with any conditions for withdrawing from the class prescribed by the court. Either party may elect instead (of submitting



EXHIBIT 8

Respondents have signed a *limited* Uniform Submission Agreement, declining to arbitrate claims covered by a settled class action, and seek Claimants' voluntary dismissal of this aspect of his claim, or, in the alternative, will move the United States District Court that presided over this action to bar litigation or arbitration of the settled claim.

This Claim also raises an additional issue in that the claim relates back to activity in the Claimants' accounts occurring nearly eight years ago. This is well beyond the NASD's own "six-year rule" regarding this panel's ability to preside over the circumstances that are the subject of the Statement of Claim. The Respondent Ameriprise has not employed Mr. Gerald Denney, by the Claimants' own admission, since 1998. The fact that the Claimants have named Mr. Denney as a party to this arbitration should weigh heavily as to the timeliness of their claim. If this untimely claim actually makes it to an evidentiary hearing, the evidence will show that the claims are contrary to undisputable facts. Respondents seek not only dismissal of the claim, but also expungement of Mr. Denney's and Mr. Stinnett's CRD records, and an award of all of Respondents attorney's fees and costs.

## FACTS

- **THE PARTIES**

1. Respondent Ameriprise is a broker-dealer of securities and has been engaged in the sale of financial products throughout the United States since 1894. Ameriprise provides financial advice, prepares financial plans, offers over 3,000 mutual funds, virtually any individual stock or bond, investment certificates (CDs) and various insurance products.

---

the issue to the NASD Panel) to petition the court with jurisdiction over the putative or certified class action to resolve such disputes.

2. Respondent Gerald H. Denney began his registration with Ameriprise in 1990. Mr. Denney assisted the Claimants during the initial planning stages of their relationship with the Respondents. As noted in the Statement of Claim, Mr. Denney ended his registration with Ameriprise in 1998. At that time, Mr. Denney moved out of state; he continues to work as an advisor in the securities industry.
3. Respondent David L. Stinnett was a registered Ameriprise advisor for six years from 1997 through 2003. During this six-year period, Mr. Stinnett was involved in the planning of the Claimants' accounts, the opening of the Claimants' accounts, and remained Claimants' advisor until he terminated his registration with Ameriprise in 2003.
4. Claimant Katherine Margaret Caradori first became a customer of Ameriprise in 1997. At the time, she was 52 years old. Prior to this, Kathy held a variety of investments in stocks, bonds, real estate, and insurance products through various sources. In addition, her primary financial asset was farmland which she owned jointly with her mother.
5. Claimant Mary M. Campbell is Kathy's mother. Her joint ownership of real estate with her daughter prompted her involvement in the planning and investment process which her daughter initiated in 1997 with respondent Ameriprise. Although Mary was 71 years old in 1997, she was of sound mind, had substantial investment experience and remained actively involved in the management and oversight of her investment accounts.

**FACTUAL DISCUSSION**

Kathy first approached the Respondents for financial planning advice in January 1997. She had recently been divorced, and, although she had a significant amount of assets, most of her assets were tied up in farmland she owned with her mother. The farmland was not generating income (or at least any significant income), and Kathy was interested in possibly selling the

farmland. Her accountant had informed her, however, that if the farmland was sold at projected prices, the capital gains tax on the sale would be very high and would dramatically reduce what she would receive from the sale.

In addition to the issue of the farmland, Kathy owned a smattering of stocks and bonds at various financial institutions, but wanted to gain a better picture of what she owned, whether she should re-position it, and whether there was a way to consolidate all of it to make management of the account easier. Because Kathy owned the farmland jointly with her mother, Mary, Mary got involved in the financial planning discussions as well, and ultimately decided to re-position and consolidate her assets in a fashion similar to her daughter's accounts.

Advisors Stinnett and Denny worked with Kathy and Mary for about a year and a half before they made any decisions to invest with Ameriprise or implement any Ameriprise recommendations. During this year and a half long planning phase, Mr. Stinnett and Mr. Denny presented several different financial plans, and the Campbell's accountant was brought into the discussions as well. Mr. Stinnett and Mr. Denny also recommended that they retain an attorney to help them explore some of the tax planning issues surrounding the sale of the highly appreciated farmland.

The initial summaries show that Kathy had a net worth of approximately $1.4 million. She was recently divorced and had a 24-year-old son. Mary had a net worth of approximately $1 million. The actual net worth figures were significantly lower when the tax consequences of selling the highly appreciated farmland was considered.

