C

**Motions, Pleadings and Filings**

Only the Westlaw citation is currently available.

United States District Court,
N.D. Illinois, Eastern Division.
Martin W. SMITH Applicant.
v.
Elizabeth A. (nee Sipe) BARTOLINI, Respondent.
**No. 01 C 4311.**

May 14, 2003.

Investment advisor filed action seeking to vacate arbitration award in favor of investor. Upon cross-motions for summary judgment, the District Court, Nordberg, Senior Judge, held that investor was a "customer" for purposes of National Association of Securities Dealers (NASD) Code of Arbitration Procedure where she was associated person's customer, not brokerage firm's customer, and her dispute arose out of associated person's activities.

Defendant's motion granted.

West Headnotes

**[1] Alternative Dispute Resolution 412**
25Tk412 Most Cited Cases
(Formerly 33k91 Arbitration, 160k11(11.1))
Investor was a "customer" for purposes of National Association of Securities Dealers (NASD) Code of Arbitration Procedure where she was associated person's customer, not brokerage firm's customer, and her dispute arose out of associated person's activities.

**[2] Alternative Dispute Resolution 412**
25Tk412 Most Cited Cases
(Formerly 33k91 Arbitration, 160k11(11.1))
Investor was a "customer" of brokerage firm for purposes of National Association of Securities Dealers (NASD) Code of Arbitration Procedure where she received investment advice from its president, who invested her funds in investment vehicle created for president's clients; investment vehicle shared the same offices and employees with brokerage firm and passed profits along to brokerage firm, which used them to pay president's salary.

**[3] Alternative Dispute Resolution 412**
25Tk412 Most Cited Cases
(Formerly 33k91 Arbitration, 160k11(11.1))
National Association of Securities Dealers (NASD) Code of Arbitration Procedure did not require that investor have purchased a security.

**[4] Alternative Dispute Resolution 412**
25Tk412 Most Cited Cases
(Formerly 33k91 Arbitration, 160k11(11.1))
Uniform submission agreement executed by investment advisor, in which he agreed to "submit the present matter in controversy" to arbitration, covered investor's claim arising out of advisor's activities.

*MEMORANDUM OPINION AND ORDER*
NORDBERG, Senior J.

***1** After a four-day hearing, a panel of NASD arbitrators found that Martin W. Smith committed fraud against Elizabeth Bartolini and ordered him to pay an award of more than a half million dollars including $100,000 in punitive damages. Smith filed this action seeking to vacate that award on the ground that the NASD arbitrators lacked jurisdiction to hear the dispute because Bartolini was not technically a "customer" under the Code of Arbitration Procedure and because the investment vehicle was not a "security." Bartolini filed a counter petition to confirm the award. *See* Federal Arbitration Act, 9 U.S.C. §§ 9, 10. Both sides have moved for summary judgment.

*BACKGROUND*
The essential facts are undisputed. In 1997, Elizabeth Bartolini's husband died of cancer, leaving her with approximately $400,000 in life insurance proceeds, which then constituted the bulk of her net worth. Soon after her husband's death, she went to Martin W. Smith for advice on how to invest the proceeds. Smith was married to Bartolini's deceased husband's sister.

Smith is a man who--as the business expression goes--wore several hats. In addition to being Bartolini's

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

brother-in-law, he was president, 50% shareholder, and chairman of the board of World Securities, Inc. ("WSI"). At the same time, he was president of Investors Financial, Inc. ("IFI"). During the relevant time period, WSI was registered as an SEC broker-dealer while IFI was an SEC registered investment adviser. Both WSI and IFI were Missouri corporations, both were located at the same address, and both used the same employees. However, for purposes of this case, they differed in one key respect--WSI was a member of NASD but IFI was not. As will be discussed below, this fact underlies Smith's central argument against arbitration.

When Bartolini approached Smith for investment advice, it is undisputed that she was emotionally fragile (due to the recent death of her husband) and was an inexperienced investor. It is also undisputed that Smith provided her investment advice, which she followed. Specifically, Smith advised Bartolini to put all her money into a single investment--World Capital Management, L.P. ("World Capital"), which operated a high-risk hedge fund that Smith created and managed. Both WSI and IFI were involved in its operation. IFI was the general partner and WSI provided brokerage services. [FN1]

FN1. World Capital also had the same address, shared the same office space, and had the same employees as WSI and IFI.

Although Smith advised Bartolini to invest in World Capital, he advised her to do so indirectly through a complicated series of business entities. After consulting with attorneys for WSI, Smith established an irrevocable trust that was funded by the $300,000 of the life insurance proceeds. The trust in turn acquired all the outstanding stock of a shell corporation known as Jazzy Internet Services, Inc., a Nevada corporation ("Jazzy"), for a nominal amount and then made a loan to Jazzy for $300,000. Jazzy used the money to purchase a limited partnership interest in World Capital. In return, Jazzy executed a promissory note back to the trust. In short, as Smith describes the investment, it was "twice removed" in that Bartolini was a beneficiary of a trust that owned the shares of a corporation that became a limited partner of World Capital.

***2** Bartolini's "twice removed" investment in World Capital eventually declined to virtually nothing. Smith was the trading manager for World Capital and he made the trading decisions that resulted in more than a thousand trades, eventually leading to the loss of around $20 million of investors' money. However, during this time, WSI made approximately $2.2 million in commissions from World Capital.

On November 26, 1999, Bartolini filed a statement of claim with the NASD alleging that the World Capital investment was unsuitable because it involved speculative and high volume trading. On February 2, 2000, Smith executed a Uniform Submission Agreement in which he agreed to "submit the present matter in controversy [to arbitration], as set forth in [Bartolini's] statement of claim" and "to abide by and perform any [arbitration] award(s) rendered pursuant to this Submission Agreement." In the arbitration, Smith and WSI raised the same arguments they are making here; namely, that the arbitrators had no jurisdiction. The arbitrators twice rejected this argument--first on September 15, 2000 and again later at the hearing. Before the arbitration hearing began, Smith and WSI did not--as they had a right to do--bring this issue to federal court for a ruling on whether the dispute was arbitrable. A four-day hearing was held beginning in late January 2001. Smith participated in the hearing through his attorney and raised various defenses and arguments.

On March 26, 2001, the arbitrators ordered WSI and Smith, jointly and severally, to pay Bartolini $401,111.95 in out-of-pocket losses, $100,000 in punitive damages, $75,000 in attorneys' fees, and $15,000 for witness and other fees for a total of $591,111.95. The arbitrators specifically concluded that Smith and WSI (i) "committed fraud while acting in a fiduciary capacity;" (ii) "obtained [Bartolini's] money under false pretenses;" and (iii) engaged in a "malicious and willful violation of trust and confidence placed in them by [Bartolini]." The panel awarded Bartolini $100,000 in punitive damages to "punish [Smith and WSI] and deter them [ ] from similar treatment of public customers." (Arb. Award at 4.)

Smith and WSI filed this action seeking to vacate the arbitration award. Subsequently, WSI settled with

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Bartolini and is no longer a part of this action. Bartolini filed a counter petition to confirm the arbitration award. The parties agreed to file simultaneous cross-motions for summary judgment. We have reviewed these briefs as well as the supporting exhibits and affidavits.

*DISCUSSION*

Smith argues that this dispute is not arbitrable under Section 10301 of the NASD Code of Arbitration Procedure because (i) Bartolini was not a "customer" and (ii) she did not purchase a "security." Neither argument has merit. *See* Sections I & II. Even if there were some doubt about whether this dispute were arbitrable based on the NASD Code, we would still find it arbitrable under the Uniform Submission Agreement executed by Smith. *See* Section III.

I. Was Bartolini A "Customer" Under NASD Section 10301?

***3** Both sides agree that the general question of whether this dispute is arbitrable is governed by NASD Code Section 10301(a), which states as follows:

> Any dispute, claim, or controversy eligible for submission under the Rule 10100 Series between a customer and a member and/or associated person arising in connection with the business of such member or in connection with the activities of such associated persons shall be arbitrated under this Code, as provided by any duly executed and enforceable written agreement or upon the demand of the customer.

Smith argues that Bartolini cannot show that she was a "customer" under this section. This argument contains two parts. First, he asserts that the above language contains an implied requirement that Bartolini must show either that she was a direct customer of the member firm (*i.e.* WSI) or that Smith dealt with her while he was acting solely in his role as an associated person of WSI. Second, he asserts that Bartolini cannot meet this implied requirement. As set forth below, neither the legal premise nor the factual support is persuasive.

*A.*

[1] The parties argue over the meaning of the term "customer" in Section 10301. To understand these arguments, it is important to consider this section from a broader perspective rather than trying to define one word in isolation.

Section 10301 contains several pathways to arbitration, as reflected by the use of the word "or" in lines two and three of the above quotation. In line two, the Section refers to a dispute between a "customer" and *either* (i) a "member" *or* (ii) an "associated person." In lines three and four, the Section imposes the additional requirement that the dispute must arise in connection with *either* (i) "the business of such member" *or* (ii) "the activities of such associated person."

Applying the latter half of the two clauses, arbitration is required if the dispute is between a customer and an associated person arising out of the activities of the associated person. Interpreting this language in a straightforward and commonsense manner, we think it is clear that this dispute is arbitrable regardless of whether or not (as discussed in Section I.B) there was any connection to WSI.

First, it is undisputed that Smith was an associated person. Second, there can be no dispute that Bartolini's claims arose out of the "activities" of Smith--specifically, his investment advice and his actions in carrying out this advice. Third, the only remaining point even arguably in dispute is whether Bartolini was a "customer." Smith focuses heavily on the word "customer" and believes that it carries with it an implied requirement that Bartolini must have been a customer *of the member firm* or that the associated person must have been *acting in his role as an associated person at the time of the dispute.*

We are not persuaded by either assertion. Section 10301 contains no language explicitly imposing any such requirements. Moreover, the first assertion--that Bartolini must show that she was a customer *of WSI*--makes no sense as a matter of logic. As noted above, Section 10301 contains two separate pathways to arbitration--one involving disputes with a member firm and a separate one involving disputes with an associated person. Under Smith's interpretation, the second pathway would be redundant and would collapse into the first.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

***4** The second assertion--that Bartolini must show that Smith was *acting in his role as an associated person of WSI*--has no merit as well. Again, there is no such requirement in the text of 10301, which merely refers to the fact that one party to the dispute must have the general status of an "associated person." Moreover, Section 10301 does not require (as it could have) that the dispute with the associated person be related to the business of the member firm. Instead, it adopted much broader language, merely requiring that the dispute "arise[ ] in connection" with the "activities" of that person. As the Seventh Circuit has noted, this language is "quite broad." *Miller v. Flume,* 139 F.3d 1130, 1136 (7th Cir.1998).

Smith does point to one district court decision--*Investors Capital Corp. v. Brown,* 145 F.Supp.2d 1302 (M.D.Fla.2001)--to support his claim that there must be some additional link to a member firm. In *Brown,* the court stated that "being a customer of an associated person is not, in itself, a sufficient basis for compelling [NASD] arbitration." *Id.* at 1307. We are not inclined to follow *Brown* in this case for several reasons.

First, *Brown* dealt with a different (and more compelling) issue than the one here. The investors in that case sought to compel a securities firm to arbitrate investment losses that arose from purchases they made from two men who, at the time of purchase, were not yet associated with the securities firm but who were later hired by the firm. The issue was thus akin to successor liability. Believing that it would "do significant injustice to the reasonable expectations of NASD members," the court concluded that arbitration was not required under Section 10301 when the dispute arose before the person became associated with the member firm. *Id.* at 1308. The court's decision was not based on any specific language in 10301 but was more of a policy decision. In fact, the court admitted that its assertion that a customer of an associated person is not by itself enough to warrant arbitration was based merely on *dicta* from another case. *Id.* at 1307.

Second, this case raises no such concern about remote successor liability, as Smith clearly gave Bartolini investment advice during the same time period that he was working as an associated person for WSI.

Third, the majority of courts have not interpreted the language of Section 10301 in the way the *Brown* court did. This point was documented by the district court in *Hornor, Townsend & Kent, Inc. v. Hamilton,* 218 F.Supp.2d 1369 (N.D.Ga.2002). In *Hornor,* a brokerage firm sought to avoid NASD arbitration, claiming that the investors were never "customers" of the firm because they did not open an account with the firm, did not receive any account statements from the firm, and did not otherwise have any direct relationship with the firm and because they never purchased any securities from the firm. *Id.* at 1376. (Smith makes many of the same arguments here.) The court conceded that the firm was correct in its factual assertions but nonetheless concluded that they were "irrelevant" because, under the "plain language of Rule 10301," a claimant is not required to show that he was a customer of the brokerage firm but only that he was a customer of the associated person. *Id.*

***5** The brokerage firm in *Hornor,* like Smith here, cited to *Brown* as authority for the proposition that a claimant must show something more than that he was a customer of the associated person. After reviewing the existing case law, the *Hornor* court concluded that the holding in *Brown* was "contrary to the plain language of Rule 10301." *Id.* The court's analysis is thorough and worth quoting at some length:

> The Court rejects th[e] holding by the court in [*Brown* ] because it is contrary to the plain language of 10301. Rule 10301 states that any dispute "between a customer and a member and/or associated person" that arises "in connection with the business of such member or in connection with the activities of such associated persons shall be arbitrated under this Code." NASD Code § 10301. The Court has reviewed the cases cited by the parties, and has conducted a thorough review of other cases that have addressed this issue, and has been unable to uncover any other decision other than [*Brown* ], holding that a NASD member is not required to arbitrate claims brought by the customer of an "associated person." Indeed, every other court that has addressed this issue has reached a contrary result; *i.e.,* a claim brought by a customer of an associated person plainly falls within the scope of Rule 10301,

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

and is subject to the mandatory arbitration procedure. *See, e.g., John Hancock Life Ins. Co.,* 254 F.3d at 59-60 (expressly rejecting holding of [*Brown* ] as contrary to plain language of Rule 10301); *see also Vestax Sec. Corp.,* 280 F.3d at 1081-1082 (customers of an associated person entitled to arbitration); *BMA Fin. Servs., Inc. v. Guin,* 164 F.Supp.2d 813, 820 (W.D.La.2001) (" 'customer' plainly refers to either the member's or the associated person's customer"); *Vestax Sec. Corp. v. Skillman,* 117 F.Supp.2d 654, 657 (N.D.Ohio 2000) ("The fact that defendants never opened accounts with plaintiff is irrelevant. By conducting business with plaintiff's registered representative, defendants conducted business with plaintiff and became its customers.") (citing *WMA Sec., Inc. v. Ruppert,* 80 F.Supp.2d 786, 789 (S.D.Ohio 1999); *First Montauk Sec. Corp. v. Four Mile Ranch Dev. Co.,* 65 F.Supp.2d 1371, 1381-82 (S.D.Fla.1999) (NASD member forced to arbitrate a claim brought by a customer of an associated person, even when the account was held at another brokerage firm).

*Id.* 1376-77 (footnote omitted). [FN2]

FN2. To be fair, we note that--a week after *Hornor*--one district court did rely on the reasoning of *Brown. See Mony Sec. Corp. v. Vasquez,* 238 F.Supp.2d 1304, 1307-08 (M.D.Fla.2002). However, this decision does not change our conclusion because, like *Brown,* it addressed a more compelling factual scenario.

In sum, we do not agree with the first prong of Smith's argument and find that Bartolini need only show that she was Smith's customer (not WSI's customer) and that her dispute arose out of his activities. She can easily meet this burden. No one would dispute that she was Smith's customer. She met with him face-to-face. He gave her investment advice. She followed that advice. It is that simple. Therefore, arbitration is warranted on this ground alone.

*B.*

Even if we were to proceed on the assumption that Bartolini must establish some connection or customer relationship with WSI, we would still find in her favor given that Smith and WSI were so closely intertwined and given the broad scope of the arbitration provision.

***6** To the extent that a "customer" relationship or connection is required, most courts have only required that there be "some" connection between the claimant and the member firm. Consistent with a broad and non-technical understanding of the term customer, courts have not required that a claimant open a formal account or establish a traditional business relationship in order to be a customer. For example, in the *Brown* case discussed above, the court made it clear that the claimant merely has to show some kind of "informal relationship." 145 F.Supp.2d at 1308. Similarly, in *Lehman Brothers Inc. v. Certified Reporting Co.,* 939 F.Supp. 1333 (N.D.Ill.1996), the court came to the same conclusion in interpreting a similar NYSE arbitration rule. "Defining customers to include not only those who executed purchases with member firms, but also those who maintained a less formal business relationship at the time of the alleged misconduct, furthers NYSE policy and recognizes market reality." *Id.* at 1340. [FN3]

FN3. *Accord WMA Sec., Inc. v. Ruppert,* 80 F.Supp.2d 786, 789 (S.D.Ohio 1999) (investors were "customers" of the member firm even though they that had no formal account with the firm and even though their investments were not approved by the member firm); *First Montauk Sec. Corp. v. Four Mile Ranch Dev. Co.,* 65 F.Supp.3d 1371, 1380-82 (S.D.Fla.1999) (investors were "customers" even though they did not have any account with the brokerage firm).

[2] Applying this broad definition here, we find that there is sufficient evidence to show that Bartolini was a customer of WSI. It is important to put this case into perspective. Unlike most cases in this area, which involve a claim by a securities firm that an agent did something without its knowledge or permission, there is no such claim here. In fact, for all practical purposes, Smith and WSI were inseparable as the following undisputed facts illustrate.

Smith was president, chairman of the board, and a 50% shareholder of WSI. He worked out of WSI's of-

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

fices. WSI was a full-service broker-dealer with an emphasis on retail sales, which included giving investment advice to individuals. Smith gave Bartolini investment advice. In doing so, he consulted with (among others) attorneys for WSI. Bartolini's money was ultimately put into the World Capital, which was an investment vehicle created for Smith's clients and which shared the same offices and employees with WSI. WSI was trading manager for World Capital and received $2.2 million in revenue during the same time that the partnership lost $20 million in investors' money. WSI passed these profits along to Smith in the form of a salary (ranging between $200,000 and $500,000) and other substantial benefits. At one point, Bartolini was given a booklet with materials about her investment, which had a sticker on it that said World Securities, Inc. (Arb. Tr. 43.)

If these facts were not enough, Smith directly conceded in the arbitration hearing that Smith would have been reasonable under the circumstances in believing that he was dealing with her in some capacity as a representative of WSI. (Arb. Tr. 222.) Why did he make such a concession? Obviously because he knew that there was an objective basis for her to believe that he was working for WSI. In addition, Bartolini's expert witness in the arbitration hearing testified that, based on industry practice, Bartolini was a customer of WSI. (Arb. Tr. 484-85.)

***7** In this litigation, Smith argues that, despite the abundance of facts suggesting that he was working for WSI and suggesting that Bartolini had reasonable grounds to believe that he was working for WSI, he was really working *solely* for IFI at the time that he gave her investment advice. This is the argument that he was not wearing his WSI hat at the time. The sole basis for this argument is the fact that WSI was registered with the SEC as a broker-dealer at the time and that IFI was a registered investment adviser. Smith argues that the "only logical conclusion to draw" is that Bartolini must have dealt with him only in his role as a agent for IFI.

This argument-from-logic ignores the facts and strains credibility. First, the argument is directly contradicted by the undisputed fact that WSI could give investment advice incidental to its business. Second, even if there were some regulatory requirement preventing Smith from giving investment advice, this does not automatically mean that he followed it. After all, the arbitrators found that he committed fraud in his dealings with Bartolini. Third, as also noted above, Smith testified that Bartolini would have been reasonable in believing that he was working for WSI. Fourth, not only has Smith ignored these undermining his argument, he also has failed to pointed to *any* facts supporting his argument.

Moreover, given the close interrelationship of these entities, we think that the burden should be on Smith (not the customer) to provide clear evidence that he was *not* acting for WSI. It is undisputed that WSI, World Capital, and IFI were thoroughly intertwined. They shared the same offices and employees. There is no evidence to suggest that Smith ever took steps to keep these roles separate or to alert Bartolini (or others) of his revolving allegiances. Smith apparently believes that he was free to put on his metaphorical WSI hat one minute of the day and then put on his IFI the next minute and that his customers should somehow know the difference. Yet, how was Bartolini to know that he was "switching hats" at various times? *See* Washington Square Sec., Inc. v. Sowers, 218 F.Supp.2d 1108, 1117 (D.Minn.2002) ("The customers are not the ones who will usually know the vagaries of the mechanism by which a person becomes involved with the brokerage firm"). The answer is that she had no way of knowing that Smith was allegedly dealing with her in a special and limited role as agent of one particular entity. To the contrary, any person in this situation would have been reasonable in believing that Smith was working at least in part on behalf of WSI.

This case does not present any legitimate concern about remote liability to a member firm similar to the concern that motivated the *Brown* court. In such cases, the member firm came to court and contested jurisdiction on the ground that it had no connection with or close relationship to the agent and did not profit in any way from the agent's activities. *See, e.g.,* Mony Sec. Corp. v. Vasquez, 238 F.Supp.2d 1304, 1307 (M.D.Fla.2002) (securities firm did not receive any profits or commissions from the transactions at issue). In contrast here, WSI has settled with Barto-

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

lini and is not contesting the claim that she was its customer. We therefore have the odd scenario of Smith arguing that Bartolini was not WSI's customer even though WSI itself is not here making the argument. Moreover, it is clear that WSI was closely involved in this matter and that it benefitted from Bartolini's investments in a direct way in the form of large commissions on trades made for World Capital.

II. Whether There Was A "Security"

***8** [3] In addition to arguing that Bartolini was not a customer, Smith very briefly makes a second argument that this dispute was not arbitrable because the trust created for Bartolini to invest in supposedly was not a security. Smith relies on the definition of a "security" applied in the Securities Act of 1933 and the Securities Exchange Act of 1934 and also on the Supreme Court's ruling in *SEC v. W.J. Howey & Co.*, 328 U.S. 293, 66 S.Ct. 1100, 90 L.Ed. 1244 (1946). He argues that Bartolini, by investing in the trust, was not making an "investment of money" in any traditional sense and that there was no "horizontal commonality" in a common enterprise.

We find this argument unconvincing. Smith has not cited to any case indicating that the NASD Code contains any requirement that the investor must have purchased a security as defined by the 1933 or 1934 Acts. The pertinent sections of the Code--10101 and 10301--do not tie arbitrability to the presence of a "security" but instead refer to a "dispute," "claim," or "controversy." Moreover, as Bartolini points out, the Seventh Circuit in *Miller* rejected a similar argument, holding that an investor's fraudulent conveyance claim was arbitrable despite the fact that it did not involve the buying or selling of securities. 139 F.3d at 1136. Finally, Smith's technical argument that there was no security would be contrary to the spirit and structure of the Code.

