**UNITED STATES DISTRICT COURT**
**DISTRICT OF MINNESOTA**

LESA BENACQUISTO, DANIEL BENACQUISTO, RICHARD THORESEN, ELIZABETH THORESEN, ARNOLD MORK, ISABELLA MORK, RONALD MELCHERT and SUSAN MELCHERT, on behalf of themselves and all others similarly situated,

Plaintiffs,

v.

AMERICAN EXPRESS FINANCIAL CORPORATION, AMERICAN EXPRESS FINANCIAL ADVISORS, AMERICAN CENTURION LIFE ASSURANCE COMPANY, AMERICAN ENTERPRISE LIFE INSURANCE COMPANY, AMERICAN PARTNERS LIFE INSURANCE COMPANY, IDS LIFE INSURANCE COMPANY, and IDS LIFE INSURANCE COMPANY OF NEW YORK,

Defendants.

Case No. 00-1980 DSD/JMM

**FINAL ORDER AND JUDGMENT APPROVING CLASS ACTION SETTLEMENT AND DISMISSING COMPLAINT**

WHEREAS plaintiffs and defendants entered into a Stipulation of Settlement, with exhibits (collectively, the "Settlement Agreement"), dated September 18, 2000, to settle this class action litigation; and

WHEREAS on October 2, 2000, this Court and the Minnesota State Court for the County of Hennepin jointly entered an Order (the "Hearing Order") preliminarily certifying the putative class in this Action for settlement purposes under Minn. R. Civ. P. 23.01, 23.02(c), and 23.03(b) and Fed. R. Civ. P. 23(a), 23(b)(3), and 23(c)(2), ordering individual and publication notice to potential class members, scheduling a Fairness Hearing for March 6, 2001, and providing those persons with an opportunity either to exclude themselves from the settlement class or object to the proposed settlement; and

FILED 5-15-01
FRANCIS E. DOSAL, CLERK
Judgment Ent'd 5-15-01
Deputy Clerk's Initials

WHEREAS this Court and the Minnesota State Court for the County of Hennepin jointly held a Fairness Hearing on March 6, 2001 to determine whether to give final approval to the proposed settlement; and

WHEREAS this Court has issued Findings of Fact and Conclusions of Law Concering Class Action Settlement, dated MAY 15, 2001, granting final certification of the settlement class, approving the proposed settlement, and dismissing the settlement class members' claims (among other things); now, therefore,

Based on the submissions of the Parties and Class Members, on the evidence adduced at the Fairness Hearing, and on this Court's Findings of Fact and Conclusions of Law dated MAY 15, 2001, it is hereby **ORDERED, ADJUDGED AND DECREED** as follows:

1. **Incorporation of Other Documents.** This Order and Judgment Approving Class Action Settlement incorporates and makes a part hereof:

(a) the Stipulation of Settlement dated September 18, 2000, and filed with the Courts on September 18, 2000 (the "Stipulation of Settlement");

(b) the following exhibits to the Stipulation of Settlement: (i) Exhibit A (Guidelines for Determining, Scoring and Awarding Relief in the Claim Review Process); (ii) Exhibit B (Class Notice Package); (iii) Exhibit C (Publication Notice); (iv) Exhibit D (Proposed Hearing Order); (v) Exhibit E (Confidentiality Agreement); (vi) Exhibit G (Statement to Accompany Post-Execution Date Responses to Customer Complaints); (vii) Exhibit H (Post-Settlement Claim Form Mailing); (viii) Exhibit I

(Post-Mailing Reminder); and (ix) Exhibit J (Claim Review Administrative Forms and Letters); and

(c) the Affidavit of Jeffrey D. Dahl, sworn to February 23, 2001, Exhibit __ to this Order and Judgment (describing the Class Notice Package, its distribution to Class Members, and the Publication Notice).

2. **Jurisdiction.** This Court has personal jurisdiction over all Class Members (as defined below) and has subject matter jurisdiction over this Action and all claims and causes of action resolved by this settlement, including all the Claims and Causes of Action referred to in the Release. Accordingly, this Court has jurisdiction to approve the proposed settlement, grant final certification of the Class, release Claims and Causes of Action as set forth in the Release, and dismiss this Action on the merits and with prejudice.

3. **Final Class Certification.** The Class that was previously certified preliminarily is hereby finally certified for settlement purposes under Fed. R. Civ. P. 23(a), 23(b)(3), and 23(c)(2). The Class consists of (A) All persons or entities who, as of the Eligibility Date, have or had (i) an ownership interest in a cash value life insurance policy issued by IDS Life Insurance Company ("IDS") or IDS Life Insurance Company of New York ("IDSNY") pursuant to an individual sale in the United States, including its territories and commonwealths, issued at any time during the Class Period; or (ii) an ownership interest in an individual deferred annuity contract or a participation interest in a Group Qualified Annuity issued by IDS, IDSNY, American Centurion Life Assurance Company, American Enterprise Life Insurance Company or American Partners Life Insurance Company in the United States, including its territories and

commonwealths, that was in force at any time during the Class Period; and (B) all Qualified Plans and Qualified Plan Representatives that purchased, owned, held or had any interest with respect to any Group Qualified Annuity. The Class does not include (i) any present officer, any former officer of grade 50 and above, or equivalent, or any financial advisor of Defendants; or (ii) any insurance company that owns or owned a Policy or Annuity pursuant to an absolute assignment effected as part of an exchange under Section 1035 of the Internal Revenue Code.

Notwithstanding the foregoing, the Class shall not include (unless and to the extent such persons or entities are Class Members by virtue of their ownership interest in another Policy or Annuity) the following: (i) any persons or entities who make a timely election to be excluded from the proposed Class with respect to a particular Policy or Annuity otherwise included within the Class; (ii) any persons or entities who have an ownership interest in (a) a Policy that was terminated prior to the Eligibility Date due to the death of the insured and on which death benefits were paid; (b) an Annuity that was terminated prior to the Eligibility Date by reason of the death of the annuitant; (c) a Policy or Annuity that was issued, but not accepted or funded, or was returned to the issuer, as part of the exercise of a free look provision in the Policy or Annuity; (d) a Policy or Annuity that was rescinded as part of a reissue of a new life insurance policy or annuity contract, or because of a material misrepresentation on a Policy or Annuity application, or where the Policy or Annuity was rescinded and the premiums or other monies paid were returned to the Policy or Annuity owner; (e) a Policy or Annuity that is the subject of a release signed by any person or entity while represented by counsel settling a claim or dispute and releasing the issuer from any further liability concerning such Policy or Annuity; (f) a life insurance policy that was a term life

insurance policy or graded premium whole life insurance policy; (g) an annuity contract that was settled (*i.e.*, annuitized) prior to the inception of the Class Period; or (h) an annuity contract that was issued as an immediate annuity. A list of those persons who have validly excluded themselves from the Class, and who therefore are not bound by this Order and Judgment, is on file with this Court as Plaintiffs' and Defendants' Joint Submission of Exclusions From Class, dated March 21, 2001, and is incorporated herein and made a part hereof. A small number of requests for exclusion were deficient and subject to "cure" letters. The Parties will supplement their submission once those outstanding issues are resolved.

