annuities was not suitable. *Id.* at 6. Moreover, the representative had not fully disclosed the negative aspects of annuities. *Id.* These facts fully supported the finding that the representative had made unsuitable recommendations. *Id.*

Here, as in *Praml*, Respondents initially recommended that Claimants invest a disproportionate amount of their initial investment into annuities, with the exception of two mutual funds amounting to a quarter of the portfolio and an additional cash reserve. In 2000, when Claimants rolled-over John Gavula's retirement fund, Respondents again recommended an annuity plus the SPS Advantage Account. Roughly two-thirds of the portfolio was still locked into annuities, while the remaining third was concentrated in volatile equity funds. As in *Praml*, Respondents did not review the negative features of annuities with Claimants in advance of the purchase. Instead, Respondents disclosed the downsides in a piecemeal fashion and Claimants were only fully apprised of the features of annuities when their accounts had significantly declined.

Respondents had a duty to manage Claimants' accounts suitably and in a manner comporting with Claimants' objectives. They further had a duty to explain forthrightly the practical impact and risks of the transactions they recommended. They had a duty to explain the relevant features of variable annuities, such as surrender charges and tax penalties. Respondents failed to fulfill their duties.

2. *Breach of Fiduciary Duty*

Respondents had a fiduciary duty to exercise the utmost good faith in dealing with Claimants. *See Gilmour v. Bohmueller*, No. Civ.A 04-2535, 2005 WL 241181, at *10-11 (E.D. Pa. Jan. 27, 2005) (where a representative holds himself out as an expert to gain the trust of the purchaser, a fiduciary duty arises that the representative breaches by failing to disclose the

benefits and drawbacks of annuities); *Mihara v. Dean Witter & Co.*, 619 F.2d 814, 823-826 (9th Cir. 1980) (court upheld claim for breach of fiduciary duty for recommending unsuitable stocks); *Paine Webber, Inc. v. Voorhees*, 891 S.W.2d 126, 130 (Mo. 1995) (broker has a fiduciary duty to "manage the account as dictated by the customer's needs and objectives, to inform of risks in particular investments, to refrain from self-dealing, to follow order instructions, to disclose self-interest, to stay ahead of market changes and explain strategies.")

When the registered representative holds himself or herself out as an expert and promises to monitor accounts, a fiduciary duty attaches, even when the account is non-discretionary. *Pearce v. Duchesneau Group, Inc.*, No. 04-11409-NG (D. Mass. Sep. 8, 2005). For example, in *Pearce*, the plaintiff sought an adviser with expert qualifications to invest her retirement funds. To induce plaintiff to invest with their firm, defendant allegedly held himself as a knowledgeable and experienced investment advisor who could provide professional recommendations. Moreover, defendant promised that he would monitor the accounts and plaintiff relied on that representation when choosing him as an advisor. Thereafter, defendant failed to take any action as the accounts declined until plaintiff contacted them. Denying a motion to dismiss, the court held that these allegations, if proven, were sufficient to establish that defendant owed and breached a fiduciary duty.

Here, the financially unsophisticated Claimants, distracted by frequent medical crises, also sought expert advice to manage their retirement assets. As in *Pearce*, Respondents similarly promised to monitor Claimants' accounts and use their expertise to recommend changes. Respondents thus assumed a fiduciary duty, which they completely failed to discharge. Despite their assurances to Claimants, Respondents failed to monitor the account on an ongoing basis and, consequently, failed to advise Claimants how to adjust the accounts in response to changing

advantage of annuities is redundant (i.e. that most other investment products provide the same benefit) and that the issuer failed to engage in suitability determinations. *Id.* at 250-51. The court held that either omission, if proven, could constitute securities fraud under the Securities and Exchange Act of 1934 and SEC Rule 10b-5 if the plaintiffs were in fact misled by those omissions. *Id.* at 252-53.

Respondents' omissions are more severely misleading than those identified in *Cooper*. While the defendants in *Cooper* failed to disclose that the tax-deferral benefits of annuities are not unique, the Respondents here made no concerted attempt to explain *any* of the tax features of annuities, nor explain the surrender charges, until well after Claimants were first induced to purchase the annuities. Claimants reasonably relied upon Respondents representations and omissions, were induced to purchase securities and were thereby damaged, thus warranting an award of compensatory and punitive damages. *See also Praml*, 2005 WL 2290943 at *6-7 (upholding compensatory and punitive damages assessed in arbitration against a registered representative who misstated and "glossed over" the negative features of annuities).

*4. Negligence*

Taken in its best possible light, Respondents' conduct shows they acted with reckless disregard for the rights and welfare of Claimants and were negligent in failing to prevent the losses in the Claimants' holdings, and failed to act within the professional standards imposed upon them.

*5. Breach of Contract*

Respondents were obligated to provide Claimants with competent and professional services in accordance with applicable industry rules, regulations, customs and practices. They solicited and received their business by promising they would do so. Such obligations were

**WHEREFORE**, Claimants demand judgment against the Respondents jointly and severally as follows:

(a) Compensatory damages of $45,000;

(b) Declaratory and injunctive relief compelling Respondent Ameriprise to refund the full balance of Claimants' three annuities without imposing any surrender charge and with a credit for the IRS early withdrawal penalty, in the amount of 10% of the balance of each annuity upon liquidation;

(c) Punitive damages;

(d) Pre-judgment and post-judgment interest at the maximum rate allowed by law;

(e) Attorney's fees and costs associated with this proceeding; and

(f) Such other relief as the panel may deem equitable, just and necessary.

TRESSLER SODERSTROM MALONEY & PRIESS
744 Broad Street, Suite 1510
Newark, New Jersey 07102
(973) 848-2900
Attorneys for Claimants

Dated: May 22, 2006

By: ______________________
Michael J. Van Riper

**STATE OF MINNESOTA** **DISTRICT COURT**
**COUNTY OF HENNEPIN** **FOURTH JUDICIAL DISTRICT**

LESA BENACQUISTO, DANIEL BENACQUISTO, RICHARD THORESEN, ELIZABETH THORESEN, ARNOLD MORK, ISABELLA MORK, RONALD MELCHERT and SUSAN MELCHERT, on behalf of themselves and all others similarly situated,

Plaintiffs,

v.

AMERICAN EXPRESS FINANCIAL CORPORATION, AMERICAN EXPRESS FINANCIAL ADVISORS, AMERICAN CENTURION LIFE ASSURANCE COMPANY, AMERICAN ENTERPRISE LIFE INSURANCE COMPANY, AMERICAN PARTNERS LIFE INSURANCE COMPANY, IDS LIFE INSURANCE COMPANY, and IDS LIFE INSURANCE COMPANY OF NEW YORK,

Defendants.

Case No. 96-018477

(Consolidated Cases: 96-018477, 97-004742, 98-105681)

**UNITED STATES DISTRICT COURT**
**DISTRICT OF MINNESOTA**

LESA BENACQUISTO, DANIEL BENACQUISTO, RICHARD THORESEN, ELIZABETH THORESEN, ARNOLD MORK, ISABELLA MORK, RONALD MELCHERT and SUSAN MELCHERT, on behalf of themselves and all others similarly situated,

Plaintiffs,

v.

AMERICAN EXPRESS FINANCIAL CORPORATION, AMERICAN EXPRESS FINANCIAL ADVISORS, AMERICAN CENTURION LIFE ASSURANCE COMPANY, AMERICAN ENTERPRISE LIFE INSURANCE COMPANY, AMERICAN PARTNERS LIFE INSURANCE COMPANY, IDS LIFE INSURANCE COMPANY, and IDS LIFE INSURANCE COMPANY OF NEW YORK,

Defendants.

