**UNITED STATES DISTRICT COURT**
**DISTRICT OF MINNESOTA**

LESA BENACQUISTO, DANIEL BENACQUISTO, RICHARD THORESEN, ELIZABETH THORESEN, ARNOLD MORK, ISABELLA MORK, RONALD MELCHERT and SUSAN MELCHERT, on behalf of themselves and all others similarly situated,

Plaintiffs,

v.

AMERICAN EXPRESS FINANCIAL CORPORATION, AMERICAN EXPRESS FINANCIAL ADVISORS, AMERICAN CENTURION LIFE ASSURANCE COMPANY, AMERICAN ENTERPRISE LIFE INSURANCE COMPANY, AMERICAN PARTNERS LIFE INSURANCE COMPANY, IDS LIFE INSURANCE COMPANY, and IDS LIFE INSURANCE COMPANY OF NEW YORK,

Defendants.

Case No. 00-1980 DSD/JMM

**FINAL ORDER AND JUDGMENT APPROVING CLASS ACTION SETTLEMENT AND DISMISSING COMPLAINT**

WHEREAS plaintiffs and defendants entered into a Stipulation of Settlement, with exhibits (collectively, the "Settlement Agreement"), dated September 18, 2000, to settle this class action litigation; and

WHEREAS on October 2, 2000, this Court and the Minnesota State Court for the County of Hennepin jointly entered an Order (the "Hearing Order") preliminarily certifying the putative class in this Action for settlement purposes under Minn. R. Civ. P. 23.01, 23.02(c), and 23.03(b) and Fed. R. Civ. P. 23(a), 23(b)(3), and 23(c)(2), ordering individual and publication notice to potential class members, scheduling a Fairness Hearing for March 6, 2001, and providing those persons with an opportunity either to exclude themselves from the settlement class or object to the proposed settlement; and

FILED 5-15-01
FRANCIS E. DOSAL, CLERK
Judgment Ent'd 5-15-01
Deputy Clerk's Initials ____

WHEREAS this Court and the Minnesota State Court for the County of Hennepin jointly held a Fairness Hearing on March 6, 2001 to determine whether to give final approval to the proposed settlement; and

WHEREAS this Court has issued Findings of Fact and Conclusions of Law Concering Class Action Settlement, dated MAY 15, 2001, granting final certification of the settlement class, approving the proposed settlement, and dismissing the settlement class members' claims (among other things); now, therefore,

Based on the submissions of the Parties and Class Members, on the evidence adduced at the Fairness Hearing, and on this Court's Findings of Fact and Conclusions of Law dated MAY 15, 2001, it is hereby **ORDERED, ADJUDGED AND DECREED** as follows:

1. **Incorporation of Other Documents.** This Order and Judgment Approving Class Action Settlement incorporates and makes a part hereof:

(a) the Stipulation of Settlement dated September 18, 2000, and filed with the Courts on September 18, 2000 (the "Stipulation of Settlement");

(b) the following exhibits to the Stipulation of Settlement: (i) Exhibit A (Guidelines for Determining, Scoring and Awarding Relief in the Claim Review Process); (ii) Exhibit B (Class Notice Package); (iii) Exhibit C (Publication Notice); (iv) Exhibit D (Proposed Hearing Order); (v) Exhibit E (Confidentiality Agreement); (vi) Exhibit G (Statement to Accompany Post-Execution Date Responses to Customer Complaints); (vii) Exhibit H (Post-Settlement Claim Form Mailing); (viii) Exhibit I

(Post-Mailing Reminder); and (ix) Exhibit J (Claim Review Administrative Forms and Letters); and

(c) the Affidavit of Jeffrey D. Dahl, sworn to February 23, 2001, Exhibit __ to this Order and Judgment (describing the Class Notice Package, its distribution to Class Members, and the Publication Notice).

2. **Jurisdiction.** This Court has personal jurisdiction over all Class Members (as defined below) and has subject matter jurisdiction over this Action and all claims and causes of action resolved by this settlement, including all the Claims and Causes of Action referred to in the Release. Accordingly, this Court has jurisdiction to approve the proposed settlement, grant final certification of the Class, release Claims and Causes of Action as set forth in the Release, and dismiss this Action on the merits and with prejudice.

3. **Final Class Certification.** The Class that was previously certified preliminarily is hereby finally certified for settlement purposes under Fed. R. Civ. P. 23(a), 23(b)(3), and 23(c)(2). The Class consists of (A) All persons or entities who, as of the Eligibility Date, have or had (i) an ownership interest in a cash value life insurance policy issued by IDS Life Insurance Company ("IDS") or IDS Life Insurance Company of New York ("IDSNY") pursuant to an individual sale in the United States, including its territories and commonwealths, issued at any time during the Class Period; or (ii) an ownership interest in an individual deferred annuity contract or a participation interest in a Group Qualified Annuity issued by IDS, IDSNY, American Centurion Life Assurance Company, American Enterprise Life Insurance Company or American Partners Life Insurance Company in the United States, including its territories and

commonwealths, that was in force at any time during the Class Period; and (B) all Qualified Plans and Qualified Plan Representatives that purchased, owned, held or had any interest with respect to any Group Qualified Annuity. The Class does not include (i) any present officer, any former officer of grade 50 and above, or equivalent, or any financial advisor of Defendants; or (ii) any insurance company that owns or owned a Policy or Annuity pursuant to an absolute assignment effected as part of an exchange under Section 1035 of the Internal Revenue Code.

Notwithstanding the foregoing, the Class shall not include (unless and to the extent such persons or entities are Class Members by virtue of their ownership interest in another Policy or Annuity) the following: (i) any persons or entities who make a timely election to be excluded from the proposed Class with respect to a particular Policy or Annuity otherwise included within the Class; (ii) any persons or entities who have an ownership interest in (a) a Policy that was terminated prior to the Eligibility Date due to the death of the insured and on which death benefits were paid; (b) an Annuity that was terminated prior to the Eligibility Date by reason of the death of the annuitant; (c) a Policy or Annuity that was issued, but not accepted or funded, or was returned to the issuer, as part of the exercise of a free look provision in the Policy or Annuity; (d) a Policy or Annuity that was rescinded as part of a reissue of a new life insurance policy or annuity contract, or because of a material misrepresentation on a Policy or Annuity application, or where the Policy or Annuity was rescinded and the premiums or other monies paid were returned to the Policy or Annuity owner; (e) a Policy or Annuity that is the subject of a release signed by any person or entity while represented by counsel settling a claim or dispute and releasing the issuer from any further liability concerning such Policy or Annuity; (f) a life insurance policy that was a term life

insurance policy or graded premium whole life insurance policy; (g) an annuity contract that was settled (*i.e.*, annuitized) prior to the inception of the Class Period; or (h) an annuity contract that was issued as an immediate annuity. A list of those persons who have validly excluded themselves from the Class, and who therefore are not bound by this Order and Judgment, is on file with this Court as Plaintiffs' and Defendants' Joint Submission of Exclusions From Class, dated March 21, 2001, and is incorporated herein and made a part hereof. A small number of requests for exclusion were deficient and subject to "cure" letters. The Parties will supplement their submission once those outstanding issues are resolved.

