UNITED STATES DISTRICT COURT
UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

---

LESA BENACQUISTO, DANIEL BENACQUISTO, RICHARD THORESEN, ELIZABETH THORESEN, ARNOLD MORK, ISABELLA MORK, RONALD MELCHERT and SUSAN MELCHERT, on behalf of themselves and all others similarly situated,

Plaintiffs,

vs.

AMERICAN EXPRESS FINANCIAL CORPORATION, AMERICAN EXPRESS FINANCIAL ADVISORS, AMERICAN CENTURION LIFE ASSURANCE COMPANY, AMERICAN ENTERPRISE LIFE INSURANCE COMPANY, AMERICAN PARTNERS LIFE INSURANCE COMPANY, IDS LIFE INSURANCE COMPANY, and IDS LIFE INSURANCE COMPANY OF NEW YORK,

Defendants.

**Civil No. 00-1980 DSD/JMM**

**RESPONSE OF BYRON L. POTTS AND NANCY C. POTTS IN OPPOSITION TO MOTION TO ENFORCE CLASS ACTION SETTLMENT**

---

## INTRODUCTION

Byron L. Potts and Nancy C. Potts (the “Potts”) filed a lawsuit against Ameriprise Financial Services, Inc. a/k/a American Express Financial Services, Inc. and IDS Life Insurance Company (hereinafter collectively referred to as “Ameriprise”) in the Circuit Court for Hamilton County, Tennessee on March 1, 2007. The lawsuit set forth numerous claims against Ameriprise related to the Potts’ Ameriprise agent’s theft and

embezzlement of their retirement money, more than $248,000. On April 23, 2007, the lawsuit was removed to the United States District Court for the Eastern District of Tennessee ("Tennessee Lawsuit"). Ameriprise has filed an answer, a scheduling conference has been held, and discovery is in progress. Party depositions are scheduled to occur in early December and January.[1]

On October 17, 2007, Ameriprise filed a Motion and Memorandum of Law in Support of Motion to Enforce Class-Action Settlement ("Def. Mem.") in this Court. This was the Potts' first notice of any such class action. Ameriprise did not assert any defense in its answer to the Potts' lawsuit in Tennessee that the Potts claims were covered by a settlement of any class action lawsuit. Ameriprise contacted the Potts in the late summer or early fall of 2005 and informed them that Ameriprise was investigating its agent, Maureen Sullivan, the agent responsible for the Potts' retirement money, for fraudulent transactions. *See Affidavit of Byron Potts* ("Byron Potts Aff.") at ¶8, attached hereto as Exhibit 1[2]; *Affidavit of Nancy Potts* ("Nancy Potts Aff.") at ¶8, attached hereto as Exhibit 2. Throughout the remainder of 2005 and into 2006, Ameriprise continued to inform the Potts of more and more of Ms. Sullivan's fraudulent acts involving the Potts' retirement money. *Id.* at ¶¶8-10. Prior to this contact by Ameriprise in 2005, the Potts had no idea of any misappropriate conduct by Ameriprise regarding the Potts' accounts. *Id.* at ¶6. At no point during these communications did Ameriprise inform the Potts of the subject class action or its settlement. *Id.* at ¶¶15, 19.

---

[1] A copy of Ameriprise's Answer to the Tennessee Lawsuit is attached hereto as Exhibit 4.

[2] All Exhibits referenced herein are attached to the Affidavit of Brian C. Gudmundson.

The Potts now come before this Court and file this response in opposition to Ameriprise's Motion to Enforce Class Action Settlement ("Mot. to Enforce".) The Potts' claims are not encompassed by the Class Action's Stipulation of Settlement ("Class Settlement Stipulation") and fall squarely within the stipulation's enumerated exceptions. Even if the facts underlying the Potts' claims did somehow fall within the Class Settlement Stipulation, much of the wrongful activities, omissions, and damages alleged in the Tennessee Lawsuit arose after the Class Period.[3] Indeed, by its own admission, Ameriprise itself did not know of the Potts' injuries until the summer of 2005, well after the end of the Class Period, when they contacted the Potts with the news of Maureen Sullivan's fraud.

