UNITED STATES DISTRICT COURT
DISTRICT COURT OF MINNESOTA

LESA BENACQUISTO, DANIEL BENACQUISTO, RICHARD THORESEN, ELIZABETH THORESEN, ARNOLD MORK, ISABELLA MORK, RONALD MELCHERT and SUSAN MELCHERT, on behalf of themselves and all others similarly situated,

Plaintiffs,

vs.

AMERICAN EXPRESS FINANCIAL CORPORATION, AMERICAN EXPRESS FINANCIAL ADVISORS CORPORATION, AMERICAN CENTURION LIFE ASSURANCE COMPANY, AMERICAN ENTERPRISE LIFE INSURANCE COMPANY, AMERICAN PARTNERS LIFE INSURANCE COMPANY, IDS LIFE INSURANCE COMPANY, and IDS LIFE INSURANCE COMPANY OF NEW YORK,

Defendants.

Civ. 00-1980 DSD/JMM

CLASS ACTION
JURY REQUESTED

Plaintiffs bring this action in their individual capacities and on behalf of the class of persons defined below, and for their complaint allege, with personal knowledge as to their acts and themselves and otherwise upon information and belief based upon the investigation of plaintiffs' counsel, as follows:

## INTRODUCTION

1. This case arises out of a fraudulent scheme and common course of conduct by defendants to sell life insurance policies and annuities to an unsuspecting public over a multi-year period by means of deceptive sales practices.

2. The sales scheme, further described below, was developed, orchestrated, conducted and supervised by defendants, who recruited and trained agents, euphemistically

FILED AUG 21 2000
FRANCIS E. ... CLERK
JUDGMENT ENTD ...
DEPUTY CLERK ...

1

referred to by defendants as "financial advisors", to sell these products in a deceptive and misleading manner.

## JURISDICTION AND VENUE

3. The Court has federal question jurisdiction pursuant to 28 U.S.C. § 1331. Specifically, this Court has jurisdiction pursuant to the Truth in Lending Act ("TILA"), 15 U.S.C. §§ 1601, et seq., and Regulation Z promulgated thereunder, 12 C.F.R. § 226.01 et seq., and 18 U.S.C. §1961, et seq. Jurisdiction of the state law claims herein is proper pursuant to 28 U.S.C. § 1367.

4. This Court has supplemental jurisdiction over all other claims asserted herein pursuant to 28 U.S.C. § 1367(a).

5. Venue is proper in this district as many of the actions which form the basis of this suit occurred here and all defendants maintain their corporate headquarters and administrative offices in this district.

## THE PARTIES

6. Plaintiffs Lesa Benacquisto and Daniel Benacquisto are citizens and residents of the state of Pennsylvania.

7. Plaintiffs Richard W. Thoresen and Elizabeth J. Thoresen are citizens and residents of the state of Oregon.

8. Plaintiffs Arnold and Isabella Mork are citizens and residents of the state of Minnesota.

9. Plaintiffs Ronald and Susan Melchert are citizens and residents of the state of Wisconsin.

10. Defendant American Express Financial Corporation ("AEFC") is a wholly-owned subsidiary of American Express Company, a publicly traded corporation. AEFC provides "a variety of financial products and services to help individuals, businesses and institutions establish and achieve their financial goals," according to American Express Company Form 10-K for the fiscal year ended December 31, 1998, filed with the Securities and Exchange Commission on or about March 30, 1999 (the "Form 10-K"). Operations of AEFC and its subsidiaries named as defendants in this action are conducted in all 50 states and the District of Columbia. AEFC is incorporated in Delaware and maintains its principal offices at 52 AXP Financial Center, Minneapolis, Minnesota. AEFC engages in advertising and other activities in support of the product sales at issue in this complaint. AEFC also wholly owns defendant IDS Life Insurance Company which in turn is parent to the four other life insurance company defendants named in this action.

11. Defendant American Express Financial Advisors Incorporated ("AEFA") is a sales and marketing arm of AEFC which sells insurance and fixed and variable annuities issued by IDS Life Insurance Company and IDS Life Insurance Company of New York. AEFA is incorporated in Delaware and maintains its principal offices at 52 AXP Financial Center, Minneapolis, Minnesota.

12. Defendant IDS Life Insurance Company ("IDS Life") is a stock life insurance company organized in 1957 under the laws of the state of Minnesota. IDS Life maintains its principal offices at 52 AXP Financial Center in Minneapolis, Minnesota. IDS Life is currently licensed to do business in the District of Columbia and all states except New York.

13. Defendant IDS Life Insurance Company of New York ("IDS Life-NY") is domiciled in New York and licensed in New York and North Dakota. Although IDS Life-NY maintains offices at 20 Madison Avenue Extension, Albany, New York, and serves New York State residents, its principal administrative offices are at 52 AXP Financial Center in Minneapolis, Minnesota.

14. Defendant American Centurion Life Assurance Company ("American Centurion Life") is domiciled in New York, and is licensed in Alabama, Delaware and New York. Like IDS Life -NY, American Centurion Life maintains offices at 20 Madison Avenue Extension, Albany, New York but its principal administrative offices at 52 AXP Financial Center in Minneapolis, Minnesota.

15. Defendant American Enterprise Life Insurance Company ("American Enterprise Life") is domiciled in Indiana and is licensed in the District of Columbia and all states except New Hampshire, New York and Wyoming. American Enterprise Life maintains administrative offices at 52 AXP Financial Center in Minneapolis, Minnesota.

16. Defendant American Partners Life Insurance Company ("American Partners Life") is domiciled in Arizona and licensed in the District of Columbia and all states except Hawaii, New Hampshire, New York and Wyoming. American Partners Life maintains administrative offices at 52 AXP Financial Center in Minneapolis, Minnesota.

**DEFENDANTS' CONCERTED ACTIVITY AS JOINT CONSPIRATORS**

17. Defendants are inextricably intertwined with AEFC and each other, and function as operating units of AEFC. Advertising, sales presentations, and other materials used in connection with the sales of defendants' insurance and annuity products to the public, including

computer software used to generate such materials, are developed at, approved by, and disseminated from the administrative offices of defendants in Minnesota and are uniform in their misleading nature.

18. Defendants distribute their life insurance and annuity products primarily through a captive sales force, held out to the public as "financial advisors." These financial advisors receive training from defendants and "cross-sell" defendants' products. Defendants also distribute their products through appointed sales agents in banks and appointed sales agents associated with independent broker/dealers. These appointed sales agents receive training and compensation from defendants. However, it is not always disclosed to the potential purchaser that these appointed sales agents have a relationship with defendants.

19. In addition to jointly preparing sales and marketing materials, and training the financial advisors, other joint activities of the defendants include interacting with the public through common facilities, including shared customer service and marketing support centers. In addition, defendants promote insurance and annuity sales in unison through American Express-branded national advertising and their shared Internet site at www.americanexpress.com.

**DEFENDANTS' DECEPTIVE SCHEME**

20. In the early 1980s, IDS was failing competitively and financially. In 1984, American Express Company acquired defendant IDS Life and defendant AEFC (then known as IDS Financial Corporation) and made them part of its diversified financial services empire. As part of the drive to make IDS Life and its subsidiaries profitable, the defendants began cross-selling products and services, many based on the American Express brand. Rather than refer to its sales people as such, or even as agents, defendants euphemistically refer to them as "financial

advisors." The defendants actively tried to hire as "financial advisors" individuals with a background in social services, including social workers, ministers and teachers. Defendants purposefully sought out such individuals because they are experienced at creating an atmosphere of trust. Thus, potential customers, when approached by one of defendants' financial advisors, are led to believe that the planner has the customer's best interests at heart, and that the "financial advisor" is acting in a fiduciary capacity. The potential customer may be further deceived that the "financial advisor" is independent, unbiased and acting in the customer's best interest because some customers were charged a fee for the "advice" they received.

