of a new life insurance policy or annuity contract, or because of a material misrepresentation on a Policy or Annuity application, or where the Policy or Annuity was rescinded and the premiums or other monies paid were returned to the Policy or Annuity owner; (e) a Policy or Annuity that is the subject of a release signed by any person or entity while represented by counsel settling a claim or dispute and releasing the issuer from any further liability concerning such Policy or Annuity; (f) a life insurance policy that was a term life insurance policy or graded premium whole life insurance policy; (g) an annuity contract that was settled (*i.e.,* annuitized) prior to the inception of the Class Period; or (h) an annuity contract that was issued as an immediate annuity.

110. Defendants are able to identify members of the Class with minimum effort in that defendants maintained records, including policy and contract applications, which would identify potential class members.

**B. Class Certification Standards**

111. This action is properly brought as a class action under Fed. R. Civ. P. Rules 23(a), (b)(2) and (3) for the following reasons.

112. Membership in the Class is so numerous as to make it impractical to bring all Class Members before the Court. The exact number of Class Members is unknown, but can be determined from defendants' records. Plaintiffs believe that there are thousands of persons in the Class. Although plaintiffs do not presently know the names of all Class Members, their identities and addresses can be readily ascertained from Defendants' records.

113. The named plaintiffs are members of the Class of victims described herein. Defendants subjected them to the fraudulent scheme and common course of conduct alleged herein, and they purchased life insurance policies and annuity contracts from defendants based upon the deceptive sales practices described herein.

114. There are numerous and substantial questions of law and fact common to all of the members of the Class that control this litigation and that predominate over any individual issues. Among these common questions are:

(a) whether defendants devised and deployed a scheme or artifice to defraud or engaged in a common course of business that defrauded or deceived the Class;

(b) whether defendants routinely failed to disclose to the Class material information, such as the true nature of the products they were sold, the true costs of the products, and the extent of the commissions that the agents earn in the sale of the products;

(c) whether defendants developed, encouraged and engaged in a scheme to sell new policies to existing policyholders through fraudulent concealment of material facts;

(d) whether defendants failed to supervise and train their agents who engaged in the scheme described herein and to prevent them from violating applicable state-insurance laws and regulations;

(e) whether defendants engaged in deceptive acts and practices in the sale of defendants' products by representing, through their sales materials, that the payment of a stated amount of out-of-pocket premium (in one or more installments) would likely be sufficient to carry the cost of the policies for the life of the insured;

(f) whether the interest crediting rates, values, assumptions, mortality experience, expenses, interest-rate and investment-return projections underlying defendants' sales illustrations and product pricing assumptions lacked any reasonable basis in fact and were so flawed as to have an adverse impact on the Class;

(g) whether the interest crediting rates, values, mortality experience, expenses, lapse rates, and interest-rate and investment-return assumptions underlying defendants' sales illustrations and product design were inconsistent with or contrary to defendants' internal forecasts, business plans, estimates, analyses or projections;

(h) whether defendants failed to disclose to the Class the material consequences of using some or all of an existing policy's cash value to

purchase a new policy by means of a surrender or withdrawal/partial surrender of, or loans from, the existing policy;

(i) whether the acts alleged in this complaint constitute violations of TILA, and the regulations promulgated thereunder;

(j) what financial rewards or incentives were given or promised to defendants' sales agents for engaging in the sales scheme described herein;

(k) the nature and extent of the involvement of defendants' executives in promoting and encouraging the sales scheme described herein;

(l) the nature and extent of the activities of defendants in training their agents to conduct the sales scheme described herein;

(m) when and under what circumstances officers, directors and executives at defendants learned of the sales schemes described herein and what actions, if any, they took in response thereto;

(n) what actions, if any, officers, directors, managers and executives of defendants took to discourage or stop fraudulent sales practices;

(o) what actions, if any, were taken by officers, directors or executives of defendants as a result of complaints made by consumers and state and federal regulators throughout the country;

(p) the duration of the sales scheme described herein;

(q) whether defendants engaged in any activities to conceal their sales scheme from insurance regulators, other state and federal regulators and the public;

(r) whether defendants engaged in false, deceptive and fraudulent activities in establishing entities which employed their sales agents for the purpose of concealing from customers and potential customers that those sales agents were, in fact, life insurance and annuity sales agents;

(s) whether the Class is entitled to specific performance, injunctive relief or other equitable relief against defendants;

(t) whether the Class is entitled to punitive damages from defendants; and

(u) whether the Class has sustained damages and the proper measure of damages.

115. Plaintiffs' claims are typical of those of the Class. Plaintiffs have no interest adverse to those of the other members of the Class. Plaintiffs will fairly and adequately protect the interests of the Class and have retained counsel experienced and competent in the prosecution of class actions and complex litigation.

116. Minnesota is an appropriate forum for resolution of the class claims; it is the state in which defendants maintain their administrative offices and principal place of business, and is the state in or from which:

- defendants' policy illustration software is developed.
- defendants' illustration software is distributed to its sales agents.
- defendants' sales materials for their products are designed, developed and approved.
- defendants' training materials for their products are designed, developed and distributed.
- defendants' policyholder vanishing premium, investment policy and replacement complaints are monitored.
- defendants' vanishing premium and investment policy products are priced.
- defendants' "new" and "improved" policies are designed and priced.
- defendants' annuity products are designed and priced.
- defendants' vanishing premium policy, investment policy, replacement policy, and annuity contract applications are approved.
- defendants' vanishing premium policy, investment policy, and replacement policy premium bills are issued.
- defendants' vanishing premium policy, investment policy, and replacement policy premiums and annuity contract payments are received.
- defendants' vanishing premium policies, investment policies, replacement policies and annuity contracts are administered.

- defendants' sales agent incentive compensation decisions are made.
- defendants' Board of Directors meets to decide interest crediting rate issues.

117. A class action is superior to other available methods for the fair and efficient adjudication of this controversy for at least the following reasons:

(a) Without a class action, the Class will continue to suffer damage, defendants' violations of law will proceed without remedy, and defendants will continue to retain the proceeds of their misconduct;

(b) Given (i) the substantive complexity of this litigation, (ii) the size of individual Class Members' claims (which though significant individually pale compared to the corpus of defendants' ill-gotten gains and the cost to litigate these claims), and (iii) the limited resources of the Class Members, many of whom are elderly, few if any Class Members could afford to seek legal redress individually for the wrongs defendants have committed against them;

(c) this action will foster an orderly and expeditious administration of class claims, economies of time, effort and expense, and uniformity of decision;

(d) upon adjudication of defendants' liability, the Court can determine the claims of individual Class Members; and

(e) this action presents no difficulty that would impede the Court's management of it as a class action, and it is the best available means by which members of the Class can seek redress for the harm caused to them by defendants.