One of the strategies the parties eventually discussed was a Charitable Remainder Unitrust ("Trust"), as a method of allowing the farmland to be sold without such a large tax impact from the sale. In essence, Kathy and Mary would be able to receive a significant amount of cash from the sale, and to receive roughly $300,000 in tax deductions which could be carried forward for six years to offset future income and current and future capital gains from investments/sale of investments. The Cambells' accountant and newly retained attorney were closely involved in these discussions. There were decisions Kathy and Mary had to make, because there were positives and negatives about the use of the Trust, although the accountant, attorney and Mr. Stinnett thought that use of the Trust was a reasonable financial planning option for Kathy and Mary. Kathy and Mary decided to go forward with the Trust concept, and their attorney prepared a Trust document to implement their choice. The Claimants also hired an independent trustee to handle all of the real estate transactions for the trust and to oversee operation of the Trust.

Over a period of several months, the Claimants had their farmland appraised and they transferred various assets into the Trust, including the jointly held farmland. Mr. Stinnett prepared several alternative financial plans for Kathy and Mary' consideration-the Cambells had decisions to make regarding the amount of withdrawals they wanted to make and how they would invest to match these goals. Kathy's investment assets, net of taxes, came to around $700,000. Her mother Mary had about half of that amount invested into the Trust, but she retained a significant amount of assets outside the Trust.

On the investment planning side, Kathy and Mary were faced with the inevitable decision on risk versus return, and the parties discussed how different types of investments carried

different levels of risk and different potential levels of return. In the summer of 1998, when the Claimants transferred the majority of their assets into the Trust, a certificate of deposit was earning just about 5.5%. Low-grade bonds (BAA) were earning about 7%, with good quality bonds in between these ranges. On the other hand, the long-term return on the stock market had historically been about 9%, and equities in 1998 were generally averaging a rate of growth of about 20%. Mary and Kathy were well aware of these factors. The equities Kathy and Mary had owned , prior to becoming Ameriprise clients, had grown considerably during the course of their investments, and outperformed their bond funds handily. The Claimants, by this time, were well aware that investing in equities held a greater risk to their portfolios than bonds, but they accepted this risk because they wanted to receive better returns. Presented with any number of scenarios in which to choose, the Claimants Kathy and Mary, not the Respondents, made the decision to receive payouts from their Trust at 8% and 9% respectively. Achieving this level of return would require some risk and investment of a significant portion of their portfolio into equities.

During the nearly year and a half the Claimants spent discussing, creating and implementing the investment strategy, the Respondents provided Claimants with a substantial amount of research and informational materials to help them make the inherently difficult and imperfect choices amongst investment options. Kathy ultimately decided to use about $400,000 of her Trust assets to purchase the following portfolio of stock and bond mutual funds:

- IDS Bond Fund—Intermediate term bond fund
- IDS Extra Income Fund—High Yield Corporate Bonds
- IDS Global Bond Fund—International Bonds
- IDS Growth Fund—Large Cap Growth Equities
- IDS Cash Management Fund—Money Market Account
- IDS New Dimensions Fund—Large Cap Growth Equities
- IDS Small Company Index Fund—Small Cap Growth Equities
- IDS Emerging Market Fund—Diversified Foreign Equities

Kathy chose this mix of funds from among a number of mutual funds respondents recommended. These were well- regarded mutual funds from IDS's in-house family of mutual funds-one of the oldest and largest mutual fund complexes in the business. The New Dimensions fund, for example, had been rated by the Morningstar mutual fund rating company as a 4 or 5 star fund for a time period of nearly 20 years, but , as a growth fund, the fund entailed significant risk. At the time, the New Dimensions Fund had averaged better than 20% annual returns for two prior consecutive years and averaged nearly that much on an annual basis for 10 straight years. This track record could continue, but, then again, it might not. In 1998, the prognosis for equities was good, but such future predictions are of course as inherently uncertain as any prediction of the future.

Respondents believe that these were reasonable investments for an investor such as Kathy. An alternative approach would have been to use multiple mutual fund families, although that would then have caused higher sales loads and a more complex and arguably harder to manage account. Respondent, for example, offered what is known in the industry as a "mutual fund wrap account." This type of account has the advantage that a much wider range of mutual fund selections is possible-literally hundreds of different mutual funds from dozens of different mutual fund families. The account assesses a 1% yearly wrap fee, however, which tends to be significantly higher than the break point adjusted load on a $400,000 investment into the IDS fund family. (Respondents' counsel has not done the calculation yet, but the sales load on $400,000 should have been less than a one-time assessment of about 4%. Over the years, a 1% a year charge would obviously be much higher than this.)