III. The Uniform Submission Agreement.

[4] Even if we somehow concluded that this dispute were not arbitrable under the NASD Code, we would still find it arbitrable under a *separate* agreement to arbitrate. On February 2, 2000, after Bartolini filed her statement of claim, Smith executed a Uniform Submission Agreement in which he agreed (without reserving any rights to contest jurisdiction) to "submit the present matter in controversy [to arbitration], as set forth in [Bartolini's] statement of claim" and "to abide by and perform any [arbitration] award(s) rendered pursuant to this Submission Agreement." On its face, this language constitutes a clear and unqualified agreement to arbitrate the disputes contained in the Statement of Claim.

In *First Montauk Sec. Corp. v. Menter*, 26 F.Supp.2d 688 (S.D.N.Y.1998), the district court concluded that, when a securities firm executed a Uniform Submission Agreement, it entered into "a valid, binding agreement to submit *all* issues, including the threshold issue of arbitrability, to the [NASD] arbitration panel." *Id.* at 689 (emphasis added). In that case, the securities firm, like Smith here, submitted a Uniform Submission Agreement along with a motion to dismiss the arbitration based on lack of jurisdiction. As here, the NASD arbitrators twice denied the motion. Thereafter, unlike this case, the securities firm filed a claim in federal court seeking to enjoin the arbitration *before* a hearing on the merits began. The court dismissed the action, finding that the language of the Uniform Submission Agreement was "clear" that there was an agreement to arbitrate and that the arbitration therefore should go forward. *Id.*

***9** The securities firm (First Montauk) sought to get around this clear language by arguing that it tendered the Uniform Submission Agreement "solely for administrative purposes [based on] experience that without the form submission agreement, the NASD staff would not process [the] motion to dismiss." *Id.* The court rejected the argument for two reasons. First, relying on hornbook law, it noted that "an uncommunicated subjective intent" is irrelevant in interpreting a contract. *Id.* Therefore, it did not matter that First Montauk (allegedly) believed that the language of the agreement meant something other than what it said. Second, the court concluded that First Montauk "purposefully misled" the arbitrators by proceeding in this manner:

> the NASD panel would never have considered the motion to dismiss for lack or arbitrability had First Montauk not first expressly acknowledged the panel's authority to resolve the motion conclusively.

> Having purposefully misled the NASD arbitrators as to its intent to submit to a binding ruling on arbitrability, First Montauk may not now seek refuge in the argument that it was only pretending to be bound.

*Id.*

We find this reasoning and conclusion persuasive. Smith tries to avoid the clear language of the Uniform Submission Agreement by making an argument similar to the one rejected in *First Montauk.* In his Application To Vacate Arbitration Award, Smith claims that he executed the Uniform Submission Agreement because there is no real "motion practice" under the NASD Code and because he "must" submit to an arbitration demand made by a customer. (¶ 10.) We fail to see why he was required to submit to arbitration if there was no jurisdiction. Like the district court in New York, we cannot simply ignore clear and unequivocal language indicating that Smith agreed to arbitrate all the claims set forth in Bartolini's Statement of Claim.

*CONCLUSION*

For the reasons set forth above, Bartolini's motion for summary judgment is granted; Smith's motion is denied; and summary judgment is awarded in favor of Bartolini. The NASD arbitration award is hereby confirmed in all respects. In her counter petition, Bartolini has also requested interest at the statutory rate from March 26, 2001, plus costs and disbursements. If Smith wishes to oppose these requests, he must file a brief within three weeks from the date of this opinion. Bartolini shall have two weeks thereafter to file a reply. The court will rule by mail.

Not Reported in F.Supp.2d, 2003 WL 21148940 (N.D.Ill.)

**Motions, Pleadings and Filings (Back to top)**

• 2002 WL 32742881 (Trial Motion, Memorandum and Affidavit) Reply Memorandum in Support of Respondent-Petitioner Bartolini's Motion for Summary Judgment (Feb. 11, 2002)Original Image of this Document (PDF)

• 2002 WL 33176708 (Trial Motion, Memorandum and Affidavit) Reply Memorandum in Support of Respondent-Petitioner Bartolini's Motion for Summary Judgment (Feb. 11, 2002)Original Image of this Document (PDF)

• 2002 WL 32742867 (Trial Motion, Memorandum and Affidavit) Applicant-Respondent Martin W. Smith's Reply Memorandum to Respondent-Petitioner's Response Memorandum in Support of Cross-Motion for Summary Judgment (Feb. 6, 2002)Original Image of this Document (PDF)

• 2002 WL 32742844 (Trial Motion, Memorandum and Affidavit) Response of Respondent-Petitioner Elizabeth A. Bartolini to Applicant-Respondent Martin W. Smith's Motion for Summary Judgment (Jan. 28, 2002)Original Image of this Document (PDF)

• 2002 WL 32742855 (Trial Motion, Memorandum and Affidavit) Applicant-Respondent Martin W. Smith's Response Memorandum to Respondent-Petitioner's Memorandum in Support of Cross-Motion for Summary Judgment (Jan. 28, 2002)Original Image of this Document (PDF)

• 2002 WL 32742831 (Trial Motion, Memorandum and Affidavit) Applicant-Respondent, Martin W. Smith's Memorandum of Law in Support of Application to Vacate and in Opposition to Counter-Petition to Confirm Arbitration Award (Jan. 15, 2002)Original Image of this Document (PDF)

• 2002 WL 32742817 (Trial Motion, Memorandum and Affidavit) Motion of Respondent-Petitioner for Summary Judgment (Jan. 14, 2002)Original Image of this Document (PDF)

• 2001 WL 34707072 (Trial Pleading) Answer to Counter Petition to Confirm Arbitration Award (Dec. 17, 2001)Original Image of this Document (PDF)

• 2001 WL 34707064 (Trial Pleading) Application to Vacate Arbitration Award (Jun. 8, 2001)Original Image of this Document with Appendix (PDF)

• 2001 WL 35448795 (Expert Trial Transcript) (Transcript) (2001)Original Image of this Document (PDF)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# 10000. Code of Arbitration Procedure

## 10100. Administrative Provisions

### IM-10100. Failure to Act Under Provisions of Code of Arbitration Procedure

It may be deemed conduct inconsistent with just and equitable principles of trade and a violation of Rule 2110 for a member or a person associated with a member to:

(a) fail to submit a dispute for arbitration under the NASD Code of Arbitration Procedure as required by that Code;

(b) fail to comply with any injunctive order issued pursuant to Rule 10335;

(c) fail to appear or to produce any document in his possession or control as directed pursuant to provisions of the NASD Code of Arbitration Procedure;

(d) fail to honor an award, or comply with a written and executed settlement agreement, obtained in connection with an arbitration submitted for disposition pursuant to the procedures specified by the National Association of Securities Dealers, Inc., the New York, American, Boston, Cincinnati, Chicago, or Philadelphia Stock Exchanges, the Pacific Exchange, Inc., the Chicago Board Options Exchange, the Municipal Securities Rulemaking Board, or pursuant to the rules applicable to the arbitration of disputes before the American Arbitration Association or other dispute resolution forum selected by the parties where timely motion has not been made to vacate or modify such award pursuant to applicable law; or

(e) fail to comply with a written and executed settlement agreement, obtained in connection with a mediation submitted for disposition pursuant to the procedures specified by the National Association of Securities Dealers, Inc.

All awards shall be honored by a cash payment to the prevailing party of the exact dollar amount stated in the award. Awards may not be honored by crediting the prevailing party's account with the dollar amount of the award, unless authorized by the express terms of the award or consented to in writing by the parties. Awards shall be honored upon receipt thereof, or within such other time period as may be prescribed by the award.

Action by members requiring associated persons to waive the arbitration of disputes contrary to the provisions of the Code of Arbitration Procedure shall constitute conduct that is inconsistent with just and equitable principles of trade and a violation of Rule 2110.

Amended by SR-NASD-2005-070 eff. June 13, 2005.
Amended by SR-NASD-2004-126 eff. September 30, 2004 (extending the effectiveness of paragraph (f) to March 31, 2005).
Amended by SR-NASD-2004-40 eff. March 31, 2004.
Amended by SR-NASD-2003-153 eff. Oct. 6, 2003.
Amended by SR-NASD-2003-106 eff. July 14, 2003.
Amended by SR-NASD-2003-64 eff. March 31, 2003.
Amended by SR-NASD-2002-126 eff. September 30, 2002.
Amended by SR-NASD-99-19 eff. May 17, 1999.
Amended by SR-NASD-93-38 eff. Jan. 3, 1996.
Amended by SR-NASD-95-20 eff. Oct. 2, 1995.
Amended by SR-NASD-90-62 eff. May 7, 1991.
Amended by SR-NASD-90-03 eff. June 18, 1990.
Amended July 1, 1987.
Adopted eff. May 1, 1973.

**Selected Notices to Members:** 95-76, 02-68.

## 10101. Matters Eligible for Submission

This Code of Arbitration Procedure is prescribed and adopted pursuant to Article VII, Section 1(a)(iv) of the By-Laws of the Association for the arbitration of any dispute, claim, or controversy arising out of or in connection with the business of any member of the Association, or arising out of the employment or termination of employment of associated person(s) with any member, with the exception of disputes involving the insurance business of any member which is also an insurance company:

(a) between or among members;

(b) between or among members and associated persons;

(c) between or among members or associated persons and public customers, or others; and

(d) between or among members, registered clearing agencies with which the Association has entered into an agreement to utilize the Association's arbitration facilities and procedures, and participants, pledgees, or other persons using the facilities of a registered clearing agency, as these terms are defined under the rules of such a registered clearing agency.

Amended by SR-NASD-98-86 eff. Nov. 19, 1998.
Amended eff. May 7, 1991 and Oct. 1, 1993.

**Selected Notice to Members:** 93-64.

## 10102. National Arbitration and Mediation Committee

(a) The NASD Dispute Resolution Board of Directors, following the annual election of its members by the NASD Board of Governors, shall appoint a National Arbitration and Mediation Committee of such size and composition, including representation from the public at large, as it shall deem appropriate and in the public interest. The Chairman of the Committee shall be named by the Chairman of the NASD Dispute Resolution Board. The said Committee shall establish and maintain rosters of neutrals composed of persons from within and without the securities industry.

(b) The Committee shall have the authority to recommend to the NASD Dispute Resolution Board appropriate Rules, regulations, and procedures to govern the conduct of all arbitration matters, mediation, and other dispute resolution, mediation, and other dispute resolution before the Association. All Rules, regulations, and procedures and amendments thereto presented by the Committee must be by a majority vote of all the members of the said Committee. It also shall have such other power and authority as is necessary to effectuate the purposes of this Code.

(c) The Committee shall meet at least once each year and at such other times as are deemed necessary by the Committee.

Amended by SR-NASD-99-21 eff. July 9, 2000.
Amended by SR-NASD-98-48 eff. Nov. 17, 1998.
Amended by SR-NASD-94-77 eff. Feb. 8, 1995.

**Selected Notices to Members:** 98-90.

## 10103. Director of Arbitration

The Board of Governors of the Association shall appoint a Director of Arbitration (Director) who shall be charged with the performance of all administrative duties and functions in connection with matters submitted for arbitration pursuant to this Code. The Director shall be directly responsible to the National Arbitration and Mediation Committee and shall report to it at periodic intervals established by the Committee and at such other times as called upon by the Committee to do so. The duties and functions of the Director may be delegated by

the Director, as appropriate. In the event of the incapacitation, resignation, removal, or other permanent or indefinite inability of the Director to perform the duties and responsibilities of the Director, the President or an Executive Vice President of the Association may appoint an interim Director.

Amended by SR-NASD-98-48 eff. Nov. 17, 1998.
Amended by SR-NASD-94-77 eff. Feb. 8, 1995.

**Selected Notices to Members:** 98-90.

## 10104. Composition and Appointment of Panels

Except as otherwise specifically provided in Rule 10308, the Director shall compose and appoint panels of arbitrators from the existing pool of arbitrators of the Association to conduct the arbitration of any matter which shall be eligible for submission under this Code.

Amended by SR-NASD-98-48 eff. Nov. 17, 1998.

**Selected Notices to Members:** 98-90.

## IM-10104. Arbitrators' Honorarium

(a) All persons selected to serve as arbitrators pursuant to the Association's Code of Arbitration Procedure shall be paid an honorarium for each hearing session (including a prehearing conference) in which they participate.

(b) The honorarium shall be $200 for each hearing session and $75 per day additional honorarium to the chairperson of the panel. The honorarium for a case not requiring a hearing shall be $125.

(c) The honorarium for travel to a canceled hearing session shall be $50. If a hearing session other than a prehearing conference is adjourned pursuant to Rule 10319(d), each arbitrator shall receive an additional honorarium of $100.

(d) The Director may authorize a higher or additional honorarium for the use of a foreign hearing location.

(e) Payment for Deciding Discovery-Related Motions Without a Hearing Session

(1) NASD will pay each arbitrator an honorarium of $200 to decide a discovery-related motion without a hearing session. This paragraph does not apply to cases administered under Rules 10203 and 10302.

(2) For purposes of paragraph (e)(1), a discovery-related motion and any replies or other correspondence relating to the motion shall be considered to be a single motion.

(3) The panel will allocate the cost of the honoraria under paragraph (e)(1) to the parties pursuant to Rules 10205(c) and 10332(c).

Amended by SR-NASD-2005-052 eff. Sept. 26, 2005.
Amended by SR-NASD-2004-042 eff. June 6, 2005.
Amended by SR-NASD-2003-164 eff. Aug. 16, 2004.
Amended by SR-NASD-99-23 eff. March 18, 1999.
Amended by SR-NASD-97-79 eff. March 18, 1999.
Amended eff. May 30, 1980; Feb. 8, 1982; Jan. 14, 1987.
Adopted eff. June 14, 1977.

**Selected Notice to Members:** 99-23, 04-53, 05-35, 05-55.

## 10105. Non-Waiver of Association Objects and Purposes

The submission of any matter to arbitration under this Code shall in no way limit or preclude any right, action or determination by the Association which it would otherwise be authorized to adopt, administer or

enforce. If any matter comes to the attention of an arbitrator during and in connection with the arbitrator's participation in a proceeding, either from the record of the proceeding or from material or communications related to the proceeding, that the arbitrator has reason to believe may constitute a violation of the Association's Rules or the federal securities laws, the arbitrator may initiate a referral of the matter to the Association for disciplinary investigation; provided, however, that any such referral should only be initiated by an arbitrator after the matter before him has been settled or otherwise disposed of, or after an award finally disposing of the matter has been rendered pursuant to Rule 10330 of the Code.

Amended by SR-NASD-93-75 eff. Aug. 15, 1994.

### 10106. Legal Proceedings

No party shall, during the arbitration of any matter, prosecute or commence any suit, action, or proceeding against any other party touching upon any of the matters referred to arbitration pursuant to this Code.

**Selected Notices to Members:** 84-71, 94-61.

## 10200. Industry and Clearing Controversies

### 10201. Required Submission

(a) Except as provided in paragraph (b) or Rule 10216, a dispute, claim, or controversy eligible for submission under the Rule 10100 Series between or among members and/or associated persons, and/or certain others, arising in connection with the business of such member(s) or in connection with the activities of such associated person(s), or arising out of the employment or termination of employment of such associated person (s) with such member, shall be arbitrated under this Code, at the instance of:

(1) a member against another member;

(2) a member against a person associated with a member or a person associated with a member against a member; and

(3) a person associated with a member against a person associated with a member.

(b) A claim alleging employment discrimination, including a sexual harassment claim, in violation of a statute is not required to be arbitrated. Such a claim may be arbitrated only if the parties have agreed to arbitrate it, either before or after the dispute arose.

(c) Any dispute, claim or controversy involving an act or failure to act by a clearing member; a registered clearing agency; or participants, pledgees, or other persons using the facilities of a registered clearing agency, under the rules of any registered clearing agency with which the Association has entered into an agreement to utilize the Association's arbitration facilities and procedures shall be arbitrated in accordance with such agreement and the rules of such registered clearing agency.

Amended by SR-NASD-99-08 eff. Jan. 18, 2000.
Amended by SR-NASD-97-77 eff. Jan. 1, 1999.
Amended eff. Oct. 1, 1993.

**Selected Notice to Members:** 99-96, 98-56.

### 10202. Composition of Panels

(a) In disputes subject to arbitration that arise out of the employment or termination of employment of an associated person, and that relate exclusively to disputes involving employment contracts, promissory notes or receipt of commissions, the panel of arbitrators shall be appointed as provided by paragraph (b)(1) or (2) or Rule 10203, whichever is applicable. In all other disputes arising out of the employment or termination of employment of an associated person, the panel of arbitrators shall be appointed as provided by Rule 10212, 10302 or 10308,

whichever is applicable.

**(b)(1) Composition of Arbitration Panel**

**(A) Claims of $50,000 or Less**

If the amount of a claim is $50,000 or less, the Director shall appoint an arbitration panel composed of one non-public arbitrator, unless the parties agree to the appointment of a public arbitrator.

(i) If the amount of a claim is $25,000 or less and an arbitrator appointed to the case requests that a panel of three arbitrators be appointed, the Director shall appoint an arbitration panel composed of three non-public arbitrators, unless the parties agree to a different panel composition.

(ii) If the amount of a claim is greater than $25,000 and not more than $50,000 and a party in its initial filing or an arbitrator appointed to the case requests that a panel of three arbitrators be appointed, the Director shall appoint an arbitration panel composed of three non-public arbitrators, unless the parties agree to a different panel composition.

**(B) Claims of More than $50,000**

If the amount of a claim is more than $50,000, the Director shall appoint an arbitration panel composed of three non-public arbitrators, unless the parties agree to a different panel composition.

(2) Except as otherwise provided in paragraph (a), in all arbitration matters between or among members and/or persons associated with members and where the amount in controversy exceeds $50,000, exclusive of attendant costs and interest, a panel shall consist of three arbitrators, all of whom shall be non-public arbitrators.

(c) In proceedings relating to injunctions under Rule 10335, the provisions of Rule 10335 shall supersede the provisions of this Rule.

(d) Except as otherwise provided in this Rule or Rule 10203, the provisions of Rule 10308 shall apply to intra-industry disputes.

Amended by SR-NASD-99-08 eff. Jan. 18, 2000.
Amended by SR-NASD-98-64 eff. Nov. 17, 1998.
Amended by SR-NASD-97-22 eff. Nov. 17, 1998.
Amended eff. May 10, 1989 and Oct. 1, 1993.

**Selected Notices to Members:** 93-64; 98-90; 99-96.

## 10203. Simplified Industry Arbitration

(a) Any dispute, claim, or controversy arising between or among members or associated persons submitted to arbitration under this Code involving a dollar amount not exceeding $25,000, exclusive of attendant costs and interest, shall be resolved by an arbitration panel constituted pursuant to the provisions of subparagraph (1) hereof solely upon the pleadings and documentary evidence filed by the parties, unless one of the parties to the proceeding files with the Office of the Director of Arbitration within ten (10) business days following the filing of the last pleading a request for a hearing of the matter.

(1) In any proceeding pursuant to this Rule, an arbitration panel shall consist of a single non-public arbitrator.

(2) Notwithstanding the provisions of this Rule, any member of an arbitration panel constituted pursuant to this Rule shall be authorized to request the submission of further documentary evidence in a proceeding and any such panel may by majority vote call and conduct a hearing if such is deemed to be necessary.

(b) All awards rendered in proceedings pursuant to paragraph (a) hereof shall be made within thirty (30) business days from the date the arbitrators review all of the written statements, documents and other evidentiary material filed by the parties and have declared the matter closed.

Amended by SR-NASD-98-64 eff. Nov. 17, 1998.
Amended by SR-NASD-97-22 eff. Nov. 17, 1998.
Amended eff. May 10, 1989.

**Selected Notice to Members:** 98-90.

## 10204. Applicability of Uniform Code

Except as otherwise provided in the Rule 10200 Series, the Rules and procedures applicable to arbitrations concerning industry and clearing controversies shall be those set forth hereinafter under the Rule 10300 Series.

## 10205. Schedule of Fees for Industry and Clearing Controversies

(a) At the time of filing a Claim, Counterclaim, Third-Party Claim, or Cross-Claim in an industry or clearing controversy which is required to be submitted to arbitration before the Association as set forth in Rule 10201, above, a party who is a member shall pay a non-refundable filing fee and shall remit a hearing session deposit to the Association in the amounts stated in paragraph (k) unless such fee or deposit is specifically waived by the Director of Arbitration. A party who is an associated person shall pay a non-refundable filing fee and shall pay a hearing session deposit in the amounts specified for customer claimants in Rule 10332. If the associated person is a joint claimant with a member, the member shall pay a non-refundable filing fee and shall pay a hearing session deposit in the amounts specified in paragraph (k) of this Rule. Where multiple hearing sessions are required, the arbitrator(s) may require any of the parties to make additional hearing deposits for each additional hearing session. In no event shall the amount deposited by all parties per hearing session exceed the amount of the largest initial hearing deposit made by any party under paragraph (k) below.

(b) A hearing session is any meeting between the parties and the arbitrator(s), including a pre-hearing conference with an arbitrator, which lasts four (4) hours or less. The forum fee for a pre-hearing conference with an arbitrator shall be the amount set forth in paragraph (k) below as a hearing session deposit for a hearing with a single arbitrator.

(c) The arbitrators, in their award, shall determine the amount chargeable to the parties as forum fees and shall determine who shall pay such forum fees. Forum fees chargeable to the parties shall be assessed on a per hearing session basis and the aggregate for each hearing session may equal but shall not exceed the amount of the largest initial hearing deposit deposited by any party, except in a case where claims have been joined subsequent to filing in which case hearing session fees shall be computed as provided in paragraph (d). The arbitrator(s) may determine in the award that a party shall reimburse to another party any non-refundable filing fee it has paid. Amounts deposited by a party shall be applied against forum fees, if any. In addition to forum fees, the arbitrator(s) may determine in the award the amount of costs incurred pursuant to Rules 10319, 10321, 10322, and 10326 and, unless applicable law directs otherwise, other costs and expenses of the parties and arbitrator(s) which are within the scope of the agreement of the parties. The arbitrator(s) shall determine by whom such costs shall be borne. If the hearing session fees are not assessed against a party who had made a hearing deposit, the hearing deposit will be refunded unless the arbitrators determine otherwise.