4. **Appointment of Co-Class Counsel and Lead Counsel and Adequacy of Representation.** The law firms of Milberg Weiss Bershad Hynes & Lerach LLP and Lockridge Grindal Nauen, P.L.L.P. are hereby appointed Co-Class Counsel; the law firm of Milberg Weiss Bershad Hynes & Lerach LLP is hereby appointed Lead Counsel; and the Class representatives have fully and adequately represented the Class for purposes of entering into and implementing the settlement and have satisfied the requirements of Fed. R. Civ. P. 23(a)(4).

5. **Class Notice.** Notice was provided to the Class in accordance with the Hearing Order. Individual notice was sent by first-class mail, postage prepaid, to the last known address of the Policy and Annuity Owners and, in the case of a Group Qualified Annuity, to persons or entities who hold or held a participation interest in the Group Qualified Annuity, all as reflected by Defendants' records as maintained at the Corporate Office or by the results of any searches performed by a vendor hired by Defendants to update addresses of such persons or entities. In cases of pending litigation against the Defendants, notice was also mailed to any legal

counsel known to represent the Class Member. Also in accordance with the Hearing Order, publication notice was published and notice was posted on the internet at the web sites for Defendants and Co-Class Counsel. This Court finds that the notice outlined above:

(a) constituted the best practicable notice to Class Members under the circumstances of this Action;

(b) was reasonably calculated, under the circumstances, to apprise Class Members of (i) the pendency of this class action; (ii) their right to exclude themselves from the Class and the proposed settlement; (iii) their right to object to any aspect of the proposed settlement (including final certification of the settlement class, the fairness, reasonableness or adequacy of the proposed settlement, the adequacy of the Class' representation by Plaintiffs or Plaintiffs' counsel, and/or the award of attorneys' fees); (iv) their right to appear at the Fairness Hearing -- either on their own or through counsel hired at their own expense — if they did not exclude themselves from the Class; and (v) the binding effect of the Order and Judgment in this Action, whether favorable or unfavorable, on all persons who do not request exclusion from the Class;

(c) was reasonable and constituted due, adequate and sufficient notice to all persons entitled to be provided with notice; and

(d) fully satisfied the requirements of the Federal Rules of Civil Procedure (including Fed. R. Civ. P. 23(c)(2) and (e)), the United States Constitution (including the Due Process Clause), the Rules of this Court, and any other applicable law.

6 **Final Settlement Approval.** The terms and provisions of the Settlement Agreement, including all exhibits, have been entered into in good faith and are hereby fully and finally approved as fair, reasonable and adequate as to, and in the best interests of, each of the Parties and the Class Members, and in full compliance with all applicable requirements of the Federal Rules of Civil Procedure, the United States Constitution (including the Due Process Clause), and any other applicable law. The Parties and Class Members are hereby directed to implement and consummate the Settlement Agreement according to its terms and provisions.

7. **Early Implementation.** The Defendants are hereby authorized, in their sole discretion but in consultation with Co-Class Counsel, and without requiring further approval of this Court, to implement the settlement before the Final Settlement Date (as defined in the Settlement Agreement), in which case all provisions in the Settlement Agreement specifying actions to be taken on or after the Final Settlement Date shall, to the extent necessary, be deemed to provide that those actions shall be taken on or after the date the Defendants elect to implement the settlement.

8. **Appeal After Early Implementation.** If the Defendants choose to exercise their discretion to implement the settlement before the Final Settlement Date, anyone seeking to appeal from this Court's rulings must first (i) request to intervene upon a representation of inadequacy of counsel; (ii) request a stay of implementation of the settlement; and (iii) post an appropriate bond. Unless a would-be appellant satisfies all three of these requirements, the Defendants are authorized to implement the settlement before the Final Settlement Date even if such implementation would moot any appeal.

9. **Post-Settlement Mailing**. The Parties are hereby directed to mail the Post-Settlement Mailing materials substantially in the form attached as Exhibit H to the Settlement Agreement, as provided by the Stipulation of Settlement.

10. **Securities Registration Not Required.** This Court hereby confirms that, to the extent that any rights provided under this settlement (including but not limited to the right to designate another person as eligible to receive the ADB under the Settlement Agreement) might be deemed to be a security under section 3(a)(10) of the Securities Act of 1933, as amended, registration of any such right would not be required by virtue of this Court's approval of the settlement.

11. **No Tax Advice Being Given.** This Court hereby confirms that the Parties and their counsel are not making any representations or providing any opinions or advice concerning the tax consequences of the proposed settlement or the election of any remedies under the settlement to individual Class Members, and the Parties and their counsel shall not be held liable for any tax consequences or elections.

12. **Binding Effect.** The terms of the Settlement Agreement and of this Order and Judgment shall be forever binding on Plaintiffs and all other Class Members, as well as their heirs, executors and administrators, successors, assigns, guardians, attorneys, trustees, and representatives, and those terms shall have *res judicata* and other preclusive effect in all pending and future claims, lawsuits or other proceedings maintained by or on behalf of any such persons, to the extent those claims, lawsuits or other proceedings involve matters that were or could have been raised in the Action or are otherwise encompassed by the Release.