Civ Case No. 00-1980 DSD/JMM

# STIPULATION OF SETTLEMENT

# TABLE OF CONTENTS


| | | Page |
|---|---|---|
| I. | INTRODUCTION | 1 |
| II. | DEFINITIONS | 4 |
| III. | CERTIFICATION OF THE CLASS | 18 |
| IV. | SETTLEMENT RELIEF | 20 |
| V. | GENERAL RELIEF | 23 |
| | A. Accidental Death Benefit | 23 |
| | B. Research Initiative Regarding Terminated Policies and Annuities | 24 |
| VI. | INTERNAL REPLACEMENT RELIEF | 24 |
| | A. Procedures | 24 |
| | B. Available Relief | 25 |
| VII. | THE CLAIM REVIEW PROCESS | 28 |
| | A. Procedures | 28 |
| | B. Claim Categorization | 32 |
| | C. Review of the Claim | 32 |
| | D. Distribution of Relief Awarded in the Claim Review Process | 33 |
| | E. Payment of the Claim Evaluator Fees and Expenses | 34 |
| VIII. | DEFENDANTS' FUNDING OBLIGATIONS | 35 |
| | A. Establishing the Claim Review Relief Fund | 35 |
| | B. Funding Reverts upon Termination | 35 |
| IX. | NOTICE TO THE CLASS AND COMMUNICATIONS WITH CLASS MEMBERS | 35 |
| | A. Introduction | 35 |
| | B. Class Notice Package | 36 |
| | C. Publication Notice | 40 |
| | D. Post-Settlement Mailing | 40 |
| | E. Post-Mailing Reminder | 41 |
| | F. Retention of Administrator | 42 |
| | G. Toll-Free Telephone Number for Settlement Information | 44 |
| | H. Right of Communication with Claimants and Defendants' Customers | 46 |
| | I. Media Communications | 48 |
| | J. Defendants' Dealings with Producers | 48 |
| | K. Co-Class Counsels' Communication with Producers | 49 |
| | L. Co-Class Counsels' Administrative Responsibilities | 49 |

X. REQUESTS FOR EXCLUSION . . . . . 51

XI. OBJECTIONS TO SETTLEMENT . . . . . 51

XII. RELEASE AND WAIVER AND ORDER OF DISMISSAL . . . . . 53
A. Release and Waiver . . . . . 53
B. Release and Waiver -- Definitions . . . . . 56
C. Order of Dismissal . . . . . 59

XIII. ATTORNEYS' FEES AND EXPENSES . . . . . 59

XIV. ORDER OF NOTICE, SETTLEMENT HEARING AND ADMINISTRATION . . . . . 61

XV. FINAL APPROVAL AND FINAL ORDERS AND JUDGMENTS . . . . . 62

XVI. MODIFICATION OR TERMINATION OF THIS AGREEMENT . . . . . 62

XVII. GENERAL MATTERS AND RESERVATIONS . . . . . 65

**IT IS HEREBY STIPULATED AND AGREED**, by, between and among Lesa Benacquisto, Daniel Benacquisto, Arnold Mork, Isabella Mork, Ronald Melchert, Susan Melchert, Richard W. Thoresen and Elizabeth J. Thoresen (collectively, the "Plaintiffs"), on behalf of themselves and the Class defined below and through their duly authorized counsel, and IDS Life Insurance Company, IDS Life Insurance Company of New York, American Express Financial Corporation, American Centurion Life Assurance Company, American Enterprise Life Insurance Company, American Partners Life Insurance Company and American Express Financial Advisors (collectively, "Defendants"), through their duly authorized representatives, that the class action lawsuits entitled: Benacquisto, et al. v. American Express Financial Corporation, et al., No. 96-18477, pending before the Minnesota State Court for the County of Hennepin (together with the actions consolidated therewith, also filed in the Minnesota State Court for the County of Hennepin and entitled Mork, et al. v. IDS Life Insurance Company, et al., No. 97-04742, and Thoresen, et al. v. American Express Financial Corporation, et al., No. 98-015681), and Benacquisto, et al. v. American Express Financial Corporation, et al., No. 00-1980 DSD/JMM, pending before the United States District Court for the District of Minnesota (collectively, the "Actions"), are settled, compromised and dismissed on the merits and with prejudice, and the claims are released, on the terms and conditions set forth in this Stipulation of Settlement (the "Settlement Agreement" or "Agreement") and the Release set forth herein, subject to the approval of the Courts.

## I. INTRODUCTION

A. On or about December 13, 1996, plaintiffs in the action originally entitled Benacquisto, et al. v. IDS Life Insurance Company, et al., No. 96-18477, filed their complaint in the Minnesota State Court for the County of Hennepin. In that action, they asserted causes of

action for common law fraud, breach of fiduciary duty, negligent misrepresentation, fraudulent inducement, negligence, and violation of consumer fraud statutes in connection with defendants' replacement of cash value life insurance policies, on behalf of themselves and a class of consumers.

B. On or about March 21, 1997, plaintiffs in the action entitled Mork, et al. v. IDS Life Insurance Company, et al., No. 97-04742, filed their complaint in the Minnesota State Court for the County of Hennepin. In that action, they asserted causes of action for common law fraud, breach of fiduciary duty, negligent misrepresentation, fraudulent inducement, negligence and violation of consumer fraud statutes in connection with defendants' replacement of cash value life insurance policies and deferred annuity contracts, on behalf of themselves and a class of consumers. This action was consolidated with the Benacquisto action by court order.

C. On or about October 13, 1998, plaintiffs in the action entitled Thoresen, et al. v. American Express Financial Corporation, et al., No. 98-015681, filed their complaint in the Minnesota State Court for the County of Hennepin. In that action, they asserted causes of action for violation of the Minnesota Deceptive Trade Practices Act, false or misleading advertising, violation of the Minnesota Consumer Fraud Act, fraud, fraudulent concealment and deceit, breach of fiduciary duty/constructive fraud, negligent misrepresentation, negligence, negligence per se, unjust enrichment and imposition of constructive trust, declaratory and injunctive relief, and reformation in connection with defendants' sale of deferred annuities purchased to fund or constitute tax qualified retirement plans or arrangements established pursuant to Sections 401(a), 401(k), 403(a), 403(b), 408(a), 408(b), 408(k), 408(p), 408A or 457 of the Internal Revenue Code, on behalf of themselves and a class of consumers. On or about July 2, 1999, plaintiffs in that action filed an Amended Complaint asserting similar causes of action.

D. On or about August 29, 2000, the Minnesota State Court for the County of Hennepin entered an order consolidating the actions described in subsections B through C, above, into the action described in subsection A, above. These consolidated actions are referred to herein as the "State Court Action."

E. On or about September 1, 2000, plaintiffs in the State Court Action filed a Consolidated Complaint under the caption Benacquisto, et al. v. American Express Financial Corporation, No. 96-18477. In that Consolidated Complaint, plaintiffs assert claims relating to the marketing, sale, servicing, and administration of cash value life insurance policies and deferred annuity contracts issued and sold by Defendants.

F. On or about August 21, 2000, plaintiffs filed a complaint in the United States District Court for the District of Minnesota in an action entitled Benacquisto, et al. v. American Express Financial Corporation, et al., No. 00-1980 DSD/JMM (the "Federal Court Action"). In that action, they assert claims relating to the marketing, sale, servicing and administration of cash value life insurance policies and deferred annuity contracts issued and sold by Defendants.

G. Before commencing the Actions and throughout the pendency of the Actions, and during settlement negotiations, Plaintiffs' counsel and their professional consultants conducted a thorough examination and evaluation of the relevant law and facts to assess the merits of Plaintiffs' claims and potential claims and to determine how best to serve the interests of Plaintiffs and the Class, as defined below. In the course of their examination, Plaintiffs' counsel reviewed approximately 350,000 pages of documents produced by Defendants, deposed or interviewed 12 officers, employees and sales representatives of Defendants, and conducted other informal discovery of Defendants. In addition, Plaintiffs' counsel retained and consulted with experts

concerning the discovery conducted in this matter, the merits of Plaintiffs' claims and potential claims, alleged damages and the defenses raised by Defendants.