4. **Appointment of Co-Class Counsel and Lead Counsel and Adequacy of Representation.** The law firms of Milberg Weiss Bershad Hynes & Lerach LLP and Lockridge Grindal Nauen, P.L.L.P. are hereby appointed Co-Class Counsel; the law firm of Milberg Weiss Bershad Hynes & Lerach LLP is hereby appointed Lead Counsel; and the Class representatives have fully and adequately represented the Class for purposes of entering into and implementing the settlement and have satisfied the requirements of Fed. R. Civ. P. 23(a)(4).

5. **Class Notice.** Notice was provided to the Class in accordance with the Hearing Order. Individual notice was sent by first-class mail, postage prepaid, to the last known address of the Policy and Annuity Owners and, in the case of a Group Qualified Annuity, to persons or entities who hold or held a participation interest in the Group Qualified Annuity, all as reflected by Defendants' records as maintained at the Corporate Office or by the results of any searches performed by a vendor hired by Defendants to update addresses of such persons or entities. In cases of pending litigation against the Defendants, notice was also mailed to any legal

counsel known to represent the Class Member. Also in accordance with the Hearing Order, publication notice was published and notice was posted on the internet at the web sites for Defendants and Co-Class Counsel. This Court finds that the notice outlined above:

(a) constituted the best practicable notice to Class Members under the circumstances of this Action;

(b) was reasonably calculated, under the circumstances, to apprise Class Members of (i) the pendency of this class action; (ii) their right to exclude themselves from the Class and the proposed settlement; (iii) their right to object to any aspect of the proposed settlement (including final certification of the settlement class, the fairness, reasonableness or adequacy of the proposed settlement, the adequacy of the Class' representation by Plaintiffs or Plaintiffs' counsel, and/or the award of attorneys' fees); (iv) their right to appear at the Fairness Hearing -- either on their own or through counsel hired at their own expense — if they did not exclude themselves from the Class; and (v) the binding effect of the Order and Judgment in this Action, whether favorable or unfavorable, on all persons who do not request exclusion from the Class;

(c) was reasonable and constituted due, adequate and sufficient notice to all persons entitled to be provided with notice; and

(d) fully satisfied the requirements of the Federal Rules of Civil Procedure (including Fed. R. Civ. P. 23(c)(2) and (e)), the United States Constitution (including the Due Process Clause), the Rules of this Court, and any other applicable law.

6 **Final Settlement Approval.** The terms and provisions of the Settlement Agreement, including all exhibits, have been entered into in good faith and are hereby fully and finally approved as fair, reasonable and adequate as to, and in the best interests of, each of the Parties and the Class Members, and in full compliance with all applicable requirements of the Federal Rules of Civil Procedure, the United States Constitution (including the Due Process Clause), and any other applicable law. The Parties and Class Members are hereby directed to implement and consummate the Settlement Agreement according to its terms and provisions.

7. **Early Implementation.** The Defendants are hereby authorized, in their sole discretion but in consultation with Co-Class Counsel, and without requiring further approval of this Court, to implement the settlement before the Final Settlement Date (as defined in the Settlement Agreement), in which case all provisions in the Settlement Agreement specifying actions to be taken on or after the Final Settlement Date shall, to the extent necessary, be deemed to provide that those actions shall be taken on or after the date the Defendants elect to implement the settlement.

8. **Appeal After Early Implementation.** If the Defendants choose to exercise their discretion to implement the settlement before the Final Settlement Date, anyone seeking to appeal from this Court's rulings must first (i) request to intervene upon a representation of inadequacy of counsel; (ii) request a stay of implementation of the settlement; and (iii) post an appropriate bond. Unless a would-be appellant satisfies all three of these requirements, the Defendants are authorized to implement the settlement before the Final Settlement Date even if such implementation would moot any appeal.

9. **Post-Settlement Mailing**. The Parties are hereby directed to mail the Post-Settlement Mailing materials substantially in the form attached as Exhibit H to the Settlement Agreement, as provided by the Stipulation of Settlement.

10. **Securities Registration Not Required.** This Court hereby confirms that, to the extent that any rights provided under this settlement (including but not limited to the right to designate another person as eligible to receive the ADB under the Settlement Agreement) might be deemed to be a security under section 3(a)(10) of the Securities Act of 1933, as amended, registration of any such right would not be required by virtue of this Court's approval of the settlement.

11. **No Tax Advice Being Given.** This Court hereby confirms that the Parties and their counsel are not making any representations or providing any opinions or advice concerning the tax consequences of the proposed settlement or the election of any remedies under the settlement to individual Class Members, and the Parties and their counsel shall not be held liable for any tax consequences or elections.

12. **Binding Effect.** The terms of the Settlement Agreement and of this Order and Judgment shall be forever binding on Plaintiffs and all other Class Members, as well as their heirs, executors and administrators, successors, assigns, guardians, attorneys, trustees, and representatives, and those terms shall have *res judicata* and other preclusive effect in all pending and future claims, lawsuits or other proceedings maintained by or on behalf of any such persons, to the extent those claims, lawsuits or other proceedings involve matters that were or could have been raised in the Action or are otherwise encompassed by the Release.

13. **Release.** The following Release, which is also set forth in Section XII of the Stipulation of Settlement, is expressly incorporated herein in all respects, is effective as of the Final Settlement Date, and forever discharges the Releasees from any Claims or Causes of Action that arise from or relate to the Released Conduct:

A. Release and Waiver

1. In consideration for the relief set forth in this Agreement, Plaintiffs and all other Releasors (defined below) shall, as of the Final Settlement Date, release, acquit and forever discharge the Releasees (defined below) from any and all past or present Claims and Causes of Action (defined below) that are based upon, related to, or connected with, directly or indirectly, in whole or in part: (a) the allegations, facts or subjects set forth or otherwise raised in Benacquisto, et al. v. American Express Financial Corporation, et al., No. 96-18477, pending before the Minnesota State Court for the County of Hennepin (together with the actions consolidated therewith, also filed in the Minnesota State Court for the County of Hennepin and entitled Mork, et al. v. IDS Life Insurance Company, et al., No. 97-04742, and Thoresen, et al. v. American Express Financial Corporation, et al., No. 98-015681) and/or Benacquisto, et al. v. American Express Financial Corporation, et al., No. 00-1980 DSD/JMM, pending before the United States District Court for the District of Minnesota; or (b) the Released Conduct (defined below).