The existing Class Settlement Stipulation addresses an alleged uniform pattern of classwide conduct. This uniform conduct was based on Ameriprise's allegedly uniform corporate policies regarding the sale of insurance polices and annuities and the quality of Ameriprise's products that theoretically victimized all class members in the same manner. The Class Settlement Stipulation explicitly excludes the sort of peculiar, post-class period claims of theft and embezzlement the Potts' cases presents. Furthermore, Ameriprise waived any right to wield the Class Settlement Stipulation against the Potts by failing to properly inform them of its existence.[4] Accordingly, the Potts respectfully ask that the Court deny Ameriprise's present motion.

---

[3] The Class Period covered by the Settlement Stipulation is the "period beginning on January 1, 1985 and ending on February 29, 2000, inclusive." *Class Settlement Stipulation* at 9.

[4] Depositions are just now occurring in the Tennessee Lawsuit and additional facts that further illustrate the distinct between the Potts' claims and those released by the subject Class Settlement Stipulation may be discovered.

**BACKGROUND**

In 1993, the Potts began receiving investment advice from Maureen Sullivan, an Ameriprise (then American Express Financial Advisors or "AEFA") agent. *Byron Potts Aff.* at ¶3; *Nancy Potts Aff.* at ¶3. Upon Ms. Sullivan's specific advice, the Potts deposited funds with Ameriprise monthly for Sullivan to invest as their retirement funds. *Id.* at ¶4. Ms. Sullivan told the Potts that the funds would be invested in "safe" investments. *Id.* at ¶5.

In late summer or early fall of 2005, Ameriprise contacted the Potts and informed them that Ameriprise was in the process of investigating agent Maureen Sullivan. *Id.* at ¶8. Thereafter, the Potts met with Ameriprise and were informed that they had "been stolen from." *Id.* at ¶9. From Ameriprise, the Potts learned that the money they had given for investment had been used to purchase many unauthorized life insurance policies and inappropriate annuities. *Id.* at ¶10. To date, the Potts still do not know the total number of policies Ms. Sullivan opened and closed on their behalf without their consent or knowledge. *Id.* at ¶11. Further, the Potts learned that Ms. Sullivan secretly changed two appropriate life insurance policies the Potts had purchased to second to die policies without the Potts' consent or knowledge. *Id.* at ¶12. The Potts discovered through communications with Ameriprise in 2005 and 2006 that Ms. Sullivan used much of the Potts' investment funds to secretly pay for surrender and other fees associated with these illegal purchases. *Id.* at ¶10. Sadly, the Potts were informed that all of their investment funds were gone. *Id.* at ¶18.

During the course of communicating with Ameriprise in late 2005 and 2006, the Potts learned that Ameriprise agent Maureen Sullivan had forged the Potts' names to

many documents and used the forged documents to open and surrender life insurance policies and annuities without the Potts' permission or knowledge. *Id.* at ¶¶6, 10, 17, 20, 21. Specifically, the Potts learned in 2005 that improper signatures were contained in at least seven policy documents for life insurance and annuity policies that were admittedly opened before February 29, 2000.[5] *Byron Potts Aff.* at ¶20; *Nancy Potts Aff.* at ¶ 21. However, there were also numerous other documents in Ameriprise's files pertaining to the Potts that contained forged or otherwise inappropriate signatures for improper policies opened after February 29, 2000. *See Id.* at ¶17. Signatures on these policies were either complete forgeries or improperly obtained by Maureen Sullivan, as Sullivan often asked the Potts to sign forms in blank or had Mrs. Potts sign Mr. Potts' name to documents without his knowledge. *Nancy Potts Aff.* at ¶¶15, 19, 21.

From 2005, when Ameriprise first informed the Potts that it was investigating agent Maureen Sullivan, through March 2007, when the Potts filed their lawsuit in Tennessee, the Potts and Ameriprise had numerous communications. *Id.* at ¶15. These communications regarded Ameriprise's investigation of agent Maureen Sullivan, the fraud that had been perpetrated against the Potts, and the losses the Potts suffered. *Id.* At no point did Ameriprise inform the Potts of any class action or settlement that covered their claims. *Id.* The first notice that the Potts received of the class action was the motion to which they now respond. *Byron Potts Aff.* at ¶19; *Nancy Potts Aff.* at ¶20.