21. In fact, the "financial advisors" are little more than sales agents who have been trained by defendants to sell as much product by any means possible, including the deceptive sales practices outlined herein. Defendants, as discussed in detail below, employed numerous deceptive tactics in their scheme, among others: churning insurance policies and annuities; overstating performance of insurance policies and annuities; use of the vanishing premium concept; mis-selling insurance as an investment product; mis-selling deferred annuities (including fixed and variable, and individual and group annuities) for qualified retirement plans; mis-selling the tax advantages of non-qualified annuities; and improper targeting of senior citizens for annuity purchases.

22. Defendants designed and created a series of new insurance products and annuities to sell to existing customers as replacements of existing products. These new products were highly leveraged, volatile and extremely sensitive to changes in prevailing interest rates and other pricing assumptions. Defendants falsely represented to existing policyholders that the defendants' new policies were superior to their existing insurance coverage, and that they could

purchase these new policies by tapping the accumulated values of their existing policies, through surrenders or policy loans, to pay the new premiums, and that the new replacement policies would provide increased death benefits and greater financial benefits. Defendants failed to disclose that the new replacement policies were highly volatile and far more vulnerable to slight interest rate changes than the policies that they replaced; nor did defendants disclose the significant financial detriment policyholders suffered by engaging in these transactions. Similarly, defendants falsely represented to existing annuity holders that the defendants' new annuities were superior to their existing contracts, and that they could purchase these new annuities using their existing annuities, and that the new replacement annuities would provide greater financial benefits such as an increased amount of funds at retirement. Defendants failed to disclose the significant financial detriment annuity holders suffered by engaging in these transactions. This wrongful practice is called "churning" in the industry.

23. Defendants also made misrepresentations to potential customers in which they overstated the performance of their life insurance policies and their fixed and variable annuities, including misrepresentations regarding: the illustrated account value or cash values of a policy; the interest crediting rate of a policy; the policy's mortality and expense charges and/or cost of insurance, administrative or other charges; the policy's surrender value or rate of return; and the account value of an annuity.

24. Defendants also sold their life insurance products to unsuspecting consumers based on the false representation that policy values would generate sufficient accumulated values to pay all future premiums after a specified number of years and that policyholders would not be required to pay out-of-pocket cash premiums after that point in time. This tactic is referred to as

the "vanishing premium" concept in the industry. In a related tactic, defendants also falsely represented that premiums on certain classes of life insurance would not increase.

25. Defendants also misrepresented, inter alia, that certain insurance products being offered to potential customers were comparable to investments in savings accounts, pension maximization or retirement plans, college tuition funding plans, mutual funds, or other types of investments or savings vehicles; and concealed, inter alia, the fact that a substantial part of the money that would be paid by the customer would be used to pay a mortality charge for life insurance, to pay agents' commissions, and to pay administrative charges to defendants, and thus part of the money paid by the customer would not earn any interest or investment income.

26. Defendants also took advantage of the complexities of the retirement planning process and their reputation for expertise in retirement planning to sell deferred annuities (including fixed and variable, and individual and group annuities), which are insurance products that carry substantial fees and costs associated with the tax deferral advantage of the product, as appropriate products for retirement plans that are already tax deferred, such as IRAs, 401(k)s, Keogh accounts, and 403(b) plans.

27. Similarly, hiding behind the complexities of the retirement planning process and their reputation, defendants misled annuity purchasers, who did not place the annuity product in a qualified plan, with respect to the likely tax consequences they would encounter upon withdrawing their funds from the subaccounts.

28. Defendants trained their agents to target the "senior market" for the sale of fixed and variable deferred annuities. Agents were taught how to conduct estate planning seminars and similar "educational" seminars that were likely to be of interest to senior citizens. Drawing on

the impression of expertise created in the audience, agents were taught to identify and approach potential customers from these gatherings so that they could be sold an annuity. However, for the reasons discussed in depth below, annuities are a very poor use of a senior citizen's funds as it takes a significant number of years before an annuity will reach the same level of investment performance as a "straight" investment vehicle.

**The Churning Tactic**

29. The term "churning" is commonly used in the life insurance industry to describe the use of deceptive practices to deplete the accumulated cash value from an existing life insurance policy (either by surrender of cash values of that policy or by borrowing against the cash value) to apply that money to acquire a new insurance policy. Churning is illegal and is prohibited in every state by statute or common law. The replacement is almost never in the insured's interest as the insured loses substantial cash value from the current policy as a result of surrender fees, administrative charges and sales commissions. Moreover, the insured is subject to new contestability, suicide and exclusion clauses. The replacement is always beneficial for the insurance company and sales agent. The agent typically receives a large commission on the first year premium, and the insurance company collects fees and other administrative charges while replacing an existing policy with a restructured policy that is cheaper for the insurance company to provide.

30. Defendants' "financial advisors" would engage in straight churning whereby they represented to the policyholder that the "new" policy was significantly better than the existing insurance it would replace, and also combine "churning" with a vanishing premium presentation and/or illustration, representing that the new policy could be acquired through the use of cash

values from the existing policy, without depleting or affecting the cash value or death benefit of the existing policy, and that no additional out-of-pocket premiums need be made.

31. Defendants were aware of wholesale replacement activity occurring. Over 25% of the defendants' insurance sales were recognized as internal replacements, a figure that was admittedly "very high compared to the industry and a potential market conduct issue."

32. To facilitate replacement sales to existing policyholders, defendants designed new policies that were predicated on aggressive and insupportable pricing assumptions. When an insurance company designs a new life insurance product, its product actuaries perform pricing analyses incorporating assumed profit margins, guaranteed interest rates, sales, expenses, mortality, interest formulas, lapse rates and other critical assumptions. These assumptions determine product features -- including premium levels, interest scales and cash surrender values. These features determine how the product will perform and what interest ultimately will be credited under differing interest environments. If the pricing assumptions are overly aggressive or otherwise inaccurate, the product will perform worse than planned and, as a consequence, the policyholder will ultimately receive far less interest, cash values or death benefits than illustrated.

33. As interest rates and competition for existing policyholders increased through the mid-1980s, defendants faced tremendous pressure to design new products that would appear to offer improved performance through lower premiums, higher interest crediting rates, and cash values or death benefits providing higher internal rates of return. These new products were designed to permit the "financial advisors" to offer life insurance policies that appeared to be competitive with other emerging insurance products and other competing financial products.

The new policies were supposed to be "more economical," "more flexible," or provide greater "cash values" than existing policies. These new policies allowed illustration of shorter vanish periods and also facilitated the sale of replacement policies to existing policyholders, who were encouraged to replace their existing policies with a supposedly improved product.

34. To design and price these new products attractively, defendants' actuaries incorporated aggressive assumptions about future interest rates, expenses and other pricing factors. As a consequence, the new insurance products sold to existing policyholders were highly leveraged and volatile. Very slight deviations in interest rates or any failure to achieve overly optimistic expense or mortality assumptions would cause the policies to perform far worse than represented. None of these critical risks or assumptions was disclosed to those Class Members who were convinced to surrender or borrow against the cash values in their existing products to purchase the replacement policies.

35. The undisclosed risks associated with these replacement policies were compounded by the undisclosed loads charged in commissions and other acquisition expenses. Defendants fraudulently and intentionally induced existing policyholders to replace or borrow against their existing policies in order to purchase new policies, without informing the policyholders that by doing so they would lose substantial cash values and pay new and significant commission and other expense charges, and that, in many instances, the new policies would be financed with unauthorized loans taken against the cash value of their existing policies. This practice allowed defendants to strip or deplete the cash values from the policyholders' existing policies to finance new policies, as well as collect substantial interest on the policy loans

that were secured by underlying cash values. Tellingly, policy loans accounted for over $525 million of AEFC's balance sheet assets as of December 31, 1998.

36. Defendants promoted the churning scheme by furnishing to their agents information on policyholders, including information as to the amount of cash value available in existing policies via defendants' "Reprojection Proposal System," and by developing and distributing the software and materials necessary to execute the scheme. The "financial advisors" throughout the country practiced the churning scheme through the use of that information.

37. Defendants also trained their agents to seek out existing policyholders and provided the agents with sales materials designed to encourage replacement. One type of sales material used was called a "fact-finding" sheet. This document is essentially a series of questions, for agents to discuss with policyholders, which were geared toward convincing the policyholders to replace the existing insurance coverage with a "new" "more economical," "more flexible" plan or one that provides "better cash value." Agents were told by defendants' training materials to "Mine for Gold" in their existing client files.