118. Plaintiffs seek preliminary and permanent injunctive relief on behalf of the entire Class, on grounds generally applicable to the entire Class, to enjoin and prevent defendants from terminating the death benefits of policyholders who are unable or unwilling to pay premiums in addition to those illustrated or represented at the time of sale, or from collecting such additional premiums in the future. Plaintiffs also seek preliminary and permanent equitable relief on behalf of the entire Class, on grounds generally applicable to the entire Class, to require defendants to

specifically perform the policies as illustrated and represented, to reinstate any and all policies that were surrendered or lapsed as a result of the deceptive sales practices alleged herein, and to disgorge all premium overcharges. Plaintiffs also seek preliminary and permanent equitable relief on behalf of the entire Class, on grounds generally applicable to the entire Class, (i) enjoining defendants from soliciting sales of, or selling, deferred annuities for placement in qualified plans, using the deceptive sales practices identified above; (ii) enjoining defendants from soliciting sales of, or affirmatively recommending, annuities for placement in qualified plans, without full and fair disclosure that the tax deferred accrual feature is provided by the tax qualified retirement plan and that the tax deferred accrual feature of the deferred annuity is unnecessary; (iii) enjoining defendants from soliciting sales of annuities without full and fair disclosure of the tax consequences of such purchase; and (iv) enjoining defendants from charging surrender fees with respect to any annuity contract.

119. Because the plaintiffs seek injunctive relief and corresponding declaratory relief for the entire Class, the prosecution of separate actions by individual Class Members would create a risk of inconsistent or varying adjudications with respect to individual members of the Class and could establish incompatible standards of conduct for the defendants. Further, adjudications with respect to individual members of the Class would, as a practical matter, be dispositive of the interests of other members of the Class who are not parties to the adjudication, and could impair and impede their ability to protect their interests.

**C. Injuries To The Class**

120. The sale of defendants' life and annuity products based upon the fraudulent and deceptive sales practices described above was an enormous marketing success for defendants.

Defendants received millions of dollars in premium income and annuity fees and administrative charges from the deceptive sales of their products. As part of their plan, scheme and common course of conduct, defendants induced thousands of existing policyholders and new customers to purchase permanent life insurance policies and/or annuity contracts from defendants based upon false and misleading sales presentations and policy illustrations.

121. As a result of the fraudulent sales practices developed by defendants and employed by their network of "financial advisors," plaintiffs, together with thousands of similarly situated members of the Class, were fraudulently induced: (i) to purchase life insurance policies through the systematic omission or misrepresentation of material facts concerning the nature and terms of the policies; and/or (ii) to replace and/or deplete existing policies by using or encumbering the cash values accumulated in the existing policies; and/or (iii) purchase annuity contracts with an incomplete and inaccurate understanding of the tax consequences of the transaction and/or other potential detriments associated with the product.

122. As a direct and proximate result of defendants' fraudulent and improper course of conduct, members of the Class have sustained and continue to sustain substantial injuries and damages, including but not limited to:

(a) the payment of premiums far in excess of the amounts represented as payable by defendants at the time the policies were purchased;

(b) the payment of interest charges on policy loans and/or surrender charges on cash values used to pay premiums on the new life insurance policies;

(c) the loss and/or diminution of death benefits, cash values, paid-up additions and/or other insurance benefits;

(d) the payment of fees, insurance costs and administrative charges for benefits that they will never receive; and

(e) the payment of surrender charges when the Class Member tries to remedy the damage defendants have caused.

123. Members of the Class have suffered and will suffer immediate and irreparable harm as a direct and proximate result of the wrongful conduct alleged herein. Members of the Class have lost or face the prospect of losing hundreds of millions of dollars in death benefits, cash values, surrender values and lifetime income due to their inability or unwillingness to pay additional premiums on a policy or policies they were told would require no future premium payments. Likewise, members of the Class have been and will be forced to pay millions of dollars in additional premiums they never agreed or expected to pay. Similarly, members of the Class are suffering the wasting of their retirement savings and have paid and will be forced to pay exorbitant fees and surrender charges for an annuity-conferred tax deferral benefit that they do not in fact receive.

124. Many members of the Class are elderly persons in or nearing retirement who cannot afford to pay premiums on life insurance for the remainder of their lives. Many members of the Class are now uninsurable at any affordable cost and will be unable to obtain additional insurance on their lives for the benefit of their families and their estates. Without the equitable and injunctive relief sought herein, members of the Class will continue to suffer irreparable harm.

125. Defendants had both the duty and the ability to review sales materials systematically and to establish adequate internal controls to prevent the deceptive sales practices alleged herein. Instead, however, defendants intentionally failed and refused to discourage or stop the deceptive sales practices and, rather, authorized, encouraged and ratified the misconduct of their agents to perpetrate this fraudulent scheme.

## FACTS RELATING TO THE PLAINTIFFS' TRANSACTIONS

**The Benacquistos**

126. In or about January 1992, the Benacquistos purchased a $165,000 universal life insurance policy on the life of Lesa Benacquisto with a $175,000 spouse rider on the life of Dan Benacquisto (Policy No. 90902850104). This policy was issued in February 1992. In or about March 1992, Dan purchased a disability insurance policy from IDS and the Benacquistos obtained two term life insurance policies in the amount of $75,000 each.

127. In or about May 1995, the Benacquistos were contacted by an IDS financial advisor, Eileen DiGiovine. As she was trained, Ms. DiGiovine arranged a meeting to review the plaintiffs' financial situation. At this meeting, Ms. DiGiovine told the Benacquistos that their current insurance coverage was no good and was not earning enough money for them. Ms. DiGiovine told them that IDS had developed a new policy that would build more cash value while providing greater death benefits.

128. Based on that meeting and the representations of defendants' agent, the Benacquistos submitted an application for a new IDS life insurance policy. The new policy that was issued was an adjustable premium whole life policy with a $190,000 death benefit on Lesa Benacquisto and a spouse rider with a $175,000 death benefit on Dan. Although the Benacquistos had deposited approximately $4,500 in their earlier policy, more than half of this cash value appears to have been lost to commissions and fees connected to this transaction. The Benacquistos did not learn of the severe detriment they had suffered until a truly independent insurance advisor reviewed their insurance status. At that time, the Benacquistos realized that they had lost cash value, actually reduced the amount of their death benefits, suffered other

financial detriment, including incurring a higher cost of insurance, and were subject to new contestability clauses.

**The Thoresens**

129. On January 14, 1992, the Thoresens attended a "Planning for Financial Success" adult education class at the Cedar Hills Recreation Center near their home in Portland, Oregon. The class was lead by Judy Rubino, a "Personal Financial Planner" with "IDS Financial Services, Inc." The Thoresens accepted Rubino's invitation of a free analysis of their personal finances, and subsequently gave Rubino copies of their personal financial documents.

130. Thereafter, Rubino gave the Thoresens a 106-page "IDS Financial Analysis." The report described the complex tax laws that govern retirement accounts, the advantages of investing on a tax-deferred basis, and recommended mutual funds as an appropriate retirement investment. In a follow-up meeting, Rubino recommended to the Thoresens that they each reinvest their IRAs into IDS Life deferred variable annuities. Based on her apparent expertise in retirement planning, the Thoresens accepted Rubino's recommendation and agreed to the arrangement.