Kathy's mother, Mary, transferred approximately $130,000 in equities she owned (such as Eastman Kodak, Lockheed Martin, SBC Communications, PNC Bank, and US Bancorp) to

her Trust. She then liquidated these holdings and invested into the following blend of mutual funds:

- IDS High-Yield Tax Exempt Fund—Municipal Bond Fund
- IDS Growth Fund–Large Cap Growth
- IDS Federal Income Fund—Government Bonds
- IDS Blue Chip Advantage Fund—Large Cap Blend of Growth and Income
- IDS Global Bond Fund—International Bonds
- IDS International Fund—Global Equities
- IDS Small Company Fund—Small Cap Growth

Mary also used other assets from the Trust (primarily proceeds from the sale of the farmland) to invest $200,000 into an annuity. These were reasonable investments for Mary in light of her investment experience, her investment outlook and her needs for income and growth.

All of Mary's and Kathy's accounts with Ameriprise were "non-discretionary" accounts, meaning that Mary and Kathy had to approve and sign off on any investment which was made. Respondents do not contend that they did not give advice-they did, and they did present a wide variety of options. None of the investments at issue were ones that Kathy or Mary just choose out of the blue. However, Mary and Kathy did approve every investment they made. Mr. Stinnett gave advice to the Claimants; the Claimants in turn discussed this advice with their trust administrator and accountant, and then ultimately made the decisions regarding the accounts.

By the middle of 1998, over 7 years ago, both of the Claimants had fully implemented the investment portfolios at issue in this case. Also, at the end of 1998, Mr. Denny left Ameriprise and had no further contact with the Claimants. (This passage of time raising, amongst other questions, whether claimants' claims are eligible for arbitration under the "six year eligibility rule" or barred from litigation by statutes of limitation-see discussion infra.)

The combined total of the Trusts was approximately $1.2 million in 1998. Throughout the course of 1998, Kathy received the 8% annual distributions she had chosen to receive while her mother, Mary, received the 9% annual distribution she chose. After 1998, Kathy and Mary continued to receive regular income from their Trusts at the combined rate of approximately $100,000 per year. Claimants have been receiving income from their Trust for nearly eight full years as of the date of the Claimants' claim. During the course of their 8 years with Ameriprise, the Claimants' portfolios remained structurally the same.

From 1998 until well into 2000, the Claimants' equity funds grew substantially and outperformed their bond funds. (Indeed, part of the "losses" at issue came on the bond funds, which performed poorly in 1999 and well into 2000) When the market began to turn on investors, the Claimants' advisor, Mr. Stinnett, began to advise Kathy and Mary on alternative investments. Respondent Stinnett offered to the Claimants many alternative ways to protect the assets within their Trusts. Mary, for example, agreed to Mr. Stinnett's recommendation to transfer $70,000, in the spring of 2000, into three Real Estate Investment Trusts ("REITs"). Although REITs do entail some market risk as well, these were all triple net-leased, all cash REITs generating income in excess of 7% per year. This amounted to approximately 1/3rd of her investment outside of the annuities she owned.

Kathy, on the other hand, chose to remain in the same investments. She made this decision in light of the performance of the funds in her portfolio. Her Growth Fund gained nearly 40% during 1999; the New Dimensions fund had an annual return greater than 30% that year, and the Emerging Market Fund had an annual return near 80%. It is a fact that from 2000 to 2003 the stock market witnessed the greatest and longest decline in modern history. Equity

investments of all types declined in value effecting millions. The Claimants' equity investments responded no differently.

Throughout this time-period, Mr. Stinnett continued to advise the Claimants on alternative and more conservative investments. Although Mr. Stinnett did not claim that he could predict the future, he did discuss the market volatility and how it very well could continue. If Mary or Kathy were uncomfortable about market volatility or investment losses, there were many more conservative investment options available. For example, within the IDS fund family, Mary and Kathy could switch to other mutual funds at no charge. They already were invested in both bond funds and stock funds withion the IDS fund family, and thus plainly knew there were options. Their prospectuses informed them that they always had the option to alter their investment mix however they wanted, and Mr. Stinnett reminded them of this many times. Moving to bonds would mean less risk, but it would be unlikely that bond funds would generate returns in the range of the performance *possible* from stock funds. This was a choice, but not one Mr. Stinnett could make for them.