(d) For claims filed separately which are subsequently joined or consolidated under Rule 10314(d) of this Code, the hearing deposit and forum fees assessable per hearing session after joinder or consolidation shall be based on the cumulative amount in dispute. The arbitrator(s) shall determine by whom such fees shall be borne.

(e) If the dispute, claim, or controversy does not involve, disclose, or specify a money claim, the non-refundable filing fee assessed on a party who is a member shall be $500. If the dispute, claim, or controversy does not involve, disclose, or specify a money claim, the hearing session deposit to be remitted by a party shall be $1000. These amounts may be adjusted by the Director of Arbitration or the panel of arbitrators may require the maximum amount specified in the schedule.

(f) The Association shall retain the total initial amount deposited as hearing session deposits by all the parties in any matter submitted and settled or withdrawn within eight business days of the first scheduled hearing session other than a pre-hearing conference.

(g) Any matter submitted and thereafter settled or withdrawn subsequent to the commencement of the first hearing session, including a pre-hearing conference with an arbitrator, shall be subject to an assessment of forum fees and costs incurred pursuant to Rules 10319, 10321, 10322, and 10326 based on hearing sessions held and scheduled within eight business days after the Association receives notice that the matter has been

settled or withdrawn. The arbitrator(s) shall determine by whom such fees and costs shall be borne.

(h) In each industry or clearing controversy which is required to be submitted to arbitration before the Association as set forth in Rule 10201, above, where interim injunctive relief is requested or where a court has issued a temporary injunction and a party requests expedited proceedings, a total non-refundable surcharge of $2,500 shall be paid by the party or parties requesting the expedited proceedings as provided in Rule 10335. For purposes of this Rule, where expedited proceedings are mandated by Rule 10335(g), the party that sought and was granted injunctive relief by a court shall be deemed a party requesting expedited proceedings. These surcharge fees shall be in addition to all other non-refundable filing fees, hearing deposits, or costs which may be required. The arbitrator may determine that a party shall reimburse another party for any non-refundable surcharge it has paid.

(i) Reserved

(j) Reserved

(k) Schedule of Fees

| **Schedule of Fees** | | | | |
|---|---|---|---|---|
| | | | **Hearing Session Deposit** | |
| **Amount in Dispute**<br><br>**(Exclusive of Interest and Expenses)** | **Claim Filing Fee** | **Deposit for Cases to be Decided on the Paper Record** | **One Arbitrator**[1] | **Three Arbitrators**[2] |
| $.01–$1,000 | $ 200 | $ 25 | $ 25 | NA |
| $1,000.01–$2,500 | $ 300 | $ 50 | $ 50 | NA |
| $2,500.01–$5,000 | $ 400 | $ 125 | $ 125 | NA |
| $5,000.01–$10,000 | $ 500 | $ 250 | $ 250 | NA |
| $10,000.01–$25,000 | $ 750 | $ 300 | $ 450 | NA |
| $25,000.01–$30,000 | $1,000 | NA | $ 450 | $ 600 |
| $30,000.01–$50,000 | $1,000 | NA | $ 450 | $ 600 |
| $50,000.01–$100,000 | $1,000 | NA | $ 450 [3] | $ 750 |
| $100,000.01–$500,000 | $1,000 | NA | $ 450 [4] | $1,125 |
| $500.000.01–$1,000,000 | $1,250 | NA | $ 450 [4] | $1,200 |
| $1,000,000.01–$5,000,000 | $2,000 | NA | $ 450 [4] | $1,200 |
| $5,000,000.01–$10,000,000.00 | $2,500 | NA | $ 450 [4] | $1,200 |
| Over $10,000,000 | $5,000 | NA | $ 450 [4] | $1,200 |

[1] The dispute is resolved by one arbitrator per hearing session, including pre-hearing conferences.

[2] The dispute is resolved by three arbitrators per hearing session.

[3] Fee applies only to pre-hearing conferences with a single arbitrator and to disputes resolved by one arbitrator

per hearing session under the Rule 10210 Series.

[4] Fee applies only to pre-hearing conferences with a single arbitrator.

Amended by SR-NASD-2000-65 eff. Dec. 30, 2000.
Amended by SR-NASD-2000-11 eff. Nov. 1, 2000.
Amended by SR-NASD-99-23 eff. March 18, 1999
Amended by SR-NASD-97-79 eff. March 18, 1999.
Amended by SR-NASD-95-25 eff. Aug. 1, 1995.
Amended by SR-NASD-94-10 eff. May 2, 1995.
Amended by SR-NASD-94-75 eff. Jan. 1, 1995.
Amended by SR-NASD-90-03 eff. June 18, 1990.
Added eff. May 10, 1989.

**Selected Notices to Members:** 99-23; 99-96.

## 10210. Statutory Employment Discrimination Claims

The Rule 10210 Series shall apply only to disputes that include a claim alleging employment discrimination, including a sexual harassment claim, in violation of a statute. The Rule 10210 Series shall supersede any inconsistent Rules contained in this Code.

Adopted by SR-NASD-99-08 eff. Jan. 18, 2000.

**Selected Notice to Members:** 99-96.

## 10211. Special Arbitrator Qualifications for Employment Discrimination Disputes

**(a) Minimum Qualifications for All Arbitrators**

Only arbitrators classified as public arbitrators as provided in Rule 10308 shall be selected to consider disputes involving a claim of employment discrimination, including a sexual harassment claim, in violation of a statute.

**(b) Single Arbitrators or Chairs of Three-Person Panels**

(1) Arbitrators who are selected to serve as single arbitrators or as chairs of three-person panels should have the following additional qualifications:

(A) law degree (Juris Doctor or equivalent);

(B) membership in the Bar of any jurisdiction;

(C) substantial familiarity with employment law; and

(D) ten or more years of legal experience, of which at least five years must be in either:

(i) law practice;

(ii) law school teaching;

(iii) government enforcement of equal employment opportunity statutes;

(iv) experience as a judge, arbitrator, or mediator; or

(v) experience as an equal employment opportunity officer or in-house counsel of a corporation.

(2) In addition, a chair or single arbitrator with the above experience may not have represented primarily the views of employers or of employees within the last five years. For purposes of this Rule, the term "primarily" shall be interpreted to mean 50% or more of the arbitrator's business or professional

activities within the last five years.

**(c) Waiver of Special Qualifications**

If all parties agree, after a dispute arises, they may waive any of the qualifications set forth in paragraph (a) or (b) above.

Adopted by SR-NASD-99-08 eff. Jan. 18, 2000.

**Selected Notice to Members:** 99-96.

## 10212. Composition of Panels

For disputes involving a claim alleging employment discrimination, including a sexual harassment claim, in violation of a statute:

(a) Each panel shall consist of either a single public arbitrator or three public arbitrators qualified under Rule 10211, unless the parties agree to a different panel composition.

(b) A single arbitrator shall be appointed to hear claims for $100,000 or less.

(c) A panel of three arbitrators shall be appointed to hear claims for more than $100,000, unless the parties agree to have their case determined by a single arbitrator.

Adopted by SR-NASD-99-08 eff. Jan. 18, 2000.

**Selected Notice to Members:** 99-96.

## 10213. Discovery

(a) Necessary pre-hearing depositions consistent with the expedited nature of arbitration shall be available.

(b) The provisions of Rule 10321 shall apply to proceedings under this Rule 10210 Series.

Adopted by SR-NASD-99-08 eff. Jan. 18, 2000.

**Selected Notice to Members:** 99-96.

## 10214. Awards

The arbitrator(s) shall be empowered to award any relief that would be available in court under the law. The arbitrator(s) shall issue an award setting forth a summary of the issues, including the type(s) of dispute(s), the damages or other relief requested and awarded, a statement of any other issues resolved, and a statement regarding the disposition of any statutory claim(s).

Adopted by SR-NASD-99-08 eff. Jan. 18, 2000.

**Selected Notice to Members:** 99-96.

## 10215. Attorneys' Fees

The arbitrator(s) shall have the authority to provide for reasonable attorneys' fee reimbursement, in whole or in part, as part of the remedy in accordance with applicable law.

Adopted by SR-NASD-99-08 eff. Jan. 18, 2000.

**Selected Notice to Members:** 99-96.

## 10216. Coordination of Claims Filed in Court and in Arbitration

**(a) Option to Combine Related Claims in Court**

(1)(A) If a current or former associated person of a member files a statutory discrimination claim in court against a member or its associated persons, and asserts related claims in arbitration at the Association against some or all of the same parties, a respondent who is named in both proceedings shall have the option to move to compel the claimant to bring the related arbitration claims in the same court proceeding in which the statutory discrimination claim is pending, to the full extent to which the court will accept jurisdiction over the related claims.

(B) The respondent shall notify the claimant in writing, before the time to answer under Rule 10314 has expired, that it is exercising this option and shall file a copy of such notification with the Director. If the respondent files an answer without having exercised this option, it shall have waived its right to move to compel the claimant to assert related claims in court, except as provided in paragraph (b).

(2)(A) If a member or current or former associated person of a member ("party") has a pending claim in arbitration against a current or former associated person of a member and the current or former associated person thereafter asserts a related statutory employment discrimination claim in court against the party, the party shall have the option to assert its pending arbitration claims and any counterclaims in court.

(B) The party shall notify the current or former associated person in writing, before filing an answer to the complaint in court, that it is exercising this option and shall file a copy of such notification with the Director. If the party files an answer in court without having exercised this option, it shall have waived its right to assert the pending arbitration claim in court.

(C) The party may not exercise this option after the first hearing has begun on the arbitration claim.

**(b) Option Extended When Claim is Amended**

(1) If the claimant files an amended Statement of Claim adding new claims not asserted in the original Statement of Claim, a respondent named in the amended Statement of Claim shall have the right to move to compel the claimant to assert all related claims in the same court proceeding in which the statutory discrimination claim is pending, to the full extent that the court will accept jurisdiction over the related claims, even if those related claims were asserted in the original Statement of Claim.

(2) The respondent shall notify the claimant in writing, before the time to answer the amended Statement of Claim under Rule 10314 has expired, that it is exercising this option and shall file a copy of such notification with the Director. If the respondent files an answer to the amended Statement of Claim without having exercised this option, it shall have waived its right to move to compel the claimant to assert related claims in court.

**(c) Requirement to Combine All Related Claims**

If a party elects to require a current or former associated person to assert all related claims in court, the party shall assert in the same court proceeding all related claims that it has against the associated person to the full extent to which the court will accept jurisdiction over the related claims.

**(d) Right of Respondent to Remain in Arbitration**

(1) If there are multiple respondents and a respondent has exercised an option under paragraph (a) or (b), but another respondent wishes to have the claims against it remain in arbitration, then any remaining party may apply for a stay of the arbitration proceeding.

(2) The arbitration shall be stayed unless the arbitration panel determines that the stay will result in substantial prejudice to one or more of the parties. If a panel has not been appointed, the Director shall appoint a single arbitrator to consider the application for a stay. Such single arbitrator shall be selected using the Neutral List Selection System (as defined in Rule 10308) and is not required to have the special

employment arbitrator qualifications described in Rule 10211.

**(e) Pre-Filing Certification**

(1) Prior to or concurrently with filing a Statement of Claim, a claimant may file with the Director a certification that it had communicated unsuccessfully with the respondent concerning the consolidation of all claims in court prior to filing a Statement of Claim, in an effort to save the expense of arbitration fees. A copy of such certification shall be sent to the respondent at the same time and in the same manner as the filing with the Director.

(2) If, after a certification has been filed, all the respondents later exercise the option to consolidate all claims in court, the Director will return the claimant's filing fee and any hearing session deposits for hearings that have not been held, but will retain the member surcharge and any accrued member process fees. If there are any remaining respondents, the filing fee and any hearing deposits will be adjusted to correspond to the claims against the remaining respondents.

**(f) Motion to Compel Arbitration**

If a member or a current or former associated person of a member files in court a claim against a member or a current or former associated person of a member that includes matters that are subject to mandatory arbitration, either by the rules of the Association or by private agreement, the defending party may move to compel arbitration of the claims that are subject to mandatory arbitration.

**(g) Definitions**

For purposes of this Rule:

(1) The term "related claim" shall mean any claim that arises out of the employment or termination of employment of an associated person.

(2) The term "statutory discrimination claim" means a claim alleging employment discrimination, including a sexual harassment claim, in violation of a statute.

Adopted by SR-NASD-99-08 eff. Jan. 18, 2000.

**Selected Notice to Members:** 99-96.

## 10217. Fees

(a) For any claim of statutory employment discrimination submitted to arbitration that is subject to a predispute arbitration agreement, a party who is a current or former associated person shall pay a non-refundable filing fee according to the schedule of fees set forth in Rule 10332, provided that:

(1) In no event shall such a person pay more than $200 for a filing fee;

(2) A member that is a party to such an arbitration proceeding under this rule shall pay the remainder of all applicable arbitration fees set forth in Rule 10332; and

(3) No party shall be required to remit a hearing session deposit.

(b) The arbitration fees described in paragraph (a)(2) are not subject to allocation in the award. The panel, however, may assess to a party who is a current or former associated person those costs incurred under Rules 10319, 10321, 10322, and 10326.

Adopted by SR-NASD-2005-046 eff. Jan. 17, 2006.

# 10300. Uniform Code of Arbitration

## 10301. Required Submission

(a) Any dispute, claim, or controversy eligible for submission under the Rule 10100 Series between a customer and a member and/or associated person arising in connection with the business of such member or in connection with the activities of such associated persons shall be arbitrated under this Code, as provided by any duly executed and enforceable written agreement or upon the demand of the customer. A claim involving a member in the following categories shall be ineligible for submission to arbitration under the Code unless the customer agrees in writing to arbitrate the claim after it has arisen:

1. A member whose membership is terminated, suspended, canceled, or revoked;

2. A member that has been expelled from the NASD; or

3. A member that is otherwise defunct.

(b) Under this Code, the Director of Arbitration, upon approval of the Executive Committee of the National Arbitration and Mediation Committee, or the National Arbitration and Mediation Committee, shall have the right to decline the use of its arbitration facilities in any dispute, claim, or controversy, where, having due regard for the purposes of the Association and the intent of this Code, such dispute, claim, or controversy is not a proper subject matter for arbitration.

(c) Claims which arise out of transactions in a readily identifiable market may, with the consent of the Claimant, be referred to the arbitration forum for that market by the Association.

(d) Class Action Claims

(1) A claim submitted as a class action shall not be eligible for arbitration under this Code at the Association.

(2) Any claim filed by a member or members of a putative or certified class action is also ineligible for arbitration at the Association if the claim is encompassed by a putative or certified class action filed in federal or state court, or is ordered by a court to an arbitral forum not sponsored by a self-regulatory organization for classwide arbitration. However, such claims shall be eligible for arbitration in accordance with paragraph (a) or pursuant to the parties' contractual agreement, if any, if a claimant demonstrates that it has elected not to participate in the putative or certified class action or, if applicable, has complied with any conditions for withdrawing from the class prescribed by the court.

Disputes concerning whether a particular claim is encompassed by a putative or certified class action shall be referred by the Director of Arbitration to a panel of arbitrators in accordance with Rule 10302 or Rule 10308, as applicable. Either party may elect instead to petition the court with jurisdiction over the putative or certified class action to resolve such disputes. Any such petition to the court must be filed within ten business days of receipt of notice that the Director of Arbitration is referring the dispute to a panel of arbitrators.

(3) No member or associated person shall seek to enforce any agreement to arbitrate against a customer, other member or person associated with a member who has initiated in court a putative class action or is a member of a putative or certified class with respect to any claims encompassed by the class action unless and until: (A) the class certification is denied; (B) the class is decertified; (C) the customer, other member or person associated with a member is excluded from the class by the court; or (D) the customer, other member or person associated with a member elects not to participate in the putative or certified class action or, if applicable, has complied with any conditions for withdrawing from the class prescribed by the court.

(4) No member or associated person shall be deemed to have waived any of its rights under this Code or under any agreement to arbitrate to which it is party except to the extent stated in this paragraph.

Amended by SR-NASD-2001-08 eff. June 11, 2001.
Amended by SR-NASD-98-48 eff. Nov. 17, 1998.
Amended by SR-NASD-93-65 eff. Apr. 20, 1994.
Amended by SR-NASD-92-28 eff. Oct. 28, 1992.
Amended by SR-NASD-91-49 eff. Jan. 2, 1992.

**Selected Notices to Members:** 84-51, 92-65, 01-29.

## 10302. Simplified Arbitration

(a) Any dispute, claim, or controversy arising between a public customer(s) and an associated person or a member subject to arbitration under this Code involving a dollar amount not exceeding $25,000, exclusive of attendant costs and interest, shall be arbitrated as hereinafter provided.

(b) The Claimant shall file with the Director of Arbitration an executed Submission Agreement and a copy of the Statement of Claim of the controversy in dispute and the required deposit, together with documents in support of the Claim. Sufficient additional copies of the Submission Agreement and the Statement of Claim and supporting documents shall be provided to the Director of Arbitration for each party and the arbitrator. The Statement of Claim shall specify the relevant facts, the remedies sought and whether a hearing is demanded.

(c) The Claimant shall pay a non-refundable filing fee and shall remit a hearing session deposit as specified in Rule 10332 of this Code upon the filing of the Submission Agreement. The final disposition of the fee or deposit shall be determined by the arbitrator.

(d) The Director of Arbitration shall endeavor to serve promptly by mail or otherwise on the Respondent(s) one (1) copy of the Submission Agreement and one (1) copy of the Statement of Claim. Within twenty (20) calendar days from receipt of the Statement of Claim, Respondent(s) shall serve each party with an executed Submission Agreement and a copy of Respondent's Answer. Respondent's executed Submission Agreement and Answer shall also be filed with the Director of Arbitration with sufficient additional copies for the arbitrator(s) along with any deposit required under the schedule of fees for customer disputes. The Answer shall designate all available defenses to the Claim and may set forth any related Counterclaim and/or related Third-Party Claim the Respondent(s) may have against the Claimant or any other person. If the Respondent(s) has interposed a Third-Party Claim, the Respondent(s) shall serve the Third-Party Respondent with an executed Submission Agreement, a copy of the Respondent's Answer containing the Third-Party Claim, and a copy of the original Claim filed by the Claimant. The Third-Party Respondent shall respond in the manner herein provided for response to the Claim. If the Respondent(s) files a related Counterclaim exceeding $25,000 exclusive of attendant costs and interest, the arbitrator may refer the Claim, Counterclaim and/or Third-Party Claim, if any, to a panel of three (3) arbitrators in accordance with Rule 10308 or, he may dismiss the Counterclaim and/or Third-Party Claim without prejudice to the Counterclaimant(s) and/or Third-Party Claimant(s) pursuing the Counterclaim and/or Third Party Claim in a separate proceeding. The costs to the Claimant under either proceeding shall in no event exceed the total amount specified in Rule 10332.

(e) All parties shall serve on all other parties and the Director of Arbitration, with sufficient additional copies for the arbitrator(s), a copy of the Answer, Counterclaim, Third-Party Claim, Amended Claim, or other responsive pleading, if any. The Claimant, if a Counterclaim is asserted against him, shall within ten (10) calendar days either (1) serve on each party and on the Director of Arbitration, with sufficient additional copies for the arbitrator (s), a Reply to any Counterclaim or, (2) if the amount of the Counterclaim exceeds the Claim, shall have the right to file a statement withdrawing the Claim. If the Claimant withdraws the Claim, the proceedings shall be discontinued without prejudice to the rights of the parties.

(f) The dispute, claim or controversy shall be submitted to a single public arbitrator knowledgeable in the securities industry appointed by the Director of Arbitration. Unless the public customer demands or consents to a hearing, or the arbitrator calls a hearing, the arbitrator shall decide the dispute, claim or controversy solely upon the pleadings and evidence filed by the parties. If a hearing is necessary, such hearing shall be held as soon as practicable at a locale selected by the Director of Arbitration.

(g) The Director of Arbitration may grant extensions of time to file any pleading upon a showing of good cause.

(h)(1) The arbitrator shall be authorized to require the submission of further documentary evidence as he, in his sole discretion, deems advisable.

(2) If a hearing is demanded or consented to in accordance with paragraph (f), the General Provisions Governing Pre-Hearing Proceedings under Rule 10321 shall apply.

(3) If no hearing is demanded or consented to, all requests for document production shall be submitted in writing to the Director of Arbitration within ten (10) business days of notification of the identity of the arbitrator selected to decide the case. The requesting party shall serve simultaneously its request for document production on all parties. Any response or objections to the requested document production shall be served on all parties and filed with the Director of Arbitration within five (5) business days of receipt of the requests for production. The appointed arbitrator shall resolve all requests under this Rule on the papers submitted.

(i) Upon the request of the arbitrator, the Director of Arbitration shall appoint two (2) additional arbitrators to the panel which shall decide the matter in controversy.

(j) In any case where there is more than one (1) arbitrator, the majority shall be public arbitrators.

(k) In his discretion, the arbitrator may, at the request of any party, permit such party to submit additional documentation relating to the pleadings.

(l) Except as otherwise provided herein, the general arbitration rules of the Association shall be applicable to proceedings instituted under this Rule.

Amended by SR-NASD-97-22 eff. Nov. 17, 1998.
Amended eff. Oct. 1, 1984; Apr. 1, 1988; May 10, 1989; June 1, 1990; Apr. 26, 1991; Jan. 8, 1992; Sept. 8, 1992.

**Selected Notice to Members:** 98-90.

## IM-10302. Related Counterclaim

As used in Rule 10302, the term "related Counterclaim" shall mean any Counterclaim related to a customer's accounts with a member.

## 10303. Hearing Requirements — Waiver of Hearing

(a) Any dispute, claim or controversy except as provided in Rule 10203 (Simplified Industry Arbitration) or Rule 10302 (Simplified Arbitration), shall require a hearing unless all parties waive such hearing in writing and request that the matter be resolved solely upon the pleadings and documentary evidence.

(b) Notwithstanding a written waiver of a hearing by the parties, a majority of the arbitrators may call for and conduct a hearing. In addition, any arbitrator may request the submission of further evidence.

## 10304. Time Limitation Upon Submission

(a) No dispute, claim, or controversy shall be eligible for submission to arbitration under this Code where six (6) years have elapsed from the occurrence or event giving rise to the act or dispute, claim or controversy. The panel will resolve any questions regarding the eligibility of a claim under this Rule.