13. **Release.** The following Release, which is also set forth in Section XII of the Stipulation of Settlement, is expressly incorporated herein in all respects, is effective as of the Final Settlement Date, and forever discharges the Releasees from any Claims or Causes of Action that arise from or relate to the Released Conduct:

A. Release and Waiver

1. In consideration for the relief set forth in this Agreement, Plaintiffs and all other Releasors (defined below) shall, as of the Final Settlement Date, release, acquit and forever discharge the Releasees (defined below) from any and all past or present Claims and Causes of Action (defined below) that are based upon, related to, or connected with, directly or indirectly, in whole or in part: (a) the allegations, facts or subjects set forth or otherwise raised in Benacquisto, et al. v. American Express Financial Corporation, et al., No. 96-18477, pending before the Minnesota State Court for the County of Hennepin (together with the actions consolidated therewith, also filed in the Minnesota State Court for the County of Hennepin and entitled Mork, et al. v. IDS Life Insurance Company, et al., No. 97-04742, and Thoresen, et al. v. American Express Financial Corporation, et al., No. 98-015681) and/or Benacquisto, et al. v. American Express Financial Corporation, et al., No. 00-1980 DSD/JMM, pending before the United States District Court for the District of Minnesota; or (b) the Released Conduct (defined below).

2. Plaintiffs and all other Class Members, on their own behalf and on behalf of all other Releasors also hereby contractually agree and acknowledge that, unless this settlement is ultimately disapproved, they shall not now or hereafter initiate, participate in, maintain, maintain a right to or assert against the Releasees, or any of them, either directly or indirectly, derivatively, on their own behalf, or on behalf of the Class or the general public or any other person or entity, any Claims and Causes of Actions (defined below) that are based upon, related to, or connected with, directly or indirectly, in whole or in part: (a) the allegations, facts or subjects set forth or otherwise raised in Benacquisto, et al. v. American Express Financial Corporation, et al., No. 96-18477, pending before the Minnesota State Court for the County of Hennepin (together with the actions consolidated therewith, also filed in the Minnesota State Court for the County of Hennepin and entitled Mork, et al. v. IDS Life Insurance Company, et al., No. 97-04742, and Thoresen, et al. v. American Express Financial Corporation, et al., No. 98-015681) and Benacquisto, et al. v. American Express Financial Corporation, et al., No. 00-1980 DSD/JMM, pending before the United States District Court for the District of Minnesota; or (b) that relate in any way to the Released Conduct.

3. Nothing in this Release shall be deemed to alter (i) a Class Member's right to make a claim for contractual benefits that will become payable in the future pursuant to the express written terms of an In Force Policy or In Force Annuity issued by any of Defendants; (ii) a Class Member's right to assert any claim that independently arises from acts, facts or circumstances that occur for the first time after the last day of the Class Period; (iii) a Class Member's right to make a claim for theft or embezzlement in connection with a Policy or Annuity; (iv) a Class Member's right to assert any claim based on facts arising out of or relating to the administration or servicing of a Policy or Annuity after its purchase unless they arise out of or relate to any of the matters described in sections XII.B.2.(i)-(xiii) of the Stipulation of Settlement; or (v) a Class Member's right to assert any claim peculiar to the Class Member that falls outside the general categories of claims or conduct described in the complaints in the Actions or the Release in this settlement and is based on facts that were not discovered and could not with reasonable care have been discovered by the Class Member before the deadline to submit an Election Form set forth in the Stipulation of Settlement.

4. Plaintiffs and all other Class Members, on their own behalf and on behalf of all other Releasors, expressly agree that this Release will be, and may be raised as, a complete defense to, and will preclude any action or proceeding that relates in any way to, the Released Conduct.

5. Plaintiffs and all other Class Members, on their own behalf and on behalf of all other Releasors, expressly understand that certain principles of law, such as Section 1542 of the Civil Code of the State of California, provide that a "general" release does not extend to claims that a creditor does not know or suspect to exist in his favor at the time of executing the release and which, if known by him, must have materially affected his settlement with the debtor. To the extent that these principles of law arguably may be applicable — notwithstanding that the parties have chosen Minnesota law to govern the Stipulation of Settlement — Plaintiffs and the Class Members hereby agree that these principles (including Cal. Civ. Code Section 1542 and all similar federal or state laws, rights, rules, or legal principles of any jurisdiction that may be applicable herein) are hereby knowingly and voluntarily waived and relinquished by Plaintiffs and the Class Members, and Plaintiffs and the Class Members hereby agree and acknowledge that this is an essential term of both the Settlement Agreement and this Release.

6. In connection with this Release, Plaintiffs and all other Class Members, on their own behalf and on behalf of all other Releasors, acknowledge that they are aware that they may hereafter discover claims presently unknown or unsuspected, or facts in addition to or different from those that they now know or believe to be true with respect to the matters released herein that occurred prior to the last day of the Class Period. Nevertheless, subject to paragraph 3 above, it is the intention of Plaintiffs and the Class Members in executing this Release fully, finally and forever to settle and release all such

matters that exist, hereafter may exist, or might have existed (whether or not previously or currently asserted in any action or proceeding) with respect to their Policies and Annuities.

7. Nothing in this Release shall preclude any action to enforce any of the terms of the Settlement Agreement, provided that such action shall be brought in the Minnesota State Court for the County of Hennepin or the United States District Court for the District of Minnesota.

8. Plaintiffs and all other Class Members, on their own behalf and on behalf of all other Releasors, hereby agree and acknowledge that the provisions of this Release, individually and collectively, constitute an essential and material term of the Settlement Agreement.

9. This Release is the result of a compromise of a disputed claim and shall never at any time be used as evidence of any admission of liability, wrongdoing or damages by the Company.

B. Release and Waiver -- Definitions

1. "Claims and Causes of Action" (as used in this Release) means any and all claims for relief (including any federal, exclusively federal, state, or other causes of action, suits, petitions, or demands in law or equity), any and all allegations of liability (including any allegations of debts, obligations, promises, guarantees, damages, awards, or for any equitable, legal and administrative relief), and any and all demands for damages or equitable relief (including any claims for rescission, reformation, restitution or all damages of any kind, including those in excess of actual damages and claims for mental anguish), that have been, could have been, may be or could be asserted in any court action, whether federal, state or otherwise, or before any administrative body (including any brought by or on behalf of any state or local insurance, prosecutorial or other organization), tribunal, arbitration panel, or other adjudicatory body, regardless of whether based on federal, state or local law, statute, ordinance, regulation, contract, common law, or any other source, and regardless of whether foreseen or unforeseen, suspected or unsuspected, or fixed or contingent at the time of this Settlement.