H. Based upon their discovery, investigation and evaluation of the facts and law relating to the matters alleged in the pleadings, and after reviewing this Agreement with their various consultants and experts, Plaintiffs and their counsel have agreed to settle the Actions pursuant to the provisions of this Agreement after considering, among other things: (i) the substantial benefits available to Plaintiffs and the Class under the terms of this Agreement, which are fair, reasonable and adequate, in the best interests of the Class, and fairly resolve the claims at issue; (ii) the attendant risks and uncertainty of litigation, especially in complex actions such as these, as well as the difficulties and delays inherent in such litigation; and (iii) the desirability of consummating this Agreement promptly to provide effective relief to Plaintiffs and the Class.

I. Defendants expressly deny any wrongdoing alleged in the Actions, and do not admit or concede that any facts or claims that have been or could have been alleged against them in the Actions have merit, would overcome their defenses, or would result in any determination of liability or damages. Without conceding any liability, wrongdoing or fault, and without admitting that any damages are recoverable or the amount of any damages that may have been incurred, Defendants consider it desirable for the Actions to be settled and dismissed because this settlement will (i) provide significant benefits to Defendants' present and former policy and annuity owners; and (ii) avoid the substantial expense, burdens and uncertainties associated with continued litigation of those claims.

## II. <u>DEFINITIONS</u>

As used in this Agreement and the annexed exhibits (which are an integral part of this Agreement and are incorporated in their entirety by reference), the following terms have the

following meanings, unless a section or subsection of this Agreement or its exhibits provides otherwise:

1. "Accidental Death Benefit" or "ADB" means the form of General Relief to be provided to Class Members as described in section V below.

2. "Actions" means the class action lawsuits entitled: Benacquisto, et al. v. American Express Financial Corporation, et al., No. 96-18477, pending before the Minnesota State Court for the County of Hennepin (together with the actions consolidated therewith, also filed in the Minnesota State Court for the County of Hennepin and entitled Mork, et al. v. IDS Life Insurance Company, et al., No. 97-04742, and Thoresen, et al. v. American Express Financial Corporation, et al., No. 98-015681), and Benacquisto, et al. v. American Express Financial Corporation, et al., No. 00-1980 DSD/JMM, pending before the United States District Court for the District of Minnesota.

3. "Administrator" means Rust Consulting of Minneapolis and Faribault, Minnesota or any other third-party administrator(s) whom Defendants shall retain to help implement the terms of this Agreement, upon consultation with Co-Class Counsel.

4. "Affinity Group" means (i) the Class Member, his or her spouse, parent or child (including a stepchild residing with the Class Member); and (ii) any person in whom the Class Member has an insurable interest.

5. "Agreement" or "Settlement Agreement" means this Stipulation of Settlement and the attached exhibits, including any subsequent amendments thereto and any exhibits to such amendments.

6. "Alternate Measuring Life" means, for purposes of any Accidental Death Benefit provided for in this settlement, a person designated on the Designation Form, as provided

herein, who is a member of the Class Member's (which, in the case of a participation interest in a Group Qualified Annuity, means the participant's) Affinity Group and is not the insured under the Policy or the annuitant under the Annuity making the Class Member eligible for relief.

7. "Alternate Payee" means such person as the Class Member (which, in the case of a participation interest in a Group Qualified Annuity, means the participant) may designate on the Designation Form, as provided herein, to receive the Accidental Death Benefit pursuant to the terms and conditions set forth below.

8. "Annuity" or "Annuities" means one or more fixed or variable deferred annuity contracts, including individual contracts, group contracts and participation interests in group contracts issued by any of the Defendants in the United States, including its territories and commonwealths, that was In Force at any time during the Class Period.

9. "Attorneys' Fees and Expenses" means such funds as may be awarded to Co-Class Counsel to compensate them and all other attorneys for Plaintiffs or Class Members in the Actions for their fees and expenses in connection with the Actions.

10. "Benefit Voucher" means the voucher to be included in the Class Notice Package, substantially in the form contained in the attached Exhibit B, entitling the Class Member to payment of the ADB upon Defendants' receipt of due proof of the qualifying death of the Measuring Life within the applicable period, as provided in this Agreement.

11. "Claim" means a claim by a Class Member or his or her representative timely submitted on the Claim Form (with any necessary attachments) for consideration pursuant to the Claim Review Process, as provided in this Agreement.

12. "Claim Categorization" means the assignment of a Claim to one or more Claim categories, as described in the attached Exhibit A.

13. "Claim Designation" means the scoring of a Claim by the Claim Evaluator pursuant to the attached Exhibit A.

14. "Claim Evaluator" means a person chosen by Co-Class Counsel who is responsible for Claim Review Administration, Claim Categorization, Claim Designation, and, where appropriate, awarding relief for Claims pursuant to the terms of this Agreement. The Claim Evaluator may retain assistants as are reasonably necessary to process Claims in an efficient and timely manner. Defendants may request that Co-Class Counsel remove the Claim Evaluator for financial or gross misconduct. Such request shall not be unreasonably denied. Co-Class Counsel may also remove the Claim Evaluator for any reason at any time. If the Claim Evaluator is removed, Co-Class Counsel shall choose another Claim Evaluator.

15. "Claim Evaluator Fees and Expenses" means the fees and expenses incurred by the Claim Evaluator in connection with carrying out his or her duties as provided in this Agreement.

16. "Claim File" means the file to be assembled for each Claim, as provided in this Agreement, for use in the Claim Review Process. The Claim File shall include (i) the Claim Form and all other materials submitted by the Claimant; (ii) the Customer File; (iii) any other information agreed to by the Parties; and (iv) any other information provided to the Claim Evaluator.

17. "Claim Form" means the form for Claimants to submit a Claim to the Claim Review Process, which shall be substantially in the form contained in the attached Exhibit H. Each Claim Form, in order to be included in the Claim Review Process, shall include a signed Claimant Oath.

18. "Claim Review Administration" means, with respect to each Claim submitted to the Claim Review Process, those administrative tasks to be completed after Defendants deliver the relevant Claim File to the Claim Evaluator, and includes, without limitation, the categorization, designation, and awarding of relief for that Claim.

19. The "Claim Review Process" means the procedures and process described in section VII to this Agreement and in the attached Exhibit A for the presentation, evaluation and resolution of Claims.

20. "Claim Review Relief Fund" means the total amount of $85 million, plus interest as described in this Agreement, available to provide relief to Claimants through the Claim Review Process.

21. "Claimant" means a Class Member, or the legal or authorized representative of a Class Member, who submits a Claim to the Claim Review Process. The legal or authorized representative of a Class Member who submits a Claim on a Class Member's behalf shall, in order for the Claim to be included in the Claim Review Process, include with the Claim Form any documentation supporting his or her authorization to act on the Class Member's behalf for this purpose.

22. "Claimant Oath" means the oath, signed by each Claimant, that appears at the conclusion of the Claim Form. Each oath shall state: "I swear under penalty of perjury that (i) the foregoing is true and correct; (ii) I submit herewith copies of all documents in my possession or control relating to the life insurance policy or deferred annuity contract that is the subject of my claim; and (iii) all such copies (if any) are authentic and unaltered copies of the original documents."

23. "Class" or "Class Member" means the persons or entities described in section III of this Agreement.

24. "Class Notice" means the legal notice of the terms of the proposed settlement included in the Class Notice Package.