2. Plaintiffs and all other Class Members, on their own behalf and on behalf of all other Releasors also hereby contractually agree and acknowledge that, unless this settlement is ultimately disapproved, they shall not now or hereafter initiate, participate in, maintain, maintain a right to or assert against the Releasees, or any of them, either directly or indirectly, derivatively, on their own behalf, or on behalf of the Class or the general public or any other person or entity, any Claims and Causes of Actions (defined below) that are based upon, related to, or connected with, directly or indirectly, in whole or in part: (a) the allegations, facts or subjects set forth or otherwise raised in Benacquisto, et al. v. American Express Financial Corporation, et al., No. 96-18477, pending before the Minnesota State Court for the County of Hennepin (together with the actions consolidated therewith, also filed in the Minnesota State Court for the County of Hennepin and entitled Mork, et al. v. IDS Life Insurance Company, et al., No. 97-04742, and Thoresen, et al. v. American Express Financial Corporation, et al., No. 98-015681) and Benacquisto, et al. v. American Express Financial Corporation, et al., No. 00-1980 DSD/JMM, pending before the United States District Court for the District of Minnesota; or (b) that relate in any way to the Released Conduct.

3. Nothing in this Release shall be deemed to alter (i) a Class Member's right to make a claim for contractual benefits that will become payable in the future pursuant to the express written terms of an In Force Policy or In Force Annuity issued by any of Defendants; (ii) a Class Member's right to assert any claim that independently arises from acts, facts or circumstances that occur for the first time after the last day of the Class Period; (iii) a Class Member's right to make a claim for theft or embezzlement in connection with a Policy or Annuity; (iv) a Class Member's right to assert any claim based on facts arising out of or relating to the administration or servicing of a Policy or Annuity after its purchase unless they arise out of or relate to any of the matters described in sections XII.B.2.(i)-(xiii) of the Stipulation of Settlement; or (v) a Class Member's right to assert any claim peculiar to the Class Member that falls outside the general categories of claims or conduct described in the complaints in the Actions or the Release in this settlement and is based on facts that were not discovered and could not with reasonable care have been discovered by the Class Member before the deadline to submit an Election Form set forth in the Stipulation of Settlement.

4. Plaintiffs and all other Class Members, on their own behalf and on behalf of all other Releasors, expressly agree that this Release will be, and may be raised as, a complete defense to, and will preclude any action or proceeding that relates in any way to, the Released Conduct.

5. Plaintiffs and all other Class Members, on their own behalf and on behalf of all other Releasors, expressly understand that certain principles of law, such as Section 1542 of the Civil Code of the State of California, provide that a "general" release does not extend to claims that a creditor does not know or suspect to exist in his favor at the time of executing the release and which, if known by him, must have materially affected his settlement with the debtor. To the extent that these principles of law arguably may be applicable — notwithstanding that the parties have chosen Minnesota law to govern the Stipulation of Settlement — Plaintiffs and the Class Members hereby agree that these principles (including Cal. Civ. Code Section 1542 and all similar federal or state laws, rights, rules, or legal principles of any jurisdiction that may be applicable herein) are hereby knowingly and voluntarily waived and relinquished by Plaintiffs and the Class Members, and Plaintiffs and the Class Members hereby agree and acknowledge that this is an essential term of both the Settlement Agreement and this Release.

6. In connection with this Release, Plaintiffs and all other Class Members, on their own behalf and on behalf of all other Releasors, acknowledge that they are aware that they may hereafter discover claims presently unknown or unsuspected, or facts in addition to or different from those that they now know or believe to be true with respect to the matters released herein that occurred prior to the last day of the Class Period. Nevertheless, subject to paragraph 3 above, it is the intention of Plaintiffs and the Class Members in executing this Release fully, finally and forever to settle and release all such

matters that exist, hereafter may exist, or might have existed (whether or not previously or currently asserted in any action or proceeding) with respect to their Policies and Annuities.

7. Nothing in this Release shall preclude any action to enforce any of the terms of the Settlement Agreement, provided that such action shall be brought in the Minnesota State Court for the County of Hennepin or the United States District Court for the District of Minnesota.

8. Plaintiffs and all other Class Members, on their own behalf and on behalf of all other Releasors, hereby agree and acknowledge that the provisions of this Release, individually and collectively, constitute an essential and material term of the Settlement Agreement.

9. This Release is the result of a compromise of a disputed claim and shall never at any time be used as evidence of any admission of liability, wrongdoing or damages by the Company.

B. Release and Waiver -- Definitions

1. "Claims and Causes of Action" (as used in this Release) means any and all claims for relief (including any federal, exclusively federal, state, or other causes of action, suits, petitions, or demands in law or equity), any and all allegations of liability (including any allegations of debts, obligations, promises, guarantees, damages, awards, or for any equitable, legal and administrative relief), and any and all demands for damages or equitable relief (including any claims for rescission, reformation, restitution or all damages of any kind, including those in excess of actual damages and claims for mental anguish), that have been, could have been, may be or could be asserted in any court action, whether federal, state or otherwise, or before any administrative body (including any brought by or on behalf of any state or local insurance, prosecutorial or other organization), tribunal, arbitration panel, or other adjudicatory body, regardless of whether based on federal, state or local law, statute, ordinance, regulation, contract, common law, or any other source, and regardless of whether foreseen or unforeseen, suspected or unsuspected, or fixed or contingent at the time of this Settlement.

2. "Released Conduct" means any and all direct or indirect acts, representations, omissions, suggestions, or communications that are related to or connected in any way with the design, development, marketing, sale, administration, servicing, underwriting, or performance of the Policies or the Annuities, including, without limitation, acts, representations, omissions, suggestions or communications in connection with (i) the explanation, description, marketing, sale, solicitation, illustration or replacement of any Policy or Annuity; (ii) the application for or purchase of any Policy or Annuity; (iii) the suitability of any purchases, sales or replacements of any Policy or

Annuity; (iv) the taking of any loans, or the accumulation of any interest or cash values on any Policy or Annuity; (v) the setting, reduction, adjustment, payment, or lack of payment of any interest rates, purchase rates or renewal rates on any Policy or Annuity; (vi) the setting, charging or reducing of any cost of insurance, commissions, incentives, premiums, taxes, fees, mortality and expense fees, charges, contract charges, surrender charges, or expenses on any Policy or Annuity; (vii) the investment choices made with respect to assets held in any Policy or Annuity; (viii) the surrender, lapse, or termination of any Policy or Annuity; (ix) the tax status, tax impact or tax consequences of any Policy or Annuity or any actions or inaction taken with respect thereto; (x) the costs, commissions, terms, or benefits or disadvantages of any Policy or Annuity compared to any other life insurance policy, annuity contract or investment; (xi) the comparison or lack of comparison of any Policy or Annuity to any other product; (xii) the preparation by any financial advisor acting for the Company of any financial plan or the provision of financial or investment advice insofar as it resulted in the sale, modification or maintenance of any Policy or Annuity; (xiii) the effect that a Class Member's election and award of benefits in this Settlement Agreement may have on the value of any Policy or Annuity; and (xiv) the administration or servicing of any Policy or Annuity after its purchase.

3. "Releasees" means the Company[1] and its past, present and future parents, subsidiaries, affiliates, partners, predecessors, successors and assigns, and each of their respective past, present and future officers, directors, shareholders, employees, general agents, agents, advisors, branch managers, producers, sales representatives, brokers, solicitors, representatives, attorneys, heirs, administrators, executors, insurers, predecessors, successors and assigns, or any of them, including any person or entity acting on behalf of, or at the direction of, any of them.