---

[5] As the Potts attest in their affidavits (attached hereto as Exhibits 1 and 2) improper signatures were contained in annuity policy 93106212303, annuity policy 930062837669, annuity policy 93006283757, annuity policy 93106297841, annuity policy 931062978362, life insurance policy 090906499940, and life insurance policy 090906227087.

In addition to written communications from Ameriprise, the Potts met on several occasions with Ameriprise to discuss the Potts' stolen money. *Id.* at ¶¶9, 10. The Potts were told that Ameriprise was sorry and that Ameriprise was on "their side." *Id.* at ¶13. The Ameriprise employees that met with the Potts throughout 2005 and 2006 never mentioned any class action to the Potts. *Id.* at ¶16.When it became apparent that the Potts were not going to resolve their problems with Ameriprise**,** the Potts filed their lawsuit in Tennessee. At that time, they had no knowledge of the class action pending in Minnesota, having never received any notice of the class action and no mention of any such class action through correspondence or in person communications with agents of Ameriprise. *Byron Potts Aff.* at ¶19; *Nancy Potts Aff.* at ¶20.

In their complaint, the Potts stated causes of action against Ameriprise for fraud, intentional misrepresentation, fraudulent inducement, promissory fraud, negligent misrepresentation, breach of fiduciary duty, negligence, violation of the Tennessee Consumer Protection Act, negligent supervision, and violations of the Investment Advisors Act. The Potts' claims encompass actions of Ameriprise through its agent from 1993 through 2006. As stated throughout, the Potts were unaware of the fact that they had been defrauded until 2005 when Ameriprise contacted them. *Id.* at ¶¶6, 9.

Ameriprise was clearly cognizant of the class action settlement that occurred in 2001 when it filed its answer to the Potts' complaint in May 2007. Despite this, in Ameriprise's answer to the Tennessee Lawsuit, there is no specific mention of any class

action. Ameriprise does make a vague affirmative defense regarding accord and satisfaction in its answer; however, there is no specific mention of the class action.[6]

By Ameriprise's own calculations, the Potts have lost more than $190,000[7], plus the benefits of any legitimate insurance policies purchased with their money that there wrongly terminated, all as a result of the actions and criminal conduct of Ameriprise agent Maureen Sullivan. The value of the settlement to which Ameriprise claims the Potts are entitled under the Class Settlement Stipulation is valued at about $500.

## ARGUMENT

### I. The Class Settlement Stipulation Does Not Cover The Potts' Claims.

The Potts' claims against Ameriprise in Tennessee do not fall under the definition of "Released Conduct" in the Class Settlement Stipulation and even if they did they are excluded by the stipulation's specific exceptions. Specifically, the Class Settlement Stipulation covers claims related to "a fraudulent scheme and common course of conduct by defendants to sell life insurance policies and annuities to an unsuspecting public over a multi-year period by means of defective service practices." *See Benacquisto Class Action Compl.* at ¶1, attached hereto as Exh. 7; *see also Class Settlement Stipulation* at 53-54. The class action complaint underlying the Class Settlement Stipulation alleged that Ameriprise through its agents engaged in uniform conduct and corporate policies that resulted in misrepresentations to customers and potential customers regarding the quality of the products being sold by Ameriprise, the performance of such products, and the

---

[6] It would seem that if Ameriprise truly believed this matter bound by the Class Settlement Stipulation it would have prudently filed its current motion six months ago before filing an answer to the Potts' complaint.

[7] The Potts' claim actually exceeds $190,000. Their total investment loss was in excess of $248,000.

suitability of such products. *Benacquisto Class Action Comp.* at ¶20-25. By contrast, the Potts' Tennessee Lawsuit alleges that a specific Ameriprise agent perpetrated pervasive fraud and theft that caused significant, unique damage to the Potts. Ameriprise's agent, Maureen Sullivan, forged the Potts names on policy forms, had the Potts sign documents in blank, opened policies on behalf of the Potts without their consent or knowledge, and secretly surrendered policies and converted policies without ever informing the Potts.[8] Simply put, the Potts' case concerns the theft and embezzlement of their retirement money. In Ameriprise's own words, the Potts "were stolen from."