38. Using the information supplied by defendants, the "financial advisors" would identify those IDS policyholders who had accumulated substantial cash values in their existing policies. The sales agents are connected via laptop computer into the defendants' records and can access data for every policyholder, including the amount of cash that has accumulated in the policyholder's current cash value life insurance policy. This computer link also allows the agent to prepare a sales and marketing tool developed by defendants called a "Personalized Financial Proposal." The Personalized Financial Proposal, more often than not, contained a policy

illustration of an IDS cash value life insurance policy available for purchase which appeared to provide greater benefits and was more attractive than the current policy.

39. Under the guise of reviewing the policyholder's overall financial well-being, the sales agents would call upon those customers, present them with a "Personalized Financial Proposal," and recommend that those customers replace their existing policy with a new insurance policy that would provide an additional death benefit or some other additional benefit. If the policyholder did not wish to replace his or her existing policy, the "financial planner" would encourage the policyholder to purchase a new supplemental insurance policy. Typically, the policyholders were told that they could obtain these additional benefits at little or no additional cost. The policyholders were not told that the cash value would be stripped from their existing policies, either through surrender or through policy loans, to obtain the new policy. Nor were they told that they would be charged substantial commissions and fees.

40. In order to effectuate the churning scheme, the "financial advisors," with the tacit consent of the defendants, failed to provide detailed disclosure forms required by state law when a policy was being replaced. Defendants were criticized by state regulators for failing to comply with state regulations concerning internal replacements. For example, in 1994 IDS Life entered into a consent order and paid a penalty to the Arizona Department of Insurance for failing to provide replacement notices. Similarly, the Nevada Department of Insurance found that IDS Life violated Nevada's replacement regulations.

41. In order to facilitate the replacement of existing policies so to increase earnings and sales, the defendants, in addition to providing their agents with information concerning cash values and encouraging their agents to sell replacement policies, created and distributed

simplified forms that enabled their agents to effectuate a churn with a simple check mark. Additional corporate documents were designed and distributed to effectuate this internal replacement, making such sales easy and familiar.

42. Similarly, defendants were aware that their agents were churning existing annuity holders into "new" or "modified" annuity contracts. Typically, the agent would take the entire cash value of the existing annuity and identify that amount as a lump sum deposit. This allowed the agent to increase the commission and fees he would receive. The new annuity contract would be issued with a "modified" retirement age which would be many years into the future. This foreclosed annuity holders from accessing their funds without incurring substantial fees and penalties. The churning of annuity holders also benefitted defendants because it allowed them to replace existing contracts which paid high rates of interest with new contracts which paid significantly lower rates of interest. In addition, the new contracts typically shift the investment risk from the defendant onto the annuity contract holders. Moreover, the new contracts provide for lower guaranteed minimum accumulation and surrender values than the existing contracts. The financial benefit to defendants from this practice was so great that agents were directed that they must "change over", i.e., churn, a minimum number of existing annuity contracts.

43. The dissemination of false information and omission of material information by defendants through their agents was a substantial factor in effectuating the churning scheme. Defendants disseminated false information to policyholders and failed to disclose to plaintiffs and members of the Class, numerous material facts necessary to avoid misleading the Class, including the following:

(a) the replacement policies were highly leveraged, volatile and extremely interest sensitive;

(b) performance of the replacement policies was dependant on overly aggressive and unattainable pricing assumptions about credited interest rates, expenses, persistency and other critical assumptions;

(c) there were substantial risks that the replacement policies would not perform as represented due to defendants' insupportable pricing assumptions;

(d) there are material adverse financial and non-financial consequences whenever a policyholder or annuity holder surrenders or borrows against an existing policy or annuity to purchase a new policy or annuity, even if the new policy has a higher face amount of death benefit or the new annuity is supposed to deliver a greater financial benefit;

(e) the cash value in insureds' existing policies would be depleted or pledged as collateral for policy loans without their knowledge or permission;

(f) the death benefits of insureds' existing policies would be eliminated or reduced as a result of the loan(s) secured by the cash value of such existing policies;

(g) when the cash value in existing policies was depleted, the policyholder would owe premiums on the new policy, premiums on the existing policies, and interest on the policy loan(s) secured by the cash value of the existing policy;

(h) as a result of the transaction, the agent would receive substantial commissions, which would diminish the cash value otherwise available to the policyholder or the annuity holder;

(i) as a result of the transaction, defendants would charge a substantial sales load or administrative charge, which would diminish the cash value otherwise available to the policyholder or the annuity holder;

(j) it was not in a policyholder's best interest to surrender or borrow against an existing policy to purchase a new policy, even if the new policy has a higher face amount of death benefit;

(k) it was not in an annuity holder's best interest to replace an existing annuity with a new annuity, even if the new annuity appeared to provide a greater financial benefit as the surrender of the existing annuity often resulted in payment of substantial surrender charges;

(l) it was not in an annuity holder's best interest to replace an existing annuity with a new annuity, even if the new annuity appeared to provide a greater financial benefit as the new annuity would bring with it the potential imposition of substantial surrender charges, and as these surrender charges often diminished over time, would subject the purchaser to more onerous surrender charges then he may face under the existing annuity contract;

(m) if an existing policy was fully surrendered or lapsed, valuable policy benefits such as suicide clauses, contestability clauses, and medical waivers would be lost;

(n) the replacement policy was subject to new underwriting standards, at an older insurable age and thus the underlying costs of insurance charged to the policyholder would be greater;

(o) the replacement policy would have new contestability and suicide clauses;

(p) the transaction exposed the policyholder to numerous undisclosed risks, including tax risks;

(q) the existing policy had important features, such as favorable policy loan provisions or "non-forfeiture values," which would be lost upon replacement;

(r) the existing annuity had important features, such as favorable interest rates and contractually guaranteed minimum values which would be lost upon replacement; and

(s) the true financial effect of the transaction to the policyholder or annuity holder.

44. The defendants directly benefitted from the churning of their policyholders. Substantial charges and fees are assessed upon the issuance of new policies and when surrenders or loans are made against an existing policy. The charges imposed for new policies may include a load charge, an annual policy fee, monthly payment charges and other administrative charges. When the existing policy is surrendered, policyholders incur a "surrender charge." When a loan is taken on an existing policy, interest is charged. If the loan and interest are not repaid, the policy eventually lapses. Thus, defendants are economically motivated to encourage agents to

sell new policies by surrendering or loaning against current products. These charges, and defendants' corresponding substantial benefits, were not disclosed to the plaintiffs and members of the Class.

45. Defendants benefit in another way when policies are replaced. Typically, as an insured ages, he or she becomes more expensive to insure because a natural part of the aging process is the deterioration of the insured's health and well-being. For example, a 30 year old man pays less for $100,000 of newly issued life insurance than a 50 year old man. Thus, when the insured is churned from one policy into another, he or she will pay a greater amount to receive the insurance coverage that already exists in the current policy.

46. As expected by defendants, the interest generated by the existing policies and/or the accumulated interest from the existing policies were not sufficient to pay premiums on the new policy. Consequently, insureds were deceived for a period of years to believe that they had obtained increased death benefits or other benefits with no additional premiums. However, when the cash value in the existing policy or policies was exhausted -- often as a result of policy loans taken without the policyholder's knowledge or consent -- the insured would be required to pay, out-of-pocket, additional premiums for the new policy. The insured would also be required to continue to pay the premiums on the existing policy plus interest on the loan on the existing policy. If not serviced or repaid, the policy loan reduced the death benefit or caused the existing policy to lapse. Additionally, if the insured was unable or unwilling to pay such amounts, either or both of the policies would lapse.

**The "Vanishing Premium" and "Overstating Performance" Tactics**

47. During the Class Period, defendants implemented an extensive marketing program to encourage their "financial advisors" to sell vanishing premium policies. The fundamental premise underlying the vanishing premium concept is the following: that premiums after the "vanish year" will be paid from interest credited on accumulated policy values, the surrender of paid-up additions, policy loans, internal borrowings or some combination of these funding sources -- but not the policyholder's out-of-pocket cash. A similar premise was also used to support the concept that premiums on universal life policies would not exceed the illustrated or "target" premium represented to the purchaser.