131. On May 4, 1992, IDS Life issued the Thoresens two "Flexible Annuity" deferred variable annuity contracts. Rubino acted as an agent for IDS Life in the transactions. The Thoresens had been led to believe that the purchase was categorically appropriate for IRAs. They were not told, and the documents provided in the sale did not state, that deferred annuity purchasers do not obtain the benefit of the products' primary justification -- tax-deferral of earnings -- when such products are used in qualified plans.

132. The quarterly account statements that the Thoresens received from IDS Life further misled them as to the nature of their investment. For example, the statements reflect the deduction of a $6 per quarter "contract charge" from their subaccount investments, but failed to disclose that this was only a partial depiction of charges, hiding the deduction of hundreds of dollars in additional annual annuity fees.

133. In July 1995, upon review of their retirement plan arrangements in consultation with an advisor, the Thoresens learned of the true nature of their purchases -- that the insurance features, high fees, loss of liquidity and other detriments of the product were in exchange for unnecessary tax-deferral. Had these material facts been communicated to them in the sale, the Thoresens would not have purchased the deferred annuities. The Thoresens have sought to cancel their contracts but have been deterred by the substantial surrender fees that would be imposed by IDS Life upon termination.

**The Morks**

134. Mr. Arnold Mork and Mrs. Isabella Mork have been loyal, long-time IDS Life customers; Mrs. Mork has, for example, been an IDS Life customer since the 1950s. Arnold Mork is a retired Rochester, Minnesota police officer. Isabella Mork is a retired registered nurse with the Mayo Clinic in Rochester, Minnesota. The Morks have been married since 1964.

135. Now in their 70s, during the course of three in-person, "hard-sell" meetings with IDS agent Gary Hughes beginning in January 1996, the Morks were told by IDS agent Hughes (who held and holds himself out as an IDS "financial advisor," and so lists his IDS agency as such in the local, Rochester, Minnesota telephone directory) that the Morks needed to "change over" their old IDS life insurance and annuity products (which products were performing under

interest rates more favorable than current, similar IDS products and which prior products were purchased by the Morks when the actuarial factors applicable to the Morks at the time of their purchase of the prior products were, due to their age and other factors, more favorable).

136. Since October 3, 1988, Mrs. Mork has owned a fully-paid IDS deferred annuity contract (Contract No. 930002094822) which had a net single premium amount of $30,000 and has specified guaranteed minimum accumulation values (at a first interest rate of 8.85%), minimum surrender values, and retirement/maturity date of October 3, 1996. In January 1996, however, this annuity contract was "churned" by IDS agent Hughes.

137. For reasons unbeknownst to the Morks (and based upon purported "financial advice" received by the Morks from IDS agent Hughes), the retirement date on the aforementioned annuity contract was changed from October 3, 1996 to October 3, 2018. Changing the maturity date on this contract was not, contrary to IDS agent Hughes' representations to the Morks, in the Morks' best financial interest and was not sound "financial advice." Under the old maturity date on this contract, the Morks were to begin receiving annuity payments under the contract last year, beginning in October of 1996. Now, under the new retirement/maturity date, the Morks must wait until 2018 to begin receiving annuity payments (even though they have already been retired now for several years and depend upon their IDS investment income). In any event, if they are still living when this annuity contract matures in the year 2018, the Morks will both be nearly 95 years old.

138. To confuse matters, upon IDS agent Hughes' "financial advice," this annuity contract was further "modified" by changing the net single premium from $30,000 to $49,389.22 (which number presumably reflects the accumulated value of the original annuity contract issued

in October 1988). IDS agent Hughes told the Morks that it would be in their best financial interest to surrender their original October 3, 1988 annuity contract prior to the October 3, 1996 maturity date on that contract (not telling them that they would incur various charges in doing so), "change over" the contract into a "new" annuity contract (bearing the same contract number), pay the premium on the "new" contract with the accumulated value of the "old" contract, then move the retirement date on the contract twenty-two years into the future.

139. While IDS agent Hughes represented to the Morks that these transactions on their annuity contracts would be in their best financial interest, the terms of the IDS life insurance contract dated January 30, 1996 (the "new contract") were drastically inferior to the terms of the 1988 contract (the "old contract"). For example:

(a) The first year interest rate applicable to the new contract is 6.8%. Conversely, the first year interest rate under the old contract was 8.85%.

(b) The guaranteed minimum accumulation and surrender values under the new contract are substantially less than under the old contract.

(c) The surrender charges under the new contract are substantially higher than under the old contract.

(d) The settlement rates upon which monthly annuity payments are made upon maturity of the new contract are drastically less than under the old contract.

140. Within the recessionary period provided on the face of the new contract, the Morks went to IDS agent Hughes' office and told him that they wanted to exercise their right to cancel the new contract, and wanted to have their old contract reinstated. IDS agent Hughes refused to comply with the request, advised the Morks that they keep the new contract "for at

least a year" and told them that the new contract would perform at a 13% rate of return. That representation has not proven to be true.

141. Agent Hughes also induced Mrs. Mork into buying yet another annuity contract, also bearing a contract date of January 30, 1996 (Contract No. 930000789617) with a net single premium of $7,319.49, specified guaranteed minimum accumulation values (at a first year interest rate of 6.45%), guaranteed minimum surrender values, and a retirement date of March 7, 2009. Upon Mr. Hughes' "financial advice," this IDS annuity contract was paid by the accumulated value of another IDS product owned by Mrs. Mork. Mrs. Mork will now have to wait until she is 85 years old to begin receiving annuity payments under this contract.

142. Taken together with lost interest and accumulated value, commissions paid and other charges, the Morks have suffered a significant loss as a result of having their IDS annuity contracts churned by IDS.

143. The Morks have also suffered a loss by having their IDS life insurance policies churned by IDS.

144. On or about March 13, 1989, Mrs. Mork purchased an IDS flexible premium adjustable whole life insurance policy (Policy No. 909002164151) (the "old policy"), with a face value of $100,000. The initial premium payment on the policy was $48,314.57. The policy was based upon the life of her husband, Arnold Mork, and Mrs. Mork named herself as beneficiary under the policy. This policy was "churned" by IDS agent Hughes. Over the insistence of Mrs. Mork that this policy remain in full force and effect, she and her husband were induced by IDS agent Hughes to convert the policy into another IDS life insurance product (of a different type

and with less favorable terms, benefits and conditions) and, unbeknownst to them, incur substantial charges, losses and expenses in the transaction.

145. On or about January 31, 1996, upon the "financial advice" and representations of IDS agent Hughes, Mrs. Mork "changed over" her prior whole life IDS policy and purchased an IDS flexible premium variable life insurance policy (Policy No. 909005168749) (the "new policy") on the life of her husband with a face value of $105,000, naming herself as a beneficiary. The policy bears a maturity date of January 31, 2023. On that date, Mrs. Mork, if then living, will be 99 years old. Mr. Mork, if then living, will be 100.