Kathy always decided against transferring her money into more conservative investments because she hoped to receive a higher rate of return than the amount earned by CDs and bond funds. She had elected a distribution rate of 8% and wanted to remain in a blend of investments which could generate at least this much return. Mary did agree with Mr. Stinnett's advise on diversifying a bit into REITs, but , otherwise, she also decided to stay the course with what she had.

In 2003, the Claimants finally did decide to take the advice of Mr. Stinnett regarding a change to their annuity policies. What the Claimants fail to note is that this change did not come at a cost to them as described in the Statement of Claim. At the time, Allianz was offering a 10%

bonus for the purchase of its annuity policies. For every $1,000 the Claimants used to purchase their policy, Allianz added an additional $100. This 10% bonus more than accounted for any surrender fee they would pay on the policy they were exchanging. Although Claimants are correct that they ended up losing money in their first year into these policies, they fail to mention that, subsequently, the accounts appreciated in value.

In September 2003, Respondent Stinnett retired from Ameriprise. Ameriprise promptly reassigned the Claimants to another advisor.

The Claimants continued to retain their own charitable trust administrator and accountant who oversaw the transactions that took place in their accounts. In 2004, the Claimants' trust administrator and accountant decided that the Claimants should transfer their accounts to another firm. The Claimants transferred the majority of their assets during that year. The Claimants raised no issues or complaints during the time of their transfer. The most current documentation regarding correspondence in the account shows that the Claimants are still using the same trust administrator and accountant concerning their investments.

The Claimants explicitly directed and approved the transactions in their Ameriprise portfolio at all times pertinent to this claim. At the time of each purchase, they signed the acknowledgement sections of the investment applications, affirming that they received full and fair disclosure of each investment prior to purchase, including inherent risks pertaining to market fluctuation. Respondents' files indicate that recommendations made by the Respondents were reasonable and suitable - in line with the goals, time horizon and risk tolerances stated by the Claimants.

Prior to making any purchases, the Claimants received prospectuses for all of the investments presented. The prospectuses clearly detailed investment objectives, past

performance and all the risks related to each product. Claimants reviewed the disclosure pages on the applications to discuss risks and costs. Their advisors also reviewed market volatility with the Claimants and their independent agents on numerous occasions. The Claimants received account statements disclosing all activity within their investments, as did their charitable trust administrator and accountant, and the Claimants provided explicit authorization for each transaction that took place.

While Respondents understand the concerns of the millions of investors impacted by the unpredicted stock market decline, neither Ameriprise nor its advisors are responsible for any downturn in the market. Under the market conditions since the Claimants opened their accounts, market value volatility of great magnitude was not unusual. The Respondents did not make any misrepresentations, nor did the Respondents violate any rules or laws, as the Statement of Claim alleges. Instead, the stock market went down, and the Claimants' accounts may have suffered along with the general market decline.

While the Respondents have not yet had the opportunity to conduct an accounting of the Claimants' accounts, the Respondents believe Kathy and Mary, at the least, share responsibility for losses, if any, in the Claimants' accounts and for the decisions they made. The Claimants received a sizable tax benefit by creating the Trust in 1997. They received hundreds of thousands of dollars of continuous withdrawals from the accounts during the nearly seven years the accounts were with Ameriprise. The Claimants received a 10% cash bonus to the purchases made in 2003 through Allianz. The IDS Life Insurance and Annuity policies were all part of a class action in which the Claimants did not opt out and in which they received a settlement in 2001. For these reasons, among other various factors relating to the Trusts, Respondents do not believe that the Claimants have losses in their accounts.

What is actually happening in this case is that Claimants wanted to receive high returns from their investments. Like millions of other investors, they consciously chose to invest in the stock market because they thought they could get better returns than what was available on safe, conservative, fixed return investments such as CDs. Regretfully, in the medium term at least, the stock market disappointed most everyone during 2000-2003. Claimants invested as capitalists in a capitalist system in which an investor shares in gains ***and*** losses. Most of the assets they "lost" were assets they "gained" because stocks went up in value – the going down concept is part of the formula of investing: we all hope it will not happen, but it might, and when it does, we must take our losses with our gains.