(b) Dismissal of a claim under this Rule does not prohibit a party from pursuing the claim in court. By requesting dismissal of a claim under this Rule, the requesting party agrees that if the panel dismisses a claim under the Rule, the party that filed the dismissed claim may withdraw any remaining related claims without prejudice and may pursue all of the claims in court.

(c) This Rule shall not extend applicable statutes of limitations; nor shall the six-year time limit on the submission of claims apply to any claim that is directed to arbitration by a court of competent jurisdiction upon request of a member or associated person.

Amended by SR-NASD-2003-101 eff. May 1, 2005.
Amended eff. Oct. 1, 1984.

**Selected Notice to Members:** 05-10.

## 10305. Dismissal of Proceedings

(a) At any time during the course of an arbitration, the arbitrators may either upon their own initiative or at the request of a party, dismiss the proceeding and refer the parties to their judicial remedies, or to any dispute resolution forum agreed to by the parties, without prejudice to any claims or defenses available to any party.

(b) The arbitrators may dismiss a claim, defense, or proceeding with prejudice as a sanction for willful and intentional material failure to comply with an order of the arbitrator(s) if lesser sanctions have proven ineffective.

(c) The arbitrators shall at the joint request of all the parties dismiss the proceedings.

Amended by SR-NASD-97-34 eff. Aug. 6, 1997; SEC Rel. No. 34-38907 (8/14/97).

## 10306. Settlements

(a) Parties to an arbitration may agree to settle their dispute at any time.

(b) If the parties agree to settle their dispute, they will remain responsible for payment of fees incurred, including fees for previously scheduled hearing sessions and fees incurred as a result of adjournments, pursuant to Rule 10319.

(c) The terms of a settlement agreement do not need to be disclosed to the Association. However, if the parties fail to agree on the allocation of outstanding fees, the fees shall be divided equally among all parties.

Amended by SR-NASD-2003-164 eff. Aug. 16, 2004.
Amended by SR-NASD-2001-21 eff. Nov. 19, 2001.

**Selected Notices to Members:** 01-70, 04-53.

## 10307. Tolling of Time Limitation(s) for the Institution of Legal Proceedings and Extension of Time Limitation(s) for Submission to Arbitration

(a) Where permitted by applicable law, the time limitations which would otherwise run or accrue for the institution of legal proceedings shall be tolled where a duly executed Submission Agreement is filed by the Claimant(s). The tolling shall continue for such period as the Association shall retain jurisdiction upon the matter submitted.

(b) The six (6) year time limitation upon submission to arbitration shall not apply when the parties have submitted the dispute, claim or controversy to a court of competent jurisdiction. The six (6) year time limitation shall not run for such period as the court shall retain jurisdiction upon the matter submitted.

Amended eff. Oct. 1, 1984.

## 10308. Selection of Arbitrators

**(a) Definitions**

**(1) "day"**

For purposes of this Rule, the term "day" means calendar day.

**(2) "claimant"**

For purposes of this Rule, the term "claimant" means one or more persons who file a single claim.

**(3) "Neutral List Selection System"**

The term "Neutral List Selection System" means the software that maintains the roster of arbitrators and performs various functions relating to the selection of arbitrators.

**(4) "non-public arbitrator"**

The term "non-public arbitrator" means a person who is otherwise qualified to serve as an arbitrator and:

(A) is, or within the past 5 years, was:

(i) associated with a broker or a dealer (including a government securities broker or dealer or a municipal securities dealer);

(ii) registered under the Commodity Exchange Act;

(iii) a member of a commodities exchange or a registered futures association; or

(iv) associated with a person or firm registered under the Commodity Exchange Act;

(B) is retired from, or spent a substantial part of a career, engaging in any of the business activities listed in subparagraph (4)(A);

(C) is an attorney, accountant, or other professional who has devoted 20 percent or more of his or her professional work, in the last two years, to clients who are engaged in any of the business activities listed in subparagraph (4)(A); or

(D) is an employee of a bank or other financial institution and effects transactions in securities, including government or municipal securities, and commodities futures or options or supervises or monitors the compliance with the securities and commodities laws of employees who engage in such activities.

**(5) "public arbitrator"**

(A) The term "public arbitrator" means a person who is otherwise qualified to serve as an arbitrator and:

(i) is not engaged in the conduct or activities described in paragraphs (a)(4)(A) through (D);

(ii) was not engaged in the conduct or activities described in paragraphs (a)(4)(A) through (D) for a total of 20 years or more;

(iii) is not an investment adviser;

(iv) is not an attorney, accountant, or other professional whose firm derived 10 percent or more of its annual revenue in the past 2 years from any persons or entities listed in paragraph (a)(4)(A); and

(v) is not the spouse or an immediate family member of a person who is engaged in the conduct or activities described in paragraphs (a)(4)(A) through (D).

(B) For the purpose of this Rule, the term "immediate family member" means:

(i) the parent, stepparent, child, or stepchild, of a person engaged in the conduct or activities described in paragraphs (a)(4)(A) through (D);

(ii) a member of the household of a person engaged in the conduct or activities described in paragraphs (a)(4)(A) through (D);

(iii) a person who receives financial support of more than 50 percent of his or her annual income from a person engaged in the conduct or activities described in paragraphs (a)(4)(A) through (D); or

(iv) a person who is claimed as a dependent for federal income tax purposes by a person engaged in the conduct or activities described in paragraphs (a)(4)(A) through (D).

**(6) "respondent"**

For purposes of this Rule, the term "respondent" means one or more persons who individually or jointly file an answer to a complaint.

**(7) "send"**

For purposes of this Rule, the term "send" means to send by first class mail, facsimile, or any other method available and convenient to the parties and the Director.

**(b) Composition of Arbitration Panel; Preparation of Lists for Mailing to Parties**

**(1)** Composition of Arbitration Panel

(A) Claims of $50,000 or Less

If the amount of a claim is $50,000 or less, the Director shall appoint an arbitration panel composed of one public arbitrator, unless the parties agree to the appointment of a non-public arbitrator.

(i) If the amount of a claim is $25,000 or less and an arbitrator appointed to the case requests that a panel of three arbitrators be appointed, the Director shall appoint an arbitration panel composed of one non-public arbitrator and two public arbitrators, unless the parties agree to a different panel composition.

(ii) If the amount of a claim is greater than $25,000 and not more than $50,000 and a party in its initial filing or an arbitrator appointed to the case requests that a panel of three arbitrators be appointed, the Director shall appoint an arbitration panel composed of one non-public arbitrator and two public arbitrators, unless the parties agree to a different panel composition.

(B) Claims of More Than $50,000

If the amount of a claim is more than $50,000, the Director shall appoint an arbitration panel composed of one non-public arbitrator and two public arbitrators, unless the parties agree to a different panel composition.

**(2) One List for Panel of One Arbitrator**

If one arbitrator will serve as the arbitration panel, the Director shall send to the parties one list of public arbitrators, unless the parties agree otherwise.

**(3) Two Lists for Panel of Three Arbitrators**

If three arbitrators will serve as the arbitration panel, the Director shall send two lists to the parties, one with the names of public arbitrators and one with the names of non-public arbitrators. The lists shall contain numbers of public and non-public arbitrators, in a ratio of approximately two to one, respectively, to the extent possible, based on the roster of available arbitrators.

**(4) Preparation of Lists**

(A) Except as provided in subparagraph (B) below, the Neutral List Selection System shall generate the lists of public and non-public arbitrators on a rotating basis within a designated geographic hearing site and shall exclude arbitrators based upon conflicts of interest identified within the Neutral List Selection System database.

(B) If a party requests that the lists include arbitrators with expertise classified in the Neutral List Selection System, the lists may include some arbitrators having the designated expertise.

**(5) Sending of Lists to Parties**

The Director shall send the lists of arbitrators to all parties at the same time approximately 30 days after the last answer is due.

**(6) Information About Arbitrators**

The Director shall send to the parties employment history for each listed arbitrator for the past 10 years and other background information. If a party requests additional information about an arbitrator, the Director shall send such request to the arbitrator, and shall send the arbitrator's response to all parties at the same time. When a party requests additional information, the Director may, but is not required to, toll the time for the parties to return the ranked lists under paragraph (c)(2).

**(c) Striking, Ranking, and Appointing Arbitrators on Lists**

**(1) Striking and Ranking Arbitrators**

(A) Striking An Arbitrator

A party may strike one or more of the arbitrators from each list for any reason.

(B) Ranking — Panel of One Arbitrator

Each party shall rank all of the arbitrators remaining on the list by assigning each arbitrator a different, sequential, numerical ranking, with a "1" rank indicating the party's first choice, a "2" indicating the party's second choice, and so on.

(C) Ranking — Panel of Three Arbitrators

Each party shall rank all of the public arbitrators remaining on the list by assigning each arbitrator a different, sequential, numerical ranking, with a "1" rank indicating the party's first choice, a "2" indicating the party's second choice, and so on. Each party separately shall rank all of the non-public arbitrators remaining on the list, using the same procedure.

**(2) Period for Ranking Arbitrators; Failure to Timely Strike and Rank**

A party must return to the Director the list or lists with the rankings not later than 20 days after the Director sent the lists to the parties, unless the Director has extended the period. If a party does not timely return the list or lists, the Director shall treat the party as having retained all the arbitrators on the list or lists and as having no preferences.

**(3) Process of Consolidating Parties' Rankings**

The Director shall prepare one or two consolidated lists of arbitrators, as appropriate under paragraph (b)(2) or (b)(3), based upon the parties' numerical rankings. The arbitrators shall be ranked by adding the rankings of all claimants together and all respondents together, including third-party respondents, to produce separate consolidated rankings of the claimants and the respondents. The Director shall then rank the arbitrators by adding the consolidated rankings of the claimants, the respondents, including third-party respondents, and any other party together, to produce a single consolidated ranking number, excluding arbitrators who were stricken by any party.

**(4) Appointment of Arbitrators**

(A) Appointment of Listed Arbitrators

The Director shall appoint arbitrators to serve on the arbitration panel based on the order of rankings on the consolidated list or lists, subject to availability and disqualification.

(B) Discretion to Appoint Arbitrators Not on List

If the number of arbitrators available to serve from the consolidated list is not sufficient to fill a panel, the Director shall appoint one or more arbitrators to complete the arbitration panel. Unless the parties agree otherwise, the Director may not appoint a non-public arbitrator under paragraphs (a)(4)(B) or (a)(4)(C). The Director shall provide the parties information about the arbitrator as provided in paragraph (b)(6), and the parties shall have the right to object to the arbitrator as provided in paragraph (d)(1).

**(5) Selecting a Chairperson for the Panel**

The parties shall have 7 days from the date the Director sends notice of the names of the arbitrators to select a chairperson. If the parties notify Dispute Resolution staff prior to the expiration of the original deadline that they need more time in which to reach an agreement, Dispute Resolution staff will extend the time to select a chairperson for an additional 8 days. If the parties cannot agree within the allotted time, the Director shall appoint a chairperson from the panel as follows:

(A) The Director shall appoint as the chairperson the public arbitrator who is the most highly ranked by the parties as long as the person is not an attorney, accountant, or other professional who has devoted 50% or more of his or her professional or business activities, within the last two years, to representing or advising public customers in matters relating to disputed securities or commodities

transactions or similar matters.

(B) If the most highly ranked public arbitrator is subject to the exclusion set forth in subparagraph (A), the Director shall appoint as the chairperson the other public arbitrator, as long as the person also is not subject to the exclusion set forth in subparagraph (A).

(C) If both public arbitrators are subject to the exclusion set forth in subparagraph (A), the Director shall appoint as the chairperson the public arbitrator who is the most highly ranked by the parties.

**(6) Additional Parties**

If a party is added to an arbitration proceeding before the Director has consolidated the other parties' rankings, the Director shall send to that party the list or lists of arbitrators and permit the party to strike and rank the arbitrators. The party must return to the Director the list or lists with numerical rankings not later than 20 days after the Director sent the lists to the party. The Director shall then consolidate the rankings as specified in this paragraph (c).

**(d) Disqualification and Removal of Arbitrator Due to Conflict of Interest or Bias**

**(1) Disqualification By Director**

After the appointment of an arbitrator and prior to the commencement of the earlier of (A) the first pre-hearing conference or (B) the first hearing, if the Director or a party objects to the continued service of the arbitrator, the Director shall determine if the arbitrator should be disqualified. If the Director sends a notice to the parties that the arbitrator shall be disqualified, the arbitrator will be disqualified unless the parties unanimously agree otherwise in writing and notify the Director not later than 15 days after the Director sent the notice.

**(2) Removal by Director**

After the commencement of the earlier of (A) the first pre-hearing conference or (B) the first hearing, the Director may remove an arbitrator from an arbitration panel based on information that is required to be disclosed pursuant to Rule 10312 and that was not previously disclosed.

**(3) Standards for Deciding Challenges for Cause**

The Director will grant a party's request to disqualify an arbitrator if it is reasonable to infer, based on information known at the time of the request, that the arbitrator is biased, lacks impartiality, or has an interest in the outcome of the arbitration. The interest or bias must be direct, definite, and capable of reasonable demonstration, rather than remote or speculative.

**(4) Vacancies Created by Disqualification or Resignation**

Prior to the commencement of the earlier of (A) the first pre-hearing conference or (B) the first hearing, if an arbitrator appointed to an arbitration panel is disqualified or is otherwise unable or unwilling to serve, the Director shall appoint from the consolidated list of arbitrators the arbitrator who is the most highly ranked available arbitrator of the proper classification remaining on the list. If there are no available arbitrators of the proper classification on the consolidated list, the Director shall appoint an arbitrator of the proper classification subject to the limitation set forth in paragraph (c)(4)(B). The Director shall provide the parties information about the arbitrator as provided in paragraph (b)(6), and the parties shall have the right to object to the arbitrator as provided in paragraph (d)(1).

**(e) Discretionary Authority**

The Director may exercise discretionary authority and make any decision that is consistent with the purposes of this Rule and the Rule 10000 Series to facilitate the appointment of arbitration panels and the resolution of arbitration disputes.

**(f) Challenges by Customers**

In cases involving public customers, any close questions regarding arbitrator classification or challenges for cause brought by a customer will be resolved in favor of the customer.

Amended by SR-NASD-2004-164 eff. March 9, 2005 with a delayed operational date [Approval Order].

Amended by SR-NASD-2004-39 eff. Sept. 17, 2004.
Amended by SR-NASD-2003-95 eff. July 19, 2004.
Amended by SR-NASD-2004-87 eff. June 7, 2004.
Amended by SR-NASD-2000-34 eff. Feb. 12, 2001.
Amended by SR-NASD-98-64 eff. Nov. 17, 1998.
Amended by SR-NASD-98-48 eff. Nov. 17, 1998.
Amended by SR-NASD-97-22 eff. Nov. 17, 1998.
Amended eff. July 1, 1986; Apr. 1, 1988; May 10, 1989; Oct. 7, 1992.

**Selected Notice to Members:** 98-90; 01-13; 04-49; 04-61.

### IM-10308. Arbitrators Who Also Serve as Mediators[1]

Mediation services performed by mediators who are also arbitrators shall not be included in the definition of "professional work" for purposes of Rule 10308(a)(4)(C), so long as the mediator is acting in the capacity of a mediator and is not representing a party in the mediation.

Mediation fees received by mediators who are also arbitrators shall not be included in the definition of "revenue" for purposes of Rule 10308(a)(5)(A)(iv), so long as the mediator is acting in the capacity of a mediator and is not representing a party in the mediation.

Arbitrators who also serve as mediators shall disclose that fact on their arbitrator disclosure forms.

---

[1] This IM will be renumbered as appropriate following Commission approval of the pending revisions of the Customer and Industry Codes, SR-NASD-2003-158 and SR-NASD-2004-011.

Adopted by SR-NASD-2005-007 eff. May 6, 2005.

**Selected Notices to Members:** 05-36.

### 10309. Composition of Panels

Except as otherwise specifically provided in Rule 10308, the individuals who shall serve on a particular arbitration panel shall be determined by the Director. Except as otherwise specifically provided in Rule 10308, the Director may name the chairman of the panel.

Amended by SR-NASD-98-48 eff. Nov. 17, 1998.

**Selected Notice to Members:** 98-90.

### 10310. Notice of Selection of Arbitrators

(a) The Director shall inform the parties of the arbitrators' names and employment histories for the past 10 years, as well as information disclosed pursuant to Rule 10312, at least 15 business days prior to the date fixed for the first hearing session. A party may make further inquiry of the Director concerning an arbitrator's background. In the event that, prior to the first hearing session, any arbitrator should become disqualified, resign, die, refuse or otherwise be unable to perform as an arbitrator, the Director shall appoint a replacement arbitrator to fill the vacancy on the panel. The Director shall inform the parties as soon as possible of the name and employment history of the replacement arbitrator for the past 10 years, as well as information disclosed pursuant to Rule 10312. A party may make further inquiry of the Director concerning the replacement arbitrator's background and within the time remaining prior to the first hearing session or the 10 day period provided under Rule 10311, whichever is shorter, may exercise its right to challenge the replacement arbitrator as provided in Rule 10311.

(b) This Rule shall not apply to arbitration proceedings that are subject to Rule 10308.

Amended by SR-NASD-98-48 eff. Nov. 17, 1998.
Amended by SR-NASD-97-34 eff. Aug. 6, 1997; SEC Rel. No. 34-38907 (8/14/97).
Amended eff. Sept. 19, 1988; May 10, 1989.

**Selected Notice to Members:** 98-90.

## 10311. Peremptory Challenge

(a) In an arbitration proceeding, except as provided in Rule 10335, each party shall have the right to one peremptory challenge. In arbitrations where there are multiple Claimants, Respondents, and/or Third-Party Respondents, the Claimants shall have one peremptory challenge, the Respondents shall have one peremptory challenge, and the Third-Party Respondents shall have one peremptory challenge. The Director may in the interests of justice award additional peremptory challenges to any party to an arbitration proceeding. Unless extended by the Director, a party wishing to exercise a peremptory challenge must do so by notifying the Director in writing within 10 business days of notification of the identity of the person(s) named under Rule 10310 or Rule 10321(d) or (e), whichever comes first. There shall be unlimited challenges for cause.

(b) This Rule shall not apply to arbitration proceedings that are subject to Rule 10308.

Amended by SR-NASD-98-48 eff. Nov. 17, 1998.
Amended by SR-NASD-97-34 eff. Aug. 6, 1997; SEC Rel. No. 34-38907 (8/14/97).
Amended by SR-NASD-93-38 eff. Jan. 3, 1996.
Amended by SR-NASD-91-49 eff. Jan. 2, 1992.
Amended eff. Oct. 1, 1984.

**Selected Notice to Members:** 98-90.

## 10312. Disclosures Required of Arbitrators and Director's Authority to Disqualify

(a) Each arbitrator shall be required to disclose to the Director of Arbitration any circumstances which might preclude such arbitrator from rendering an objective and impartial determination. Each arbitrator shall disclose:

(1) Any direct or indirect financial or personal interest in the outcome of the arbitration;

(2) Any existing or past financial, business, professional, family, social, or other relationships or circumstances that are likely to affect impartiality or might reasonably create an appearance of partiality or bias. Persons requested to serve as arbitrators must disclose any such relationships or circumstances that they have with any party or its counsel, or with any individual whom they have been told will be a witness. They must also disclose any such relationship or circumstances involving members of their families or their current employers, partners, or business associates.

(b) Persons who are requested to accept appointment as arbitrators must make a reasonable effort to inform themselves of any interests, relationships or circumstances described in paragraph (a) above.

(c) The obligation to disclose interests, relationships, or circumstances that might preclude an arbitrator from rendering an objective and impartial determination described in paragraph (a) is a continuing duty that requires a person who accepts appointment as an arbitrator to disclose, at any stage of the arbitration, any such interests, relationships, or circumstances that arise, or are recalled or discovered.

**(d) Removal by Director**

(1) The Director may remove an arbitrator based on information that is required to be disclosed pursuant to this Rule.

(2) After the commencement of the earlier of (A) the first pre-hearing conference or (B) the first hearing, the Director may remove an arbitrator based only on information not known to the parties when the arbitrator was selected. The Director's authority under this subparagraph (2) may be exercised only by the Director or the President of NASD Dispute Resolution.

(3) The Director will grant a party's request to disqualify an arbitrator if it is reasonable to infer, based on information known at the time of the request, that the arbitrator is biased, lacks impartiality, or has an

interest in the outcome of the arbitration. The interest or bias must be direct, definite, and capable of reasonable demonstration, rather than remote or speculative.

(e) The Director shall inform the parties to an arbitration proceeding of any information disclosed to the Director under this Rule unless either the arbitrator who disclosed the information withdraws voluntarily as soon as the arbitrator learns of any interest, relationship, or circumstances described in paragraph (a) that might preclude the arbitrator from rendering an objective and impartial determination in the proceeding, or the Director removes the arbitrator.

Amended by SR-NASD-2003-95 eff. July 19, 2004.
Amended by SR-NASD-2000-34 eff. Mar. 8, 2001.
Amended by SR-NASD-98-48 eff. Nov. 17, 1998.
Amended eff. May 10, 1989.

**Selected Notices to Members:** 98-90; 01-13; 04-49.

## 10313. Disqualification or Other Disability of Arbitrators

(a) In the event that any arbitrator, after the commencement of the earlier of (1) the first pre-hearing conference or (2) the first hearing but prior to the rendition of the award, should become disqualified, resign, die, refuse or otherwise be unable to perform as an arbitrator, the Director shall appoint a replacement arbitrator to fill the vacancy and the hearing shall continue. In the alternative, if all parties agree to proceed with any remaining arbitrator(s), they shall inform the Director in writing within 5 business days of notification of the vacancy, and the remaining arbitrator(s) shall continue with the hearing and determination of the controversy.

(b) The Director shall inform the parties as soon as possible of the name and employment history of the replacement arbitrator for the past 10 years, as well as information disclosed pursuant to Rule 10312. A party may make further inquiry of the Director concerning the replacement arbitrator's background. If the arbitration proceeding is subject to Rule 10308, the party may exercise his or her right to challenge the replacement arbitrator within the time remaining prior to the next scheduled hearing session by notifying the Director in writing of the name of the arbitrator challenged and the basis for such challenge. If the arbitration proceeding is not subject to Rule 10308, within the time remaining prior to the next scheduled hearing session or the 10 day period provided under Rule 10311, whichever is shorter, a party may exercise the party's right to challenge the replacement arbitrator as provided in Rule 10311.

Amended by SR-NASD-2002-38 eff. Apr. 22, 2002.
Amended by SR-NASD-98-48 eff. Nov. 17, 1998.
Amended by SR-NASD-97-34 eff. Aug. 6, 1997.
Amended by SR-NASD-89-19 eff. May 10, 1989.
Amended eff. Sept. 19, 1988.