2. "Released Conduct" means any and all direct or indirect acts, representations, omissions, suggestions, or communications that are related to or connected in any way with the design, development, marketing, sale, administration, servicing, underwriting, or performance of the Policies or the Annuities, including, without limitation, acts, representations, omissions, suggestions or communications in connection with (i) the explanation, description, marketing, sale, solicitation, illustration or replacement of any Policy or Annuity; (ii) the application for or purchase of any Policy or Annuity; (iii) the suitability of any purchases, sales or replacements of any Policy or

Annuity; (iv) the taking of any loans, or the accumulation of any interest or cash values on any Policy or Annuity; (v) the setting, reduction, adjustment, payment, or lack of payment of any interest rates, purchase rates or renewal rates on any Policy or Annuity; (vi) the setting, charging or reducing of any cost of insurance, commissions, incentives, premiums, taxes, fees, mortality and expense fees, charges, contract charges, surrender charges, or expenses on any Policy or Annuity; (vii) the investment choices made with respect to assets held in any Policy or Annuity; (viii) the surrender, lapse, or termination of any Policy or Annuity; (ix) the tax status, tax impact or tax consequences of any Policy or Annuity or any actions or inaction taken with respect thereto; (x) the costs, commissions, terms, or benefits or disadvantages of any Policy or Annuity compared to any other life insurance policy, annuity contract or investment; (xi) the comparison or lack of comparison of any Policy or Annuity to any other product; (xii) the preparation by any financial advisor acting for the Company of any financial plan or the provision of financial or investment advice insofar as it resulted in the sale, modification or maintenance of any Policy or Annuity; (xiii) the effect that a Class Member's election and award of benefits in this Settlement Agreement may have on the value of any Policy or Annuity; and (xiv) the administration or servicing of any Policy or Annuity after its purchase.

3. "Releasees" means the Company[1] and its past, present and future parents, subsidiaries, affiliates, partners, predecessors, successors and assigns, and each of their respective past, present and future officers, directors, shareholders, employees, general agents, agents, advisors, branch managers, producers, sales representatives, brokers, solicitors, representatives, attorneys, heirs, administrators, executors, insurers, predecessors, successors and assigns, or any of them, including any person or entity acting on behalf of, or at the direction of, any of them.

4. "Releasors" means, to the extent they are not excluded from the Class with respect to a Policy or Annuity, the Plaintiffs and all Class Members, on behalf of themselves and their respective heirs, executors, administrators, successors, assigns, guardians, attorneys, trustees, qualified plans, fiduciaries, plan fiduciaries, plan trustees, plan sponsors, plan participants, plan beneficiaries, and representatives, and on behalf of the Policies' insureds and beneficiaries, the Annuities' annuitants and beneficiaries, and the Policies' and Annuities' nominal and beneficial owners.

---

1 "Company" means IDS Life Insurance Company, IDS Life Insurance Company of New York, the American Express Company, American Express Financial Corporation, American Express Financial Advisors, American Express Service Corporation, American Express Trust Company, American Centurion Life Assurance Company, American Enterprise Life Insurance Company and American Partners Life Insurance Company, collectively.

14. **Permanent Injunction.** All Class Members who have not been timely excluded from the Class with respect to a Policy or Annuity are hereby permanently barred and enjoined from (i) filing, commencing, prosecuting, maintaining, intervening in, participating in (as class members or otherwise), or receiving any benefits or other relief from, any other lawsuit, arbitration, or administrative, regulatory or other proceeding or order in any jurisdiction based on or relating to the Claims and Causes of Action, or the facts and circumstances relating thereto, in the Action and/or the Released Conduct (as that term is defined in the Settlement Agreement) as to that Policy or Annuity, and (ii) organizing or soliciting the participation of any Class Members in a separate class for purposes of pursuing as a purported class action (including by seeking to amend a pending complaint to include class allegations, or by seeking class certification in a pending action) any lawsuit or other proceeding based on or relating to the Claims and Causes of Action, or the facts and circumstances relating thereto, in the Action and/or the Released Conduct as to that Policy or Annuity. This Court finds that issuance of this permanent injunction is necessary and appropriate in aid of this Court's jurisdiction over the Action and to protect and effectuate this Order and Judgment.

15. **Enforcement of Settlement.** Nothing in this Order and Judgment shall preclude any action to enforce the terms of the Settlement Agreement; nor shall anything in this Order and Judgment preclude Plaintiffs or Class Members from participating in the Claim Review Process described in the Settlement Agreement if they are entitled to do so under the terms of the Settlement Agreement.

16. **Attorneys' Fees and Expenses.** The Court hereby grants Co-Class Counsels' application for an award of attorneys' fees and reimbursement of their disbursements and expenses for their past and future work on the Actions in the amount of $28 million, to be paid by Defendants to Lead Counsel. The $28 million consists of approximately $27, 380, 000 in fees and $620,000 in reimbursement of expenses. Such fees and expenses are to be paid by Defendants within 10 days after the last date of entry of the Order and Judgment in the Actions, subject to the conditions set forth in the Stipulation of Settlement. Plaintiffs' counsel shall set aside in a Qualified Settlement Fund ten percent, or $2,738,000, of the fee award pending substantial completion of the administration of the Claim Review Process. Plaintiffs' counsel shall advise this Court when payments are made to Class Members in the Claim Review Process, and may draw down this final ten percent (plus any accumulated interest) at that time without further order of this Court. Lead Counsel, in its sole discretion, shall allocate and distribute this award of attorneys' fees and expenses among counsel for the Class.

17. **No Other Payments.** The preceding paragraph of this Order and Judgment covers, without limitation, any and all claims for attorneys' fees and expenses, costs or disbursements incurred by Co-Class Counsel or any other counsel representing Plaintiffs or Class Members, or incurred by Plaintiffs or the Class Members, or any of them, in connection with or related in any manner to the Actions, the settlement of the Actions, the administration of such settlement, and/or the Released Conduct except to the extent otherwise specified in this Order and Judgment and the Stipulation of Settlement.

18. **Modification of Settlement Agreement.** The Parties are hereby authorized, without needing further approval from this Court, to agree to and adopt such amendments to, and modifications and expansions of, the Settlement Agreement -- including without limitation, the Post-Settlement Mailing materials and the forms to be used in the Claim Review Process -- as are consistent with this Order and Judgment and do not limit the rights of Class Members under the Settlement Agreement.