25. "Class Notice Package" means the notice package, as approved in form and content by Co-Class Counsel and Defendants' Counsel and the Courts, and substantially in the form of the attached Exhibit B, to be provided to Class Members pursuant to section IX of this Agreement. Except as otherwise provided in section IX.B, below, the Class Notice Package shall include (i) a cover letter from Defendants; (ii) the Class Notice; (iii) one or more Election Forms (depending on the number of Policies or Annuities); (iv) one or more Designation Forms (depending on the number of Policies or Annuities); (v) one or more Statements of Eligibility (depending on the number of Policies or Annuities); (vi) a Benefit Voucher evidencing the relief to which the Class Member is entitled if the Class Member does not elect the Internal Replacement Relief or the Claim Review Process; (vii) a fact sheet for Qualified Plans (for Class Notice Packages sent to the Owners of Group Qualified Annuities); and (viii) a Plan Participant Information Sheet (for Class Notice Packages sent to persons or entities with participation interests in Group Qualified Annuities).

26. "Class Period" means that period beginning on January 1, 1985 and ending on February 29, 2000, inclusive.

27. "Co-Class Counsel" means the law firms of Milberg Weiss Bershad Hynes & Lerach LLP and Lockridge Grindal Nauen, P.L.L.P.

28. "Company" means IDS Life Insurance Company, IDS Life Insurance Company of New York, the American Express Company, American Express Financial

Corporation, American Express Financial Advisors, American Express Service Corporation, American Express Trust Company, American Centurion Life Assurance Company, American Enterprise Life Insurance Company and American Partners Life Insurance Company, collectively.

29. "Company Liaison" means a person appointed by the Defendants to serve as a liaison between the Claim Evaluator and the Defendants, as more particularly described in section VII.A.2 below.

30. "Corporate Office" means the headquarters of Defendants at 52 AXP Financial Center, Minneapolis, Minnesota and its administrative offices that provide administrative support functions for the operations of Defendants.

31. "Cost of Insurance Rate Band" means the premium or cost of insurance rate table assigned to a Policy based on the Policy Face Amount.

32. "Courts" means the Minnesota State Court for the County of Hennepin and the United States District Court for the District of Minnesota, where the Actions are pending.

33. "Customer File" means a file of information for each Policy or Annuity about which a Claim is timely submitted that shall include to the extent available from Defendants' records as maintained at the Corporate Office at the time the Customer File is created: (i) the Policy or Annuity Owner's (or the participant's, in the case of a Group Qualified Annuity) name, current address and social security number or tax identification number; (ii) the Policy or Annuity number; (iii) the Policy or Annuity plan code; (iv) the Policy Face Amount as of the Issue Date; (v) the Policy's or Annuity's Issue Date; (vi) the type of Qualified Plan being funded by a Qualified Annuity; (vii) the issue age and gender of the Policy's insured or the Annuity's annuitant; (viii) the Policy's or Annuity's termination date, if applicable; (ix) any Policy or Annuity surrender charge paid; (x) the Policy's scheduled premium, if applicable; (xi) the payment, loan and transaction

history and current values of the Policy or Annuity as of the Eligibility Date; (xii) to the extent available, the Policy's or Annuity's application file (excluding any medical underwriting); and (xiii) any summaries of complaints relating to the Policy or Annuity as electronically maintained by the Company's Client Relations area.

34. "Default Measuring Life" means, with respect to the ADB provided for in this Agreement, the insured under the applicable Policy or the annuitant under the applicable Annuity, except that, in the case of a participation interest in a Group Qualified Annuity, "Default Measuring Life" means the participant or, where applicable, the beneficiary of a deceased participant.

35. "Default Payee" means, with respect to the ADB provided for in this Agreement, the Owner of the applicable Policy or Annuity, except that in the case of a participation interest in a Group Qualified Annuity, "Default Payee" means the participant.

36. "Defendants" means IDS Life Insurance Company, IDS Life Insurance Company of New York, American Express Financial Corporation, American Centurion Life Assurance Company, American Enterprise Life Insurance Company, American Partners Life Insurance Company and American Express Financial Advisors, collectively.

37. "Defendants' Counsel" means the law firms of LeBoeuf, Lamb, Greene & MacRae, L.L.P. and Leonard, Street and Deinard, P.A.

38. "Designation Form" means the document substantially in the form attached as part of Exhibit B, one or more copies of which form (i) shall be included in the Class Notice Package; and (ii) may be used by Class Members to designate an Alternate Payee and/or an Alternate Measuring Life, pursuant to this Agreement.

39. "Election Form" means the document substantially in the form attached as part of Exhibit B, one or more copies of which will be included in the Class Notice Package and must be used by Class Members in electing Internal Replacement Relief or the Claim Review Process pursuant to sections VI and VII of this Agreement.

40. "Eligibility Date" means a date specified by the Company that is not more than 90 days before the date on which the Class Notice Package is first mailed, as provided in this Agreement.

41. "Execution Date" means the first date on which the Agreement has been executed by all of the undersigned.

42. "Fairness Hearing" means the hearing at or after which the Courts will make final decisions whether to approve this Agreement as fair, reasonable and adequate.

43. "Favorable Underwriting" means the underwriting requirements and guidelines ordinarily applied by Defendants, except that if the applicant is table rated for excess mortality risk, he or she will be charged cost of insurance charges at a rate two tables (or if rated at Table A, one table) less than his or her actual rating.

44. "Final Order and Judgment" means the order finally certifying the Class for settlement purposes only and approving the settlement and this Agreement, and the judgment entered pursuant to that order, as contemplated in section XV of this Agreement and substantially in the form attached as Exhibit F.

45. "Final Settlement Date" means the last date on which the Final Order and Judgment approving this Agreement becomes final. For purposes of this definition, the Final Order and Judgment shall become final: (i) if no appeal is taken therefrom, on the date on which the time to appeal therefrom has expired; (ii) if any appeal is taken therefrom, on the date on

which all appeals therefrom, including petitions for rehearing or reargument, petitions for rehearing en banc and petitions for certiorari or any other form of review, have been finally disposed of in a manner resulting in affirmance of the Final Order and Judgment; or (iii) on a date after entry of the Final Order and Judgment, which date counsel for the Parties agree to in writing.

46. "General Relief" means the benefits available to Class Members as more particularly described in section V.A of this Agreement.

47. "Group Qualified Annuity" means, for purposes of this Agreement only, a group Annuity that was purchased to fund or constitute all or part of a Qualified Plan, including all participation interests in such group deferred annuity contract.

48. "Hearing Order" means the order to be entered by the Courts concerning notice, administration and the Fairness Hearing, as contemplated in section XIV of this Agreement, and substantially in the form attached as Exhibit D.

49. "Implementation Date" means (i) for purposes of General Relief and Internal Replacement Relief, a date selected by Defendants, and communicated in writing to Co-Class Counsel, that is no more than 30 days after the Final Settlement Date; and (ii) for purposes of the Claim Review Process, the date Defendants first commence the Post-Settlement Mailing. Defendants shall use their best efforts to begin mailing the Post-Settlement Mailing no later than 30 days after the Final Settlement Date.

50. "In Force" means, for purposes of this Agreement only, that a Policy or Annuity has not lapsed, been surrendered, or otherwise terminated, and has not ceased to provide coverage due to the death of the insured or the annuitant. The term "In Force," for purposes of this Agreement only, does not include (i) a Policy providing coverage under a reduced paid-up

insurance non-forfeiture option or an extended term non-forfeiture option; or (ii) an Annuity that has been settled (*i.e.*, annuitized).

51. "Interest Rate" means interest, compounded quarterly, at the rate equal to ten basis points plus the coupon issue yield equivalent (as determined by the Secretary of the Treasury) of the average accepted auction price for the last auction of 52-week United States Treasury bills, or if more recent, the longest term United States Treasury bill of not less than 300 days in maturity at the auction settled immediately before the Fairness Hearing or, if the auction immediately preceding the Fairness Hearing does not include such bills, then at the most recent auction prior to the Fairness Hearing that includes United States Treasury bills of not less than 300 days in maturity.