4. "Releasors" means, to the extent they are not excluded from the Class with respect to a Policy or Annuity, the Plaintiffs and all Class Members, on behalf of themselves and their respective heirs, executors, administrators, successors, assigns, guardians, attorneys, trustees, qualified plans, fiduciaries, plan fiduciaries, plan trustees, plan sponsors, plan participants, plan beneficiaries, and representatives, and on behalf of the Policies' insureds and beneficiaries, the Annuities' annuitants and beneficiaries, and the Policies' and Annuities' nominal and beneficial owners.

---

[1] "Company" means IDS Life Insurance Company, IDS Life Insurance Company of New York, the American Express Company, American Express Financial Corporation, American Express Financial Advisors, American Express Service Corporation, American Express Trust Company, American Centurion Life Assurance Company, American Enterprise Life Insurance Company and American Partners Life Insurance Company, collectively.

14. **Permanent Injunction**. All Class Members who have not been timely excluded from the Class with respect to a Policy or Annuity are hereby permanently barred and enjoined from (i) filing, commencing, prosecuting, maintaining, intervening in, participating in (as class members or otherwise), or receiving any benefits or other relief from, any other lawsuit, arbitration, or administrative, regulatory or other proceeding or order in any jurisdiction based on or relating to the Claims and Causes of Action, or the facts and circumstances relating thereto, in the Action and/or the Released Conduct (as that term is defined in the Settlement Agreement) as to that Policy or Annuity, and (ii) organizing or soliciting the participation of any Class Members in a separate class for purposes of pursuing as a purported class action (including by seeking to amend a pending complaint to include class allegations, or by seeking class certification in a pending action) any lawsuit or other proceeding based on or relating to the Claims and Causes of Action, or the facts and circumstances relating thereto, in the Action and/or the Released Conduct as to that Policy or Annuity. This Court finds that issuance of this permanent injunction is necessary and appropriate in aid of this Court's jurisdiction over the Action and to protect and effectuate this Order and Judgment.

15. **Enforcement of Settlement.** Nothing in this Order and Judgment shall preclude any action to enforce the terms of the Settlement Agreement; nor shall anything in this Order and Judgment preclude Plaintiffs or Class Members from participating in the Claim Review Process described in the Settlement Agreement if they are entitled to do so under the terms of the Settlement Agreement.

16. **Attorneys' Fees and Expenses.** The Court hereby grants Co-Class Counsels' application for an award of attorneys' fees and reimbursement of their disbursements and expenses for their past and future work on the Actions in the amount of $28 million, to be paid by Defendants to Lead Counsel. The $28 million consists of approximately $27, 380, 000 in fees and $620,000 in reimbursement of expenses. Such fees and expenses are to be paid by Defendants within 10 days after the last date of entry of the Order and Judgment in the Actions, subject to the conditions set forth in the Stipulation of Settlement. Plaintiffs' counsel shall set aside in a Qualified Settlement Fund ten percent, or $2,738,000, of the fee award pending substantial completion of the administration of the Claim Review Process. Plaintiffs' counsel shall advise this Court when payments are made to Class Members in the Claim Review Process, and may draw down this final ten percent (plus any accumulated interest) at that time without further order of this Court. Lead Counsel, in its sole discretion, shall allocate and distribute this award of attorneys' fees and expenses among counsel for the Class.

17. **No Other Payments.** The preceding paragraph of this Order and Judgment covers, without limitation, any and all claims for attorneys' fees and expenses, costs or disbursements incurred by Co-Class Counsel or any other counsel representing Plaintiffs or Class Members, or incurred by Plaintiffs or the Class Members, or any of them, in connection with or related in any manner to the Actions, the settlement of the Actions, the administration of such settlement, and/or the Released Conduct except to the extent otherwise specified in this Order and Judgment and the Stipulation of Settlement.

18. **Modification of Settlement Agreement.** The Parties are hereby authorized, without needing further approval from this Court, to agree to and adopt such amendments to, and modifications and expansions of, the Settlement Agreement -- including without limitation, the Post-Settlement Mailing materials and the forms to be used in the Claim Review Process -- as are consistent with this Order and Judgment and do not limit the rights of Class Members under the Settlement Agreement.

19. **Retention of Jurisdiction.** This Court has jurisdiction to enter this Order and Judgment. Without in any way affecting the finality of this Order and Judgment, this Court expressly retains jurisdiction as to all matters relating to the administration, consummation, enforcement and interpretation of the Settlement Agreement and of this Order and Judgment, and for any other necessary purpose, including, without limitation,

(a) enforcing the terms and conditions of the Settlement Agreement and resolving any disputes, claims or causes of action that, in whole or in part, are related to or arise out of the Settlement Agreement, this Order and Judgment (including, without limitation, whether a person or entity is or is not a Class Member; whether claims or causes of action allegedly related to this case are or are not barred by this Order and Judgment, etc.);

(b) entering such additional Orders as may be necessary or appropriate to protect or effectuate this Order and Judgment approving the Settlement Agreement, dismissing all claims on the merits and with prejudice, and permanently enjoining

Class Members from initiating or pursuing related proceedings, or to ensure the fair and orderly administration of this settlement; and

(c) entering any other necessary or appropriate Orders to protect and effectuate this Court's retention of continuing jurisdiction;

*provided, however,* that nothing in this paragraph is intended to restrict the ability of the Parties to exercise their rights under paragraphs 7 and 18 above.

20. **No Admissions.** This Order and Judgment, and the Settlement Agreement (and any other document referred to here, or any action taken to carry out this Order and Judgment) shall not be used or construed as an admission or concession by the Defendants of any actual or potential fault, wrongdoing, liability or damages whatsoever, and shall not be used as any evidence or inference of any fault, wrongdoing, liability or damage against the Defendants. Entering into or carrying out the Settlement Agreement, and any negotiations or proceedings related to it, shall not be construed as, or deemed evidence of, an admission or concession by Defendants as to any actual or potential fault, wrongdoing, liability or damages and shall not be offered or received in evidence or used for impeachment in any action or proceeding against any party hereto in any court, administrative agency or other tribunal for any purpose whatsoever, except as evidence of the settlement or to enforce the provisions of this Order and Judgment and the Settlement Agreement; *provided, however,* that this Order and Judgment and the Settlement Agreement may be filed in any action against or by the Defendants or Releasees (as defined in the Stipulation of Settlement) to support a defense of *res judicata*, collateral estoppel, release,

waiver, good-faith settlement, judgment bar or reduction, full faith and credit, or any other theory of claim preclusion, issue preclusion or similar defense or counterclaim.

21. **Dismissal of Action.** The Action, including all individual and Class claims resolved in them, are hereby dismissed on the merits and with prejudice against Plaintiffs and all other Class Members, without fees or costs to any party except as otherwise provided in this Order and Judgment.

22. **Bond Requirement.** Any appeal of the orders and judgment of this Court in this action shall be conditioned upon the posting of a bond by the proposed appellant of $500,000.