**A. <u>The Potts' Claims Were Not Released in the Class Settlement Stipulation.</u>**

The Potts' unique factual claims do not fit within the Class Settlement Stipulation's definition of "Released Conduct" because the facts underlying their Tennessee claims simply were not at issue in *Benacquisto* or any of the litigation underlying the Class Settlement Stipulation. When interpreting the scope of a settlement agreement, a court is guided by "general rules of contract construction." *Gilbert v. Monsanto*, 216 F.3d 695, 600 (8th Cir. 2000). In turn, "When interpreting a contract, the Court's goal is to divine the parties' intent." *Bores v. Domino's Pizza LLC*, 489 F. Supp. 2d 940, 946 (D. Minn. 2007). Thus, this Court must determine if the parties to the *Benacquisto* and related litigations intended to preempt claims such as the Potts'. *Id.* According to Section XII(B)(2) the Class Settlement Stipulation:

[8] Regarding Ms. Sullivan's pervasive forgery, the Potts have gone through Ameriprise's documents and informed Ameriprise of which signatures were forged or otherwise improper. In addition to completing an Affidavit of Forgery at Ameriprise's request, the Potts have provided in their affidavits in support of this response (attached hereto as Exhs. 1 and 2) a breakdown of the improper signatures in policies that fall within the class period.

"Released Conduct" means any and all direct or indirect acts, representations, omissions, suggestions, or communications that are related to or connected in any way with the design, development, marketing, sale, administration, servicing, underwriting, or performance of the Policies or the Annuities, including, without limitation, acts, representations, omissions, suggestions or communications in connection with

(i) the explanation, description, marketing, sale, solicitation, illustration or replacement of any Policy or Annuity;

(ii) the application for or purchase of any Policy or Annuity;

(iii) the suitability of any purchases, sales or replacements of any Policy or Annuity;

(iv) the taking of any loans, or the accumulation of any interest or cash values on any Policy or Annuity;

(v) the setting, reduction, adjustment, payment or lack of payment of any interest rates, purchase rates or renewal rates on any Policy or Annuity;

(vi) the setting, charging or reducing of any cost of insurance, commissions, incentives, premiums, taxes, fees, mortality and expense fees, charges, contract charges, surrender charges, or expenses on any Policy or Annuity;

(vii) the investment choices made with respect to assets held in any Policy or Annuity;

(viii) the surrender, lapse, or termination of any Policy or Annuity;

(ix) the tax status, tax impact or tax consequences of any Policy or Annuity or any actions or inaction taken with respect thereto;

(x) the costs, commissions, terms, or benefits or disadvantages of any Policy or Annuity compared to any other life insurance policy, annuity contract or investment;

(xi) the comparison or lack of comparison of any Policy or Annuity to any other product;

(xii) the preparation by any financial advisor acting for the Company of any financial plan or the provision of financial or investment

advice insofar as it resulted in the sale, modification or maintenance of any Policy or Annuity;

(xiii) the effect that a Class Member's election and award of benefits in this Settlement Agreement may have on the value of any Policy or Annuity; and

(xiv) the administration or servicing of any Policy or Annuity after its purchase. [9]

*See Settlement Class Stipulation* at 57-58. It is a voluminous release to be sure, so voluminous in fact that it appears to exempt Ameriprise from liability from any claim against it whatsoever no matter what its basis. This could not have been the parties' intent. Thus, this recitation of "Released Conduct" cannot be read alone but must be interpreted in conjunction with the facts and issues actually litigated between the parties' in *Benacquisto*. In *Benacquisto,* the plaintiffs asserted claims alleging Ameriprise's uniform corporate policies for marketing, selling and misrepresenting the quality of its financial products. *See, e.g., Benacquisto Class Action Compl.* at ¶20-25.