48. Defendants developed and approved uniform sales presentations, materials and illustrations promoting the vanishing premium sales scheme that misstated or omitted the underlying risks and assumptions associated with the purchase of vanishing premium policies and incorporated knowingly inflated and unsustainable interest crediting rates. These promotional materials and uniform presentations were disseminated to the agents, who thereafter necessarily and invariably used them to sell vanishing premium policies to Class Members. It was not disclosed to the agents that the software they were given, or the illustrations produced by that software, were premised on product performance assumptions known by defendants to be inflated and unsustainable.

49. Defendants targeted both existing[1] and new policyholders as victims of their vanishing premium sales tactic. In both instances, policyholders were induced to purchase vanishing premium policies based on the misleading representations that the policies would provide substantial death benefits and increasing cash values with only a single prepayment or a short-term payment of premiums and that no additional out-of-pocket premiums would be due because, after the "vanish year," the policies would be self-funding.

50. To effectuate the vanishing premium sales tactic, defendants prepared and disseminated uniform written and oral sales presentations creating the false illusion that out-of-pocket premium payments would "vanish" after Class Members made a specified number of cash payments. With regard to the related illustrated or "target premium" sales tactic, Class Members were told that their premiums would remain level. To do so, defendants needed to project interest crediting accumulations and performance over the duration of the policies. Computerized policy illustrations thus became a necessary and central ingredient to the scheme to sell vanishing premium and illustrated or target premium policies to the unsuspecting public.

51. The policy illustrations defendants employed to sell vanishing premium policies to plaintiffs and the Class were false and misleading by design. The illustrations were cast in a format that was intended to deceive policyholders to believe that cash premium payments would cease at the designated vanish year or that premiums at a set level would achieve the illustrated

[1] Defendants' "financial advisors" often called upon customers with existing policies and recommended that the customers buy a vanishing premium policy that would require no additional premiums or out-of-pocket costs. Agents represented that the new policy could be acquired through the use of cash values from the existing policy (this practice is known as churning or replacement and is more fully described above) which would prepay all premiums due on the vanishing premium policy, or would only require payments for a very few years after the initial deposit.

life insurance coverage. Defendants created and distributed software, via the "Info Serve" system, to their agents which would illustrate so-called "natural" vanishing premiums and "fractional" vanishing premiums. The agents could select any interest crediting rate to achieve the desired "vanish" date. Defendants knew and intended that this graphic depiction of the purported "vanish" would cause prospective policyholders to believe that their out-of-pocket premium payments would cease at that point. Indeed, defendants informed their agents that "premiums can't really vanish although this is the insured's perception."

52. Similarly, the agents could input a desired premium payment and life insurance coverage amount and allow the software to "solve" for the applicable interest crediting rate that would allow the premium payment amount to achieve that death benefit. These illustrations would lead the purchaser to believe that he could obtain the life insurance indicated for the premium amount shown without disclosing the unreasonably high nature of the interest crediting rate.

53. In summary, the illustrations and presentations prepared, approved and disseminated by defendants failed to disclose even the most fundamental facts and information concerning the vanishing premium policies. Among other things, the illustrations and presentations failed to disclose to Class Members:

(a) that premiums do not "vanish" but continue to be payable over the term of the policies;

(b) the actual number of "out-of-pocket," cash premium payments a policyholder would have to pay for his or her policy;

(c) the cash value, interest earned and other policy benefits a policyholder would realize under his or her policy based on a particular number of cash premium payments;

(d) that the vanishing premium policy illustrations were based on crediting rates, expense factors and mortality and other assumptions that lacked any reasonable basis in fact;

(e) that the vanishing premium policies would not pay for themselves as represented and illustrated;

(f) the fact that relatively minor deviations from the assumed performance of any of the various factors built into the policy and its illustrations would have a devastating impact on the ability of the policy's premiums to vanish, or with the illustrated or target premium tactic, to remain level, and provide the promised death benefit; and

(g) that the uniform illustrations and the viability of the vanishing premium concept were premised on multiple undisclosed assumptions lacking any reasonable basis in fact.

54. Without disclosure of the foregoing material facts and information, the uniform sales presentations and policy illustrations prepared, approved and disseminated by defendants were inherently false, misleading and deceptive.

55. Another of the schemes utilized by defendants is commonly referred to in the life insurance industry as the "Performance Tactic." The essence of the Performance Tactic is the built-up expectation that dividends and/or interest would accrue on the policy in specified amounts at specified future policy years. This anticipated growth of dividends and/or interest over the life of the policy was shown at a rate that in the then-existing economic environment was attractive to the new or existing policyholder purchasing the policy. The Performance Tactic was incorporated into every vanishing premium illustration and related documents used as part of the Vanishing Premium Tactic, but was also part of every other non-vanishing illustration and related documents used for non-term policies where out-of-pocket premiums were shown to be payable for the life of the policy. Defendants also utilized this Performance Tactic with respect

to annuities including by, among other things, misrepresenting that the account value of an annuity would be maintained at a certain level over the life of the annuity or that the account value of a variable annuity would, at the time of the death of the annuitant or annuity owner, exceed the purchase payments made in connection with the annuity.

**The Insurance as Investment Tactic**

56. Another of the tactics utilized by defendants to sell policies is commonly referred to in the life insurance industry as the "Insurance as Investment" tactic ("Investment tactic"). The essence of the Investment tactic is to misrepresent the true nature of the product -- i.e., that the product is a life insurance policy -- by concealing, either partially or totally, the insurance coverage aspect and how the purchaser's monies were to be used. Defendants used illustrations to create in the potential purchaser a belief and expectation that interest credited to the policy would reach specified amounts at specified dates in the future. This anticipated growth of interest over the life of the product was shown generally at a rate higher than was available for other investments at the then-existing economic environment. This made the product more attractive to the potential customer and allowed defendants to sell life insurance products as investments comparable to mutual funds, savings plans and securities.

57. Defendants routinely trained their agents to sell life insurance polices as an investment by not disclosing, or by de-emphasizing, the life insurance aspect and by euphemistically referring to premium payments as "deposits" or "contributions" or investments or other similar terms not normally associated with payments that are made on life insurance policies.

58. Defendants' Investment tactic involved selling life insurance policies to Class Members upon deceptive and misleading policy illustrations and related documents which represented that interest would accrue on Class Members' policies in specified amounts at specified future policy years, based upon then illustrated interest crediting rates and the payment of the specific amounts illustrated.

59. When disseminating these performance materials to policyholders, defendants knew or recklessly disregarded that there was a likelihood and/or expectation that interest crediting rates for those types of policies would decrease in the successive years, and if interest crediting rates decreased, the victims of the Investment tactic would not achieve their financial goals as represented by illustrations and related documents. Defendants' illustrations and related documents used in the Investment tactic misrepresented, failed to disclose to and, in fact, concealed from Class Members this material information.

60. To implement this tactic, defendants intentionally, recklessly and/or negligently created computer software programs that would generate illustrations and related documents based upon numerous erroneous assumptions. Defendants' software allowed their agents to create illustrations using any rate of interest they chose. Thus, by increasing the rate of interest, the agent could create illustrations which made defendants' products look more attractive to the purchaser as an investment and compare favorably to mutual funds, certificates of deposit and other investments.

61. Defendants knew, but failed to disclose, that the illustrations and related documents used by their agents to sell life insurance policies as investment vehicles were false,

misleading and misrepresented what, in fact, purchasers were likely to receive in return for their money.

62. Defendants knew or recklessly disregarded that the illustrations and related documents that they prepared, approved and disseminated and that were used by their agents to sell life insurance policies to the victims of the Investment tactic were materially false and misleading in at least the following respects:

(a) They misrepresented that credited interest rates may increase or decrease from the interest crediting rate used to create the illustrations in that defendants knew the rates of return for those types of policies were likely to and/or were expected to decrease in successive years; and

(b) They concealed and/or failed to disclose that the illustrations and related documents as well as the viability of defendants' performance concepts were premised on multiple undisclosed assumptions lacking any reasonable basis in fact.