146. The new policy contains a "right to cancel" provision on the face of the policy which states various times within which the policy owner may exercise the right to terminate the policy.

147. Within the time set forth on the face of the new policy to terminate the policy, the Morks personally met with IDS agent Hughes and told him to cancel the new policy and reinstate the old policy. IDS agent Hughes refused to do so. As with the new (annuity) contract, IDS agent Hughes told the Morks to keep the new policy, and represented to them that the new policy would perform at a 13% rate of return (rather than, agent Hughes represented, "the only 4% they were earning under the old policy"). The new policy has not performed as IDS agent Hughes represented to the Morks.

148. During the meeting when the Morks urged IDS agent Hughes to cancel the new policy and reinstate the old policy, IDS agent Hughes told the Morks that he (Hughes) had been told by his superiors to "change over" 20 IDS life insurance policies and annuity contracts, and theirs (the Morks) were among those that he was directed to "change over." Apparently in

compliance with that directive, in signing the application on the new policy as the selling agent, IDS agent Hughes checked a box on the application affirming that

> "To the best of your knowledge and belief this application **does** involved replacement of existing insurance or annuities"

(emphasis in original). Moreover, the old policy was identified by policy number (90902164151-1), face value amount ($100,000), and original date of issue (March 13, 1989), and it was noted on the new policy application that the old policy would be "replaced" by the new policy.

149. The terms, benefits and provisions of the new policy are substantially less favorable than the terms, benefits and provisions of the old policy. For example, and in addition to "changing over" from the whole life to a variable life policy, contrary to Mr. Hughes' representation to the Morks that the new policy would perform at a 13% rate of return, on the Morks' Financial Planning Statement of Accounts for the period January 1, 1996 to February 17, 1997, the actual rate of return cn the new policy during the reporting period was less than 2%.

150. Additionally, Mr. Mork (on whose life the old and new policies were based) aged 7 years by the issue date of the new policy, thus adversely impacting the actuarial premium rates applicable to the new policy by increasing the monthly premium paid on the policy from $307.00 under the old policy to $522.71 under the new policy. Despite realizing higher premium payments and a reduced rate of return, IDS agent Hughes represented to the Morks that "changing over" from the old policy to the new policy was in their best financial interest. That representation was untrue.

151. The make matters worse, the Morks incurred additional premium expense charges, policy fee charges, death benefit guarantee charges, and were subject to substantially

higher (and new ) surrender charges. In the latter regard, for example, under the old policy, surrender charges for the first year of the policy were $2,904.00. Under the new policy, first year surrender charges nearly doubled to $4,827.90.

152. As a result of having their IDS life insurance and annuity products "churned," the Morks have suffered substantial losses in their IDS investments, have paid unnecessary commissions and other charges, and have suffered damages and other losses by taking on new life insurance and annuity products during a time (and due to their increased age) when the actuarial rates applicable to their policies would be necessarily higher and based upon less favorable interest rates.

153. On or about February 19, 1997, the Morks received a letter of that date from American Express Financial Advisors President and Chief Executive Officer David R. Hubers which, among other things, thanked the Morks "for entrusting us with your business in 1996" and, despite the flurry of aforementioned activity on the Morks' annuity and life insurance products, urged the Morks to again "make an appointment to meet with your American Express financial advisor." The letter told the Morks that they "should rely on your advisor's expertise and objective advice to help you make wise investment decisions." In each of the aforementioned transactions with IDS, the Morks did rely (to their detriment) on the IDS advisor's advice and purported expertise. Nothing that occurred during the course of those transactions, however, suggests or supports the contention that the "advice" they received was at all "wise" or in any way "objective."

**The Melcherts**

154. In or about February, 1990, Ronald Melchert purchased an IDS universal life insurance life (Policy No. 090023685516004) with a face value of $100,000, naming his wife, Susan Melchert, as the beneficiary.

155. On or about June 30, 1992, the Melcherts received a statement from IDS providing account detail on their policy and indicating that the cash value in their policy was approximately $2,660.90.

156. In or about May or June 1993, Mr. Melchert was approached by an IDS "financial advisor," Mr. Rick Nelsen, to arrange a meeting to purportedly evaluate and discuss Mr. Melchert's current and future insurance needs. During the course of the ensuing meeting, Mr. Nelsen told Mr. Melchert that it would be in his best financial interest to convert his existing IDS life insurance policy to a new policy, and that in doing so Mr. Melchert would receive greater benefits under the new policy.

157. Based upon and as a result of the representations made by Mr. Nelsen during the course of the meeting between Mr. Nelsen and Mr. Melchert referenced above, Mr. Melchert submitted an application for and purchased a new variable universal life insurance policy (Policy No. 0909023685516004) with a face value of $100,000, naming his wife as beneficiary. Mr. Nelsen told Mr. Melchert that he simply needed to check a box to convert the old policy to the new policy, and that the aforementioned cash value from his previous policy could be applied to the new policy.

158. As a result of being induced into converting their old IDS life insurance policy into a new policy, the Melcherts have lost cash value in their policy to commissions and fees and suffered other financial detriment because of the purchase of this new policy.

COUNT I

VIOLATIONS OF THE TRUTH IN LENDING ACT ("TILA")

159. Plaintiffs repeat and reallege the allegations set forth in the foregoing paragraphs as if fully set forth herein.

160. In connection with their deceptive scheme, defendants offered policyholders an option to take loans secured by the cash value of their policies.

161. This type of borrowing constitutes an "open-end credit" loan in which each defendant meets the definition of a "creditor" and Class Members meet the definition of "consumers."

162. During the Class Period, defendants did in fact extend policy loans to the Class Members that required the payment of a finance charge as that term is defined by TILA.

163. In conjunction with these open-end credit loans, defendants were required by TILA to make certain disclosures to borrowing policyholders. TILA required that these mandatory disclosures be given in specific wording, form and number.

164. In making these loans, defendants did not comply with TILA requirements that they (a) describe and itemize the amount financed; (b) give the borrowing policyholder a plain-language itemization of the finance rate and whether it was variable or an annual percentage, a payment schedule, an explanation of total payments, whether prepayment was permissible and under what conditions; (c) provide a description of penalties for late payments, and making

citations to appropriate contract references. Moreover, in the case of variable rate loans, defendants further violated TILA by failing to disclose the circumstances under which the rate might increase, limitations (if any) on that increase, and the effects of such an increase.

165. Defendants did not make all of these required disclosures to the Class members who took loans secured by the cash values of their policies before extending them credit as required by TILA. To the extent that defendants did provide disclosures, they were inadequate in wording, form, number and timing.

166. As a result of the above-described wrongful practices, Class Members have sustained and will continue to sustain, damages, losses and injuries.

167. Defendants' violations of TILA make them liable to the Class for the greater of (a) the actual damages suffered by the Class; or (b) the lesser of $500,000 or 1% of each defendant's net worth for each separate violation. Defendants are also liable to the Class for the costs of this action, including reasonable attorneys' fees.

COUNT II

VIOLATION OF 28 U.S.C. § 1961, et seq.