## LEGAL DISCUSSION

The Statement of Claim alleges that the Respondents misled Mary and Kathy into a number of inappropriate investments. Claimants cite violations of federal and state security laws in addition to negligence and lack of supervision. However, the Claimants have not identified any action by the Respondents that represent the violation of any applicable statute, rule, regulation, or common law legal theory. Therefore, the Respondents will only briefly recite its legal defenses, but it retains all legal defenses available under the law. Prior to reciting the key legal defenses as affirmative defenses, Respondents states as follows:

### I. Claimants Must Bear Responsibility for Their Own Decisions

From a legal standpoint, the Claimants' claims are barred by the doctrines of estoppel, waiver, ratification, and laches and by applicable statutes of limitation, such as the one-year limitation on any misrepresentation or fraud claim. The doctrines of estoppel, waiver, and laches essentially say that a person cannot "sit on their rights." For example, if a person has a complaint about something he or she purchased, he or she must raise that complaint in a timely

fashion. The Claimants alleges a failure on the part of Respondents relating to decisions and purchases made in 1997 and 1998 yet they waited until 2005 to file their Statement of Claim.

Numerous court, arbitrator, NASD Office of Hearing Officer, SEC, and CFTC decisions have dismissed investor claims marked by delay as is present with Mr. Campbell and Caradori's claim. For example, in Lake v. Kidder Peabody & Co. 1978 WL 1101(N.D. Ind. 1978), the Court held that the plaintiff/customer waived suitability claims when he reviewed his account statements, but did nothing except wait to see how things would turn out. Similarly, in Altshul v. Paine Webber, Jackson & Curtis, Inc., 518 F. Supp. 591(S.D.N.Y. 1981) the Court held that the defendant/brokerage firm was not responsible for allegedly unsuitable management of the plaintiff/customer's account, where the customer reviewed his account statements, but did not complain until he began to experience losses in his accounts. Prior to that time, he said nothing about his stock market investments because he was at that time happy with the returns on his portfolio. See also, e.g., Zimmerman v. Merrill Lynch, Pierce, Fenner & Smith, 151 Mich. App. 566(Ct. App 1986) (estoppel for failure to read account statements and take corrective action); Marshak v. Blyth, Eastman Dillon & Co., 413 F. Supp. 377 (N.D. Okla. 1975) (estoppel for failure to read account statements); Roberson v. Leighton, 1998 WL 429625(C.F.T.C. 1998) (customer has a responsibility to read account statements and complain in a timely fashion if the investments are inconsistent with the customer's risk tolerance); Clark v. Thomson McKinnon Securities, Inc., Comm. Fut. L. Rep(CCH) 23,796(C.F.T.C. 1987) (same).

The Claimants' accounts gained and declined in value. Both of the Claimants, as well as their charitable trust administrator and accountant, received account statements revealing this. Their Ameriprise financial advisors spoke with them and met with them on a regular basis. By the year 2005, it becomes a bit late to contend that the Claimants' investments from 1997 and

1998 were unsuitable. The time to make such a claim was long before 2005 at the time in which the Respondents allegedly failed in its obligations. Under the sampling of case law cited above, and the industry standards reflected in this case law, the Claimants' claims are barred or, at minimum, dramatically reduced in value, pursuant to the doctrines of mitigation of damages, ratification, estoppel, the second investment decision doctrine, assumption of risk and comparative negligence.

The Uniform Commercial Code, by analogy, sets forth a similar well-accepted principal of commercial law. This concept is that a seller of goods, products or services can limit liability to a customer by indicating on an account statement that the customer has a limited time to complain about a purchase reflected on his statement. Otherwise, any claims regarding the reported transactions are barred.

The courts have regularly held that provisions on account statements, which give clients only a certain amount of time to object to transactions, are enforceable contracts, so long as the time period is "commercially reasonable." Periods of 30 days are typical, and regularly held to be enforceable. See Stowell v. Cloquet, 557 N.W.2d 567 (Minn. 1997).

> ...Consistent with industry-wide practice, the Credit Union relies on the account holders to examine the statements each month and contact the Credit Union if he identifies any unauthorized checks.
>
> ...Under...the UCC, an account holder is generally barred from recovering [for an unauthorized transaction] if the account holder does not exercise "reasonable promptness" in examining his or his account statements and notifying the bank of any [unauthorized transaction].

Id. The court held that a requirement that the account holder notify the financial institution of any unauthorized transactions within 20 days of receipt of an account statement was a reasonable provision under law. Id.