**Selected Notice to Members:** 98-90.

## 10314. Initiation of Proceedings

Except as otherwise provided herein, an arbitration proceeding under this Code shall be instituted as follows:

**(a) Statement of Claim**

(1) The Claimant shall file with the Director of Arbitration an executed Submission Agreement, a Statement of Claim of the controversy in dispute, together with the documents in support of the Claim, and the required deposit. Sufficient additional copies of the Submission Agreement and the Statement of Claim and supporting documents shall be provided to the Director of Arbitration for each party and each arbitrator. The Statement of Claim shall specify the relevant facts and the remedies sought. The Director of Arbitration shall endeavor to serve promptly by mail or otherwise on the Respondent(s) one (1) copy of the Submission Agreement and one (1) copy of the Statement of Claim.

(2) A Claimant or counsel (referred to herein collectively as "Claimant") may use the online claim notification and filing procedure to complete part of the arbitration claim filing process through the Internet. To commence this process, a Claimant may complete a Claim Information Form that can be accessed

through an NASD Web site. In completing the Claim Information Form, the Claimant may attach an electronic version of the Statement of Claim to the form, provided it does not exceed 50 pages. Once this online form has been completed, an NASD Dispute Resolution Tracking Form will be generated and displayed for the Claimant to reproduce as necessary. The Claimant shall then file with the Director of Arbitration the rest of the materials required in subparagraph (1), above, along with a hard copy of the NASD Dispute Resolution Tracking Form.

**(b) Answer — Defenses, Counterclaims, and/or Cross-Claims**

(1) Within 45 calendar days from receipt of the Statement of Claim, Respondent(s) shall serve each party with an executed Submission Agreement and a copy of the Respondent's Answer. Respondent's executed Submission Agreement and Answer shall also be filed with the Director of Arbitration with sufficient additional copies for the arbitrator(s) along with any deposit required under the schedule of fees. The Answer shall specify all relevant facts and available defenses to the Statement of Claim submitted and may set forth any related Counterclaim the Respondent(s) may have against the Claimant, any Cross-Claim the Respondent(s) may have against any other named Respondent(s), and any Third-Party Claim against any other party or person based upon any existing dispute, claim, or controversy subject to arbitration under this Code.

(2)(A) A Respondent, Responding Claimant, Cross-Claimant, Cross-Respondent, or Third-Party Respondent who pleads only a general denial to a pleading that states specific facts and contentions may, upon objection by a party, in the discretion of the arbitrators, be barred from presenting any facts or defenses at the time of the hearing.

(B) A Respondent, Responding Claimant, Cross-Claimant, Cross-Respondent, or Third-Party Respondent who fails to specify all available defenses and relevant facts in such party's answer may, upon objection by a party, in the discretion of the arbitrators, be barred from presenting such facts or defenses not included in such party's Answer at the hearing.

(C) A Respondent, Responding Claimant, Cross-Claimant, Cross-Respondent, or Third-Party Respondent who fails to file an Answer within 45 calendar days from receipt of service of a Claim, unless the time to answer has been extended pursuant to subparagraph (5), below, may, in the discretion of the arbitrators, be barred from presenting any matter, arguments, or defenses at the hearing. Such a party may also be subject to default procedures as provided in paragraph (e) below.

(3) Respondent(s) shall serve each party with a copy of any Third-Party Claim. The Third-Party Claim shall also be filed with the Director of Arbitration with sufficient additional copies for the arbitrator(s) along with any deposit required under the schedule of fees. Third-Party Respondent(s) shall answer in the manner provided for response to the Claim, as provided in subparagraphs (1) and (2) above.

(4) The Claimant shall serve each party with a Reply to a Counterclaim within ten (10) days of receipt of an Answer containing a Counterclaim. The Reply shall also be filed with the Director of Arbitration with sufficient additional copies for the arbitrator(s).

(5) The time period to file any pleading, whether such be denominated as a Claim, Answer, Counterclaim, Cross-Claim, Reply, or Third-Party Pleading, may be extended for such further period as may be granted by the Director of Arbitration or with the consent of the initial claimant. Extensions of the time period to file an Answer are disfavored and will not be granted by the Director except in extraordinary circumstances.

**(c) Service and Filing with the Director of Arbitration**

(1) Service may be effected by mail or other means of delivery. Service and filing are accomplished on the date of mailing either by first-class postage pre-paid or by means of overnight mail service or, in the case of other means of service, on the date of delivery. Filing with the Director of Arbitration shall be made on the same date as service on a party.

(2) If a member firm and a person associated with the member firm are named parties to an arbitration proceeding at the time of the filing of the Statement of Claim, service on the person associated with the member firm may be made on the associated person or the member firm, which shall perfect service upon the associated person. If the member firm does not undertake to represent the associated person, the member firm shall serve the associated person with the Statement of Claim, shall advise all parties and the Director of Arbitration of that fact, and shall provide such associated person's current address.

**(d) Joinder and Consolidation — Multiple Parties**

(1) Permissive Joinder. All persons may join in one action as claimants if they assert any right to relief jointly, severally, or arising out of the same transaction, occurrence, or series of transactions or occurrences and if any questions of law or fact common to all these claimants will arise in the action. All persons may be joined in one action as respondents if there is asserted against them, jointly or severally, any right to relief arising out of the same transaction, occurrence, or series of transactions or occurrences and if any questions of law or fact common to all respondents will arise in the action. A claimant or respondent need not assert rights to or defend against all the relief demanded. Judgment may be given for one or more of the claimants according to their respective rights to relief, and against one or more respondents according to their respective liabilities.

(2) In arbitrations where there are multiple Claimants, Respondents, and/or Third-Party Respondents, the Director of Arbitration shall be authorized to determine preliminarily whether such parties should proceed in the same or separate arbitrations. Such determination will be considered subsequent to the filing of all responsive pleadings.

(3) The Director of Arbitration shall be authorized to determine preliminarily whether claims filed separately are related and shall be authorized to consolidate such claims for hearing and award purposes.

(4) Further determinations with respect to joinder, consolidation, and multiple parties under this paragraph (d) shall be made by the arbitration panel and shall be deemed final.

**(e) Default Procedures**

(1) A Respondent, Cross-Respondent, or Third-Party Respondent that fails to file an Answer within 45 calendar days from receipt of service of a Claim, unless the time to answer has been extended pursuant to paragraph (b)(5), may be subject to default procedures, as provided in this paragraph, if it is:

(A) a member whose membership has been terminated, suspended, canceled, or revoked;

(B) a member that has been expelled from the NASD;

(C) a member that is otherwise defunct; or

(D) an associated person whose registration is terminated, revoked, or suspended.

(2) If all Claimants elect to use these default procedures, the Claimant(s) shall notify the Director in writing and shall send a copy of such notification to all other parties at the same time and in the same manner as the notification was sent to the Director.

(3) If the case meets the requirements for proceeding under default procedures, the Director shall notify all parties.

(4) The Director shall appoint a single arbitrator pursuant to Rule 10308 to consider the Statement of Claim and other documents presented by the Claimant(s). The arbitrator may request additional information from the Claimant(s) before rendering an award. No hearing shall be held, and the default award shall have no effect on any non-defaulting party.

(5) The Claimant(s) may not amend the claim to increase the relief requested after the Director has notified the parties that the claim will proceed under default procedures.

(6) An arbitrator may not make an award based solely on the non-appearance of a party. The party who appears must present a sufficient basis to support the making of an award in that party's favor. The arbitrator may not award damages in an amount greater than the damages requested in the Statement of Claim, and may not award any other relief that was not requested in the Statement of Claim.

(7) If the Respondent files an Answer after the Director has notified the parties that the claim will proceed under default procedures but before an award has been rendered, the proceedings under this paragraph shall be terminated and the case will proceed under the regular procedures.

Amended by SR-NASD-2004-16 eff. Aug. 5, 2004.
Amended by SR-NASD-2002-62 eff. Oct. 14, 2002.
Amended by SR-NASD-2002-15 eff. Oct. 14, 2002.

Amended by SR-NASD-98-07 eff. Mar. 16, 1998.
Amended by SR-NASD-90-62 eff. May 7, 1991.
Amended eff. Oct. 1, 1984; July 1, 1986; May 10, 1989.

**Selected Notice to Members:** 04-56.

## 10315. Determination of Hearing Location

(a) Designation of Time and Place of Hearing

The Director shall determine the time and place of the first meeting of the arbitration panel and the parties, whether the first meeting is a pre-hearing conference or a hearing, and shall give notice of the time and place at least 15 business days prior to the date fixed for the first meeting by personal service, registered or certified mail to each of the parties unless the parties shall, by their mutual consent, waive the notice provisions under this Rule. The arbitrators shall determine the time and place for all subsequent meetings, whether the meetings are pre-hearing conferences, hearings, or any other type of meetings, and shall give notice as the arbitrators may determine. Attendance at a meeting waives notice thereof.

(b) Foreign Hearing Location

(1) If the Director and all parties agree, parties may have their hearing in a foreign hearing location and conducted by foreign arbitrators, provided that the foreign arbitrators have:

(A) met NASD background qualifications for arbitrators;

(B) received training on NASD arbitration rules and procedures; and

(C) satisfied at least the same training and testing requirements as those arbitrators who serve in U. S. locations of NASD.

(2) The parties shall pay an additional surcharge for each day of hearings held in a foreign hearing location. The amount of the surcharge will be determined by the Director and must be agreed to by the parties before the foreign hearing location may be used. This surcharge shall be specified in the agreement to use a foreign hearing location and shall be apportioned equally among the parties, unless they agree otherwise. The foreign arbitrators shall have the authority to apportion this surcharge as provided in Rules 10205 and 10332.

Amended by SR-NASD-2004-042 eff. June 5, 2005.
Amended by SR-NASD-98-48 eff. Nov. 17, 1998.
Amended eff. May 7, 1991.

**Selected Notice To Members:** 98-90, 05-35.

## 10316. Representation by Counsel

All parties shall have the right to representation by counsel at any stage of the proceedings.

## 10317. Attendance at Hearings

The attendance or presence of all persons at hearings including witnesses shall be determined by the arbitrators. However, all parties to the arbitration and their counsel shall be entitled to attend all hearings.

## IM-10317. Closing Arguments

In response to recent questions concerning the order of closing argument in arbitration proceedings conducted under the auspices of the National Association of Securities Dealers, Inc., it is the practice in these proceedings to allow claimants to proceed first in closing argument, with rebuttal argument being permitted. Claimants may reserve their entire closing for rebuttal. The hearing procedures may, however, be varied in the

discretion of the arbitrators, provided all parties are allowed a full and fair opportunity to present their respective cases.

## 10318. Failure to Appear

If any of the parties, after due notice, fails to appear at a hearing or at any continuation of a hearing session, the arbitrators may, in their discretion, proceed with the arbitration of the controversy. In such cases, all awards shall be rendered as if each party had entered an appearance in the matter submitted.

Amended eff. Jan. 8, 1992.

## 10319. Adjournments

(a) The arbitrator(s) may, in their discretion, adjourn any hearing(s) either upon their own initiative or upon the request of any party to the arbitration.

(b) If an adjournment requested by a party is granted after arbitrators have been appointed, the party requesting an adjournment shall pay a fee equal to the initial deposit of hearing session fees for the first adjournment and twice the initial deposit of hearing session fees, not to exceed $1,500, for a second or subsequent adjournment requested by that party. The arbitrators may waive these fees in their discretion. If more than one party requests the adjournment, the arbitrators shall allocate the fees among the requesting parties.

(c) Upon receiving a third request consented to by all parties for an adjournment, the arbitrator(s) may dismiss the arbitration without prejudice to the Claimant filing a new arbitration.

(d) If an adjournment request is made by one or more parties and granted within three business days before a scheduled hearing session, the party or parties making the request shall pay an additional fee of $100 per arbitrator. If more than one party requests the adjournment, the arbitrators shall allocate the $100 per arbitrator fee among the requesting parties. The arbitrators may allocate all or portion of the $100 per arbitrator fee to the non-requesting party or parties, if the arbitrators determine that the non-requesting party or parties caused or contributed to the need for the adjournment. In the event that a request results in the adjournment of consecutively scheduled hearing sessions, the additional fee will be assessed only for the first of the consecutively scheduled hearing sessions. In the event that an extraordinary circumstance prevents a party or parties from making a timely adjournment request, arbitrators may use their discretion to waive the fee, provided verification of such circumstance is received.

Amended by SR-NASD-2003-164 eff. Aug. 16, 2004.
Amended by SR-NASD-2001-21 eff. Nov. 19, 2001.
Amended eff. July 1, 1986; June 1, 1990; Dec. 30, 1991.

**Selected Notices to Members:** 01-70, 04-53.

## 10320. Acknowledgement of Pleadings

The arbitrators shall acknowledge to all parties present that they have read the pleadings filed by the parties.

## 10321. General Provisions Governing Pre-Hearing Proceedings

### (a) Requests for Documents and Information

The parties shall cooperate to the fullest extent practicable in the voluntary exchange of documents and information to expedite the arbitration. Any request for documents or other information should be specific, relate to the matter in controversy, and afford the party to whom the request is made a reasonable period of time to respond without interfering with the time set for the hearing.

**(b) Document Production and Information Exchange**

(1) Any party may serve a written request for information or documents ("information request") upon another party 45 calendar days or more after service of the Statement of Claim by the Director of Arbitration or upon filing of the Answer, whichever is earlier. The requesting party shall serve the information request on all parties and file a copy with the Director of Arbitration. The parties shall endeavor to resolve disputes regarding an information request prior to serving any objection to the request. Such efforts shall be set forth in the objection.

(2) Unless a greater time is allowed by the requesting party, information requests shall be satisfied or objected to within thirty (30) calendar days from the date of service. Any objection to an information request shall be served by the objecting party on all parties and filed with the Director of Arbitration.

(3) Any response to objections to an information request shall be served on all parties and filed with the Director of Arbitration within ten (10) calendar days of receipt of the objection.

(4) Upon the written request of a party whose information request is unsatisfied, the matter will be referred by the Director of Arbitration to either a pre-hearing conference under paragraph (d) of this Rule or to a selected arbitrator under paragraph (e) of this Rule.

**(c) Pre-Hearing Exchange**

At least twenty (20) calendar days prior to the first scheduled hearing date, all parties shall serve on each other copies of documents in their possession they intend to present at the hearing and shall identify witnesses they intend to present at the hearing. The arbitrators may exclude from the arbitration any documents not exchanged or witnesses not identified. This paragraph does not require service of copies of documents or identification of witnesses which parties may use for cross-examination or rebuttal.

**(d) Pre-Hearing Conference**

(1) Upon the written request of a party, an arbitrator, or at the discretion of the Director of Arbitration, a pre-hearing conference shall be scheduled. The Director of Arbitration shall set the time and place of a pre-hearing conference and appoint a person to preside. The pre-hearing conference may be held by telephone conference call. The presiding person shall seek to achieve agreement among the parties on any issue which relates to the pre-hearing process or to the hearing, including but not limited to exchange of information, exchange or production of documents, identification of witnesses, identification and exchange of hearing documents, stipulation of facts, identification and briefing of contested issues, and any other matters which will expedite the arbitration proceedings.

(2) Any issues raised at the pre-hearing conference that are not resolved may be referred to a single member of the arbitration panel for decision.

**(e) Decisions by Selected Arbitrator**

The Director of Arbitration may appoint a single member of the arbitration panel to decide all unresolved issues under this Rule. In matters involving public customers, such single arbitrator shall be a public arbitrator, except that the arbitrator may be either public or industry when the public customer has requested a panel consisting of a majority from the securities industry. Such arbitrator shall be authorized to act on behalf of the panel to issue subpoenas, direct appearances of witnesses and production of documents, set deadlines for compliance, and issue any other ruling which will expedite the arbitration proceedings. Decisions under this Rule shall be made upon the papers submitted by the parties, unless the arbitrator calls a hearing. The arbitrator may elect to refer any issue under this Rule to the full panel.

Amended by SR-NASD-98-91 eff. Jan. 11, 1999.
Amended by SR-NASD-95-05 eff. Mar. 23, 1995.
Amended eff. May 10, 1989.

## 10322. Subpoenas and Power to Direct Appearances

**(a) Subpoenas**

The arbitrators and any counsel of record to the proceeding shall have the power of the subpoena process

as provided by law. All parties shall be given a copy of a subpoena upon its issuance. Parties shall produce witnesses and present proofs to the fullest extent possible without resort to the subpoena process.

**(b) Power to Direct Appearances and Production of Documents**

The arbitrator(s) shall be empowered without resort to the subpoena process to direct the appearance of any person employed or associated with any member of the Association and/or the production of any records in the possession or control of such persons or members. Unless the arbitrator(s) directs otherwise, the party requesting the appearance of a person or the production of documents under this Rule shall bear all reasonable costs of such appearance and/or production.

Amended eff. May 10, 1989.

## 10323. Evidence

The arbitrators shall determine the materiality and relevance of any evidence proffered and shall not be bound by rules governing the admissibility of evidence.

## 10324. Interpretation of Provisions of Code and Enforcement of Arbitrator Rulings

The arbitrators shall be empowered to interpret and determine the applicability of all provisions under this Code and to take appropriate action to obtain compliance with any ruling by the arbitrator(s). Such interpretations and actions to obtain compliance shall be final and binding upon the parties.

Amended eff. Nov. 16, 1992.

## 10325. Determination of Arbitrators

All rulings and determinations of the panel shall be by a majority of the arbitrators.

## 10326. Record of Proceedings

(a) A verbatim record by stenographic reporter or a tape recording of all arbitration hearings shall be kept. If a party or parties to a dispute elect to have the record transcribed, the cost of such transcription shall be borne by the party or parties making the request unless the arbitrators direct otherwise. The arbitrators may also direct that the record be transcribed. If the record is transcribed at the request of any party, a copy shall be provided to the arbitrators.

(b) A verbatim record of mediation conducted pursuant to the Rule 10400 Series shall not be kept.

Amended by SR-NASD-95-25 eff. Aug. 1, 1995.
Amended eff. May 10, 1989.

## 10327. Oaths of the Arbitrators and Witnesses

Prior to the commencement of the first session, an oath or affirmation shall be administered to the arbitrators. All testimony shall be under oath or affirmation.

## 10328. Amendments

(a) After the filing of any pleadings, if a party desires to file a new or different pleading, such change must be made in writing and filed with the Director of Arbitration with sufficient additional copies for each arbitrator. The party filing a new or different pleading shall serve on all other parties, a copy of the new or different pleading

in accordance with the provisions set forth in Rule 10314(b). The other parties may, within ten (10) business days from the receipt of service, file a response with all other parties and the Director of Arbitration in accordance with Rule 10314(b).

(b) If a new or amended pleading increases the amount in dispute, all filing fees, hearing session deposits, surcharges, and process fees required under Rules 10332 and 10333 will be recalculated based on the amended amount in dispute.

(c) After a panel has been appointed, no new or different pleading may be filed except for a responsive pleading as provided for in (a) above or with the panel's consent.

Amended by SR-NASD-2001-21 eff. Nov. 19, 2001.
Amended eff. Oct. 1, 1984 and Apr. 26, 1991.

**Selected Notice to Members:** 01-70.

### 10329. Reopening of Hearings

Where permitted by applicable law, the hearings may be reopened by the arbitrators on their own motion or at the discretion of the arbitrators upon application of a party at any time before the award is rendered.

### 10330. Awards

(a) All awards shall be in writing and signed by a majority of the arbitrators or in such manner as is required by applicable law. Such awards may be entered as a judgment in any court of competent jurisdiction.

(b) Unless the applicable law directs otherwise, all awards rendered pursuant to this Code shall be deemed final and not subject to review or appeal.

(c) The Director will serve a copy of the award on each party, or the representative of the party. The Director will serve the award by using any method available and convenient to the parties and the Director, and that is reasonably expected to cause the award to be delivered to all parties, or their counsel, on the same day. Methods the Director may use include, but are not limited to, registered or certified mail, hand delivery, and facsimile or other electronic transmission.

(d) The arbitrator(s) shall endeavor to render an award within thirty (30) business days from the date the record is closed.

(e) The award shall contain the names of the parties, the name of counsel, if any, a summary of the issues, including the type(s) of any security or product, in controversy, the damages and other relief requested, the damages and other relief awarded, a statement of any other issues resolved, the names of the arbitrators, the dates the claim was filed and the award rendered, the number and dates of hearing sessions, the location of the hearings, and the signatures of the arbitrators concurring in the award.

(f) All awards and their contents shall be made publicly available.

(g) Fees and assessments imposed by the arbitrators under Rules 10205 and 10332 shall be paid immediately upon the receipt of the award by the parties. Payment of such fees shall not be deemed ratification of the award by the parties.

(h) All monetary awards shall be paid within thirty (30) days of receipt unless a motion to vacate has been filed with a court of competent jurisdiction. An award shall bear interest from the date of the award: (1) if not paid within thirty (30) days of receipt, (2) if the award is the subject of a motion to vacate which is denied, or (3) as specified by the arbitrator(s) in the award. Interest shall be assessed at the legal rate, if any, then prevailing in the state where the award was rendered, or at a rate set by the arbitrator(s).

Amended by SR-NASD-97-34 eff. Aug. 6, 1997; SEC Rel. No. 34-38907 (8/14/97).
Amended by SR-NASD-91-49 eff. Jan. 2, 1992; Oct. 1, 1993.
Amended by SR-NASD-90-62 eff. May 7, 1991.

Amended by SR-NASD-91-09 eff. Apr. 26, 1991.
Amended eff. May 10, 1989.

**Selected Notices to Members:** 93-37, 93-63, 94-54.

## 10331. Incorporation by Reference

This Code shall be deemed a part of and incorporated by reference in every agreement to arbitrate under the Rules of the Association including a duly executed Submission Agreement.

Amended eff. May 7, 1991.

## 10332. Schedule of Fees for Customer Disputes

(a) At the time of filing a Claim, Counterclaim, Third-Party Claim or Cross-Claim, a party shall pay a non-refundable filing fee and shall remit a hearing session deposit to the Association in the amounts indicated in the schedules below unless such fee or deposit is specifically waived by the Director of Arbitration.

Where multiple hearing sessions are required, the arbitrators may require any of the parties to make additional hearing deposits for each additional hearing session. In no event shall the amount deposited by all parties per hearing session exceed the amount of the largest initial hearing deposit made by any party under the schedules below.