19. **Retention of Jurisdiction.** This Court has jurisdiction to enter this Order and Judgment. Without in any way affecting the finality of this Order and Judgment, this Court expressly retains jurisdiction as to all matters relating to the administration, consummation, enforcement and interpretation of the Settlement Agreement and of this Order and Judgment, and for any other necessary purpose, including, without limitation,

(a) enforcing the terms and conditions of the Settlement Agreement and resolving any disputes, claims or causes of action that, in whole or in part, are related to or arise out of the Settlement Agreement, this Order and Judgment (including, without limitation, whether a person or entity is or is not a Class Member; whether claims or causes of action allegedly related to this case are or are not barred by this Order and Judgment, etc.);

(b) entering such additional Orders as may be necessary or appropriate to protect or effectuate this Order and Judgment approving the Settlement Agreement, dismissing all claims on the merits and with prejudice, and permanently enjoining

Class Members from initiating or pursuing related proceedings, or to ensure the fair and orderly administration of this settlement; and

(c) entering any other necessary or appropriate Orders to protect and effectuate this Court's retention of continuing jurisdiction;

*provided, however,* that nothing in this paragraph is intended to restrict the ability of the Parties to exercise their rights under paragraphs 7 and 18 above.

20. **No Admissions.** This Order and Judgment, and the Settlement Agreement (and any other document referred to here, or any action taken to carry out this Order and Judgment) shall not be used or construed as an admission or concession by the Defendants of any actual or potential fault, wrongdoing, liability or damages whatsoever, and shall not be used as any evidence or inference of any fault, wrongdoing, liability or damage against the Defendants. Entering into or carrying out the Settlement Agreement, and any negotiations or proceedings related to it, shall not be construed as, or deemed evidence of, an admission or concession by Defendants as to any actual or potential fault, wrongdoing, liability or damages and shall not be offered or received in evidence or used for impeachment in any action or proceeding against any party hereto in any court, administrative agency or other tribunal for any purpose whatsoever, except as evidence of the settlement or to enforce the provisions of this Order and Judgment and the Settlement Agreement; *provided, however,* that this Order and Judgment and the Settlement Agreement may be filed in any action against or by the Defendants or Releasees (as defined in the Stipulation of Settlement) to support a defense of *res judicata*, collateral estoppel, release,

waiver, good-faith settlement, judgment bar or reduction, full faith and credit, or any other theory of claim preclusion, issue preclusion or similar defense or counterclaim.

21. **Dismissal of Action.** The Action, including all individual and Class claims resolved in them, are hereby dismissed on the merits and with prejudice against Plaintiffs and all other Class Members, without fees or costs to any party except as otherwise provided in this Order and Judgment.

22. **Bond Requirement.** Any appeal of the orders and judgment of this Court in this action shall be conditioned upon the posting of a bond by the proposed appellant of $500,000.

SO ORDERED this 15TH day of MAY, 2001. LET THE JUDGMENT BE ENTERED ACCORDINGLY.

The Honorable David S. Doty
United States District Judge

# UNITED STATES DISTRICT COURT
# DISTRICT OF MINNESOTA

## CIVIL NOTICE

The purpose of this notice is to summarize the time limits for filing with the District Court Clerk's Office a Notice of Appeal to the Eighth Circuit Court of Appeals from a final decision of the District Court in a civil case.

> ***This is a summary only. For specific information on the time limits for filing a Notice of Appeal, review the applicable federal civil and appellate procedure rules and statutes.***

Rule 4(a) of the Federal Rules of Appellate Procedure (Fed. R. App. P.) requires that a Notice of Appeal be filed within:

1. Thirty days (60 days if the United States is a party) after the date of "entry of the judgment or order appealed from;" or

2. Thirty days (60 days if the United States is a party) after the date of entry of an order denying a timely motion for a new trial under Fed. R. Civ. P. 59; or

3. Thirty days (60 days if the United States is a party) after the date of entry of an order granting or denying a timely motion for judgment under Fed. R. Civ. P. 50(b), to amend or make additional findings of fact under Fed. R. Civ. P. 52(b), and/or to alter or amend the judgment under Fed. R. Civ. P. 59; or

4. Fourteen days after the date on which a previously timely Notice of Appeal was filed.

If a Notice of Appeal is not timely filed, a party in a civil case can move the District Court pursuant to Fed. R. App. P. 4(a)(5) to extend the time for filing a Notice of Appeal. This motion must be filed no later than 30 days after the period for filing a Notice of Appeal expires. If the motion is filed after the period for filing a Notice of Appeal expires, the party bringing the motion must give the opposing parties notice of it. The District Court may grant the motion, but only if excusable neglect or good cause is shown for failing to file a timely Notice of Appeal.

FORMS\APPEAL.NO CIV
Rev. August 11, 1995

# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

### Prehearing Conference Program

The United States Court of Appeals for the Eighth Circuit has established an early intervention Prehearing Conference Program. The purpose of the program is twofold: (1) to facilitate settlement discussions in civil cases by providing an impartial atmosphere for an open discussion of the case and alternative methods of disposition and (2) to promote the delineation of issues, early resolution of procedural problems, and effective administration of an appeal throughout the appellate process. See 8th Cir. R. 33A.

The program is directed by Mr. John Martin. Mr. Martin screens newly filed appeals based on information furnished by both appellants and appellees in the court's Appeal Information Forms A and B. Contact with counsel is by telephone and in personal conferences held in several cities throughout the Circuit. All communications with Mr. Martin are confidential. Counsel can openly discuss and evaluate the issues and explore alternatives in a non-adversarial setting without fear that the subsequent processing of the appeal or ultimate disposition of the case will be adversely affected by participation in the program.

Participation in the program is voluntary. However, the Court strongly encourages your participation and cooperation. Over the past twenty years, the program has enabled many appellate litigants to achieve mutually satisfactory resolution of certain issues or an overall settlement prior to progressing through all stages of the appellate process. Issue delineation enables counsel to focus only on those issues that need judicial resolution. The program has helped relieve the ever-increasing caseload confronting the Court, and it has also saved litigants and attorneys substantial amounts of time and money.

In order for the program to function effectively certain information <u>must</u> be provided at the initiation of the appeal. *Eighth Circuit Rule 3B directs each civil appellant to: (1) file a completed Appeal Information Form A with the Notice of Appeal at the time the Notice is filed with the District Court clerk and (2) forward a copy of the completed Form A and a copy of Appeal Information Form B to the appellee for completion.* Appellee may complete Form B and send it to the clerk of the Court of Appeals. If you have any questions about the Prehearing Conference Program or the Appeal Information Forms, please contact Mr. Martin at (314)-539-3669.