52. "Internal Replacement," for purposes of the Internal Replacement Relief, means the use of the full cash or account value of one or more cash value life insurance policies (excluding graded premium whole life policies) that were issued by one of the Defendants, by means of a surrender or withdrawal of values from one or more such policies, in order to purchase within twelve months of such surrender or withdrawal a Policy or Policies issued by one of the Defendants. The term "Internal Replacement" shall not apply to transactions involving (i) such replacements where the policy owner is exercising a contractual change or conversion privilege; (ii) group term life insurance; (iii) term insurance; or (iv) such replacements where the policy owner is exercising an option under a binding or conditional receipt.

53. "Issue Date" means the "issue date" set forth on the Policy or Annuity.

54. "Lead Counsel" means the law firm of Milberg Weiss Bershad Hynes & Lerach LLP.

55. "Measuring Life" means the person upon whose qualifying death the ADB provided for in this Agreement will be paid, which person shall be the Default Measuring Life unless an Alternate Measuring Life is designated as provided herein.

56. "Owner" means the person or entity whose Social Security number or taxpayer identification number appears in Defendants' records as maintained at the Corporate Office as the identifying owner of the Policy or Annuity as of the Eligibility Date or, if earlier, the date of termination of the Policy or Annuity.

57. "Parties" or "Party" means Plaintiffs (in their individual and representative capacities) and/or Defendants, and, where applicable, their respective counsel.

58. "Payee" means the person to whom the ADB under this Agreement shall be paid. That person shall be the Default Payee unless an Alternate Payee is designated as provided herein; provided, however, that if the Default Payee and the Alternate Payee are deceased or cannot be paid for any reason, the Defendants may pay the ADB to any person named as the beneficiary of the Policy or Annuity, or if that person is deceased or cannot be paid for any reason, to any relative of the Class Member or Measuring Life by blood or marriage appearing to Defendants to be equitably entitled to such payment.

59. "Plaintiffs" means Lesa Benacquisto, Daniel Benacquisto, Arnold Mork, Isabella Mork, Ronald Melchert, Susan Melchert, Richard W. Thoresen and Elizabeth J. Thoresen, and any other Class Members who may subsequently be added as named plaintiffs, in their individual and representative capacities.

60. "Policy" or "Policies" means a cash value life insurance policy or policies issued by any of the Defendants pursuant to an individual sale in the United States, including its territories and commonwealths, during the Class Period.

61. "Policy Face Amount" means, for traditional policies, the face amount of the base policy, excluding any riders sold at issue. For variable or non-variable universal life policies, "Policy Face Amount" means the specified face amount of the policy, excluding any riders sold at issue.

62. "Post-Settlement Mailing" means the letter and Claim Form to be mailed to all Class Members who have timely elected the Claim Review Process.

63. "Proceeding" means any formal action or hearing commenced by written claim or process, whether conducted by a court or administrative agency, where there is an opportunity for appeal.

64. "Producer" means any of the Company's current or former advisors, producers, account representatives, sales representatives, sales agents, general agents, branch managers, brokers or solicitors, and any other person who engages or has engaged in the sale or distribution of the Defendants' cash value life insurance or deferred annuity products.

65. "Publication Notice" means the published summary of the Class Notice, including notice of the proposed settlement, the Fairness Hearing and the Class Members' exclusion and objection rights, as approved in form and content by the Courts, as described in section IX.C and substantially in the form of the attached Exhibit C.

66. "Qualified Annuity" means, for purposes of this Agreement only, an Annuity that was purchased to fund or constitute all or part of a Qualified Plan.

67. "Qualified Plan" means, for purposes of this Agreement only, a tax qualified retirement plan or arrangement pursuant to Sections 401(a), 401(k), 403(a), 403(b), 408(a), 408(b), 408(k), 408(p), 408A, or 457 of the Internal Revenue Code.

68. "Qualified Plan Representatives" means, for purposes of this Agreement only, all persons or entities who act or acted on behalf of the Qualified Plan and its participants and beneficiaries (with respect to the Qualified Plan), including but not limited to trustees, plan administrators and plan sponsors. Qualified Plan Representatives does not mean the Plaintiffs or the attorneys for Plaintiffs.

69. "Release" means the release and waiver set forth in section XII of this Agreement.

70. "Relief Tables" means the accompanying tables and schedules for use in connection with the General Relief and the Claim Review Process.

71. "Replaced Policy," for purposes of the Internal Replacement Relief, means a cash value life insurance policy, the values of which were used in order to purchase a Policy as described in the definition of "Internal Replacement" above.

72. "Statement of Eligibility" means a statement prepared by Defendants, and provided as part of the Class Notice Package, that includes: (i) the Class Member's name and address as reflected from Defendants' records as maintained at the Corporate Office; (ii) the identification number of each Policy or Annuity making the Class Member eligible for relief; (iii) the status of each Policy or Annuity as of the Eligibility Date; (iv) a statement of the form(s) of relief for which the Class Member may be eligible; (v) the Default Payee and Default Measuring Life, if any, for purposes of the ADB provided for in this Agreement; and (vi) the identity of any co-owner of record of each Policy or Annuity. The Statement of Eligibility will be substantially in the form included in the attached Exhibit B.

73. "Surrender Charge" means the charge provided for in certain life insurance policies or annuity contracts that is payable, unless waived, upon termination or partial surrender of such policy or annuity as set forth therein.

74. "Target Premium" is the amount of annual premium payment equal to the guideline level premium as defined in the Internal Revenue Code.

75. "Terminated" means, for purposes of this Agreement only, that a Policy or Annuity has lapsed, been surrendered or otherwise terminated, and has not been reinstated, including any Policy providing coverage under an extended term non-forfeiture option or a reduced paid-up insurance non-forfeiture option or any Annuity that has been settled (*i.e.*, annuitized).

76. "Underwriting Rate Class" means the class assigned to an individual insured person based on that person's use of tobacco, height, weight, medical history, occupation and avocations.

## III. <u>CERTIFICATION OF THE CLASS</u>

Promptly after execution of this Agreement, Co-Class Counsel shall apply to the Courts for, among other things, certification of the Class for purposes of satisfying the provisions of this Agreement. The Class shall consist of the following Class Members:

(A) All persons or entities who, as of the Eligibility Date, have or had (i) an ownership interest in a cash value life insurance policy issued by IDS Life Insurance Company ("IDS") or IDS Life Insurance Company of New York ("IDSNY") pursuant to an individual sale in the United States, including its territories and commonwealths, issued at any time during the Class Period; or (ii) an ownership interest in an individual deferred annuity contract or a participation or beneficial interest in a Group Qualified Annuity

issued by IDS, IDSNY, American Centurion Life Assurance Company, American Enterprise Life Insurance Company or American Partners Life Insurance Company in the United States, including its territories and commonwealths, that was In Force at any time during the Class Period; and (B) all Qualified Plans and Qualified Plan Representatives that purchased, owned, held or had any interest with respect to any Group Qualified Annuity. The Class does not include (i) any present officer, any former officer of grade 50 and above, or equivalent, or any financial advisor of Defendants; or (ii) any insurance company that owns or owned a Policy or Annuity pursuant to an absolute assignment effected as part of an exchange under Section 1035 of the Internal Revenue Code. Notwithstanding the foregoing, the Class shall not include (unless and to the extent such persons or entities are Class Members by virtue of their ownership interest in another Policy or Annuity) the following: (i) any persons or entities who make a timely election to be excluded from the proposed Class with respect to a particular Policy or Annuity otherwise included within the Class; (ii) any persons or entities who have an ownership interest in (a) a Policy that was terminated prior to the Eligibility Date due to the death of the insured and on which death benefits were paid; (b) an Annuity that was terminated prior to the Eligibility Date by reason of the death of the annuitant; (c) a Policy or Annuity that was issued, but not accepted or funded, or was returned to the issuer, as part of the exercise of a free look provision in the Policy or Annuity; (d) a Policy or Annuity that was rescinded as part of a reissue of a new life insurance policy or annuity contract, or because of a material misrepresentation on a Policy or Annuity application, or where the Policy or Annuity was rescinded and the premiums or other monies paid were returned to the Policy or Annuity owner; (e) a Policy or Annuity that is the subject of a release signed by any

person or entity while represented by counsel settling a claim or dispute and releasing the issuer from any further liability concerning such Policy or Annuity; (f) a life insurance policy that was a term life insurance policy or graded premium whole life insurance policy; (g) an annuity contract that was settled (*i.e.*, annuitized) prior to the inception of the Class Period; or (h) an annuity contract that was issued as an immediate annuity.