SO ORDERED this 15th day of May, 2001. LET THE JUDGMENT BE ENTERED ACCORDINGLY.

The Honorable David S. Doty
United States District Judge

# UNITED STATES DISTRICT COURT
# DISTRICT OF MINNESOTA

## CIVIL NOTICE

The purpose of this notice is to summarize the time limits for filing with the District Court Clerk's Office a Notice of Appeal to the Eighth Circuit Court of Appeals from a final decision of the District Court in a civil case.

***This is a summary only. For specific information on the time limits for filing a Notice of Appeal, review the applicable federal civil and appellate procedure rules and statutes.***

Rule 4(a) of the Federal Rules of Appellate Procedure (Fed. R. App. P.) requires that a Notice of Appeal be filed within:

1. Thirty days (60 days if the United States is a party) after the date of "entry of the judgment or order appealed from;" or

2. Thirty days (60 days if the United States is a party) after the date of entry of an order denying a timely motion for a new trial under Fed. R. Civ. P. 59; or

3. Thirty days (60 days if the United States is a party) after the date of entry of an order granting or denying a timely motion for judgment under Fed. R. Civ. P. 50(b), to amend or make additional findings of fact under Fed. R. Civ. P. 52(b), and/or to alter or amend the judgment under Fed. R. Civ. P. 59; or

4. Fourteen days after the date on which a previously timely Notice of Appeal was filed.

If a Notice of Appeal is not timely filed, a party in a civil case can move the District Court pursuant to Fed. R. App. P. 4(a)(5) to extend the time for filing a Notice of Appeal. This motion must be filed no later than 30 days after the period for filing a Notice of Appeal expires. If the motion is filed after the period for filing a Notice of Appeal expires, the party bringing the motion must give the opposing parties notice of it. The District Court may grant the motion, but only if excusable neglect or good cause is shown for failing to file a timely Notice of Appeal.

FORMS\APPEAL.NO CIV
Rev. August 11, 1995

# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

### Prehearing Conference Program

The United States Court of Appeals for the Eighth Circuit has established an early intervention Prehearing Conference Program. The purpose of the program is twofold: (1) to facilitate settlement discussions in civil cases by providing an impartial atmosphere for an open discussion of the case and alternative methods of disposition and (2) to promote the delineation of issues, early resolution of procedural problems, and effective administration of an appeal throughout the appellate process. See 8th Cir. R. 33A.

The program is directed by Mr. John Martin. Mr. Martin screens newly filed appeals based on information furnished by both appellants and appellees in the court's Appeal Information Forms A and B. Contact with counsel is by telephone and in personal conferences held in several cities throughout the Circuit. All communications with Mr. Martin are confidential. Counsel can openly discuss and evaluate the issues and explore alternatives in a non-adversarial setting without fear that the subsequent processing of the appeal or ultimate disposition of the case will be adversely affected by participation in the program.

Participation in the program is voluntary. However, the Court strongly encourages your participation and cooperation. Over the past twenty years, the program has enabled many appellate litigants to achieve mutually satisfactory resolution of certain issues or an overall settlement prior to progressing through all stages of the appellate process. Issue delineation enables counsel to focus only on those issues that need judicial resolution. The program has helped relieve the ever-increasing caseload confronting the Court, and it has also saved litigants and attorneys substantial amounts of time and money.

In order for the program to function effectively certain information <u>must</u> be provided at the initiation of the appeal. *Eighth Circuit Rule 3B directs each civil appellant to: (1) file a completed Appeal Information Form A with the Notice of Appeal at the time the Notice is filed with the District Court clerk and (2) forward a copy of the completed Form A and a copy of Appeal Information Form B to the appellee for completion.* Appellee may complete Form B and send it to the clerk of the Court of Appeals. If you have any questions about the Prehearing Conference Program or the Appeal Information Forms, please contact Mr. Martin at (314)-539-3669.

Forms A and B are available from the District Court clerk and the Court of Appeals clerk and can be found at the Court of Appeals' web site at: www.ca8.uscourts.gov

*June 1, 2000*

Forms/8thcircuitprehearingconf.wpd

**STOLTMANN LAW OFFICES, P.C.**

10 South LaSalle Street, Suite 3500, Chicago, IL 60603
Telephone 312-332-4200 Facsimile 312-332-4201
www.InvestmentFraud.Pro

June 7, 2007

**Via Federal Express**

George Friedman
Director of Arbitration
NASD Dispute Resolution
165 Broadway, 27th Floor
New York, NY 10006

**RE: Initial Statement of Claim for Jackie Calvert (Claimant) vs. American Express Financial Advisors, Inc. (n/k/a Ameriprise Financial Services Inc.) (Respondent)**

Dear Ms. Friedman:

This firm has been retained by the above listed individual to recover damages caused by the actions, misrepresentations, omissions, unsuitable investment recommendations, negligence, negligent supervision, and fraud perpetrated by the Respondent, American Express Financial Advisors, Inc. Accordingly, we have prepared this Initial Statement of Claim so that you may promptly commence the administration of this matter.

The above captioned Claimant was originally a member of NASD Dispute Resolution Case No. 05-06035. That claim was severed by the arbitration panel for that action. Accordingly, the above Claimant submits this individual claim in accordance with the Order of that Panel.

**Jackie L. Calvert**

Claimant Jackie Calvert is a resident of Louisville, Kentucky. The account at issue is an IDS Life Retirement Advisor Variable Annuity Rollover IRA, Contract number 0931 0651 0662 3 004. Ms. Calvert is 62 years old. Ms. Calvert was forced to retire from Philip Morris in 1998 when the local plant closed down after 32 years of dedicated service. Ms. Calvert was born and raised in Hammond, Indiana where she earned her high school education. After she graduated high school in 1963, she joined the Army and served honorably for three years. After her service, she moved to Louisville and started her employment with Philip Morris.

The funds at American Express represented Ms. Calvert's retirement plan built up over 32 years at Phillip Morris. Ms. Calvert informed her Agent that one of her primary goals was the generation of income from her portfolio. This message was explicitly told to the Agent on multiple occasions. Ms. Calvert also made it clear that she would need to take monthly withdrawals from her portfolio. Ms. Calvert left the entire decision making process of which securities to buy or sell to American Express.

**<u>Respondent Ameriprise Financial Services, Inc. f/k/a American Express Financial Advisors, Inc.</u>**

Ameriprise Financial Services, Inc. f/k/a American Express Financial Advisors, Inc. ("American Express") is a full service brokerage firm headquartered in Minneapolis, Minnesota. The firm's address is 50611 AXP Financial Center, Minneapolis, MN, 55474. The firm's CRD number is 6363.

**<u>Causes of Action</u>**
**<u>Suitability and Negligent Account Management</u>**

American Express made wholly unsuitable investment recommendations to Ms. Calvert that were inconsistent with her actual investment objectives. Before her dealings with American Express, Ms. Calvert had virtually no prior investment experience other than a company managed 401K plan through her employer, Philip Morris. Ms. Calvert made it clear to American Express that the funds she invested with American Express were for her retirement. Ms. Calvert exclusively relied upon American Express to manage her accounts with these actual investment objectives in mind.