Given this, the Potts' peculiar factual scenario, in which their money was "stolen" from them by a rogue, criminal Ameriprise agent, cannot be read into the Class Settlement Stipulation's definition of released claims, which relate to the marketing, performance and suitability of Ameriprise's financial products. *See Class Settlement Stipulation* at 53-54, 56-57. The Potts do not allege that Ameriprise's products are of a poor quality or that their investments did not perform according to Ameriprise's representations. Rather, the Potts' unique claims involve the factual allegations that

[9] By opposing Defendant's present motion, Plaintiffs assert they are not members of the settlement class contemplated by the Settlement Class Stipulation. Plaintiffs here make use of the term "class member" solely for purposes of interpreting the Settlement Class Stipulation's coverage.

Ameriprise agent Maureen Sullivan defrauded and stole the Potts' money by forging their signature, secretly opening and closing numerous improper accounts and by misappropriating the Potts' investment deposits to cover her tracks and pay off penalties and termination fees. The Potts further allege Ms. Sullivan terminated the Potts' legitimate policies without ever notifying the Potts, even while the Potts were still paying premiums for the policies.[10] Unbeknownst to the Potts, these fraudulent, repeated cancellations and transfers accrued significant surrender fees and other expenses. Ms. Sullivan covered these fees and expenses by diverting the Potts' monthly investment deposits to Ameriprise. While this type of conduct may be abstractly insinuated into the Class Settlement Stipulation's broad definitions of released conduct, this is simply not the type of behavior the *Benacquisto* litigation or Class Settlement Stipulation involved. *See, e.g., Benacquisto Class Action Compl.* at ¶¶20-25; *see also Class Settlement Stipulation* at 53-54. But even if the facts underlying the Potts' claims were at issue in *Benacquisto*, which they were not, the Class Settlement Stipulation contains several exceptions to the released claims which clearly except the Potts' claims.

**B. <u>The Class Settlement Stipulation Explicitly Excludes the Potts' Claims.</u>**

The Potts' claims in the Tennessee Lawsuit should also go forward because specifically excluded from release by the Class Settlement Stipulation. Specifically, Section XII(A)(3) of the Class Settlement Stipulation explicitly excludes several types of claims from the stipulation's coverage. *See Class Settlement Stipulation* at 54-55. For example, section XII(A)(3) explicitly states that "Nothing in this Release shall be deemed

[10] The lapsing of these policies caused even more damage to the Potts as they do not now even have the benefit of those policies, whether they were legally purchased or not.

to alter… (ii) a Class Member's right to assert any claim that independently arises from acts, facts or circumstances that occur for the first time after the last day of the Class Period [February 29, 2000.]" *Id.* at 54. This exception is further clarified by section XII(B)(1) which defines released "Claims and Causes of Action" as those "that have been, could have been, may be or could be asserted… at the time of this Settlement." *Id.* at 56-57. In the Potts case, Maureen Sullivan's misconduct occurred pervasively throughout her relationship with the Potts from 1993-2005 and it remains unclear exactly what occurred before and what occurred after February 29, 2000.[11] *See Byron Potts. Aff.* at ¶¶11, 17; *Nancy Potts Aff.* at ¶¶11, 17. Numerous instances of actionable misconduct clearly arose after the class period however. For example, Ameriprise's records show that all of the policies that Ameriprise claims are included in the class action settlement were surrendered after the end of the class period. *See* Docs. at Bates Nos. Amer/Ben 79-81, 502-503, 536, 830-831, 869, 971, 1040, 1523-1526, 2724-2726, attached hereto as Exhibit 3. Moreover, Ameriprise apparently itself did not uncover and inform the Potts of the damage Maureen Sullivan inflicted until 2005, some five years after the class period ended. Thus, the overwhelming portion of the Potts' damages, including the improper termination and other fees, arose after the Class period and should not be preempted by the Class Settlement Stipulation.

Next, Section XII(A)(3)(iii) of the Class Settlement Stipulation specifically preserves, "a Class Member's right to make a claim for theft or embezzlement in connection with a Policy or Annuity…" *Id.* at 54. The Potts' claims fit squarely within

---

[11] Discovery is ongoing with the intent of resolving these issues. Should the Court decide to enforce the Class Settlement Stipulation against the Potts, which it should not, such enforcement does not warrant dismissal of the Potts' complaint but mere limitation to post-February 29, 2000 conduct.

this exception as all of the facts underlying their claims involve the secret forgery, theft and embezzlement of their funds by Ameriprise's agent Maureen Sullivan. Indeed, it was Ameriprise itself who informed the Potts that they had been "stolen from." The Potts' claims may clearly go forward under exception (iii).