Defendants and their agents at all relevant times herein actively concealed from and/or failed to disclose the foregoing material facts and information.

63. Without disclosure of the foregoing material facts and information, the policy illustrations and related documents prepared, approved and disseminated by defendants and used by their agents were inherently false, misleading and deceptive.

64. Defendants and their agents knowingly engaged in the tactic described herein with the intent to and the result of obtaining profits, commissions and other financial benefits for themselves to the financial detriment of the victims of the Investment tactic.

65. Defendants knew or recklessly disregarded that their agents were selling life insurance policies by misrepresenting the true nature of the products and using false, misleading and deceptive illustrations and related documents.

66. Defendants, by supplying their agents with computer programs that generated false and misleading illustrations and related documents and through their sales and commission policies and practices, knowingly fostered a climate that encouraged their agents to engage in the practices described herein in relation to the Investment tactic.

67. The misrepresentation made to each potential purchaser and the information concealed from each potential purchaser were virtually the same because defendants' agents were uniformly trained in this scheme by experienced managers and training supervisors to present false information to, and to conceal information from, members of the Class.

68. In addition to the direct training, instruction and sales materials provided by defendants to their agents, the agents were also substantially motivated by defendants' sales commission and compensation structure. That commission structure provided significant incentive for the agents to misrepresent the life insurance policies actually being sold.

**Deceptive Annuity Sales Tactics**

69. The deferred annuities sold by defendants are complex, specialized insurance products designed to accumulate funds for retirement. Under current law, insurance products, including deferred annuities, accumulate investment earnings on a tax-deferred basis and the main economic value of such annuities is to act as a device that confers a tax-deferred benefit for the investment in the deferred annuity.

70. Defendants' sales materials promote tax-deferral as a primary inducement for the purchase of their deferred annuities. Yet, defendants target their sales of deferred annuities to persons who wish to fund a tax-qualified retirement plan.

71. "Qualified plans," as that term is used in this complaint, refers to contributory plans and accounts which themselves already enjoy tax-deferred status (and are thus "qualified") under the Internal Revenue Code. These include many of the most popular and common plans for retirement investing: Individual Retirement Arrangements (IRAs), Keogh and 401(k) plans, and other accounts treated similarly by the tax code.[2]

72. The result is that the primary justification for the extra layer of fees and other detriments imposed by the product evaporates. Any investment inside a qualified plan is tax-deferred. Defendants intentionally deceive and defraud consumers, most of whom are not experts on annuities, by selling them an expensive tax shelter product to fund a tax sheltered account. Defendants falsely market and sell their deferred annuities for funding qualified plans on the basis of a purported tax-deferral advantage that does not actually exist.

73. As one of the last tax shelters available to the middle class, deferred annuities have become extraordinarily popular during the 1990's. For example, sales of variable deferred annuities -- which offer investment returns linked to stock market performance, similar to mutual funds -- totaled $121 billion in 1999 compared to just $4.6 billion in 1987. Defendants are among the largest sellers in the nation of deferred annuities (including fixed and variable, and individual and group annuities) for funding tax qualified plans. Based on calendar year of 1996

---

[2] Specifically, these are qualified for favorable income tax treatment pursuant to Internal Revenue Code §§ 401(a), 401(k), 403(a), 403(b), 408(a), 408(b), 408(k), 408(p), 408A, or 457. "Qualified plans," as that term is used in this complaint, exclude defined benefit plans (traditional non-contributory pension plans).

premiums, A.M. Best Company, a ratings company that closely follows the insurance and annuity industry, ranked IDS Life as the 7th largest seller of deferred annuities for funding qualified plans.

74. The sales transactions at issue in this complaint, particularly those involving roll-over IRAs, are in many instances the single most financially consequential decision many persons will make in their lifetimes. Given the simultaneous growth in recent years of tax-deferred products (deferred annuities) and tax-deferred contributory retirement savings plans, many people are easily confused by sales materials and presentations presenting tax-deferral as a reason to buy deferred annuities. Defendants have capitalized on this point of confusion to profit from improperly induced purchases of deferred annuities.

75. As part of their scheme, defendants and their agents represent in sales materials and presentations that defendants' deferred annuities are unconditionally appropriate ("ideal") for funding qualified plans. These unqualified representations are materially false and deceptive in the absence of full and accurate disclosure of the most important facts that a consumer needs to know -- that a qualified plan investor does not actually obtain the tax-deferral advantages of a deferred annuity contract. The fact that the primary economic value of a product is never actually obtained is material to a consumer's informed decision to purchase the product. Defendants have created a duty to disclose these objective facts by, inter alia, falsely representing that deferred annuities are categorically appropriate for qualified plans.

76. Defendants also deceptively promote the insurance features of deferred annuities used to fund qualified plans. In their sales materials, contracts and prospectuses, defendants deceptively described the deferred annuity mortality insurance features. In those contracts that

contain a death benefit feature, defendants deceptively describe the death benefit as providing valuable protection for heirs, without disclosing the material fact that annuity death benefits are taxed adversely and in substantial part will not benefit heirs. Defendants also deceptively extol the lifetime annuity payout option in the deferred annuity as having value, when in fact any qualified plan investment can be annuitized at any time. The buyer of the deferred annuity essentially holds only a coupon to buy a payout annuity in the future. The coupon is totally worthless, except in some contingent, remote circumstances, because the annuity purchase rates that are specified in the deferred annuity contract will likely not be favorable compared to market rates for payout annuities.

77. Persons who agreed to place a deferred annuity inside their qualified plans do not know that deferred annuities provide no tax-deferral benefit in this context. A SmartMoney magazine article states that "perhaps the most common pitfall in retirement investing [is] a tax-deferred product inside a tax-deferred account." Jersey Gilbert, James R. Hagy and Christopher Oster, "Investing for Retirement," SMARTMONEY, December 1998, at 111. Scrupulous marketers of deferred annuities devote substantial portions of their advertising and sales materials to inform consumers that deferred annuities should not be considered until after the consumer has fully funded her qualified plans.

78. Over time, consumers who are sold deferred annuities to fund their qualified plans suffer severe economic harm. By retirement age, insurance fees and other detriments (described more fully below) that purportedly relate to the annuity portion of the product cause the loss of up to <u>one-third</u> of a retirement investor's account. Defendants are well aware that, in the absence of a tax-deferral benefit, the protection provided by a deferred annuity's insurance features is

nominal relative to its extra cost, and would be unlikely to justify a purchase by an informed qualified plan investor. Moreover, once they purchase the deferred annuity, consumers are trapped; high surrender fees inhibit them from exiting the arrangement.

79. Conversely, defendants' exorbitant deferred annuity insurance fees provide generous rewards for the seller. Deferred annuities generally provide sales commissions two to three times higher than those typically provided by mutual funds or other investments, ostensibly because it is supposed to be more difficult for sales representatives to find appropriate buyers for deferred annuities as compared to straight investments.

80. A "deferred annuity" is an accumulation product. The purchaser invests money and allows the value of the account to grow (depending on the type of investment vehicle that is chosen).[3] Later, during the payout period, the purchaser may elect to take out the amounts contributed and earned, with one such payout option being an annuity.

(a) The investment phase. With a deferred annuity, the premiums(s) paid by the purchaser to the insurance company are invested until the time specified in the contract for payout. Variable deferred annuities offer a wide range of investment options. In a fixed deferred annuity, the purchaser receives from the insurer an interest rate on the amount of premium invested by the purchaser; the insurer may contractually agree to a particular rate for a period of time, but more typically the insurer adjusts the rate at its discretion. In a variable deferred annuity, the purchaser receives "units" representing interests in one or more "subaccounts" of the

---

[3] In industry parlance, an individual purchases an annuity "contract," and a participant in a group retirement plan invested in a deferred annuity holds a "certificate," evidencing his rights to an account balance in the contract's fixed accounts and/or unit interests in variable subaccounts offered within the deferred annuity. Annuity "contacts" and "certificates" are jointly referred to herein as "contracts."

insurer's separate account, containing equity, bond, or money market portfolios, which are usually managed by outside investment managers (and are often managed and named so as to mimic well-known "brand name" mutual funds offered by those managers, even though they are different investments and will have different performance records).