168. Plaintiffs repeat and reallege the allegations set forth in the foregoing paragraphs as if fully set forth herein.

169. Plaintiffs and members of the Class are each persons, as defined in 18 U.S.C. § 1961, and each of them has sustained injury to their business or property as a result of the acts and the conduct of the defendants described herein.

170. The affiliated organizations through which defendants marketed and distributed their life insurance products and annuities constitute an enterprise as that term is defined in 18

U.S.C. § 1961. The defendants participated in the activities, operation and/or management of the affairs of one or more of these enterprises with which they were associated.

171. The defendants are persons as defined in 18 U.S.C. § 1961.

172. The defendants, acting individually and through agents and employees for whom they are responsible, since 1985 or prior thereto, continuously engaged in related acts which constitute a pattern of racketeering activity as that term is defined in 18 U.S.C. § 1961. The racketeering activity consisted of, but was not limited to, the following:

(a) Violations of 18 U.S.C. § 1343 as a result of the fraudulent scheme, more fully described above. These violations consist of numerous telephone calls made by defendants' sales agents and other representatives at their sales offices to customers, including members of the Class, in numerous states. In addition, thousands of telephone calls were made by defendants' home office in Minnesota to their sales offices located in other states and to their customers, including members of the Class. In the phone calls, defendants' agents and executives engaged in further fraudulent and deceitful sales practices, more fully described above, in an effort to market defendants' life insurance policies and annuity contracts. Further, there were numerous wire transfers of funds from Class Members to defendants to pay premiums and charges on the policies which were sold pursuant to the sales scheme described herein. These acts occurred between approximately 1985 and continued to 2000 or thereafter. All such acts were interrelated and were part of a common sales scheme to defraud and

obtain money by false and fraudulent pretenses, by concealment, by misrepresentations and/or false promises.

(b) Violations of 18 U.S.C. § 1341 as a result of the fraudulent scheme, more fully described above. These violations consist of the mailing, via United States Postal Service, of thousands of false, fraudulent and misleading correspondence and policy or contract documents to insureds, potential insureds and annuity contract holders in various states throughout the country in an effort to market defendants' products pursuant to the tactics described more fully above. These mailings were sent or caused to be sent by agents to several states in the United States and took place during the approximate time period of 1985 through 2000. These mailings were interrelated and were a common part of a uniform and systematic sales scheme to defraud and to obtain money by false and fraudulent pretenses, by fraudulent concealment, by misrepresentations and/or false promises.

173. Defendants' conduct, as described above, constitutes a pattern of acts involving two or more predicate acts with the meaning of 18 U.S.C. § 1961(1). Moreover, all such acts were related to a common objective or objectives, or were consistently repeated and are capable of further repetition. Such acts constitute a pattern of racketeering activity within the meaning of 18 U.S.C. § 1961(5).

174. As a direct and indirect result of such conduct described above, substantial income was generated and received by and came under the control of the defendants. That income was used by the defendants to establish and/or operate the enterprises described herein,

all of which were engaged in interstate or foreign commerce. Therefore, the defendants have violated 18 U.S.C. § 1961(a).

175. The defendants, through such conduct described above, acquired, maintained and exercised control over the enterprises described above, all of which were engaged in or affected interstate or foreign commerce. Therefore, the defendants have violated 18 U.S.C. § 1961(b).

176. The defendants, through such conduct described above, conducted or participated in conducting the affairs of the enterprises described above and those enterprises were engaged in and/or affected interstate or foreign commerce. Therefore, the defendants have violated 18 U.S.C. § 1962(c).

177. As a result and by reason of the foregoing, plaintiffs and members of the Class have been injured, suffered irreparable harm and sustained damage to their business and property, and are therefore entitled to recover actual and treble damages, and their costs of suit, including reasonable attorneys' fees, pursuant to 18 U.S.C. § 1964(c).

## COUNT III

### DECEPTIVE TRADE PRACTICES IN VIOLATION OF MINNESOTA STATUTE §§ 325D.43 - 325.48

178. Plaintiffs repeat and reallege the allegations set forth in the foregoing paragraphs as if fully set forth herein.

179. This action is brought pursuant to Minnesota's consumer protection laws and to the extent applicable, the consumer protection laws of other states. The defendants and their agents have engaged in acts and practices, including misrepresentation, concealment, and deceit, which confuse and mislead consumers. Defendants' acts and practices, as alleged herein,

violated and continue to violate the Minnesota Uniform Deceptive Trade Practices Act, §§ 325D.43 - 325D.48, in at least the following respects:

(a) The acts, omissions, misrepresentations, practices and nondisclosures of the defendants and their agents relating to the sale of defendants' products violated Minn. Stat. § 325D.44 for the following reasons:

(i) Defendants' acts and practices constitute representations that the products have qualities, characteristics, benefits or uses which they do not have;

(ii) Defendants' acts and practices constitute misrepresentations that the goods or services are of a particular standard, quality or grade;

(iii) Defendants' acts and practices constitute advertisements of goods and services with the intent not to sell them as advertised; and

(iv) Defendants' acts and practices are likely to create confusion or misunderstanding.

(b) Defendants' acts, omissions, misrepresentations, practices, and nondisclosures relating to the sale of their products also violated Minn. Stat. § 325D.44 as follows:

(i) All written promotional materials, advertising, standardized oral presentations, telephone solicitations and other publicity and promotional efforts undertaken by the defendants and their agents constitute unlawful business practices in violation of Minnesota's Prevention of Consumer Fraud Act, Minn. Stat. § 325F.69, as set forth more fully below, because defendants engaged in a plan to deceive the public with respect to the truth and validity of their

advertising and representations concerning their products, including the products' benefits and characteristics, as described more fully in this complaint;

(ii) The acts, omissions, misrepresentations, practices and nondisclosures of defendants and their agents, as more fully described in the preceding paragraphs, constitute a deceptive trade practice within the meaning of Minnesota's Unlawful Trade Practices Act, Minn. Stat. § 325D.13;

(iii) Accordingly, plaintiffs and members of the Class are entitled to restitution, actual damages, equitable and injunctive relief, costs, and attorneys' fees pursuant to Minn. Stat. § 8.31, subd. 3a.

180. Defendants are liable for the above wrongful acts committed by their agents. As set forth in this complaint, defendants' agents, acting within the scope of the agency to which defendants and their agents have both agreed, deceptively sold defendants' products in a deceptive manner as described above. Each sale was made with the express approval of defendants. Defendants ratified and affirmed each of the deceptive sales by the agents by reviewing and approving applications of, and issuing the policies and/or contracts to, plaintiffs and the members of the Class and/or their employers. Defendants (as well as their agents) accepted the benefits that flowed from these improperly induced sales, as set forth in this complaint.

181. Plaintiffs and the Class Members accordingly are entitled to restitution, their actual damages, equitable and injunctive relief, costs and attorneys' fees pursuant to Minn. Stat. § 8.31, subd. 3a.