The Claimants' Ameriprise investment confirmations (and account statements) informed them that they had only 30 days after receipt of the confirmations or account statements to allege that the purchases reflected on the confirmations and account statements were incorrect or unsuitable. Mary and Kathy made no claim alleging unsuitable investments within this reasonable time period, and therefore, their claims are barred by contract law as well.

Applicable statutes of limitation and the doctrine of laches also bar the claims and allegations submitted by the Claimants. Typically, investors who raise suitability claims in an untimely manner will assert that they were somehow not on notice about their claims or that their broker misled them about the risks of their investments or the like. In this case, the Claimants cannot truthfully make such a claim. The Claimants *knew* they had invested into equities, and they knew these equities could decline in value. In addition, the Claimants had significant experience prior to investing with Ameriprise regarding the risks inherent with investing in the stock market.

Although it seems to be common sense that all types of investing includes a degree of risk, even if the Claimants attempt to show that they did not possess such common sense, many cases have held that such common sense will be imputed to a plaintiff as of the time such information (e.g., that investing in stocks carries risk) became publicly available. See, e.g., In re Valence Tech., 986 F. Supp. 796, 804 (N.D.Cal. 1997); Sterlin v. Biomore Sys., Inc., 960 F.Supp. 1531 (D. Utah 1997); City Nominees Ltd. v. Macro Media, Inc., No. C97-3521 SC (N.D. Cal. 1998). "Publicly filed documents are sufficient to trigger inquiry notice." Salinger v. Projectavision, Inc., 934 F. Supp. 1402 (S.D.N.Y. 1996).

Of course, information regarding the inherent risks of the stock market has been public knowledge since the genesis of the stock market. Certainly, during the period in which the

Claimants invested through Respondents, information filled the media with information on the stock market, its risks and its rewards. The only "new" information the Claimants assert to have discovered is that the stock market dropped, and the value of the equities in their Ameriprise portfolio declined. Part of the reason for the time limitations is to prevent investors from purchasing stock or other equity-based investments, and then sitting around to see how the investments perform. If the investment goes down in value, the investor sues in order to claim reimbursement for market losses. This appears to be what the Claimants are attempting with their Statement of Claim.

NASD Rule 10304 additionally sets out terms to limit the time in which a Claimant may bring an action. Commonly known as the "six-year" rule, it provides that a claim is ineligible for arbitration under the Code if six or more years have elapsed from the occurrence or event giving rise to the claim. In sum, the applicable statutes of limitations have run on Claimants' claims and their claims barred by the doctrines of estoppel, ratification and laches. Their Claims are ineligible for arbitrationunder the NASD six-year rule.

## II. No Misrepresentation Occurred

Proof of any variant of a "misrepresentation" or "failure to disclose" claim requires that the Claimants prove that the Respondents misrepresented an **existing fact**, with either **intent to deceive** the listener or with a **reckless disregard for the truth**, and that the listener "justifiably relied" on the misrepresentation to his detriment. See, e.g. Zobrist v. Coal-X, 708 F.2d 1511 (10th Cir. 1983). An expression of opinion, or a prediction of the future, can never form the basis of a misrepresentation claim. To the contrary, opinions and predictions are constitutionally protected free speech. Id.

Thus, for example, an investment advisor can give his opinion regarding the future direction of the market, without fear of liability for his failure to predict the future. The only exception is if the speaker knows that his representations are untrue as a matter of a current, existing ***fact*** – e.g., a prediction that Enron is a good current investment when the speaker knows that Enron just filed bankruptcy and was indicted for criminal fraud. Alternatively, it is not an illegal misrepresentation for weather reporters to forecast the weather, for economists to predict the course of the economy, or for sports commentators to predict the outcome of sporting events, even if the forecasts prove dead wrong. See, e.g., John v. Shearson, Civ. No. 82-CU-70597-DT (E.D. Mich. 1989) (A broker's prediction that the market would recover cannot form the basis of a misrepresentation claim).

In his Statement of Claim, Mary and Kathy have been unable to identify ***any*** misrepresentation of an existing fact or ***any*** failure by Respondents to disclose a relevant fact. The Claimants were fully aware they had purchased investments consisting of various equities, but this was precisely what they wanted and needed to achieve their long-term investment objectives.