(b) A hearing session is any meeting between the parties and the arbitrator(s), including a pre-hearing conference with an arbitrator, which lasts four (4) hours or less. The forum fee for a pre-hearing conference with an arbitrator shall be the amount set forth in the schedules below as a hearing session deposit for a hearing with a single arbitrator.

(c) The arbitrators, in their awards, shall determine the amount chargeable to the parties as forum fees and shall determine who shall pay such forum fees. Forum fees chargeable to the parties shall be assessed on a per hearing session basis, and the aggregate for each hearing session may equal but shall not exceed the amount of the largest initial hearing deposit deposited by any party, except in a case where claims have been joined subsequent to filing in which case hearing session fees shall be computed as provided in paragraph (d). The arbitrator(s) may determine in the award that a party shall reimburse to another party any non-refundable filing fee it has paid. If a customer is assessed forum fees in connection with an industry claim, forum fees assessed against the customer shall be based on the hearing deposit required under the industry claims schedule for the amount awarded to industry parties to be paid by the customer and not based on the size of the industry claim. No fees shall be assessed against a customer in connection with an industry claim that is dismissed; however, in cases where there is also a customer claim, the customer may be assessed forum fees based on the customer claim under the procedure set out above. Amounts deposited by a party shall be applied against forum fees, if any. In addition to forum fees, the arbitrator(s) may determine in the award the amount of costs incurred pursuant to Rules 10319, 10321, 10322, and 10326 and, unless applicable law directs otherwise, other costs and expenses of the parties and arbitrator(s) which are within the scope of the agreement of the parties. The arbitrator(s) shall determine by whom such costs shall be borne. If the hearing session fees are not assessed against a party who had made a hearing deposit, the hearing deposit will be refunded unless the arbitrators determine otherwise.

(d) For claims filed separately which are subsequently joined or consolidated under Rule 10314(d), the hearing deposit and forum fees assessable per hearing session after joinder or consolidation shall be based on the cumulative amount in dispute. The arbitrator(s) shall determine by whom such fees shall be borne.

(e) If the dispute, claim, or controversy does not involve, disclose, or specify a money claim, the non-refundable filing fee for a public customer shall be $250 and the non-refundable filing fee for an industry party shall be $500. The hearing session deposit to be remitted by a party shall be $1000 or such greater or lesser amount as the Director of Arbitration or the panel of arbitrators may require, but shall not exceed the maximum amount specified in the schedule.

(f) The Association shall retain the total initial amount deposited as hearing session deposits by all the parties in any matter submitted and settled or withdrawn within eight business days of the first scheduled hearing session other than a pre-hearing conference.

(g) Any matter submitted and thereafter settled or withdrawn subsequent to the commencement of the first hearing session, including a pre-hearing conference with an arbitrator, shall be subject to an assessment of forum fees and costs incurred pursuant to Rules 10319, 10321, 10322, and 10326 based on hearing sessions held and scheduled within eight business days after the Association receives notice that the matter has been settled or withdrawn. The arbitrator(s) shall determine by whom such forum fees and costs shall be borne.

(h) Reserved

(i) Reserved

(j) Reserved

(k) Schedule of Fees

For purposes of the schedule of fees, the term "claim" includes Claims, Counterclaims, Third-Party Claims, and Cross-Claims. Any such claim made by a customer is a customer claim. Any such claim made by a member or associated person of a member is an industry claim.

| **Customer or Associated Person Claimant** | | | | |
|---|---|---|---|---|
| | | | **Hearing Session Deposit** | |
| **Amount in Dispute** (Exclusive of Interest and Expenses) | **Claim Filing Fee** | **Deposit for Cases to be Decided on the Paper Record** | **One Arbitrator**[1] | **Three Arbitrators**[2] |
| $.01–$1,000 | $ 25 | $ 25 | $ 25 | NA |
| $1,000.01–$2,500 | $ 25 | $ 50 | $ 50 | NA |
| $2,500.01–$5,000 | $ 50 | $ 125 | $ 125 | NA |
| $5,000.01–$10,000 | $ 75 | $ 250 | $ 250 | NA |
| $10,000.01–$25,000 | $125 | $ 300 | $ 450 | NA |
| $25,000.01–$30,000 | $150 | NA | $ 450 | $ 600 |
| $30,000.01–$50,000 | $175 | NA | $ 450 | $ 600 |
| $50,000.01–$100,000 | $225 | NA | $ 450 [3] | $ 750 |
| $100,000.01–$500,000 | $300 | NA | $ 450 [3] | $1,125 |
| $500.000.01–$1,000,000 | $375 | NA | $ 450 [3] | $1,200 |
| $1,000,000.01–$3,000,000 | $500 | NA | $ 450 [3] | $1,200 |
| $3,000,000.01–$5,000,000 | $600 | NA | $ 450 [3] | $1,200 |
| $5,000,000.01–$10,000,000 | $600 | NA | $ 450 [3] | $1,200 |
| Over $10,000,000 | $600 | NA | $ 450 [3] | $1,200 |

[1] The dispute is resolved by one arbitrator per hearing session, including pre-hearing conferences.

[2] The dispute is resolved by three arbitrators per hearing session.

[3] Fee applies only to pre-hearing conferences with a single arbitrator.

| Member Claimant | | | | |
|---|---|---|---|---|
| | | | Hearing Session Deposit | |
| **Amount in Dispute** (Exclusive of Interest and Expenses) | **Claim Filing Fee** | **Deposit for Cases to be Decided on the Paper Record** | **One Arbitrator[1]** | **Three Arbitrators[2]** |
| $.01–$1,000 | $ 200 | $ 25 | $ 25 | NA |
| $1,000.01–$2,500 | $ 300 | $ 50 | $ 50 | NA |
| $2,500.01–$5,000 | $ 400 | $ 125 | $ 125 | NA |
| $5,000.01–$10,000 | $ 500 | $ 250 | $ 250 | NA |
| $10,000.01–$25,000 | $ 750 | $ 300 | $ 450 | NA |
| $25,000.01–$30,000 | $1,000 | NA | $ 450 | $ 600 |
| $30,000.01–$50,000 | $1,000 | NA | $ 450 | $ 600 |
| $50,000.01–$100,000 | $1,000 | NA | $ 450 [3] | $ 750 |
| $100,000.01–$500,000 | $1,000 | NA | $ 450 [3] | $1,125 |
| $500.000.01–$1,000,000 | $1,250 | NA | $ 450 [3] | $1,200 |
| $1,000,000.01–$5,000,000 | $2,000 | NA | $ 450 [3] | $1,200 |
| $5,000,000.01–$10,000,000 | $2,500 | NA | $ 450 [3] | $1,200 |
| Over $10,000,000 | $5,000 | NA | $ 450[3] | $1,200 |

[1] The dispute is resolved by one arbitrator per hearing session, including pre-hearing conferences.

[2] The dispute is resolved by three arbitrators per hearing session.

[3] Fee applies only to pre-hearing conferences with a single arbitrator.

Amended by SR-NASD-2000-65 eff. Dec. 31, 2000.
Amended by SR-NASD-2000-11 eff. Nov. 1, 2000.
Amended by SR-NASD-99-23 eff. March 18, 1999.
Amended by SR-NASD-97-79 eff. March 18, 1999.
Amended by SR-NASD-95-25 eff. Aug. 1, 1995.
Amended by SR-NASD-94-10 eff. May 2, 1995.

Amended by SR-NASD-94-75 eff. Jan. 1, 1995.
Amended by SR-NASD-90-03 eff. June 18, 1990.
Amended eff. Oct. 1, 1984; July 1, 1987; Apr. 1, 1988; May 10, 1989; June 1, 1990.

**Selected Notices to Members:** 99-23.

## 10333. Member Surcharge and Process Fees

**(a) Member Surcharge**

(1) Each member that is named as a party to an arbitration proceeding, whether in a Claim, Counterclaim, Cross-Claim or Third-Party Claim, shall be assessed a surcharge pursuant to the schedule below when the Director of Arbitration perfects service of the claim naming the member on any party to the proceeding.

(2) For each associated person who is named, the surcharge shall be assessed against the member or members that employed the associated person at the time of the events which gave rise to the dispute, claim or controversy. No member shall be assessed more than a single surcharge in any arbitration proceeding.

(3) The surcharge shall not be chargeable to any other party under Rules 10332(c) and 10205(c) of the Code. The Director will refund the surcharge paid by a member in an arbitration filed by a customer if the arbitration panel: (A) denies all of the customer's claims against the member or associated person; and (B) allocates all forum fees assessed pursuant to Rule 10332(c) against the customer. The Director may also refund or cancel the member surcharge in extraordinary circumstances.

| Member Surcharge Schedule | |
|---|---|
| Amount in Dispute | |
| $.01–$2,500 | $150 |
| $2,500.01–$5,000 | $200 |
| $5,000.01–$10,000 | $325 |
| $10,000.01–$25,000 | $425 |
| $25,000.01–$30,000 | $600 |
| $30,000.01–$50,000 | $875 |
| $50,000.01–$100,000 | $1,100 |
| $100,000.01–$500,000 | $1,700 |
| $500,000.01–$1,000,000 | $2,250 |
| $1,000,000.01–$5,000,000 | $2,800 |
| $5,000,000.01–$10,000,000 | $3,350 |
| Over $10,000,000 | $3,750 |

(4) For purposes of this Rule, service is perfected when the Director of Arbitration properly serves the Respondents to such proceeding under Rule 10314 of the Code.

(5) If the dispute, claim, or controversy does not involve, disclose, or specify a money claim, the non-refundable surcharge shall be $1,500 or such greater or lesser amount as the Director of Arbitration or the panel of arbitrators may require, but shall not exceed the maximum amount specified in the schedule.

**(b) Prehearing and Hearing Process Fees**

(1) Each member that is a party to an arbitration proceeding in which more than $25,000 is in dispute will pay:

(A) a non-refundable prehearing process fee of $750, due at the time the parties are sent arbitrator lists in accordance with Rule 10308(b)(5); and

(B) a non-refundable hearing process fee, due when the parties are notified of the date and location of the first hearing session, as set forth in the schedule below.

(2) If an associated person of a member is a party, the member that employed the associated person at the time of the events which gave rise to the dispute, claim or controversy will be charged the process fees, even if the member is not a party. No member shall be assessed more than one prehearing and one hearing process fee in any arbitration proceeding.

(3) The prehearing and hearing process fees shall not be chargeable to any other party under Rules 10332(c) and 10205(c) of the Code.

| Hearing Process Fee Schedule | |
|---|---|
| Damages Requested | Hearing Process Fee |
| $1–$25,000 | $ 0 |
| $25,000.01–$50,000 | $ 1,000 |
| $50,000.01–$100,000 | $ 1,700 |
| $100,000.01–$500,000 | $ 2,750 |
| $500,000.01–$1,000,000 | $ 4,000 |
| $1,000,000.01–$5,000,000 | $ 5,000 |
| More than $5,000,000 | $ 5,500 |
| Unspecified | $ 2,200 |

Amended by SR-NASD-2003-01 eff. Jan. 13, 2003.
Amended by SR-NASD-2001-62 eff. Nov. 19, 2001.
Amended by SR-NASD-98-93 eff. Dec. 11, 1998.
Amended by SR-NASD-97-96 eff. Jan. 2, 1998.
Amended by SR-NASD-97-88 eff. Dec. 11, 1997.
Amended by SR-NASD-97-40 eff. July 1, 1997.
Amended by SR-NASD-94-74 eff. Dec. 28, 1994.
Amended by SR-NASD-94-16 eff. Mar. 31, 1994.
Added by SR-NASD-94-11 eff. Feb. 25, 1994.

**Selected Notices to Members:** 87-55, 88-14, 90-47, 94-26, 95-1, 98-1, 01-70, 03-06.

## 10334. Direct Communication Between Parties and Arbitrators

(a) This rule provides procedures under which parties and arbitrators may communicate directly.

(b) Only parties that are represented by counsel may use direct communication under this Rule. If, during the proceeding, a party chooses to appear pro se (without counsel), this Rule shall no longer apply.

(c) All arbitrators and all parties must agree to the use of direct communication during the Initial Prehearing Conference or a later conference or hearing before it can be used.

(d) Parties may send the arbitrators only items that are listed in an order.

(e) Parties may send items by regular mail, overnight courier, facsimile, or email. All the arbitrators and parties must have facsimile or email capability before such a delivery method may be used.

(f) Copies of all materials sent to arbitrators must also be sent at the same time and in the same manner to all parties and the Director. Materials that exceed 15 pages, however, shall be sent to the Director only by

regular mail or overnight courier.

(g) The Director must receive copies of any orders and decisions made as a result of direct communications among the parties and the arbitrators.

(h) Parties may not communicate orally with any of the arbitrators outside the presence of all parties.

(i) Any party or arbitrator may terminate the direct communication order at any time, after giving written notice to the other arbitrators and the parties.

Adopted by SR-NASD-2003-163 eff. Sept. 30, 2004.

**Selected Notice to Members:** 04-62.

## 10335. Temporary Injunctive Orders; Requests for Permanent Injunctive Relief

**(a) Temporary Injunctive Orders**

(1) In industry or clearing disputes required to be submitted to arbitration pursuant to Rule 10201, parties may seek a temporary injunctive order, as defined in paragraph (a)(2) of this Rule, from a court of competent jurisdiction. Parties to a pending arbitration may seek a temporary injunctive order from a court of competent jurisdiction even if another party has already filed a claim arising from the same dispute in arbitration pursuant to this paragraph, provided that an arbitration hearing on a request for permanent injunctive relief pursuant to paragraph (b) of this Rule has not yet begun.

(2) For purposes of this Rule, temporary injunctive order means a temporary restraining order, preliminary injunction or other form of initial, temporary injunctive relief.

(3) A party seeking a temporary injunctive order from a court with respect to an industry or clearing dispute required to be submitted to arbitration pursuant to Rule 10201 shall simultaneously file with the Director a Statement of Claim requesting permanent injunctive and all other relief with respect to the same dispute in the manner specified under this Code. The party seeking temporary injunctive relief shall also serve the Statement of Claim requesting permanent injunctive and all other relief on all other parties in the same manner and at the same time as the Statement of Claim is filed with the Director. Filings and service under this Rule shall be made by facsimile, overnight delivery service or messenger. Service shall be made on all parties at the same time and in the same manner, unless the parties agree otherwise. A party obtaining a court-issued temporary injunctive order shall notify the Director and the other parties of the issuance of the order within one business day.

(4) Unless otherwise stated, for purposes of computation of time under any paragraph of this Rule, any reference to days means calendar days, including Saturdays, Sundays or any NASD holiday. However, if a party must provide notice or a response to the Director and the day on which that notice or response to the Director must be given falls on a Saturday, Sunday or any NASD holiday, then the time period is extended until the next business day.

**(b) Hearing on Request for Permanent Injunctive Relief**

**(1) Scheduling of Hearing**

If a court issues a temporary injunctive order, an arbitration hearing on the request for permanent injunctive relief shall begin within 15 days of the date the court issues the temporary injunctive order. If the 15th day falls on a Saturday, Sunday, or NASD holiday, the 15-day period shall expire on the next business day. Unless the parties agree otherwise, a hearing lasting more than one day shall be held on consecutive days when reasonably possible. The Director shall provide to all parties notice of the date, time and place of the hearing at least three days prior to the beginning of the hearing.

**(2) Composition of Arbitration Panel**

The hearing on the request for permanent injunctive relief shall be heard by a panel of three arbitrators, who shall either be all non-public arbitrators as defined in Rule 10308(a)(4), or, if the underlying dispute would be heard by a public arbitrator or panel consisting of a majority of public arbitrators under Rule 10202, a majority of public arbitrators as defined in Rule 10308(a)(5).

**(3) Selection of Arbitrators and Chairperson**

(A)(i) In cases in which all of the members of the arbitration panel are non-public under paragraph (b)(2) of this Rule, the Director shall generate and provide to the parties a list of seven arbitrators from a national roster of arbitrators. The Director shall send to the parties the employment history for the past 10 years for each listed arbitrator and other background information. At least three of the arbitrators listed shall be lawyers with experience litigating cases involving injunctive relief.

(ii) Each party may exercise one strike to the arbitrators on the list. Within three days of receiving the list, each party shall inform the Director which arbitrator, if any, it wishes to strike, and shall rank the remaining arbitrators in order of preference. The Direct shall consolidate the parties' rankings, and shall appoint arbitrators based on the order of rankings on the consolidated list, subject to the arbitrators' availability and disqualification.

(B)(i) In cases in which the panel of arbitrators consists of a majority of public arbitrators under paragraph (b)(2) of this Rule, the Director shall generate and provide to the parties a list of nine arbitrators from a national roster of arbitrators. The Director shall send to the parties employment history for the past 10 years for each listed arbitrator and other background information. At least a majority of the arbitrators listed shall be public arbitrators, and at least four of the arbitrators listed shall be lawyers with experience litigating cases involving injunctive relief.

(ii) Each party may exercise two strikes to the arbitrators on the list. Within three days of receiving the list, each party shall inform the Director which arbitrators, if any, it wishes to strike, and shall rank the remaining arbitrators in order of preference. The Director shall consolidate the parties' rankings, and shall appoint arbitrators based on the order of rankings on the consolidated list, subject to the arbitrators' availability and disqualification.

(C)(i) Each party shall inform the Director of its preference of chairperson of the arbitration panel by the close of business on the next business day after receiving notice of the panel members.

(ii) If the parties do not agree on a chairperson within that time, the Director shall select the chairperson. In cases in which the panel consists of a majority of public arbitrators, the Director shall select a public arbitrator as chairperson. Whenever possible, the Director shall select as chairperson the lawyer with experience litigating cases involving injunctive relief whom the parties have ranked the highest.

(D) The Director may exercise discretionary authority and make any decision that is consistent with the purposes of this Rule and Rule 10308 to facilitate the appointment of arbitration panels and the selection of chairperson.

**(4) Applicable Legal Standard**

The legal standard for granting or denying a request for permanent injunctive relief is that of the state where the events upon which the request is based occurred, or as specified in an enforceable choice of law agreement between the parties.

**(5) Effect of Pending Temporary Injunctive Order**

Upon a full and fair presentation of the evidence from all relevant parties on the request for permanent injunctive relief, the panel may prohibit the parties from seeking an extension of any court-issued temporary injunctive order remaining in effect, or, if appropriate, order the parties jointly to move to modify or dissolve any such order. In the event that a panel's order conflicts with a pending court order, the panel's order will become effective upon expiration of the pending court order.

**(6) Fees, Costs and Expenses, and Arbitrator Honorarium**

(A) The parties shall jointly bear reasonable travel-related costs and expenses incurred by arbitrators who are required to travel to a hearing location other than their primary hearing location(s) in order to participate in the hearing on the request for permanent injunctive relief. The arbitrators may reallocate such costs and expenses among the parties in the award.

(B) The party seeking injunctive relief shall pay the expedited hearing fees pursuant to Rule 10205(h), or, where both sides seek such relief, both parties shall pay such fees. In either event, however, the arbitrators may reallocate such fees among the parties in the award.

(C) Notwithstanding any other provision in the Code, the chairperson of the panel hearing a request for permanent injunctive relief pursuant to this Rule shall receive an honorarium of $375 for each single session, and $700 for each double session, of the hearing. Each other member of the panel shall receive an honorarium of $300 for each single session, and $600 for each double session, of the hearing. The parties shall equally pay the difference between these amounts and the amounts panel members and the chairperson receive under the Code pursuant to IM-10104. The arbitrators may reallocate such amount among the parties in the award.

**(c) Hearing on Damages or other Relief**

(1) Upon completion of the hearing on the request for permanent relief, the panel, may, if necessary, set a date for any subsequent hearing on damages or other relief, which shall be held before the same panel of arbitrators and which shall include, but not be limited to, the same record.

(2) The parties shall jointly bear reasonable travel-related costs and expenses incurred by arbitrators who are required to travel to a hearing location other than their primary hearing location(s) in order to participate in any subsequent hearings on damages or other relief. The arbitrators may reallocate such costs and expenses among the parties in the award.

**(d) Effective Date**

This Rule shall apply to arbitration claims filed on or after March 25, 2002. Except as otherwise provided in this Rule, the remaining provisions of the Code shall apply to proceedings instituted under this Rule.

Amended by SR-NASD-2000-02 eff. March 25, 2002.
Amended by SR-NASD-2001-89 eff. Dec. 18, 2001 (extending expiration date).
Amended by SR-NASD-2000-75 eff. Jan. 5, 2001.
Amended by SR-NASD-99-72 eff. Dec. 28, 1999.
Amended by SR-NASD-99-27 eff. June 16, 1999.
Amended by SR-NASD-98-97 eff. Dec. 28, 1998.
Amended by SR-NASD-98-42 eff. June 24, 1998.
Amended by SR-NASD-97-87 eff. Jan. 3, 1998.
Amended by SR-NASD-96-44 eff. Dec. 20, 1996.
Adopted by SR-NASD-93-38 eff. Jan. 3, 1996.

**Selected Notices to Members:** 95-83, 02-13.

## 10400. NASD Code of Mediation Procedure

### 10401. Definitions.

Unless otherwise defined in the Code, terms used in the Code and interpretive material, if defined in the NASD By-Laws, shall have the meaning as defined in the NASD By-Laws.

**(a) Board**

The term “Board” means the Board of Directors of NASD Dispute Resolution, Inc.

**(b) Code**

The term “Code” means the NASD Code of Mediation Procedure.

**(c) Director**

The term “Director" in the Rule 10400 Series refers to the Director of Mediation at NASD Dispute Resolution. Unless the Code or any other NASD rule provides otherwise, the term includes NASD staff to whom the Director of Mediation has delegated authority.

**(d) Matter**

The term “matter” means a dispute, claim, or controversy.

**(e) NAMC**

The term “NAMC” means the National Arbitration and Mediation Committee of the Board of Directors of NASD Dispute Resolution, Inc.

**(f) NASD**

Unless the Code specifies otherwise, the term “NASD” includes NASD, Inc., and NASD Dispute Resolution, Inc.

**(g)**

Reserved.

**(h)**

Reserved.

**(i) Submission Agreement**

The term “Submission Agreement” means the NASD Mediation Submission Agreement. The NASD Mediation Submission Agreement is a document that parties must sign at the outset of a mediation in which they agree to submit to mediation under the Code.

Adopted by SR-NASD-2004-013 eff. Jan. 30, 2006.

**Selected Notice to Members:** 05-85.

## 10402. Applicability of Code

The Code applies to any matter submitted to mediation at NASD.