Forms A and B are available from the District Court clerk and the Court of Appeals clerk and can be found at the Court of Appeals' web site at: www.ca8.uscourts.gov

*June 1, 2000*

Forms/8thcircuitprehearingconf.wpd

# NASD DISPUTE RESOLUTION, INC.

| | |
|---|---|
| JOHN GAVULA and BEVERLY TANENHAUS,<br><br>Claimants,<br><br>vs.<br><br>AMERICAN EXPRESS FINANCIAL ADVISORS; AMERIPRISE FINANCIAL SERVICES, INC.; MEHTA, WITTMAN & JOSHI; AJAY MEHTA, and HEMA JOSHI,<br><br>Respondents. | NASD-DR No.<br><br>**STATEMENT OF CLAIM** |

John Gavula and Beverly Tanenhaus, a married couple with one son, had three straightforward investment goals: saving for their retirement and their son's education, protecting their principal, and maintaining liquid reserves to defray the tremendous costs of John Gavula's rare metastasized brain cancer. Claimants, who had no investment experience, entrusted their money to American Express Financial Advisors ("AEFA") and two of its Princeton, New Jersey registered representatives: Ajay Mehta and Hema Joshi of the firm Mehta, Wittman, & Joshi[1].

Mehta and Joshi promised to take care of the accounts personally and assured Claimants that they need not bother to monitor the accounts. Yet, when Mehta and Joshi were not completely ignoring Claimants' accounts, they were actively mismanaging them. Mehta and Joshi recommended patently unsuitable investments: variable annuities that locked Claimants' funds away behind surrender charges and IRS penalties and a Strategic Portfolio Services

[1] Following the events giving rise to this claim, American Express Financial Advisors spun-off from American Express and renamed itself "Ameriprise", the second named party to the suit. For simplicity, this Statement of Claim refers to this Respondent as "AEFA" throughout. Mehta, Wittman, & Joshi was formerly named Ajay Mehta and Associates.

Advantage Account ("SPS Advantage Account") combined with two additional equity funds[2], all of which were exposed to unsuitable stock market positions vulnerable to downturns in the market. Furthermore, Mehta and Joshi deliberately obscured and fraudulently misstated the nature of Claimants' investments, preventing Claimants from understanding their unsuitable recommendations. Through it all, AEFA failed to supervise its registered representatives, continuing a pattern of poor or non-existent supervision in its central New Jersey offices[3]. Ultimately, Respondents' mismanagement inflicted approximately $30,000 dollars of direct market losses on Claimants, even without including the 10% IRS withdrawal penalty and well-managed account opportunity losses. Moreover, the annuity death benefit, in addition to the withdrawal penalties, has pinned Claimants' annuities in their place: because the death benefit is many thousands of dollars higher than the current value of the annuities, Claimants cannot withdraw these funds without permanently locking in their losses.

Accordingly, Mr. Gavula and Ms. Tanenhaus now seek recovery of $45,000 in compensatory damages for the losses caused by AEFA and its registered representatives, as well as attorney fees, costs, interest, punitive damages and an order compelling AEFA to relinquish

---

[2] The New Dimensions and Diversified Equity funds.

[3] AEFA's failure to supervise Mehta, Wittman & Joshi is just another instance in a documented pattern. After an investigation conducted by the New Jersey Attorney General's office, AEFA and the State of New Jersey entered a consent order on June 25, 2005 in which AEFA agreed to pay $400,000 in restitution and a $5,000,000 civil fine. (Exhibit C, Consent Order Between AEFA and New Jersey Office of the Attorney General, Bureau of Securities). The investigation had revealed widespread problems in AEFA's central New Jersey offices, including: "weaknesses in the supervision of financial advisory services contracts"; "weaknesses in the surveillance of financial advisory services"; and "weaknesses in the selection process by which registered principals historically had been assigned and paid directly by financial advisors for supervision in New Jersey". Similarly, in a 2002 NASD Enforcement Action, *American Express Financial Advisors* (Case Number CAF-020057), AEFA was sanctioned because its registered representatives invested in variable annuities without explaining the costs and features to their customers – exactly what happened to Claimants. (Exhibit D, Abstract of Recent Enforcement Actions Involving Sale of Variable Annuities). Moreover, the NASD sanctioned AEFA for failing to establish, maintain, and enforce adequate supervisory policies and procedures governing the sale of annuities. AEFA submitted to a censure and a $350,000 fine. The full details of this settlement are not publicly available. Finally, in a class-action settlement entered in 2000 before the United States District Court for the District of Minnesota, AEFA provided policy replacement and compensatory relief to over two million annuity customers. *See Benacquisto v. American Express Financial Corp. et. al.*, No. 00-1980.

the remaining balance of their annuity sub-accounts without exacting the surrender charge and with an additional credit to offset the IRS withdrawal penalty.

## I. Respondents Recommended Four Patently Unsuitable Investments

Claimants invested their money with Respondents on two separate occasions: an initial investment in December 1998, used to purchase two unsuitable nine-year variable annuities and two mutual funds and John Gavula's retirement fund roll-over in August 2000, used to purchase a ten-year annuity and an unsuitable mutual fund portfolio composed entirely of equity funds, the SPS Advantage Account. (Exhibit A, Table of Investments and Losses). Respondents sat by and did nothing while the 1998 variable annuities lost approximately $4,000, the 1998 mutual funds lost a combined total of $1,100 and the May 2000 investments lost approximately $25,400 (Exhibit B, Year 2005 Account Statement). These direct losses amount to nearly 35% of the original investments.

Variable annuities are simply not suitable investments for any family in Claimants' position. Annuities carry a surrender charge and an IRS early withdrawal penalty, making them wholly inappropriate for a family who needs access to its money. John Gavula has long suffered from metastasized brain cancer. The family needed liquid reserves to defray the costs of his treatment, not thousands of dollars worth of illiquid investments, and certainly not long-term nine and ten-year annuities.

On the other hand, variable annuities running nine and ten years are a fine investment from the broker-dealer's and the registered representative's perspective. Both receive their commissions up front from the annuity or life insurance company. The surrender charges then allow the life insurance company to recoup those commissions by imposing a penalty that strongly discourages the customer from withdrawing the investments. These investments were

very suitable for Respondents -- guaranteeing substantial up-front commissions -- but they were not at all suitable for Claimants.

Similarly, the SPS Advantage Account, composed entirely of equity funds prone to market downturns, was not suitable for Claimants, particularly when combined with the New Dimensions and Diversified Equity funds. As they stressed to Respondents when they opened their accounts and frequently thereafter, neither Mr. Gavula nor Ms. Tanenhaus had any prior experience with investments. Claimants requested that Respondents properly advise them and monitor their accounts, and Respondents agreed to do so. Despite that promise, Respondents simply instructed Claimants to invest their money into the SPS Advantage Account without giving any advice and then ignored the account as it wasted away. Had Respondents properly advised Claimants, they would have insisted on more suitable bond funds or simply taken their money elsewhere.