## IV. <u>SETTLEMENT RELIEF</u>

A. Pursuant to this Agreement, three alternative types of relief are being made available with respect to a Policy or Annuity (consistent with subsection C herein): General Relief, Internal Replacement Relief or the Claim Review Process. With respect to each applicable Policy or Annuity, a Class Member may either accept General Relief or elect one of the other available forms of relief, but in no case shall more than one form of relief be provided with respect to a particular Policy or Annuity. After making an election, except as provided for in sections VI.B.3 and VII.A.1.b.(1), a Class Member may not change that election at some later time.

B. A Class Member who wishes to elect the Internal Replacement Relief, if eligible, or the Claim Review Process with respect to a particular Policy or Annuity must submit an Election Form indicating the election for the particular form of relief no later than 30 days before the Fairness Hearing.

C. Except as provided otherwise in this paragraph and notwithstanding any other provision of this Agreement, where more than one person or entity has or had a current or prior ownership interest in a Policy or Annuity, all such persons and entities, including persons or entities who have or had a participation interest in a Group Qualified Annuity, shall be presumed to be acting jointly with the Policy's or Annuity's Owner in exercising any right and receiving any benefit created under this Agreement (including all exhibits hereto) with respect to that Policy or

Annuity, including the completion of any Election Form and/or Claim Form. Except with respect to Group Qualified Annuities, if any one person or entity excludes himself or herself from the Class with respect to a Policy or Annuity in which more than one person or entity has a current or prior ownership interest, then all persons and entities having a current or prior ownership interest in that Policy or Annuity will be deemed to be excluded with respect to that Policy or Annuity. The Owner of a Group Qualified Annuity may exclude all persons or entities with participation or ownership interests in a Group Qualified Annuity from the Class with respect to such participation or ownership interests, but may not exclude such persons or entities on an individual basis. A person or entity who has a current or prior participation interest in a Group Qualified Annuity may exclude himself or herself from the Class with respect to that participation interest. There shall be only one award of relief with respect to each Policy or Annuity, regardless of the number of Class Members with current or prior ownership interests therein. In the case of a Group Qualified Annuity, any election of remedies shall be made only by the Owner of such Annuity, and any award of relief will be made only to persons or entities holding the participation interests in the Group Qualified Annuity.

D. A Class Member who, for good cause shown, is unable to return an Election Form electing the Claim Review Process in a timely manner may, along with the Election Form, present the reason for the delay. The Claim Evaluator shall determine if an extension should be granted, whether based on hardship or other good cause shown. If the request for such extension is made within 30 days before the anticipated conclusion of the scoring process for all Claims, no extension shall be granted without the written consent of Defendants. Defendants or the Administrator will promptly provide such untimely Election Forms to the Claim Evaluator. Untimely Election Forms that are granted an extension as provided in this paragraph shall not be

counted as electing the Claim Review Process for purposes of determining the percentage set forth in section XVI.F, below, regardless of the election actually evidenced by such Election Form.

E. If Defendants determine that any particular form of relief provided under this Agreement could cause adverse consequences to the Class Member or to his or her Policy or Annuity, or if the provision of enhancements to the cash value of a Policy or Annuity in connection with the Internal Replacement Relief or the Claim Review Process will be unduly administratively burdensome for Defendants, Defendants may, in their sole discretion, provide the cash equivalent of any such relief. Nothing in this paragraph shall require Defendants to review or analyze the potential or actual consequences of any form of relief provided under this Agreement upon any Class Member, nor shall Defendants be liable for any such consequences.

F. If, under the terms of this Agreement, a Class Member is entitled to relief with respect to a Policy or Annuity that is In Force on the Implementation Date, but such Policy or Annuity becomes Terminated prior to the award of such relief, Defendants will provide the relief in the form that would have been available if the Policy or Annuity had been Terminated on the Implementation Date.

G. Defendants and Co-Class Counsel agree and warrant that they will act in good faith in overseeing and implementing this Settlement Agreement. Defendants agree and warrant that they will not utilize any extraordinary or exceptional accounting or actuarial principles to recapture from Policy and Annuity owners the costs of, or deprive Class Members of, the benefits provided in this Settlement Agreement. This provision shall not be construed to interfere with Defendants' conduct of their business in the ordinary course.

# V. GENERAL RELIEF

## A. Accidental Death Benefit

1. General Relief will automatically be provided for each Policy or Annuity for which Internal Replacement Relief or the Claim Review Process is not elected. The General Relief consists of the ADB. The ADB will commence on the Implementation Date.

2. The specific terms of the ADB are set forth in the Benefit Voucher. Among other things, those terms provide that the Payee shall receive upon Defendants' receipt of timely and due proof of the accidental death of the Measuring Life during the period beginning on the Implementation Date and continuing for up to three years thereafter, an amount provided in the Relief Tables. The estimated amount and duration of the ADB with respect to each Policy or Annuity will be set forth in the Benefit Voucher.

3. If the Default Measuring Life is deceased as of the Implementation Date, then prior to the Implementation Date (or within 30 days of the death of the Measuring Life, whichever is later), the Class Member (which, in the case of a participation interest in a Group Qualified Annuity, means the participant) or his or her estate must use the Designation Form to designate a member of the Class Member's Affinity Group as an Alternate Measuring Life for purposes of the ADB and provide written proof of the date of death of the Default Measuring Life.

4. At any time prior to payment of a claim under the ADB, the Class Member (which, in the case of a participation interest in a Group Qualified Annuity, means the participant) may designate an Alternate Payee by fully completing and submitting the Designation Form to be provided as part of the Class Notice Package.

5. The amount of the ADB will be adjusted after all Claims in the Claim

Review Process and all elections for the Internal Replacement Relief have been fully processed. The applicable ADB amounts will be adjusted proportionally, accounting for all Class Members receiving ADBs as part of the settlement, except as provided in section IV.A.10 of Exhibit A to this Agreement, such that the total actuarially determined value to Class Members of the ADB is equal to $100 million, based on comparable insurance rates in the open market.

B. Research Initiative Regarding Terminated Policies and Annuities

One year following the Implementation Date and then annually thereafter until the ADB provided for in this Agreement is no longer in effect, Defendants shall determine or cause to be determined, based on the Social Security numbers of the Measuring Lives with respect to all Terminated Policies and Annuities receiving General Relief, whether any Measuring Life has died since the Implementation Date. If the foregoing research reveals that any such person has died, Defendants will provide notice to the Payee at his or her last known address, as reflected in Defendants' records as maintained at the Corporate Office or as updated through the research initiative described in this paragraph, of the potential availability of the benefits provided for herein, regardless of whether the death of the Measuring Life was accidental.

## VI. INTERNAL REPLACEMENT RELIEF

A. Procedures

1. Class Members who were issued Policies as a result of an Internal Replacement may, under the circumstances set forth below, be eligible for (subject to confirmation by Defendants) and receive one of the forms of relief set forth below, whichever reasonably appears to have the highest value. To receive Internal Replacement Relief, a Class Member must have selected Internal Replacement Relief on the Election Form included in the Class Notice Package and timely returned the Election Form.