When Ms. Calvert retirement funds were transferred to American Express in 2000, American Express was told that these assets represented the vast majority of Ms. Calvert' life savings and constituted her largest asset, which all told took 32 years to accumulate. Ms. Calvert made it clear to American Express that she wanted to live off these investments during her golden years. Given her frugal lifestyle, these funds, combined with Social Security she would soon be receiving and a modest pension, would have been enough to sustain Ms. Calvert through her retirement.

Upon Ms. Calvert's retirement, American Express believed it was suitable to lock her into a variable annuity, with sub-accounts allocated exclusively in equity

based, proprietary mutual funds. The sale of variable annuities in most instances to retired investors' IRA's has recently been demonstrated by the NASD and the SEC to be wholly unsuitable. (See Exhibit 1, page 3-4).

Variable annuities are the toxic waste of the securities industry and purchases in IRAs are especially inappropriate and unsuitable for most clients. Annuities are the highest commissioned product that financial advisors can sell. Importantly, there are no breakpoints (reduced sales discounts for large purchases) with annuities. The investors' funds are typically tied up for years with high surrender charges. The annuities have extraordinarily high fees. There are big upfront sales charges and back-end surrender charges, which linger around 7% if the funds are withdrawn too soon. In addition, there are mortality and expense charges to cover the risk the insurance company takes on to pay the investor lifetime income. There are also administrative and annual records maintenance fees. The average annuity has an expense ratio of 2.35% annually, according to Morningstar. The average mutual fund, on the other hand, charges just 1.44% annually.

The unsuitable and egregious nature of stockbroker's buying variable annuities for the retired and in their retired clients' IRAs has been well documented by NASD Enforcement and NASAA, the national group of state securities commissioners. For example, the following disclosures about variable annuities by Lawrence Kosciulek, assistant director of advertising/investment-companies regulation with NASD Regulation, are illuminating in this case:

> The message is clear. As securities, variable products are subject to the 1938 NASD Suitability Rule, and before recommending them you must make a reasonable effort to determine whether they're suitable for the client. **And reasonable in this context means a greater effort than is required for other securities products. Variable annuities are subject to a higher level of suitability scrutiny than 100 shares of Gm because they're more complex.**

According to the national organization of state securities regulators, NASAA (the North American Securities Administrators Association), variable annuities have made their top ten list of investment "scams" each of the last six years. Last year, NASAA disclosed its 2006 forecast of the 13 most common ways "investors are likely to be trapped in 2006." According to NASAA, on its list were variable annuities. NASAA states:

> **Variable Annuities.** Variable annuities are tax-deferred investments that typically place mutual funds inside of an insurance wrapper for tax deferred potential investment growth. While these products are legitimate investments, regulators are concerned about their popularity in the sales community. **Commissions to those who sell variable annuities are very high, which provides incentive for sellers to engage in inappropriate sales. Variable annuities are only suitable for a very small percentage of the investing public and generally are not appropriate for most seniors.** The steep penalties for early withdrawals also make variable annuities unsuitable for short-term investors. **Be especially wary of any broker who wants to sell you a variable annuity to hold inside a 401(k) or IRA. You are already getting tax-deferred growth in an IRA or a 401(k), and the variable annuity simply adds a layer of cost with no additional tax benefit.**

The press has also cast light on the inappropriate and unsuitable nature of variable annuities, especially ones bought in an IRA. As noted by the Sun Times' Terry Savage in an article entitled "Tax-Deferred Annuities Often A Big Mistake" on August 22, 2005:

> **It's becoming a national financial epidemic: tax-deferred annuities sold to people who don't understand them, don't need them, and might even be harmed by their high fees and surrender charges. The people who fall for this trap tend to be seniors**, widows and others who have a sum of cash to invest and are seeking security. **Instead, they get locked into expensive and ongoing management fees. And what do the salespeople get? Huge commissions. As much as 10 percent of the initial investment, and ongoing commissions for years after that! It's a huge violation of trust** because a great number of these tax-deferred annuities are sold inside banks, where the trusting clients don't realize they aren't dealing with a banker. They're dealing with a securities broker licensed by the bank, and paid on commission. (See Exhibit 2).

Jane Bryant Quinn in an article entitled "One Faulty Investment" states the following about variable annuities:

> **<u>You rarely find me so deeply angry at a common investment product that I dream of blowing it to smithereens.</u>** Especially one that's sold by America's leading financial institutions, commands $393 billion in assets and sounds like a winner for retirees. **<u>But stand back, I'm going to light the fuse. My target: tax-deferred, variable annuities—a name that hints of probity, with a soupcon of tax savings on the side. What a laugh.</u>** It will cost you more in taxes and possibly risk your security, too. 'I cannot imagine a personal financial situation where I'd recommend a VA as a good idea,' says actuary John Biggs, former chair of TIAA-CREF pension funds." (See Exhibit 3).

See also "Don't Be A Sucker: Variable Annuities Are A Lousy Investment" (Forbes Cover story 2/9/98); "The Great Annuity Rip-Off" (Forbes 6/6/98); "Again, Variable Annuities Not For Everyone" (Chicago Tribune 6/20/04); and "What's Wrong With Variable Annuities" (SmartTrade Magazine 8/5/05).

Given the substantial funds Ms. Calvert was able to accumulate by the time of her retirement in 1998 and her subsequent rollover to American Express in 2000, her 401K rollover should have been invested almost exclusively in fixed income investments like bonds, bond mutual funds, certificates of deposit and other income producing investments. Instead, American Express decided to concentrate the Claimant's portfolio in a variable annuity with sub-accounts loaded with equities in high-risk industry sectors. These types of investments were grossly unsuitable given the Claimant's age, retirement status and actual investment objectives.

## <u>Misrepresentations and Omissions</u>

Whether a stockbroker made a material misrepresentation or omission depends upon whether a reasonable and prudent investor would attach importance to the facts or fact omitted or misrepresented in determining his choice of action in the transaction in question. Typically, when the Claimant would talk to her American Express Agent about the investments soon to be purchased, the Agent failed to disclose that the recommendations involved a great deal of risk and expense to the Claimant's principal.

Once losses started occurring, the Claimant was consistently told to "ride it out" and never informed that the mutual funds within the annuity had money market sub-accounts that would have allowed her to limit her losses. Unfortunately,

American Express neglected to disclose, as required under the Kentucky Uniform Securities Act and Kentucky common law, other highly relevant information necessary for the Claimant to make a knowledgeable evaluation about the merits of the mutual funds and other investments made in her accounts and whether she should remain in the stock market.

Furthermore, the Agent's failure to disclose the additional compensation he received from the sale of American Express proprietary annuities and mutual funds constituted an omission under the and common law of the Commonwealth of Kentucky. The full disclosure of additional remuneration for the sale of a proprietary securities product is a fact material to an investor's decision to invest in said securities. Had the Claimant been made aware of this additional, hidden compensation and that other options were available, these other funds would have been chosen.