Finally, Section XII(A)((v) of the Class Settlement Stipulation explicitly preserves:

> [A] Class Member's right to assert any claim peculiar to the Class Member that falls outside the general categories of claims or conduct described in the complaints in the Actions or the Release in this settlement and is based on facts that were not discovered and could not with reasonable care have been discovered by the Class Member before the deadline to submit an Election Form set forth in this Agreement.

*Id.* at 55. The Potts' claims also fall squarely within this exception. First, the facts underlying the Potts' injuries are distinctly peculiar to the Potts and clearly not the result of some uniform, classwide conduct or corporate policy of theft and forgery by Ameriprise. Second, the Potts did not discover the facts of their claim until 2005, some five years after the class period ended, when Ameriprise brought the matter to their attention. Nor could the Potts have uncovered the thefts on their own through reasonable case. Indeed, Ms. Sullivan's pervasive improper conduct apparently went undiscovered by Ameriprise itself until 2005 when it brought the problems to the Potts' attention. By including several specific exceptions, the drafters of the Class Settlement Stipulation specifically carved out cases, such as the Potts', from release under the settlement. The Potts' case is specifically excepted by three of these exclusions. The Court should deny defendant's present motion.

## II. The Class Settlement Stipulation Is Unenforceable Because The Potts Did Not Receive Notice Or The Opportunity To Opt Out.

The Class Settlement Stipulation should not bar the Potts' claims because the Potts did not receive any class notice, were not given the opportunity to opt out, and had no knowledge of the class action at all until Ameriprise filed its present motion in October 2007. *See Byron Potts Aff.* at ¶¶15, 19; *Nancy Potts Aff.* at ¶¶15, 20. While Ameriprise claims it sent notice of the class action to the Potts, the Potts simply did not receive any notice that Ameriprise claims were sent. *Byron Potts Aff.* at 19; *Nancy Potts Aff.* at 20. *see also Def. Mem.* at 10-11. Ameriprise clearly knew how to get in contact with the Potts as it contacted them repeatedly once it became aware of the actions of its agent, Maureen Sullivan. It would be a denial of due process for the Potts to be enjoined from proceeding with the Tennessee Lawsuit because of Ameriprise's failure to properly notify the Potts of the class action.[12] Ameriprise's claim that the Potts "voluntarily entered into" the class action settlement agreement is simply wrong. *See Def. Mem.* at 15-16. The Potts not only had no knowledge of the class action, they had no knowledge of the existence of the policies or annuities at issue in their own case because they had been secretly opened and closed without the Potts' consent. Simply said, the Class Settlement Stipulation should not operate to deny the Potts' unique claims. The Court should deny Ameriprise's present motion.

---

[12] By Ameriprise's own admissions, the Potts lost more than $190,000 of actual cash paid to Ameriprise due to Ms. Sullivan's fraud. The value of the settlement to which Ameriprise claims the Potts are entitled under the Class Settlement is about $500. This gross disparity further highlights the due process burden suffered by the Potts for Ameriprise's failure to notify the Potts of the Class Settlement.

## CONCLUSION

For all the reasons set forth above, the Potts respectfully ask the Court to deny Ameriprise's Motion to Enforce Class Action Settlement and permit the Potts to move forward with their pending litigation in Tennessee.

Dated: December 7, 2007.

Respectfully submitted,

ZIMMERMAN REED, P.L.L.P.

s/Brian C. Gudmundson
Brian C. Gudmundson (#336695)
651 Nicollet Mall, Suite 501
Minneapolis, MN 55402
Telephone: (612) 341-0400
Facsimile: (612) 341-0844
Email: *bcg@zimmreed.com*

PATRICK, BEARD, SCHULMAN & JACOWAY, P.C.

Gary R. Patrick TN Bar #1941
537 Market Street
Suite 202, Market Court
Chattanooga, TN 37402
(423) 756-7117
(423) 267-5032 facsimile
gpatrick@pbsjlaw.com

*Attorneys for Plaintiffs*