(b) The payout phase. A deferred annuity contract typically gives the contract owner a number of options when the investment phase ends. The owner may take an immediate lump sum or a periodic withdrawal plan. Or, as another payout option, he or she may "annuitize." This is an irrevocable decision to give the accumulation account to the insurer in exchange for a stream of periodic payments. Contract owners may choose payments that continue for life or for the joint lives of the annuitant and spouse. The amount of the periodic payment is calculated based on the life expectancy of a person of the annuitant's age. To "annuitize" a deferred annuity is functionally the same as the purchase of an immediate annuity.

81. Deferred annuities typically contain two insurance features: minimum annuity purchase rates for the annuity payout options, as described above (in practice, other payout options, such as lump-sum or systematic withdrawal, are much more popular); and a "death benefit" that ensures that if the account owner dies during the investment period, heirs receive some defined amount (i.e., the principal amount invested) even if the account has declined in value at that time. However, the number of contract owners who actually benefit from this sliver of mortality insurance protection is very small:

- On average, fewer than 1 percent of deferred annuity owners choose to exercise the annuity payout option at the end of the investment period. Of those who do, few, if any, annuitize at the contract's minimum guaranteed annuity purchase rates, which tend to be less favorable than the rates paid on payout annuities available in the market at that time.

- Of the contracts "surrendered" during the investment phase due to the death of the account owner, only a few, if any, involve investment losses across all the portfolios in which the contract owner may be invested of such a magnitude that any death benefit is paid.

Even the life insurance industry's own experts have conceded that, as a matter of objective fact, the value of the insurance features of a deferred annuity is so nominal that, in the absence of a tax-deferral benefit the insurance features do not in good conscience justify a recommendation of the product. See, e.g., "Annuity Expert Evaluates Media's VA Gripes," National Underwriter -- Life/Heath/Financial Services Edition, February 22, 1999 at 15 (Michael Lane, President of AEGON Financial Services Group, reportedly reminds his colleagues that the reality is that the "death benefit feature is a waste" for buyers because, of the contract holders who die, the number "actually benefitting from the death benefit [is] statistically irrelevant.").

82. However, because of the mortality risks and insurance component, deferred annuities are deemed to be insurance products and enjoy a privileged status under the income tax laws. This means that annuity earnings (interest, dividends, or capital gains) accumulate on a tax-deferred basis. I.R.C. § 72. The tax-deferral benefit is especially valuable to purchasers because it applies regardless of whether the contract owner elects to exercise his option to purchase a payout annuity at the end of the investment period.

83. Because of their tax-deferred status, deferred annuities are potentially attractive financial products to people seeking tax-deferral for retirement assets (and may be appropriate for those who have already made their maximum contributions to IRAs or other qualified plans available to them). Because defendants sold annuities for placement in qualified plans, plaintiffs and Class Members have paid fees and suffered detainments while not receiving the primary benefit of the deferred annuity.

84. The unreasonable and excessive charges and other detriments incurred by purchasers of defendants' deferred annuities include:

(a) With a variable annuity, the annuity fees are typically in the form of annual asset-based percentage charges assessed against the contract owner's subaccount investments. These fees are in addition to the asset-based investment management fees assessed by the managers of the investments. The two major asset-based annuity fees are the "mortality and expense-risk" (M&E) charge, which averages 1.25 percent (125 basis points) annually according to industry surveys, and the "administration" charge, an additional 0.15 percent (15 basis points) annually.

(b) With a fixed annuity (and the fixed-rate general account investment option in a variable annuity), the contract owner's money is invested in the insurer's general account, and the insurer typically adjusts the interest crediting rate at its discretion, even though contract owners are locked into the contract for long periods of time. A recently published book on annuities, authored by an annuity promoter, states that "every [annuity] has expenses; some of them are more identifiable than others. There are two basic approaches used by insurers in obtaining these fees -- explicit and implicit. Explicit charges are clearly spelled out. . . [i]mplicit charges are made indirectly and can often be much higher than their explicit counterparts. . . . Implicit charges [are] indirect, hidden costs, such as the difference between returns actually earned versus the amount credited to your account." Gordon K. Williamson, <u>Getting Started In Annuities</u> (John Wiley & Sons, Inc. 1999) at 218.

(c) A contract charge of $24 to $40 is typically assessed annually against annuity accounts.

(d) Deferred annuities also have back-end loads, or surrender fees. These fees are assessed in the event that the contract owner elects to withdraw invested funds prior to the expiration of a contractually specified period. The fees are calculated as a percentage charge of the withdrawn funds, typically 6 to 9 percent if the "surrender" occurs in the first year and on a declining scale thereafter for 7 to 10 years. With many contracts, the surrender fee period begins anew for each additional investment of principal after the initial investment.

85. Although defendants' contract prospectuses represent to prospective purchasers that the M&E charge is used solely to pay for the insurance features, in truth the actual cost of the insurance features accounts for the smallest portion of the M&E charge. The M&E charge

actually is in large part earmarked in advance for distributions expenses, including paying off the sales commission.

86. In addition to high annuity insurance fees to cover the high commissions defendants pay to their agents for selling the deferred annuities, defendants also use surrender fee income to finance the sales commissions. Agents receive the commissions either as up-front payments or spread over time. If an annuity purchaser decides to terminate her contract within the first 7 to 10 years -- i.e., before defendants have had a chance to collect enough annuity fees to cover the sales commission paid to the agent -- the additional surrender fee provides defendants with funds to cover the full amount of commissions. As a result, plaintiffs and the Class Members are trapped: by the time they realize they are paying exorbitant annuity fees out of their retirement accounts for insurance features that provide no tax benefits, the only way they can extract themselves from the arrangement is to pay a further large surrender fee, which is used to finance the compensation of the agent that recommended the deferred annuity in the first place.

87. The compounded effect of these unreasonable and excessive annuity fees over the course of a few decades -- not counting any surrender fees -- can consume as much as one-third of a retirement investor's account.

88. Defendants and their agents made material misrepresentations or failed to disclose material facts to plaintiffs and the Class Members or their employers as follows:

(a) Material Misrepresentations About Tax-Deferral Benefit. Defendants and their agents expressly promoted a tax-deferral advantage for purchasers of deferred annuities that does not exist when the annuity is being recommended for funding a qualified plan. Defendants

typically stated, for example, that "Annuities . . . offer the valuable advantage of tax deferral until withdrawal, which means your earnings will accumulate faster." Sales literature for defendants' IDS Life Flexible Portfolio Annuity states that when you invest in such annuity, "the benefits of tax deferral can help you achieve your retirement goals faster." Sales material for the IDS Life Fixed Retirement Annuity-Value Plus states that "[w]ith IDS Life's Fixed Retirement Annuity-Value Plus. . . [y]ou'll accumulate more money through tax-deferral."

These statements fraudulently induce purchases of the product because they give the materially false and misleading impression that tax-deferral is a key reason to purchase the deferred annuity for funding qualified plans when, in fact, it is not a justification because any asset funding a qualified plan is tax-deferred. Reasonable consumers are not experts in annuities and would consider it important to know what defendants know -- which is that the extra layer of insurance fees and other detriments imposed by the product to confer a tax-deferral benefit to the annuity do not provide a "valuable advantage" when such products are used to fund a qualified plan -- instead, it is a senseless wasting of retirement assets.

(b) Material Misrepresentations About Appropriateness Of Product For Qualified Plan Funding. Defendants and their agents affirmatively deceived and made material misrepresentations to prospective purchasers by stating that defendants' deferred annuities are categorically appropriate, and by recommending deferred annuities as appropriate products, for funding tax-deferred plans or accounts, such as IRAs and 401(k)s. The sales materials and prospectuses utilized by defendants for their deferred annuities generally state, verbatim or in substance, that the deferred annuity "is available for qualified and non-qualified retirement plans" and that deferred annuities are "ideal" for funding qualified plans. For example, defendants' sales

materials state: "A tax-sheltered annuity (TSA) is. . . an ideal vehicle for funding a retirement savings plan. An annuity offers significant tax advantages and accumulation potential." Another brochure titled "IDS Life Annuities" states that the "value" of a deferred annuity is "helping you defer income taxes." Under the heading **"Use annuities in your qualified plan,"** the brochure states: "If you have a qualified retirement plan such as an IRA or Keogh, you can add the benefits of annuities to your retirement plan as well." The sales materials and prospectuses also include detailed discussions of the tax laws governing qualified plans, which is intended to convey that the product is appropriate for qualified plans. Many contracts have reduced initial payment requirements if the contract is used to fund a qualified plan.