182. Certain members of the Class are senior citizens (age 62 or older) and/or handicapped, within the meaning of Minn. Stat. § 325F.71, subd. 1(b). Defendants and their agents knew or should have known that their conduct, as alleged above, was directed to senior citizens and handicapped persons. Many such persons are more vulnerable to defendants' deceptive marketing tactics and representations than other members of the public, due to their age, poor health or infirmity, impaired understanding, restricted mobility or disability.

183. As a result of defendants' violations of Minn. Stat. §§ 325D.43 - 325D.48, members of the Class who are senior citizens and/or handicapped persons are entitled to damages, equitable relief, costs and attorneys' fees as determined by the Court, pursuant to Minn. Stat. § 325F.71, subd. 4, as well as civil penalties in the amount of $10,000.00 per violation, pursuant to Minn. Stat. § 325F.71, subd. 2.

## COUNT IV

## FALSE OR MISLEADING ADVERTISING

184. Plaintiffs repeat and reallege the allegations set forth in the foregoing paragraphs as if fully set forth herein.

185. By engaging in the uniformly misleading sales presentations and disseminating the uniformly misleading sales materials, contracts, and prospectuses described herein, defendants and their agents have engaged in acts of false or misleading advertising. The nationwide newspaper, radio, televison and magazine campaign, high pressure sales techniques, written promotional materials, telephone solicitations and all other promotional efforts undertaken by the defendants and their agents constitute advertising devices. These advertisements were disseminated by the defendants and their agents, containing material

assertions, representations or statements concerning their products which are untrue, deceptive and/or misleading, and which are known, or by the exercise of reasonable care should have been known, to be untrue, deceptive or misleading, by the defendants, in violation of Minnesota's false statement in advertising statute, Minn. Stat. § 325F.67. As discussed above, defendants are liable for the acts of their agents.

186. Plaintiffs and the Class Members accordingly are entitled to restitution, their actual damages, equitable and injunctive relief, costs and attorneys' fees, pursuant to Minn. Stat. § 8.31, subd. 3a.

187. As a result of defendants' violations of Minn. Stat. § 325 F.67, members of the Class who are senior citizens and/or handicapped persons are entitled to damages, equitable relief, costs and attorneys' fees as determined by the Court, pursuant to Minn. Stat. § 325F.71, subd. 4, as well as civil penalties in the amount of $10,000.00 per violation, pursuant to Minn. Stat. § 325F.71, subd. 2.

## COUNT V

### CONSUMER FRAUD IN VIOLATION OF MINNESOTA STATUTES, §§ 325F.68 - 325F.70

188. Plaintiffs repeat and reallege the allegations set forth in the foregoing paragraphs as if fully set forth herein.

189. As detailed in the preceding paragraphs, defendants and their agents engaged in a pattern or practice involving fraudulent and deceptive schemes to sell defendants' products. The conduct complained of offends public policy, as set forth more fully in the statutes and common law alleged in this complaint. Moreover defendants' practices were unethical, oppressive, and unscrupulous. Defendants' conduct caused and continues to cause substantial injury to

consumers, including plaintiffs and Class Members. The justifications for defendants' wrongful conduct were and are vastly outweighed by the adverse effects of such conduct.

190. Defendants' acts, practices, misrepresentations and omissions constitute fraud, false pretense, false promise, and misrepresentation as well as deceptive sales practices and dissemination of misleading information.

191. Defendants and their agents engaged in such acts, practices, misrepresentations and omissions with the intent that plaintiffs, Class Members and/or their employers would rely upon such misrepresentation and omissions, and with specific and deliberate intent to oppress, defraud, and deceive plaintiffs, members of the Class and/or their employers. Further, defendants persisted in the conduct described herein, despite knowing, or recklessly disregarding, that said conduct constituted a breach of their duties to plaintiffs and Class Members, and further constituted fraud.

192. As a direct and proximate result of defendants' conduct, plaintiffs and Class Members have incurred damages and are, pursuant to Minn. Stat. §8.31, subd. 3a, entitled to be compensated in an amount to be established according to the proof at trial.

193. As a result of defendants' violations of Minn. Stat. §§ 325D.43 - 325D.48, members of the Class who are senior citizens and/or handicapped persons are entitled to damages, equitable relief, costs and attorneys' fees as determined by the Court, pursuant to Minn. Stat. § 325F.71, subd. 4, as well as civil penalties in the amount of $10,000.00 per violation, pursuant to Minn. Stat. § 325F.71, subd. 2.

COUNT VI

FRAUD, FRAUDULENT CONCEALMENT AND DECEIT

194. Plaintiffs repeat and reallege the allegations set forth in the foregoing paragraphs as if fully set forth herein.

195. The defendants, by and through their agents, knowingly made affirmative misrepresentations to plaintiffs and the other members of the Class. These knowing affirmative misrepresentations consisted of, among others, (i) representations about replacing existing IDS cash value life insurance policies and that Class Members would be in a better position by surrendering or loaning against cash values from existing policies and using the money to purchase new life insurance, and/or (ii) representing that a policyholder's obligation to pay out-of-pocket premiums would "vanish" at a set date in the future; and/or (iii) representing that a purchaser would achieve a specific level of cash value at a set date in the future; and/or (iv) representing that defendants' deferred annuities offered particular features and were ideal for funding qualified plans.

196. In addition to affirmative misrepresentations, there were numerous material facts about the transactions that were knowingly concealed. For example, the true cost of the product was concealed. The nature and extent of the commissions that would be earned by the agent was concealed. The nature and extent of administrative, surrender and other charges were also concealed. It was further concealed that, in the future, there might be substantial increases in the premiums and/or decreases in the benefits.

197. Defendants' statements, representations and/or omissions were material in that there was a substantial likelihood that a reasonable prospective purchaser would have considered them important in deciding whether or not to purchase defendants' product.

198. Defendants and their agents failed to disclose material information to plaintiffs and class members and/or their employers in the sales process that defendants and their agents were under a duty to disclose, because of (i) their respective relationships with plaintiffs and Class Members, including relationships that give rise to a duty of fair dealing; (ii) their holding themselves out as experts with respect to life insurance and annuities; and (iii) the false and misleading affirmative representations that they made, as set forth in this complaint.

199. At the time that defendants and their agents made these misrepresentations or omissions of fact, they knew or were reckless in not knowing the true facts, and knew or were reckless in not knowing that their misrepresentations and omissions were deceptive and misleading. Defendants and their agents knew such information was material and knew of the information that was not disclosed, as described above. Moreover, defendants and their agents had a duty to plaintiffs and Class Members to disclose such facts, and to ensure that all of their statements and representations were complete, truthful, and not false or misleading.

200. Defendants' misrepresentations and omissions were made with the intent that plaintiffs and other members of the Class rely on such statements and omissions, and purchase defendants' products, whether it be a new and improved policy replacing existing insurance, or a "vanishing premium" policy, or a policy that was to supply specific cash values at a set time in the future, or an annuity that was supposed to provide a tax-deferral benefit.