Claimants appear to believe that Respondents had an obligation to protect them from the volatility of the stock market by moving them into alternative investments, regardless of their actual risk tolerance, their long-term financial objectives, the explicit approvals of the investment strategies at issue, and their disapproval of advice on which they chose not to act. Respondents do not contend that it was able to predict the future and acknowledges that it, like most everyone else, failed to predict the severity and length of the stock market downturn – although Respondents always disclosed the possibility of this happening as is set forth in all of the

literature presented to the Claimants. The converse side of all of this is that it is equally difficult to predict when, if ever, a market turnaround will happen.

### III. No Suitability Violation

The NASD's suitability rule provides that the NASD may sanction an NASD registered representative who makes investment recommendations to a client without having a reasonable basis for believing that such investments are suitable for the clients, based on the clients' expressed risk tolerance, financial circumstances, and goals.

However, there is no "private cause of action" for a violation of the NASD's suitability rule. See, e.g., Jablon v. Dean Witter, 614 F.2d 677, 681 (9th Cir. 1980); Daniel Boone Area Sch. Dist. v. Lehman Bros. Inc., 187 F. Supp. 2d 400(W.D. Pa. 2002); Rozsa v. May Davis Group, Inc. 187 F. Supp. 2d 123(S.D.N.Y. 2002). A Claimant can only assert a suitability claim as an SEC Rule 10b-5 claim, assuming that one can prove the elements of such a claim and files the claim within the two-year time period allowed for filing Rule 10b-5 claims or as a negligence claim. The alleged unsuitability presented by the Claimants occurred in 1997 and 1998, well beyond the two-year time-period for bringing such a claim.

Based on any applicable legal theory, the first component of a "suitability" claim requires the Claimants to prove that Respondents' investment recommendations did not have a "reasonable basis." *Websters Dictionary* defines "reasonable" as "rational" or "having a rationale." Respondents contend that the proposals to the Claimants had two important rationales. First, Claimants had a history of investing into equities, and expressed a desire to receive growth and income investments. Second, the historical fact is that, over the long term, investments into stocks have generally outperformed fixed investments and bonds. Respondents believe that this obviously common recommendation throughout the brokerage industry and U.S.

capital markets is inherently rational or customary. There is no guarantee that such a recommendation will prove accurate.

Nonetheless, the Respondents made rational recommendations in-line with industry standards. There is not a "right" answer; rather, the question is whether one's viewpoint is one of the many "rational" ones possible. Hindsight will always allow us to find a "best" answer, but it is both unrealistic and impossible to hold past actions to such a standard.

In addition to the requirement that a suitability claim prove that the Respondents' recommendations were unreasonable - based on Claimants' financial goals and risk tolerances – the Claimants must prove the elements of fraud or negligence. The key element of a negligence claim (in addition to "proximate cause/loss causation" as discussed below) is the requirement that the Claimants prove a lack of "due" or "ordinary" care. In other words, the Claimants in this case must prove that Respondents' investment recommendations were unreasonable for an investor in the context of the prevailing circumstances at the time the Claimants made the investment decisions at issue. Respondents believe Claimants cannot prove this, because it is not true. Respondents' recommendations were not unreasonable or out of the ordinary for an investor under the prevailing circumstances when Mary and Kathy initially invested through Ameriprise.

Respondents did not misrepresent any existing facts, and they certainly did not act recklessly or with any intent to deceive Claimants. Admittedly, Claimants and Respondents failed to predict the future of the market with accuracy, but this is irrelevant. Nor did the Claimants "justifiably rely" on any misrepresentation of an existing fact to their detriment. Every reasonable person knows, and the law presumes, that opinions about the future cannot be relied on as the basis of a "fraud" claim. In order to accept the Claimants' claim, one must find

that they somehow believed that the investments proposed by Respondents could *not* decline in value. One must believe this despite the detailed explanation of each investment provided to the Claimants during the lengthy period of planning prior to the creation of the Trust and the making of these investments, and the prior years of experience investing in the stock market held by each Claimant.

## IV. Proximate Cause

Any investment claim, whether categorized as suitability, misrepresentation or negligence, requires that the Claimants prove that the alleged misdeed by Respondents was the "proximate cause" of their loss. Similarly, the law requires proof of "loss causation," i.e. that alleged misdeeds by the Respondents were the cause of the Claimants' losses. In other words, as to a market loss claim, losses are not recoverable if the cause of those losses is normal, ordinary market fluctuation. The risks of the stock market are obvious and inherent. If the cause of one's losses lies in a market downturn, rather than any alleged misdeed by the broker, the Claimants have no valid claim.