Adopted by SR-NASD-2004-013 eff. Jan. 30, 2006.

**Selected Notice to Members:** 05-85.

## 10403. National Arbitration and Mediation Committee

(a) Pursuant to Part V(C)(1)(b) of the Plan of Allocation and Delegation of Functions by NASD to Subsidiaries (“Delegation Plan”), the Board shall appoint a National Arbitration and Mediation Committee (“NAMC”).

(1) The NAMC shall consist of no fewer than ten and no more than 25 members. At least 50 percent of the NAMC shall be Non-Industry members.

(2) The Chairperson of the Board shall name the Chairperson of the NAMC.

(b) Pursuant to the Delegation Plan, the NAMC shall have the authority to recommend rules, regulations, procedures and amendments relating to arbitration, mediation, and other dispute resolution matters to the Board. All matters recommended by the NAMC to the Board must have been approved by a quorum, which shall consist of a majority of the NAMC, including at least 50 percent of the Non-Industry committee members. If at least 50 percent of the Non-Industry committee members are either (i) present at or (ii) have filed a waiver of attendance for a meeting after receiving an agenda prior to such meeting, the requirement that at least 50 percent of the Non-Industry committee members be present to constitute the quorum shall be waived. The NAMC has such other power and authority as is necessary to carry out the purposes of this Code.

(c) The NAMC may meet as frequently as necessary, but must meet at least once a year.

Adopted by SR-NASD-2004-013 eff. Jan. 30, 2006.

**Selected Notice to Members:** 05-85.

### 10404. Director of Mediation

(a) The Board shall appoint a Director of Mediation to administer mediations under the Code. The Director will consult with the NAMC on the administration of mediations, as necessary.

(b) The Director may delegate his or her duties when appropriate, unless the Code provides otherwise.

Adopted by SR-NASD-2004-013 eff. Jan. 30, 2006.

**Selected Notice to Members:** 05-85.

### 10405. Mediation Under the Code

(a) Mediation under the Code is voluntary, and requires the written agreement of all parties. No party may be compelled to participate in a mediation or to settle a matter by NASD, or by any mediator appointed to mediate a matter pursuant to the Code.

(b) If all parties agree, any matter that is eligible for arbitration under the NASD Code of Arbitration Procedure, or any part of any such matter, or any dispute related to such matter, including procedural issues, may be submitted for mediation under the Code.

(c) A matter is submitted to mediation when the Director receives an executed Submission Agreement from each party.

(d) The Director shall have the sole authority to determine if a matter is eligible to be submitted for mediation.

Adopted by SR-NASD-2004-013 eff. Jan. 30, 2006.

**Selected Notice to Members:** 05-85.

### 10406. Effect of Mediation on Arbitration Proceedings

(a) Unless the parties agree otherwise, the submission of a matter for mediation will not stay or otherwise delay the arbitration of a matter pending at NASD. If all parties agree to stay an arbitration in order to mediate the matter, the arbitration will be stayed, notwithstanding any provision to the contrary in this Code or any other NASD rule.

(b) If mediation is conducted through NASD, no adjournment fees will be charged for staying the arbitration in order to mediate.

Adopted by SR-NASD-2004-013 eff. Jan. 30, 2006.

**Selected Notice to Members:** 05-85.

### 10407. Mediator Selection

(a) A mediator may be selected:

- By the parties from a list supplied by the Director;
- By the parties from a list or other source of their own choosing; or

• By the Director if the parties do not select a mediator after submitting a matter to mediation.

(b) For any mediator assigned or selected from a list provided by NASD, the parties will be provided with information relating to the mediator's employment, education, and professional background, as well as information on the mediator's experience, training, and credentials as a mediator.

(c) Any mediator selected or assigned to mediate a matter shall comply with the provisions of Rule 10312 (a), (b) and (c) of the NASD Code of Arbitration Procedure, unless, with respect to a mediator selected from a source other than a list provided by NASD, the parties elect to waive such disclosure.

(d) No mediator may serve as an arbitrator of any matter pending in NASD arbitration in which he served as a mediator; nor may the mediator represent any party or participant to the mediation in any subsequent NASD arbitration relating to the subject matter of the mediation.

Adopted by SR-NASD-2004-013 eff. Jan. 30, 2006.

**Selected Notice to Members:** 05-85.

### 10408. Limitation on Liability

NASD, its employees, and any mediator named to mediate a matter under the Code shall not be liable for any act or omission in connection with a mediation administered under the Code.

Adopted by SR-NASD-2004-013 eff. Jan. 30, 2006.

**Selected Notice to Members:** 05-85.

### 10409. Mediation Ground Rules

(a) The following Ground Rules govern the mediation of a matter. The parties to a mediation may agree to amend any or all of the Ground Rules at any time. The Ground Rules are intended to be standards of conduct for the parties and the mediator.

(b) Mediation is voluntary and any party may withdraw from mediation at any time prior to the execution of a written settlement agreement by giving written notice of withdrawal to the mediator, the other parties, and the Director.

(c) The mediator shall act as a neutral, impartial, facilitator of the mediation process and shall not have any authority to determine issues, make decisions or otherwise resolve the matter.

(d) Following the selection of a mediator, the mediator, all parties and their representatives will meet in person or by conference call for all mediation sessions, as determined by the mediator or by mutual agreement of the parties. The mediator shall facilitate, through joint sessions, caucuses and/or other means, discussions between the parties, with the goal of assisting the parties in reaching their own resolution of the matter. The mediator shall determine the procedure for the conduct of the mediation. The parties and their representatives agree to cooperate with the mediator in ensuring that the mediation is conducted expeditiously, to make all reasonable efforts to be available for mediation sessions, and to be represented at all scheduled mediation sessions either in person or through a person with authority to settle the matter.

(e) The mediator may meet with and communicate separately with each party or the party's representative. The mediator shall notify all other parties of any such separate meetings or other communications.

(f) The parties agree to attempt, in good faith, to negotiate a settlement of the matter submitted to mediation. Notwithstanding that a matter is being mediated, the parties may engage in direct settlement discussions and negotiations separate from the mediation process.

(g) Mediation is intended to be private and confidential.

(1) The parties and the mediator agree not to disclose, transmit, introduce, or otherwise use opinions, suggestions, proposals, offers, or admissions obtained or disclosed during the mediation by any party or

the mediator as evidence in any action at law, or other proceeding, including a lawsuit or arbitration, unless authorized in writing by all other parties to the mediation or compelled by law, except that the fact that a mediation has occurred shall not be considered confidential.

(2) Notwithstanding the foregoing, the parties agree and acknowledge that the provisions of this paragraph shall not operate to shield from disclosure to NASD or any other regulatory authority, documentary or other information that NASD or other regulatory authority would be entitled to obtain or examine in the exercise of its regulatory responsibilities.

(3) The mediator will not transmit or otherwise disclose confidential information provided by one party to any other party unless authorized to do so by the party providing the confidential information.

Adopted by SR-NASD-2004-013 eff. Jan. 30, 2006.

**Selected Notice to Members:** 05-85.

## 10410. Mediation Fees

(a) Filing Fees: Cases Filed Directly in Mediation

Each party to a matter submitted directly to a mediation administered under the Code must pay an administrative fee to NASD in the amounts indicated in the schedule below, unless such fee is specifically waived by the Director.

| Amount in Controversy | Customer and Associated Person Fee | Member Fee |
|---|---|---|
| $.01–$25,000 | $ 50 | $150 |
| $25,000.01–$100,000 | $150 | $300 |
| Over $100,000 | $300 | $500 |

(b) Filing Fees: Cases Initially Filed in Arbitration

When a matter is initially filed in arbitration and subsequently submitted to mediation under the Code, each party must pay an administrative fee to NASD in the amounts indicated in the schedule below, unless such fee is specifically waived by the Director.

| Amount in Controversy | Customer and Associated Person Fee | Member Fee |
|---|---|---|
| $.01–$25,000 | $ 0 | $ 0 |
| $25,000.01–$100,000 | $100 | $150 |
| Over $100,000 | $250 | $500 |

(c) Mediator Fees and Expenses

The parties to a mediation administered under the Code must pay all of the mediator's charges, including the mediator's travel and other expenses. The charges shall be specified in the Submission Agreement and shall be apportioned equally among the parties unless they agree otherwise. Each party shall deposit with NASD its proportional share of the anticipated mediator charges and expenses, as determined by the Director, prior to the first mediation session.

Adopted by SR-NASD-2004-013 eff. Jan. 30, 2006.

**Selected Notice to Members:** 05-85.

About NASD | Press Room | Resources | Career Opportunities | FAQ | Site Map | Contact Us
© 2006 NASD. All rights reserved. | Legal Notices and Privacy Policy.

**NATIONAL ASSOCIATION OF SECURITIES DEALERS, INC.**

| | |
|---|---|
| Mrs. Mary Campbell, individually, and as Trustee and Mrs. Katherine Caradori, individually, and as Trustee,<br><br>Claimants,<br><br>vs.<br><br>American Express Financial Advisors, Inc., n/k/a Ameriprise Financial, David L. Stinnett and, and Gerald Denney,<br><br>Respondents. | NASD-DR #05-03008<br><br><br><br>**STATEMENT OF ANSWER** |

## INTRODUCTION

This is the Statement of Answer of David L. Stinnett, Gerald Denney and American Express Financial Advisors, Inc. now known as Ameriprise Financial ("Ameriprise"). Respondents deny any liability to Claimants, deny all allegations in the Statement of Claim, other than as admitted or qualified hereafter, and respectfully request dismissal of the Claimants' claim in its entirety.

It has turned out there are matters which limit Respondents' ability to Answer, and may require an Amended Answer. Several of the Claimants' accounts are included in a class-action lawsuit regarding life insurance and variable annuities from which the Claimants did not opt out. The claims involving the Claimants' insurance products are not subject to NASD arbitration.[1]

[1] NASD Code of Arbitration Procedure 10301(d)(2) provides that "Any claim filed by a member or members of a putative or certified class action is also ineligible for arbitration at the Association if the claim is encompassed by a putative or certified class action filed in federal or state court...(unless)...Claimants demonstrates that it has...complied with any conditions for withdrawing from the class prescribed by the court. Either party may elect instead (of submitting

Respondents have signed a *limited* Uniform Submission Agreement, declining to arbitrate claims covered by a settled class action, and seek Claimants' voluntary dismissal of this aspect of his claim, or, in the alternative, will move the United States District Court that presided over this action to bar litigation or arbitration of the settled claim.

This Claim also raises an additional issue in that the claim relates back to activity in the Claimants' accounts occurring nearly eight years ago. This is well beyond the NASD's own "six-year rule" regarding this panel's ability to preside over the circumstances that are the subject of the Statement of Claim. The Respondent Ameriprise has not employed Mr. Gerald Denney, by the Claimants' own admission, since 1998. The fact that the Claimants have named Mr. Denney as a party to this arbitration should weigh heavily as to the timeliness of their claim. If this untimely claim actually makes it to an evidentiary hearing, the evidence will show that the claims are contrary to undisputable facts. Respondents seek not only dismissal of the claim, but also expungement of Mr. Denney's and Mr. Stinnett's CRD records, and an award of all of Respondents attorney's fees and costs.

## FACTS

- **THE PARTIES**

1. Respondent Ameriprise is a broker-dealer of securities and has been engaged in the sale of financial products throughout the United States since 1894. Ameriprise provides financial advice, prepares financial plans, offers over 3,000 mutual funds, virtually any individual stock or bond, investment certificates (CDs) and various insurance products.

---

the issue to the NASD Panel) to petition the court with jurisdiction over the putative or certified class action to resolve such disputes.

2. Respondent Gerald H. Denney began his registration with Ameriprise in 1990. Mr. Denney assisted the Claimants during the initial planning stages of their relationship with the Respondents. As noted in the Statement of Claim, Mr. Denney ended his registration with Ameriprise in 1998. At that time, Mr. Denney moved out of state; he continues to work as an advisor in the securities industry.
3. Respondent David L. Stinnett was a registered Ameriprise advisor for six years from 1997 through 2003. During this six-year period, Mr. Stinnett was involved in the planning of the Claimants' accounts, the opening of the Claimants' accounts, and remained Claimants' advisor until he terminated his registration with Ameriprise in 2003.
4. Claimant Katherine Margaret Caradori first became a customer of Ameriprise in 1997. At the time, she was 52 years old. Prior to this, Kathy held a variety of investments in stocks, bonds, real estate, and insurance products through various sources. In addition, her primary financial asset was farmland which she owned jointly with her mother.
5. Claimant Mary M. Campbell is Kathy's mother. Her joint ownership of real estate with her daughter prompted her involvement in the planning and investment process which her daughter initiated in 1997 with respondent Ameriprise. Although Mary was 71 years old in 1997, she was of sound mind, had substantial investment experience and remained actively involved in the management and oversight of her investment accounts.

**FACTUAL DISCUSSION**

Kathy first approached the Respondents for financial planning advice in January 1997. She had recently been divorced, and, although she had a significant amount of assets, most of her assets were tied up in farmland she owned with her mother. The farmland was not generating income (or at least any significant income), and Kathy was interested in possibly selling the

farmland. Her accountant had informed her, however, that if the farmland was sold at projected prices, the capital gains tax on the sale would be very high and would dramatically reduce what she would receive from the sale.

In addition to the issue of the farmland, Kathy owned a smattering of stocks and bonds at various financial institutions, but wanted to gain a better picture of what she owned, whether she should re-position it, and whether there was a way to consolidate all of it to make management of the account easier. Because Kathy owned the farmland jointly with her mother, Mary, Mary got involved in the financial planning discussions as well, and ultimately decided to re-position and consolidate her assets in a fashion similar to her daughter's accounts.

Advisors Stinnett and Denny worked with Kathy and Mary for about a year and a half before they made any decisions to invest with Ameriprise or implement any Ameriprise recommendations. During this year and a half long planning phase, Mr. Stinnett and Mr. Denny presented several different financial plans, and the Campbell's accountant was brought into the discussions as well. Mr. Stinnett and Mr. Denny also recommended that they retain an attorney to help them explore some of the tax planning issues surrounding the sale of the highly appreciated farmland.

The initial summaries show that Kathy had a net worth of approximately $1.4 million. She was recently divorced and had a 24-year-old son. Mary had a net worth of approximately $1 million. The actual net worth figures were significantly lower when the tax consequences of selling the highly appreciated farmland was considered.

One of the strategies the parties eventually discussed was a Charitable Remainder Unitrust ("Trust"), as a method of allowing the farmland to be sold without such a large tax impact from the sale. In essence, Kathy and Mary would be able to receive a significant amount of cash from the sale, and to receive roughly $300,000 in tax deductions which could be carried forward for six years to offset future income and current and future capital gains from investments/sale of investments. The Cambells' accountant and newly retained attorney were closely involved in these discussions. There were decisions Kathy and Mary had to make, because there were positives and negatives about the use of the Trust, although the accountant, attorney and Mr. Stinnett thought that use of the Trust was a reasonable financial planning option for Kathy and Mary. Kathy and Mary decided to go forward with the Trust concept, and their attorney prepared a Trust document to implement their choice. The Claimants also hired an independent trustee to handle all of the real estate transactions for the trust and to oversee operation of the Trust.

Over a period of several months, the Claimants had their farmland appraised and they transferred various assets into the Trust, including the jointly held farmland. Mr. Stinnett prepared several alternative financial plans for Kathy and Mary' consideration-the Cambells had decisions to make regarding the amount of withdrawals they wanted to make and how they would invest to match these goals. Kathy's investment assets, net of taxes, came to around $700,000. Her mother Mary had about half of that amount invested into the Trust, but she retained a significant amount of assets outside the Trust.

On the investment planning side, Kathy and Mary were faced with the inevitable decision on risk versus return, and the parties discussed how different types of investments carried

different levels of risk and different potential levels of return. In the summer of 1998, when the Claimants transferred the majority of their assets into the Trust, a certificate of deposit was earning just about 5.5%. Low-grade bonds (BAA) were earning about 7%, with good quality bonds in between these ranges. On the other hand, the long-term return on the stock market had historically been about 9%, and equities in 1998 were generally averaging a rate of growth of about 20%. Mary and Kathy were well aware of these factors. The equities Kathy and Mary had owned , prior to becoming Ameriprise clients, had grown considerably during the course of their investments, and outperformed their bond funds handily. The Claimants, by this time, were well aware that investing in equities held a greater risk to their portfolios than bonds, but they accepted this risk because they wanted to receive better returns. Presented with any number of scenarios in which to choose, the Claimants Kathy and Mary, not the Respondents, made the decision to receive payouts from their Trust at 8% and 9% respectively. Achieving this level of return would require some risk and investment of a significant portion of their portfolio into equities.

During the nearly year and a half the Claimants spent discussing, creating and implementing the investment strategy, the Respondents provided Claimants with a substantial amount of research and informational materials to help them make the inherently difficult and imperfect choices amongst investment options. Kathy ultimately decided to use about $400,000 of her Trust assets to purchase the following portfolio of stock and bond mutual funds:

- IDS Bond Fund—Intermediate term bond fund
- IDS Extra Income Fund—High Yield Corporate Bonds
- IDS Global Bond Fund—International Bonds
- IDS Growth Fund—Large Cap Growth Equities
- IDS Cash Management Fund—Money Market Account
- IDS New Dimensions Fund—Large Cap Growth Equities
- IDS Small Company Index Fund—Small Cap Growth Equities
- IDS Emerging Market Fund—Diversified Foreign Equities

Kathy chose this mix of funds from among a number of mutual funds respondents recommended. These were well- regarded mutual funds from IDS's in-house family of mutual funds-one of the oldest and largest mutual fund complexes in the business. The New Dimensions fund, for example, had been rated by the Morningstar mutual fund rating company as a 4 or 5 star fund for a time period of nearly 20 years, but , as a growth fund, the fund entailed significant risk. At the time, the New Dimensions Fund had averaged better than 20% annual returns for two prior consecutive years and averaged nearly that much on an annual basis for 10 straight years. This track record could continue, but, then again, it might not. In 1998, the prognosis for equities was good, but such future predictions are of course as inherently uncertain as any prediction of the future.

Respondents believe that these were reasonable investments for an investor such as Kathy. An alternative approach would have been to use multiple mutual fund families, although that would then have caused higher sales loads and a more complex and arguably harder to manage account. Respondent, for example, offered what is known in the industry as a "mutual fund wrap account." This type of account has the advantage that a much wider range of mutual fund selections is possible-literally hundreds of different mutual funds from dozens of different mutual fund families. The account assesses a 1% yearly wrap fee, however, which tends to be significantly higher than the break point adjusted load on a $400,000 investment into the IDS fund family. (Respondents' counsel has not done the calculation yet, but the sales load on $400,000 should have been less than a one-time assessment of about 4%. Over the years, a 1% a year charge would obviously be much higher than this.)

Kathy's mother, Mary, transferred approximately $130,000 in equities she owned (such as Eastman Kodak, Lockheed Martin, SBC Communications, PNC Bank, and US Bancorp) to

her Trust. She then liquidated these holdings and invested into the following blend of mutual funds:

- IDS High-Yield Tax Exempt Fund—Municipal Bond Fund
- IDS Growth Fund–Large Cap Growth
- IDS Federal Income Fund—Government Bonds
- IDS Blue Chip Advantage Fund—Large Cap Blend of Growth and Income
- IDS Global Bond Fund—International Bonds
- IDS International Fund—Global Equities
- IDS Small Company Fund—Small Cap Growth

Mary also used other assets from the Trust (primarily proceeds from the sale of the farmland) to invest $200,000 into an annuity. These were reasonable investments for Mary in light of her investment experience, her investment outlook and her needs for income and growth.

All of Mary's and Kathy's accounts with Ameriprise were "non-discretionary" accounts, meaning that Mary and Kathy had to approve and sign off on any investment which was made. Respondents do not contend that they did not give advice-they did, and they did present a wide variety of options. None of the investments at issue were ones that Kathy or Mary just choose out of the blue. However, Mary and Kathy did approve every investment they made. Mr. Stinnett gave advice to the Claimants; the Claimants in turn discussed this advice with their trust administrator and accountant, and then ultimately made the decisions regarding the accounts.

By the middle of 1998, over 7 years ago, both of the Claimants had fully implemented the investment portfolios at issue in this case. Also, at the end of 1998, Mr. Denny left Ameriprise and had no further contact with the Claimants. (This passage of time raising, amongst other questions, whether claimants' claims are eligible for arbitration under the "six year eligibility rule" or barred from litigation by statutes of limitation-see discussion infra.)

The combined total of the Trusts was approximately $1.2 million in 1998. Throughout the course of 1998, Kathy received the 8% annual distributions she had chosen to receive while her mother, Mary, received the 9% annual distribution she chose. After 1998, Kathy and Mary continued to receive regular income from their Trusts at the combined rate of approximately $100,000 per year. Claimants have been receiving income from their Trust for nearly eight full years as of the date of the Claimants' claim. During the course of their 8 years with Ameriprise, the Claimants' portfolios remained structurally the same.

From 1998 until well into 2000, the Claimants' equity funds grew substantially and outperformed their bond funds. (Indeed, part of the "losses" at issue came on the bond funds, which performed poorly in 1999 and well into 2000) When the market began to turn on investors, the Claimants' advisor, Mr. Stinnett, began to advise Kathy and Mary on alternative investments. Respondent Stinnett offered to the Claimants many alternative ways to protect the assets within their Trusts. Mary, for example, agreed to Mr. Stinnett's recommendation to transfer $70,000, in the spring of 2000, into three Real Estate Investment Trusts ("REITs"). Although REITs do entail some market risk as well, these were all triple net-leased, all cash REITs generating income in excess of 7% per year. This amounted to approximately 1/3rd of her investment outside of the annuities she owned.

Kathy, on the other hand, chose to remain in the same investments. She made this decision in light of the performance of the funds in her portfolio. Her Growth Fund gained nearly 40% during 1999; the New Dimensions fund had an annual return greater than 30% that year, and the Emerging Market Fund had an annual return near 80%. It is a fact that from 2000 to 2003 the stock market witnessed the greatest and longest decline in modern history. Equity

investments of all types declined in value effecting millions. The Claimants' equity investments responded no differently.