## II. Respondents' Mismanagement of Claimants' Investments

Respondents mismanaged Claimants' accounts in several overlapping ways. They gave poor advice, no advice, or fraudulent advice to Claimants, they recommended unsuitable investments, and they promised to monitor Claimants' accounts but then let them waste away without even notifying Claimants that their investments were in trouble.

### *1. Respondents' Initial Flawed Recommendations and Failure to Properly Advise Claimants*

Following a friend's recommendation, Ms. Tanenhaus and Mr. Gavula met with Ajay Mehta and Hema Joshi, Mr. Mehta's niece, in late 1998 and early 1999. The firm charged a $500 fee for its financial planning services and recommendations, but was offering a promotional $100 discount at the time. However, when Ms. Joshi mentioned the $100 discount, Mr. Mehta

insisted that the fee was actually $600, thus neatly wiping out the firm's promotional discount. It was the first in a series of deceptions.

At these meetings, Claimants fully informed Respondents of their desire to generate income for retirement and provide for their son's education, their desire to preserve principal, and Mr. Gavula's precarious health. Claimants told Respondents that, because of Mr. Gavula's catastrophic illness, they wanted their assets invested prudently: accordingly, their account applications reflect a moderate risk preference. Furthermore, Claimants emphasized that, because they were unsophisticated investors and because of their frequent medical crises, they would rely heavily on Respondents' advice and management. (Exhibit E - Claimants' June 3, 2003 Letter to Joshi).

Respondents agreed to monitor the accounts. Ajay Mehta even instructed Claimants to ignore their account statements entirely, trusting Respondents to do the work. Mr. Mehta's expressed theory was that because Claimants were investing long-term, they should not worry about temporary fluctuations in the values of their investments. Instead, Mr. Mehta and Ms. Joshi would keep a watchful eye on the accounts.

Respondents violated the NASD "suitability rule" requiring registered representatives to explain the basic features and fees associated with variable annuities to their customers. *See* NASD Notice to Members 99-35. Mr. Mehta and Ms. Joshi missed all the key points. They did not explain the differences between equity funds, bond funds, variable annuities and variable life insurance. They did not explain the nature of surrender charges in variable annuities, nor that the IRS assesses a 10% tax penalty for withdrawals from variable annuities before the age of 59 1/2. They did not explain how the assets in a variable annuity are allocated across sub-accounts that

usually consist of mutual funds, nor the additional risk that this structure can entail when sub-accounts are not properly monitored.

The Financial Management proposal Mehta and Joshi prepared for Claimants did not include annuity prospectuses. Those were sent under separate cover at a later date, after Claimants had signed their applications. Respondents did not review the variable annuity contracts with Claimants and did not ask Claimants to sign the contracts. Mr. Mehta and Ms. Joshi simply urged Claimants to put nearly all of their money, approximately 75% of the initial investment, into two nine-year annuities without explaining anything about these investments. To the contrary, Claimants left their meetings thinking that Respondents had recommended a full portfolio of mutual funds, not annuities, and that their annuity sub-accounts were actually individual mutual fund holdings. Claimants were left completely in the dark.

Respondents then compounded these problems by instructing Claimants to select unsuitable sub-accounts. Initially, Respondents instructed Claimants to complete their applications with an initial allocation to bond fund sub-accounts. But in May 1999, shortly after the initial purchase, Respondents advised Claimants to move all of the sub-accounts from bond funds to more volatile equity funds. (Exhibit A). Those equity funds contained disproportionate numbers of high-risk emerging market and tech stocks.

Respondents never explained these investment moves to Claimants. They merely solicited the necessary authorizations while offering hazy or incomprehensible explanations of what was actually going on. For example, Ms. Joshi wrote Claimants a letter in May 1999 that explained her recommendations as follows:

> Reviewed current investment allocations within your Flexible Portfolio Annuities and discussed reallocating the funds during a downward trend in the market vs. entering all assets immediately. Discussed the pros and cons of waiting, specifically if the market

> does not correct or go down, this strategy will result in your purchasing investment at a higher cost. You expressed that you were comfortable with this approach.

(Exhibit F – Joshi's March 6, 1999 Letter to Claimants).

There is no investment "approach" described in this passage, only obfuscation. Claimants were "comfortable with this approach" only insofar as, at that time, they still trusted Respondents to properly advise them.

2. *Roll-Over of John Gavula's Retirement Account into Unsuitable and Overly Risky Investments*

By May of 2000, Mr. Gavula was again facing a medical crisis, including two major spinal surgeries to remove malignant tumors, and faced a deadline for the roll-over of a retirement fund he kept with his recently defunct employer. Claimants again turned to Mehta and Joshi, meeting with them at the end of May, 2000. At this meeting, Hema Joshi explicitly told Ms. Tanenhaus that her husband had to roll-over a substantial portion of his retirement fund into a variable annuity. Ms. Joshi did not just *recommend* a variable annuity; rather, she fraudulently stated that Claimants' were *obliged* to invest much of the roll-over funds into annuities. By so doing, Ms. Joshi opted once again for guaranteed commissions, this time under a ten-year annuity. Ms. Joshi then suggested that the remainder of the retirement funds go into the SPS Advantage Account, but did not explain that this account was not an annuity.

Although Ms. Joshi did explain annuity surrender charges at this meeting, she explained very little else, and her flawed advice once again violated NASD rules. Ms. Joshi did not explain the difference between annuities and mutual fund portfolios; she did not explain the IRS withdrawal penalty; she provided no prospectus until afterward; she did not explain the difference between bonds and equities or the difference between Class A and Class B mutual fund shares – Hema Joshi did not explain anything that might have helped Ms. Tanenhaus and

Mr. Gavula avoid her unsuitable recommendations. This combination of misrepresentation and omission ensured that Claimants would acquiesce in Respondents' plan; they thereafter opened the Retirement Advisor Variable Annuity and SPS Advantage Account in August 2000.