2. A Class Member who satisfies the eligibility criteria for the Internal Replacement Relief set forth in subsection B, below, shall nevertheless not be eligible for this form of relief if the applicable Internal Replacement was reversed without cost prior to the Eligibility Date.

B. Available Relief

1. A Class Member whose Policy was issued as the result of an Internal Replacement may, subject to confirmation by the Defendants, be eligible to elect Internal Replacement Relief and receive one form of relief as follows:

a. A Class Member who owns a Policy that is In Force on the Implementation Date and who paid a Surrender Charge(s) as the result of an Internal Replacement shall receive a contribution to the Policy's cash value, within 90 days of the Implementation Date, of 50% of the Surrender Charge(s) actually paid.

b. A Class Member who owned a Policy that is Terminated on the Implementation Date and who paid a Surrender Charge(s) as the result of an Internal Replacement shall receive a payment, to be sent within 90 days of the Implementation Date, of 50% of the Surrender Charge(s) actually paid.

c. A Class Member who owns a Policy that is In Force on the Implementation Date and who, as the result of an Internal Replacement, received a Policy with an Underwriting Rate Class that was higher than the Underwriting Rate Class of the Replaced Policy shall receive, effective for cost of insurance deductions beginning within 120 days after the Implementation Date, reinstatement of the original Underwriting Rate Class applicable to the Replaced Policy on that portion (up to 100%) of the Policy equal to the original face amount of the Replaced Policy.

d. A Class Member who owns a Policy that is In Force on the Implementation Date and who, as the result of an Internal Replacement, received a Policy with a lower face amount than the Replaced Policy such that the Policy is in a lower Cost of Insurance Rate Band (resulting in a higher cost of insurance deduction per $1000 of coverage) than the Replaced Policy shall receive, effective for the cost of insurance deductions beginning within 120 days after the Implementation Date, reinstatement of the original Cost of Insurance Rate Band applicable to the Replaced Policy.

e. A Class Member who owns a Policy that is In Force on the Implementation Date and who, as the result of an Internal Replacement, received the same product as the Replaced Policy in the same face amount and with the same Underwriting Rate Class as the Replaced Policy shall receive, within 90 days after the Implementation Date, a one-time 75 basis point bonus applicable to the Policy's cash value at the time of the replacement, which bonus will be credited to the Policy.

f. A Class Member who owns or owned a Policy that is Terminated on the Implementation Date and who, as the result of an Internal Replacement, (i) received a Policy with an Underwriting Rate Class that was higher than the Underwriting Rate Class of the Replaced Policy; (ii) received a Policy with a lower face amount than the Replaced Policy such that the Policy is in a lower Cost of Insurance Rate Band (resulting in a higher cost of insurance deduction per $1000 of coverage) than the Replaced Policy; and/or (iii) received the same product as the Replaced Policy in the same face amount and with the same Underwriting Rate Class as the Replaced Policy, shall be eligible, for a period starting on the Implementation Date and concluding 120 days thereafter, to apply for a new individual universal life or individual variable universal life insurance policy to be issued by one of the Defendants on the life of the Terminated Policy's

insured, with either a smoker or non-smoker classification, as applicable, with no less than the minimum policy issue amount, and with a face amount equal to or less than the face amount of the Policy, and to receive as a policy credit on such new policy a one-time bonus of 100 basis points on the premium payments (up to the amount of the Target Premium) received during the first year of that new policy, which policy credit is payable within 90 days after the end of the first year of such policy. The application for such new policy will be subject to Favorable Underwriting. If the insured under the Policy does not satisfy Favorable Underwriting and is therefore declined (or if he or she is deceased before the end of 90 days after the Implementation Date), the Class Member (or his or her estate) may, within 90 days of receiving notice that the application was declined, designate another person in his or her Affinity Group who may be named as the insured, subject to the same policy limits and Favorable Underwriting. If the designee described in the previous sentence does not satisfy Favorable Underwriting and is therefore declined, the Class Member may, within 90 days of receiving notice that the application was declined, designate another person in his or her Affinity Group who may be named as the insured, subject to the same policy limits and Favorable Underwriting.

2. Any relief to be awarded under the Internal Replacement Relief shall be reduced by any relief previously granted in favor of a Class Member as a result of a customer or insurance department complaint or inquiry or other claim or litigation involving an Internal Replacement and the applicable Policy.

3. In the event a Class Member who elects the Internal Replacement Relief is not eligible for such relief for the applicable Policy as set forth above, Defendants shall notify such Class Member of his or her ineligibility and provide that Class Member with the opportunity to elect the Claim Review Process or, if no such election is made within 45 days of such notice,

provide the Class Member with the General Relief. If a Class Member elects the Claim Review Process as set forth in this paragraph, that election shall not count as an election of the Claim Review Process for purposes of determining the percentage set forth in section XVI.F, below.

## VII. THE CLAIM REVIEW PROCESS

### A. Procedures

1. Claim Submission. Class Members who elect to forgo General Relief and Internal Replacement Relief with respect to a Policy or Annuity may submit a Claim based on that Policy or Annuity to the Claim Review Process. Claims submitted to the Claim Review Process shall be evaluated in accordance with this section and the attached Exhibit A; relief for such Claims, if any, shall be awarded in accordance with Exhibit A. Except as provided in this paragraph or Exhibit A, Class Members who submit an Election Form selecting the Claim Review Process with respect to a Policy or Annuity shall not be entitled to any form of General Relief or Internal Replacement Relief with respect to that Policy or Annuity.

a. To submit a Claim to the Claim Review Process, a Class Member must elect Claim Review on the Election Form included in the Class Notice Package and timely return the Election Form as provided herein.

b. Beginning on the Implementation Date, Defendants shall mail a Post-Settlement Mailing, including a Claim Form, to each Class Member who elected the Claim Review Process on a timely returned Election Form.

(1) The Claim Form sent to each such Class Member shall advise the Class Member that he or she shall have 60 days from Defendants' mailing of the Claim Form to submit a Claim by completing and returning the Claim Form. The Claim Form shall also advise the Class Member that he or she may choose not to submit a Claim Form, and that if he or

she does not timely submit a Claim Form, he or she will no longer be eligible for the Claim Review Process, but instead will receive the General Relief for which he or she would have been eligible had he or she not elected the Claim Review Process on the Election Form.

(2) Claimants shall retain the right to supplement their Claim Forms at any time prior to the scoring of their Claims. Any such supplementation shall not impose any unreasonable administrative burden on the Defendants. Each Claim submitted to the Claim Review Process must be made by means of a Claim Form executed with the Claimant Oath, that is completed to the best of the Claimant's ability, and shall include copies of all documents in the Claimant's possession or control relating to the Policy or Annuity that is the subject of the Claim, and any affidavits or other materials the Claimant wishes to submit.

(3) A Claimant's failure, without reasonable justification, to provide a completed Claim Form and all relevant documents in his or her possession or control may result in a default or adverse relief determination under the Claim Review Process.

c. A Class Member who, for good cause, is unable to return his or her Claim Form in a timely manner may present the reason for the delay and request additional time to file the Claim Form. If a Class Member seeks an extension of time to file a Claim Form, the Claim Evaluator shall determine if an extension shall be granted, whether based on hardship or other good cause shown. If the request for such extension is made within 30 days before the anticipated conclusion of the scoring process for all Claims, no extension shall be granted without the written consent of Defendants. Untimely Claim Forms that are granted an extension as provided in this paragraph shall not be counted as Claim Forms for purposes of determining the percentages set forth in section VII.E, below.