The sale of the investments at issue to the Claimant by the Respondents under the facts and circumstances previously cited constitutes an incomplete and misleading material disclosure. See *City of Monroe Emples. Ret. Sys. v. Bridgestone Corp.*, 387 F.3d 468, 486 (6th Cir. 2004). ("As for materiality, whether or not a statement is material turns on a fact-intensive test. Materiality "depends on the significance the reasonable investor would place on the withheld or misrepresented information." (quoting *Basic Inc. v. Levinson*, 485 U.S. 224, 240(1988)). That is, would the information, had it been presented accurately, "alter the total mix of information made available?" (*Basic*, at 231-32 (citation omitted)).

The facts here make it clear that the Claimant, an unsophisticated factory worker, depended entirely on the information or misinformation provided to her by the Respondent. The omission of the material facts that the Respondent earned more compensation by selling proprietary annuities and funds and that the variable annuity sold to the Claimant was the most expensive investment product on the market, altered the total mix of information available and prevented the Claimant from making an informed decision regarding these funds. The Claimant's damages are the direct and proximate result of the Respondents' fraudulent misrepresentations and omission under the Kentucky Securities Act.

## Breach of Fiduciary Duty and Constructive Fraud

American Express Financial Advisors were licensed Financial Advisors under the Investment Advisors Act of 1940. Furthermore, American Express Agents were

held out as "Financial Advisors" by the Respondent. Therefore, Claimant's Agent was a *pre se* fiduciary and owed the Claimant duties as such.

Regardless of the Agent's status as a *pre se* fiduciary, the Agent stood in a fiduciary relationship with the Claimant. Case law from around the country, including cases from Kentucky, establishes that that a Financial Advisor owes a fiduciary duty to his client. See *Schwartz v. Oberweis*, 826 F.Supp. 280 (N.D. Ind. 1993)("Oberweis claims that there is no fiduciary duty between a broker and a customer. However, it is well accepted that a broker is a fiduciary to his client."). See also *U.S. v. Dial*, 757 F.2d 163, 168 (7th Cir. 1985) (a securities broker stands in a fiduciary relationship with its customer, and such a duty imposes an affirmative duty of utmost good faith, and full and fair disclosure of all material facts).

The Court in *Dial* went on to express that ". . . . broker was a fiduciary of his customers when he solicited his customers to participate in block orders, implicitly represented to them that he would try to get the best possible price." *Id.* at 168. In *Marchese v. Shearson Hayden Stone, Inc.*,734 F.2d 414, 418 (9th Cir. 1984) the 9th Circuit, citing *Securities & Exchange Commission v. Capital Gains Research Bureau, Inc.*, 375 U.S. 180, 194 (1963), stated that "a securities broker stands in a fiduciary relationship with its customer, and such duty imposes an affirmative duty of utmost good faith and full and fair disclosure of all material facts." See also *Pfaff v. Petrie*, 71 N.E.2d 345, 348 (Ill. 1947) ("A fiduciary relation exists in all cases in which a confidential relationship has been acquired."); *Burdett v. Miller*, 957 F.2d 1375, 1381 (7th Cir. 1992) (imposing fiduciary duty on securities brokers because a fiduciary relationship arises in situations where "one person has reposed trust and confidence in another who thereby gains influence and superiority over the other."); *In Re Oberweis Securities, Inc.*, 1992 WL 119272 (Bankr. N.D. Ill. 1992); *Gochnauer v. A.G. Edwards & Sons, Inc.*, 810 F.2d 1042, 1049 (11th Cir. 1987) ("The law is clear that a broker owes a fiduciary duty of care and loyalty to a securities investor."); *Ward v. Atlantic Security*, 777 So.2d 1144 (Fla. App. 2001); *State ex. rel. PaineWebber v. Voorhees*, 891 S.W.2d 126 (Mo. 1995); *Glisson v. Freeman*, 532 S.E.2d 442 (Ga. App. 2000); *Beckstrom v. Parnell*, 730 So.2d 942 (La. App. 1998).

Respondent's likely argument related to the non-discretionary status of the Claimant's account, which is sure to follow in Respondent's Answer, is a red-herring and is not relevant. *See e.g., Shields & Co. v. Bright*, 254 F. Supp. 2d 1253, 1260 (M.D. Fla. 2003) (finding fiduciary duty despite fact that client maintained "non-discretionary" because broker exercised "functional control"

over account); *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Millar*, 274 F. Supp. 2d 701, 708 (W.D. Pa. 2003) (fact that clients' accounts were technically "non-discretionary" is not determinative because existence of fiduciary duty between broker and client cannot be determined "by recourse to rigid formulas"); *Davis v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 906 F.2d 1206, 1216 (8th Cir. 1990) (rejecting "discretionary" versus "non-discretionary" distinction as elevating "form over substance;" the critical question being "who exercised actual control over the account"); *Leib v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 461 F.Supp. 951, 954 (E.D. Mich. 1978) (same); *Paine, Webber, Jackson & Curtis, Inc. v. Adams*, 718 P.2d 508, 517-18 (Colo. 1986) (same). The discretionary versus non-discretionary dichotomy is, in this case, truly a distinction without a difference and should be disregarded by the Panel.

In *Burdett v. Miller*, the Seventh Circuit held that under common law, a broker-investor relationship does not impose a *per se* fiduciary relationship on the broker, but that "special circumstances", such as trust and confidence, can give rise to such a fiduciary duty. 957 F.2d 1375 (7th Cir. 1992). The *Burdett* court stated that a fiduciary relationship arises in the situation where, **"one person has reposed trust and confidence in another who thereby gains influence and superiority over the other"** *Id.* at 1381. Similarly, when examining the nature of a fiduciary relationship on another occasion, the Seventh Circuit stated in *U.S. v. Dial* that, "the essence of a fiduciary relationship is that the fiduciary agrees to act as his principal's alter ego rather than to assume the standard arm's length stance of traders in a market." 757 F.2d 163, 168.

Furthermore, the Kentucky Supreme Court in *Steelvest, Inc. v. Scansteel Service Center, Inc.*, 807 S.W.2d 476, 485 (1991) reaffirmed the long-held proposition espoused in *Security Trust Co. v. Wilson*, 307 Ky. 152, 157 (1948) and of the Commonwealth of Kentucky that "The fiduciary relationship may exist under a variety of circumstances; it exists in **all cases where there has been a special confidence reposed in one who in equity and good conscience is bound to act in good faith and with due regard to the interests of the one reposing confidence."**

At page 2-17 of *Broker Dealer Law and Regulation* (3rd Ed. 2002 Supplement), Professor Poser summarizes the law as follows:

> A fiduciary relation exists: Wherever confidence on one side results in superiority and influence on the other side; where a special confidence is reposed in one who in equity and good conscience is

> bound to act in good faith and with due regard to the interest of the one reposing the confidence; where confidence is reposed and accepted, whether the origin is moral, social, domestic or merely personal; or where a person has knowledge and authority which he is bound to exercise for the benefit of another person...There must be something approximating **business agency, professional relationship,** or family tie impelling or inducing the trusting party to relax the care and vigilance he would ordinarily exercise.