Defendants and their agents created the materially false and misleading impression that their deferred annuities (including their fixed and variable, and individual and group annuities) are designed for and/or unconditionally appropriate for funding qualified plans when, in fact, deferred annuity purchasers do not obtain any actual tax-deferral benefit -- the product's primary value -- when such products are used in qualified plans.

89. By contrast, scrupulous marketers prominently disclose in advertising and sales materials that the product is not appropriate for persons that have not already fully funded their qualified plans. For instance, prospective Fidelity customers are informed that "a deferred variable annuity might be right for you if you're contributing the maximum to your 401(k) or other employer-sponsored retirement plan, fully funding your IRA, and are looking for yet another way to build assets that you can use for income in retirement."

90. Defendants' uniform failure to disclose, in the sales to plaintiffs and Class Members, the redundancy of any tax deferral benefit of the deferred annuity was a material

omission. The fair value of the insurance features of the product is minimal relative to the higher fees and other detriments of the product associated with its redundant tax deferral advantages. To further mislead buyers, defendants deceptively described the insurance features in sales materials as follows:

(i) Deceptive Description Of Annuitization Option. Defendants deceptively stated in their sales materials, contracts and prospectuses that their deferred annuities provide a benefit to purchasers because "you can choose a steady income you can't outlive" through exercise of a life annuity payout option. For instance, a sales brochure states that "[o]nce you retire, the IDS Life Flexible Portfolio Annuity provides these additional benefits: . . . you can choose . . . a payout option that pays a guaranteed income for the rest of your life." However, contrary to these representations, it is more likely that the deferred annuity will not provide any payout "benefit" whatsoever, because the option price is not favorable. The annuity purchase rates that are specified in the deferred annuity contract will likely not be favorable compared to market rates for payout annuities. Therefore, the deferred annuity's life annuity payout option will not be exercised -- even in those instances when an investor selects a life annuity payout of her account. Rather, the deferred annuity owner will get, or will shop around to find, a market rate for a payout annuity. Defendants are essentially promoting as valuable a coupon to buy a payout annuity in the future, without disclosing that the coupon is totally worthless except in some contingent, remote circumstances. In addition, defendants deceptively state or imply that persons who do not purchase a deferred annuity will not have an annuitization option for their assets in retirement. However, in truth any investment can be annuitized for lifetime retirement income through the purchase of a payout annuity.

(ii) Failure to Disclose Adverse Tax Treatment of Deferred Annuity Death Benefit. Defendants deceptively promoted annuity death benefits as valuable protection for heirs, when in fact annuity death benefits are taxed adversely and therefore do not benefit heirs in significant part. For instance, under the heading "Benefits for your heirs" in an IDS Life sales brochure, it states that "[t]he IDS Life Flexible Portfolio Annuity can provide financial assistance to your beneficiaries" through its death benefit provision. Defendants failed to disclose that, in contrast to life insurance death benefits, which are income tax-free whether the policy is purchased inside or outside a qualified plan, annuity death benefits in excess of tax basis are subject to federal and state income taxes. Consumers would find this to be a material fact, since it significantly reduces the value of the supposed protection for heirs. By omitting this material fact, defendants seek to mislead consumers into reaching the false conclusion that a deferred annuity death benefit is an efficient method of buying life insurance protection.

The misrepresentations and omissions described above were contained in the uniform advertising, sales presentations, and sales materials prepared, approved, and disseminated by defendants and used by their agents in selling deferred annuities to plaintiffs and Class Members. The misrepresentations and omissions described above were material. Plaintiffs and Class Members and/or their employers would not have purchased deferred annuities from defendants for placement in their qualified retirement plans if they had been told the truth about these issues.

**The Mis-selling of the Tax Advantages of Non-Qualified Annuities Tactic**

91. In the promotion of deferred variable annuities to purchasers who were purchasing the product outside of a tax qualified retirement plan, defendants deceptively described the tax deferral feature of the product without full and fair disclosure that capital gains on subaccount

investments are subject to federal income tax upon withdrawal at ordinary income rates rather than at capital gains tax rates. Under current tax law, capital gains are subject to a maximum 20% tax rate for most taxpayers, compared to higher marginal tax rates (28% to 39.6%) for ordinary income.

92. Defendants had a duty to disclose the adverse nature of the taxation of variable annuities relative to the taxation of capital gains on straight investments, such as stocks and mutual funds, because they promoted the sale of these products on the basis of their supposed tax advantages relative to straight investments. The failure to meaningfully disclose the risk of disadvantageous tax treatment upon withdrawal was material to an informed decision to purchase the product, particularly since misled purchasers cannot easily extract themselves from these arrangements -- purchasers are required to maintain a purchased annuity until age 59 ½ or else face an additional 10% penalty tax upon the withdrawal of taxable earnings. As a result of defendants' material misrepresentations and omissions concerning the tax treatment of deferred annuities, purchasers were induced to purchase the product based on the supposed tax advantages of the product. Purchasers paid insurance fees and surrender charges in excess of straight investments, which they otherwise would not have paid had they not been misled. In addition, purchasers who were misled and then elected to exit these disadvantageous arrangements to mitigate their losses paid higher income taxes and penalty taxes they otherwise would not have had to pay.

**Defendants' Practice of Targeting Senior Citizens**

93. Defendants trained their agents on the most effective methods for targeting the "senior market" for sales of annuities, including the use of estate planning seminars and other

methods that would establish, or show, a reputation of expertise in financial affairs. However, senior citizens are not good candidates to purchase annuities, because it takes many years before the value of tax deferral will outweigh the detrimental effect on investment returns caused by the extra layer of insurance fees, high spreads on fixed accounts, and other detriments of the product. Moreover, senior citizens often have emergency needs for liquidity for which the deferred annuities sold by defendants are ill-suited, given their high surrender fees.

94. In addition, unlike straight investments, variable annuities do not enjoy any step-up in basis upon death, and thus, may present serious adverse tax consequences for purchasers' heirs.

95. Notwithstanding these facts, defendants and their agents improperly targeted senior citizens for sales of deferred annuities, over other more appropriate products, because of the higher profits and sales commissions generated by deferred annuities. These inappropriate sales caused financial loss to purchasers, who paid insurance fees and surrender fees that they otherwise never would have agreed to pay had they not relied upon the supposed expertise of defendants and their agents in their recommendation of the deferred annuity as an appropriate product.

**Defendants' Additional Deceptive Practices**

96. In furtherance of their scheme, defendants employed additional deceptive practices including failing to properly and adequately disclose the true nature and cost of the product being sold, failure to adhere to suitability guidelines when selling annuities and life insurance policies, failure to render proper advice concerning the underlying investments associated with variable annuities and life policies, failure to properly and adequately disclose

first year and renewal interest crediting rates on fixed annuities, failure to properly and adequately disclose the bonus or purchase crediting rates on variable annuities, making false statements about the interest rate that would be credited to the annuities or policies or the costs that would be charged in connection with the products, and administering the policies and annuities to the benefit of defendants and the detriment of the Class Members.

**Defendants' Control of the Sales Process**

97. Defendants exercised substantial control over the entire sales process. Defendants had a practice and policy of closely monitoring their agents, the so-called "financial advisors." Defendants' relationship with their sales agents is one in which the agents are the functionaries of the defendants in effecting sales of defendants' products. On information and belief, defendants prepare or preapprove each piece of advertising and sales material used to effect sales of their products. Defendants prepared, developed and distributed computer software to ensure uniform, home-office approved sales presentations and policy performance illustrations.