201. The members of the Class were ignorant of the falsity of defendants' statements and omissions, believed them to be true, and reasonably relied on their truth and accuracy. In reasonable reliance on defendants' representations of material fact, and/or the fidelity, integrity, fiduciary responsibility and/or superior knowledge of defendants, and in ignorance of the true facts, the members of the Class were induced to purchase defendants' products. Had the Class known the true facts, they would not have purchased these products.

202. The representations and omissions on which the Class relied were not true, and defendants did not believe them to be true when made. Defendants acted with reckless indifference to the truth and the rights of the Class.

203. Based on the facts and circumstances described above, the defendants acted toward plaintiffs and the members of the Class willfully, intentionally and with malice.

204. As a direct and proximate result of the affirmative misrepresentations and the concealment of material facts, plaintiffs and the members of the Class did purchase defendants' products have been harmed and damaged in an amount to be determined at trial.

205. By reason of the foregoing, plaintiffs and Class Members are entitled to compensatory and punitive damages in an amount to be determined at the trial of this action.

## COUNT VII

## BREACH OF FIDUCIARY DUTY/CONSTRUCTIVE FRAUD

206. Plaintiffs repeat and reallege the allegations set forth in the foregoing paragraphs as if fully set forth herein.

207. Defendants owed plaintiffs and Class Members fiduciary duties, including the duty of good faith and fair dealing, the duty of full disclosure, and the duty of care arising out of their relationship with plaintiffs and Class Members as alleged more fully above.

208. Defendants had a duty to provide complete and truthful information to plaintiffs and Class Members and/or their employers when selling the products at issue, including, without limitation, complying with state and federal disclosure laws and curing any prior misrepresentations or omissions.

209. As fiduciaries, defendants owed plaintiffs and members of the Class an affirmative duty of full and fair disclosure. Defendants failed to honor and discharge that duty. Rather than ensure truthful disclosure of material facts, defendants, through their agents, concealed material facts and made affirmative misrepresentations relating to the cost and benefits of defendants' products, the advisability of entering into the transactions at issue and defendants' true motivation for encouraging the transactions.

210. By engaging in the conduct alleged herein, defendants breached their fiduciary duties to plaintiffs and Class Members and/or their employers, by misrepresenting or omitting and failing to disclose, while under a duty to do so, the numerous material facts set forth more fully in this complaint.

211. Defendants also took steps to actively conceal material information and the fundamental nature of the life insurance products and annuity contracts from plaintiffs and Class Members and/or their employers, as alleged more fully herein.

212. As a result of defendants' breaches of fiduciary duty and constructive fraud, plaintiffs and the members of the Class have been harmed and are entitled to compensatory and punitive damages in an amount to be determined at trial.

COUNT VIII

NEGLIGENT MISREPRESENTATION

213. Plaintiffs repeat and reallege the allegations set forth in the foregoing paragraphs as if fully set forth herein.

214. Defendants and their agents made materially false and misleading statements to plaintiffs and Class Members and/or their employers through uniform advertising, sales presentations and sales materials approved and prepared by defendants. For example, defendants represented to plaintiffs and the Class that they could achieve a set level of benefits with only a set level of premium payment or that it was in their best interest to replace their current IDS cash value life insurance policies with newly issued IDS cash value life insurance policies or that defendants' deferred annuity products were ideal for funding qualified plans.

215. At the time defendants made these misrepresentations, they were both material and false. These false statements and representations were negligently made by defendants without reasonable grounds to believe that they were true.

216. At the time these representations were made, defendants knew that the members of the Class needed the information to decide whether to purchase their products and would rely on the information in making that decision.

217. When defendants made the statements and representations, they were both material and false. The Class did not know the statements were false and reasonably believed

them to be true. In actual and justifiable reliance on defendants' omissions and misrepresentations of material fact, and in ignorance of the true facts, the Class was induced to purchase defendants' products. As a result, the Class has suffered economic harm.

218. The members of the Class were foreseeable recipients of defendants' negligent and false statements, inasmuch as defendants specifically targeted the Class for the sale of its products via their scheme.

219. Despite their greater knowledge and position, defendants, in complete disregard of their duty to speak honestly, and with care that the statements they make are accurate, disseminated information and made statements to plaintiffs and other members of the Class without regard to the truth or falsity of such statements.

220. Based on defendants' relationship with the Class, defendants owed the Class a duty to act with reasonable skill and diligence in conducting its business and a duty to ensure that the information it imparted to the Class was delivered accurately and correctly. As set forth herein, defendants breached these duties.

221. Plaintiffs and Class Members and/or their employers reasonably relied on defendants' misrepresentations. If defendants had not made those misrepresentations, plaintiffs and Class Members and/or their employers would not have purchased defendants' products.

222. Defendants reasonably should have known that plaintiffs and Class Members and/or their employers, at the time these representations were made, did not possess the expertise necessary to detect the sophisticated nature of defendants' deceptions and did not know the truth but believed defendants' representations to be true, reasonably relied upon them, and were thereby induced to purchase the products at issue.

223. Defendants reasonably should have known that plaintiffs and Class Members would suffer injury from the purchases of the products at issue. Plaintiffs and Class Members were so injured.

224. By reason of the foregoing, plaintiffs and Class Members are entitled to compensatory damages in an amount to be determined at the trial of this action.

## COUNT IX

## NEGLIGENCE

225. Plaintiffs repeat and reallege the allegations set forth in the foregoing paragraphs as if fully set forth herein.

226. Defendants owed members of the Class a duty to act with reasonable skill and diligence in training defendants' sales agents; to supervise the agents' conduct in selling defendants' products; to ensure that the sales were conducted in accordance with the law; to ensure that the agents fully disclosed all material facts and did not misrepresent or omit such facts to the Class in conducting such sales; and to use reasonable care, skill and judgment in the sale of defendants' products.

227. Defendants breached their duties, as set forth herein, by hiring, retaining, promoting, and associating themselves with agents who they reasonably should have known had engaged in the conduct complained of in this complaint. Defendants further breached their duties, as set forth herein, by failing to properly train agents not to engage in such activities, and by failing to supervise agents to prevent the conduct complained of herein. Defendants further breached their duties by failing to prepare sales materials and advertisements that were not misleading.

228. With full knowledge of the fraudulent sales scheme being conducted, or with intentional or negligent ignorance of that scheme, defendants, through management, recklessly and/or negligently failed to prevent, discourage or halt the agents from engaging in those sales practices.

229. Plaintiffs and Class Members have been damaged as a direct and proximate result of defendants' misconduct.

230. By reason of the foregoing, plaintiffs and Class Members are entitled to compensatory damages in an amount to be determined at the trial of this action.

## COUNT X

## FRAUDULENT INDUCEMENT

231. Plaintiffs repeat and reallege the allegations set forth in the foregoing paragraphs as if fully set forth herein.

232. As a result of the affirmative misrepresentations and the concealment of material facts alleged herein, knowingly made by defendants or made with reckless disregard for the truth by defendants, defendants fraudulently induced the Class to purchase its products. Defendants made these statements and omissions intending that the Class would rely on them and would purchase the products.