The value of the Claimants' Ameriprise portfolios rose and declined primarily due to the general market and their numerous account withdrawals. The Claimants' losses, if any, were not "proximately caused" by anything the Respondents did or failed to do. Respondents did not bind or obligate the Claimants to make or hold the investments at issue. They had an opportunity to reap substantial gains in the investments they purchased. Obviously, it is only in hindsight that they now claim the proposed investments to be unsuitable, and the **only evidence** for this claim of unsuitable investments is the alleged loss itself.

Claimants' investments did not go down in value because of any misdeed by Respondents. Instead, equity investments of all sorts went down in value, causing over 80

million investors to lose, collectively, over $8.0 trillion dollars in three years. No one is happy with this, but clearly, Respondents did not "proximately cause" this market downturn. The Claimants have provided no valid or reasonable basis for why an arbitration panel should treat them any differently than the millions of other investors who have suffered losses due to the recent downturn in the stock market.

## AFFIRMATIVE DEFENSES

### FIRST AFFIRMATIVE DEFENSE

Claimants have failed to state a cause of action upon which relief can be granted.

### SECOND AFFIRMATIVE DEFENSE

Claimants have failed to demonstrate any actual damages.

### THIRD AFFIRMATIVE DEFENSE

The alleged damages claimed by Claimants are not the result of any act or omission on the part of Respondents.

### FOURTH AFFIRMATIVE DEFENSE

The actions or inactions of Claimants caused whatever unknown losses of which they now complain.

### FIFTH AFFIRMATIVE DEFENSE

Claimants, and their charitable trust administrator and accountant, received confirmations and written statements reflecting every transaction in the accounts. The Claimants did not object to such information. Claimants ratified and waived objection to all transactions or lack of transactions in their accounts.

### SIXTH AFFIRMATIVE DEFENSE

Claimants, by their conduct and under all circumstances of this case, are estopped from

asserting their claims.

SEVENTH AFFIRMATIVE DEFENSE

Stock market events and fluctuations occurred, not caused by Respondents, constituting a superseding or intervening cause of some or all of the alleged damages.

EIGHTH AFFIRMATIVE DEFENSE

Respondents performed all duties owed to Claimants fully and faithfully.

NINTH AFFIRMATIVE DEFENSE

Claimants' damages, if any, were due to the fault of persons and to factors and circumstances presently unknown to Respondents, over which Respondents exercised no control, and for whose actions it is not responsible.

TENTH AFFIRMATIVE DEFENSE

There was no negligence on the part of Respondents in handling Claimants' accounts.

ELEVENTH AFFIRMATIVE DEFENSE

Claimants' claims are barred in part or in whole by the applicable statutes of limitations, by the doctrine of laches, and are ineligible for arbitration pursuant to NASD Code of Arbitration Procedure Rule 10304 (the "Six Year Rule.")

TWELFTH AFFIRMATIVE DEFENSE

Claimants caused or contributed to the damages through their own negligence or fault.

THIRTEENTH AFFIRMATIVE DEFENSE

Respondents did not act with any intent to defraud Claimants or with any willful disregard for them.

FOURTEENTH AFFIRMATIVE DEFENSE

Claimants failed to act reasonably to mitigate their losses.

FIFTEENTH AFFIRMATIVE DEFENSE

Claimants have failed to join an indispensable party.

SIXTEENTH AFFIRMATIVE DEFENSE

The Claimants' claims have been released and are accordingly barred by operation of the Final Orders and Judgments Approving Class Action Settlement and Dismissing Complaint, dated May 15, 2001, in the actions styled by Benacquisto, et al. v. American Express Financial Corporation et al., Minnesota State Court, Hennepin County, Case No. 96-018477, United States District Court for the District of Minnesota, Case No. 00-1980 DSD/JMM.

**CONCLUSION**

For all the above reasons, Respondents request dismissal of the claims against them and that all costs associated with this claim be assessed to the Claimants.

Dated: December 8, 2005

Edgerton, Weaver & Irwin, L.L.C.

By: Gary R. Irwin (0179991)
5050 Lincoln Drive, Suite 480
Minneapolis, MN 55436
(952) 345-4444 (Phone)
(952) 345-4445 (Fax)
girwin@neilaw.com
*Attorney for Respondents Ameriprise, Gerald Denney and David L. Stinnett*