Throughout this time-period, Mr. Stinnett continued to advise the Claimants on alternative and more conservative investments. Although Mr. Stinnett did not claim that he could predict the future, he did discuss the market volatility and how it very well could continue. If Mary or Kathy were uncomfortable about market volatility or investment losses, there were many more conservative investment options available. For example, within the IDS fund family, Mary and Kathy could switch to other mutual funds at no charge. They already were invested in both bond funds and stock funds withion the IDS fund family, and thus plainly knew there were options. Their prospectuses informed them that they always had the option to alter their investment mix however they wanted, and Mr. Stinnett reminded them of this many times. Moving to bonds would mean less risk, but it would be unlikely that bond funds would generate returns in the range of the performance *possible* from stock funds. This was a choice, but not one Mr. Stinnett could make for them.

Kathy always decided against transferring her money into more conservative investments because she hoped to receive a higher rate of return than the amount earned by CDs and bond funds. She had elected a distribution rate of 8% and wanted to remain in a blend of investments which could generate at least this much return. Mary did agree with Mr. Stinnett's advise on diversifying a bit into REITs, but , otherwise, she also decided to stay the course with what she had.

In 2003, the Claimants finally did decide to take the advice of Mr. Stinnett regarding a change to their annuity policies. What the Claimants fail to note is that this change did not come at a cost to them as described in the Statement of Claim. At the time, Allianz was offering a 10%

bonus for the purchase of its annuity policies. For every $1,000 the Claimants used to purchase their policy, Allianz added an additional $100. This 10% bonus more than accounted for any surrender fee they would pay on the policy they were exchanging. Although Claimants are correct that they ended up losing money in their first year into these policies, they fail to mention that, subsequently, the accounts appreciated in value.

In September 2003, Respondent Stinnett retired from Ameriprise. Ameriprise promptly reassigned the Claimants to another advisor.

The Claimants continued to retain their own charitable trust administrator and accountant who oversaw the transactions that took place in their accounts. In 2004, the Claimants' trust administrator and accountant decided that the Claimants should transfer their accounts to another firm. The Claimants transferred the majority of their assets during that year. The Claimants raised no issues or complaints during the time of their transfer. The most current documentation regarding correspondence in the account shows that the Claimants are still using the same trust administrator and accountant concerning their investments.

The Claimants explicitly directed and approved the transactions in their Ameriprise portfolio at all times pertinent to this claim. At the time of each purchase, they signed the acknowledgement sections of the investment applications, affirming that they received full and fair disclosure of each investment prior to purchase, including inherent risks pertaining to market fluctuation. Respondents' files indicate that recommendations made by the Respondents were reasonable and suitable - in line with the goals, time horizon and risk tolerances stated by the Claimants.

Prior to making any purchases, the Claimants received prospectuses for all of the investments presented. The prospectuses clearly detailed investment objectives, past

performance and all the risks related to each product. Claimants reviewed the disclosure pages on the applications to discuss risks and costs. Their advisors also reviewed market volatility with the Claimants and their independent agents on numerous occasions. The Claimants received account statements disclosing all activity within their investments, as did their charitable trust administrator and accountant, and the Claimants provided explicit authorization for each transaction that took place.

While Respondents understand the concerns of the millions of investors impacted by the unpredicted stock market decline, neither Ameriprise nor its advisors are responsible for any downturn in the market. Under the market conditions since the Claimants opened their accounts, market value volatility of great magnitude was not unusual. The Respondents did not make any misrepresentations, nor did the Respondents violate any rules or laws, as the Statement of Claim alleges. Instead, the stock market went down, and the Claimants' accounts may have suffered along with the general market decline.

While the Respondents have not yet had the opportunity to conduct an accounting of the Claimants' accounts, the Respondents believe Kathy and Mary, at the least, share responsibility for losses, if any, in the Claimants' accounts and for the decisions they made. The Claimants received a sizable tax benefit by creating the Trust in 1997. They received hundreds of thousands of dollars of continuous withdrawals from the accounts during the nearly seven years the accounts were with Ameriprise. The Claimants received a 10% cash bonus to the purchases made in 2003 through Allianz. The IDS Life Insurance and Annuity policies were all part of a class action in which the Claimants did not opt out and in which they received a settlement in 2001. For these reasons, among other various factors relating to the Trusts, Respondents do not believe that the Claimants have losses in their accounts.

What is actually happening in this case is that Claimants wanted to receive high returns from their investments. Like millions of other investors, they consciously chose to invest in the stock market because they thought they could get better returns than what was available on safe, conservative, fixed return investments such as CDs. Regretfully, in the medium term at least, the stock market disappointed most everyone during 2000-2003. Claimants invested as capitalists in a capitalist system in which an investor shares in gains ***and*** losses. Most of the assets they "lost" were assets they "gained" because stocks went up in value – the going down concept is part of the formula of investing: we all hope it will not happen, but it might, and when it does, we must take our losses with our gains.

## LEGAL DISCUSSION

The Statement of Claim alleges that the Respondents misled Mary and Kathy into a number of inappropriate investments. Claimants cite violations of federal and state security laws in addition to negligence and lack of supervision. However, the Claimants have not identified any action by the Respondents that represent the violation of any applicable statute, rule, regulation, or common law legal theory. Therefore, the Respondents will only briefly recite its legal defenses, but it retains all legal defenses available under the law. Prior to reciting the key legal defenses as affirmative defenses, Respondents states as follows:

### I. Claimants Must Bear Responsibility for Their Own Decisions

From a legal standpoint, the Claimants' claims are barred by the doctrines of estoppel, waiver, ratification, and laches and by applicable statutes of limitation, such as the one-year limitation on any misrepresentation or fraud claim. The doctrines of estoppel, waiver, and laches essentially say that a person cannot "sit on their rights." For example, if a person has a complaint about something he or she purchased, he or she must raise that complaint in a timely

fashion. The Claimants alleges a failure on the part of Respondents relating to decisions and purchases made in 1997 and 1998 yet they waited until 2005 to file their Statement of Claim.

Numerous court, arbitrator, NASD Office of Hearing Officer, SEC, and CFTC decisions have dismissed investor claims marked by delay as is present with Mr. Campbell and Caradori's claim. For example, in Lake v. Kidder Peabody & Co. 1978 WL 1101(N.D. Ind. 1978), the Court held that the plaintiff/customer waived suitability claims when he reviewed his account statements, but did nothing except wait to see how things would turn out. Similarly, in Altshul v. Paine Webber, Jackson & Curtis, Inc., 518 F. Supp. 591(S.D.N.Y. 1981) the Court held that the defendant/brokerage firm was not responsible for allegedly unsuitable management of the plaintiff/customer's account, where the customer reviewed his account statements, but did not complain until he began to experience losses in his accounts. Prior to that time, he said nothing about his stock market investments because he was at that time happy with the returns on his portfolio. See also, e.g., Zimmerman v. Merrill Lynch, Pierce, Fenner & Smith, 151 Mich. App. 566(Ct. App 1986) (estoppel for failure to read account statements and take corrective action); Marshak v. Blyth, Eastman Dillon & Co., 413 F. Supp. 377 (N.D. Okla. 1975) (estoppel for failure to read account statements); Roberson v. Leighton, 1998 WL 429625(C.F.T.C. 1998) (customer has a responsibility to read account statements and complain in a timely fashion if the investments are inconsistent with the customer's risk tolerance); Clark v. Thomson McKinnon Securities, Inc., Comm. Fut. L. Rep(CCH) 23,796(C.F.T.C. 1987) (same).

The Claimants' accounts gained and declined in value. Both of the Claimants, as well as their charitable trust administrator and accountant, received account statements revealing this. Their Ameriprise financial advisors spoke with them and met with them on a regular basis. By the year 2005, it becomes a bit late to contend that the Claimants' investments from 1997 and

1998 were unsuitable. The time to make such a claim was long before 2005 at the time in which the Respondents allegedly failed in its obligations. Under the sampling of case law cited above, and the industry standards reflected in this case law, the Claimants' claims are barred or, at minimum, dramatically reduced in value, pursuant to the doctrines of mitigation of damages, ratification, estoppel, the second investment decision doctrine, assumption of risk and comparative negligence.

The Uniform Commercial Code, by analogy, sets forth a similar well-accepted principal of commercial law. This concept is that a seller of goods, products or services can limit liability to a customer by indicating on an account statement that the customer has a limited time to complain about a purchase reflected on his statement. Otherwise, any claims regarding the reported transactions are barred.

The courts have regularly held that provisions on account statements, which give clients only a certain amount of time to object to transactions, are enforceable contracts, so long as the time period is "commercially reasonable." Periods of 30 days are typical, and regularly held to be enforceable. See Stowell v. Cloquet, 557 N.W.2d 567 (Minn. 1997).

> ...Consistent with industry-wide practice, the Credit Union relies on the account holders to examine the statements each month and contact the Credit Union if he identifies any unauthorized checks.
>
> ...Under...the UCC, an account holder is generally barred from recovering [for an unauthorized transaction] if the account holder does not exercise "reasonable promptness" in examining his or his account statements and notifying the bank of any [unauthorized transaction].

Id. The court held that a requirement that the account holder notify the financial institution of any unauthorized transactions within 20 days of receipt of an account statement was a reasonable provision under law. Id.

The Claimants' Ameriprise investment confirmations (and account statements) informed them that they had only 30 days after receipt of the confirmations or account statements to allege that the purchases reflected on the confirmations and account statements were incorrect or unsuitable. Mary and Kathy made no claim alleging unsuitable investments within this reasonable time period, and therefore, their claims are barred by contract law as well.

Applicable statutes of limitation and the doctrine of laches also bar the claims and allegations submitted by the Claimants. Typically, investors who raise suitability claims in an untimely manner will assert that they were somehow not on notice about their claims or that their broker misled them about the risks of their investments or the like. In this case, the Claimants cannot truthfully make such a claim. The Claimants *knew* they had invested into equities, and they knew these equities could decline in value. In addition, the Claimants had significant experience prior to investing with Ameriprise regarding the risks inherent with investing in the stock market.

Although it seems to be common sense that all types of investing includes a degree of risk, even if the Claimants attempt to show that they did not possess such common sense, many cases have held that such common sense will be imputed to a plaintiff as of the time such information (e.g., that investing in stocks carries risk) became publicly available. See, e.g., In re Valence Tech., 986 F. Supp. 796, 804 (N.D.Cal. 1997); Sterlin v. Biomore Sys., Inc., 960 F.Supp. 1531 (D. Utah 1997); City Nominees Ltd. v. Macro Media, Inc., No. C97-3521 SC (N.D. Cal. 1998). "Publicly filed documents are sufficient to trigger inquiry notice." Salinger v. Projectavision, Inc., 934 F. Supp. 1402 (S.D.N.Y. 1996).

Of course, information regarding the inherent risks of the stock market has been public knowledge since the genesis of the stock market. Certainly, during the period in which the

Claimants invested through Respondents, information filled the media with information on the stock market, its risks and its rewards. The only "new" information the Claimants assert to have discovered is that the stock market dropped, and the value of the equities in their Ameriprise portfolio declined. Part of the reason for the time limitations is to prevent investors from purchasing stock or other equity-based investments, and then sitting around to see how the investments perform. If the investment goes down in value, the investor sues in order to claim reimbursement for market losses. This appears to be what the Claimants are attempting with their Statement of Claim.

NASD Rule 10304 additionally sets out terms to limit the time in which a Claimant may bring an action. Commonly known as the "six-year" rule, it provides that a claim is ineligible for arbitration under the Code if six or more years have elapsed from the occurrence or event giving rise to the claim. In sum, the applicable statutes of limitations have run on Claimants' claims and their claims barred by the doctrines of estoppel, ratification and laches. Their Claims are ineligible for arbitrationunder the NASD six-year rule.

## II. No Misrepresentation Occurred

Proof of any variant of a "misrepresentation" or "failure to disclose" claim requires that the Claimants prove that the Respondents misrepresented an **existing fact**, with either **intent to deceive** the listener or with a **reckless disregard for the truth**, and that the listener "justifiably relied" on the misrepresentation to his detriment. See, e.g. Zobrist v. Coal-X, 708 F.2d 1511 (10th Cir. 1983). An expression of opinion, or a prediction of the future, can never form the basis of a misrepresentation claim. To the contrary, opinions and predictions are constitutionally protected free speech. Id.

Thus, for example, an investment advisor can give his opinion regarding the future direction of the market, without fear of liability for his failure to predict the future. The only exception is if the speaker knows that his representations are untrue as a matter of a current, existing ***fact*** – e.g., a prediction that Enron is a good current investment when the speaker knows that Enron just filed bankruptcy and was indicted for criminal fraud. Alternatively, it is not an illegal misrepresentation for weather reporters to forecast the weather, for economists to predict the course of the economy, or for sports commentators to predict the outcome of sporting events, even if the forecasts prove dead wrong. See, e.g., John v. Shearson, Civ. No. 82-CU-70597-DT (E.D. Mich. 1989) (A broker's prediction that the market would recover cannot form the basis of a misrepresentation claim).

In his Statement of Claim, Mary and Kathy have been unable to identify ***any*** misrepresentation of an existing fact or ***any*** failure by Respondents to disclose a relevant fact. The Claimants were fully aware they had purchased investments consisting of various equities, but this was precisely what they wanted and needed to achieve their long-term investment objectives.

Claimants appear to believe that Respondents had an obligation to protect them from the volatility of the stock market by moving them into alternative investments, regardless of their actual risk tolerance, their long-term financial objectives, the explicit approvals of the investment strategies at issue, and their disapproval of advice on which they chose not to act. Respondents do not contend that it was able to predict the future and acknowledges that it, like most everyone else, failed to predict the severity and length of the stock market downturn – although Respondents always disclosed the possibility of this happening as is set forth in all of the

literature presented to the Claimants. The converse side of all of this is that it is equally difficult to predict when, if ever, a market turnaround will happen.

### III. No Suitability Violation

The NASD's suitability rule provides that the NASD may sanction an NASD registered representative who makes investment recommendations to a client without having a reasonable basis for believing that such investments are suitable for the clients, based on the clients' expressed risk tolerance, financial circumstances, and goals.

However, there is no "private cause of action" for a violation of the NASD's suitability rule. See, e.g., Jablon v. Dean Witter, 614 F.2d 677, 681 (9th Cir. 1980); Daniel Boone Area Sch. Dist. v. Lehman Bros. Inc., 187 F. Supp. 2d 400(W.D. Pa. 2002); Rozsa v. May Davis Group, Inc. 187 F. Supp. 2d 123(S.D.N.Y. 2002). A Claimant can only assert a suitability claim as an SEC Rule 10b-5 claim, assuming that one can prove the elements of such a claim and files the claim within the two-year time period allowed for filing Rule 10b-5 claims or as a negligence claim. The alleged unsuitability presented by the Claimants occurred in 1997 and 1998, well beyond the two-year time-period for bringing such a claim.

Based on any applicable legal theory, the first component of a "suitability" claim requires the Claimants to prove that Respondents' investment recommendations did not have a "reasonable basis." *Websters Dictionary* defines "reasonable" as "rational" or "having a rationale." Respondents contend that the proposals to the Claimants had two important rationales. First, Claimants had a history of investing into equities, and expressed a desire to receive growth and income investments. Second, the historical fact is that, over the long term, investments into stocks have generally outperformed fixed investments and bonds. Respondents believe that this obviously common recommendation throughout the brokerage industry and U.S.

capital markets is inherently rational or customary. There is no guarantee that such a recommendation will prove accurate.

Nonetheless, the Respondents made rational recommendations in-line with industry standards. There is not a "right" answer; rather, the question is whether one's viewpoint is one of the many "rational" ones possible. Hindsight will always allow us to find a "best" answer, but it is both unrealistic and impossible to hold past actions to such a standard.

In addition to the requirement that a suitability claim prove that the Respondents' recommendations were unreasonable - based on Claimants' financial goals and risk tolerances – the Claimants must prove the elements of fraud or negligence. The key element of a negligence claim (in addition to "proximate cause/loss causation" as discussed below) is the requirement that the Claimants prove a lack of "due" or "ordinary" care. In other words, the Claimants in this case must prove that Respondents' investment recommendations were unreasonable for an investor in the context of the prevailing circumstances at the time the Claimants made the investment decisions at issue. Respondents believe Claimants cannot prove this, because it is not true. Respondents' recommendations were not unreasonable or out of the ordinary for an investor under the prevailing circumstances when Mary and Kathy initially invested through Ameriprise.

Respondents did not misrepresent any existing facts, and they certainly did not act recklessly or with any intent to deceive Claimants. Admittedly, Claimants and Respondents failed to predict the future of the market with accuracy, but this is irrelevant. Nor did the Claimants "justifiably rely" on any misrepresentation of an existing fact to their detriment. Every reasonable person knows, and the law presumes, that opinions about the future cannot be relied on as the basis of a "fraud" claim. In order to accept the Claimants' claim, one must find

that they somehow believed that the investments proposed by Respondents could *not* decline in value. One must believe this despite the detailed explanation of each investment provided to the Claimants during the lengthy period of planning prior to the creation of the Trust and the making of these investments, and the prior years of experience investing in the stock market held by each Claimant.

## IV. Proximate Cause

Any investment claim, whether categorized as suitability, misrepresentation or negligence, requires that the Claimants prove that the alleged misdeed by Respondents was the "proximate cause" of their loss. Similarly, the law requires proof of "loss causation," i.e. that alleged misdeeds by the Respondents were the cause of the Claimants' losses. In other words, as to a market loss claim, losses are not recoverable if the cause of those losses is normal, ordinary market fluctuation. The risks of the stock market are obvious and inherent. If the cause of one's losses lies in a market downturn, rather than any alleged misdeed by the broker, the Claimants have no valid claim.

The value of the Claimants' Ameriprise portfolios rose and declined primarily due to the general market and their numerous account withdrawals. The Claimants' losses, if any, were not "proximately caused" by anything the Respondents did or failed to do. Respondents did not bind or obligate the Claimants to make or hold the investments at issue. They had an opportunity to reap substantial gains in the investments they purchased. Obviously, it is only in hindsight that they now claim the proposed investments to be unsuitable, and the **only evidence** for this claim of unsuitable investments is the alleged loss itself.

Claimants' investments did not go down in value because of any misdeed by Respondents. Instead, equity investments of all sorts went down in value, causing over 80

million investors to lose, collectively, over $8.0 trillion dollars in three years. No one is happy with this, but clearly, Respondents did not "proximately cause" this market downturn. The Claimants have provided no valid or reasonable basis for why an arbitration panel should treat them any differently than the millions of other investors who have suffered losses due to the recent downturn in the stock market.

**AFFIRMATIVE DEFENSES**

FIRST AFFIRMATIVE DEFENSE

Claimants have failed to state a cause of action upon which relief can be granted.

SECOND AFFIRMATIVE DEFENSE

Claimants have failed to demonstrate any actual damages.

THIRD AFFIRMATIVE DEFENSE

The alleged damages claimed by Claimants are not the result of any act or omission on the part of Respondents.

FOURTH AFFIRMATIVE DEFENSE

The actions or inactions of Claimants caused whatever unknown losses of which they now complain.

FIFTH AFFIRMATIVE DEFENSE

Claimants, and their charitable trust administrator and accountant, received confirmations and written statements reflecting every transaction in the accounts. The Claimants did not object to such information. Claimants ratified and waived objection to all transactions or lack of transactions in their accounts.

SIXTH AFFIRMATIVE DEFENSE

Claimants, by their conduct and under all circumstances of this case, are estopped from

asserting their claims.

SEVENTH AFFIRMATIVE DEFENSE

Stock market events and fluctuations occurred, not caused by Respondents, constituting a superseding or intervening cause of some or all of the alleged damages.

EIGHTH AFFIRMATIVE DEFENSE

Respondents performed all duties owed to Claimants fully and faithfully.

NINTH AFFIRMATIVE DEFENSE

Claimants' damages, if any, were due to the fault of persons and to factors and circumstances presently unknown to Respondents, over which Respondents exercised no control, and for whose actions it is not responsible.

TENTH AFFIRMATIVE DEFENSE

There was no negligence on the part of Respondents in handling Claimants' accounts.

ELEVENTH AFFIRMATIVE DEFENSE

Claimants' claims are barred in part or in whole by the applicable statutes of limitations, by the doctrine of laches, and are ineligible for arbitration pursuant to NASD Code of Arbitration Procedure Rule 10304 (the "Six Year Rule.")

TWELFTH AFFIRMATIVE DEFENSE

Claimants caused or contributed to the damages through their own negligence or fault.

THIRTEENTH AFFIRMATIVE DEFENSE

Respondents did not act with any intent to defraud Claimants or with any willful disregard for them.

FOURTEENTH AFFIRMATIVE DEFENSE

Claimants failed to act reasonably to mitigate their losses.

FIFTEENTH AFFIRMATIVE DEFENSE

Claimants have failed to join an indispensable party.

SIXTEENTH AFFIRMATIVE DEFENSE

The Claimants' claims have been released and are accordingly barred by operation of the Final Orders and Judgments Approving Class Action Settlement and Dismissing Complaint, dated May 15, 2001, in the actions styled by Benacquisto, et al. v. American Express Financial Corporation et al., Minnesota State Court, Hennepin County, Case No. 96-018477, United States District Court for the District of Minnesota, Case No. 00-1980 DSD/JMM.

**CONCLUSION**

For all the above reasons, Respondents request dismissal of the claims against them and that all costs associated with this claim be assessed to the Claimants.

Dated: December 8, 2005

Edgerton, Weaver & Irwin, L.L.C.

By: Gary R. Irwin (0179991)
5050 Lincoln Drive, Suite 480
Minneapolis, MN 55436
(952) 345-4444 (Phone)
(952) 345-4445 (Fax)
girwin@neilaw.com
*Attorney for Respondents Ameriprise, Gerald Denney and David L. Stinnett*

STATE OF MINNESOTA )
) SS:
COUNTY OF HENNEPIN )

AFFIDAVIT OF MAILING

GARY R. IRWIN, deposes and certifies that he caused four copies of the foregoing Statement of Answer (in the matter of NASD Dispute Resolution Case Number 05-03008, Mary Campbell, et al. v. American Express Financial Advisors, Inc., n/k/a Ameriprise Financial Services, Inc., et al.) to be served by Federal Express overnight delivery on this 9th day of December, 2005 to NASD Dispute resolution, and one copy of the foregoing Statement of Answer to be served by Federal Express overnight delivery on this 9th day of December, 2005 to Claimant's counsel addressed as follows:

Elisa Guerrero
NASD Dispute Resolution – Midwest Region
10 South LaSalle Street – Suite 1110
Chicago, Illinois 60603-1002
PH: 312-899-4440

Gail E. Boliver
Boliver Law Firm
8712 West Dodge Road – Suite 400
Omaha, Nebraska 68114
PH: 402-392-0107

Gary R. Irwin, Esq.

#163203 v01