Once again, Ms. Joshi compounded her failure to properly advise Claimants by selecting inappropriate equity funds for the annuity sub-accounts and SPS Advantage portfolio, containing a disproportionate number of high-risk emerging market, telecommunications and tech stocks. (Exhibit A). Altogether, the August 2000 retirement fund rollover, combined with the original 1999 investments, produced an all-equity portfolio, horrendously exposed to the market, with the exception of a small cash reserve in a money market fund. That aggressive strategy was wholly inappropriate for a family who sought to preserve and grow income, with a moderate risk tolerance, and an overriding need for liquidity. Ms Joshi and Mr. Mehta then made matters worse by ignoring Claimants' accounts while the market depleted their savings, despite their oft-repeated promises to monitor the accounts.

*3. Respondents' Failure to Monitor Claimants' Accounts and Warn Them of Losses*

Respondents sat by and did nothing to prevent the wasting of Mr. Gavula's and Ms. Tanenhaus' assets. Claimants heard nothing from them while the investments dwindled. To the contrary, Claimants' friend, not Respondents, was the first to warn them that they should change their investment strategy to staunch the loss of money in their AEFA accounts.

On her own initiative, Ms. Tanenhaus then met with Ms. Joshi three times in March 2003. By then it was too late: roughly 40-45% of the family portfolio had been lost. (Exhibit A); (Exhibit E); (Exhibit H, Year 2003 Account Statement). Up to that point, the same Respondents who had told Claimants to ignore their account statements had recommended only one more trade: transferring the balance of one of the 1999 Flexible Portfolio Annuity sub-

accounts on July 13, 2001. (Exhibit A). Until Claimants took the initiative in March 2003, Respondents had, over the years, left only one telephone message and made absolutely no effort to contact Claimants in writing. As she later explained, Ms. Joshi was simply too busy to reach out to clients by letter. (Exhibit E).

Respondents did not even notify Claimants when several of their mutual funds were downgraded. And even after Claimants contacted them, Respondents' advice was absurdly simplistic: for example, although the Invesco Telecoms Fund had lost 80% of its original value, Ms. Joshi told Claimants not to make any changes, noting that "everybody needs telephones". (Exhibit E). Significantly, when Ms. Joshi responded to Ms. Tanenhaus' June 3, 2003 letter, she did not dispute this account of her facile approach to these investment recommendations. (Exhibit G – Joshi's June 5 Letter to Claimants).

*4. Respondents Induced Claimants Not to Immediately Terminate Their Accounts But Still Failed to Take any Corrective Measures*

At their March 2003 meeting, Ms. Joshi tried to deflect criticism by noting that all of Ms. Joshi's other clients -- and even Ms. Joshi herself -- had suffered similarly huge losses. (Exhibit E). Claimants decided to move the accounts to another firm. However, Ms. Joshi then, at last, fully explained that surrender charges of around 8%-10% of the account value based on the original investment amount, now greatly diminished, would apply if Claimants withdrew their annuities. Ms. Joshi did not distinguish between the annuities, which are subject to the surrender charge, and the SPS Advantage Account, which is not. Ms. Joshi also agreed to make changes to the mutual funds and annuity sub-accounts to stem the losses.

Faced with the surrender charges, Ms. Tanenhaus and Mr. Gavula decided to leave most of the accounts with Respondents. Yet Respondents did virtually nothing to mitigate the losses, liquidating two of the 1999 Flexible Portfolio Annuity sub-accounts and folding them over into

the remaining sub-accounts rather than seeking a fund that was actually making money. (Exhibit A); (Exhibit B). Moreover, Respondents completely deserted the larger 2000 Retirement Advisor Annuity -- by then reduced to nearly 50% its original value -- making no subsequent investment recommendations that had even the slightest chance of restoring the annuity to its original purchase value. Instead, Respondents simply liquidated each sub-account and transferred the proceeds into a single money market sub-account, which has accrued little interest since then. Accordingly, in the past three years, Claimants' accounts have mostly languished at their already depleted levels, while Respondents have prevented Claimants from moving their accounts somewhere else and while Respondents continued to draw their commissions.

Though Respondents compelled Claimants to preserve the annuity and SPS Advantage Account, Ms. Tanenhaus and Mr. Gavula decided to withdraw the money market account. Ms. Joshi insisted that Claimants leave some funds in the account so that she could deduct future transaction fees from the account. Ms. Joshi assured Claimants that the account would continue to accrue interest. However, Ms. Joshi concealed the fact that the monthly fees on the account would greatly exceed any interest, leading to monthly decreases in the account balance. By August 31, 2004 the account had dwindled to $185.67 from a balance of $377.37 (Exhibit I – AEFA Compliance Officer's December 9, 2004 Letter to Claimants) and it eventually reached a negative balance, which was deducted from the corpus of Claimants' investments, already vastly diminished by Respondents' mismanagement.

By letter dated September 24, 2004, Claimants contacted AEFA's Compliance Department to complain about Mehta's and Joshi's mismanagement and to demand relief. Claimants informed the Compliance Department that Respondents failed to explain their recommendations and investment products and failed to monitor the accounts as they had

promised. (Exhibit J – Claimants' September 24, 2004 Letter to Beth Weimer / AEFA Compliance Office). Claimants asked AEFA to relinquish the balance of funds in their unsuitable annuities without penalty and to restore their losses overall. (Exhibit J). AEFA offered them no remedy, and refused to waive the remaining surrender charges. Even now, AEFA refuses to relinquish the annuities, blaming Claimants for the decline in their investments. Claimants now seek recovery through this action.

## III. Legal Claims

### *1. Unsuitability*

Respondents recommended and sold to Claimants unsuitable securities. Investment suitability is a basic responsibility established by securities industry regulations, and is a natural product of fiduciary duty.

Under the NASD's "suitability rule", a broker recommending the purchase or sale of a security to a customer is required to have "reasonable grounds" for believing that the recommendation is suitable for such customer. NASD Conduct Rule 2310. Federal law likewise holds that a broker cannot recommend a security unless there is an adequate and reasonable basis for such recommendation. *See generally Hanley v. SEC.,* 415 F.2d 589, 597 (2d Cir. 1969). The suitability rule applies with greater force to the sale of variable annuities. *See* NASD Notice to Members 99-35.

Federal case law demonstrates that Respondent's recommendations were not suitable. For example, in *Praml v. Linsco/Private Ledger Corp.*, No. Civ. 05-581, 2005 WL 2290943, at *6-7 (D. Minn. Sep. 20, 2005) the court upheld an arbitration panel's findings that recommending total investment into annuities was not suitable. The broker-dealer's own compliance literature had stated that the investment of more than 30% of a portfolio into