2. Defendants' Gathering of Certain Information

a. Upon receipt of a Claim Form from a Class Member, the Administrator shall provide Defendants with a copy of the Claim Form and copies of all documents submitted by the Class Member.

b. For each timely filed Claim Form, Defendants shall use their best efforts to assemble the Customer File and, at Defendants' expense, provide a Claim File to the Claim Evaluator as follows: (i) within 60 days after the date on which Claim Forms are due from Claimants for 30,000 timely filed Claim Forms received by Defendants; and (ii) within an additional 30 days thereafter for each additional 15,000 timely filed Claim Forms received by Defendants. For each Claim Form for which an extension has been granted pursuant to paragraph 1.c. of this subsection, Defendants shall use their best efforts to assemble the Customer File and, at Defendants' expense, provide a Claim File to the Claim Evaluator within 30 days of the date on which Defendants receive written notice from the Claim Evaluator that such Claim Form has been granted an extension, for the first 1,000 such Claim Forms, and within 30 additional days for each additional 1,000 such Claim Forms. The Claim Evaluator shall keep all information received from Defendants confidential.

c. Defendants shall designate a Company Liaison to serve at the Defendants' expense as a customer resource liaison to reasonably and promptly respond to (i) general requests from the Claim Evaluator for information that is reasonably necessary and appropriate with respect to the evaluation, designation and resolution of Claims submitted to the Claim Review Process and which can be easily obtained electronically from the Defendants' current computer systems; and (ii) individualized requests by the Claim Evaluator for information and other assistance with respect to particular Policies or Annuities about which Claims have been

made that are reasonably necessary and appropriate with respect to the evaluation, designation and resolution of Claims submitted to the Claim Review Process, including, but not limited to, specific complaint files relating to a Claimant's Claim. This provision shall not permit the Claim Evaluator to shift any of his or her obligations to the Company or the Company Liaison.

d. In addition to providing the Claim File for each Claim, as provided above, Defendants shall provide the Claim Evaluator with the following information: (i) the product trade names that correspond to the Policy and Annuity plan codes referenced in the Customer Files; (ii) insofar as it is electronically maintained at the Corporate Office, the disciplinary histories of the advisors who sold Policies and Annuities that are the subject of Claims in the Claim Review Process to the extent such histories relate to the sale of Policies and Annuities; and (iii) for each advisor who sold Policies and Annuities that are the subject of Claims in the Claim Review Process, the number of replacements resulting in the issuance of Policies or Annuities performed by such advisor, insofar as such data is electronically maintained at the Corporate Office.

e. Nothing contained in this Agreement or in Exhibit A hereto shall be construed to require the Claim Evaluator to obtain any information that is not contained in the Claim File, or to undertake any analysis or perform any services beyond those which the Claim Evaluator deems necessary, in his or her discretion, to implement the provisions of Exhibit A.

f. Nothing contained in this Agreement or in the attached Exhibit A shall be construed to require Defendants to provide any information to the Claim Evaluator other than the Claim File and the materials specified in subparagraph c and d, above.

g. All such information, and all other information provided to Plaintiffs, to Co-Class Counsel, to any individual Class Member or counsel for any Class Member,

or to the Claim Evaluator regarding Policy and Annuity owners, Class Members, and present or former advisors, employees or representatives, as well as any procedures of Defendants disclosed to any of the foregoing in connection with implementing the terms of this Agreement, constitute trade secrets and highly confidential and proprietary business information which shall be deemed "Confidential" pursuant to the stipulated Protective Order Regarding Use and Disclosure of Confidential Information, entered on March 1, 2000 in the State Court Action, and the Stipulated Protective Order Regarding Use and Disclosure of Confidential Information entered in the Federal Court Action, and shall be subject to all of the provisions thereof.

3. Nothing herein shall make the Defendants liable or otherwise responsible for any acts or omissions by the Claim Evaluator or his or her agents, including, without limitation, the Claim Evaluator's categorization and designation of Claims.

B. Claim Categorization

1. Based solely upon his or her review of the Claim File and in accordance with the attached Exhibit A, the Claim Evaluator shall determine the Claim category or categories applicable to the Claim.

2. Any decision by the Claim Evaluator regarding the categorization of a Claim shall be final and binding.

3. In no event shall more than one form of relief be awarded for a single Policy or Annuity, nor shall there be duplicative relief for a single Policy or Annuity.

C. Review of the Claim

1. For each Claim that the Claim Evaluator has categorized, the Claim Evaluator shall determine, based upon his or her review of the Claim File and in accordance with the attached Exhibit A, (i) the Claim Designation or Designations applicable to the Claim in each

applicable Claim category; and (ii) the relief for the Claim, if any, that takes into account, among other things, the nature and strength of the Claim and the damages incurred because of the alleged misrepresentation(s) or other alleged wrongdoing.

2. The Claim Evaluator shall use his or her reasonable best efforts (i) to complete review of each Claim within 150 days of his or her receipt of the Claim File; and (ii) to complete the Claim Review Process within 180 days of his or her receipt of the last Claim File delivered with respect to a timely filed Claim Form.

3. The Claim Evaluator shall not contact any Producer except with Co-Class Counsel and Defendants' counsel, as provided in section IX.K herein.

4. Any final scoring of Claims and/or award of relief in the Claim Review Process by the Claim Evaluator shall be final and binding, subject to the provisions of the attached Exhibit A. Defendants, the Claimant, Class Members, Co-Class Counsel, Defendants' Counsel, the successors or assigns of any of the foregoing, and any other party in interest, are prohibited from seeking review or in any other way challenging in any forum whatsoever, including in a judicial proceeding or an arbitration, a decision or award of relief, if any, pursuant to the foregoing provisions and the attached Exhibit A.

D. <u>Distribution of Relief Awarded in the Claim Review Process</u>

1. The relief provided as a result of the Claim Review Process shall be paid for from the Claim Review Relief Fund, which will have an aggregate cash value of $85 million. Defendants shall have no obligation to provide any money in excess of $85 million, plus any interest as provided in section VIII.A, to the Claim Review Relief Fund for any reason.

2. After the Claim Evaluator has scored all Claims received in the Claim Review Process, he or she shall make a preliminary determination of the appropriate relief for

those Claims pursuant to the procedures described in the attached Exhibit A. If, based on the Claim Evaluator's determinations, the aggregate preliminary awards in the Claim Review Process would exceed the Claim Review Relief Fund, together with any available interest accrued thereon in accordance with section VIII.A, then the Claim Evaluator shall reduce all final awards from the Claim Review Relief Fund pursuant to the formula described in the attached Exhibit A.

3. If, based on the Claim Evaluator's determination, the value of the aggregate preliminary awards in the Claim Review Process is less than the Claim Review Relief Fund, together with any available interest accrued thereon in accordance with section VIII.A, then the relief available to Class Members will be increased as provided in the attached Exhibit A.

E. Payment of the Claim Evaluator Fees and Expenses

Within 10 days after the last date of entry of the Final Order and Judgment, the Defendants shall make a payment of $2 million to Lead Counsel which shall be applied by Lead Counsel to pay the Claim Evaluator Fees and Expenses. If Claim Forms are timely submitted with respect to Policies and Annuities amounting to more than two percent (2%) of the total number of all Policies and Annuities (counting each participation interest in a Group Qualified Annuity separately), then the Defendants shall pay to Lead Counsel an additional amount up to a total of $1 million, which shall be applied by Lead Counsel to pay the Claim Evaluator Fees and Expenses. This additional amount will be paid in increments as follows: $100,000 for each full tenth of one percent (0.1%) of the total number of Policies and Annuities by which the number of Policies and Annuities for which Claim Forms are timely submitted exceeds two percent (2%) of the total number of Policies and Annuities; provided, however, that the additional amount to be paid by Defendants to be applied toward the Claim Evaluator Fees and Expenses shall in no event exceed $1 million, and the total amount paid by Defendants for the Claim Evaluator Fees and