Here, the Claimant, a retired factory worker with a high school education and with virtually no prior investment experience, entrusted her entire life savings to American Express. Respondent's Agent who handled Ms. Calvert's account was a Registered Investment Advisor under the Investment Advisors Act of 1940 and was held out by the Respondent as an Investment Advisor. Additionally, the Claimant, an uneducated and blue collar factory worker with virtually no prior investment experience, reposed all of her trust and confidence in American Express. This trust was solicited by the Respondent when it paraded through the greater Louisville area actively pursuing individuals like the Claimant who had just lost their life-long jobs and were at the precipice of despair. The Respondent swooped in and solicited this very trust and confidence from the Claimant.

Specifically, the American Express Agent at issue's breaches includes but is not limited to: the failure to disclose material information; failure to provide investment advice solely for the best interest of the Claimant; and failure to properly allocate and diversify the Claimant's IRA. Through these failures, the Respondents breached their fiduciary duty to the Claimant and these breaches are the direct and proximate cause of the Claimant's damages.

## Violations of Section 2310 Conduct Rules of the NASD

The Respondents violated Rule 2310 which provides that "in recommending to a customer the purchase, sale, or exchange of any security a member shall have reasonable grounds for believing that the recommendation is suitable for such customer upon the basis of facts available, including other security holdings, financial situation, and needs." Clearly, American Express believed concentrating the portfolio of the retired Claimant into a variable annuity with sub-accounts invested exclusively in American Express mutual funds whereby excessive sales charges were incurred was appropriate.

**Violations of Section 2110 Conduct Rules of the NASD**

The conduct of the Respondent constituted a willful violation of Section 2110 of the NASD'S Conduct Rules in that, in connection with the purchase and sale of securities, Respondent, by and through its Agent, had the responsibility to observe high standards of commercial honor and just and equitable principals of trade; and engaged in acts, practices and courses of business which operated as a breach of such responsibility.

**Violation of Section 2120 Conduct Rules of the NASD**

The conduct of the Respondent constituted a willful violation of Section 2120 of the NASD Conduct Rules in that, in connection with the purchase and sale of securities, American Express, by and through its Agent, had the responsibility to not effectuate any transaction in, or induce the purchase or sale of, any security by means of any manipulative, deceptive or fraudulent device or contrivance. However, because of the acts, practices, misrepresentations and omissions together with the negligent handling of the accounts coupled with unsuitable investment recommendations, such conduct operated as a breach of such responsibility.

**Violation of Section 3010 Conduct Rules of the NASD**

It is apparent by the conduct of American Express' Agent that the "Financial Advisor" received no meaningful supervision. The "Financial Advisor" who serviced the accounts engaged in a systematic pattern of purchasing unsuitable investments and failed to disclose highly material information to the Claimant. According to the NASD Rules of Fair Practice Section 3010, Respondent, American Express, had a duty to supervise its Agent's servicing of the Claimant's accounts. Upon information and belief, Respondent American Express had no reasonable supervisory procedures in place and/or failed to follow such procedures to supervise this account. This is evidenced by the recent $13 million dollar fine imposed on American Express by the NASD for its supervisory violations and mutual fund sales practices.

**Breach of Contract**

The Claimant entered into a contract with the Respondent. This contract stated the terms of the agreement between the parties. Implicit in this agreement was the provision that the Respondent would supply brokerage services in a legal, ethical and professional manner and in accordance with applicable rules and regulations

of the securities industry. By and through the allegations set forth above, the Respondent breached this contract and said breach is the actual and proximate cause of the Claimant's damages.

**Common Law Fraud and Misrepresentation**

The Respondent, by and through the allegations set forth above, intentionally withheld material information regarding the level of risk associated with the securities purchased and the level of compensation earned for said sale. This material was withheld intentionally in order to induce the Claimant into purchasing a variable annuity and proprietary American Express products. The Claimant relied on these misrepresentations to her detriment and otherwise would not have purchased a variable annuity or proprietary American Express funds. By and through the allegations set forth above, the Respondent is liable for fraud and misrepresentation to the Claimant and said fraud and misrepresentation is the actual and proximate cause of the Claimant's damages.

**Respondeat Superior**

The Respondent American Express, by and through the allegations set forth above, is liable to the Claimant under the theory of *Respondeat Superior* in that the conduct of its Agent was performed within the scope and course of his/her employment as an Agent of American Express in that, in connection with the purchase and sale of securities, the Agent directly and/or indirectly performed services on behalf of American Express; American Express, directly and/or indirectly induced the acts set forth above; all of the services were performed in the scope and course of the employment of the Agent; and therefore Respondent, American Express, is liable, under the common law and statutory law of Kentucky.

**Negligence and Negligent Supervision**

Respondent American Express owed the Claimant a duty to use reasonable care in the conduct of its affairs, especially in the supervising of its "Financial Advisor," and the Agent's dealings with the retired Claimant who trusted and relied on the representations of the unsupervised "Financial Advisor." This duty increased given the age, investment experience, and retired status of the Claimant. By and through the allegations set forth above, the Respondent breached these duties which are the direct and proximate cause of the Claimant's damages.

## Damages

As a result of the damages suffered by the Claimant through the acts, omissions, breaches of duties, unsuitable investment recommendations, negligence and fraud of American Express and its Agent, the Claimant requests an award against the Respondent in an amount that includes the following:

1. actual damages in the approximate amount of $75,441 as measured under the Kentucky Uniform Securities Act; [1]

2. the gains the portfolio would have earned had it been properly invested and asset allocated;

3. attorney fees and costs of arbitration, including but not limited to expert witness fees, expenses and accounting fees;

4. pre and post award interest at the statutory rate; and

5. punitive damages in an amount to be determined by this Arbitration Panel.

## Conclusion

American Express and its Investment Advisor made wholly unsuitable investment recommendations and failed to disclose the risks and expenses associated with the securities purchased in the Claimant's accounts. Based on information and belief, American Express' internal policies all but guaranteed that the Claimant would receive proprietary, underperforming, American Express products. This behavior must not be tolerated.

The Investment Advisor disregarded the Claimant's actual investment objectives and needs and further failed to properly asset allocate the Claimant's accounts. Unfortunately, American Express negligently failed to detect the above listed violations. Because of Respondent American Express' actions, omissions, misrepresentations, negligence, breaches of duties and failure to properly supervise, it is liable to the Claimant on a number of legal grounds, including, but not limited to, the following:

---

[1] The Claimants reserve the right to amend their damage amount once profit and loss analyses have been completed.

1. sale of unsuitable investments;
2. negligence;
3. misrepresentations and omissions;
4. failure to supervise:
5. breach of contract;
6. constructive fraud/breach of fiduciary duty; and
7. common law fraud.

The Claimant requests a hearing locale of Louisville, Kentucky and a panel of three arbitrators. We appreciate your immediate commencement of this arbitration, and if you should have any questions please do not hesitate to contact me.

Very Truly Yours,

Andrew Stoltmann