98. Defendants extensively train their agents with respect to how sales should be accomplished, from the initial identification of potential customers through to follow-up visits and calls after the sales transaction has closed. Defendants provide training materials and guidance to their agents. Defendants perform training seminars which agents are required to attend. Defendants provide mock sales presentations materials and drill their agents in sales techniques.

99. Defendants have the ultimate control over each sales transaction as defendants review at the home office every application to purchase a product and determine, based on the information submitted, whether to issue the life insurance policy or annuity contract. With

respect to improper replacements, defendants have the ability to reject applications which indicate that a replacement is occurring or indicate that the policyholder is not fully aware of the detriments and costs of the transaction. Defendants can easily identify investment policies and vanishing premium policies from a simple review of the application, the policy face amount and the premium payment amount. A vanishing premium policy requires larger premium payments in the policy's initial years to fund the policy. Investment policies typically have premium amounts which are round numbers and face amounts which are not round numbers, in contrast to most life insurance policies. Defendants have the ultimate authority to determine whether to issue a policy based on the application received. If any questions are raised by an application, defendants had the ability and resources to further investigate the sale before issuing the policy. With respect to improper annuity sales, each deferred annuity application is forwarded to defendants, who discern from information on the application that the deferred annuity will be used to fund a qualified plan. Defendants have sole authority to determine whether to issue the contract for that particular purpose. The qualified plans at issue are established by defendants or their affiliates.

100. In addition to their direct relationships with their customers, the defendants also assume responsibility for the deceptive sales practices described herein as principals for the actions of their sales agents. When they recommend purchase of defendants' products to prospective customers, defendants' agents are acting in their capacity as defendants' commissioned sales agents. By holding themselves out to the public as "financial planners" or "investment advisors," defendants' agents encourage consumers, including plaintiffs and Class Members, to reveal personal confidential information to them, and to rely upon them for

financial advice and counseling based on their supposed knowledge and expertise concerning the specialized and complex financial products offered by defendants. Defendants' agents do these acts as they were trained to do by defendants.

101. By virtue of the fact that the agents are acting within the scope of their agency relationship with defendants in selling defendants' products, the deficiencies in the manner in which these sales are effected are the responsibility of and imputed to the principals. In addition, the deceptive sales practices at issue in this complaint are conceived, orchestrated, ratified and affirmed by the defendants, as described above.

**Defendants Fraudulently Concealed**
**<u>Their Wrongful Actions From Class Members</u>**

102. Despite exercising reasonable diligence, members of the Class could not discover and were prevented from discovering defendants' fraudulent sales practices described herein. As fiduciaries to members of the Class, defendants owed them an affirmative duty to full and fair disclosure but failed to honor and discharge that duty. Rather than ensure truthful disclosure of material facts, defendants concealed material facts relating to the deceptive, fraudulent and unlawful conduct alleged herein.

103. Defendants affirmatively concealed their wrongful actions from Class Members. This fraudulent concealment began at the time defendants sold defendants' products in a deceptive manner using one of the listed schemes and continues through the present.

104. Defendants took affirmative steps to conceal from plaintiffs and the Class the truth concerning the true nature, costs and expenses of the products they purchased. For example, defendants did not take affirmative steps to alert vanishing premium policyholders that their premium payments were insufficient to realize the "vanish" goal; instead defendants silently

collected premium payments for years, sending annual statements designed to lull policyholders into a false sense of security that their policies were proceeding as planned. Defendants did not inform policyholders of problems until additional premiums were demanded or until the policyholder actively sought out information concerning his or her policy. Even then, defendants did not disclose the true reasons additional premium payments would be due. Defendants also sent statements to victims of the Investment tactic that made it appear the policies were performing as planned and would reach their goals. Similarly, defendants mailed materials to policyholders which continued to tout the additional benefits of the "new" or "improved" policies churned policyholders had purchased without alerting them to the continuing harm they suffered in these transactions. With respect to improper annuity sales, defendants used contracts and other materials written in technical insurance jargon designed to conceal that purchasers do not actually receive any of the promoted tax advantages or benefits of the deferred annuity when the product is used for the funding of qualified retirement plans and to mislead purchasers about the value of the insurance features of the contracts.

105. Subsequent materials provided by defendants after the sale affirmatively concealed and delayed or forestalled investigation by plaintiffs and Class Members that would have uncovered the deception perpetrated by defendants. The annual statements mailed to policyholders did not alert policyholders that their policies would not perform as promised or that they were not receiving the benefits promised. Instead, the statements made it appear that everything was fine with the policies until that time additional premiums were demanded. Defendants continued to send churned policyholders materials that touted the benefits and advantages of their new policies without ever disclosing the detriments the policyholders

suffered. Defendants also mailed promotional materials to existing annuity contract owners that deceptively claimed that deferred annuity purchasers were enjoying a tax deferral benefit as a result of buying the deferred annuity.

106. To further forestall investigation by plaintiffs and Class Members into the true nature and cost of the products, defendants took affirmative steps to conceal information that may have alerted policyholders that something was amiss. For example, with respect to the deferred annuities, defendants concealed the exorbitant fees charged against the deferred annuity accounts in their communications with existing contract owners. For instance, quarterly annuity account statements displayed the deduction of a $6 per quarter "contract charge" from subaccount investments, but failed to disclose that this was only a partial depiction of fees and charges, hiding the deduction of hundreds or thousands of dollars in additional annual annuity fees. Similarly, with respect to the "Investment" policies, defendants failed to fully disclose the portion of the "investment" that would be used to pay insurance and administrative costs.

107. Defendants' post-sale acts prevented and deterred any meaningful inquiry or investigation by plaintiffs and Class Members that would have disclosed defendants' deceptive conduct.

108. The running of the statute of limitations has been suspended and did not accrue until plaintiffs' discovery of the defendants' deception, or has been tolled with respect to any claims which plaintiffs and Class Members have brought or could bring as a result of the fraudulent concealment and course of conduct alleged herein. Defendants, through various devices of misrepresentation and secrecy as alleged herein, affirmatively and fraudulently concealed the truth about the nature and costs of their products from plaintiffs and Class

Members. Plaintiffs and Class Members had no knowledge of defendants' schemes and unlawful conduct, or of any of the facts that might have led to the discovery of the wrongdoing, and could not reasonably have obtained such an advanced level of expert knowledge even through diligent effort, before filing suit.

## CLASS ALLEGATIONS

### A. Class Definition and Identification

109. This action is brought, pursuant to Federal Rule 23, on behalf of the following Class:

> (A) All persons or entities who have or had (i) an ownership interest in a cash value life insurance policy issued by IDS Life Insurance Company or IDS Life Insurance Company of New York pursuant to an individual sale in the United States, including its territories and commonwealths, issued at any time during the period of January 1, 1985 through and including February 29, 2000 (the "Class Period;" such a policy is referred to herein as a "Policy");or (ii) an ownership interest in an individual deferred annuity contract or a participation interest in a group deferred annuity contract issued by IDS Life , IDS Life-NY, American Centurion Life Assurance Company, American Enterprise Life Insurance Company or American Partners Life Insurance Company, in the United States, including its territories and commonwealths, that was in force at any time during the Class Period (an "Annuity"); and (B) Qualified Plans and Qualified Plan Representatives that purchased, owned, held or had any interest with respect to any Group Qualified Annuity. The Class does not include (i) any present or former financial advisor or appointed sales agent of defendants; or (ii) any insurance company that owns or owned a Policy or Annuity pursuant to an absolute assignment effected as part of an exchange under Section 1035 of the Internal Revenue Code. Notwithstanding the foregoing, the Class shall not include (unless and to the extent such persons or entities are Class Members by virtue of their ownership interest in another Policy or Annuity) the following: (i) any persons or entities who make a timely election to be excluded from the proposed Class with respect to a particular Policy or Annuity otherwise included with the Class; (ii) any persons or entities who have an ownership interest in (a) a Policy that was terminated due to the death of the insured and on which death benefits were paid; (b) an Annuity that was terminated by reason of the death of the annuitant; (c) a Policy or Annuity that was issued, but not accepted or funded, or was returned to the issuer, as part of the exercise of a free look provision in the Policy or Annuity; (d) a Policy or Annuity that was rescinded as part of a reissue