233. As defendants intended, the Class relied upon defendants' misrepresentations and its failure to disclose material facts. The Class did not know and could not have learned the truth before purchasing the policies. As a result, the Class purchased products from defendants and sustained damages in an amount to be determined at trial.

234. The purchases by plaintiffs and other Class Members were induced by sales presentations, policy illustrations and other sales materials and representations prepared, created, approved and allowed by defendants. Defendants knew at the time the policy illustrations and other materials were prepared and presented to plaintiffs and other Class Members that the policies would not perform as promised and/or that the products were not superior to the insured's current coverage, and/or that the product should not be placed in a qualified plan.

## COUNT XI

## BREACH OF CONTRACT

235. Plaintiffs repeat and reallege the allegations set forth above as if fully set forth herein.

236. Defendants entered into oral and written contracts with the members of the Class by which defendants (i) promised that the payment of a fixed amount of premium (in one or more installments) would be sufficient to carry the cost of the policies for the life of the members of the Class without reducing the death benefit of the policies; or (ii) promised that the payment of a certain level of premiums would result in a certain level of value at a set date in the future; or (iii) promised that policyholders would receive greater benefits with a new policy; or (iv) promised that annuity purchasers would receive a tax deferral benefit; or (v) would not be subject to certain adverse tax consequences. By (i) demanding that members of the Class pay additional premiums beyond those originally agreed to; or (ii) failing to deliver the value promised to have attached to a policy; or (iii) failing to deliver a policy with greater benefits for the insured; or (iv) failing to deliver a tax deferral benefit, or (v) by failing to deliver a product that was not subject to adverse tax consequences, defendants have failed to perform the conditions of the contracts.

237. Moreover, every contract imposes on each party a duty of good faith and fair dealing in its performance and enforcement. Defendants were obligated to exercise good faith and reasonable skill in performing their contracts with Class Members.

238. Defendants breached their duty of good faith and fair dealing by engaging in the dishonest and deceitful course of conduct alleged herein, which, among other things, destroyed or impeded the rights of the Class to receive the bargained for fruits of their contracts.

239. As a direct and proximate result of the foregoing, the Class has been damaged in an amount to be determined at the trial of this action.

**PRAYER FOR RELIEF**

WHEREFORE, plaintiffs demand judgment against defendants for themselves and the members of the Class as follows:

A. Determining that the action is a proper class action and certifying an appropriate plaintiff class pursuant to Rule 23;

B. Granting the Class declaratory, injunctive and other equitable relief including, inter alia, a judgement and order (i) enjoining and preventing defendants from terminating the death benefits of policyholders who are unable or unwilling to pay premiums in addition to those illustrated or represented at the time of sale, or from collecting such additional premiums in the future; (ii) requiring that defendants specifically perform the policies as illustrated and represented, to reinstate any and all policies that were surrendered or lapsed as a result of the deceptive sales practices alleged herein, and to disgorge all premium overcharges; (iii) enjoining defendants from soliciting sales of, or selling, deferred annuities for placement in qualified plans, using the deceptive sales practices identified above; (iv) enjoining defendants from soliciting

sales of, or affirmatively recommending, annuities for placement in qualified plans, without full and fair disclosure that the tax deferred accrual feature is provided by the tax qualified retirement plan and that the tax deferred accrual feature of the deferred annuity is unnecessary; (v) enjoining defendants from soliciting sales of annuities without full and fair disclosure of the tax consequences of such purchase; and (vi) enjoining defendants from charging surrender fees with respect to any annuity contract.

C. Awarding the Class actual damages based on their expectation interests and the benefit of their bargain with defendants including consequential or incidental losses or damages, together with pre-judgment and post-judgment interest;

D. Awarding any the Class any damages as may be provided for by statute.

E. Establishing a claims resolution facility for the determination of any individual issues;

F. Awarding plaintiffs and members of the Class punitive damages against defendants in an amount to be determined at trial;

G. Awarding plaintiffs and members of the Class their costs and disbursements incurred in connection with this action, including reasonable attorneys' fees, expert witness fees and other costs; and

H. Granting such other relief as the Court deems just and proper.

**JURY DEMAND**

Plaintiffs, on behalf of themselves and all others similarly situated, hereby demand trial by jury on all issues triable at law.

DATED: August 18, 2000

**CHESTNUT & CAMBRONNE, P.A.**

Jack L. Chestnut, Esq.
Karl L. Cambronne, Esq. (Bar No. 14321)
3700 Piper Jaffray Tower
222 South Ninth Street
Minneapolis, MN 55402
TEL/(612) 339-7300
FAX/(612) 336-2940

**MILBERG WEISS BERSHAD HYNES & LERACH LLP**
Melvyn I. Weiss, Esq.
Barry A. Weprin, Esq.
Brad Friedman, Esq.
Janine Pollack, Esq.
Regina LaPolla, Esq.
One Pennsylvania Plaza
New York, NY 10119
TEL/(212) 594-5300
FAX/(212) 868-1229

**BONNETT FAIRBOURN FRIEDMAN & BALINT, P.C.**
Andrew Friedman, Esq.
4041 North Central Avenue, Suite 1100
Phoenix, AZ 85912
TEL/(602) 274-1100
FAX/(602) 274-1199

**ARNZEN, PARRY & WENTZ, P.S.C.**
Ronald Parry, Esq.
Rob Sparks, Esq.
128 East Second Street
Covington, KY 41012-0472
TEL/(606) 431-6100
FAX/(606) 431-2211

**LOCKRIDGE GRINDAL NAUEN, P.L.L.P.**
Richard Lockridge, Esq.
Joseph Henderson, Esq.
2200 Washington Square Building
100 Washington Avenue South
Minneapolis, MN 55401
TEL/(612) 339-6900
FAX/(612) 339-0981

**HUBBARD & BIEDERMAN, LLP**
Steven Hubbard, Esq.
David Grossman, Esq.
1717 Main Street, Suite 4700
Dallas, TX 75201
TEL/(214) 857-6000
FAX/(214) 857-6001

**JAMES HOYER NEWCOMER FORIZS & SMILJANICH, P.A.**
John Newcomer, Esq.
1 Urban Center, Suite 147
4830 W. Kennedy Blvd.
Tampa, FL 33609
TEL/(813) 286-4100
FAX/(813) 286-4174

**THE LUSTIGMAN FIRM PC**
Sheldon S. Lustigman, Esq.
Andrew B. Lustigman, Esq.
Empire State Building
60th Floor
New York, NY 10118
TEL/(212) 268-0797
FAX/(212) 268-1989

**SCHIFFRIN & BARROWAY, LLP**
David Kessler, Esq.
Three Bala Plaza East
Suite 400
Bala Cynwyd, PA 19004
TEL/(610) 667-7706
FAX/(610) 667-7056

**UITZ & ASSOCIATES**
Ronald A. Uitz, Esq.
1730 K Street N.W., Suite 304
Washington, DC 20006
TEL/(202) 296-5280
FAX/(202) 296-5135